1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

_____

3

UNITED STATES OF AMERICA

4
                        Plaintiff

5
        vs.          Criminal Action No. 01-06ERIE

6
DANIEL J. LEVETO

7
                        Defendant

8  _____

9
                   PROCEEDINGS

10
          Transcript of Sentencing commencing on Thursday,
11  October 13, 2005, United States District Court, Erie,
    Pennsylvania, before Honorable Maurice B. Cohill, Jr.,
12  District Judge.

13  APPEARANCES:

14  For the Government:      For the Department of Justice
                        By:  Rita Calvin, Esq.
15                       By:  Thomas Voracek, Esq.

16  For the Defendant:      Pro Se
                        Stephen Misko, Esq.(Standby)

17
                        Reported by:
18                       Michael D. Powers, RMR
                        Official Court Reporter
19                       Room 5335 USPO & Courthouse
                        Pittsburgh, Pennsylvania 15219
20                       (412) 208-7572

21

22
   Proceedings recorded by mechanical stenography.  Transcript
23  produced by computer-aided transcription.

24

25

2

1             I N D E X

2  GOVERNMENT WITNESSES   DIRECT  CROSS  REDIRECT  RECROSS

3  KIMBERLY IDDON

4    By Mr. Voracek      19        84
      By Mr. Misko          58
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          P R O C E E D I N G S

2  (Court convened on Thursday, October 13, 2005, at 9:15 a.m.)

3          THE COURT:  Good morning.  Be seated, please.

4          MR. VORACEK:  Good morning, Your Honor.

5          MS. CALVIN:  Good morning, Your Honor.

6          MR. MISKO:  Good morning, Your Honor.

7          MR. LEVETO:  Good morning, Your Honor.

8          THE COURT:  This is the time set for the sentencing

9  of Dr. Daniel Leveto.  And we note that Dr. Leveto and his

10   counsel have signed the notice indicating they received and

11   reviewed the presentence report.  We'll make the report part

12   of the record under seal.  Of course, if there should be an

13   appeal taken, why, counsel, upon appeal, will be permitted

14   access to that report.

15        There has been no information withheld from the

16   defendant which was given to the Court.  I've received a

17   number of letters from family members, including Dr. Leveto's

18   former wife and their three daughters, a letter from

19   Dr. Leveto and some other members of the family as well, all

20   of which I've read.

21        In the wake of the recent decision by the

22   United States Supreme Court in United States against Booker,

23   the Sentencing Guidelines are advisory only, but we are still

24   obligated to consult those guidelines in determining the

25   imposition of a reasonable sentence.

4

1        And, therefore, to the extent necessary, I'm going

2   to address the objections to the presentence report.  And I

3   think the right procedure to follow there would be to take up

4    the objections one by one, hear what the defendant has to say

5    and then what the government as to say in response, and then

6    I'll rule on them as we go along.

7        And the government also has -- I don't know if you

8    call it an objection -- but, their position is that the Court

9    order restitution, and that raises a legal question which

10   we'll get into when we get to that part of the hearing.

11       So, I would now state that I find initially that

12   the offense level here is 21 and the Sentencing Guidelines

13   and the criminal history category is Roman numeral I.

14       Therefore, the applicable guideline range would be

15   thirty-seven to forty-six months of imprisonment, supervised

16   release of two to three years at Count 1, supervised release

17   of one year at Counts 2 and 3, a fine in the range of

18   $7,500.00 to $75,000.00, a special assessment of $200.00,

19   which is $100.00 at Count 1 and $50.00 each at each of

20   Counts 2 and 3.

21       So, I think the first objection here is the -- it's

22   paragraphs 28 through 32 and 39 of the presentence report

23   which concluded that the applicable guideline range for a

24   violation of 26 United States Code, Section 7201, is found in

25   Sentencing Guideline Section 2T1.1(a), which derives the base

5

1  offense level from 2T4.1 when the amount of the tax loss is

2  known.  And it concludes that the tax loss is $408,034.00,

3  which equates to a base offense level of 17.

4       Mr. Leveto, as I understand it, he was indicted for

5  a conspiracy not to evade the payment of income taxes

6  pursuant to 28 USC, Section 7201 but, rather, to make a false

7  or fraudulent statement pursuant to 26 USC, 7206.

8       So, why don't we hear from you on that one,

9  Mr. Misko, and then we'll hear what the government has to

10  say.

11       MR. MISKO:  Yes, Your Honor.  Your Honor, there are

12  multiple objections, as the Court has indicated, in reference

13  to the computation as indicated in the presentence

14  investigation report.

15       The first objection, first and foremost, would be

16  that the indictment, itself, is silent as to any tax loss

17  suffered by the government.  I will analogize this to the

18  drug cases we have had in the Western District of

19  Pennsylvania and also analogize it to the cases as decided by

20   the U.S. Supreme Court; one being Apprendi v. New Jersey;

21   the other one being Blakely v. Washington; and then the other

22   is, as the Court mentioned, the Booker Fan-Fan case.

23          There has been specific litigation in reference to

24   amounts contained within the indictment. The Western

25   District of Pennsylvania is a little bit different because,


                                  6


1   as the Court knows, at least in drug cases they always put

2   amounts in excess of based on the statutory language of 841.

3          But, there has been a lot of talk about the other

4   Circuits wherein the indictments are silent as to amounts,

5   and then the case goes forward to trial, amounts are

6   discussed, but no amounts are presented to the jury. And, as

7   such, the jury comes back with a disposition of guilty, but

8   it is left up to the Court via a preponderance at sentencing

9   to determine what the amounts were. And that's why the U.S.

10   Supreme Court cases come into effect, i.e., is there a

11   violation of the defendant's Sixth Amendment rights because

12   the jury has sole province to determine factual issues? And

13   an issue that I think that is not left to the jury, but to

14   the Judge at sentencing, which would potentially increase the

15  sentence, is a violation of the defendant's Sixth Amendment

16  rights.

17      In the instant case, if the Court reviews the

18  indictment, what Mr. Leveto is alleged to do is conspire to

19  make false or fraudulent statements under 7206.  Clearly, it

20  is not an income tax evasions case.  Clearly, the government

21  could have charged an additional count which implicated 7201,

22  which they did not.  Not only is the indictment silent as to

23  amounts which Mr. Leveto allegedly is responsible for, but

24  there was evidence discussing tax loss during the course of

25  the trial.


                            7


1       However, the government did not choose to present

2   interrogatories to the Court to present to the jury to

3   determine what the tax loss amount was.

4       The mens rea for Counts 1, 2 and 3, specifically

5   Count 1, is different than under a 7201 statute only because

6   what the government is alleging is that Dr. Leveto filed

7   false or fraudulent returns, i.e., Counts 2 and 3

8   specifically which are the substantive counts, he simply

9  failed to check a block off about having knowledge of foreign

10  accounts, about being a signatory on foreign accounts.

11       If you relate Counts 2 and 3 back to Count 1,

12  that's the same mens rea.  We are talking about false or

13  fraudulent statements.  Did he conspire with other people to

14  deceive the government via false and fraudulent statements?

15       Now, as the Court knows, there is a case back -- I

16  believe it was 1957, United States versus Hymen Klein,

17  247 F.2d 908, which talked about conspiracies as it related

18  to tax issues.  And clearly the Court in that case had talked

19  about the fact that under Title 26, there were no conspiracy

20  statutes per se.  So, what the government does is, they tie

21  in the violation of Title 26 with 371 of Title 18 and then

22  there was two and distinct types of conspiracies.

23       One.  There was a conspiracy where there was a

24  substantive count, again, like a lot of drug cases say where

25  somebody possesses with intent to deliver or delivers.  Then

8

1  there is the conspiracy as it relates to the drug case.

2  There is a substantive count and substantive issues.  And

3  then there is what they call the Klein conspiracy, which is

4    just defrauding the United States government, which is a more

5    general type of conspiracy.

6         And that is what the thrust of one of the

7    objections are as put forth by the defendant, is that this is

8    not a case -- indictment -- strike that -- that the

9    indictment, Count 1, is not a case where there is a

10   substantive count as to what Mr. -- or Dr. Leveto did, but

11   eventually this is just some way to deceive the United States

12   government out of income.

13        Again, this relates back to Counts 2 and 3 where

14   there is a conspiracy between individuals to file false and

15   fraudulent returns under 7206.

16        The government's evidence at trial, and the PSI

17   even is replete with indications about tax evasion.  This is

18   not a tax evasion case.  Had the government averred that it

19   was a tax evasion case, then they would have pled so directly

20   in the indictment, but they did not do so.

21        Again, they had the opportunity when the jury

22   finished and the case was over and they were deliberating to

23   present the jury with interrogatories as to what the tax loss

24   amounts were.

25          And as the Court knows, under 2T1.1, and I think I

9

1   have this indicated in my objections, that the base offense

2   level drastically increases.  I believe it's a base offense

3   level of ten, actually six, pursuant to 2T1.1(a)(2) when we

4   don't know what the tax loss amount is.

5          But, what the government is trying to do is, they

6   are trying to bootstrap a tax evasion case into a 7206 case

7   by talking about tax loss when, in fact, A, Dr. Leveto was

8   not indicted on tax evasion, and there was no -- and B, there

9   was no tax loss indicated in the indictment, and C, the jury

10   did not come back with any disposition about a tax loss

11   amount, which they clearly could have done.

12          Based upon those arguments, it's our position that

13   this is a -- you start with a base offense level of six

14   versus seventeen because of the reasons that I just stated.

15          THE COURT:  Well, isn't there kind of a dichotomy

16   here?

17          The Court can take evidence at the sentencing

18   hearing with respect to the amount involved for purposes of

19   establishing the guideline but, at the same time, can the

20  Court pass the ball off, so to speak, to the IRS to obtain

21  the restitution?

22       They are in a much better position to go after

23  restitution in a Tax Court or some civil procedure than the

24  District Court is, aren't they?

25       MR. MISKO:  Two separate and distinct issues

10

1  though, Your Honor.  One, we are using this tax loss amount

2  to establish incarceration time.

3       THE COURT:  You have to, don't you?  At least, of

4  course, the guidelines are now discretionary, but you have to

5  look at them for advice.

6       MR. MISKO:  I understand that.  But, that

7  implicates Dr. Leveto's Fifth and Sixth Amendment rights.

8  One, that he has notice of what he is being charged with, and

9  the indictment has no notice as to what he is being charged

10  with other than filing or conspiring to file a false and

11  fraudulent return.  Because he has no notice, how is he to

12  prepare an adequate defense?

13       So, there is a Fifth Amendment issue, I think, and

14  there is also a Sixth Amendment issue that because there is a

15  variance between the offense levels, seventeen versus a six

16  that should rightly have been decided by a jury, and the

17  government had the opportunity to present that to the jury

18  and they chose not to.  They chose to ignore the Booker

19  Fan-Fan issues and left the Court decide what the base

20  offense level is.

21       That is the one issue, and that doesn't even speak

22  to the restitution issue, which I haven't addressed yet.

23  That just goes plainly to the fact that a there is a Fifth

24  Amendment violation and there is a Sixth Amendment violation.

25       And my perception, Your Honor, I think that the

11

1  government is unfairly burdening the Court with establishing

2  this.  Easily, they could have presented the interrogatories

3  to the jury and they could have determined what the base

4  offense level was via tax loss.  This is what we believe the

5  tax loss amount was.

6       That way, the Court would never even have to take

7  any evidence at the time of sentencing and could impose

8  whatever if it chose to, on an advisory capacity, chose that

9   base offense level, but it's not choosing to do that.

10          It chooses to place a revenue agent on the stand,

11   the same revenue agent that testified at trial, to establish

12   an amount, a tax loss amount, A, that we believe is

13   inappropriate based on what Dr. Leveto is charged with and,

14   B, in violation of his Fifth and Sixth Amendment right.

15          In reference to restitution, I clearly don't think

16   that -- again, the government is trying to burden this Court

17   with trying to establish a restitution tax loss amount where,

18   again, I think that the appropriate way to do that is through

19   the civil audit function of the Internal Revenue Service.

20          The other argument, Your Honor, is because Counts 2

21   and 3 are substantive counts, it's clear that the jury

22   believed beyond a reasonable doubt that Dr. Leveto either

23   inappropriately or did not check the proper boxes as it

24   relates to the IRS documents related to a foreign account.

25          So, is the jury finding Dr. Leveto guilty because

12

1   he is not checking the appropriate boxes or are they finding

2   Dr. Leveto guilty because there was some conspiracy that

3    involved tax loss in Counts 2 and 3 relating back to Count 1?

4         Count 1 is the conspiracy with Don Turner and

5    Margaret Leveto relating to false and fraudulent returns.

6    And that actually creates a good issue, because now we have

7    to try to determine for ourselves after the jury has been --

8    has done their duty to determine, well, what did the jury

9    exactly find Dr. Leveto guilty of?

10         Well, we know they found him guilty of Counts 2

11   and 3 having to do with those specific returns and whether he

12   was a signatory or not; nothing to do with tax loss at all.

13         And so if you analogize that to Count 1, just take

14   it a step further, the conspiracy could also involve those

15   same conclusions versus now trying to say, no, the jury

16   decided that Dr. Leveto was involved in a conspiracy to

17   deceive the government where there was a tax loss amount.

18         Again, that would have been another proper

19   interrogatory for the jury to decide whether, are you finding

20   him guilty of just falsifying or creating fraudulent

21   documents, or are you finding him guilty of not evading taxes

22   but owing taxes based upon the type of conspiracy?

23         That is what I have now.

24         THE COURT:  Let's hear what the government has to

25  say on that one.  Mr. Voracek.

13

1        MR. VORACEK:  Thank you, Your Honor.

2        MS. CALVIN:  One moment, Your Honor, please.

3        Your Honor, we were prepared to present testimony

4  regarding the actual tax loss, but before we do that, I would

5  like to address some of the issues raised by defense counsel.

6        The first issue that was raised was that the

7  indictment was silent as to the figures of any tax loss that

8  might be involved.

9        And, as we are aware, the jury must decide any of

10  those issues which involve increasing the statutory maximum

11  that a person could receive.  In this case --

12        THE COURT:  You mean the statutory maximum

13  sentence?

14        MS. CALVIN:  Yes.  And in this case, the statutory

15  maximum of these crimes which are charged is not at all

16  dependent upon an actual finding of an amount as in many drug

17  cases, or as in perhaps the use of a weapon, which would

18  increase the statutory amount that could be given to the

19  defendant.

20      In this case, the statutory maximum is five years

21  for the conspiracy and three each for Counts 2 and 3.  So, it

22  is not necessary that the jury find these monetary amounts.

23      I would like to address the type of conspiracy

24  issue that was raised by defense counsel.

25      It is true that the conspiracy statute identifies

14

1  two distinct types of crimes, a crime to defraud and a crime

2  which is an attempt to conspire to commit a specific offense.

3  The government did, in fact, charge a Klein type conspiracy.

4  It is not accurate to say, however, that this conspiracy was

5  a conspiracy to file false tax returns.

6      In fact, I would read paragraph fifteen from the

7  indictment which states the object of the conspiracy.

8      The object of the conspiracy were to conceal and

9  prevent the United States, in particular, the Internal

10  Revenue Service, from discovering and identifying income

11  received by co-conspirators defendants Daniel Leveto and

12  another defendant, whose name was struck yesterday, and

13  assets held by them as a result of their involvement in the

14   veterinary business and other business endeavors and to

15   prevent the ascertainment, computations, assessment and

16   collection of taxes.

17        This conspiracy to defraud involves far more than

18   merely filing false income tax returns.

19        Finally, as to the interaction between the

20   conspiracy, it is true that you can charge a tax conspiracy,

21   a conspiracy to violate a specific tax statute or you can

22   charge a Klein type.  In the event that you charge a Klein

23   type, that the guideline 2S1.3 refers you back --

24        I'm sorry.  I have that wrong -- refers you back to

25   2T1.1.  And, therefore, you take the guideline level from

                              15

1   2T1.1 and it applies to evasion, willful failure to file a

2   return, willful failure to supply information or pay a tax,

3   fraudulent or false returns, statements or other documents.

4        And that's the statute that the guideline -- that

5   you would use for a Klein type conspiracy.  And it is

6   dependent upon a finding of tax loss and we are prepared, at

7   this point, to put on evidence of the actual tax loss, but I

8   would state that we are in agreement with the findings of the

9   presentence report.

10          THE COURT:  Well, let me ask you this, though:

11              Since the guidelines are, quote, advisory, under

12   the instruction from U.S. against Booker, does it matter what

13   amount I find with respect to the taxes, assuming I would not

14   order the restitution but let the government do whatever it

15   has to do to recover, let the IRS go after Dr. Leveto on its

16   own to determine the amount?

17          MS. CALVIN:  Well, as I understand it, the

18   guidelines are advisory and that the Court can look to it and

19   say under the guidelines I think this is the range that

20   defendant falls into.

21          THE COURT:  That is what I am getting at.  Do I

22   have to be as accurate as the IRS might in obtaining

23   restitution?

24          MS. CALVIN:  It would be the government's position

25   that you do not need to be, Your Honor.


                                16


1           MR. MISKO:  Your Honor, may I address one issue?

2           THE COURT:  Sure.  I'm sorry.  You were finished?

file:///A|/LEVSENT1.TXT

3          MS. CALVIN:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MR. MISKO:  I think the government's conclusion as

6    to the issue of statutory maximum is incorrect.  Quoting the

7    language of Blakely v. Washington, the statutory maximum for

8    Apprendi purposes is the maximum sentence a Judge may impose

9    solely on the basis of the facts reflected in the jury

10   verdict or admitted by the defendant.  It is not the

11   statutory maximum.

12          Blakely was -- as the Court knows, Blakely was

13   before Booker and Blakely's case in the State of Washington

14   dealt with state guidelines, and they were trying to increase

15   the state guidelines for a fact that the defendant did not

16   admit to.

17          Similarly, here we have an advisory guideline

18   range.  And in this case, the Court has indicated on

19   twenty-one, it's thirty-seven to forty-six months.  That is

20   based on a base offense level of, well, seventeen plus if the

21   Court accepts the four-level increase for sophisticated means

22   of obstruction.

23          However, if the Court chooses to impose a base

24  offense level of seventeen wherein the jury had a fair

25  opportunity to, as the deciders of fact, to determine tax

17

1  loss amount then what in effect it is doing is, that it is

2  increasing the statutory maximum for Apprendi purposes, which

3  is, again, a guideline issue, not a statutory maximum as it

4  relates to an offense itself.

5        And that language is found again from -- actually

6  quotes Apprendi v. New Jersey, 530 U.S. 466, 490, and this

7  was at Blakely 2004.  The -- I have the Westlaw of 1402697,

8  and that is the actual direct quote from that case, Your

9  Honor.

10        THE COURT:  I'm still not sure I understand what

11  you are driving at because the statute clearly says -- goes

12  through these fraud and false -- this is 26 USC 7206, goes

13  through the various items which are violations of 7206 and

14  then says after, anybody that does one of those things shall

15  be guilty of a felony upon conviction thereof, fined not more

16  than a hundred thousand or imprisoned not more than three

17  years, or both.  That's the -- the maximum is three years,

18  isn't it?

19      MR. MISKO:  I understand, Your Honor.  But, this

20   goes back to whether this should be a base offense level

21   under 2T1.1 or should it be a base offense level of six since

22   the government did not provide the jury the opportunity to

23   determine the tax loss amount and is now asking the Court to

24   determine tax loss amount by a preponderance of evidence at

25   sentencing.

18

1      Had the jury determined that there was no tax loss

2   amount, then we would be at a base offense level of six.  If

3   the Court determines it to be a base offense level of

4   seventeen, it's actually increasing the statutory maximum

5   that would be not -- or strike that -- eleven levels based

6   upon a finding of tax loss amount that is just an argument

7   based upon Sixth Amendment right to have the tax loss given

8   to the jury.

9      I would agree with the Court's determination

10   though, and I think the case law clearly supports the Court,

11   that if the Court does not buy my argument per say, that it

12   can determine its tax loss amount and it doesn't have to be

13    an exact amount.  I would agree with that conclusion.

14         THE COURT:  Why don't we take the testimony that

15    you want to offer on the amount in question.

16         MS. CALVIN:  Yes, Your Honor.  Before we do that,

17    may I state that earlier when I gave a section for

18    conspiracy, it was the incorrect one.  2T1.9 refers us back

19    to 2T1.4.

20         THE COURT:  Okay.  Go ahead, Mr. Voracek.

21         MR. VORACEK:  Your Honor, the United States calls

22    Kimberly Iddon to the witness stand.

23         THE COURT:  Would you come forward and be sworn,

24    please?

25                   * * * * *


                Iddon - Direct(By Mr. Voracek)         19


1          KIMBERLY IDDON, having first been duly sworn,

2    testified as follows:

3         THE COURT:  Would you have a seat up here, please,

4    give us your name and spell your last name?

5         THE WITNESS:  My name is Kimberly Iddon.

6    I-d-d-o-n.

7         THE COURT:  I-d-d-o-n?

8        THE WITNESS:  Yes, sir.

9        THE COURT:  Thank you.

10              DIRECT EXAMINATION

11   BY MR. VORACEK:

12   Q    Now, Miss Iddon, are you employed?

13   A    Yes.  I am employed by the Internal Revenue Service.

14   Q    How long have you been so employed?

15   A    Seventeen years.

16   Q    What is your current position with the IRS?

17   A    I'm an Internal Revenue agent.

18   Q    And what is some of your duties as an Internal Revenue

19   agent?

20   A    I examine tax returns of individuals, corporations,

21   partnerships, and I also assist the Criminal Investigation

22   Division in their investigations on the same tax matters.

23   Q    And have you been doing that for seventeen years?

24   A    As a revenue agent, I have been doing examinations for

25   all seventeen years.  And for the last three years, I have

              Iddon - Direct(By Mr. Voracek)          20

1   been doing the -- assisting the Criminal Investigation

2  Division in their examinations or investigations.

3  Q    And what is some of your training and educational

4  background?

5  A    I have a Bachelor's Degree in accounting from Robert

6  Morris University and I have been through five phases of

7  training with the Internal Revenue Service.  And each year, I

8  am provided with at least forty hours of continuing education

9  classes ranging in all kinds of tax matters, financial

10  matters.

11  Q    Now, Miss Iddon, you indicated that you examine an

12  individual's tax returns, correct?

13  A    Yes, I do.

14  Q    Have you also had an occasion in your profession to

15  examine tax returns for an individual who owns his own

16  business?

17  A    Yes.  Those tax returns, the 1040's, would include a

18  self-employed individual.  They would file a Schedule C, so I

19  would have looked at individuals who are self-employed.

20       Also, anybody who was incorporated or a partner in

21  a partnership, all those returns.

22  Q    And in looking at an individual's tax returns for audit

23  purposes, do you also reconstruct an individual's tax

24   returns?

25   A   If it is necessary, if the books and records are --

Iddon - Direct(By Mr. Voracek)          21

1   either in the absence of books or records or in a situation

2   where books and records are incomplete, I would have a

3   situation in which I would have to reconstruct their income

4   or expenses at that time, yes.

5   Q   Now, Miss Iddon, with regard to the matter of

6   Daniel Leveto, were you in trial every day during that

7   criminal matter?

8   A   Yes, I was in attendance.

9   Q   And did you have an opportunity to listen to all the

10   testimony presented?

11   A   Yes, I did.

12   Q   And did you also have an opportunity to review all the

13   documentation that was admitted into evidence?

14   A   Yes, I also did.

15   Q   And, Miss Iddon, did you testify in that case?

16   A   Yes, I did testify.

17   Q   And did you prepare summaries based upon the evidence in

18  that case?

19  A    Yes, I did prepare summaries that were also admitted

20  into evidence during the trial.

21  Q    Now, some of the evidence admitted at trial that would

22  help you in reconstructing a tax returns would entail what?

23  A    The exhibits?

24  Q    Just the types of evidence.

25  A    The types of evidence would have been the business

Iddon - Direct(By Mr. Voracek)        22

1  ledgers that were presented during trial, the -- well,

2  obviously the testimony of the bookkeeper, Mrs. Leveto,

3  herself, about how the books were kept, how the business was

4  run, how the family personal living expenses were paid, how

5  their lifestyle was, the bank statements that were presented.

6  Q    And based upon the information that was admitted at the

7  trial, are you prepared to do a reconstruction of

8  Dan Leveto's tax returns for the years 1991 through 2000?

9  A    Yes.

10        MR. VORACEK:  Your Honor, if I may approach the

11  witness?

12        THE COURT:  Sure.

13   Q    Miss Iddon, I am going to preface most of my questions

14   here with an introduction that your testimony would be based

15   upon the evidence that was admitted at trial.

16        Do you understand that?

17   A    Yes, I do.

18   Q    Was Dr. Leveto engaged in an income-producing activity

19   from 1991 through the year 2000?

20   A    Yes.  Dr. Leveto had a veterinarian business from 1991

21   through 2000.

22   Q    Did we also hear some evidence that he was engaged in

23   that same activity prior to 1991?

24   A    Oh, yes.  I am sorry.  Yes, he was engaged in the

25   veterinary business for quite some time before that.

Iddon - Direct(By Mr. Voracek)        23

1   Q    And who was the owner of that business?

2   A    Dr. Leveto was the owner.

3   Q    And was the business incorporated or was it operated as

4   a partnership?

5   A    Actually, the veterinarian business was a Schedule C,

6   which means that it's a sole proprietor, means it's owned by

7   one individual and it's reported on a form Schedule C that's

8   an attachment to the Form 1040.

9   Q    And who was the owner of the veterinary business?

10  A    That was Dr. Leveto.

11  Q    And how does one report the business activity of a sole

12  proprietorship?

13  A    All your income and expenses are reported on the form

14  Schedule C, which, again, is the attachment to the Form 1040,

15  where all of your income from all worldwide sources are

16  reported on that Form 1040.

17  Q    So, you report all the receipts that the business has

18  for a particular year?

19  A    You would report all the receipts and, again, all the

20  expenses business expenses and you would come up with a net

21  profit.  And that net profit is then put back on the face of

22  the Form 1040 and included with wages, interest income,

23  dividends, basically any form of other income that you have.

24          So, your Schedule C is where the breakdown of

25  income and expenses are detailed out and the mere net profit

Iddon - Direct(By Mr. Voracek)          24

1   is flowed or shown on the Form 1040 on the face.

2   Q   Now, did Dan Leveto file Forms 1040 for the years 1989

3   through 2000?

4   A   Um, I believe for 1989 -- may I refer to the filed

5   returns --

6   Q   Yes.  Certainly.

7   A   -- just so I don't misstate which years?

8          Mr. Leveto and Mrs. Leveto filed joint returns for

9   '89, '90, '91 and '92, but the Schedule C no longer appeared

10  in the 1992 year.

11         They did file a joint return for '93, again, with

12  no Schedule C; '94, joint, no Schedule C; '95, a joint return

13  with no Schedule C.

14         In 1996, they filed married filing separate,

15  neither one reporting a Schedule C.

16         In '97 Mr. Leveto filed married filing separate

17  with no Schedule C; same for '98.

18         And I believe that's the last filing that I have

19  for a Form 1040.

20  Q   So, there was no 1040 filed by Dan Leveto for 1999 or

21  the year 2000?

22  A   Or 2000, correct.

23  Q    And you have had an opportunity to review those returns?

24  A    Yes, I have.

25  Q    Now, in reviewing those returns, did you find anything

                    Iddon - Direct(By Mr. Voracek)           25


1   improper about the 1989 and 1990 returns as filed by

2   Dr. Leveto?

3   A    Anything improper?

4   Q    Anything improper.

5   A    Without having the books and records and being able to

6   do a thorough examination, those returns appeared to be, from

7   a cursory review, I would say normal or adequate for that

8   taxpayer.

9   Q    There were Schedule C's filed with the 1989 and 1990

10  returns?

11  A    Yes, sir, there were.

12  Q    And was there a net profit earned by or received by the

13  business for those two years?

14  A    Yes, sir, there was for both years.

15  Q    And a fairly substantial net profit?

16  A    Yes, sir.

17  Q    And in 1991, was there anything improper about

18  Dr. Leveto's return for that year?

19  A    Well, in the 1991 return, I believe the timeframe of

20  January through sometime in August, there was actually a

21  Schedule C submitted with the 1991 return that appears to

22  also be relatively accurate.

23       And, once again, without having done a complete

24  examination at that time, it appears to be normal and

25  ordinary for that business.


                Iddon - Direct(By Mr. Voracek)         26


1  Q    When you reviewed the 1991 return with the business

2  ledgers, did you notice whether all of the receipts and

3  expenses for the entire year of 1991 were reported on

4  Dr. Leveto's Schedule C?

5  A    Only those from January through August.

6  Q    Of 1991?

7  A    Of 1991, yes.  I am sorry.

8  Q    And for 1992 through 1998, on those tax returns as filed

9  by Dr. Leveto, did he report any of the business activity of

10  his veterinary clinic?

11  A    Not 1040, no.

12  Q    Did he attach a Schedule C to those returns?

13  A    No, sir.  That ended in -- the last year that a

14  Schedule C was attached, I believe I stated was 1991.

15  Q    Did Dr. Leveto report any business income on his 1992

16  through 1998 tax returns from the veterinary clinic?

17  A    No, sir, there was no flow through for the 1040 for

18  veterinary receipts.

19  Q    And I believe you stated no returns were filed at all by

20  Dr. Leveto for the year 1999 and 2000?

21  A    That's correct.

22  Q    Now, did you determine whether any other entity,

23  nominee, reported some of the veterinary business activity

24  from 1991 through 2000?

25  A    Yes.  What would be found is that beginning in 1991,

                    Iddon - Direct(By Mr. Voracek)          27

1  there was a Form 1040 NR that started to be filed by

2  Dr. Leveto and that was, I believe -- I am flipping through

3  it.  The name on the -- is Center Company.  And, again, that

4  started in 1991.

5         And I believe what you are going to find in that

6  year is that it is a partial year.  As I stated a little

7   earlier in my testimony, January through August was actually

8   on a Schedule C, and I believe this Form 1040 NR picks up in

9   August and takes it to the end of December of 1991.

10  Q   Now, with regard to the 1040 NR's as filed by Center

11  Company reporting business activity from the veterinary

12  business, did Center Company pay any tax on income from that

13  business -- from the veterinary business?

14  A   No.  The 1040 NR's do not have any tax due.  It does

15  have a Schedule C attached showing gross receipts and sales

16  along with business expenses and a net profit.

17       But, once the net profit was taken to the face of

18  the 1040 NR, there were deductions taken that offset any type

19  of incomes and no tax was ever paid.

20       THE COURT:  Does NR stand for something?

21       THE WITNESS:  Nonresident.  Nonresident, sir.

22  Q   Now, based on your review of the testimony and the

23  documentations admitted at trial, for the years 1991 through

24  2000, who had the obligation to report the income from the

25  veterinary clinic?

                Iddon - Direct(By Mr. Voracek)          28

1  A   From the testimony that I heard, I would say that the

2  business did not change.  It was not -- the entity did not

3  change.  So that the income and expenses should have

4  continued to be reported on the form Schedule C attached to a

5  Form 1040 by Dr. Leveto.

6  Q   Now, have you been able to determine what the gross

7  receipts were for the veterinary business for the years 1991,

8  2000?

9  A   What I utilized to be able to do that was the business

10  receipt ledgers that were introduced as evidence during the

11  trial and also the bank statements for the business that were

12  also introduced during the trial.  And that's what I utilized

13  to compare or come up with gross receipts that should have

14  been or were reported.

15  Q   Miss Iddon, I ask you to look at Government Exhibit 700

16  in front of you.

17  A   Yes, sir.

18  Q   And have you had an opportunity to review Government

19  Exhibit 700 prior to trial?

20  A   Yes, I have.

21  Q   And what is Government Exhibit 700?

22  A   Exhibit 700 is a recap or a summary of the veterinary

23  business gross receipts from 1991 through 2000.  Each year is

24  listed, and across that are the receipts per the business

25  ledgers.  Any book receipts, as we heard during the trial,

              Iddon - Direct(By Mr. Voracek)          29

1  that Dr. Leveto, in addition to having the veterinary

2  business, also had sales of books.  I believe the title was

3  Tax Free.  And those books were also recorded on the business

4  ledgers.

5         So, there is several amounts in '93, '94 and '95,

6  book income receipts.

7  Q    Now, the amounts on Government Exhibit 700, are those

8  all amounts that were admitted into evidence before the jury

9  in the case of Dr. Leveto?

10  A    Yes.  All these were taken directly from -- or these

11  amounts came directly from the ledgers, and those ledgers

12  were introduced as evidence during the trial.

13  Q    And how about the Center Company returns, were they in

14  evidence as well?

15  A    Yes, absolutely.

16         MR. VORACEK:  Your Honor, the government moves for

17  the admission of Government Exhibit 700.

18        THE COURT:  700 is admitted.

19  Q   And the receipts per the Center Company return, the

20  final column, Miss Iddon, is that the amounts that you as a

21  Revenue Agent had determined accurately reflect the receipts

22  from the business?

23  A   The last column is titled Receipts per Center Company

24  returns.  Those amounts would actually be based on the

25  information that I had available to review.  I would say


                Iddon - Direct(By Mr. Voracek)           30


1  that, yes, those are now given -- 1996 is an estimate because

2  there was no return filed.  There was no 1040 or no 1040 NR.

3  So, that's basically an estimate.

4        But, those other amounts were what was reported on

5  either the Center Company return and it was corroborated with

6  the amount from the business ledgers when they were

7  available.

8  Q   So, for 1996, you had no documentation to rely upon?

9  A   That's correct.  There was no filing and there are also

10  no business ledgers that were at least available to us at the

11  time.

12  Q    Did you hear any testimony at trial with regard to

13  whether or not the veterinary clinic was operating during

14  1996?

15  A    Oh, yes.  We do know that it was operating and we also

16  heard testimony that the business did not drastically change.

17  It didn't -- that the customer base stayed the same, that the

18  employee base stayed the same, that the business continued to

19  run throughout those years.

20        So, we can assume that those records are just

21  missing and that that year was no different than before or

22  after.

23  Q    Now, I see for 1996 you put down 500,000.  That is an

24  estimate?

25  A    It's an estimate based on the pattern in which the

                Iddon - Direct(By Mr. Voracek)          31

1  receipts were going throughout those years.

2  Q    And that appears to be a lower amount than the receipts

3  that were reported for the year 1991, 2000?

4  A    It does, and based upon the fact that we don't have

5  records.

6   Q    And what was the total amount of receipts then for the

7   years 1991, 2000?

8   A    $5,240,526.00.

9   Q    Now, are gross receipts the same as income?

10  A    Gross receipts and gross income, those terms can be

11  interchanged, yes.

12  Q    And do we also have to make some adjustments to receipts

13  before we get to a net profit on a business?

14  A    Absolutely, yes.  You have -- your business expenses

15  would have to be reduced and costs of goods sold.

16  Q    And did you determine the profit or net income of the

17  business -- of the veterinary business for those years, 1991,

18  2000?

19  A    Did I do that?

20  Q    Yes.

21  A    Yes, I did.

22  Q    And I ask you to look at Government Exhibit 702.

23        Do you have that in front of you?

24  A    Yes, I do.

25  Q    And have you had an opportunity to review Government

Iddon - Direct(By Mr. Voracek)          32

1    Exhibit 702 for accuracy?

2    A    Yes, sir.  This is the gross income computation, again,

3    for the tax years 1991 through 2000, using the gross receipts

4    for the Center Company returns which, again, those were the

5    1040 NR's that were filed.  1991 being a partial year, as I

6    stated, from September through December, and the rest of the

7    years being full years.

8    Q    Now, I see, Miss Iddon, from Government Exhibit 702 that

9    profit percentages of 25 percent, 31 percent and 28 percent

10   are indicated on that document.

11        How did you arrive at those numbers?

12   A    Well, as we stated earlier in my testimony, the 1989 and

13   1990 tax returns for Dr. Leveto and Mrs. Leveto were filed

14   with a form Schedule C attached to it.

15        And as I earlier stated, based on the review of

16   those returns, we felt -- or I felt that they were adequate

17   or, as best I could tell, properly reflective of income and

18   expenses and net profit.

19   Q    Miss Iddon, I am going to stop you for a minute.

20   Government Exhibit 701, does that reflect the 1989, 1990 and

21   then the early 1991 tax returns of the veterinary business?

22  A   Yes, sir.  It's reflective of what was filed as gross

23  receipts for the Schedule C or, as we said before, gross

24  income.  And you will see the next column is the Schedule C

25  net profit.

Iddon - Direct(By Mr. Voracek)          33

1       So, in other words, being after all business

2  expenses were deducted, the net profit is what remains.

3  What's available as -- for the sole proprietor as his profit.

4  And what I've determined is for '89 and '90, after taking the

5  gross receipts and comparing the net profit, you will see

6  that 31.2 percent in 1990 or 25.8 percent in 1989.  These

7  were the amounts that was -- 25.8 percent of the gross income

8  was available as a net profit after expenses and 31.2 percent

9  in '90.

10      And also for 1991, from January through August,

11  doing that same comparison, you will see that the profit

12  personal was at 35.1 percent.

13  Q   So, when we look at the profit percentage for 1991,

14  35 -- the Center Company or the Dr. Leveto reported a profit

15  of 35 percent of his gross receipts?

16  A   From January through August, that's correct.

17  Q   All right.  And then if we go back to Government

18  Exhibit 702.

19  A   Now, you will see that those columns, what we've done

20  is, I've taken that 25 percent, which was from '89, the 31

21  percent, which was from 1990, and I've also come up with an

22  average of between 25 and 31, and you come up with 28

23  percent.  And those columns are reflective of, if you would

24  say that there was a 28 percent profit average, those amounts

25  in that last column are reflective of what that profit would

Iddon - Direct(By Mr. Voracek)          34

1  be.

2  Q   Using the 28 percent average, profit average, what was

3  the total gross income for the veterinary business from 1991

4  through 2000?

5  A   So, the total of -- if you used 28 percent profit, the

6  total profit from 1991 through 2000 would have been

7  $1,457,267.00

8  Q   Now, in your review of the returns filed by Dr. Leveto

9  on his 1040, did he report income approximating -- in that

10  amount of profit?

11  A   No.

12  Q   Did he report any business income on his 1991 through

13  2000 1040's?

14  A   There was no flow through for those turns; nothing.

15  Q   Now, I think you stated that you heard testimony that

16  the business stayed pretty constant from 1991 through 2000?

17  A   We did hear testimony.

18  Q   Did you also hear any testimony regarding Dr. Leveto's

19  lifestyle and any changes in his lifestyle from 1991 through

20  2000?

21  A   No.  As Mrs. Leveto stated, if anything, they were

22  looking to buy a larger house, a bigger house, a more

23  expensive house.  They continued to take their family

24  vacations.  They continued to buy new vehicles.

25      We heard from the employees that the business did


                Iddon - Direct(By Mr. Voracek)          35


1  not change.  It didn't -- they didn't reduce employees or

2  staffing or customer base.

3      MR. VORACEK:  Your Honor, the United States moves

4  for admission of 701 and 702.

5      THE COURT:  They are admitted.

6  Q   Now, one final point, Miss Iddon.

7      Based on the profit of the business as reflected on

8  Government Exhibit 702, did the nominee, Center Company, pay

9  any tax on that gross income?

10  A   No.  There was no tax reported on the Form 1040 NR's for

11  any of the years which are reflective of the Center Company

12  returns.

13  Q   Now, Miss Iddon, as a revenue agent, you reconstruct tax

14  returns based on the best information available to you?

15  A   As I stated before, right, in the absence of books and

16  records, or in a situation where there are incomplete books

17  and records, we do have the ability and we have been trained

18  on how to reconstruct income and expenses using various

19  indirect methods or mark-up calculations.

20  Q   Now, in this case, I believe there were business ledgers

21  that were introduced into evidence.

22      Why didn't you use the expenses as reflected on

23  those ledgers in reconstructing the tax returns?

24  A   Well, as we heard testimony and we had entered into

25  evidence those business receipts ledgers and those bank

Iddon - Direct(By Mr. Voracek)          36

1  accounts, we also had testimony that there were numerous and

2  large amounts of personal business -- personal expenditures

3  that were written off from the business account and deducted

4  from the business ledgers.

5      So, based on the testimony that I heard, I can't

6  rely on the fact that those business expenses are adequately

7  or properly reflective of business -- legitimate business

8  expenses.

9  Q   So, as a revenue agent, when you audit an individual's

10  business, you specifically look at the ledgers which reflect

11  on the business expenses?

12  A   Right.  The first step would be to tie those business

13  expenses from the tax return back to the ledgers, and at that

14  point I would look at the ordinary and necessary expenses and

15  try to determine whether or not those were legitimate

16  business expenses ordinary and necessary of doing business

17  for that individual or business.

18  Q   Miss Iddon, I ask you to look at Government Exhibits 716

19  and 717.

20  A   I have those in front of me.

21  Q   Can you identify Government Exhibit 716?

22   A    716 are some -- a recap or breakdown of personal

23   expenses that were paid out of the business.  And they were

24   also deducted on the business expenses -- I'm sorry.  They

25   were deducted business expenses on the business ledgers.

Iddon - Direct(By Mr. Voracek)          37

1          Now, these breakdowns are actually just from

2   January through March of 1994.  That would be Government

3   Exhibit 716.

4   Q    And I see the first heading on there is Calvary Baptist

5   Christian Academy.

6          Did we hear any testimony at trial regarding that?

7   A    Yes.  We heard that the Calvary Baptist Christian

8   Academy was where Dr. Leveto and Mrs. Leveto's daughters

9   attended child care.

10   Q    And what is indicated underneath there are check

11   numbers.  Were those business checks?

12   A    Yes.  Those were business checks that have been

13   cross-referenced back to the business ledgers showing that

14   they were deducted as a business expense for those dates and

15   for those amounts.

16  Q    Now, all of the amounts on Government Exhibit 716, are

17  those amounts that you as an auditor would not allow a

18  business to take as a business expense?

19  A    Based on the testimony that was heard and during the

20  trial, I would say that, yes, these expenses were proven to

21  be personal in nature and they would not be allowed as a

22  legitimate business expense.

23  Q    I see in there in Government Exhibit 716 a number of

24  payments made to what appears to be credit card companies, is

25  that correct?

Iddon - Direct(By Mr. Voracek)          38

1  A    Yes.  They start with Kaufmann's on the bottom of the

2  first page and continue through pages two and three and four.

3  Q    And did we hear any testimony at trial as to whether or

4  not business expenses, true business accurate business

5  expenses were paid with credit cards?

6  A    We did hear testimony from the bookkeeper that she

7  stated that the business expenses were paid by check, that

8  she was directed by Dr. Leveto to pay these credit card

9  statements, but they paid them by check.

10  Q    But, with regard to the items on the credit card

11  statements, did we hear any testimony at trial with regard to

12  whether or not those were personal in nature or business in

13  nature?

14  A   The -- they did not have use of a credit card for

15  business expenditures.  That was what was heard at testimony.

16  And we also heard from Mrs. Leveto that many of these

17  expenses were personal in nature during her purchases and

18  also during their family vacations.

19  Q   And when you said they did not have a credit card, who

20  are you referring to?

21  A   The veterinarian business.  I am sorry.  The

22  veterinarian practice did not have use of a credit card for

23  business expenses.

24  Q   And is Government Exhibit 717, is that just -- that is a

25  similar type of summary prepared and reviewed by you with


                    Iddon - Direct(By Mr. Voracek)            39


1  regard to the first three months of 1995?

2  A   It is similar, almost identical in nature, except that,

3  again, it is for 1995.

4       MR. VORACEK:  Your Honor, The United States moves

5    for the admission of Government Exhibits 716 and 717.

6        THE COURT:  716 and 717 are admitted.

7    Q    Miss Iddon, I ask you to specifically refer to a

8    document that was admitted at trial.

9        Do you have Government Exhibit 22-C-2 in front of

10   you?

11   A    Yes, I do.

12   Q    And what was Government Exhibit 22-C-2?

13   A    22-C-2 are actually copies of the credit card statements

14   for tax years '94, '95 and '96 for credit card MBNA, I

15   believe.

16   Q    And did we hear any testimony with regard to 22-C-2 at

17   trial?

18   A    Yes, we did hear testimony that these were a personal

19   credit card that was paid out of the business account.

20   Q    And who provided such testimony at trial?

21   A    I believe it was Karen Jeannerett.

22   Q    Did anybody else testify as to the items that are listed

23   on the credit card?

24   A    I believe also Mrs. Leveto testified to several of the

25   charges that were specifically on these as being personal

1  family vacations.

2  Q    And, Miss Iddon, I ask you to look at the third page of

3  22-C-2.

4  A    These are charges that occurred on the closing date of

5  February 13th, 1995 statement.  And what they are are, I

6  believe, five airline tickets for Daniel, Margaret, Andrea,

7  Amy and Rebecca on American Airlines for a round trip ticket

8  between Pittsburgh and JFK Airport for $476.59 each.

9  Q    Now, does the credit card statement reflect as to

10  whether or not payment was made for those charges?

11  A    Yes.  There is also a $1,000.00 charge for Saphire Beach

12  Resort in St. Thomas of $1,000.00, as well, and that payment

13  is made from business check 6479 on March 9th, 1995.

14  Q    Miss Iddon, I ask you to look at the monitor.  This is

15  Government Exhibit 32-C.  And what is 32-C?

16  A    32-C is the business ledgers from 1995.

17  Q    Have you had an opportunity to see that document before?

18  A    Yes.

19  Q    It was admitted into evidence?

20  A    Yes.

21  Q    Now, with regard to the check No. 6479 that paid the

22  credit card statement to which you just referred, is that

23  check number reflected in the business ledger of 32-C?

24  A    Yes.  If you look closely at May 8th, you will see that,

25  or 9th, 1995, a payment was made to MBNA America, again,

Iddon - Direct(By Mr. Voracek)          41

1  check number 6479 in the amount of $3,382.95.

2  Q    And does the business ledgers reflect how that

3  particular payment was expensed on the business ledgers?

4        And if you look on the second page.

5  A    Yes.  You will have to flip to the second page.  And,

6  again, if you look at line No. 8, you will see that that same

7  amount of $3,382.95 is deducted under supplies, the first

8  column, supplies expense.

9  Q    And, Miss Iddon, if you would turn to page five of

10  Government Exhibit 22-C-2.

11  A    Reflected on this statement of closing date April 14th,

12  1995, we find several charges for Hard Rock Boutique in

13  St. Thomas Virgin Islands, the Hard Rock Restaurant,

14  St. Thomas Virgin Islands, Imperial Jewelers, St. Thomas

15  Virgin Islands, in the amount of $3,050.00.  And, again,

16   another charge for Saphire Beach Resort in St. Thomas resort

17   of $1,736.90.

18   Q    Does that statement reflect how those charges were paid?

19   A    Yes, sir.  It's notated that on May 4th of 1995,

20   business check No. 6708 for $4,955.90 was paid.

21   Q    Miss Iddon, again, I ask you to look at the monitor.

22   This is the business ledgers for Government Exhibit 32-C

23   admitted in evidence before the jury.

24        Do we have a reflection of check No. 6708 that paid

25   those charges to which you just testified?

Iddon - Direct(By Mr. Voracek)          42

1   A    We do.  But, on my monitor, I can't tell you what line

2   item it is.  It is slightly to the -- okay.  Yes.  You will

3   see that line No. 18 is for MBNA America referencing check

4   No. 6708 for the amount $4,955.90.

5   Q    And do the ledgers reflect how that charge was expensed

6   on the business ledgers?

7   A    Yes.  You have to flip to page two.  Once again, I

8   believe if you look at line item 18 and follow it across,

9   that same amount was deducted under the supplies expense.

10  Q    Miss Iddon, did you also find other such examples of

11  personal expenses paid out of the business account?

12  A    Yes, we did.

13  Q    And reflected on the business ledgers as supplies?

14  A    That is correct.

15  Q    Miss Iddon, do you have Government Exhibit 33-C up

16  there?

17  A    Those are the business ledgers.  Yes.

18  Q    33-C would be the annual business ledger?

19  A    I do not have those up here.

20  Q    Miss Iddon, I am going to put on the monitor

21  Government Exhibit 33-C.  Do you see that in front of you?

22  A    Yes, I do.

23  Q    And you have had an opportunity to review this document

24  prior to trial, during trial and after trial?

25  A    Yes.  On several occasions, yes, sir.


                    Iddon - Direct(By Mr. Voracek)          43


1   Q    And what is Government Exhibit 33-C?

2   A    33-C is the 1995 -- I believe this is what you -- I

3   would refer to as a recap or a reconciliation of the 1995

4   year for income and expenses.

5        If you'll see -- you will see each month, January

6    through December, is written out, and you will see total

7    deposits, total income as we go across the columns, and then

8    also a recap of each one of the expenditures, supplies,

9    equipment, utilities, for each month, and then totalled after

10    all twelve months.

11    Q    And with regard to supplies, what was the total amount

12    of supplies as taken -- as reflected on the business ledgers

13    for 1995?

14    A    Would it be possible for -- thank you.  $198,438.00, and

15    I believe that's forty cents.

16    Q    And as you testified, some of the expenditures for

17    supplies include payments for charge cards such as what you

18    just previously testified with regard to family vacations?

19    A    That's correct.  What we were able to identify, that a

20    lot of the personal credit cards were paid out of the

21    business account, and that those expenses were deducted under

22    the supplies expenses on the business ledgers.

23    Q    Now, Miss Iddon, the total amount of supplies then for

24    1995 as reflected on the business ledgers was about 198,000?

25    A    Yes, it was.

Iddon - Direct(By Mr. Voracek)          44

1   Q    I am going to put on the monitor the return 1040 NR as

2   filed by Center Company for 1995 which was admitted into

3   evidence as Government Exhibit 2E.

4        Do you see that on the monitor before you?

5   A    Yes, I do.

6   Q    As you testified, there was a Schedule C that was

7   attached to the Center Company 1040 NR return, correct?

8   A    Correct.  On page two of the Schedule C, materials and

9   supplies deducted on that 1040 NR for 1995 was $197,817.00.

10  Q    As materials and supplies would have been taken as a

11  deduction on the Center Company return?

12  A    On the Center Company Form 1040 NR, yes.

13  Q    And I think as you just testified the supplies reflected

14  on the business ledger was around 198,000?

15  A    That's correct.

16  Q    Miss Iddon, as a Revenue Agent, do you oftentimes see

17  that the business ledgers don't specifically match up a

18  hundred percent with tax returns filed for a business?

19  A    Yeah.  What you normally have is, taxpayers who keep

20  books and records many times will turn those over to a tax

21   preparer, at which point a tax preparer may go through and

22   remove some non-business items.  They may categorize things.

23   They may lump two expenses together or re-categorize things.

24        As you see on the form Schedule C, those expenses

25   are predetermined or those line items are already listed.

Iddon - Direct(By Mr. Voracek)          45

1   Not every business fits those Schedule C line items

2   precisely.  So, you may have somebody re-categorizing an

3   expense so that it fits the Schedule C as provided by the

4   Internal Revenue Service.

5        So, what you are going to have on some occasions

6   is -- actually is a recompilation or a cover sheet where they

7   may actually -- the accountant for the taxpayer may

8   re-categorize some things so that it fit a little nicer on

9   the tax return.

10  Q    Now, based upon your review of the business ledgers and

11   the testimony that you heard at trial, as a revenue agent,

12   would you rely on those business ledgers for 1991 through

13   1995 in reconstructing the veterinary business' tax returns?

14  A    For the expenses?

15  Q   For the expenses.

16  A   No, sir.  I could not rely on those expenses based on

17  the testimony and what has been proven by following up on the

18  personal items.

19       We heard testimony and we see the expenses being

20  paid and deducted on those business ledgers.  Those are

21  personal items.  They should not have been deducted on the

22  business returns.

23       So, I could not rely on those veterinary business

24  ledgers as accurately -- an accurate picture of what the

25  business expenses were.


                Iddon - Direct(By Mr. Voracek)          46


1  Q   Now, Miss Iddon, with regard to the Center Company

2  returns that purportedly declared the business activities

3  from the veterinary clinic, have you had an opportunity to

4  review them?

5  A   Yes, I have.

6  Q   They were filed from 1991 through the year 2000 with one

7  exception for 1996?

8  A   Correct.

9  Q   Were business expenses, costs of goods sold, other

10  expenses reported on the Center Company returns?

11  A   Yes, they were.

12  Q   And did you determine whether or not you, as a Revenue

13  Agent, could take the expenses as reflected on the Center

14  Company returns as an accurate reflection of the veterinary

15  business expenses for a particular year?

16  A   I determined that I could not based on the fact that if,

17  and as we looked earlier, we have gross profit percentage and

18  we looked at what the profit margin was on the earlier-filed

19  returns for '89 and '90.

20       In the later years on the Form 1040 NR, we have

21  profit margins of nothing, or actually tax losses.  And we

22  know that the lifestyle and the business did not change and

23  that those possibly could not be accurately reflective of

24  what actually occurred.

25  Q   Miss Iddon, I ask you to look at Government Exhibit 715.

               Iddon - Direct(By Mr. Voracek)          47

1  Do you have that before you?

2  A   Yes, sir, I do.

3  Q   What is 715?

4   A   715 is from 1991 through 1995. It's the gross receipts

5   that were reported on the Center Company's 1040 NR's, that

6   is, line one. Any cost of goods sold that was reported from

7   the 1040 NR's any other income that was included, arriving at

8   total gross income for those years for 1040 NR returns, the

9   total expenses that were reported and the profit that was

10  remaining to that 1040 NR return from '91 through 2000.

11  Q   And that was the profit that was reported by Center

12  Company?

13  A   Yeah. Page two actually is '96 through 2000. I

14  apologize.

15      MR. VORACEK: Your Honor, the United States moves

16  for the admission of 715.

17      THE COURT: 715 is admitted.

18  Q   Now, based on you looking at the Center Company returns,

19  purportedly reporting the business activity of the veterinary

20  clinic, were you able to determine the percentages -- the

21  percentage amount of expenses taken on those returns?

22  A   Yes, I was. In 1991, you will see that was September

23  through December. That was the partial year. We had 87

24  percent of the business income was actually business

25  expenses. And you will see that in '92, it's 97.9 percent.

Iddon - Direct(By Mr. Voracek)          48

1   98.6 percent in '93.  98.8 in '94.  99.1 percent in '95.

2         There was no return for '96.  In '97, it's 94.5

3   percent.  And in the years '98 through 2000, we actually have

4   a -- rather than a profit, a loss, which means that over a

5   100 percent of the business income was spent on expenses.

6   Q   And if I you look at Government Exhibit 714.

7   A   Yes, sir.

8   Q   What does 714 indicate?

9   A   714, again, is talking of the 1989 and the 1990 and the

10  1991 from January through August of the form Schedule C as it

11  was attached and filed on Dr. Leveto's Form 1040.  And it

12  shows his gross receipts for those years, his cost of goods

13  sold for those years and the business expenses for those

14  years.

15        And the very last column is the profit

16  percentage -- or I'm sorry -- the business expense percentage

17  of -- in other words, 74.6 percent of the total gross

18  receipts were spent for business expenditures for 1989.

19  Q   And I believe you indicated earlier that the 1989 and

20  1990 returns you found to be appropriate?

21  A   I did.  Based on what was available, I did.

22  Q   And how does the returns filed in '89 and '90 reporting

23  the business activity compare with the business activity as

24  reported by Center Company during the 1990's?

25  A   Well, you will see that there is no profit, there is no

                    Iddon - Direct(By Mr. Voracek)          49

1  profit margin at all in the 1998 through 2000.  It is

2  actually showing a loss, substantial in 1999 of 157,000.

3        And in these earlier years, you got a profit margin

4  of at least 25, percent, if not 30 to 35.

5  Q   Now, based upon your review of the Center Company

6  returns purportedly reporting the business activity of the

7  veterinary clinic, did you determine whether or not you

8  could, as a Revenue Agent, use those Center Company returns

9  as an accurate reflection of the business expenses?

10  A   The business expenses that were deducted on the 1040 NR,

11  we -- first of all, I couldn't, line for line, take it back

12  exactly to a specific business expense, which is not unusual

13  for not having all the books and records available.

14        In other words, as I stated before, there is

15  probably some commingling of expenses, pulling of one to

16  another to combine a line item.  I would be guessing at which

17  expenses may be combined to be placed on that 1040 NR.

18        But, we also know that the deductions that were

19  taken on those business ledgers included many personal items

20  and some very high ticket personal items that should not have

21  ever been placed on the face of that 1040 NR.

22  Q   Is it your opinion, based on a Revenue Agent who has

23  done hundreds of other audits, whether or not the cost of

24  goods sold and the expenses, as taken on the Center Company

25  returns for 1991 to the year 2000, is reflective of reality?


                Iddon - Direct(By Mr. Voracek)          50


1  A   It couldn't have been.  Their lifestyle would have

2  drastically changed.  The business would have been losing

3  money.  They would have had to have been losing patients,

4  animals, their clients, and we heard testimony that that did

5  not change.

6  Q   Now, let me ask you to look at Government Exhibits 718

7  and 719.

8  A   Yes, sir.

9   Q    What is Government Exhibit 718?

10  A    Government Exhibit 718 is from 1994.  And basically what

11  it is is, it's the expenditures or the payments between

12  January and March of that year 1994 that were made out of the

13  Center Company Operating Account for personal expenditures.

14         And also, in addition, there were payments that

15  were made directly from the business to Mrs. Margaret Leveto

16  of $32,000.00 in '94.

17  Q    Was this an attempt by you to determine what income

18  Dr. Leveto was actually able to receive from his business

19  during 1994?

20  A    Yes.  What this basically shows, that between January

21  and March of 1994, we have -- we went through the various

22  credit cards and some of the other expenditures that we heard

23  testimony on that were deemed personal.

24         We also -- I also displayed the very last column on

25  page two of this exhibit that which category they were

                    Iddon - Direct(By Mr. Voracek)          51

1   deducted under, in other words, which business category, and

2   supplies being the one that took the brunt of or the most

3   deductions.

4          And, again, this is just for January through March,

5     so we considered it to be a quarter.  And, there being four

6     quarters in a year, determined that if you multiply it by

7     four, you will find that roughly $138,000.00 were payments

8     that were made from the business for personal expenditures.

9     And, in addition, $32,000.00 was directly paid to

10    Mrs. Leveto.

11         So, we estimate that for the tax year 1994, there

12    was an estimated gross profit available to Dr. and

13    Mrs. Leveto of $170,000.

14    Q    And does Government Exhibits 719 reflect the same type

15    of information except for the 1995 years?

16    A    Correct.  It is identical, except that it is for 1995,

17    and obviously the dollar amounts are reflective of those that

18    occurred in 1995.

19         MR. VORACEK:  Your Honor, the United States moves

20    for the admission of 718 and 719.

21         THE COURT:  They are admitted.

22    Q    Miss Iddon, I ask you to compare the income amount on

23    718, the $170,344.00 with the amounts of gross income that

24    are reflected on Government Exhibit 702 based on a profit

25  percentage, and I have it in front of you on the monitor.


Iddon - Direct(By Mr. Voracek)         52


1   A    Oh, thank you.  For 1994, you'll see that, again, using

2   the different profit margins, you will see that the average,

3   the 28 percent is $162,910.00.  And I have estimated on

4   Exhibit 718 that we estimate that availability and expenses

5   that were paid for personal was $170,344.00.

6   Q    So, in other words, Government Exhibits 718 and 719, is

7   that another method employed by a Revenue Agent in order to

8   determine income that an individual receives from a business?

9   A    Right.  When we do a reconstruction of income, we would

10   like to have as much hard evidence that we can or different

11   angles that we can show that support our conclusion of

12   arriving at these figures.

13        So, this was just another attempt to arrive at

14   documentation to say or some proof to say that that gross or

15   that net profit is as adequate as we could do based on

16   estimates and that this reconstruction shows that at least

17   this much was available for a net profit to be able to be

18   paid for personal expenses and directly to Mrs. Leveto, it

19   had to be available.

20          It couldn't have been paid out to business vendors.

21   It was actually paid for personal items and directly to

22   Mrs. Leveto.

23   Q    Now, in a situation where you are unable to verify the

24   accuracy of the business ledgers, in your experience as a

25   Revenue Agent, have you ever before reconstructed returns

                Iddon - Direct(By Mr. Voracek)          53

1   based upon profit percentages as you have done in this case

2   here?

3   A    For the last three years, I have probably done nothing

4   but indirect method because working with the Criminal

5   Investigation Division, 99 percent of the time we have to

6   create or establish our own because these returns are not

7   filed.  So, we have got to reconstruct and come up with a

8   method in determining income and expenses.

9          And, of course, over the seventeen years of my

10   career, I have, on numerous occasions, had the opportunity to

11   try to attempt to reconstruct a tax return based on what was

12   available.

13   Q    Now, Miss Iddon, I ask you to look at Government

14  Exhibit 703 that I have put on the monitor in front of you.

15  Do you see that?

16  A    Yes, sir, I do.

17  Q    And what is that?

18  A    703 is a mere tax loss computation summary.  And, again,

19  looking down lines one, two and three, you will see that the

20  25 percent margin, which we got from the 1989 return, 28

21  percent which is an average, and the 31 percent which is

22  taken, I believe, from the 1990 year, and we have the total

23  gross receipts -- I am sorry -- that would have been the net

24  profit for, I believe, 1991 through 2000, multiplied by 28

25  percent, which are the guidelines allowable under

                  Iddon - Direct(By Mr. Voracek)            54

1  Section 2T1, and those are the different tax losses based on

2  if you utilize the 25 percent profit margin, 28 percent or 31

3  percent.  And for an average 28 percent profit margin, it's

4  $408,034.00 is the tax loss from 1991 through 2000.

5  Q    This is using a tax rate of 28 percent?

6  A    Right.  A tax rate of 28 percent.

7  Q    Now, as a revenue agent, when you do civil audits, do

8  you use 28 percent?

9   A    No, we use actual -- I would recalculate the entire tax

10  return and use the tax rates that were allowable or whichever

11  would be the most beneficial to the taxpayer in each one of

12  those tax years.  They may or may have not been in that 28

13  percent tax bracket.

14         MR. VORACEK:  Your Honor, the United States moves

15  for the admission of Government Exhibit 703, if I haven't

16  done so already.

17         THE COURT:  703 is admitted.

18  Q    And, Miss Iddon, you stated that you do reconstruct tax

19  returns and don't just automatically use the 28 percent?

20  A    Yes, sir.

21  Q    And I ask you to look at Government Exhibits 704 through

22  713.

23  A    Yes, sir.  These are the tax returns that I had

24  reconstructed or re-prepared based on the inclusion of what

25  we deemed was the corrected amount of business net profit.


                Iddon - Direct(By Mr. Voracek)         55


1   Q    The other amounts that are reflected on the

2   reconstructed returns, where did you get those amounts?

3   A    From the returns as originally filed.  In other words,

4   Dr. and Mrs. Leveto had included some wages, some interest

5   and some other business income.  In other words, they had IRA

6   distributions in one year.  They had partnership -- or I'm

7   sorry -- sale of business property in one year.  They had a

8   flow through from an 1120-S in one year.

9        So, those amounts that are on there are what was

10  originally reported on their Form 1040's.  The only thing

11  that I changed was the inclusion of the net profit.  And also

12  if I can get into a little bit about self-employment tax.  An

13  individual who is self-employed is responsible form paying

14  not only their federal income tax, but the self-employment

15  tax which is paying into Social Security.

16       So, your net profit on line twelve is also subject

17  to self-employment tax in each of those years.  So, that

18  would have not been reported originally on the Levetos' tax

19  returns.  So, that's also an inclusion and an addition on

20  these returns as well.

21       MR. VORACEK:  Your Honor, the United States moves

22  for the admission of Government Exhibits 704 through 713.

23       MR. MISKO:  Objection.  Your Honor, these are --

24  included in the government exhibits that were provided to the

25  defense, there are accurate tax returns that were


                Iddon - Direct(By Mr. Voracek)        56


1  authenticated by the Internal Revenue Service at the time of

2  trial.

3        These tax returns, which they are seeking to admit

4  now, are handwritten from those tax returns and the figures

5  on those are not accurate as they relate to the ones that

6  were admitted at trial.

7        MR. VORACEK:  Your Honor, these are -- as the agent

8  has testified, these are simply reconstructed returns with

9  the inclusion of the business profit of which she just

10  testified in order to arrive at a different way to approach

11  the tax loss amounts rather than just using the 28 percent as

12  provided in the guidelines.

13        THE COURT:  I mean, we realize that she is using a

14  indirect method anyway, so we'll admit it.

15  Q    And, finally, Miss Iddon, I ask you to look at

16  Government Exhibit 720.

17  A    Government Exhibit 720 is a summary of these

18  reconstructed tax returns, and it's basically -- it does look

19  at the bottom line, and it's from 1991 through 2000.  It is

20  what are the total tax that would have been due had these

21  returns been prepared and filed properly, less any tax

22  payments that were made by the Levetos.

23       And the last column being the total tax still due

24  and owing to the Internal Revenue Service with a bottom line

25  figure of $481,056.00 tax due and owing to the IRS from tax

                Iddon - Direct(By Mr. Voracek)          57

1  years 1991 through 2000.

2  Q    And, again, those are based on your reconstruction of

3  the returns --

4  A    Yes.

5  Q    -- in Government Exhibits 704 through 713?

6  A    That's correct.

7       THE COURT:  Excuse me.  According to my notes here,

8  I thought we come out at a figure of 408,000.

9       MR. VORACEK:  Yes, Your Honor.  That was Government

10  Exhibit 703.

11       THE COURT:  How is 703 different from 720?

12  BY MR. VORACEK:

13  Q    Miss Iddon, Government Exhibit 703, with regard to the

14  tax loss using a 28 percent profit margin, what would that

15  be?

16  A   Well, Your Honor, the 28 percent is just using a basic

17  28 percent across the board.  In Government Exhibit 720, that

18  would include -- that total tax amount is going to be

19  slightly higher because I mentioned earlier the

20  self-employment tax, that 28 percent is simply a federal

21  income tax rate, and self-employment taxes were roughly 12 to

22  15 percent, depending upon what year.

23        So, our Government Exhibit 720, that tax due and

24  owing is going to be slightly higher because different tax

25  rates in the different years put him in a higher bracket.


                    Iddon - Cross              58


1        I believe the one year, he was actually in a 39

2  percent bracket.  And in Government Exhibit 702?  703?  Where

3  we use the straight 28 percent, it's probably a low-ball

4  figure.  But, it's a standard rate that is allowable under

5  those guidelines.

6        MR. VORACEK:  I have no further questions, Your

7  Honor.

8          THE COURT:  Okay.  This looks like a good time to

9   take a break.  So, we will reconvene at eleven o'clock.

10  (Court recessed at 10:40 a.m.)

11  (Court reconvened at 11:00 a.m.)

12          THE COURT:  Be seated, please.

13          Okay, Mr. Misko, you may cross-examine.

14          MR. MISKO:  Thank you, Your Honor.

15                  CROSS-EXAMINATION

16  BY MR. MISKO:

17  Q    Miss Iddon, you indicated that your function at the

18  Internal Revenue Service is as a Revenue Agent, is that

19  correct?

20  A    That is correct.

21  Q    And part of your responsibilities are to audit tax

22  returns?

23  A    Yes, sir.  On a tax -- audit tax returns that are

24  assigned to me for examination.  And as I stated, for the

25  last roughly three years, I have been assisting as a Special

                    Iddon - Cross              59


1   Enforcement Program Revenue Agent, which basically means that

2   we assist the criminal investigation and joint investigations

3   and also grand jury investigations.

4   Q    There are also audit functions on the civil side of the

5   Internal Revenue Service, correct?

6   A    I am really still the civil side of the Internal Revenue

7   Service, Mr. Misko, yes; as a Revenue Agent, yes.

8   Q    The audits performed -- for instance, let's say I am one

9   of the random people chosen to have their tax return audited.

10      Is the audit function the same as if I'm randomly

11  chosen as in reference to Dr. Leveto's position?

12  A    The only difference, I would say that you as a

13  randomly-chosen individual would probably be in a situation

14  where it's more current.  In other words, we would be doing a

15  more current tax return year.  The records, I would think if

16  they really exist, would be more readily available.

17      And I would also have the opportunity to discuss

18  with you as the taxpayer your oral testimony and to assist me

19  in reconstructing the books and records.  That would be the

20  difference between my reconstruction of the books and records

21  as a Revenue Agent in a randomly-inspected exam, and as

22  distinguished from what I did here in this case.

23  Q    Do you know if Dr. Leveto was ever audited, per se?

24   A   From my recollection of reviewing -- I don't recall ever

25   seeing that he was examined, no.

                     Iddon - Cross                 60


1   Q   So, it is fair to say because he was indicted that he

2   did not have that fair opportunity to discuss his returns

3   with you or whoever else audited or reconstructed the

4   returns?

5   A   I did not have the ability or the benefit of having

6   Dr. Leveto to assist me in the reconstruction of what I have

7   done, correct.

8   Q   And it is fair to say that if he had the opportunity to

9   have some input in your reconstruction of his returns, then

10   potentially some of your decisions as to whether something

11   was an expense that was allowable under the IRS may have

12   altered --

13   A   It could have.

14   Q   So, certainly in your position, you had to make certain

15   assumptions, correct?

16   A   Based on the testimony from the bookkeeper and from

17   Mrs. Leveto, I used that testimony to arrive at what I deemed

18   personal expenditures, that's correct.

19   Q    All right.

20   A    I did not have the benefit of having Dr. Leveto change

21   that categorization.

22   Q    Two questions.

23        First question.  In reference to the returns from

24   1991 to 1995, were there specific ledgers and credit card

25   statements supporting those ledgers that were available to

                    Iddon - Cross            61

1    you?

2    A    The business ledgers for 1991 through 1995 were

3    available and the credit card statements as they were -- they

4    were also available.

5        They were all here.  Actually, only a few of them

6    were brought out as examples today.

7    Q    You were at the trial listening to the evidence?

8    A    Yes, I was.

9    Q    Mrs. Leveto testified in reference to personal expenses?

10   A    Yes, she did.

11   Q    However, she did not testify as to every specific

12   expense, did she?

13  A   No.  We did not go charge through charge statement

14  through statement.  She did not.

15  Q   So, in reference to, for instance, an MBNA credit card,

16  it was your understanding that she just assumed or testified

17  that -- assumed that all those expenses were personal,

18  correct?

19  A   The ones that she testified to specifically, we did know

20  that those were of a personal nature, and some of the other

21  statements that were looked at, there were similar type

22  charges, maybe not as large, maybe not precisely for the

23  exact trip, but there were also some other expenditures on

24  those credit cards that gave the appearance as if they may

25  have all been personal in nature.


                    Iddon - Cross              62


1  Q   And since they had the appearance of being personal in

2  nature, you concluded that they were personal and, therefore,

3  not deductible via his tax return, correct?

4  A   Based on the evidence and testimony that was available

5  at hand, that is how I determined it.

6  Q   All right.  And Mrs. Leveto did not go through every --

7  she did not testify in reference to all the credit cards that

8  were used, correct?

9  A    That's, I believe, correct, she did not testify to every

10  single card and every single charge on that card.

11  Q    Now, unless I was in a different courtroom, there was no

12  evidence of specific expenses from years 1996 to 2001, were

13  there?

14  A    I do not believe that we had evidence that was for those

15  years.

16  Q    All right.  Mrs. Leveto's testimony was restricted to

17  the years of '91 through '95, is that correct?

18  A    Based on the actual statements and the charges

19  themselves, that's correct.

20  Q    So, it's fair to say that in years 1996 to 2001, you had

21  to make more assumptions as to whether the expenses were

22  personal or business related?

23  A    I made the assumptions based on the testimony that their

24  lifestyle didn't change and that the business practices

25  didn't change.

Iddon - Cross                    63

1        But, yes, the assumptions were based on those

2  statements, and I did not have the benefactor of having

3  ledgers and statements to fall back on to also do a

4  comparative analysis.

5  Q    Do you know whether the Internal Revenue Service, as

6  part of their search warrant, confiscated bank statements and

7  ledgers from 1996 to 2001?

8  A    Honestly, I have no knowledge.  I was not involved in

9  this during the search warrant and having had the privilege

10  of seeing an inventory list of what was or wasn't taken.

11  Q    Did you ask or inquire as to whether there were bank

12  ledgers, statements, veterinarian ledgers that were seized by

13  agents of the Internal Revenue Service during their criminal

14  probe?

15      Did you ask if these were available?

16  A    When I was assigned to assist as the Revenue Agent in

17  this case to testify for trial, I was provided with all of

18  the records that were going to be available to be used.

19      I made the assumption that if those records were

20  not given to me, they did not exist.

21  Q    So, it is fair to say you did not inquire?  You just

22  assumed they were not available?

23  A    That's correct.

24  Q    How did you treat an expense -- and I think actually the

25  government had placed -- excuse me for one minute.


                        Iddon - Cross              64


1   A    Certainly.

2   Q    The Government referred to Exhibit 22-C-2.

3   A    That's the tax return, correct?

4   Q    No.

5   A    I'm sorry.  Credit charge statement.

6   Q    Yes.  I have it up on the monitor.

7           And I want to direct your attention specifically to

8   the fourth line down, posting date 11-26, transaction date

9   11-21, reference No. 5849, BP Oil, in the amount of $18.60.

10          Did you inquire as to whether that was gasoline

11  that was used as a business-related expense in a

12  business-related vehicle?

13  A    Did I inquire to Mrs. Leveto?

14  Q    Mrs. Leveto, or anybody, as to whether that was a

15  legitimate business expense.

16  A    Once again, I did not have the privilege of interviewing

17  Mr. or Mrs. Leveto in the reconciliation or reconstruction of

18  these tax returns.

19         So, the answer to your question is no, I would not

20  have been able to inquire.

21  Q    And it appears that the total amount on this credit

22  card -- and I don't know what credit card it is.  It's MBNA.

23         It appears that on this billing cycle, there was a

24  balance of 443.20, and that's cut off on mine.

25  A    It's 443.21.  Those were the total charges.


                    Iddon - Cross                65


1  Q    Is it fair to say that you took that 443.21 as

2  non-permitted business expenses?

3  A    You mean when I reconstructed the returns?

4  Q    Yes.

5  A    I can't say that that is exactly what I did.

6         What we did, and what I did was, I did not use the

7  business ledgers at a face value.  What I determined was that

8  an adequate gross profit percentage of -- average of 28

9  percent was probably more realistic than trying to go through

10  each business expense and guesstimate that this is personal

11  or this is business.

12         So, in other words, we took the gross receipts that

13  were reported on the business ledgers and supported by the

14  business bank accounts, and we took 28 percent of that amount

15  and said that that would be a more realistic net profit and

16  then allowed the remainder of it to be business expenses.

17  But, I did not go expense by expense and try to say this is

18  personal or this is business.

19       And as a backup to that, we're saying that so many

20  of these credit card charges were verified as personal

21  expenses to support why I had to use my indirect or my

22  reconstructed method.

23  Q   Is it fair to say you don't know the percentage of

24  legitimate expenses versus non-legitimate expenses, do you?

25  A   This is not a precise science, Mr. Misko, no.


                    Iddon - Cross              66


1  Q   Ma'am, if you could just please answer my question.

2  A   You mean --

3  Q   You don't know, by reviewing the credit card statements,

4  the percentage of legitimate expenses versus non-legitimate

5  expenses, do you?

6  A   Oh, no.

7  Q   All right.  And it's fair to say that the reason why --

8  strike that.

9       If this went through a civil audit, they would go

10  through the credit card statements and they would determine

11  legitimate versus non-legitimate expenses, wouldn't they, in

12  a typical audit?

13  A   If the taxpayer was cooperating --

14  Q   -- yes.

15  A   -- and able to perform that -- if the taxpayer wasn't

16  cooperating, this same type situation would hold true in a

17  civil examination.

18  Q   All right.

19       So, in a civil audit, they would go expense by

20  expense by expense on the ledgers to determine whether they

21  were legitimate or not, correct?

22  A   I would ask the taxpayer to provide documentation to

23  prove all business expenses, correct.

24  Q   If you felt that they were not legitimate, they were

25  stricken as an expense, correct?

Iddon - Cross              67

1  A   Correct.

2   Q    Thereby, that would increase the amount of taxable

3   income, correct?

4   A    If you just allowed a personal expenditure, it would

5   increase the taxable income, yes.

6   Q    So, all this testimony that you went through with Judge

7   Cohill in reference to whether they were legitimate expenses,

8   personal expenses, it doesn't really matter, does it, because

9   all you did is, you took the gross receipts and you

10  multiplied it by a figure to get profit, multiply it by

11  another figure to get taxable income, correct?

12  A    Based on a reconstruction, yes.

13  Q    All right.  Well, let's talk about some of those figures

14  that you used.

15          For instance, on the Government Exhibit 702, we

16  know from the 1989 tax return that there was a 25 percent

17  profit, don't we?

18  A    Yes.

19  Q    And then 714 shows us that on the Schedule C, he had

20  gross receipts of 531,844, cost of goods sold was 10,113 and

21  business expense was 386,970.

22          So, if you add the 386,970 and the 10,113, that

23   represents 74.6 percent of the gross receipts, correct?

24   A   Correct.

25   Q   Now, if you subtract -- strike that.


                    Iddon - Cross                68


1        Did you subtract 386,970 and 10,113 from 531,844 to

2   get your adjusted gross income?

3   A   The adjusted gross income?

4   Q   Yes.

5   A   On the reconstructed 1040?

6   Q   Yes.

7   A   It would have been added.  That net profit would have

8   been added to other income items that were already on his

9   Form 1040.

10   Q   So, you would have a --

11       Do you have a copy of the 1989 1040?

12   A   Yes.  It's Government Exhibit 1A.

13   Q   And is there a Schedule C attached to that?

14   A   On page six of 1040, there is a Schedule C.

15   Q   And the figures on the first line of Government Exhibit

16   714 pretty much match the numbers on the Schedule C, is that

17   correct?

18  A    The Schedule C gross receipts is 531,844, which matches

19  Government Exhibits 714, column two.

20  Q    The bottom on line thirty of Government Exhibit 1A,

21  Schedule C, is 137,058 correct?

22  A    That is the net profit, that is correct.

23  Q    All right.  Now, when you did your reconstruction on

24  your tax returns, did you take the amount listed on line

25  thirty, which would also appear on line twelve of the 1040,

                    Iddon - Cross                    69

1  multiply that times your percentage to get your net profit?

2  A    On the reconstructed returns that I did, I took line

3  thirty, the net profit, listed it on line twelve and included

4  it with other income items that were on the 1040's as filed

5  by the Levetos so that net profit would have been included

6  with other income items.

7  Q    All right.  So, the -- is it fair to say that the

8  137,058 represents 25 percent of the gross receipts from

9  1989?

10  A    Correct.

11  Q    And then after we get the 137,058, you multiplied that

12  figure by 28 percent to get your tax loss, right, your

13  taxable income?

14  A   In the reconstructed returns?

15  Q   Yes.

16  A   I would have added that with all the other income and

17  used whatever tax bracket that that put the Levetos into.

18        It may have been 28 or it may not have been 28.

19  Each year would have stood on its own.

20  Q   Well, I'm just going back to your Exhibit 702 because

21  this is basically what Judge Cohill and everybody else is

22  going by, and I think even the Probation Officer is going by,

23  is this figure --

24  A   Well, in 1989 --

25  Q   If I could finish, please.


                    Iddon - Cross              70


1  A   Okay.  I'm sorry.

2  Q   -- on 702, 1,457,267 was multiplied by 28 percent to get

3  to our figure of 408 plus change, correct?

4  A   Yeah.  I think what I am confused is, in 1989, sir, this

5  return was filed.

6        So, if you are asking me what I did in other years

7  when the return wasn't filed, okay, how I arrived at the 28

8  percent figure, we all know that it's based on gross

9  receipts.  28 percent of that amount is profit.  That 28

10  percent profit was then carried over, okay, to the face of

11  the 1040 and included with other income items.

12  Q    Such as?

13  A    Interest income.

14  Q    Capital gains?

15  A    Capital gains.  And in those years where there is

16  capital gains, I would have had to use the Schedule D,

17  capital gain rates, to calculate his accurate and complete

18  tax.

19  Q    So, we look at the net profit, correct?

20  A    Sure.

21  Q    Plus whatever income there is, correct?

22  A    Correct.

23  Q    And then we multiply that times 25, 28 or 31 percent,

24  correct?

25  A    Depending upon what the tax rate is for that year.  Is

Iddon - Cross            71

1    that what you are saying?

2  Q    Yes.

3  A    Yes.

4  Q    All right.  Did you allow for deductions?

5  A    You mean itemized deductions, exemptions, those kind of

6  deductions?

7        Is that is that what you are referring to?

8  Q    Yes.

9  A    I believe, in the majority of the years, I allowed him,

10  to the best of my knowledge, when he was still married.

11  Unless they elected to be married filing separate, I allowed

12  him -- married filing joint status, I allowed him for an

13  exemption for himself, his wife and his three children.

14       Once they were deemed separated or divorced, I gave

15  him married filing separate.  And if Mrs. Leveto did not take

16  the children, I gave him his children as exemptions as well.

17  Q    Did you also give him itemized deductions or standard

18  deductions?

19  A    If I was able to determine from the information that was

20  available to me that itemized deductions were allowable or

21  that they were paid, I did give him those.  I believe, in

22  most cases, I didn't have enough documentation.

23          So, he was given the standard deductions for that,

24   the filing status of married filing joint or married filing

25   separate.


                    Iddon - Cross                    72


1   Q    Do you have a chart which shows how you came to a

2   taxable income figure after all the additions and

3   subtractions?

4   A    Other than the reconstructed returns themselves?

5   Q    Yes.  We have a plethora of charts here and government

6   exhibits.

7          Do we have one for each tax year that shows this is

8   what I believe his net profits were, this is what I believe

9   his additional income was, this is what I believe his

10  deductions were so, therefore, this is what I believe his

11  taxable income is?

12  A    I don't believe that there is a summary, per se, that

13  just summarizes taxable income.

14  Q    Now, did you have --

15          THE COURT:  Excuse me.

16          Each of your reconstructed returns shows what you

17  believe the tax due to be?

18      THE WITNESS:  I can come up with a summary.  All I

19  have to do is go back to each tax year and write down taxable

20  income for each one of those tax years.

21  BY MR. MISKO:

22  Q   Those are the ones that you handwrote, correct?

23  A   Correct.

24  Q   Did you also include -- if you look at 1A, there is a

25  deduction under eighteen for rents, royalties, partnerships


                    Iddon - Cross              73


1  minus 73,111.

2  A   I'm sorry?

3  Q   Did you determine what that figure was and did you

4  account for that figure in future returns?

5  A   You will find that that figure of loss of $73,111.00 is

6  from an S corporation by the name of Magdan, Inc., and I did

7  allow that loss on my reconstructed return and I continued to

8  do so, on the reconstructed returns, allow him losses for

9  that company as long as it -- as it continued to be filed on

10  his 1040, I allowed it on my reconstructed returns as well.

11  Q   All right.  And were there instances where you did not

12    allow that deduction?

13    A    On the reconstructed returns themselves, what I did was,

14    if it was an income item that resolved -- or involved the

15    sale of Center Company or Langdon and Leveto, the

16    veterinarian practice, I felt that that was not a valid --

17    from the testimony that we heard, that that was not a valid

18    sale.

19         So, I treated anything that had to do with the

20    sale -- in other words, there was supposedly interest paid

21    from Center Company to Mr. Leveto personally.  I did not pick

22    that up.

23         I also did not include any of the -- I believe

24    there was an employment contract that was handled on his

25    personal 1040.  Those items were not picked up.  Anything

                    Iddon - Cross                    74

1    that had to do with the sale was disregarded, but any other

2    income item of profit or loss that was on the Form 1040

3    originally filed was still figured on my reconstructed 1040.

4    Q    Did you have the opportunity to have tax returns from

5    the early and mid-1980's?

6   A   I believe the earliest tax return that I had the

7   privilege of working with was the 1989, to the best of my

8   recollection.

9   Q   How did you obtain the 1989 tax return?

10   A   I believe it was Exhibit 1A during the trial.

11   Q   Is that the first time you saw that?

12   A   I saw it in preparation for the trial.

13   Q   Did you inquire as to whether you could obtain, for

14   instance, 1984 through 1988 tax returns?

15   A   I did not.  And to be quite honest, I was impressed that

16   we were able to find something back to 1989.  Those other

17   years, the IRS does not -- unfortunately, we cannot keep

18   records that long.

19       But, no, I didn't inquire.

20   Q   How long does the Internal Revenue Service keep tax

21   returns?

22   A   That's probably going to be a guess by me.  Mary Somma

23   probably would have been the one that could have answered

24   that better, Mr. --

25   Q   Well, it's fair to say that you guessed on a lot of

Iddon - Cross                75

1   these things?  Can you guess --

2   A   Many times, if we go back more than five or seven years,

3   we have a hard time securing those from the file.

4   Q   So, you guesstimate maybe they keep tax returns seven

5   years prior to the current year?

6   A   That would be a guess but, yes.

7   Q   And do you know what year the criminal probe started?

8   A   In the eighties, or early nineties.  I would be guessing

9   at that, too.

10  Q   Would you agree that had the 1980 tax returns been

11  available, they be would have been a legitimate source to

12  determine taxable income?

13  A   The year again?  I'm sorry.  19?

14  Q   '84 through '88.

15  A   I think it would have given us a larger pattern in which

16  to base our gross profit percentage.  In other words, we had

17  '89 and '90 and a part of '91 to work with in this particular

18  case to come up with a gross profit percentage.

19        I had all of -- if I had all of the 1980's, I

20  probably would have included those and done the same thing,

21  come up with an amount.  Whether it would have changed it

22  significantly, I doubt it.

23  Q    You had indicated that you felt that the 1989 tax return

24  was a legitimate tax return and something that was credible

25  during the course of your investigation, correct?


                    Iddon - Cross              76


1   A    Based on the limited information that I had about it,

2   I -- from a cursory review, I don't see anything that -- I

3   mean, given it to examine, would I have looked at things?

4   Yes.

5          But, from a cursory review, I would have to say

6   that it looks ordinary and reasonable.

7   Q    And the fact that an accounting firm prepared the tax

8   return as to its legitimacy, is that correct?

9   A    It was prepared by an accounting firm.

10  Q    So, is it fair to say that the way you reconstructed

11  your tax returns to show tax loss was simply based upon only

12  the gross receipts from the veterinary practice, is that

13  right?

14  A    And the testimony that we heard.

15  Q    Notwithstanding any other deductions that were allowable

16  under the Internal Revenue Code?

17  A   I'm sorry?  The question again?

18  Q   You showed gross profit and then you took a

19  percentages -- I'm sorry.

20      You showed gross receipts and took a percentage as

21  net profit and used that in your reconstruction

22  notwithstanding whatever deductions they were entitled to,

23  correct?

24  A   Correct.

25  Q   And is it fair to say that the reason why you disallowed

Iddon - Cross          77

1  so many expenses once the corporation -- or strike that --

2  once the veterinary practice was bought by Center Company, is

3  because you could not find any -- strike that -- ledgers or

4  records to substantiate the expenses, correct?

5  A   Correct.

6  Q   And most of those occurred after 1996 when the 1040 NR's

7  were prepared, correct?

8  A   That the information is not available for those years?

9  Q   Correct.

10 A   Correct.

11  Q    Is it fair to state you really had to make a lot of

12  assumptions after 1996 because of the sparsity of records, is

13  that right?

14  A    Absolutely correct.

15  Q    And you would agree with me that by not reviewing the

16  1984 to, for instance, 1988 tax returns, we don't know what

17  the profit margin would have been back in those years,

18  correct?

19  A    We don't.

20  Q    Is it fair to say it could have been significantly less

21  than 25 percent, correct?

22  A    It could have been.

23  Q    All right.  And is it fair to say also that if it was

24  less than 25 percent, that may have skewed the 28 percent

25  that you eventually used to calculate tax loss?

                    Iddon - Cross              78


1  A    Had it been any different amount, right.  And as I said

2  before, it could -- having a bigger tax base year as a

3  starting point, it would have or could have changed the

4  profit margin; may have increased it; may have decreased it.

5  Q    Were there returns filed from 1999 to 2001?

6  A    When you say "returns," are you referring to any 1040,

7  1040 NR's?  Is that what you are saying?

8  Q    Correct.

9  A    Okay.  Just let me refresh my memory.

10       I believe the last tax return filed for Dr. Leveto

11  was 1998, and that would have been a Form 1040.

12       And I believe the last 1040 NR that was filed based

13  on exhibits was the 2000 1040 NR.

14  Q    Did the 1998 tax return indicate itemized or standard

15  deductions?

16  A    1998?

17  Q    Correct.

18  A    And you are referring again to Dr. Leveto's personal

19  1040, 1998, correct?

20  Q    Correct.

21  A    In that particular case, Dr. Leveto filed all zeros on

22  his tax returns and he listed only himself as his exemption

23  and a filing status of married filing separate.

24       So, he did -- he did not take itemized or standard

25  deductions since he listed all zeros on his return.

Iddon - Cross          79

1  Q    And is it fair to say that, again, had there been

2  itemized deductions, that would have skewed the result of the

3  taxable income for that particular year?

4  A    Had Dr. Leveto had itemized deductions in excess of the

5  standard deductions given to him, yes, it would have changed

6  the bottom line or the tax due.

7  Q    But, again, all you are projecting in your indirect

8  computation is, is the profit from the veterinarian practice

9  from 1991 through the years 2000, is that correct?

10  A    That's what I projected?

11  Q    Yes.

12  A    And that profit was then carried over to the 1040 and

13  included with all other income items.

14  Q    And it fair to say that the reason why you again used

15  the indirect is because you didn't want to go through the

16  complexities and time-consuming business of going through all

17  the books, ledgers, statements, to determine acceptable

18  expenses versus non-legitimate expenses, correct?

19  A    Not only time-consuming, but some of them were -- they

20  may -- I may not have had access to them.

21        Some years, we didn't have ledgers.  We don't know

22  if they didn't exist or if they were destroyed or just not

23  part of the search warrant.

24  Q   And you would agree that had a civil audit been done --

25  or if a civil audit is done, that would be a more accurate

                    Iddon - Cross                80


1  way to determine tax loss than the indirect computation?

2  A   With a cooperating taxpayer?

3  Q   Yes.

4  A   Oh, absolutely.

5  Q   And you have no evidence to suggest that Dr. Leveto

6  would not be a cooperating taxpayer, do you?

7  A   I don't have any evidence?

8  Q   Right.

9  A   Well, the fact that he filed tax returns listing all

10  zero when he did, in fact, have income, I think that he might

11  not have been as forthcoming during a civil investigation as

12  most law-abiding taxpayers would have been.

13  Q   In those cases, all those were stamped not timely and

14  nothing was done with those tax returns, correct?

15  A   The all zero returns you mean?

16  Q    Yeah.

17  A    They were -- I believe they were processed.

18  Q    Weren't they stamped at the bottom untimely?

19  A    I don't see a notation on the 1998, which just happens

20  to be the one I grabbed.  I believe in -- there was a certain

21  year in which it was received by the Criminal Investigation,

22  the list return branch.

23  Q    Just one other question.

24       There was some testimony about these business

25  expenses, for instance, the plane tickets, and you were able

                    Iddon - Cross              81

1   to track from the credit card statement to the business

2   ledger indicating that those were supplies, correct?

3   A    It was deducted under supplies expense, right.  We were

4   able to track that payment that was made to MBNA and deducted

5   under the supplies expense.

6   Q    Further, you were able to track that probably on a

7   monthly ledger sheet, correct?

8   A    You mean that -- for -- the total for the month that it

9   was paid out, yes, sir.

10  Q    Did you carry that through for yearly expenses?

11  A    There was a recap sheet on some of the years that was

12  available where they showed those total expenses by month,

13  bill, category, and those were reconciled.

14  Q    In fact, I think you testified -- the government asked

15  you and you testified about one year there was $198,000.00 in

16  supplies and you did some reconstruction to show maybe

17  $197,000.00 in supplies.

18        My question is:  When you take this yearly figure

19  of 198 -- $198,000.00, did you, during your reconstruction,

20  add up every specific expense for every specific month to get

21  to the 198, or did you just assume that the 198 was inclusive

22  of all the expenses listed in the monthly ledgers?

23  A    Can I say that for each ledger?

24  Q    Yes.

25  A    I absolutely lined -- totalled every line?  No.


                    Iddon - Cross              82


1         But, in some instances, where the numbers were not

2  clear, I did, in fact, have to add up every single expense

3  for that month, reconcile it to come up with a total for each

4  month, each month for the year to reconstruct it.

5        Did I do it for every single expense every single

6  month for every single year?  No.

7  Q   So, you don't know, in some cases, whether that expense

8  was backed out based on a yearly figure of supplies?

9  A   There was nothing that I saw that would have been

10  prepared showing that any items were changed between the

11  business ledgers to the Schedule C.

12        As I said, in some instances, you've got tax

13  preparers who will come up with summary sheets or a synopsis

14  where they may comingle two expenses to categorize them

15  differently.

16        That did not exist or, to my recollection, we did

17  not have access to anything like that.

18  Q   It's fair to say, though, it doesn't really matter, does

19  it, because you just had come to the conclusion that they

20  were so replete with personal expenses that they were not

21  reliable?

22        So, therefore, it's fair to say you just kind of

23  pushed aside all the evidence of the ledgers and bank

24  statements and just did your indirect computation, is that

25  correct?

1  A    Well, the bank statements did support the business

2  income that was listed on there.

3        But, as far as documentation showing business

4  versus personal for expenditures, that wasn't in existence so

5  we used -- I used the net profit percentage versus the actual

6  business expenses, correct.

7  Q    In fact, you got most of your information from the 1040

8  NR's even from Center Company, right?  That is how you

9  started with your gross receipts, you just took the figure

10  listed on the 1040 NR?

11  A    Which, in most cases, is justified by the bank deposits

12  and also what was on the ledgers.  But, yes.

13  Q    And pretty much matched up with other preceding years

14  and income, too, didn't they?  They were pretty consistent?

15  A    The income pretty much stays relatively the same.

16  Q    Right.  You just ignored the business expenses because

17  you thought that they were either excessive or not documented

18  properly?

19  A    Correct.  And it was mixed with the testimony that there

20  was so much personal in there that we couldn't take it, those

21  expenses at a face value, and there wasn't any other support

22  to show differently business versus personal.

23  Q    And it is fair to say that, had there been evidence that

24  there was legitimacy to these expenses, maybe not all of

25  them, but 90 percent of them, had there been legitimacy to

Iddon - Redirect(By Mr. Voracek)          84

1  these expenses, again, your tax loss figure may have been

2  substantially lower than what you calculated it to be?

3  A    Had I had the support and substantiation, the tax loss

4  number could have been different, yes.

5  Q    Okay.

6       MR. MISKO:  That is all I have, Judge.

7       THE COURT:  Any redirect?

8       MR. VORACEK:  Briefly, Your Honor.

9              REDIRECT EXAMINATION

10  BY MR. VORACEK:

11  Q    Miss Iddon, I would like you to look at Government

12  Exhibit 702, the gross income computation.

13       THE COURT:  Excuse me.  I noted I didn't mark 720

14  as admitted.  Are you offering that?

15       MR. VORACEK:  Yes.

16        THE COURT:  It is admitted.

17  Q    702.  I have it on the monitor, Miss Iddon.

18  A    Sometimes it's better when I look a little closer.

19  Sorry.

20  Q    Okay.

21  A    This is gross income computation for '91 through 2000.

22  Q    All right.  And you have come up with a total amount of

23  gross income based on a 28 percent profit for all ten years

24  of the veterinary practice, correct?

25  A    Correct.


                Iddon - Redirect(By Mr. Voracek)            85


1  Q    And if you look at 703, that amount is then times by 28

2  percent, which I believe is reflected in the guidelines,

3  correct?

4  A    It just happens to be -- I know this is going to be a

5  little confusing.  It's just a coincidence when you take 28

6  and 31 and divide it, you come up with 28.  And it just so

7  happens that 28 is the rate that the guidelines is, just

8  merely a coincidence.

9  Q    And it's 28 percent of the unreported gross income,

10  correct?

11  A    Correct.  It's 28 percent of the unreported gross

12  income.

13  Q    And in this case, the unreported gross income was the

14  veterinary practice's profit, correct?

15  A    Correct.

16  Q    Because that wasn't reported by Dr. Leveto, right?

17  A    The profit was not reported, right.

18  Q    So, the amounts that we are looking at on Government

19  Exhibits 702 and 703 are just purely and only the unreported

20  profit from the business, from the business veterinary

21  clinic, and times that by 28 percent under the guidelines,

22  correct?

23  A    Correct.

24  Q    That doesn't -- these 702 and 703 has nothing whatsoever

25  to do with your reconstruction of the returns, does it?


                    Iddon - Redirect(By Mr. Voracek)            86


1  A    No, sir.  There is no other income items even being

2  considered in Exhibits 702 and 703.  It's merely the net

3  profit that should have been reported on schedule C's.

4  Q    So, when we look at Government Exhibit 720 --

5   A   Yes, sir.

6   Q   -- the tax due and owing based on your reconstructed

7   returns --

8   A   Yes, sir.

9   Q   -- you come up with the total amount of tax of 481,056

10   that is significantly or somewhat different than the tax loss

11   due on 703, right?

12   A   Yes, sir.  Because we -- I, when reconstructing the tax

13   returns, have included other income and expense items.

14        In addition, it's also going to have

15   self-employment income.  It also, on Government Exhibit 720,

16   gives him credit for any tax payments that were made

17   during -- through -- 1991 through the year 2000.

18        So, those differences are reflected on the

19   reconstructed tax returns and, in essence, this Exhibit 720,

20   which is a summary of that.

21   Q   So, the tax due and owing on Government Exhibit 720 is

22   just another way to look at tax loss, as opposed to

23   Government Exhibit 703?  They are not the same, it's just a

24   different way of looking at it?

25   A   Right.  It's just another aspect or -- the different

1   ways that I tried to reconstruct and show credibility in the

2   methodology that was used in reconstructing this.

3   Q    But, that is not to say that the profit from the

4   business that's reflected on -- is also reflected in

5   Government Exhibit 720, the net profit?

6   A    Yes, sir, it is included because it would be part of the

7   adjusted gross income and the taxable income.  And those

8   figures are, in essence, starting points before arriving at

9   what the total tax is.

10  Q    So, it seems to me that the essential difference between

11  Government Exhibits 703 and 720 is that Government

12  Exhibit 703, you are using a tax rate of 28 percent of

13  unreported income?

14  A    That's correct.

15  Q    To arrive at tax loss?

16  A    Correct.

17  Q    While on Government Exhibit 720, the tax rate is not

18  necessarily 28 percent, it's based upon whatever that year's

19  tax rate schedule looks like, and you look at what an

20  individual actually has as income?

21  A    Right.  And in the years in which Dr. Leveto had some

22  capital gain, those amounts are treated or taxed at capital

23  gain tax rates which, in most cases, are much more beneficial

24  to the taxpayer.

25       So, those calculations were all taken into effect

Iddon - Redirect(By Mr. Voracek)          88

1  in each one of those years and credence was given to the

2  proper tax brackets in which Dr. Leveto should have fallen in

3  that year on Government Exhibit 720, as opposed to 703, which

4  is where we just use a flat average allowable by guidelines

5  of 28 percent tax rate.

6  Q    And, Miss Iddon, as a final note here.

7       The reason that you did not rely upon the business

8  ledgers for expense computation in your analysis of the tax

9  due and owing was, based in part, upon the testimony that

10  personal expenses were paid out of the business, correct?

11  A    That's correct.

12  Q    Based in part on that?

13       That wasn't the only reason why you rejected or

14  discounted the business expenses on the business ledgers, was

15   it?

16        I mean, isn't it true that you also looked at --

17        MR. MISKO:  Objection, leading.  He's on redirect,

18   Your Honor.

19        THE COURT:  Go ahead.

20   Q   Isn't it true that you also looked at the Center Company

21   returns that allegedly reported the business activity of the

22   veterinary practice, correct?

23   A   Oh, the Center Company returns, the 1040 NR's that were

24   filed, yes, I looked at those.

25   Q   And you looked at the expenses, the cost of goods that

            Iddon - Redirect(By Mr. Voracek)          89

1    were taken on the Center Company return, did you not?

2    A   Absolutely.

3    Q   And what was the percentage of the expenses that were

4    taken on the Center Company's returns for the years 1991

5    through 2000?

6    A   They were in the nineties -- oh, I'm sorry.  97, 98, 99,

7    and then well over 100 percent in the later years resulting

8    in a tax loss.

9    Q   So, if you looked at the Center Company returns

10  supposedly reporting the business activity of the vet center

11  for 19 -- for the years 1991 through the years 2000, you

12  would find that in some years there was no profit at all

13  whatsoever with regard to the business activity, was there?

14  A    That is what was reflected on the 1040 NR's, yes.

15  Q    So, there was an additional reason really not to rely

16  upon not only the business ledgers but also the 1040 NR's as

17  just not ground or based in reality as to what the true

18  business expenses really were?

19  A    That's correct.

20  Q    And based upon that, I think you testified on direct

21  that when you approach a case like this and you don't have

22  the records available so that you can do correct taxes, you

23  have to approach it -- you have to go from a different

24  methodology, do you not?

25  A    That's correct.


                    Iddon - Redirect(By Mr. Voracek)          90


1   Q    And in this case, you looked at prior year returns and

2   prior profits of the business and then just simply took an

3   average of that profit and applied it to what you knew to be

4   the receipts for the business for later years?

5   A   That's correct.

6   Q   And you have done that before many times?

7   A   Yes, sir I have.

8   Q   And, Miss Iddon, during an audit when you have a

9   taxpayer come in and talk to you -- and you have had that

10  occasion before, haven't you?

11  A   Several hundred.

12  Q   And a similar situation like this where you have an

13  individual who owns his own business, is that true?

14  A   I had many opportunities to interview sole proprietors,

15  shareholders, corporate presidents, yes, sir.

16  Q   And you sit down with the taxpayer and you ask him about

17  the business expenses that are taken on the business return?

18  A   Yes.  We interview them about their recordkeeping, their

19  history of how they report personal expenditures, do they

20  take a salary, do they pay expenses out of the business

21  account and deduct them at the end of the year, do they have

22  a draw account where they pull funds from.

23        All these types of questions would be part of my

24  interview with the business owner.

25  Q   And a taxpayer, I assume, makes oral representations to

Iddon - Redirect(By Mr. Voracek)        91

1  you regarding whether or not an expense is personal or

2  business?

3  A    Correct.

4  Q    Now, as a Revenue Agent doing an audit, do you just

5  automatically accept whatever a taxpayer tells you?

6  A    There is a certain amount that goes to oral testimony.

7  I mean, what they say.  I mean, unless they give me some

8  evidence that I shouldn't believe them, I would have to at

9  least take their word.

10        But, I would also ask for business support, be it

11  an invoice, a log book many times for business mileage, those

12  types of items; that is, the taxpayer basically creating

13  those types of documents as it occurs, but it is supported by

14  hard, written evidence.

15  Q    You want to both listen to a taxpayer but also see some

16  back-up document regarding the expense?

17  A    Correct.

18  Q    And in this case, for instance, that back-up

19  documentation would be credit card statements, would it not?

20  A    Correct.

21  Q    And it would also be the business ledgers, correct?

22  A    Yes.

23  Q    Now, if Dr. Leveto came in and sat down with you and

24  tried to justify an expense for supply, I assume that some of

25  the documentation he might show you would be the credit card

Iddon - Redirect(By Mr. Voracek)        92

1  statement and the business ledger?

2  A    That is correct.

3  Q    And you would look at the credit card statement, as in

4  this case you did on direct testimony, and see that that

5  statement reflects a trip to the Virgin Islands and the

6  purchase of jewelry, which is expensed as supplies, that

7  would be some of the -- some of your acceptance of what could

8  support that business expense?

9  A    Right.  Typically in a civil exam, had I seen those type

10  of expenses, I probably would have initially said to him, all

11  of these charge cards appear to be personal, and unless you

12  go line by line and show me where the business expenses

13  exist, I am going to consider this a personal business card.

14        Once we have enough evidence showing that something

15  is tainted more personal than business, it's almost the

16  taxpayer's responsibility to then show me where it's business

17  related.

18  Q    And, finally, Miss Iddon, when did you become involved

19  in the Dan Leveto case?  Do you recall?

20  A    I believe it was approximately about a year before the

21  trial actually occurred because of the different changes in

22  the due dates.  So, probably about 2003.

23  Q    You didn't perform any civil audit on Dr. Leveto prior

24  to your becoming involved in this case, in the criminal case?

25  A    Oh, no, sir.  This case was already docketed for trial

Iddon - Redirect(By Mr. Voracek)        93

1  before I ever got involved as -- I was going to be needed for

2  possibly summary or expert witness, depending upon how it

3  went, and that's how I was assigned and when I was assigned

4  to this particular case.

5  Q    And your testimony today and your testimony at trial was

6  based upon the evidence that was put forward before the jury?

7  A    Oh, right.  All the evidence that was submitted at the

8  trial was what I was to testify to, correct.

9   Q   So, the jury has considered all the evidence that forms

10  the foundation of the tax loss figures that you testified to

11  today?

12  A   Right.  Only the evidence that was entered into the

13  trial was used as a consideration for my numbers.

14  Q   And all you have done is, you have taken the unreported

15  gross income that was put forward in evidence before the jury

16  and you have applied a 28 percent tax loss as provided for

17  under the guidelines?

18  A   Under one methodology.  The other is using the similar

19  net profit and reconstructions, the returns, and using the

20  proper tax breaks as a comparative analysis.

21  Q   But, again, everything you have done was based on

22  evidence before the jury?

23  A   Correct.  It was all in evidence before the jury,

24  correct.

25       MR. VORACEK:  No other questions, Your Honor.

94

1   Thank you.

2        MR. MISKO:  Nothing else.

3        THE COURT:  Thank you, Miss Iddon.

4        THE WITNESS:  Thank you.

5   (The witness was excused.)

6        THE COURT:  Well, I'm satisfied that the

7   guideline -- the point of departure for the guideline

8   application is an offense level seventeen.  Plus, and we have

9   got the other four points to argue about.  But, the point of

10  departure is a seventeen.

11       Government Exhibit 703 estimates the tax loss of

12  $408,034.00.  Government Exhibit 720, based on varying tax

13  rates and self-employment tax, comes out at a tax loss of

14  $481,056.00.

15       And the guideline calls for, at this level,

16  seventeen, calls for a tax loss that lies between $325,000.00

17  and $550,000.00.  And so that's a good -- there is a lot of

18  leeway there.  The difference between 325 and 550,000 is

19  $225,000.

20       So, we find that either the 408,000 figure, or the

21  481,000 figure, Government Exhibits 703 or 720, both lie

22  between those offense level seventeen number.

23       So, we are going to rule that seventeen is the

24  appropriate line from which we will depart.

25          And now I think there is some other objections

95

1   which Mr. Misko has filed with the Court.

2          I think the next one is, I think, goes to the

3   question of the sophistication of the scheme.

4          MR. MISKO:  Yes, Your Honor.

5          THE COURT:  Let's hear from you on that then,

6   Mr. Misko.

7          MR. MISKO:  Thank you, Your Honor.

8          In reference to that argument, it's twofold, and I

9   really don't have much more to provide.  I don't have to

10  burden the Court with more argument other than what's

11  provided in my response to the PSI.

12          Specifically, obviously, the one argument would be

13  that sophisticated means is a fact that should have been

14  given to the jury for them to decide.  And because they did

15  not decide that, any increase, again, would be within the

16  Booker Fan-Fan decision by the United States Supreme Court

17  that the punishment would be increased by a fact not

18  addressed by either the jury or admitted to by the defendant.

19          The other argument is, quite frankly, that

file:///A|/LEVSENT1.TXT

20  everything that Dr. Leveto did during the course of these tax

21  years was opened.  I mean, the filings were open.  The

22  Internal Revenue Service received the 1040's from all the

23  taxable years prior to the sale to Center Company and after

24  the sale to Center Company.

25       They also received 1040 NR forms from Center

96

1  Company which indicated taxable income.  There was nothing

2  actually that was concealed or hidden.  Dr. Leveto believed

3  that the sale was a legitimate sale to Center Company.  And,

4  therefore, since there was no scheme to conceal from the

5  United States Government, that, therefore, there would be no

6  sophisticated means.  That by the nature of the indictment,

7  itself, and there were fifteen paragraphs to Count 1, the

8  government essentially averred some sophistication, i.e.,

9  assets being channeled to the foreign accounts in the

10  indictment itself.

11       Because the government is averring it in the

12  indictment and also asking for the upward increase because of

13  sophisticated means, that that would be a form of double

14  counting and which would not be appropriate.

15      THE COURT:  Well, I don't need to hear from the

16  government on that one.  I think the fact that what we have

17  heard today indicates just how complicated this scheme was,

18  and I think it even came out moreso at the trial because we

19  heard about bank accounts in the Caribbean and taxi drivers

20  who were executive directors of corporations, and that kind

21  of thing.

22      So, I think here clearly there should be a

23  two-point increase for the sophistication of the scheme.

24      I think the last thing is, more or less, the

25  obstruction of justice.  Did you have anything you wanted to

97

1  say on that, Mr. Misko?

2      MR. MISKO:  Yes, Your Honor.  I think there was a

3  response from the Probation Department in reference to that.

4  It had to do with avoiding the summons.

5      This had to do with the after the government and

6  the defense filed objections, there was a response, and it's

7  clear in this case, Your Honor, not only from the case law

8  that I provided in my objections, but also from the notes,

9    themselves, that avoiding arrest -- and that would be

10   application note 4-D -- avoiding or fleeing from arrest,

11   unless there is some averment as to reckless endanger during

12   flight, does not merit a two-level increase.

13         The evidence at this trial indicated that

14   Dr. Leveto, I believe a summons was directed to him, but

15   there was no service.  There was no -- quite frankly, no

16   evidence that there was notice of the summons.  There was

17   no -- and the arrest warrant was only issued after there was

18   a failure to appear based upon the issuance of the summons.

19         The case law is replete, Judge, and the application

20   notes support this, that providing false I.D. or having I.D.

21   while you were in the midst of flight is not a basis for

22   upward departure.

23         There is actually, I think, a Third Circuit case,

24   United States versus Jenkins, 275 F.3d 283, which basically

25   reversed the lower court which gave the defendant a two-level

98

1    increase pursuant to obstruction and gave a pretty detailed

2    explanation as to when the upward departure can be used.

3          Basically, to paraphrase under Roman numeral V in

4    this case, it said the defendant need not even be aware of

5    the federal investigation at the time of the obstructive

6    conduct.  The obstructive conduct cannot merely affect some

7    global application of the administration of justice.  The

8    federal proceedings must be obstructed or impeded by the

9    defendant's conduct.  In other words, there must be a nexus

10   between the defendant's conduct in the investigation,

11   prosecution or sentencing of the federal offense.  This

12   defendant's failure to appear in State Court did not obstruct

13   proceedings initiated against him.  Therefore, the

14   enhancement was not appropriate.

15          Same thing in this case.  It is clear, Judge, that

16   Dr. Leveto, in no way there was any evidence to suggest that

17   he interfered or impeded in the federal investigation or

18   obstruction.  And simply just not abiding by the summons,

19   which there is no notice that he had evidence of or notice of

20   the summons.

21          Again, it's replete and the case law, both the

22   Third Circuit and elsewhere, that that is not sufficient for

23   a two-level increase for obstruction.

24          THE COURT:  Okay.  Ms. Calvin.

25          MS. CALVIN:  Your Honor, we would agree that a

99

1    non-appearance in a State Court proceeding would not be

2    sufficient for this.  If it had, we would have, in fact,

3    argued it in this case because Dr. Leveto did not appear as

4    he was directed in a State Court proceeding.

5          But, I think it is fair to say that there is a

6    split in the Circuit Courts on the focus of this particular

7    enhancement.  The Sixth and the Fourth Circuits focus on

8    whether or not the defendant is in actual custody when his

9    flight occurs, and this is consistent with the guideline that

10   mere flight would not be sufficient.

11          However, there is another line of cases out there,

12   the Seventh and the Second Circuits focus on whether the

13   defendant's acts were calculated, as opposed to spontaneous,

14   panicked type of acts which are instinctive.  And if you

15   focus on that type of conduct of someone who suddenly

16   realizes that they are faced with arrest, takes flight

17   without thinking about it, that this would not be sufficient

18   for an obstruction of justice.

19          However, in this case, we have certainly more than

20   that as far as the flight goes.  We have the fact that while

21   he was in this status that he was gone, we do have his

22   admission that he did know that the indictment had come down

23   at the time that he was in flight.

24          We also have that he transferred the title of his

25   truck to someone else on June 10th, 2002, but continued to

100

1   drive it, and that that vehicle was the one that crossed the

2   border from Canada at the same time that someone named

3   Chester Leveto crossed the border.  And it was that same

4   vehicle and that Dr. Leveto was found with identification

5   with that name.

6          At the time of his arrest, he had numerous pieces

7   of identification in his -- in other names.  And it's our

8   position that not only did he flee, but he took numerous

9   steps to stay away from the government that he knew was

10   looking for him, and that this was not a spontaneous,

11   panicked event, but a thoughtful event with numerous actions

12   over a long period of time that, in fact, did delay the

13   process.

14        MR. MISKO:  Your Honor, if I can respond to that?

15        THE COURT:  Yes.

16        MR. MISKO:  The bottom line is, from 1995, the

17   Guidelines are quite clear on this, and Application Note 4(a)

18   says providing a false statement or identification document

19   at arrest does not merit the increase.

20        Now, that is far more egregious than having it in

21   your possession during the course of flight.  And if you go

22   downs to 4(d), it says avoiding or fleeing from arrest.  It

23   doesn't matter what means you use, what country you go to,

24   you can avoid or flee from arrest and it still doesn't merit

25   the upward departure.

101

1        And in this case, the notice of the indictment was

2   after he fled.  It was not before he fled.  He fled, and

3   there is no evidence to say that he fled because of the

4   indictment.  There is only evidence that there was some

5   admission that he knew about it after he fled.

6        And I think the Third Circuit has taken the

7   position that there has to be some willfulness that's shown

8   by the government in the attempt to obstruct or impede the

9   administration of justice, not just I don't want to be

10  arrested so I am out of here.

11          And that is all the government is saying is, hey,

12  he knew there was a summons eventually at some point in time

13  and him just evading law enforcement, in and of itself, with

14  this false I.D. merits the increase, and I think that is

15  wrong not only under our law in the Third Circuit, but the

16  guidelines don't support that.

17          THE COURT:  The guidelines make a very fine

18  distinction here, I think, with respect to a non-exception --

19  in the words of the guideline, a non-exhaustive list of

20  examples of the types of conduct to which the enhancement

21  applies.  And 3(e) says escaping or attempting to escape from

22  custody before trial or sentencing or willfully failing to

23  appear, as ordered for a judicial proceeding.

24          Now, that's the basis for increasing it.  And then

25  their non-exhaustive list for types of conduct as in a

102

1   separate count of conviction do not warrant the enhancement.

2   They say avoiding or fleeing from arrest.  That doesn't -- as

3   I say, I think it's a pretty close question, but here it's so

4   clear from all the circumstances that Dr. Leveto knew about

5   the indictment.  The indictment was handed down on

6   February 15th, 2001.  He wasn't arrested until three years

7   later, three years and a month later, March 17th, 2004, and I

8   think all that adds up to an enhancement of two points.

9          So, my final answer, as they say, on the guidelines

10  is as follows:

11         We find that the offense level here is 21, as I

12  tentatively said at the outset of this hearing, the Roman

13  numeral -- the criminal history category is Roman numeral I.

14  The applicable guideline range is thirty-seven to forty-six

15  months of imprisonment, supervised release of two to three

16  years at Count 1, supervised release of one year at Counts 2

17  and 3, a fine in the range of $7,500.00 to $75,000.00, and

18  that the amount of loss to the government lies between

19  $325,000.00 and $550,000.00.

20         So, that's my finding with respect to the

21  guidelines.

22         I think I've now resolved all the objections to it.

23  If I'm incorrect on that -- are there any further objections

24    from either side?

25           MR. MISKO:  I had no other objections, Your Honor.


                                  103


1            MS. CALVIN:  The government has no more objections,

2    Your Honor.

3            THE COURT:  And because of the complicated nature

4    of this proceeding, I'm not -- I find that certainly the

5    government is a victim of the conduct of Dr. Leveto.  But,

6    for this Court to order a specific amount of restitution, I

7    think what we've heard this morning is a good example of why

8    this Court is reluctant to do that.  And I am going to leave

9    it to the IRS to pursue other remedies available to it to get

10   restitution in this matter.

11           So, with that, Mr. Misko, is there anything you

12   wish to say or introduce any additional testimony with

13   respect to sentencing here?

14           MR. MISKO:  Your Honor, I have nothing further to

15   add other than what was already before the Court today.

16   There is no additional testimony.

17           I would only request that, when imposing sentence,

18   that the Court recommend to the Bureau of Prisons a federal

19  correctional facility that's closest to the Erie --

20  metropolitan Erie area as possible for purposes of family

21  visitations.

22      THE COURT:  I am sure you have explained to

23  Dr. Leveto what I say to the Bureau of Prisons isn't an

24  order, only a recommendation.  Although I find that they do

25  follow the recommendation of the Court.


104


1      Does Dr. Leveto wish to make a statement?

2      MR. LEVETO:  I just want to confirm, Your Honor,

3  that you did receive my letter.

4      THE COURT:  Yes, I did.

5      MR. LEVETO:  Okay.  That is all.

6      THE COURT:  Does the government have anything to

7  say at this time?

8      MS. CALVIN:  Your Honor, the government would just

9  note that every year millions of Americans file honest tax

10  returns and they pay what they owe.  Few, if any, probably

11  like paying these taxes and few, if any, probably agree with

12  everything that the government does with their tax dollars,

13  but they do pay and they recognize that taxes are the price

14  that we pay for civilization.

15         And we have the defendant who took these elaborate

16  and sophisticated steps to keep the IRS from being able to

17  assess and collect his taxes.

18         We have been through all of the steps that he took

19  and the presentence report adequately lays them out, but we

20  believe that this is a case that shows that tax crimes are

21  serious crimes and that we believe that a substantial

22  sentence is in order.

23         THE COURT:  Thank you.  Well, this has been a long

24  and a difficult case, and part of it is, Dr. Leveto, your own

25  doing.  I mean, it was a big mistake to flee the

                                105


1  jurisdiction, and we did go through a lot of purported

2  negotiations before the case finally came to trial.  I hoped

3  that it could be resolved without a trial, but that became

4  impossible.

5         So, for that reason, we're prepared to impose

6  sentence at this time.

7         Is there any reason why sentence should not be

8    imposed at this time, Mr. Misko?

9           MR. MISKO:  No, Your Honor.

10          THE COURT:  Dr. Leveto?

11          MR. LEVETO:  No.

12          THE COURT:  Government?

13          MR. VORACEK:  No, Your Honor.

14          MS. CALVIN:  No, Your Honor.

15          THE COURT:  After consulting the Sentencing

16   Guidelines and after hearing the testimony today, it is the

17   judgment of the Court that the defendant, Daniel J. Leveto,

18   is hereby committed to the custody of the Bureau of Prisons

19   to be imprisoned for a term of forty-six months.  This term

20   consists of forty-six months at Count 1 and thirty-six months

21   at Counts 2 and 3, to be served concurrently, for a total of

22   forty-six months.

23          Upon release from imprisonment, the defendant shall

24   be placed on supervised release for a term of three years.

25   This term consists of three years at Count 1 and one year at

106

1   Counts 2 and 3, with all such terms to run concurrently.

2           Within seventy-two hours of release from the

3    custody of the Bureau of Prisons, the defendant shall report

4    in person to the Probation Office in the district to which he

5    is released.

6           While on supervised release, the defendant shall

7    not commit another federal, state or local crime, shall

8    comply with the standard conditions that have been

9    recommended by the Sentencing Commission and adopted by this

10   Court and shall comply with the following additional

11   conditions:

12          The defendant shall not illegally possess a

13   controlled substance.

14          The defendant shall not possess a firearm or

15   destructive device.

16          The defendant shall provide the Probation Officer

17   with access to any requested financial information.

18          The defendant shall make arrangements with the IRS

19   for payment of applicable back taxes, penalties and interest.

20          The defendant shall timely file federal tax returns

21   as required by law.

22          It is further ordered that the defendant shall pay

23   to the United States a special assessment of $200.00 which

24  shall be paid to the United States District Court Clerk

25  forthwith.  This consists of $100.00 at Count 1 and $50.00 at

107

1  each of Counts 2 and 3.

2       The Court finds that the defendant does not have

3  the ability to pay a fine.  The Court will waive a fine in

4  this case.

5       The periodic drug testing mandated by the Violent

6  Crime Control and Law Enforcement Act of 1994 is hereby

7  suspended.  The Court finds that this offense is not drug

8  related and this defendant has no current or past history of

9  substance abuse.

10       The sentence is, in this case, within the guideline

11  range, albeit at the top of the guideline range, but we

12  believe that, in view of all the circumstances of this case,

13  that a sentence at the high end is appropriate.  And we find

14  that the period of three years of supervised release in

15  addition to the sentence does -- the prison sentence does

16  adequately address the sentencing objectives of individual

17  and general deterrence and punishment, as well as protection

18  of the community.

19       Dr. Leveto, you have a right to appeal.  An appeal

20  must be filed within ten days.  You are entitled to a lawyer

21  at every stage of the proceedings.  If you cannot afford an

22  attorney, one will be provided for you without charge.

23       With that, court is adjourned.

24  (Court adjourned on Thursday, October 13, 2005,

25  at 12:15 a.m.)


108


1               * * * * *

2        I certify that the forgoing is a correct transcript

3  from the record of proceedings in the above-entitled matter.

4

5                    S/Michael D. Powers
                     Michael D. Powers
6                    Official Reporter

7     *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25