1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

   _____

3

   UNITED STATES OF AMERICA

4
                    Plaintiff

5
         vs.        Criminal Action No. 01-06ERIE

6

   DANIEL J. LEVETO

7
                    Defendant

8  _____

9

                 PROCEEDINGS

10

          Transcript of Jury Trial commencing on Wednesday,

11   June 1, 2005, United States District Court, Erie,
     Pennsylvania, before Honorable Maurice B. Cohill, Jr.,

12   District Judge.

13   APPEARANCES:

14   For the Government:      For the Department of Justice
                    By:  Rita Calvin, Esq.

15                   By:  Thomas Voracek, Esq.

16   For the Defendant:      Pro Se
                    Stephen Misko, Esq.(Standby)

17

                    Reported by:

18                   Michael D. Powers, RMR
                    Official Court Reporter

19                   Room 5335 USPO & Courthouse
                    Pittsburgh, Pennsylvania 15219

20                   (412) 208-7572

21

22
Proceedings recorded by mechanical stenography.  Transcript
23  produced by computer-aided transcription.

24

25

2

1            I N D E X

2  DEFENDANT WITNESSES   DIRECT  CROSS  REDIRECT  RECROSS

3  ROBERT LAPINA

4    By Mr. Leveto       3          16
      By Ms. Calvin            13
5
   DANIEL LEVETO
6
     By Mr. Leveto       26
7    By Mr. Voracek            59

8  GOVERNMENT'S CLOSING(BY MR. VORACEK)  - PAGE 155

9  DEFENDANT'S CLOSING             - PAGE 181

10  GOVERNMENT'S REBUTTAL(BY MS. CALVIN)  - PAGE 198

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


3


1          P R O C E E D I N G S

2     (Court reconvened on Wednesday, June 1st, 2005, at 9:10 a.m.)

3          THE COURT:  Good morning.

4     (The jury entered the courtroom.)

5          THE COURT:  Good morning.  Be seated, please.

6          Ladies and gentlemen, as you know, I think,

7     yesterday concluded the presentation of the government's

8     case, and now it becomes Dr. Leveto's turn to present any

9     evidence or testimony that he wishes to.

10         MR. LEVETO:  I would like to call

11    Agent Robert Lapina to the stand, please.

12         THE COURT:  Okay.  Agent Lapina, you're already

13    under oath from having testified the other day.  So, just

14    take the witness stand and identify yourself once again and

15    give us the spelling of your name.

16         THE WITNESS:  Okay.  My name is Robert A. Lapina.

17    L-a-p-i-n-a.

18         THE COURT:  Thank you.  And you previously

19    testified on behalf of the government in this case, is that

20    correct?

21         THE WITNESS:  Correct.

22              * * * * *

23         ROBERT A. LAPINA, having first been duly sworn,

24    testified as follows:

25              DIRECT EXAMINATION


                    Lapina - Direct              4


1    BY MR. LEVETO:

2    Q    Good morning, Agent Lapina.

3    A    Good morning.

4  Q    Agent Lapina, was it you that authored the affidavit of

5  probable cause --

6  A    For the execution of the search warrants at 316 Conneaut

7  Lake Road, at 388 Edgewood Drive, Meadville.

8  Q    Yes.  Can you tell us what -- can you define hearsay

9  evidence?

10  A    Hearsay evidence.  Somebody tells you something

11  essentially that you don't have a documentation or they

12  weren't a direct party to the transaction essentially is my

13  understanding.

14  Q    Is it your understanding that normally that type of

15  evidence would be some of the strongest evidence or some of

16  the weakest evidence in your experience?

17  A    I guess it could be both.

18  Q    If you think back generally to the affidavit of probable

19  cause, that was a sworn statement by you, was it not?

20  A    Yes.

21  Q    And most of that sworn statement, would you agree that

22  when you had essentially testified on that or swore to that,

23  there was a lot of information on there from the undercover

24  agent and from the Kalustians and the CW-1's that they had

25  told you various things, is that correct?

Lapina - Direct          5

1   A    There was information from the Kalustians that were --

2   was in the affidavit and it was subsequently, I believe, a

3   lot of that information was corroborated through the

4   undercover operation.

5   Q    Okay.  The undercover operation consisted primarily of

6   tape-recordings, is that correct?

7   A    Well, I mean, it involved meetings between yourself and

8   the undercover agent that were tape-recorded.

9   Q    Right.  But, the -- what you developed in hearsay

10  evidence, could it be safe to assume that you got that pretty

11  much from the tape-recordings and the transcript?

12       MS. CALVIN:  Objection to characterizing this as

13  hearsay.  These are statements of the defendant.

14       THE COURT:  Yes.  What goes on between two persons

15  in a conversation is not hearsay unless it's repeated by

16  someone else who wasn't there.

17  BY MR. LEVETO:

18  Q    Agent Lapina, could you tell me that if generally a

19  person would be confessing to someone, or versus someone

20   talking about their activities, versus someone just saying

21   that someone heard them say that, what would be the strongest

22   evidence to you, in other words, a tape-recording of a

23   confession or that someone told you that someone said

24   something?

25   A    Well, no.  A direct conversation would be to me the

                    Lapina - Direct              6

1    strongest evidence, rather than someone coming back to me and

2    repeating what they had heard.

3    Q    Could you tell me, Agent Lapina, why on the affidavit of

4    probable cause, there was no reference at all to the tapes

5    that were made of me?

6        I mean, wouldn't it be kind of commonsensical to

7    say, well, there are multiple layers and we've established

8    that hearsay is certainly okay on the affidavit of probable

9    cause, but when someone was telling someone else, and then

10   someone else told you something, could you tell me why that

11   you would choose not to use the tape-recordings on the

12   affidavit of probable cause or any reference to them

13   whatsoever?

14   A    Well, I mean, I believe in this affidavit, there are

15   several summaries of conversations that took place between

16   yourself and the undercover agent.  And I took excerpts of

17   those tapes, taped conversations and put them in here.

18          I don't know what you are referring to.  I mean,

19   did you want me to -- are you talking about attaching all the

20   tapes to the affidavit?

21   Q    No, I am not saying that.  I am saying that we had

22   personally convicted felons that were providing the hearsay,

23   we had an undercover agent --

24          MS. CALVIN:  Objection to this characterization as

25   hearsay, Your Honor.

                          Lapina - Direct                 7

1          THE COURT:  Well, first of all, a Judge or a

2    Federal Magistrate would have had to approve the -- I am

3    telling the jury this -- that a -- some sort of judicial

4    authority, either a Judge or a Magistrate Judge, has to

5    review an affidavit of probable cause for a search warrant,

6    and then approve of it before the warrant can be executed.

7    BY MR. LEVETO:

8    Q    Was there anywhere within the affidavit that the tapes

9   were referred to, or was any knowledge given to the

10   Magistrate that they existed?

11   A   Well, in No. 14, you know, it says in there that we had

12   an approved undercover operation.  And the following is a

13   chronological listing of the applicable information obtained

14   and developed during the course of the undercover operation.

15   Q   But, there was no reference to any primary taped

16   matter --

17   A   Well, specifically, Dr. Leveto, it's my experience that

18   you don't send an undercover agent into a situation unless

19   you have him wired.

20       So, to me, that was assumed that we got this

21   information from tape-recordings.

22   Q   It was assumed?  Okay.

23       Okay, Mr. Lapina, if I could take you back to the

24   interrogation and our interview that we had on May 2nd, 1996.

25   A   Okay.


                    Lapina - Direct                8


1   Q   Do you have that with you?

2   A   Yeah.

3   Q   Could you define for the Court what custodial and

4   non-custodial interrogation is?

5   A   A -- well, custodial would be a situation where someone

6   is interrogated, they are not free to leave.

7        Non-custodial would be essentially a situation

8   where they would be free to leave.

9   Q   And on that day at the practice on May 2nd, 1996, what

10  type of interrogation was that?

11  A   Non-custodial.

12  Q   Agent Lapina, would you define non-custodial on that day

13  as sixteen agents coming in with jackets and weapons, and if

14  I was -- was I allowed to answer the telephone that day, that

15  morning?

16  A   Well, if I may, I can go into the events of that

17  morning.

18  Q   No.  I really would just like to have my questions

19  answered.

20  A   Well, you were free to leave.  I told you that you could

21  come -- or you were free to leave, but you could not come

22  back.  Okay?  And you chose to stay.  All right.  That is the

23  first part of that.

24        Now, the second part of it was, you know, you had

25   children at your residence and I had given you an option as

Lapina - Direct              9

1   to whether or not you wanted me to execute that search

2   warrant up at the residence or would you like for me to wait

3   until they left to go to school.  And you said you chose for

4   me to wait until they went to school.  Okay.

5          In the meantime, to prevent destruction of evidence

6   if you chose to stay and you wanted me to wait, you would not

7   be allowed to telephone, use the telephone because I was

8   afraid about the possibility of destruction of evidence at

9   the residence.

10  Q    Agent Lapina, when you and your officers came in, are

11  you saying that I was free to leave at that time?

12  A    You were free to leave.  Like I said, if you left at

13  that time, you would not be permitted to return and re-enter

14  the business and I would execute the other warrant at the

15  residence.  That's how I recall the whole situation.

16  Q    So, in your recollection of that, my not being allowed

17  to speak to emergencies, or would it be considered if I had

18  to be accompanied to the restroom and if I was held

19  incommunicado in an office?  Is that your position of saying

20  that I was free to leave?

21  A    You were free to leave.  But, if you chose to stay,

22  again, I would not have you roaming around the veterinarian

23  business.

24         Again, there are surgical instruments and different

25  things there, you know, and I have to be concerned for the

                    Lapina - Direct              10

1  safety of our people there.  Okay.  So, we had to keep an eye

2  on you.  But, you were free to leave.

3  Q    Agent Lapina, is it against the law to wire funds?

4  A    I'm sorry?

5  Q    Is it against the law to wire funds?

6         THE COURT:  To wire what?

7         MR. LEVETO:  To wire money, to wire funds.

8  A    Oh, to wire transfer money?  No.

9  Q    You testified to some of the foreign accounts that have

10  been in question here.

11         Is it true that authority over foreign accounts can

12  be ownership, investment, permissive or any type of

13  authority?

14          Are they always the same or are there different

15   types of connections to foreign accounts?

16   A    Could you repeat the question?

17   Q    Okay.  When we speak of foreign accounts, the foreign

18   accounts that you examined, were there any, other than the

19   TSB -- well, rephrase it another way -- that there was any

20   ownership shown to me or, you know, any signatory ownership

21   shown to me?

22   A    No.  However, I believe that control was exhibited.

23   Q    But, as far as the paperwork went, you weren't -- you

24   are not saying that there were signatory controls, and things

25   like that?

                    Lapina - Direct               11


1          I understand your theory and the government's

2   theory.

3   A    Right.  I guess you are talking specifically about

4   Leonard Adler and Box Elder.  Those are the two accounts I

5   recall.

6          I mean, they were not in your name, if that's what

7   you are saying.

8   Q    Could you tell me if borrowed money is taxable or

9   reportable generally?

10   A   Not if it's a legitimate transaction.

11   Q   And from your experience and your investigation, was

12   there anything unlawful that you found about the domestic

13   colato Wayne Co.?

14   A   I don't recall specifically.

15   Q   Are you aware of anything unlawful about having a

16   domestic trust to open up a Post Office box?

17   A   I can't comment either way on that.

18   Q   And if a domestic trust or another entity were going to

19   perhaps open up a checking account or thought about going

20   into business, would it be kind of normal procedure to submit

21   an SS-4 to the government for an employee I.D. number?

22   A   If a trust was legitimately established, it probably

23   would be, you know, standard practice to get an EIN number.

24   Q   Let me go back to the affidavit of general manager's

25   powers.  I believe it's Government Exhibit No. 89.  You have

                    Lapina - Direct              12


1   seen that document, is that correct?

2   A   Yeah.  I believe it may have been one of the exhibits

3   that was read into evidence by myself last week.

4   Q   Were you aware of anything unlawful about a general

5   manager having wide powers?

6   A   Not if it's a legitimate transaction.

7   Q   Well, there really isn't a transaction.  I mean, it's

8   just your perception of wide powers for a general manager.  I

9   mean, is that a reasonable --

10  A   No.  General manager has certain duties and powers.

11  Q   You had testified previously that you had examined the

12  lien that was placed on our home at 388 Edgewood Drive.

13       Do people normally borrow money against their home

14  or lien their home?  Is that an unusual thing, say, a second

15  mortgage, or something like that?

16  A   No, it is not unusual.

17  Q   And when that's done, is that typically to frustrate

18  collection efforts by the Internal Revenue Service?

19  A   Well, depends on who put the lien on there.  Sometimes

20  those are done for purposes other than what it really

21  appears.

22  Q   Okay.  During the time in question of this lien, did I

23  have any jeopardy assessment or any collection efforts, or

24  anything like that, going on with the Internal Revenue

25  Service?


Lapina - Cross(By Ms. Calvin)          13


1   A    Not at that time.

2   Q    So, would you characterize it, that it's kind of

3   difficult to frustrate something that's not even occurring if

4   we are talking about the purpose of a lien?

5   A    Well, there certainly was the potential for that to

6   happen in this case.

7   Q    The potential is what leads to the theory or the

8   conclusion that it was fraudulent?

9   A    Well, I mean, I've seen a number of cases where there

10  are no assessments, or jeopardy assessments currently, and

11  people do take steps to prevent these actions when they do

12  occur.

13  Q    Would you say that people sometimes take steps to do it

14  even to help make themselves judgment proof or really just

15  for their own protection and do that?  I mean, is that

16  another thing that, you know, is generally seen?

17  A    I'm sure there is legitimate reasons for having loans

18  and liens placed on assets.  I'm not saying that there isn't.

19          MR. LEVETO:  That is all I have, Your Honor.

20          THE COURT:  Does the government have any questions?

21          MS. CALVIN:  Yes, just a few.

22                    CROSS-EXAMINATION

23   BY MS. CALVIN:

24   Q     Agent Lapina, you were asked about the tape-recordings

25   between the undercover agent and the defendant, and that the

                Lapina - Cross(By Ms. Calvin)          14

1   defendant was recorded, is that correct?

2   A     Yes.

3   Q     Now, at the time of the recordings, were you listening

4   in at the time that the recordings were being made?

5   A     Well, sometimes the undercover agent will wear a

6   transmitter, you know, so that the surveillance team can

7   protect the undercover agent in case a situation occurs where

8   the undercover agent is possibly accosted or gets physically

9   assaulted.

10          So, there were times that I was able to listen in

11   concurrently as the conversations occurred, but there were

12   times that the transmitter also did not work.

13   Q     And since there was a lot of talk about the search

14  warrants and the affidavit, it was presented to a Judge, was

15  it not?

16  A   Magistrate Baxter.

17  Q   And she authorized the search?

18  A   Yes, she did.

19  Q   You were asked also about the circumstances under which

20  the warrant was executed.

21       Had you driven a drive-by by the office to know

22  what time Dr. Leveto would arrive at work?

23  A   On numerous times.  So, I had a good idea what time he

24  would arrive.

25  Q   And did you time your arrival so that it would be the

                Lapina - Cross(By Ms. Calvin)          15

1  least disruptive time to the business?

2  A   Well, we arrived at six o'clock in the morning and he

3  arrived, I believe, at twenty after six, and it was done that

4  way so that we would not come in in the middle of the day and

5  disrupt the business and have exposure to patients, and

6  everything else like that.

7  Q   And had you also done a drive-by by the home?

8   A    On a number of occasions, yes.

9   Q    And so you were aware of what time the children left for

10  school?

11  A    Yes, I was.

12  Q    And that was later than this period that Dr. Leveto

13  would be in his office?

14  A    Yeah.  I believe that it was typically after seven a.m.

15  that the children would go to school.

16  Q    And so you timed your search at the home to be the least

17  disruptive as it could of the home, is that correct?

18  A    Correct.

19  Q    You were also asked about borrowed money and that not

20  being taxable.

21       For a loan to be legitimate, is there an

22  expectation that it would be paid back?

23  A    Of course.

24  Q    Did you have any information that that was occurring

25  here?


                    Lapina - Redirect                16


1   A    Well, my evidence indicated that the sale -- this

2   alleged sale of the business, business assets, was not an

file:///A|/LEVETO10.TXT

3    arm's length transaction.  And basically I had no reason to

4    believe that any loans associated in this case with

5    individuals involved were legitimate transactions either.

6        MS. CALVIN:  I have no further questions, Your

7    Honor.

8              REDIRECT EXAMINATION

9    BY MR. LEVETO:

10   Q    Agent Lapina, if we could travel back into the affidavit

11   of probable cause again.  Do you have that with you?

12   A    Yes.

13   Q    I would like to take your attention to No. 17, or

14   page seventeen first.

15   A    Okay.

16   Q    Well, look at page seventeen, the last paragraph.

17   A    Under November 1st, 1995?

18   Q    Yes.

19   A    Yes.

20   Q    That last paragraph, could you read that, please?

21   A    Leveto explained to the UCA that if something were to

22   happen to him, he has instructions, located in a fireproof

23   safe, as to how this whole process can be unwound.  Leveto --

24  Q    That's fine.

25  A    Is that good?


                    Lapina - Redirect            17


1   Q    Yes.  That's a pretty damning statement, wouldn't you

2   say that, Agent Lapina?

3   A    Well, it's a statement that was gleaned from the

4   undercover operation.  That's all I can tell you.

5   Q    Okay.  I have with me government exhibits -- some

6   excerpts out of Government Exhibit 64-B, which is a

7   transcript actually.  It was of that November 1st meeting.

8        And I would just like to bring to your attention a

9   few things.  I can't get it to you, but I am going to -- I

10  can ask you to examine it for authenticity if, you would like

11  to see it.  I'm going to go through just a few things about

12  it.  Would you like to see it?

13  A    I don't have it in front of me.  I mean, if you are

14  going to refer to it.

15  Q    I'm sorry.  I forgot about the great Holywood visual

16  aids here, and I do not know how to operate it so I may need

17  a little help here.

18        MR. VORACEK:  You hit the green button.

19  Q   Okay.  This is part of Government Exhibit 64-B.  This is

20  page one.  And these are the transcripts, or this is just the

21  first page of that transcript.  I think you will recognize it

22  as being the transcripts actually on November 1st.

23        Now, I want to take your attention to -- and what I

24  am going to give you here is an example of what took place,

25  and I would like you to interpret it for me, if you would,

                    Lapina - Redirect              18

1  because I think that interpreting the transcripts was a great

2  part of your job in putting this together.

3        Starting at line twenty-one, let me see if I can

4  zoom that in a little bit.  Starting at line twenty-one,

5  Agent Gonzalez was asking me and talking with me, and he had

6  said:

7        You know, I know you explained to me the protection

8  is that you have a letter in there.

9        I said that -- you know, I mean, is there any other

10  method that could be used?  I mean, is that -- you know, did

11  you use that?

12        And I told him at that time:

13    Well, you really don't have a letter.  Not with a

14  foreigner.  No, you -- you really don't have -- you have --

15  with a foreigner it's pretty much totally on faith.

16    Now, we will move down the page because Agent

17  Gonzalez does not give up easily.  Down, we move, to

18  fourteen.

19    And as the conversation went on here, I made it

20  very clear again.

21    I told you before that you make up colatos -- we

22  were talking about domestic colatos -- and you have people

23  controlling them, you have letters from them of resignation.

24    And continue down.

25    Agent Gonzalez:  Yeah.  That's what I'm saying.


                    Lapina - Redirect            19


1    And I said:  Okay.  Now --

2    Agent Gonzalez:  Right.

3    And then I said:

4    -- it has nothing to do with working for a

5  foreigner.

6    So, it was pretty clear there that, the main thrust

7  of that conversation.  But, as I said, the transcript shows

8  that Agent Gonzalez was not to give up.

9        So, we move further on to page twenty-one, and I

10  believe that here on page twenty-one, it shows:

11        Agent Gonzalez:  You said something that -- that a

12  letter of resignation would suffice in that it would protect

13  me against the colato coming back and trying to pull the plug

14  on me and say -- you know.  And that --

15        And at that particular time, I said:

16        That's the domestic colatos.  And there's a lot of

17  usage for domestic colatos.  That's not for -- that's not for

18  using it to the nth degree dealing in a foreign entity.

19        Agent Lapina, would it be your understanding, or

20  would you look at that and say, if you look at the affidavit

21  of probable cause, does the affidavit of probable cause

22  really reflect what that conversation was about?

23        In other words, it's clear in the affidavit of

24  probable cause, wouldn't you agree, that we are talking about

25  the business, we are talking about the foreigners?

Lapina - Redirect                20

1  A    Well, again, the statement that I had in there was

2    gleaned from me going through the undercover tapes.  Okay?

3        Did I put every single one of these statements that

4    you just referenced in there?  No, I did not.

5    Q    Well, we would not expect that.

6        But, I am saying, the gist of this conversation,

7    would you interpret this conversation -- because this

8    conversation took place many times through the transcripts --

9    but, would you interpret this conversation as being very

10   clearly nothing to do with a foreigner, as on page

11   twenty-one, as I just pointed that out to you, because in the

12   affidavit of probable cause, this is a very, very damning

13   statement and perhaps we can bring out why the tapes weren't

14   referred to, but wouldn't you say that it's pretty clear in

15   the transcript?

16   A    Well,  again, there is a lot of dialogue there about

17   domestic colatos.  But, what I have in here is what I had

18   gleaned from some portion of that tape.  That's all I can

19   tell you.

20   Q    Okay.  Agent Lapina, could we turn to page -- let me see

21   which page it is.  Page twenty-six.

22   A    Twenty-six of the affidavit?

23   Q    Yes.  Twenty-six of the affidavit.

24        And would you read really the first -- where it

25   starts with my name, Leveto, would you read that, the rest of


                    Lapina - Redirect                21


1   that sentence?

2   A   I'm sorry?  Can you repeat that?

3   Q   Right at the top where you see my name, Leveto, page

4   twenty-six.  Maybe I told you the wrong page.

5   A   Leveto has made admissions to both CW-1 and the UCA

6   reflecting the -- and the UCA reflecting the fact that he is

7   involved in nothing more than a charade or sham.

8        THE COURT:  Will you tell us what "UCA" means?

9        THE WITNESS:  Undercover agent.  I am sorry.  That

10   is an abbreviation.

11   BY MR. LEVETO:

12   Q   Agent Lapina, wouldn't you say that that is a smoking

13   gun?

14   A   I believe that statement is representative of what we

15   have here.  The investigation statements --

16   Q   Agent Lapina, excuse me.  We are only talking about now

17   the affidavit of probable cause.

18   A    Well, that's I mean.  You can look at that however you

19   want, you know, that that was my belief.  I mean, you can

20   interpret it to be a smoking gun, however you want it to be.

21   Q    I guess what I am asking you, Agent Lapina, with the

22   recordings made and that statement being made and, of course,

23   wouldn't you even find that a little bit strange if there was

24   no agenda, wouldn't you find that strange to sell someone a

25   book for a large amount of money and tell them then that it's

                    Lapina - Redirect                22

1   nothing more than a charade or a sham?

2        Would that be logical to you?  Would that be

3   reasonable?

4   A    Well, I am not really talking about here about the sale

5   of a book to someone else.  I am talking about your

6   situation.

7   Q    What I am saying is, Agent Lapina, I am speaking to the

8   undercover agent who bought the book.

9   A    Okay.

10   Q    I don't know he's an undercover agent, is that correct?

11   A    You may or may not have at that point in time.

12   Q    You kind of -- well, some of the discussions could be

13  frustrating, and you might allege that, but the thing is, I

14  am talking really to a customer that bought the book, is that

15  correct?

16  A    You are talking to an individual who had purchased the

17  book.

18  Q    Correct.

19        MS. CALVIN:  Your Honor, we object to this line of

20  questioning.  He is trying to re-litigate the search warrant,

21  and this issue has already been decided.

22        THE COURT:  The search warrant has been upheld.  I

23  will tell the jury that.

24        MR. LEVETO:  This goes to credibility, Your Honor.

25        THE COURT:  Go ahead.  Go ahead.


                    Lapina - Redirect            23


1        MR. LEVETO:  Okay.

2  BY MR. LEVETO:

3  Q    I would like to take you back to the transcript, and

4  this is on the same -- it's in the same transcript of this

5  particular meeting right here.  That within the transcript, a

6  scanning of that transcript does reveal a conversation that

7   uses some kind of strong language that we will go over.  It's

8   page eighteen on that transcript.

9          And from line twelve to line sixteen, I am

10  speaking, and it says:

11         He doesn't even have the foggiest idea what I'm

12  doing.  But it's legal the way it's being done.  He doesn't

13  have the foggiest idea.  And if I did not truly give up what

14  I tell you is necessary to give up, it's all a sham, it's all

15  illegal and it's -- then the conversation was kind of cut

16  off.

17         Agent Lapina, if you interpreted that, if you put

18  that together as the agent on this case, would it be natural

19  for you to transpose that information into what is at the top

20  of page twenty-six, an admission to me that I was involved in

21  a sham?

22  A   I believe that to be a self-serving statement.  You have

23  somebody you are trying to sell a book to possibly get

24  involved in the purchase of these programs.  Are you going to

25  tell them it's illegal?


                    Lapina - Redirect              24


1   Q   Agent Lapina, I am saying that this is a sworn document

2   this affidavit, and you swore that I made the admission to

3   both CW-1 and the UCA reflecting the fact that he was

4   involved in nothing more than a charade and a sham.

5   A    There are a number of representations throughout the

6   course of that affidavit which is indicative that this was

7   not an arm's length transaction.  You are focusing on one

8   particular conversation.

9   Q    I am just focusing on --

10        THE COURT:  Just ask a question.

11  Q    Okay.  Will you not call this one of the most serious

12  things to be alleging within the affidavit for me that I said

13  that?

14  A    Again, you know, there were a number of representations,

15  when you look at them in their sum, okay, that essentially

16  indicate that this was nothing more than a charade or a sham.

17  Q    Agent Lapina, I'm just asking you a simple question.

18  This alleges that I made an admission.

19        Would you call that statement right there an

20  admission of that?

21  A    No.  I'd call that a self-serving statement.

22  Q    Did you have an agenda to prosecute me in this case?

23  A    No, I did not.  But, again, I am trying to say that

24  there are other statements that you made during the course of

25  the undercover operation that, you know, I am not being

Lapina - Redirect                25

1  permitted to focus on here.

2  Q    But, Agent Lapina, that is not the issue here.  I guess

3  I am -- I don't want to argue with you about it.  Wouldn't it

4  be safe to say that we are not going to litigate or discuss

5  all of the affidavit of probable cause?

6         I'm just worried somewhat about your memory.  So,

7  has your memory been functioning well?

8  A    Yes.

9  Q    Okay.  So, we talked about the Special Agent's report

10  and my interview that day that took place on May 2nd.

11  A    Correct.

12  Q    Now, isn't it true on that day, the day that you made

13  some notes and you talked with me, you waited two to three

14  weeks to even write the report?

15  A    As I had indicated before, the memo does indicate that I

16  had prepared it, I believe, starting on May 16th.  But, you

17  know, there were a number of things that prevented me from

18  writing that the day after or even a couple days after.

19  Q   I understand that, Agent Lapina.

20        Could it be said, though, that if you have a

21  transcript right in front of you and you are writing an

22  affidavit, that's a very short period of time, but could it

23  be said that your report, waiting two to three weeks to write

24  that from an interview with me could even allow more room for

25  perhaps self-serving statements on your part?

26

1  A   The interview, what I have in there, is as I recall from

2  that day that we discussed several issues.

3  Q   Best of your recollection?

4  A   Correct.

5        MR. LEVETO:  That is all I have, Your Honor.

6        MS. CALVIN:  Nothing further.

7        THE COURT:  Thank you, agent.

8  (The witness was excused.)

9        THE COURT:  Are you going to testify now?

10       MR. LEVETO:  Yes.  I need a couple of minutes, Your

11  Honor.

12          MR. VORACEK:  Your Honor, is Agent Lapina released

13  then?  May he leave?

14          THE COURT:  Sure.

15          MR. VORACEK:  Thank you.

16          THE COURT:  Unless you would think you want him for

17  rebuttal, or something?

18          MR. VORACEK:  No, sir.

19          THE COURT:  Stand here and be sworn, please.

20          THE CLERK:  Raise your right hand.

21                * * * * *

22          DANIEL J. LEVETO, having first been duly sworn,

23  testified as follows:

24          THE COURT:  Have a seat, please, and identify

25  yourself for the record.


27


1          THE WITNESS:  My name is Daniel J., James, Leveto.

2          THE COURT:  Okay.  You can proceed.

3          MR. LEVETO:  Let me just work with my documents a

4  second here.  Today with my testimony, I will be really the

5  only one in position at this time to bring some clarity to

6  this for as a -- as a witness for the defense, and I believe

7   that it's important that I do bring some clarity to this

8   because there have been a lot of facts and figures, and it's

9   been -- there have been a lot of things entered into the

10   record that need to be put into proper context.

11         But, I am going to basically speak with you today

12   and go over a number of issues so I can perhaps allow you to

13   understand better the whole picture.

14         The first thing I would like to do is talk a little

15   bit -- and I just alluded to it a little bit yesterday in the

16   opening -- about my leaving the jurisdiction.  And I believe

17   that from the outside or from a bystander, that's not

18   particularly a good thing to see someone do, but I think that

19   I need to explain a little bit the situation that governed

20   some of my behaviors and some of my actions, because in my

21   lifetime, I've certainly never shirked from any

22   responsibilities or not shown up for any types of judicial

23   proceedings, or anything like.

24         So, it was not common policy for my behavior.

25   There were protective factors that I had to consider, and two

28

1    factors, two major factors come into play.

2         The first factor, as I touched on yesterday, was

3    the pretty nasty litigation that I was involved with with

4    numerous agents of the Internal Revenue Service.  This suit

5    was heard by this Court, ultimately ended up in the Third

6    Circuit Court of Appeals.

7         The findings are of really no value at this

8    particular time, but I think the key things about it was,

9    when the case went to the Third Circuit, it was put into

10   arbitration.

11        And basically an arbitration is when the Court

12   would like parties to come to some kind of settlement, if

13   possible, to where the litigation could end there and not be

14   further necessary.

15        So, it was basically a civil suit against the

16   agents alleging constitutional and statutory violations that

17   I was seeking damages on.  Although moreso at that time, I

18   was seeking justice.

19        At that time, I had an attorney representing me

20   that was there for arbitration and as we talked to people

21   directly through the Third Circuit and the Department of

22   Justice, I was told at that time that if I were to drop my

23   lawsuit, the Department of Justice would stop the pain.  And

24   that stop the pain at that time was certainly assumed by my

25   attorney and myself and my researcher to mean that the

29

1   investigation, or whatever was going on behind the scenes

2   criminally, would stop.

3         I would not at that time, though, and I made it

4   very clear, abandon the opportunity to perhaps stopping what

5   happened to me to the next generations or other people, my

6   children or their children.  And I declined at that time and

7   pretty much knew that I certainly made an enemy.

8         Now, this was taking place in the beginning of 1998

9   into 2001.  And I have to relate that now, those facts that I

10   have just told you, I have to relate that to a divorce.  And,

11   again, if it weren't for the pertinence of this and it

12   weren't for the evidence coming in about me leaving the

13   jurisdiction, I wouldn't need to go through this.  But, I

14   think it is important for you to have the background to

15   understand that or to better understand it.

16         In 2002 -- 2001, I was involved in a pretty nasty

17  divorce, pretty difficult divorce.  And although during my

18  practice career, my wife was not heavily involved in the

19  practice, she kind of had an idea of what was going on most

20  of the time.  I at least tried to keep her apprised of the

21  salient features and events, and things like that, that were

22  important for us to understand as a couple.

23         But, the day-to-day operations, she really wasn't

24  too much a part of.  And during the divorce, we had a

25  hearing, it was August 13th of 2001, in the Court of Common

30

1  Pleas in Crawford County.  And at that time, I was very much

2  shocked because it was the on record denial in an effort to

3  obtain property of many, many of our financial realities.

4         And at that time, I guess I was in denial as to

5  what was happening, but I could see that there were great

6  difficulties and I couldn't understand the testimony that was

7  coming from her until a couple of months later that I

8  suspected of her cooperating with the IRS to the point of now

9  being in a much stronger position to punish me.

10         And I think it was at that time that I began

11  collecting and bringing things together in my life because I

file:///A|/LEVETO10.TXT

12  was not sure if I was going to stay only because I needed

13  some time to think, and it was a very difficult thing to find

14  out a person, who you had spent many years with, was actually

15  working against you for the sake of -- for the sake of money

16  and property.

17        So, I suspected this cooperation.  And I would just

18  like to enter in -- I believe it's already in the record, as

19  a matter of fact -- the Defendant's Exhibit A, the plea

20  agreement with the government, that this basically was

21  entered into on May 19th, 2004, but it's a memorialization of

22  obviously what had been going on and my suspicions were kind

23  of confirmed.

24        This will be in evidence.  It will be Exhibit A,

25  that I think it's important that the jury consider it and

31

1  look at it in light of some of the testimony.

2        MR. VORACEK:  Your Honor, the government would

3  oppose the admission of that document.  I believe Mrs. Leveto

4  was questioned about that while she was on the witness stand

5  and the point was made.  I don't see the purpose of any

6    relevancy to the issues of this case.

7        THE COURT:  Well, this is a plea agreement letter

8    between Mrs. Leveto and the government.

9        MR. VORACEK:  Yes, Your Honor.

10        THE COURT:  I think that's admissible.  We'll admit

11    it.  The Defendant's Exhibit is admitted.

12    A    I just believe, for some background, that it is

13    important to know about that and to get to examine it even

14    though I didn't refer to it.  It's quite a lengthy agreement

15    with a lot of demands and commitments on her part.

16        So, with this happening, in mid-August, 2001, yes,

17    I did know that I had some real difficulties that I had to

18    perhaps think about and get away from for a little bit.  And

19    it was very difficult for me at that time.

20        On December 11, 2001, and I've really made no

21    denials about this, that was my trigger when the indictment

22    was unsealed.  Because considering the difficulties with the

23    litigation and the lawsuit and my absolute determination to

24    continue with the lawsuit, that combined with the fact that I

25    knew someone that was very, very close to me was giving and

32

1  offering information that I had no idea the sky could be the

2  limit because what I had heard in August of 2001 was very,

3  very shocking to me not at all within the reality of our

4  finances.

5       So, I feared at that time that perhaps I could be

6  subject to some very unfair play and what I meant by -- what

7  I mean by that is, I had commitments to some offshore people

8  to pay loans off.  I had other commitments that were

9  realities.

10      In August of 2001, those realities in open court

11  were denied.  And to look at that testimony and what perhaps

12  was going on behind the scenes and my ongoing fight with the

13  Internal Revenue Service, there was a very good possibility

14  that I could get to court or get to an arraignment and some

15  surprise be brought onto me that I couldn't get out and

16  straighten things out, or I could be placed in jail without

17  bond, or something like that.

18      In my mind, the very real possibility of that

19  existed.  And I felt that I needed to conduct and insure that

20  some things offshore were potentially taken care of so when I

21  did -- or if I did come back to take care of this thing,

22    people on the outside weren't going to be suffering for that.

23         So, I had visions that perhaps my family or my

24    children could have even been in danger if there was

25    something that happened in court, and there are things that

33

1    can happen.  You can go to arraignment, and everything, look

2    as though, you know, what's going on and be presented with a

3    superseding indictment, things can be -- things can really

4    change a lot.  And I had real fears inside for doing that and

5    I believe that I really wanted to take care of other things

6    and insure that there would be no retribution for anyone

7    offshore if I was unable to take care of them if I was

8    incarcerated.

9         So, that just gives you a little bit of background.

10    I have never -- I have not ever had a history of not facing

11    up to my responsibilities.  I have had no difficulties with

12    the law, or anything, and certainly my record of litigation

13    with the Internal Revenue Service never intimates anything

14    about me not being ready to stand in front of them and defend

15    myself and work and fight for the truth.

16         Okay.  Now, I would like to talk a little bit again

17   about the book.  That is Government Exhibit 43.  And it's

18   already admitted.  We are not going to go into the book.  I

19   am just going to make some general statements.

20        MR. LEVETO:  Your Honor, I have in my exhibits.  I

21   only have one chapter of the book, and I believe the whole

22   book was on the exhibit list.  Is that correct?

23        THE COURT:  It's be admitted.  The entire book?

24   A   Okay.  Because I only had one chapter.  I think that

25   it's important that you browse the book, browse the --

34

1   certainly the preface and the forwards and things that will

2   help you understand a little bit and gain a perspective on

3   what's happening and look at the amount of information that's

4   in the book.

5        It's obviously too much for anyone to read quickly,

6   but I think it is important just to have an idea, and to have

7   an idea of the interest and staying within the limits of the

8   law.

9        Now, that book sold for anywhere from three hundred

10   to $1,275.00.  And I really believe that, and certainly it

11  was my belief at that time, that it shows many, many things

12  that most publications do not show.  And I think that I don't

13  believe that I was making friends by marketing this book.

14        Again, I wasn't the author of it, but I don't

15  believe that I was making friends offering it.  But, the

16  government makes a large amount and comments greatly about

17  lifestyle and doing things and working at things tax-wise and

18  maintaining the lifestyle.

19        Well, really if one thinks about it, it's real

20  important to understand that successful methods of tax

21  savings really necessitate that a person doesn't become a

22  pauper to be able to save them and save the taxes.

23        So, it is important to understand that that's

24  almost a measurement of many ways of avoiding, and which is

25  lawful, avoiding the taxes that you can do.


35


1        Now, one of the -- the book was always sold with a

2  guarantee, of course, if anything was found illegal or

3  untrue, there would be a full refund.  That was a very

4  important thing.  But, it was sold in such publications as

5  the Los Angeles Times, Investors Business Daily, the Wall

6  Street Journal, which I believe that it is an exhibit that's

7  already in.  It's a Government Exhibit, 109.  I would just

8  like to read this.

9      MR. LEVETO:  Steve, could you put this on the

10  monitor, please, the Wall Street Journal letter?

11  A    Any of the publications that accepted the book, there

12  would be no acceptance unless their Legal Department

13  scrutinized it.  So, it was kind of like a referee journal

14  that they had to look at it and look at the ad and feel

15  comfortable about that.

16      The Wall Street Journal?  It's the one on my

17  letterhead.  I'm sorry.  It's exhibit 109.  I'm sorry.  The

18  Wall Street Journal actually had five copies of the book

19  for -- for in the neighborhood of six weeks.

20      But, this is kind of a typical letter that I would

21  write to a publication as we would sell the book.

22      Dear Mr. Krisch,

23      Enclosed is a copy of Tax Free for your

24  examination.  Please feel free to open it and carefully look

25  at it.

36

1      Pay particular attention to page ii.  This is the

2  first of several instances where the author advises the

3  reader to seek counsel or the advice of a professional for

4  their particular situation.  He emphatically directs them to

5  insure that they break no laws.

6      Feel free to phone the author, Don Turner, at (303)

7  798-0800 for answers to any complex questions.  He is a man

8  of great integrity and would be happy to answer any

9  questions.  He has devoted a considerable number of years to

10  this intensive and documented research.  I will admit the

11  book is expensive; but I assure you that it is in reality a

12  bargain.  By the way, $1,275.00 is the minimum that the

13  author allows the book to sell for.

14      It has been cleared for advertising in the Robb

15  Report and will be published in the Physician's Classified

16  Journal on November 1st, 1992.  My real desire is to place my

17  lead generating ad in the Wall Street Journal.

18      I look forward to discussing this further.  I will

19  contact you later today.  Thank you for your time.

20      So, that is kind of the standard letter that went

21  out and the book was examined by various publications.  Now,

22  I realize that that doesn't qualify, but it speaks a little

23  bit to my interest and my openness about this.  So, it has

24  passed pretty significant scrutiny previous to this.

25        I would also like to make a note about privacy and

37

1  secrecy because it's kind of a -- there is a funny ring to it

2  a little bit because I think the people at First America

3  Research oftentimes spoke of that a lot, but I believed it

4  was kind of a value-added approach for them many times that

5  they would discuss things like that, talk about things like

6  that, and many people that offered and were intrigued to it,

7  but basically they were protecting their trade secrets many

8  times, but a lot of time making sure people were knowing

9  things that they weren't paying for.

10        Now, we are going to talk a little bit about the

11  general information within the book.  We have to -- we also

12  revolved around estate planning, vehicles, business vehicles

13  within the United States that can be constructed as trusts.

14  As I was telling you in my opening, that Erie Insurance

15  Exchange is a business here in Erie that most people don't

16  realize that it's a very strong and very old and honored type

17  of trust, very similar to a colato.

18        But, colatos in the United States are just a

19  particular breed of trust and they can be for business

20  vehicles.  They can be for estate planning.  They can be for

21  protection of assets.  And, of course, many times

22  professionals are interested in that because of lawsuits and

23  other types of litigation, but everybody is interested in

24  those types, at times, and liability protection can be very,

25  very, very, very important.

38

1        But, in the case that the government has presented,

2  there have been some things, again, that without knowing the

3  context of them, it is very difficult to know what they mean.

4        And early on in probably 1991 or 1992, I was

5  interested, after my family had personally gone through a

6  lawsuit, I was interested in asset protection.  And initially

7  we had formed some domestic colatos.  One of them was called

8  Wayne Co. and that domestic colato is in evidence.  And it

9  basically was brought about to -- similar to a corporation as

10  an entity in itself, to open up a Post Office box and/or open

11    up a -- like a safe deposit box in a bank. And I think those

12    are the things that are listed on that particular trust

13    indenture, but that's within evidence, but Wayne Co.

14    basically was just a domestic colato used for that reason.

15        Edge Co. was also one of those. It was a domestic

16    colato. And that was originally targeted to house -- a house

17    on Edgewood Drive. So, it was just called a name that would

18    ring well with that, but it was basically going to be for

19    some protection for the house, asset protection, and things

20    like that. Although the process was started, it really was

21    not taken to a full fruition later.

22        Later on, there were decisions made that that

23    wouldn't be necessary, but Wayne Co., also, we had gotten and

24    we had submitted an SS-4, I think you saw that in evidence,

25    for an employer I.D. number in case we wanted to do other

39

1    things with it or establish any kind of business entity with

2    it. But, that never happened either.

3        But basically, um, it was used at one time to

4    purchase some money orders. Some of these things to me were

5    experimentation just to see if we could do it and if it would

6    work purchasing them in that way, and it did.  But, at that

7    time, that's just what it was, it was nothing other than

8    that.

9          Again, from the outside, it raises great numbers of

10   questions, but there was really no particular function, no

11   nefarious function to it other than experimenting with the

12   strength of what we were doing.

13         Now, it's important to understand that we had

14   talked a little bit this morning of the taped conversations

15   that I was monitored on.  And it was made abundantly clear,

16   and if you peruse the transcripts from the tapes, you'll see

17   many such things talking about unwinding was always something

18   to do with a domestic colato.

19         In other words, many corporations and even trusts

20   that do business, something like even Erie Insurance

21   Exchange, large businesses, many of them have within the safe

22   of that company or organization -- with someone that is very,

23   very powerful -- and on file letter of residential.  It is

24   not an unusual thing.  And what it does is, it can tear their

25   relationship out of that organization.  So, those were in

file:///A|/LEVETO10.TXT

40

1  this case.  It was certainly always discussing domestic

2  colatos.

3         But, they are a very powerful tool.  And it's

4  important to understand that some of this evidence, that was

5  very difficult to make sense out of, was just working with

6  some of that, experimenting with them and seeing how things

7  could be put together.

8         Now, we are going to move on now with a bit about

9  my relationship with Center Company.  Within the evidence,

10  the government's evidence, I believe it's Exhibit 92, this is

11  an agreement between myself and Center Company.  It's a

12  little bit of a confusing agreement, but a lot of the reason

13  it's confusing is because a non-veterinarian in Pennsylvania

14  is really not allowed to, per se, own a veterinary practice.

15         So, there had to be some creative things done

16  within the agreement.  And to do that, Russ Schetroma from

17  Meadville from Culbertson, Weis, Schetroma & Schug, recruited

18  the services of Cohen & Grigsby, quite a large firm in

19  Pittsburgh, and from Center Company was Mr. Edwards, that

20  they talked to only a couple of times, but they did speak

21  with -- speak with either me or Don Turner representing

22  Center Company.  And James Scarpitti, who has testified here,

23  did a lot of the work putting together the accounting

24  advantages of the deal.

25       But, I would just like to let you know that

                              41

1  agreement is within evidence, and that agreement, to bring

2  these experts into it and to bring these experts to be

3  properly dealing with an unincorporated business

4  organization, we had to recruit people that felt comfortable

5  with it.  And it is very important to understand that, that

6  negotiations was somewhere in the neighborhood -- took

7  somewhere in the neighborhood of seven or $8,000.00 to put

8  together to have the expertise to do it properly.

9       MR. LEVETO:  Now, we are going to need, Steve, if

10  you could help out little bit with -- I believe it's

11  Exhibit C.  Yes, Exhibit C, the flow chart.

12  A    Basically, I would like you to understand a little bit

13  more about First America Research.

14       Basically, First America Research is an

15  organization headed up by Don Turner that performed somewhat

file:///A|/LEVETO10.TXT

16  of a finder's function.  And that finder's function is

17  bringing people in the United States together with people in

18  offshore jurisdictions, oftentimes in the Turk and Caicos

19  Islands, together that had mutual business interests or feel

20  that they can bring together some type of a business

21  relationship that can be mutually beneficial.

22          I believe it is important that, as you peruse the

23  book a little bit and look at some of the other evidence that

24  was entered here, I think you'll agree that it's a pretty

25  professional organization.

42

1          But, what we are going to do is, we are going to

2  take some of the mystique out of what happened to -- or what

3  happens to a dollar as it moves offshore with a company that

4  purchased the practice.  I think it is important to follow

5  that dollar so you can understand where it goes and what's

6  happening with it and the rationale and what's going on.

7          It will help bring a lot of the facts together and

8  a lot together that you have been presented which has been

9  somewhat confusing and, unfortunately, perhaps supports the

10    government's theory without knowing the realities of what are

11    going on.

12          So, as we look at the top, we can see that the

13    profits kept on shore basically are reportable from the

14    veterinary business and with the exceptions of loans, but the

15    dollar comes down to Center Company, which is located in the

16    Turks and Caicos Islands.

17          I don't know if that is readable over there.  Can

18    you read the board all right?  My writing is not that good,

19    but I don't know if the jury can see that.  It may need to

20    be --

21          MR. LEVETO:  Do you want to come up here, Steve?

22          If you would like to make it larger, then move the

23    page.  I apologize for my flow chart not being as nice as the

24    government's, but I am somewhat limited on my abilities where

25    I am at working at this time.

                                    43

1           You got the reverse side there.  That's good.  Just

2     make sure we have the left side, the left border here, so we

3     can finish with one and then move over.

4           It's cutting off the left side there a little bit.

5  Okay.  There we go.  That's better.  Okay.  Thank you.

6  A    Basically, you can see, as we plot this out so it is

7  easier to understand, Jack Williams is the CEO and trustee of

8  the Turks and Caicos Islands.  The dollar that he receives,

9  there is a choice, that he either can report that dollar and

10  pay tax on it or he can distribute it as a K-1 distribution.

11        You can see that, as we move to the right, a K-1

12  distribution to his investor or the colato certificate

13  holders, or it's very similar to a corporation stock, to the

14  certificate holders, into an intermediary company.

15        And at this particular time, the intermediary

16  company may be Vericon, may be ASTCO, may be Newbury.

17  Basically, the intermediary company often, as I have here

18  underneath kind of a service business, they can file or do

19  paperwork or do taxes for various organizations down there.

20        That intermediary company in the same way can

21  choose to distribute those funds, or after their return on

22  investment, they can also choose to do a K-1 distribution.

23        Now, that K-1 distribution, again, is done to the

24  certificate holders like stockholders of that particular

25  company.

44

1        I have on the arrow that's traveling downward and

2    curves over to the left towards Box Elder, a dotted line off

3    of that that I would like to explain a little bit.

4        That movement used to be to a person who had a

5    company named Leonard Adler, and that's the account that

6    we've heard a lot about over the last several days.  He was

7    the initial investor for the colato.  His company -- I am not

8    even sure what his company was, to tell you the truth,

9    because he was the investor himself.

10        But, he -- we negotiated on setting up a bit of a

11    straight depositing account because my interest from the

12    beginning was also trading commodities, and I wanted to find

13    people that were interested in commodity software programs,

14    commodities trading, and that I could help them and they

15    could be beneficial to me.

16        So, although the things were somewhat slow in my

17    development, I did have a software program that was very

18    interesting to some of the acquaintances I had there

19        But, Leonard Adler and my -- actually, my

20    relationship with him was kind of short-lived even though

21  things lasted -- you know, that account did last longer.

22       But, essentially we saw evidence that showed that

23  there was an application sent to TSB.  There were a number of

24  things that were going to happen for us to set up a trading

25  account together; the P.O. Box in Meadville; the signatory

45

1  stamp showing his trust in me as being able to direct or do

2  some things that could benefit us for trading.

3       But, essentially the authority I had there was

4  connected all to trading, trading futures, and that was

5  something that really never got off the ground.

6       But, essentially that company kind of disappeared

7  and Box Elder became the actual next certificate holder that

8  was the business that I was deal dealing with.

9       And Box Elder, one of the principals that he had

10  spoke to before was, I believe, an Arthur Acinbbo.  But, most

11  of this was done through the facilitation of First America

12  Research, also, so Don or some of his staff were in

13  communication with these people all the time.

14       Now, Box Elder, just like the other companies,

15   certainly received returns on investment.  There needs to be

16   economic realities in the transactions, and Box Elder was

17   able to have money that was not effectively connected to the

18   United States.  So, the benefits that Box Elder got was a

19   very nice return on investment, and the benefits that I got,

20   if I got benefits, could be a number.

21      One of them could be that I could have -- since we

22   were going to be involved in commodities trading -- that I

23   could have deferred compensation after I finished developing

24   the software that I was developing.

25      Another thing was to -- if I was making any

46

1   investment decisions at all, if I directed the investment

2   decisions to make profit, I could also share those profits.

3      And another thing was, depending on the situation

4   with me, I could also basically borrow that money at a good

5   rate and use that money to help develop the software or even

6   use it for personal use.  It really didn't matter.

7      But, essentially in doing this, this was a win-win

8   situation for everybody involved.  Okay?  And that's a very,

9   very important thing to understand.

file:///A|/LEVETO10.TXT

10      So, this checking account from Box Elder, I had

11   permissive control over it.  I really did not have discretion

12   over it, and at any time that I did wire anything like that,

13   I was given that permission.

14      As we had discussed yesterday, it was essentially

15   the same as what my office manager had in my practice.  I had

16   given her a blanket ability to wire funds and she had my

17   check stamp that she paid all accounts receivable and, you

18   know, that functioned fine like that without her certainly

19   having any real authority over the accounts.

20      Now, that Box Elder account, after I had done some

21   research, I had made it known, and at the same time they were

22   also discovering this, that there was a different type of

23   account, that I called it the RMA International Account.

24   And, again, as I said, I was able to advise and help invest

25   this money.  And whenever one was able to profit and do well,

47

1   it was something.  It was a win-win for everyone.

2      Now, as you have seen the money traveling here, the

3   money ultimately ended up when they made the decision to open

4    up the Box Elder account in -- I guess it was Bethesda,

5    Maryland. I was really not aware of the location that it was

6    opened up. But, the principal opened up that account in

7    Bethesda, Maryland. That account is certainly not owned by

8    me. I do look for investment opportunities to help them out.

9    It does have a book, a checkbook, and I am a signatory on

10   that checkbook with permissive authority, and I do actually

11   have a debit card for that account also.

12        But, that account actually is a domestic account at

13   this time. So, it is one of those things that I was an

14   investor -- I was -- still had no discretionary control.

15   But, that's the explanation, because it's confusing to watch

16   the movement of money to not know just what's happening.

17        But, the statements to that account were mailed to

18   my house. Again, having some input, investment input over an

19   account certainly doesn't mean ownership. But, at this

20   particular time, I do believe that account to be inactive.

21        So, this gives you kind of a roundabout way of

22   seeing what happens to funds as they go offshore.

23        Now, did I derive benefits sometimes? Well, at

24   this particular time, I have to say that I did derive

25   benefit. And the benefit I derived, though, was essentially

48

1   from loans for taking care of later down the road.

2        The other business interests that I had, the better

3   I -- or the better I performed for them with investments, the

4   better I was able to do and have, you know, some of these

5   benefits that might not normally be available.  So, I think

6   it's important for you to understand that.

7        Now, I think it's also important to understand that

8   over the years, many people have set up things themselves, to

9   have nominee businesses or fake businesses or nominee names,

10  and different entities.  That is a very, very easy thing to

11  do.  And, unfortunately, it's patently illegal and it's well

12  within the law books to see that case law as well as laws and

13  regulations.

14        But, I think that it's important to understand that

15  my situation here, I was interested from the beginning with

16  the attorneys working with me all the way through working

17  with First America Research, and working through these

18  offshore entities, I was very, very, very interested in

19  abiding by the law at all times.

20          I think there has been a lot of discussion, as

21  evidence has been reviewed, but the fact of the matter is,

22  the things that I was doing, and as you will see when you

23  peruse the book, they are issues, that those issues are

24  looked at and examined and discussed.  So, it's not done in a

25  haphazard way.


                              49


1          Those two accounts, I certainly maintain, Box Elder

2  and Leonard Adler, were not reportable and they were

3  permissive with anything I could do with them, unlike the TSB

4  account where I absolutely did have that account.  My wife

5  and I opened it up and it was opened up in a normal way.

6          Flows of funds to that account basically were flows

7  that either were legitimized by, you know, what we were doing

8  if it was our own money or if we had gotten a loan, that

9  could be another way there could be money there.  But,

10  basically the TSB account was an account that was not or did

11  not go over $10,000.00.

12          Now, the benefits in a situation like this, as I

13  had told you, I was looking for limited liability as a person

14  might do with a corporation.  It was kind of an automatic way

15    of building in some deferred compensation.  In other words,

16    if I was borrowing some money or if I was living on a certain

17    amount of money, I had the choice if I needed to borrow some,

18    or I had a choice if I actually wanted to allow other

19    investments to enhance every one's income and then have more

20    available for me to borrow.

21         The software development that I was involved with,

22    that's where I don't know if you are familiar with futures

23    trading, but futures trading is somewhat a risky business.

24    But, if people do it properly, it's not a terribly dangerous

25    investment.  But, since 1987, I have been working on software

50

1    programs and trading issues that basically were the interest

2    between -- the common interest between all of us.

3         The offshore people, I kind of had a commitment

4    that they were going to -- at the time that the software was

5    finished, they were going to get the rights to it and

6    purchase it.  And I was hoping at that time that if I had

7    some outstanding loans, that would help take care of that.

8    But, at the same time, that was kind of the common interest

9    with all of us.

10         Also, my Center Company was interested in that also

11   for me to perhaps trade for them.

12         Okay.  Let's talk about the about the veterinary

13   practice a little bit.  Kind of travel back across the blue

14   water.

15         I believe it's important to understand that not

16   many employers, nor myself, would speak very personally to

17   most of my employees.  So, there has been a lot of testimony

18   of what I had told employees, and things like that.  And I

19   think it's kind of a normal thing for an employer to allay

20   fears of employees that naturally are always concerned if

21   things are going to change, if they are going to lose their

22   job, or anything like that.

23         So, discussions with my employees.  Basically, I

24   called them together, not to say that there was a name

25   change, but to say that the practice had been sold.  I

51

1    believe that it's important to make that distinction because

2    really the practice was now named Center Company doing

3    business as Langdon and Leveto Veterinary Hospital.

4         We have seen admitted into evidence general

5    manager's powers, which were quite wide for me, which I

6    virtually had mostly unfettered powers if I was staying

7    within the realm of doing well with the business making

8    profit with the business and taking care of things.

9         It's important to note that when the Schedule C did

10   disappear from my tax returns, the Schedule C did appear on

11   Center Company's tax returns.  And with that purchase, I

12   would like to tell you a little bit about the principles in

13   the background of some of the borrowed money on shore.

14        Basically, the principle was that Center Company

15   was paying me, as evidenced by the tax returns, about

16   $2,200.00 a month.  I believe it was $2,198.00 a month.  That

17   was the payment, or the supposed payments.

18        What happened was, as I began to borrow money, that

19   was offset against some of the loan amortization that would

20   be done during the year.  So, it was always put on my tax

21   return properly because that was certainly income that I had

22   that would be matched out of some of these personal expenses

23   that you have seen.

24        But, the thing is, it was reconciled against

25    personal monies at year's end.  In other words, if we look at

52

1    just about $24,000.00 a year, that could be matched off

2    against borrowing also personally from Center Company.  And

3    that's where some of the personal expenses were being run

4    through the business, so that was being tallied each year and

5    a report was being sent to them.

6        MR. LEVETO:  Could we have 136 up on the screen?

7    A    Government Exhibit 136 is just an example of a personal

8    note made by myself in 1994.  And a copy of that would have

9    gone to Center Company.  But, essentially the accounting of

10   the personal monies and the accounting of loan monies were

11   reconciled at year's end.

12        Now, they were -- it was done in conjunction with

13   speaking to Don and Paul and some of his staff members, as

14   well as oftentimes Mr. Edwards offshore, who was the counsel

15   for Jack Williams.  But, essentially that is how that was

16   documented.  And in all actuality, depending on what my needs

17   were, this was going to be offset even by the principal

18   involved in what the value of the practice was.

19        So, during this time, this was viewed -- certainly

20  it was a very good thing for me, and it was -- also, many of

21  the things I was doing for them was helping them out also.

22        Okay.  I think it's important to note when we look

23  at everything, you will see that there really was total

24  transparency of everything.  There was really nothing hidden.

25        My office manager carried on many, many of the

53

1  day-to-day operations that I might direct or movements of

2  money.  I think that I certainly see now that there were too

3  many checking accounts, but those checking accounts kind of

4  had functions initially and they ended up being used as

5  holding areas, and things like that, that again looking from

6  the outside I was involved with it and I'm even a little

7  confused of why some of the things look as they do but,

8  again, out of context, it doesn't matter if there is five

9  checking accounts.  What matters is the funds.

10        So, the transparency is very, very important to

11  look at.  And, you know, I think it may have been a lot

12  easier -- thank you -- it may have been a lot easier if there

13  perhaps wasn't what I believe was a bit of a vendetta about

14  this book.  It would have been a lot easier to look at many

15  of these things through a civil audit where someone like

16  Miss Iddon that you have heard testimony from could question

17  a lot of these things and actually understand them or have

18  them explained in a way that perhaps they could know if they

19  are feeling comfortable with them or what documentation was

20  needed, and things like that.

21       But, I believe that what I was doing furnished the

22  proper documentation.  Again, since I never was audited, I

23  can only say that sitting here now in a way -- that it could

24  have been a way that I could have provided that information.

25       Next we are going to touch on something else that's

54

1  been brought up that I think is really important.  Government

2  Exhibit 1-F-2 is an exhibit that I would like to point out to

3  the jury -- ultimately, I would like you to examine and read.

4  It's too extensive to go over now -- the attachment on one of

5  these zero returns.

6       MR. LEVETO:  Steve, could you put up Exhibit B,

7  please?

8       THE COURT:  I think this is a good time to take a

9   break.  It's quarter to eleven.  So, we'll recess until

10  eleven o'clock.

11  (The jury left the courtroom.)

12  (Court recessed at 10:45 a.m.)

13  (Court reconvened at 11:00 a.m.)

14       THE COURT:  Good afternoon.  Be seated, please.  Or

15  good morning.  It's still morning.

16       Okay, Mr. Leveto, you can continue.

17       MR. LEVETO:  Your Honor, I would like to move to

18  admit Exhibit C.  I don't think that I did that.

19       THE COURT:  Exhibit C is your diagram?

20       MR. LEVETO:  Yes.

21       THE COURT:  Exhibit C is admitted.  I don't have a

22  B yet.

23       MR. MISKO:  I have B up, Judge.

24       MR. LEVETO:  That's coming.

25       THE COURT:  That's the letter to -- the personal

55

1   note?

2        MR. MISKO:  No, Your Honor.  That was a government

3   exhibit.  This was an article that Dr. Leveto wants on the

4   screen.  That's his Defendant's Exhibit B.

5   A    Okay.  I would like to just talk briefly about the zero

6   returns, as you have seen a few times.  And I'd ask you to

7   mark down -- I don't have it available to me, 1-F-2, which is

8   a zero return with an attachment that I would like you to pay

9   particular attention to.

10         But, at the same time, I think it will provide you

11   with -- to provide you with some insights on some of the

12   research and some of the things that I believed at that time

13   and, by the way, I believe that this was -- those were filed

14   in 1997.  I believe they were close to the end time of this.

15   They certainly had nothing to do with the book or nothing to

16   do with the things that I had done regarding the book or any

17   of the other things I was involved in.

18         But, I would like to bring to your attention

19   Exhibit B.  And Exhibit B is a letter that really summarizes

20   some of the material that -- the real thrust of what that

21   attachment is about that I filed back in 1997.

22         So, I just like to -- I would like to read this.

23   It's not very long.  I would like to read this just to give

24   you a little bit -- provide you with a little bit of insight.

25          It came from Book News, Publishers News Wire, and

                                    56

1   it is titled, Noted Tax Historian's Book Declares U.S. Income

2   Tax as Direct Tax is in Violation of Long-Established U.S.

3   Supreme Court mandates.

4          This letter was published on October 1st, 2004.

5          Tallahassee, Florida.  John Garrison, prominent tax

6   historian and legal specialist in Florida's Office of the

7   Attorney General, today announced that the income tax is

8   being erroneously enforced on employees as a direct tax

9   rather than as the excise mandated by the Sixteenth

10  Constitutional Amendment.  The current enforcement as a

11  direct tax is costing working Americans thousands of

12  improperly collected tax dollars over the course of their

13  lifetime.  Garrison is currently writing about his findings

14  in his book The New Income Tax Scandal which he is

15  co-authoring with Brian Stabley, J.D. an Assistant Attorney

16  General at Florida's Office of the Attorney General.

17          The New Income Tax Scandal is about the corruption

18  that lies at the heart of the tax system, said Garrison.  As

19   a result of my legal case against the IRS in 2000, the IRS

20   now privately concedes that, in 1915, after the ratification

21   of the Sixteenth Amendment, the U.S. Supreme Court ruled in

22   the case of Brushaber versus the Union Pacific that an income

23   tax is an excise tax, and that it is to be enforced as such.

24   An excise is not a direct tax on property, but an indirect

25   tax.

57

1        The critical difference is that a collection of

2   income tax as an excise allows for the deduction of all

3   living expenses since they are seen as necessary for the

4   maintenance and conservation of one's income producing

5   property, one's labor.  With a direct tax, this is not

6   possible.  Given this, it appears that up to my legal case,

7   the IRS had been operating as if it had no awareness of the

8   Sixteenth Amendment's intent.  End quote.

9        Clearly, concedes Garrison, this revelation has

10   enormous political and economic implications for every

11   American employee and it is my hope that my book will compel

12   policymakers to right this obvious injury to the American

13   workers.

14          John Garrison has been engaged in tax law research

15   and tax reform activism for over two decades.  He currently

16   serves as a legal specialist at Florida's Office of Attorney

17   General, Bureau of Administrative Law.

18          Brain Stabley is an Assistant Attorney General at

19   Florida's Office of the Attorney General, Bureau of

20   Administrative Law.

21          I have only read that to you not to qualify any

22   particular thing other than just letting you know that on

23   that attachment and some of the information that you would

24   read on it, the central theme to that has a lot to do with

25   what is now coming out in somewhat of the mainstream press.


58


1          So, like I said, this took place towards the end of

2   the time we are talking of these charges anyway, or after

3   them, but I just like you to -- I would like you to know

4   that.

5          Now, I would like to touch a little bit on land

6   deals and aircraft buying and selling.  And, again, I was

7   engaged in business to try to make profit and mutually

8  benefit multiple people.  If other people benefitted, I

9  benefitted as well.

10       I think that it's important to understand that I

11  can't tell you everything because I don't have a photographic

12  memory of knowing every nuance of every transaction that took

13  place.  But, I can only tell you that at that time, I was

14  interested in purchasing and doing some repairs or doing some

15  enhancing on an aircraft if I could purchase it properly and

16  selling it again at a profit.

17       Similar to the land deals, if I could make other

18  people and enhance their profit, I could do the same.

19       So, I just like you to know that, again, I think

20  it's important to understand that everything was done with

21  absolute transparency.  There was nothing at all hidden.

22  There was nothing at all done under the table to do that.

23  And that's very, very important.

24       Again, you have to look at this against the

25  backdrop of what possible reason would I be so open and do

                D. Leveto - Cross(By Mr. Voracek)          59

1  all of this if it weren't for my really sincere belief that I

2  was operating within the law?  I think that's very, very

3    important.

4         So, some of these things that have seemed so

5    confusing, really in many ways the confusion comes from the

6    avalanche of facts and numbers without a context.

7         And I hope that I helped you put that into context

8    somewhat.

9         THE COURT:  Does that conclude your direct

10   testimony?

11        MR. LEVETO:  Yes, it does.

12        THE COURT:  Cross-examine.

13        MR. VORACEK:  Yes.  Thank you, Your Honor.

14                 CROSS-EXAMINATION

15   BY MR. VORACEK:

16   Q   Dr. Leveto, I believe you've just testified that on

17   December 11th, 2001, you left the jurisdiction?

18   A   That's correct.

19   Q   That you left the Meadville area on that day?

20   A   That's correct.

21   Q   And I believe you testified that the trigger for leaving

22   the jurisdiction on that date was your becoming aware that a

23   federal indictment against you had been unsealed?

24  A   That's correct.

25  Q   Now, you mentioned a number of factors that led up to


D. Leveto - Cross(By Mr. Voracek)          60


1   you leaving the jurisdiction, I believe.

2       You indicated you had some litigation with the IRS,

3   divorce, you needed time to think.  I think you indicated all

4   those things as possible factors in leading you to leave.  Is

5   that true?

6   A   Three additional ones.  I mean, there were more than I

7   enumerated.

8   Q   All right.  But, the essence of your leaving on

9   December 11th, 2001, was the federal indictment?

10  A   No, that's incorrect.

11  Q   Was there another reason on December 11th, 2001, in

12  particular that caused you to leave on that day?

13  A   On December 11th, 2001, um, the reason I left that day

14  was because information had come to fruition that I needed to

15  take steps to protect even my family.

16  Q   All right.  So, you are saying that something else

17  happened -- on the exact date that the federal indictment was

18  unsealed against you, something else happened on that exact

19  day that caused you to leave the area?

20  A   No, nothing else happened.  That was the trigger.

21  Q   That was the trigger?

22  A   Yeah.  That was the trigger, yes.

23  Q   All right.  After you left the area on December 11th,

24  how long were you gone?

25  A   How long was I gone before I ultimately was apprehended?


                D. Leveto - Cross(By Mr. Voracek)          61


1  Q   Yes.

2  A   Until 2004.  I believe it was March 17th.

3  Q   March of 2004?

4  A   Yes.

5  Q   So, you were gone for about almost two and a half years?

6  A   Two years and three months; yes, almost.

7  Q   And during that time that you were gone, you went to

8  other countries, correct?

9  A   Yes.

10  Q   And, in fact, I believe you went to -- and if you would

11  refer to Government Exhibit 600.  Do you have that in front

12  of you?

13  A    Yes.

14  Q    That's your passport, is it not?

15  A    Yes.

16        MR. VORACEK:  Your Honor, the United States moves

17  for the admission of Exhibit 600.

18        THE COURT:  600 is admitted.

19  Q    I see, Dr. Leveto, on the first page of your passport,

20  it appears as if you applied for the passport in July of

21  1992, correct?

22  A    I believe that's what it says, yes.

23  Q    And if we page through the passport, it appears that now

24  during the time that -- during the time that you were gone

25  from the area, you went to Belize.  Was that in March of

           D. Leveto - Cross(By Mr. Voracek)          62

1  2002?  We have to go to page five of the passport.

2  A    No.  I would say that was January.

3  Q    That was January?

4  A    I believe.

5  Q    Sometime in 2002, you were in Belize, is that right?

6  A    That's correct, yes.

7  Q    Now, I think you testified that there were matters that

8  you had to clear up, that there were possible loans out there

9  that you needed to handle --

10  A   Yes.

11  Q   -- right?

12  A   Yes.

13  Q   Going to Belize, was that one of those reasons?  Were

14  there people there that you needed to talk to?

15  A   Well, I had some information that there could be, but it

16  ended up not being that way.

17  Q   All right.  Well, let's look at page six of your

18  passport.

19       And it appears as if, from page six of your

20  passport, that you were in South Africa also in 2002,

21  correct?

22  A   That's correct.

23  Q   And was that also in order to clear up some loans?

24  A   Well, that was to talk with someone that could help me

25  out in doing that, yes.

               D. Leveto - Cross(By Mr. Voracek)         63

1  Q   All right.  And let's look at page ten of your passport.

2          And in 2002, were you in Frankfort?

3   A   Yes, I passed through there on the way back to Canada.

4   Q   Oh, did you meet anybody there?

5   A   No.  That was just moving through in the airport.

6   Q   And let's page through your passport and see -- page

7   sixteen.  Were you in Mexico during 2001?

8   A   During my flight, yes.  That was during the aircraft

9   flight.  That was passing through Mexico.  I didn't really go

10  to Mexico.

11  Q   All right.  Now, as you were traveling abroad, during

12  2002, you knew that the federal indictment was still pending

13  against you, did you not?

14  A   Yes, I did.

15  Q   You knew that you were a fugitive, didn't you?

16  A   Yes, I did.

17  Q   You knew that the United States was interested in

18  apprehending you for this charge here?

19  A   Yes, I did.

20  Q   But, you didn't come back in 2002, you didn't turn

21  yourself in during that year?

22  A   No, I did not.

23  Q   You were still worried about maybe some possible loans

24  out there and you were worried about protecting your family,

25  I believe?

D. Leveto - Cross(By Mr. Voracek)          64

1  A   Well, I was worried about making the right contacts,

2  yes.

3  Q   All right.  Well in -- let's go now to 2003.

4       You are still aware that the federal indictment is

5  out there against you, right?

6  A   Yes.

7  Q   And during 2003, did you make any contacts with law

8  enforcement officials of the United States to turn yourself

9  in to answer the charges -- to answer the charges in the

10  indictment?  Did you do that?

11  A   No, I didn't.

12  Q   In fact, Dr. Leveto, during the time that you were away

13  from this country, you didn't always go by the name

14  Dr. Leveto, did you?

15  A   Well, I did carry camouflaged documents sometimes.

16  Q   Camouflaged documents?

17  A   Yes.

18  Q    Because you knew that the federal government, United

19  States Government was interested in apprehending you to face

20  these charges?

21         So, in order to conceal yourself from the United

22  States, you carried camouflaged documents with you, is that

23  true, sir?

24  A    No, that's not the term I am using camouflaged documents

25  for.  That's a misrepresentation of them.


                D. Leveto - Cross(By Mr. Voracek)          65


1          Since 9-11, camouflaged documents have become quite

2  popular for traveling and flying or doing different things

3  that may subject one to some danger so --

4  Q    Oh.  So, when you travelled abroad, you used names that

5  were not your own?

6  A    No.  I used my own because -- but, I only had documents

7  in case the necessity arose for the difference.

8          See, the principle of camouflaged documents is, if

9  you are hijacked, okay, if you are in trouble in another

10  country, depending on what the problem is, sometimes that's a

11  thing that you have to do.

12  Q    Because I think you just testified that when you went to

13  South Africa and Belize, you had the passport in your name?

14  A    Yes, I did.  Yes.

15  Q    Now, let's look at Government's Exhibit 601.

16       Do you recognize that document?

17  A    Yes, I do.

18  Q    It was a document that I believe you carried around with

19  you at the time that you were away from the United States,

20  right?

21  A    Um, yes and no.  This document was not used -- it was

22  experimentation that I did on my computer, but it was not

23  used.

24  Q    So, you prepared this document?

25  A    Yes.


              D. Leveto - Cross(By Mr. Voracek)          66


1        MR. VORACEK:  Your Honor, the United States moves

2  for the admission of Government Exhibit 601.

3        THE COURT:  601 is admitted.

4  Q    And I believe it's a certificate of birth, correct?

5  A    Yes.

6  Q    And the name is Daniel John Miller?

7   A   Yes.

8   Q   And the birth date on that is 6-12, 1950.  I believe

9   that's your birth date, is it not, sir?

10  A   No.

11  Q   What is your birth date?

12  A   My birth date is 6-21-50.

13  Q   6-21-50?

14  A   Yes.

15  Q   So, you prepared this certificate of birth in the name

16  of Daniel John Miller to carry around with you while you were

17  a fugitive of the United States Government?

18  A   Yes.  If I was flying.

19  Q   I ask you to look at Government's Exhibit 602.

20      Do you recognize that document, sir?

21  A   Yes.

22  Q   This was another document that you had with you at the

23  time that you were away from the United States, correct?

24  A   Yes.  For a small amount of time.

25  Q   And this appears to be a common law affidavit of

                    D. Leveto - Cross(By Mr. Voracek)          67

1   identification, correct, sir?

2    A    Yes.

3         MR. VORACEK:  Your Honor, the United States moves

4    for the Government Exhibit 602.

5         THE COURT:  602 is admitted.

6    Q    And the name of this piece of identification is issued

7    to a Daniel John Miller.

8         Did you prepare this document, sir?

9    A    Yes, I did.

10   Q    The address you gave, 5177 Virginia Road, Hermitage

11   Pennsylvania, who lives there?

12   A    That was a friend of mine.  An acquaintance of mine.

13   Q    You weren't living there at the time?

14   A    No.  I had passed through it, but I was not living

15   there, no.

16   Q    And, again, you were carrying this document during the

17   time that a federal indictment was pending against you, sir,

18   and that you were a fugitive from the United States?

19   A    Only when I flew.

20   Q    And this document was also used by you for camouflage?

21   A    Well, it wasn't used by me.  It was available.

22   Q    Available for camouflage purposes?

23  A   Yes.  Yes.

24  Q   And Government Exhibits 603 to 608, are those all

25  documents that were in your possession during your absence

D. Leveto - Cross(By Mr. Voracek)          68

1  from the United States from 2001 through 2004?

2  A   Yes.

3       MR. VORACEK:  Your Honor, the United States moves

4  for the admission of Government Exhibits 603 through 608.

5       THE COURT:  603 through 608 are admitted.

6  Q   And I believe, sir, if you look at Government

7  Exhibit 604, it appears to be a fishing license from

8  St. Catharines.  Is that up in Canada?

9  A   Yes, it is.

10  Q   And it's in the name of Dan Miller, and it's got a city

11  and town, I believe it must be a Canadian location, St.

12  Catharines, right?

13  A   Yes.

14  Q   Were you living in Canada at the time that there was a

15  federal indictment against you, sir?

16  A   For some of the time, yes.

17  Q   For some of the time you lived in Canada?

18  A    Yes, sir.

19  Q    All right.  But, you had also -- I think you testified

20  earlier that you had made several trips to Africa, or at

21  least one trip to Africa, one trip to Belize and one trip to

22  Mexico to take care of loans and protect your family?

23  A    Initially, I made one trip to those places, yes.

24  Q    Would you say that the bulk of your time during the

25  period of your absence from the United States was spent in

D. Leveto - Cross(By Mr. Voracek)          69

1  Canada?

2  A    No doubt, yes.

3  Q    While you were in Canada during the bulk of the time

4  that you were absent from the United States, were you meeting

5  individuals with regard to taking caring of loans?

6  A    I was contacting them, yes.

7  Q    Did you contact them in person or by phone?

8  A    Mostly by phone, yes.

9  Q    So, these people that you had loan issues with, they

10  weren't in Canada?

11  A    Oh, no.

12  Q   You were in Canada in order to avoid apprehension from

13  the United States?

14       I mean, you could have contacted them by phone from

15  here in Pennsylvania?

16  A   Absolutely, yes.

17  Q   And Government Exhibit 605, Pennsylvania driver's

18  license in the name of David Fuller.

19       Do you have that in front of you, sir?

20  A   Yes, I do.

21  Q   And that was another document that you were in

22  possession of at the time that you were away from the United

23  States?

24  A   I guess I was.  I didn't recall that.  I guess I was.

25  Q   How about Government Exhibit 606?  It's a driver's

                D. Leveto - Cross(By Mr. Voracek)          70


1  license from Ontario in the name of Daniel James Levet.

2       Did you apply for a driver's license from Canada?

3  A   Yes, I did do that.  That was a typo.

4  Q   And Government Exhibit 608.  It's another driver's

5  license in the name of Chester V. Leveto.

6       Were you also in possession of that document, sir,

7   at the time that you were away from the United States?

8   A   Well, no.  That was only a temporary possession.  I had

9   fished with him in Canada and he had lost some things.

10  Q   He lost some things?  He lost his driver's license?

11  A   Actually, his wallet.

12  Q   His wallet?

13  A   Yes.

14  Q   You were bringing it back for him?

15  A   Sure.  Sure.

16  Q   All right.  Dr. Leveto, you're an educated individual.

17  You're an educated man.  You have been to college, correct?

18  A   Yes.

19  Q   Graduated from undergrad summa cum laude, correct?

20  A   Yes.

21  Q   And you went through undergrad in two and a half years?

22  A   Yes.

23  Q   Then I believe sometime later, you went to University of

24  Pennsylvania Vet School?

25  A   Yes.

D. Leveto - Cross(By Mr. Voracek)          71

1  Q   Very good school, wouldn't you say?

2  A   Yes.

3  Q   And you graduated from the vet school second in your

4  class, summa cum laude, correct?

5  A   I believe so.

6  Q   And Dr. Leveto, after you got your vet license, you went

7  into business, correct, sir?

8  A   Yes.

9  Q   And you went into business in Meadville, that was the

10  place that you grew up, right, sir?

11  A   I travelled first, did some residency work, but it

12  wasn't right out of school.

13  Q   Not right out of school.

14       But, eventually you came back to your home --

15  A   Yes.

16  Q   -- in Meadville?

17       You married.  Did you have children at that time?

18  A   Yes.  We had three children.

19  Q   And you became associated with, I believe, a

20  Dr. Langdon, correct?

21  A   That's correct.

22  Q   And ultimately during the 1980's, you bought

23   Dr. Langdon's business from him?

24   A    That's correct.

25   Q    And you ran the business as a sole owner during the

D. Leveto - Cross(By Mr. Voracek)          72

1    1980's, true, sir?

2    A    That's correct.

3    Q    I mean, you didn't incorporate the business or run a

4    partnership, or anything, it was you, you were the owner?

5    A    Yes.

6    Q    And, Dr. Leveto, during the time that you operated the

7    business, the business was profitable, wasn't it?

8    A    Yes.

9    Q    I mean, you were able to bring in lots of business, half

10   a million dollars or so in business receipts?

11        I mean, you were a success, true, sir?

12   A    That's correct.

13   Q    And you knew a lot apparently about how businesses

14   operate and you were very good at it, true?

15   A    Well, I like to think that, yes.

16   Q    And you also knew about business books about ledgers,

17  how to read, some of the more financial aspects of owning a

18  business?

19  A    Yes.

20  Q    And you hired an accountant at that point,

21  James Scarpitti, to help you on your tax returns, correct?

22  A    That's correct.

23  Q    And I believe that during the time that James Scarpitti

24  was helping you with on your tax returns, he discussed

25  various tax issues with you, true?


                    D. Leveto - Cross(By Mr. Voracek)          73


1  A    I suppose so, yes.

2  Q    And I believe I think we heard from Mr. Scarpitti that

3  there was even a time when he was preparing your return that

4  you even caught an error that he made, a tax error, correct,

5  sir?

6  A    I don't believe I remember that, but that is what he

7  said.

8  Q    Now, during the 1980's when you owned the business, you

9  worked long, hard hours making the business operate, I

10  assume.  Did you work Saturdays?

11  A    Yes.

12    Q    You made all of the decisions regarding hiring and

13    firing of personnel?

14    A    Yes.

15    Q    When the business was to be opened, what services to

16    provide?

17    A    Yes.

18    Q    You made all the important business decisions during the

19    1980's, true, sir?

20    A    Yes.

21    Q    And during that time, you didn't answer to anybody, did

22    you?

23    A    No, I really didn't.

24    Q    You were the man.  You were also owner, correct?

25    A    That's correct.


            D. Leveto - Cross(By Mr. Voracek)          74


1    Q    Now, it's your contention that in October, 1991, you

2    gave it all up, you gave up the ownership of the business

3    that you poured your whole soul into, correct?

4    A    No, that is not what I said at all.

5    Q    Oh, you are saying that you still considered yourself

6   the owner of the business even after October, 1991?

7   A   No.  But, I didn't give up everything.

8   Q   You didn't give up everything?

9   A   Right.

10  Q   That you still controlled the business, you just didn't

11  consider yourself to be the owner, is that a fair statement

12  of --

13  A   I controlled the business adequately to be comfortable

14  with it, yes.

15  Q   You wouldn't have given up ownership or your control of

16  a business that you had purchased in the 1980's after working

17  through vet school summa cum laude, working long hours, being

18  the man in charge, 1991, a few years later, you wouldn't just

19  give up your business, would you, sir?

20  A   No, I wouldn't do that unless there were reasons and

21  that I really didn't give up a lot of things.  There had to

22  be a balance.

23  Q   A balance?

24  A   Yes.

25  Q   Now, in October, 1991, now there is apparently somebody

D. Leveto - Cross(By Mr. Voracek)          75

file:///A|/LEVETO10.TXT

1  that -- somebody that you have to answer to, isn't there?

2  A    Not in reality if things were set up properly.

3  Ultimately, there is someone to answer to.  But, if things

4  are working properly, not really.

5        As a general manager, I had wide powers.

6  Q    Very wide powers, I would say?

7  A    Yes.

8  Q    The owner of Center Company, Jack Williams, was he your

9  owner -- the owner of Center Company?

10  A    Yes, sir.

11  Q    So, he was, as of October, 1991, he was your boss?

12  A    Yes.

13  Q    And Jack Williams doesn't live in Meadville,

14  Pennsylvania, does he?

15  A    No, he doesn't.

16  Q    He's down in the Turks and Caicos Islands, correct?

17  A    Yes, that's correct.

18  Q    And Jack Williams -- I believe you stated to Agent

19  Gonzalez Jack Williams doesn't know you, does he?

20  A    No, not personally.  I've talked to him on the phone,

21  but he doesn't personally know me.

22  Q    You said that Jack Williams was the CEO of Center

23  Company.

24         Do you know of any other occupation that

25  Jack Williams had down in the Turks and Caicos Islands?


D. Leveto - Cross(By Mr. Voracek)        76


1  A    Yes.  There are a number of things that he does.  He's a

2  taxi driver.

3  Q    A taxi driver.

4  A    Yes.  He has a store.  He has a building that rents out

5  to law offices.  He also works for the government as a

6  translator.

7         There are a number of things that I know that he

8  does, and he does -- he does head up or at least takes care

9  of registering and working with other business entities.

10  Q    So, Jack Williams, a man who also functions as a cab

11  driver down in the Turk and Caicos Islands, as of October,

12  1991, is the owner of Center Company and your boss?

13  A    I believe he was the owner of Center Company before

14  that.

15  Q    All right.

16  A    But, you know, basically, yes.

17  Q    Now, even though Jack Williams is your boss, sir, the

18  cab driver from the Turks and Caicos Islands, he doesn't have

19  the authority to terminate you, does he?

20  A    Well, yes, he actually would.

21  Q    Sir, you're testifying that everything you worked for

22  for this business for seven, eight years in October, 1991,

23  you allowed a person who is a cab driver in the Turks and

24  Caicos Islands to take over your business and have the power

25  to say, Dr. Leveto, I don't want you around anymore, you're

                D. Leveto - Cross(By Mr. Voracek)          77


1   gone?  You are testifying that he had that power?

2   A    He had that power documentary-wise, but since I was the

3   practice, there were built-in safety factors only a fool

4   would feel comfortable doing and having safety factors that

5   would make that very, very unlikely, only he wouldn't have --

6   Q    So, your testimony is that Jack Williams had the power

7   to terminate you with a big "but," correct, sir?

8   A    No, he had the power to terminate me.  There is no doubt

9   about that.

10  Q    But, there were safeguards?

11  A    Well, they were in my own mind.  You are speaking to my

12  state of mind many times so I am trying to share with you

13  some of my workings.

14  Q    Dr. Leveto, I've handed you what has been admitted as

15  Government Exhibit 1B.  Do you have that in front of you,

16  sir?

17  A    Yes.

18  Q    That's your tax return for 1990, is it not, sir?

19  A    Yes, I believe it is.

20  Q    And this is a tax return that has occurred while you

21  were still the owner of your business before Center Company

22  comes in the picture, right?

23  A    That's correct.

24  Q    And this tax return, I believe, was signed by you and it

25  was prepared by your accountant, Mr. Scarpitti, correct, sir?


                D. Leveto - Cross(By Mr. Voracek)          78


1   A    That's correct.

2   Q    And, sir, now in 1990, you did file a Schedule C with

3   that tax return, did you not?

4   A    I believe so, yes.

5   Q    And you are familiar with the Schedule C, correct, sir?

6   A   Yes.

7   Q   You knew that the type of business -- you were in the

8   ownership of your business, that it's your duty as an

9   American citizen to file a Schedule C reporting the financial

10   activity from your business?

11   A   That's correct.

12   Q   And you also knew to report the gross receipts of the

13   business on line one on the Schedule C, correct, sir?

14   A   That's correct.

15   Q   Sir, I ask you, with regard to your vet business in

16   1990, was it profitable?

17   A   Yes, it was.

18   Q   Why don't we look at the very bottom line here on your

19   Schedule C.

20        What was the profit of your veterinary practice in

21   1990?

22   A   $176,969.00.

23   Q   That is the profit -- after all the expenses are taken

24   out, that's the profit, $176,969.00, correct, sir?

25   A   Yes.

D. Leveto - Cross(By Mr. Voracek)        79

1  Q   Now, sir, you know that the profit of your Schedule C is

2  transferred to the front of your 1040, is it not?

3      Look at the front page of your 1040, line twelve.

4  A   I guess it is.  I have to look at it.

5  Q   Okay.

6  A   Yes.

7  Q   And it's there, the profit, $176,969.00, is on the front

8  page of your 1040.  Do you see that, sir?

9  A   That's correct.

10  Q   Dr. Leveto, on that 1990 tax return, you had a lot of

11  total tax, didn't you, sir?  Look at line 54.

12  A   Okay.

13  Q   How much is line 54?

14  A   $29,404.00.

15  Q   Now, that was your total tax liability for the year

16  1990, correct?

17  A   I believe that to be true.

18  Q   And I believe you made some estimated payments during

19  the year of $9,600.00, did you not?  Line 56, sir.

20  A   Yes.

21  Q   So, I believe at the time that the tax return was filed

22    in April, 1991, you still owed the government $19,724.00 for

23    your 1990 taxes, correct, Dr. Leveto?

24    A    Yes, I believe that's correct.

25    Q    So, I assume, sir, that when the tax return was filed in


              D. Leveto - Cross(By Mr. Voracek)          80


1    April of 1991, you also had to write a check out to the IRS

2    for $19,724.00?

3    A    I don't recollect that, but I would think.

4    Q    That was April, 1991.

5    A    Yes.

6    Q    Sir, it appears that three months later, in July of

7    1991, you become associated with Don Turner and First America

8    Research.  Wasn't that about the time?

9    A    To the best of my recollection, yes.

10    Q    So, it was about three months after you had to pay the

11    big tax bill to the United States you became associated with

12    FAR and Don Turner?

13          Had you decided at that time, Dr. Leveto, that, you

14    know, I pay too much tax, I pay too much taxes, I am looking

15    for a way to eliminate this tax?

16        Did you decide that during that period after you

17   paid that tax bill, sir?

18   A    No.  As a matter of fact, it was for liability

19   protection initially.

20   Q    Was it just for liability protection?

21   A    Initially, that was my interest after my family had gone

22   through a lawsuit in the late eighties and early nineties.

23   Q    Sir, I hand you what's been marked as Government

24   Exhibits 43.

25        Do you have that in front of you, sir?


                D. Leveto - Cross(By Mr. Voracek)        81


1   A    Yes, I do.

2   Q    What do you have -- what do you have there in front of

3   you, Government Exhibit 43?

4   A    Tax Free, How the Super Rich Do It.

5   Q    This is the book that you purchased from Don Turner in

6   August, 1991, correct, sir, August, September, 1991?

7   A    No, I didn't buy it from Don Turner.  I bought it from

8   someone else, and it must have been before that.

9   Q    Sometime before 1991?

10   A    Yes, it was sometime in 1991.

11  Q    Now, the front of that book, does that say that this is

12  a book for -- to protect you for liability reasons?

13  A    No.  But --

14  Q    What does the front of the book say?

15  A    It says, again, Tax Free, How the Super Rich Do It.

16  Q    Tax Free?

17  A    Yes.  The mail piece to where I bought the book, though,

18  it was heavily favored in estate planning and protection and,

19  like I said, that's what first led me to it.

20         But, obviously when I bought the book for this

21  amount of money, I was also interested in all the benefits

22  that I could reap from it.

23  Q    Now, during 1991, July and August of 1991, you did have

24  a lot of correspondence back and forth with Donald Turner,

25  correct, sir?

                D. Leveto - Cross(By Mr. Voracek)        82

1  A    Yes, that's correct.

2  Q    And I believe that you signed a membership in an

3  organization called First America Research, did you not?

4  A    I believe, yes.  Yes, I did.

5  Q    Sir, I hand you what's been marked as Government

6  Exhibit 71.

7         Sir, Government Exhibit 71, is that a letter

8  written from Don Turner to yourself?

9  A    Yes, it is.

10  Q    And Don Turner, I think, describes in that letter what

11  FAR, First America Research, is about, and I believe he also

12  quotes you a price of getting involved in FAR, doesn't he?

13  A    Yes.

14  Q    How much did it cost you to join FAR?

15  A    For the full membership, finder's membership and

16  everything?

17  Q    Yes.

18  A    I believe -- let me look here.  $10,900.00.  $10,940.00.

19  I believe that was it.

20  Q    An you paid that, didn't you, sir?

21  A    Yes, I did.

22  Q    You became a member of FAR?

23  A    Yes, I did.

24  Q    And that $10,000.00 that you had to pay in the summer of

25  1991, was far less than the twenty -- or $29,000.00 tax bill

1   that you received in April, 1991, wasn't it?

2   A   Oh, yes.  Yes.

3   Q   Substantially less?

4   A   Yes.

5   Q   Now, you didn't send Don Turner the money, did you?

6       You went out to Denver, I believe?

7   A   Yes, I did.  And I believe there was a deposit involved,

8   and I believe I also took cash.

9   Q   Did you take cash?  Was the cash in a briefcase that you

10  took out there?

11  A   There wasn't that much cash, but I think I carried it,

12  the balance.

13  Q   You carried the cash?

14  A   Yes.

15  Q   Where did you meet Don Turner out there in Denver?

16  A   I am not -- I don't know if I can remember it.  It may

17  have been a residence in -- I am not sure.

18  Q   Was it a hotel room?

19  A   Yes.

20  Q   So, Don Turner, the owner of First America Research,

21  didn't invite you to his place of business, did he?

22  A    Well, his place of business was really traveling an

23  awful lot, so I believe, other than his house, and I think he

24  had gone through a divorce recently, so I really didn't

25  question that.

D. Leveto - Cross(By Mr. Voracek)          84

1  Q    Well, you are paying $10,000.00 to join a program,

2  correct, sir?

3  A    That's correct.

4  Q    And Don Turner holds himself out to be the man in charge

5  of this program.  I think he calls himself the executive

6  director, correct, sir?

7  A    That's correct.

8  Q    And it didn't cause any suspicions in your mind, sir, to

9  be giving $10,000.00 in cash to an individual who doesn't

10  have a business office?

11  A    Well, basically this was for a meeting to know if I

12  wanted to do that.  So, it wasn't like an automatic thing.  I

13  had to hear what the information exchange was going to be

14  that had to give it to me so --

15  Q    So, you met Don Turner in the hotel room?

file:///A|/LEVETO10.TXT

16  A    Yes.

17  Q    And you had some exchange of information at that time?

18  A    That's correct.

19  Q    And at the end of your meeting, did you provide him with

20  the cash?

21  A    I believe that I did, yes.

22  Q    Now, Dr. Leveto, as a smart businessman -- and you are a

23  smart businessman -- didn't some red flags or bells and

24  whistles go off in your head that, you know, meeting a guy in

25  a hotel room, paying him $10,000.00 in cash to belong to this

                D. Leveto - Cross(By Mr. Voracek)          85

1   organization, sounds a little suspicious?

2       There were no bells or whistles going off in your

3   mind at that time?

4   A    Not really.  I had talked with him a number of times and

5   I did know that he lived in that area of Littleton, and I

6   think that he had an associate there, if I remember

7   correctly, and that is how they decided to do it.

8       The associate -- supposedly, there was an office,

9   but I think that we decided, for other reasons, that that

10   would be fine.  I may have been at the residence, and I am

11   not sure how that just was.  My memory is a little foggy from

12   fourteen years ago.

13   Q    How long had you known Don Turner before you gave him

14   $10,000.00?

15   A    Well, through my readings of the book, I felt that I did

16   know him quite well.

17        But, as far as personally speaking with him, I

18   talked to him a number of times on the phone before I went

19   out there, and I can't really tell you how many times that

20   would have been.

21   Q    Did you know Don Turner to be an accountant?

22   A    No.  No.

23   Q    Did he tell you he was an accountant?

24   A    No, he didn't.

25   Q    You knew, in fact, that he was not an accountant?


                D. Leveto - Cross(By Mr. Voracek)          86


 1   A    I don't think that I knew that he wasn't, but I didn't

 2   think that he was.  I can't say that I knew that he wasn't.

 3   Q    You knew, though, that, or you suspected that Don Turner

 4   was also not an attorney?

5   A   I did know that he wasn't an attorney, that's correct.

6   Q   Before you paid $10,000.00 to Don Turner, did you

7   discuss this with your CPA back in Meadville,

8   James Scarpitti?

9   A   No, I didn't.

10  Q   You didn't ask James Scarpitti if this program was

11  something that was legit, something that you should get

12  involved in as a smart businessman?  You never mentioned it

13  to James Scarpitti?

14  A   No.  Well, I mentioned it, but I certainly gave him no

15  details.  I was not asking him for any expert advice.

16         FAR had some accountants on the staff or some

17  people that were CPA's that I did talk with.  But, no, I

18  didn't talk with Jim about it.

19  Q   The CPA that you worked with in your business down here

20  in Meadville that knows your business, that had been

21  preparing your tax returns, you didn't give him the details

22  of the organization called FAR, did you?

23  A   No.  There would really be not a lot of reason for that

24  at the beginning.

25  Q   No reason to discuss an organization that promotes a

1    book called Tax Free to your CPA?

2          There is no reason to get advice from him?

3    A    No.  As long as I felt that I was getting some expert

4    advice, and I felt like I was getting that through FAR also.

5    Q    Dr. Leveto, I ask you to open up the book, page --

6    Government Exhibit 43, and I believe there is page with two

7    little i's on it, is there not, sir?

8          Dr. Leveto, in that part of that book, Tax Free,

9    How the Super Rich Do It, that's a disclaimer section, isn't

10   it, sir?

11   A    Absolutely, yes.

12   Q    And, in fact, I think you referred to it in a document

13   that you testified to on direct examination, did you not,

14   sir?

15   A    That's correct.

16   Q    And I believe you indicated, in a letter in 1992, that

17   there is a -- that the person -- that the person is advised

18   that they should contact a professional, an accountant or an

19   attorney, with regard to this program, correct, sir?

20   A    That's if they are using just the book, yes.

21  Q    But, sir, you didn't let James Scarpitti know about

22  this, did you?

23  A    No, not about the book.

24  Q    How about -- well, how about the tax free program, did

25  you discuss that with him in detail?

D. Leveto - Cross(By Mr. Voracek)        88

1   A    Well, it wasn't a tax free program.  But, I didn't

2   discuss that because I wasn't just extracting from the book

3   in how to do that.

4   Q    All right, Dr. Leveto, I believe I had previously given

5   you Government Exhibit 71, did I not, sir?

6   A    Yes.

7   Q    This is the letter in July, 1991, from Don Turner to

8   yourself, correct, sir?

9   A    That's correct.  Yes.

10  Q    Sir, with regard to the very first paragraph, I ask you

11  to read the third sentence of the very first paragraph.

12  A    Could you say that again?

13  Q    The third sentence of the very first paragraph, please.

14  A    The verified membership application needs to be signed

15   in front of a notary as it takes the form of a promise not to

16   divulge our trade secrets, credits or other members names.

17   You would also need to send it back to us (make yourself a

18   copy), in parenthesis, along with your seat deposit.

19   Q    Now, with regard to that same document, I believe there

20   is a resolution back there.  If you go near to the end of

21   that document, sir.

22   A    Yes.

23   Q    You see the resolution?

24   A    Yes.

25   Q    Sir, I ask you to read number two on that resolution.

                D. Leveto - Cross(By Mr. Voracek)          89

1    A    Number two is:

2            I shall keep as absolutely private the name of each

3    person I believe to be a member of the association, and that

4    I shall keep all fraternal secrets as the private and

5    privileged fraternal secrets of the members and association

6    only, and will not reveal the same to any non-member without

7    the written permission of one of the officers thereof.

8    Q    So, sir, you knew that this program, this FAR program,

9    required a certain degree of secrecy, correct?

10   A    Yes.  As I alluded to, the trade secrets were very

11   tightly held.

12   Q    That there is not -- that this isn't a program that is

13   of -- really available to the general public so that we could

14   all -- or that the whole public can also become associated

15   with Tax Free?

16   A    Oh, I believe it's available to everyone.

17   Q    It's available to everyone if they have how much,

18   $10,000.00?

19   A    Well, it just depends.  The book is available to

20   everyone and, going further, it's available to everyone.

21   Q    Sir, I ask you -- I have handed you what's been marked

22   as Government Exhibit 73.

23        Do you have that in front of you?

24   A    Yes, I do.

25   Q    Sir, I believe this is another letter from Don Turner to

              D. Leveto - Cross(By Mr. Voracek)          90

1   yourself from August of 1991, correct?

2   A    That's correct.

3   Q    Sir, I ask you to read the last paragraph of that

4   letter.

5   A   Yes.

6        You are reminded not to have more than three months

7   of Center Company's business records in your possession at

8   any time, and failure to follow this rule, and to take care

9   of their business properly could result in your termination.

10  Q   So, sir, it is your understanding that in order to be a

11  member of FAR, you can't keep records for more than three

12  months, correct?

13  A   No.  It just says that you can't have them on the

14  premises.  Basically, they were being sent overseas.

15  Q   Oh, the records were being sent overseas?

16  A   Well, for the most part, I was kind of a little bit

17  sloppy about that.  I kept a lot more records.

18  Q   Well, you are familiar with the tax laws in the United

19  States.

20        Doesn't the Internal Revenue Service require a

21  business to keep records for well more than three months?

22  A   Well, right, this doesn't say that to destroy the

23  records.  The records, there is no requirements in the Code

24  that says that they have to be stored at the premises.

25  Q   But, your records for this business were to be sent away

D. Leveto - Cross(By Mr. Voracek)        91

1   from the United States to the Turks and Caicos Islands?

2   A   I viewed that as just a monetary function.

3   Q   So, after three months, any records that you have

4   related to that business are now in the Turks and Caicos

5   Islands?

6   A   Yes.

7   Q   That didn't cause any bells and whistles to go off in

8   your head, Dr. Leveto, that, you know, that perhaps there

9   isn't something quite legitimate about this program where

10  they are asking me to send these business records out of this

11  country?

12        That didn't cause any feelings that this program

13  might be something less than totally legitimate?

14  A   Not really, because I felt that that was their key way

15  of monitoring since it wasn't a nuts and bolts monitoring all

16  the other times.

17  Q   I think you liked that idea of having the records sent

18  away, did you not, sir?

19        I mean, that was something that you enjoyed, I

20  mean, not having to keep the records here in the United

21  States?

22  A   I don't know why I wouldn't enjoy it.

23  Q   Didn't you tell Agent Gonzalez that that was kind of

24  nice?

25  A   I'm not sure in what context I said it in, but it


            D. Leveto - Cross(By Mr. Voracek)            92


1  perhaps could be.

2  Q   Sir, I now ask you to look at Government Exhibit 74.

3        Do you have that in front of you?

4  A   Yes.

5  Q   This is another letter that's written to you in August,

6  1991, by both Don Turner and Paul Harris, the people in

7  charge of First America research, correct, sir?

8  A   That is correct.

9  Q   And they are welcoming you as a member of First America

10  Research, right?

11  A   Yes.

12  Q   And as part of First America Research, Don Turner and

13  Paul Harris are providing you with advice and suggestions,

14  correct, sir?

15  A   And being a facilitator.

16  Q   And being a facilitator for you?

17  A   Yes.

18  Q   And you entered this agreement with them, correct, sir?

19  A   That's correct.

20  Q   Sir, you see in the third paragraph there, there is some

21  words written in bold language?

22  A   Yes.

23  Q   Can you read the bold language?

24  A   Sure.

25       We want to take this opportunity to remind you that

D. Leveto - Cross(By Mr. Voracek)         93

1  we are each contractually charged with the responsibilities

2  to keep our trade secrets private credit and our members'

3  identities a secret.

4  Q   Now, I believe, Dr. Leveto, you have testified earlier

5  that that part where you are talking about secrets, keeping

6  them private, that that's for trade secrets, correct?

7  A   Well, I interpreted it as that pretty much.

8  Q   You interpreted it as that pretty much?

9  A    Yes.

10  Q    Why don't you read the very next line, sir?

11  A    I see it.  Well, it's keeping not only their trade

12  secrets but other members private as they promised to do with

13  everybody that joined.

14  Q    On that document, sir, right underneath the bold part,

15  would you please read the very next sentence?

16  A    This is protection for each one of us against the

17  jealous and nosey state.

18  Q    The jealous and nosey state?

19  A    Yes.

20  Q    Now, it doesn't say to protect trade secrets from

21  getting in the hands of our competitors, does it?

22  A    Well, the first -- the first bold line certainly implied

23  that.  I don't think that there is much doubt about that,

24  trade secrets being important.

25  Q    But, the very next line says that, this is protection

            D. Leveto - Cross(By Mr. Voracek)        94

1  for us against the jealous and nosey state.

2        Who did you think that Don Turner and Paul Harris

3  were referring to when they used the word "state?"

file:///A|/LEVETO10.TXT

4  A   Well, I am sure they meant just what they said.

5  That's -- you know, whether I interpreted that as an addition

6  to the sentence, or whatever, but that's how I interpreted

7  it.  I understand what it says.

8  Q   Did you interpret the jealous and nosey state to be

9  United States?

10  A   It doesn't say that.  It could be included, though.

11  Q   Dr. Leveto, when you got that letter, of this program

12  that you paid $10,000.00 into, there is no red flags at this

13  time popping up, bells and whistles that, you know, these

14  people are telling me to keep this away from the jealous and

15  nosey state, there is no red flags that are popping up

16  saying, Dr. Leveto, wait a minute, is this really a

17  legitimate program?  That never entered your mind, sir?

18  A   Not really, no.

19  Q   That to keep this -- keep these things secret from the

20  state, from the United States, that was all right, you

21  believed all that to be legitimate?

22  A   Well, I believed that it was more designed for the

23  sloppy dissemination of things and sloppy discussion of

24  things, and things like that.

25          That is how I always viewed it anyway.


                    D. Leveto - Cross(By Mr. Voracek)          95


1   Q   Dr. Leveto, I'm handing you several more documents,

2   including Government Exhibit 76.

3          Do you have that in front of you, sir?

4   A   Yes.

5   Q   Sir, it's a fax from you to Don Turner and Paul Harris?

6   A   Yes.

7   Q   The first note says:

8          Please note that this fax is now strictly

9   confidential.  Do you see that, sir?

10  A   Yes.

11  Q   Sir, I ask you to look at Government Exhibit 239.

12          Sir, do you recognize the handwriting on Government

13  Exhibit 239?

14  A   I think it may be mine.  I have to tell you that if it's

15  my handwriting, it's pretty bad.  But, I believe it is mine.

16  Q   It's your handwriting on this note, Government

17  Exhibit 239, sir?

18  A   I believe so.

19  Q   Sir, I ask you to look about half way down Government

20  Exhibit 239.

21  A    Yes.

22  Q    My reading of this note -- and correct me if I'm

23  wrong -- says, secret P.O. Box.

24        Is that what's written there, sir?

25  A    I'm not sure, but it could very well be.


            D. Leveto - Cross(By Mr. Voracek)          96


1  Q    And right underneath that, it says, my name, and then

2  there is an arrow that goes down and says, in phony name.

3        Do you read that, sir?  Is that what that says?

4  A    Yes.  But, I am not sure what that refers to.

5  Q    Secret P.O. Box in phony name?

6  A    No.  I was saying that that arrow comes from that

7  circle, and I am trying to figure the circle out.

8  Q    These are your handwritten notes, are they not, sir?

9  A    I can't say for sure, but there is a good chance of it.

10  Q    And, sir, just to put this document in context, at the

11  very beginning, I believe that there is three letters.  TSB.

12  Do you see that, sir?

13  A    Yes.

14  Q   Was that a bank account, sir?

15  A   Yes.

16  Q   In the Channel Islands, sir?

17  A   Yes.

18  Q   And I believe right underneath that, in pounds.  Do you

19  read that, sir?

20  A   Yes.

21  Q   That's the currency or denomination that they use in the

22  Channel Islands?

23  A   I believe so.

24  Q   And right underneath that it says, debit card.

25      Do you see that, sir?


                    D. Leveto - Cross(By Mr. Voracek)          97


1  A   Yes.

2  Q   Now, to put this whole note in context, we see the words

3  where it says, secret P.O. Box, my name, in phony name.

4      Do you see that, Dr. Leveto?

5  A   Like I say, I can't link that.  I don't understand what

6  that means at all.  The arrow is coming from the right-hand

7  side of what is written there, and I can't read that.  It

8  says key, or something, and I can't tell.

9   Q   Dr. Leveto, I now ask you to look at document 240, if

10  you have that, sir.

11  A   Okay.

12  Q   Dr. Leveto, these are more handwritten notes.

13      Do you recognize your handwriting?

14  A   I believe this is my handwriting.

15  Q   Do you see a line near the beginning, sir -- and correct

16  me if I'm wrong -- where it says, L. Adler, dash, totally

17  secret?

18  A   That's correct.

19  Q   And, sir, these are notes that you are writing to

20  yourself, I believe?

21  A   Right.

22  Q   And that's, in part, of implementing this program that

23  you just became involved with, this FAR program?

24  A   I believe that was implementing something about the fax

25  and it may relate back to the fax notification, that it was

                    D. Leveto - Cross(By Mr. Voracek)         98

1   secure or something.  I'm not really sure.

2   Q   Well, wasn't L. Adler to be totally secret?

3  A   Well, I don't have any reason to believe that it

4  wouldn't have been.

5  Q   Well, I mean, did the other employees at the vet clinic,

6  did they know anything about Leonard Adler?

7  A   Very little.

8  Q   Did they know anything?

9  A   Well, Karen sent a postcard one time for testing mail

10  speed, things like that.  So, they heard the name, but they

11  didn't know anything about it.

12  Q   Well, you had a stamp there with Leonard Adler's

13  signature on it?

14  A   That's correct.

15  Q   At the vet clinic?

16  A   That's correct.

17  Q   Did anybody else at the vet clinic ever see that stamp?

18  A   I don't believe so.

19  Q   Dr. Leveto, I ask you to look at Government Exhibit 255.

20  Do you have that, sir?

21  A   Yes, I do.

22  Q   Sir, again, this is your handwriting?

23  A   I believe it is, yes.

24  Q   Sir, the very first part of Government Exhibit 255

25   begins, money, Channel Islands.  Do you read that, sir?


D. Leveto - Cross(By Mr. Voracek)          99


1   A   That's correct, yes.

2   Q   These are -- again, these are notes that I believe that

3   you are writing to yourself with regard to the FAR program?

4   A   I believe so, yes.

5   Q   And I believe, if we go down to number two, number two

6   says Leonard Adler.  Do you see that, sir?

7   A   Yes

8   Q   Down the page a little bit, it says Box Elder, by number

9   three?

10   A   Yes.

11   Q   Can you read for us what you have written there beside

12   number three, Box Elder?

13   A   Box Elder, you have really no association with Box

14   Elder, only that they gave you capacity to use the money.  No

15   one is to know about Box Elder.

16   Q   Sir, you were instructed not to tell anybody about Box

17   Elder, correct?

18   A   Right.  But, it was more in the realm of not telling

19  anyone about the development of the trade secrets.  I would

20  not have any reason -- I mean, you saw wires were open and

21  everything was done openly.

22  Q   All this was open, is that your testimony, Dr. Leveto?

23       I mean, I thought one of the directions from

24  Paul Harris and Don Turner was to keep it secret from the

25  jealous and nosey state?


         D. Leveto - Cross(By Mr. Voracek)        100


1  A   Well, I conducted my affairs out in the open and I

2  really think that part of their secret part was a value-added

3  approach to you having something nobody else did because you

4  paid quite a lot of money for it.

5       I think there was a little marketing acumen

6  involved in that.

7  Q   Dr. Leveto, we're going to go back to you joining the

8  program, the FAR program, and I believe as part of you

9  becoming a member of the FAR program, you sold your business

10  to an entity called Center Company, correct, sir?

11  A   Essentially, yes.

12  Q   And that would have been in -- well, let me get you that

13  document, sir.

14          Now, Dr. Leveto, we hand you Government Exhibit 92.

15   Do you have that, sir?

16   A    Yes, I do.  I'm just checking it out, checking the back

17   side of it out.  Yes.

18   Q    Now, sir, when you sold your business to this entity

19   called Center Company, was there an actual closing where the

20   buyer was present?

21   A    No, there wasn't.

22   Q    So, you didn't sit down in some attorney's office and

23   exchange documents back and forth and money back and forth?

24   A    No, we didn't.

25   Q    And I believe there was never any money provided to you

                D. Leveto - Cross(By Mr. Voracek)          101

1   by the buyer at the time of sale, was there?

2   A    As far as a downpayment went?

3   Q    Yes.

4   A    No.

5   Q    Now, sir, I believe you testified that a Russ Schetroma

6   was involved in assisting you in preparing that document,

7   sir?

8   A   Yes.

9   Q   Dr. Leveto, I've handed you what has been marked as

10   Government Exhibit 115.  Do you have that?

11   A   Yes, I do.

12   Q   Do you recognize that document, sir?

13   A   It's apparently a letter I received from Russ in

14   September of 1992.

15   Q   In September of 1992?

16   A   Yes.

17   Q   And this was probably about a year after the sale

18   happened in October, 1991?

19   A   Evidently, yes.

20       MR. VORACEK:  Your Honor, the United States moves

21   for the admission of Government Exhibit 115.

22       THE COURT:  115 is admitted.

23   Q   Sir, and in looking at that letter, direct your

24   attention to the very last page of Government Exhibit 115.

25       Do you see the third paragraph on that page, sir,

              D. Leveto - Cross(By Mr. Voracek)       102

1   where it says, "on a parting note"?

2   A   Yes.

3  Q    Now, this letter is from your attorney to you, the

4  attorney that you say helped you with this sale.

5        Could you please read the third paragraph?

6  A    On a parting note, I must again remind you that our file

7  concerning your dealings with Denver and Center ends with the

8  submission of unsigned draft documents for your attention.

9  We have no evidence of the conclusion of any relationship

10  between you and Center or of any closing documentation.  You

11  should have your new counsel immediately review such matters

12  to be certain that he or she is comfortable with the

13  relationship and documentation and is in a position to

14  protect your interests as may be necessary.

15  Q    So, Dr. Leveto, looking at the second sentence there:

16        We have no evidence of the conclusion of any

17  relationship between you and Center or of any closing

18  documentation.

19        But, Dr. Leveto, I assume that Mr. Schetroma is

20  referring to your sale of the business to Center Company, is

21  he not?

22  A    That's correct.  And I believe we finished it up with

23  Cohen & Grigsby, but I am not sure.  I don't really remember

24   this letter, to tell you the truth.

25        We had difficulties with the overall bill.  I do

D. Leveto - Cross(By Mr. Voracek)        103

1   remember the difficulties, but I don't remember the specifics

2   of this letter.

3   Q    Now, after the sale of the veterinary clinic, you still

4   ran the business?

5   A    I was the general manager, yes.

6   Q    And I say the word "sale."

7        I believe that when you discussed -- after this

8   happened with Center Company, I believe you had a meeting

9   with your staff, did you not, sir?

10   A    Yes, I did.

11   Q    And when you discussed with your staff that another

12   business had, I guess, purchased the clinic, I believe we saw

13   Millie Custard, who was an employee of yours, testify that

14   when you said the word "sale," that you put your hands up in

15   quotations.  Do you recall that testimony, sir?

16   A    Absolutely not.

17   Q    You don't recall that?

18   A    I don't remember putting my hands up in the air and

19  putting quotations up.

20  Q   Do you recall doing that when you told your staff that

21  there was a sale a, quote, sale of the business?

22  A   I don't know why I would have done that, no.

23  Q   Well, you said -- I think you said on direct examination

24  that you wanted to allay people's fears, did you not?

25  A   Sure.


D. Leveto - Cross(By Mr. Voracek)        104


1  Q   You wanted to let them know that, in fact, hey, you are

2  still the man in charge of the business, right?

3  A   Well, I at least laid out the fact that I would be the

4  general manager to try to allay their fears.

5  Q   With regard to the operation of the veterinary practice,

6  nothing changed, other than the name, right, sir?

7  A   No, that is incorrect.

8  Q   Well, did you still do all the hiring and firing?

9  A   Yes, I did do that.

10  Q   Did you still set the office policies, the time, the

11  services to provide?

12  A   Well, sometimes that was done in conjunction with

13  talking to Mr. Edwards.

14  Q    The person, the -- is this in the -- in the Turks and

15  Caicos Islands?

16  A    Right.

17  Q    You weren't dealing with Jack Williams, the taxi driver,

18  you were dealing with his attorney?

19  A    Well, that was his attorney, right.

20  Q    But, as far as if any dispute arose among employees,

21  your employees, they would go to you, wouldn't they?

22  A    Sure.

23  Q    They weren't going to the fellow in the Turks and Caicos

24  Islands?

25  A    Right.


              D. Leveto - Cross(By Mr. Voracek)        105


1   Q    And I think you basically told the people at the staff

2   meeting that nothing is going to change here in the business,

3   right?

4   A    Functionally nothing for them would change.

5   Q    That the whole business would still firmly be in your

6   control?

7   A    Well, I don't believe that I had a reason to tell them

8   that.  I would tell them, though, that for their own -- you

9   know, for their own standpoint where they would be concerned,

10  as would be natural.

11  Q   Dr. Leveto, earlier we talked a little bit about

12  ownership and control.

13       Is it your position that you can control something

14  without owning it?

15  A   Yes.

16  Q   And is it your contention that, and I think maybe in the

17  discussions that you had with Agent Gonzalez, that you

18  likened it to a lease of an automobile.

19       Do you recall that, sir?

20  A   I may have.  Yeah, I may have likened it to that.

21  Q   That you can control the business of driving a vehicle

22  without actually owning it?

23  A   I am not sure -- I believe that I may have used that

24  analogy in a certain context, but I am not sure.

25  Q   Well, would you also say that at this time then that you

                D. Leveto - Cross(By Mr. Voracek)         106

1   controlled the business, the veterinary practice, but didn't

2   actually own it?

3   A    That's -- yeah, that's my position.

4   Q    What about the money?  What about the money that the

5   veterinary practice brought in?  Would you also say that you

6   controlled the money and enjoyed the benefit from the money

7   but didn't actually own the money?

8   A    No.  I enjoyed the benefit of the monies that I would

9   get paid from the amortization.  I had other benefits that I

10  could have but, yes, there is no doubt that I enjoyed and

11  benefitted from the money.

12  Q    You had set up a couple of bank accounts in the name of

13  Center Company, correct?

14  A    Yes.

15  Q    One was the Operating Account where you put all the

16  business receipts in and paid all the expense out of,

17  correct?

18  A    Yes.

19  Q    But, you also set up another Center Company account, the

20  Holding or the Freedom Account, correct?

21  A    There may have been two or three more.

22  Q    But, there was definitely a Holding and Freedom Account?

23  A    Yes.

24  Q    And you directed all of the ins and outs of the Center

25  Company bank accounts, correct, sir?

D. Leveto - Cross(By Mr. Voracek)          107

1   A    Pretty much.

2   Q    Pretty much?  There was somebody else that also had some

3   directions of the ins and out?

4   A    No.  I did it so -- sometimes there were discussions

5   with Mr. Edwards, but basically I pretty much controlled it.

6   Q    Everything that went in and out of the Center Company

7   bank account, both the Operating Account and the Holding

8   Account, you directed?

9   A    Pretty much, yes.

10  Q    Now, would you say, sir, that the control of the money

11  is obviously an important factor to have benefit over it?

12         Would you say that the ownership over the money is

13  a significant factor in your mind, who is actually considered

14  the owner of the money?

15  A    Could be, sure.

16  Q    And one way that that's important is when it comes down

17  to taxes, is it not, sir?

18  A   Sure.

19  Q   That it's the owner that has to report the business,

20  right?

21  A   Yes.

22  Q   So you can control everything.  You can control

23  everything about the business.  You can control all the

24  money.

25        But, if you say that your business is in another


              D. Leveto - Cross(By Mr. Voracek)        108


1  name, you can back out of your obligation to report the

2  profit?

3  A   No, that is not correct.

4  Q   Isn't that what happened here, sir?

5  A   No.  For the money that I actually had the benefit of,

6  as far as controlling it, that was a managerial position that

7  I could control it.  There are many financial people that

8  can't control money and still they derive benefit from pay or

9  other benefits they get from the company.

10  Q   Well, sir, you became involved in this program in

11  August, 1991.  The sale, the transfer occurred in October,

12  1991, correct?

13  A   I believe that that's when the final agreement was

14  finished.  It was memorialized in October of '91, but I

15  believe that it was memorialized in the agreement from before

16  that.  I am not just sure, but that's documented somewhere.

17  Q   Sir, I think when we looked at your tax return from 1990

18  before this happened, we came up with a total tax amount of

19  $30,000.00, is that right?

20  A   I believe that's right.

21  Q   Let's look at Government Exhibit 1-D-1, sir, your 1992

22  tax return.  Do you have that, sir?

23  A   Yes, I do.

24  Q   Now, for the 1992 year, now you are involved in the FAR

25  program, correct?


            D. Leveto - Cross(By Mr. Voracek)          109


1  A   Now I sold the business.

2  Q   Okay.  What was the amount of business income that you

3  reported on your tax return for 1992?

4       Did you report any on line twelve?

5  A   I don't believe so, no.  No, there wasn't any on there.

6  Q   Sir, in 1992, going to the second page, what was your

7   tax liability?  On page -- on the second page under line 53.

8   A   Total tax, $4,050.00.

9   Q   So now, sir, as someone who is still in control of the

10  veterinary practice in 1992, that still controls the

11  business, that still controls the bank accounts, that still

12  controls the money, you have enabled yourself to reduce your

13  tax liability from almost $30,000.00 to about $4,000.00 by

14  virtue of getting involved in the FAR program?

15      Is that a fair statement, sir?

16  A   Well, it's a little bit biased toward the government's

17  theory here.  The business was sold and changes occurred

18  because of that.

19  Q   Sir, with regard to the veterinary practice, I believe

20  you testified that, you know, after it was sold to Center

21  Company, that you didn't have to report the business income,

22  the expenses anymore on your tax return, correct?

23  A   That's pretty much correct, yes.

24  Q   That now another entity, Center Company, was going to

25  report everything from the veterinary practice?  True, sir?


            D. Leveto - Cross(By Mr. Voracek)          110


1   A   I believe so, yes.

2  Q   Sir, I hand you what's been marked as Government

3  Exhibit 153.  Do you have that in front of you?

4  A   Yes, I do.

5  Q   That's a tax organizer, sir?

6  A   Yes.

7  Q   Sir, and I believe that you signed this document, did

8  you not, Daniel Leveto?

9  A   Yes, I did.

10  Q   And, sir, in this tax organizer, I believe what we are

11  doing is, we are telling Center Company -- we are giving

12  Center Company some information for them to report on their

13  tax return, correct?

14  A   Ultimately, yes.  I think that this is the intermediary

15  company, Global Scope, so I have to assume, yes.  Right.

16  Q   Sir, I ask you to look at the second page of that

17  document.

18  A   Yes.

19  Q   And let's go down to the net income, all sources line.

20      Do you see that sir?

21  A   Yes.

22  Q   And what's the amount that's printed there?

23  A   $14,276.00.

24  Q   Sir, did that money, that $14,276.00, was it your

25  responsibility to send that away from Meadville to a foreign

D. Leveto - Cross(By Mr. Voracek)        111

1  area?

2  A   Yes, I believe so.

3  Q   That was part of the program, that now Center Company

4  was reporting the business income, the business receipts, the

5  business expenses, so it was part of the program for you to

6  send Center Company this amount of net income, correct?

7  A   That's correct.

8  Q   Sir, I'm going to put on the monitor here, and I believe

9  you will be able to read it in front of you, Government

10  Exhibit 587.  Do you see that, Dr. Leveto?

11  A   Yes, I can see that.

12  Q   Now, the very first part of Government Exhibit 587 shows

13  an amount leaving the Holding Company Account, does it not?

14  A   That's correct.

15  Q   And the -- and I believe it says $14,276.00, doesn't it,

16  sir?

17  A   That's correct?

18  Q    Sir, and that was the amount that you just referred to

19  as the amount that was to be sent by you with regard to your

20  business for 1995?

21  A    That's correct.

22  Q    As part of the program, right, sir?

23  A    That's correct.

24  Q    Well, sir, it looks like from the chart here that on

25  April 24th, 1996, Global Scope made a payment of $14,142.00

D. Leveto - Cross(By Mr. Voracek)          112

1  to Box Elder.  Do you see that sir?

2  A    Yes.

3  Q    And, sir, that's almost the exact amount of the

4  $14,276.00 that you previously sent to Global Scope?

5  A    Yes.

6  Q    Were you aware of that, sir?

7  A    Aware of which?

8  Q    Aware of the fact that Global Scope was sending the

9  money that you just sent them to Box Elder?

10  A    Well, I believe I would have become aware of it.

11  Global Scope at that time must have been, as I had pointed

12   out on the chart, the intermediary company.

13   Q   Right.  And you can control Box Elder, correct?

14   A   No, I didn't control Box Elder.

15   Q   You have nothing to do with Box Elder, sir?

16   A   I have some -- I have some advisory and, like I said,

17   permissive ability to borrow, and things like that, but I

18   don't control it.

19   Q   Well, you can make transfers in and out of the Box Elder

20   account, can't you, sir?

21   A   If I'm permitted.

22   Q   We saw wire transfers and that showing you had that

23   authority right, sir?

24   A   Yes, I have that authority.

25   Q   Did you think that all of this money was going into this

                D. Leveto - Cross(By Mr. Voracek)          113

1   bank account that you had authority over in April, 1996?

2   A   Ultimately, I would have expected that.

3   Q   You would have expected the money to come back?

4   A   Once the return on investments were taken proper

5   companies were refunded, yes.

6   Q   And it was to be returned to you, isn't that correct,

7  sir?

8  A   No.  That depends on what was going to happen.  I think

9  I explained that program of either investment or loan or

10  directing money, that's --

11  Q   Well, sir, let's look at what, in fact, became of some

12  of those monies.

13      It looks like five days later, on April 29th, 1996,

14  that same account Box Elder of Barclays Bank sent a

15  $16,000.00 check off to Box Elder PaineWebber, correct, sir?

16  A   That is what your chart says.  I don't have the pieces

17  of evidence to say that, but I have faith in your charts

18  being correct.

19  Q   Well, isn't that how this was supposed to work?

20  A   What's that?

21  Q   Isn't that how this system was supposed to work, sir,

22  that the amounts that you sent off as part of the business

23  were to eventually come back to the United States?

24  A   No.  PaineWebber Box Elder was a newer, newer addition

25  that normally wouldn't have been the thing.

D. Leveto - Cross(By Mr. Voracek)        114

1          The program, as I outlined on the chart, there

2   weren't expectations there.  There were only possibilities.

3   Q    But, you opened the Box Elder account at PaineWebber,

4   didn't you?

5   A    No, I did not.

6   Q    You didn't open that?

7   A    No.  The testimony was very clear that the opening

8   documents, I did not open that account.  The opening

9   documents were not -- are not within the exhibits.

10  Q    Well, you received bank statements from that account,

11  didn't you?

12  A    That's correct.  I did monitor the account.

13  Q    You monitored it?

14  A    Yes, I did.

15  Q    You controlled the ins and outs of that account?

16  A    No, I didn't control the ins and outs, but I had some

17  permissive authority, as I told you, with the other ones.

18  Q    So, if you wanted to, you could take monies out of that

19  account?

20  A    No.  If I had permission, I could take monies out of

21  that account if it was for investment purposes or if it was

22  documented as a loan, or whatever.

23  Q    And this happened on more than one occasion, didn't it,

24  Dr. Leveto, where monies left with regard to the business to

25  a foreign entity and then later those same monies came back

D. Leveto - Cross(By Mr. Voracek)        115

1  to the United States, correct?

2  A    If there was reason for that to happen, yes.

3        I mean, it may have come back to the United States

4  just for this investment account, or it may have come back as

5  a loan for me.

6  Q    And this is the company, this Center Company, that's

7  supposed to be a totally separate entity, right?

8        I mean, Center Company isn't you, is it?

9  A    Center Company, that that we just talked about, had

10  really nothing to do with Center Company.  They were a

11  distribution.  They were other businesses that held interest

12  in Center Company.

13  Q    Did Center Company ever pay tax on that money?

14  A    Did they pay tax on that money right there?  I don't

15  believe --

16  Q    Or initial --

17  A   I don't believe, because it was a distribution.

18  Q   Well, isn't it true, Dr. Leveto, that on all the Center

19  Company tax returns -- well, first of all, you knew that

20  Center Company was preparing NR tax returns reporting your

21  business activity, did you not, sir?

22  A   I believe them to be doing that.

23  Q   And you know also knew that Center Company wasn't

24  actually paying any tax on any of this income, were they?

25  A   Well, that was their choice.  They can either distribute

D. Leveto - Cross(By Mr. Voracek)          116

1  it or pay tax on it.

2  Q   You knew it was part of the program that Center Company

3  was going to take their profit and distribute it to another

4  foreign entity, correct?

5  A   Most likely, yes.

6  Q   And that that foreign entity would then report another

7  tax return and that foreign entity would say we don't have to

8  pay tax because we got money from a foreign -- from another

9  foreign company, right?

10      Isn't that how the program is supposed to work?

11  A   No.  That's oversimplifying.  The chart -- there is

12    another company in there.  But, essentially you are making it

13    a dollar that's not effectively connected within the United

14    States, that is exactly right.

15  Q    You are making it --

16  A    And it's not the program.  It's a series of business

17    people with a common goal.

18  Q    But, the -- but one of the purposes of the FAR program

19    was to insure that the profit that was made at the veterinary

20    clinic would be said to be earned by a foreign company

21    distributed to another foreign company so that no taxes to

22    the United States would ever be paid?

23  A    No, that is really not correct.  FAR was only involved

24    in gathering people together that had similar business

25    interests.  And if I had gone down there and done it myself,

D. Leveto - Cross(By Mr. Voracek)          117

1    I could have found people that were interested in certain

2    business, too.

3         And, yes, part of it is the tax advantage because

4    within that jurisdiction, all laws were being followed as

5    well.

6  Q    Sir, I believe in your direct examination --

7        THE COURT:  Excuse me.  Do you have a lot more?

8        MR. VORACEK:  I have about another half hour, Your

9  Honor.

10       THE COURT:  Well, why don't we break for lunch

11 then.  Our jury's lunch is being brought in today to save

12 some time.  So, we'll reconvene at one-thirty.

13 (The jury left the courtroom.)

14 (Court recessed at 12:35 p.m.)

15 (Court reconvened at 1:35 p.m.)

16       THE COURT:  Good afternoon.  Be seated, please.

17       Okay, Mr. Voracek.

18       MR. VORACEK:  Thank you, Your Honor.

19              CROSS-EXAMINATION

20 BY MR. VORACEK:

21 Q    Dr. Leveto, you testified earlier concerning a personal

22 note that you had with Center Company.  Do you recall that?

23 A    Yes, that's correct.

24 Q    And I believe it was noted at Government Exhibit 136.  I

25 don't know if you have that still up there with you.  But, I

              D. Leveto - Cross(By Mr. Voracek)          118

1   will put it on the monitor here so you can see it right here,

2   if you don't.  Do you see that note, sir?

3   A   Yes, I can.

4   Q   And the date of that note from April, 1994, sir?

5   A   Yes, that's correct.

6   Q   And you indicate there that you do have some sort of a

7   loan agreement with Center Company, that you intend to pay

8   them back a certain amount?

9   A   That's correct; or cancel it out in another way,

10  depending on the circumstances.

11  Q   All right.  Dr. Leveto, I am going to hand you what's

12  been marked as Government Exhibit 64-B, as in boy.

13  A   Yes.

14  Q   Sir, and this is the transcript from your meeting with

15  Agent Gonzalez on November 1st, 1995, correct, sir?

16  A   It appears to be, yes.

17  Q   Sir, I ask you to turn to page twenty-six of the

18  transcript.  Do you have that in front of you, sir?

19  A   Yes.

20  Q   Sir, I ask you -- on line seventeen on page twenty-six,

21  it says:

22          Dr. Leveto:  Second thing -- a second thing, okay,

23   I don't borrow the kind of money I'm living on.

24          Do you see that, sir, where it says that?

25   A   That's correct.


          D. Leveto - Cross(By Mr. Voracek)          119


1   Q   And that is a statement that you made in November, 1995?

2   A   Absolutely.

3   Q   Agent Gonzalez says:  Oh, you don't?

4          And then it starts off Dr. Leveto.  Can you read

5   line twenty to twenty-four, Dr. Leveto?

6   A   Yes.

7          Dr. Leveto:  No.  Because the colato pays a lot of

8   expenses -- I pass a number of things through the business.

9   Because I get rid of the paperwork, because the colato

10   doesn't allow me to have more than three months of records on

11   the --

12   Q   Okay.  If you want to continue.

13   A   Agent Gonzales:  Oh, really?

14          Dr. Leveto:  Yeah.  They don't allow me to.  It's

15   kind of nice.

16   Q   It's kind of nice?

17  A    Yes.  That the colato says after three months, you have

18  to send your business records offshore.

19  Q    You believe that to be kind of nice not to have to keep

20  those records?

21  A    Yes.

22  Q    All right.  Could you continue on, sir?

23  A    Agent Gonzalez:  Well, I guess so.  I guess that's --

24        I said:  Dr. Leveto:  But the while thing is, you

25  know, Uncle Sam comes to me and says, hey, what's with this

D. Leveto - Cross(By Mr. Voracek)          120

1  business?  And I say, well, hey, I work for da, da, da, da,

2  da.  Well, you think they're going to go to the Turks and

3  Caicos Islands and audit them?

4  Q    What does Agent Gonzalez say after in response to that?

5  A    Mr. Gonzalez:  No, that's -- I doubt that.  They are not

6  going to --

7  Q    Then how did you respond to that?

8  A    Dr. Leveto:  You doubt that very strongly.

9  Q    Dr. Leveto, I'm handing you a certain set of exhibits

10  here that I am going to ask you some questions on.

11          I believe in your direct examination you used the

12   word nominee.

13          Are you familiar with that word, sir, nominee?

14   A   Yes.

15   Q   A nominee, is another word for that an alias, would you

16   say?

17   A   I don't know.  I guess I'm not that familiar with it.  I

18   guess -- it could be in some instance, yes.

19   Q   Now, a nominee is a different name other than your own

20   that perhaps you are working for or working through?

21   A   Yes.

22   Q   All right.  And I think you have testified earlier about

23   the names of Box Elder and Leonard Adler.

24          Do you recall that, sir?

25   A   Yes.


                D. Leveto - Cross(By Mr. Voracek)          121


1   Q   Now, sir, we've seen charts in this case with regard to

2   a lot of money.  And I believe you testified on direct that

3   it's important to follow the flow of the dollars.

4          Would you say that that was important, sir?

5   A   That's correct, yes.

6    Q    Sir, and we see that there is a lot of money that's

7    flowing to Box Elder and Leonard Adler and from Box Elder and

8    Leonard Adler.

9         Would you say that that is an accurate reflection,

10   sir?

11   A    That's correct, yes.

12   Q    And, sir, I will have you look at Government Exhibit

13   165-A.  Do you have that, sir?

14   A    Yes.

15   Q    Sir, and I don't want to belabor this point, we went

16   over it the other day, but 165-A is a letter from you to

17   Barclays Bank, and it's concerning the account, the Box Elder

18   account, where you were making a request to the Barclays Bank

19   to do something with regard to Box Elder.

20        I believe in this case, it's to make out a check in

21   the Box Elder account, correct, sir?

22   A    That's correct.

23   Q    So and, sir, with regard to the Box Elder account, you

24   do have a certain amount of control over that bank account,

25   correct, sir?

D. Leveto - Cross(By Mr. Voracek)      122

1   A   Well, as I have said before, I have permissive control.

2   Q   Permissive control?

3       Dr. Leveto, I have also handed you what's been

4   marked as Government Exhibit 21A-1.

5       Do you have that in front of you there?

6   A   Yes, I have that.

7   Q   And 21A-1 is the Box Elder application agreement at

8   PaineWebber.  Do you see that, sir?

9   A   Yes, I do.

10  Q   Sir, for the address of Box Elder as given to

11  PaineWebber, what's reflected there?  It's in the very first

12  section?  What is Box Elder's address?

13  A   The mailing address here is 388 Edgewood Drive.

14  Q   And are you familiar with that address?

15  A   Yes.  That's my address.

16  Q   That's your residence?

17  A   Yes.  I receive statements there.

18  Q   And, sir, I ask you, did you sign this application form

19  to take out to open an account in the name of Box Elder at

20  PaineWebber?

21  A   No, I did not.  This basically is an adjunct to an

22   account that's already opened, as I had explained to you.

23   This is an adjunct for a money market fund.  So, it was going

24   to be investment funds.

25   Q    Did you sign this document, sir?


D. Leveto - Cross(By Mr. Voracek)          123


1    A    Yes, I did.  Yes.

2    Q    Sir, you don't deny that this Box Elder account at

3    PaineWebber was used to receive funds though from foreign

4    bank accounts?

5    A    I don't deny that at all.

6    Q    You are in agreement with that, that money is coming

7    back in foreign accounts to the Box Elder PaineWebber

8    account, correct?

9    A    That has happened, yes.

10   Q    Sir, I ask you now to look at Government Exhibit 180.

11   Do you have that, sir?

12   A    Yes.

13   Q    Sir, and I believe on the second page, it's reflecting a

14   First Home Banking document located in the Grand Cayman

15   Islands.  Do you see that, sir?

16  A   Yes.

17  Q   Sir, and the name on that is Leonard Adler?

18  A   That's correct, yes.

19  Q   And you testified you are familiar with that name,

20  Leonard Adler?

21  A   Yes.

22  Q   The mailing address of Leonard Adler is given as

23  P.O. Box 54, Meadville, correct, sir?

24  A   That's correct.

25  Q   And you know about P.O. Box 54, don't you?


               D. Leveto - Cross(By Mr. Voracek)        124


1  A   Yes, I do.

2  Q   You directed Karen Jeannerett to open that, didn't you?

3  A   Yes.

4  Q   In the name of Wayne Co., correct?

5  A   That's correct.

6  Q   And you opened that P.O. Box in the name of Wayne Co. in

7  order to receive monies from foreign sources, correct, or

8  from foreign banks?

9  A   Well, I actually opened it up just to have a domestic

10   colato, opened up a Post Office box, and I added Leonard

11  Adler's name to it because our investment statements would

12  come there.

13  Q   But, you determined not to open up the P.O. Box in your

14  own name, didn't you?

15  A   That's correct, yes.

16  Q   You didn't put it in the name of Dan Leveto, did you?

17  A   No.  I wanted it in a colato's name or a corporation.

18  Q   You wanted it in a different name?

19  A   Right.

20  Q   Now, this interview sheet here for First Home Banking

21  indicates an occupation for Leonard Adler.  Do you see that?

22  A   Yes.

23  Q   Sir, did you participate in filling out this form?

24  A   No, I didn't.

25  Q   You had nothing to do -- whatsoever to do with it?

D. Leveto - Cross(By Mr. Voracek)          125

1  A   No, I didn't.

2  Q   Do you see the occupation that's given for Leonard

3  Adler?

4  A   Let me look.  I'm sure it's something about investing.

5   Occupation, student in investment training, yes.

6   Q    And who is given as the employer?

7   A    I am.

8   Q    And your address?

9   A    388 Edgewood Drive.

10  Q    Well, Dr. Leveto, we have heard from your other

11  employees regarding Leonard Adler and they testified that

12  they don't know Leonard Adler.

13        Was Leonard Adler actually an employee of yours?

14  A    No.  He was just an associate ready to trade with me.

15  Q    Sir, and I see a customer's signature stamp here,

16  do you see that, of Leonard Adler?

17  A    Customer signature?  What do you see there?

18  Q    Do you see the signature of Leonard Adler, sir?

19  A    I see it there, yes.

20  Q    Sir, did you write that signature on there?

21  A    I certainly did not.

22  Q    Who wrote that?  Who wrote that signature, sir, to the

23  best of your knowledge?  And if you don't know, you don't

24  know.

25  A    I don't know.

D. Leveto - Cross(By Mr. Voracek)          126

1   Q   Sir, I now ask you to look at Government Exhibit 222.

2        Do you have that in front of you?

3   A   Yes.

4   Q   And Government Exhibit 222 is a bank card application

5   from a bank in the Channel Islands called TSB Bank.

6        Do you see that?

7   A   That's correct.

8   Q   The applicant, again, is Leonard Adler, correct?

9   A   Yes.

10  Q   P.O. Box 54, Meadville, Pennsylvania.  That is the P.O.

11  Box that you directed to be opened, right?

12  A   Yes.

13  Q   And it indicates the home telephone number of Dr. Daniel

14  Leveto, and that's obviously you, 316 Conneaut Lake Road.

15       Is that your business, sir?

16  A   That's correct.

17  Q   Sir, this bank account that was opened at TSB Bank, you

18  got an account at TSB Bank, don't you, in your own name?

19  A   That's correct.

20  Q   You and your wife?

21  A    Yes, sir.

22  Q    In that Channel Islands?

23  A    Yes.

24  Q    Did you fill out this form with regard to Leonard Adler?

25  A    Yes, I did.


D. Leveto - Cross(By Mr. Voracek)          127


1  Q    And did you sign Leonard Adler's name on the bottom

2  here, sir?

3  A    Yes, I did.  I did do that.

4  Q    Sir, and with regard to this foreign bank documentation

5  that we have been talking about from Barclays Bank Box Elder,

6  the First Home Banking, Leonard Adler, TSB account, Leonard

7  Adler, with regard to that foreign bank documentation, you

8  don't deny that statements regarding those foreign bank

9  accounts was all found in either your residence or your

10  business as pursuant to the search warrant, sir, correct?

11  A    I don't deny what you found.  I'm not -- I can't say

12  everything that you found.  But, no, I am not denying that at

13  all.

14  Q    You did receive statements from those foreign banks in

15  the names of those Leonard Adler Box Elder?

16  A    Right.

17  Q    Sir, is it your testimony that you didn't use the names

18  of Box Elder or Box Elder and/or Leonard Adler to move your

19  money around?

20        Wasn't that your true purpose of using those names,

21  to conceal your receipt of fund from the federal government?

22  A    No, not at all.  As a matter of fact --

23  Q    That had nothing to do with it, sir?

24  A    No.  The chart explains it very nicely how it came to

25  be.

D. Leveto - Cross(By Mr. Voracek)        128

1        And as far as moving money around, they were --

2  those companies were part and parcel to what was happening,

3  but all within the law of that jurisdiction.

4  Q    So, you deny emphatically, sir, that you are not one and

5  the same Box Elder and you are not one and the same Leonard

6  Adler?

7  A    Well, no, I am not.  Yes, I do deny it emphatically.

8  Q    That even though you filled out an application form on

9  behalf of Leonard Adler, sent it to the TSB Bank, received

10    all the bank documentation at 388 Edgewood Drive, you deny

11    that you are Leonard Adler?

12    A    No, that bank documentations, that account really never

13    went through.  There was really nothing that ever happened

14    with that.  There was no funding, or anything like that.

15         It was kind of an afterthought when First Home

16    Banking wasn't producing reasonable interest and there was no

17    Leonard Adler account in TSB that was used.

18    Q    Now, the names of Box Elder, though, and Leonard Adler,

19    that was all something that was part of the program, part of

20    the FAR program?

21    A    Well, they were two different investors, I believe.  I

22    am not absolutely sure, but it's -- when you call it the

23    program, they were the contacts.  Box Elder was one company

24    and Leonard Adler was at the helm of another one.

25    Q    Well, the fact that this program suggests that Leonard

                    D. Leveto - Cross(By Mr. Voracek)          129

1    Adler and Box Elder be used and that they have foreign bank

2    accounts and that you're to set up an account in the name of

3    Leonard Adler, and that all this foreign bank documentation

4    is to be sent back to you, given all of that information,

5   didn't that raise a red flag in your mind that maybe there is

6   something not quite legitimate about this program, sir?

7   A    No.  You misstated the facts here.

8        I did not open up a Leonard Adler account.  And you

9   said so many things there that could you break that up and we

10  can look a piece at a time at that?  I opened up none of

11  these accounts.

12  Q    Well, with regard to just you receiving bank

13  documentation from foreign banks on behalf of Box Elder and

14  Leonard Adler --

15  A    Yes.

16  Q    -- didn't that raise a red flag to you that, why am I

17  receiving this?  Why isn't Leonard Adler receiving this

18  information?

19  A    No, it raised no red flag at all.  The deals and the

20  workings and the negotiations all pointed that they were

21  interested in the same things that I were, commodities

22  trading.  And as long as I did and performed certain

23  functions, it was going to help me also.

24        I mean, there was no -- I didn't open the accounts.

25  I am not those companies.

1   Q    Now, commodities trading, Dr. Leveto, you are not -- you

2   have no specialized training in dealing with commodities, do

3   you?

4   A    No.  I have taken some seminars and paid for some

5   courses and had some pretty intense interest in it and the

6   software development package that was almost completed.

7   Q    Now, after August of 19 -- August, October, 1991, when

8   Center Company came into the picture, and from that point

9   through 1995, the living standards of you and your family

10  didn't really change at all from prior to 1991, did it?

11  A    It did a little bit, but not very much.

12  Q    How did it change, for the worse or the better?

13  A    Well, it was -- it was a little bit worse, but really,

14  really pretty close, except now we were under some debt load.

15  Q    Well, I thought we just read where, in 1995, where you

16  discussed with Agent Gonzalez that you don't borrow money?

17  A    Oh no, no.  No.  I said that all the money I borrow is

18  not on the notes.  We are talking also about the crossing off

19  of the amortizations, and things like that, and everybody

20  passing through with a lot of experiences that I couldn't

21  have before as an employer.  So, maybe some insurances, and

22  things like that.

23        But, that statement on that was more along the

24  lines that I don't borrow everything outright because there

25  is $22,000.00 -- or $24,000.00 a year that is kind of sitting

D. Leveto - Cross(By Mr. Voracek)        131

1  there as a balance or mark off of the amortization versus the

2  loan.

3  Q    Well, you mentioned expenses, Dr. Leveto.  Let's talk

4  about some of the business expenses at the veterinary clinic.

5        I believe we heard testimony from your wife,

6  Margaret Leveto, that several credit card charges, family

7  bills, were paid by the business.

8        Do you recall that testimony, sir?

9  A    Absolutely.  Of course, several of those credit cards

10  also, though, had drugs on them also.

11  Q    I believe we heard from the bookkeeper, Karen

12  Jeannerett, that she indicated that there were -- seemed

13  about a dozen different credit card bills that were paid by

14  the business.

15   A   Yes.

16   Q   And you don't deny that at least some, if not many, of

17   those credit card charges that were paid by the business

18   represent personal payment of personal living expenses, do

19   you?

20   A   That's correct.

21   Q   Moving on to a different topic for a minute, Dr. Leveto.

22       We just talked about you opening up a foreign bank

23   account at the TSB Bank in Channel Islands, correct, sir?  I

24   believe it was both you and your wife's account?

25   A   That's correct, yes.


               D. Leveto - Cross(By Mr. Voracek)        132


1   Q   Now, Dr. Leveto, I believe that with regard to the TSB

2   Bank account, you made a conscious effort to keep that amount

3   less than $10,000.00, didn't you?

4   A   Well, that was pretty much -- yeah, that was --

5   Q   Why did you do that?

6   A   Well, just basically it was a natural thing.  It's not

7   reportable if it is less than $10,000.00.

8   Q   You knew that if more than 10,000 was put into that TSB

9   Bank account, that you were going to have to check the yes

file:///A|/LEVETO10.TXT

10  box on your tax return, correct?

11  A    That's correct.

12  Q    And that at that point, the IRS would become alerted

13  that Dan Leveto has an account in the Channel Islands,

14  correct?

15  A    That's correct.

16  Q    So, you are well aware of the requirement to check the

17  yes box if you have control over a foreign financial

18  institution?

19  A    Absolutely.

20  Q    With regard to that TSB Bank account, there was a debit

21  card that the Leveto family had, correct?

22  A    Yes.

23  Q    And I believe we saw some evidence that that debit card

24  was, in fact, used, and that cash came off of that banking

25  card and went into your wife's bank account, correct?

D. Leveto - Cross(By Mr. Voracek)        133

1  A    I believe that's correct.

2  Q    And you knew about that, sir?

3  A    Yes, I did.

4  Q    And, sir, did you also know that that money that came

5  from the TSB Bank account and ultimately went into your

6  wife's bank account was actually sourced to the veterinary

7  business receipts?  Were you aware of that, sir?

8  A    Um, I can't say that all of it was.  I am sure some of

9  it was because there were some of the monies in the Holding

10  Account, and perhaps the escrow account from IRA

11  distributions that was mixed in, again, due to my sloppy

12  bookwork in there, was in some of my monies, but there were

13  certain veterinary receipts in there.

14  Q    So, the fact that some of your business income travelled

15  to the foreign account to the TSB Bank and then came back by

16  way of a debit card and was deposited into your wife's

17  account, that didn't raise any red flags or bells and

18  whistles that maybe there is something illegitimate about

19  this program working it in this fashion?

20  A    TSB really had nothing at all to do with the program.

21  That was an account that we were testing for the service of

22  it and the interest of it, and things like that, and that

23  that was really no different than getting an advance or

24  getting partial loan monies from the company and going

25  directly into her account as going over there and seeing what

D. Leveto - Cross(By Mr. Voracek)     134

1   kind of service the bank would give.

2        As you can see, the account wasn't used all that

3   long.

4   Q   I assume that a lot of the family bills are paid out of

5   your wife's bank account?

6   A   Yes, sir.

7   Q   Sir, I have a chart that's been introduced as Government

8   Exhibit 592.  I am going to put it up on the screen in front

9   of you.  This is regarding the primary deposits that were

10  made into your wife's account for a five-year period.

11       Do you see that in front of you, sir?

12  A   Yes, I see that.

13  Q   It appears that 18,000 came right from the Center

14  Company Operating Account, 61,000 from the Holding Account,

15  77,000 from the Langdon and Leveto account, and 16,000 from

16  the foreign accounts, were all deposited into your wife's

17  bank account during that period.

18       Does that sound correct, Dr. Leveto?  Were you

19  aware of that?

20  A   Oh, I am sure I was aware of it.  That was all included

21  in the personal monies that we would be talking about.  I

22  mean, the -- I mean, as far as the sources for the amount of

23  each of those numbers, I have to take your summary chart on

24  faith.

25  Q   But, you were aware that there were sums of funds from


                D. Leveto - Cross(By Mr. Voracek)          135


1  these entities going to your wife to pay the family business?

2  A   Oh, absolutely.

3  Q   And, Dr. Leveto, we talked just briefly about the Center

4  Company Holding Account.  Do you recall that, sir?

5  A   Yes, I do.

6  Q   And that you have authority over that account, correct?

7  A   Yes.  And I don't know if that is the same account or

8  two accounts that -- there was a Freedom Account and I

9  believe there was a Holding Account.

10         So, I guess that's the compilation of the two.  I

11  believe that's two accounts right there.

12  Q   All right.

13  A   Doesn't make much difference.

14  Q   But, the purpose of the Center Company Freedom/Holding

15  Account was not to handle the day-to-day business of the

16  veterinary practice, was it?

17  A    No.  That was the operating account's job.

18  Q    That was the Operating Account.  This is a separate

19  account?

20  A    Correct.

21  Q    This account -- it appears this account's job was to

22  receive monies and then to send monies out as if it was a

23  pass-through account, correct?

24  A    I can't say that for sure.  You can zoom back from that

25  and we can look, because between Peltec and all of these

                 D. Leveto - Cross(By Mr. Voracek)          136

1  different companies, it was very difficult for me to remember

2  the details here.  I believe that it was some type of -- when

3  we say Holding Account, obviously it's in name only.

4          When we talk about a pass-through account, probably

5  it was an account to do other things with money, other than

6  the Operating Account strictly the veterinary business.

7          So, I am not sure -- to tell you the truth, I am

8  not just sure what the function of it was, but I believe it

9   was just another account.

10  Q    But, you set the account up, didn't you?

11  A    Yes.  But, I think it was set up at the time that we

12  were processing credit cards heavily and programs for Peltec

13  Publishing, just some things that I don't remember the

14  details now.

15  Q    And just looking at this chart very briefly, sir, it

16  appears that it looks like over half a million dollars was

17  put into this account for that five-year period, correct?

18  Does that sound about right?

19  A    I can't tell you.  I mean, that certainly could well be.

20  Q    Well, sir, if we look at the other end of it and where

21  the monies went out, sir, we see $110,000.00 going to Jack

22  Carl Futures and that's for investment, correct, sir?

23  A    Yes.  That was where most of my trading research was at.

24  Q    And we see 61,000 going to Margaret Leveto.  Do you see

25  that, sir?


              D. Leveto - Cross(By Mr. Voracek)          137


1   A    I believe so.  Is this 1991 to '95?

2   Q    Yes, it is, sir.

3   A    Okay.  Yes, it could be.

4   Q   And we see over a quarter of a million dollars going to

5   PennBank Integra.  Do you see that, sir?

6   A   Yes.

7   Q   Sir, was that for the purchase of money orders or

8   cashier's checks in part, do you recall?

9   A   I would have to think that.  Some of it was because

10  these were -- you know, '94 and '95 was the time that I was

11  purchasing and refurbishing and working with aircraft, too,

12  so that makes quite a large difference in perhaps the

13  cashier's check.

14        I can't say that all of that money was cashier's

15  checks, but I am just saying it could be.  A good part of it

16  could be.

17  Q   So, sir, some of the monies that have gone into the

18  Holding Account went for a cashier's check to purchase an

19  aircraft, correct?

20  A   Absolutely, yes.

21  Q   And, sir, we have heard some testimony that the aircraft

22  was used by you to take your child to school to go to Cape

23  May.  Are you in agreement with that, sir?

24  A   Yes, that was part of the use.  All in acquiring hours.

25  Q    Sir, turning to a different topic.  I hand you a couple


D. Leveto - Cross(By Mr. Voracek)        138


1   of documents.

2          Sir, during 1991 through 1995, Center Company was

3   involved in the sale of some real estate, were they not?

4   A    That's correct.

5   Q    And this real estate concerned a parcel of land that I

6   believe was owned by you or your family?

7   A    It was owned by my parents, yes.

8   Q    Now, sir, prior to the actual consummation of the sale,

9   is it correct to say that Center Company became the owner for

10  purposes of the sale?

11  A    Would you state that again?

12  Q    Well, you just said that land was sold that was owned by

13  either you or your family, correct?

14  A    Um-hum.

15  Q    And was this the sale that was made to M.C.F. Land and

16  Robert Meyer?  It was the same land?

17  A    I believe that was one of them.  I think there may have

18  been a couple of sales.

19  Q    Well, prior to the actual closing date, where the land

20   transferred over to M.C.F., did Center Company become the

21   owner of that property?

22   A   Oh, no.  No.

23   Q   Well, did Center Company actually enter or sign the sale

24   documents selling the land to M.C.F.?

25   A   They may have in an optioner's type of agreement.  They

D. Leveto - Cross(By Mr. Voracek)          139

1   never -- there were complications with owning property with a

2   colato in this country.  So, upon research, I believe people

3   at Cohen & Grigsby said that that was going to be very

4   complicated and they would be better off buying the option,

5   and basically they bought the option from me.

6   Q   Sir, I have handed you what's been marked as Government

7   Exhibit 357.  Do you see that in front of you, sir?

8   A   Yes.

9   Q   And, sir, is that the letter from Cohen & Grigsby

10   regarding this land sale that we are talking about?

11   A   I believe that's correct.

12        MR. VORACEK:  Your Honor, the United States moves

13   for admission of Government Exhibit 357.

14          THE COURT:  This is a letter from Cohen & Grigsby?

15          MR. VORACEK:  Yes, it is, Your Honor.

16          THE COURT:  357 is admitted.

17  Q    Dr. Leveto, Cohen & Grigsby has written you a letter,

18  correct?

19  A    That's correct.

20  Q    And the second paragraph of the letter says:

21          As Russ explained to you -- I assume that is Russ

22  Schetroma, another attorney for you, correct?

23  A    That's correct.

24  Q    Can you read that full second paragraph for us, sir?

25  A    As Russ explained to you, both of our firms are happy to


            D. Leveto - Cross(By Mr. Voracek)        140


1   be involved with your real state transaction.  However, you

2   must be aware that the transaction currently contemplated by

3   you is of a complex nature with uncertain tax consequences.

4   Q    Okay.  And now this, again, sir, is apparently with

5   regard to the Center Company real estate transaction I

6   believe the heading on this document is?

7   A    Right.  It regarded an option and ramification of an

8   option, yes.

9  Q  So, Center Company is really being seen as the seller of

10  this land for legal purposes?

11  A  Well, I don't believe so.  See, that was the catch.  The

12  catch was that they really couldn't own the property.  So, if

13  it was an immediate assignment, I believe it was an

14  assignment of the option to the people purchasing and then

15  they purchased the property.

16      So, Center Company never purchased or never even

17  had anything connected with the property other than the

18  option.  I believe that's what it was.

19  Q  Could you read the very last paragraph on the first page

20  here?

21  A  While our firms have been requested to handle the

22  documentation of the transfer, you have specifically

23  instructed both of us not to render advice on the tax

24  implications of the transaction.  Accordingly, we render no

25  opinion on the federal income, estate or gift, state, or

D. Leveto - Cross(By Mr. Voracek)        141

1  other tax issues associated with this transaction; however,

2  we urge you to contact your tax advisor to determine the

3    appropriate tax treatment.

4    Q    And that, I believe, letter is signed by William Taxay,

5    an individual who, I believe, works at the law firm of

6    Cohen & Grigsby?

7    A    That appears to be, yes.

8    Q    Sir, is that paragraph there that you just read, is that

9    an accurate reflection of what you told Cohen & Grigsby or

10    what you didn't tell Cohen & Grigsby?

11    A    I am not so sure what you mean.

12    Q    Well, let's look at the very first sentence of that last

13    paragraph.

14        You have specifically instructed both of us not to

15    render advice on the tax implications of this transaction.

16        Did you do that, sir, or did Cohen & Grigsby get

17    this wrong?

18    A    I have no idea.  I have no idea.  I believe that since

19    it was an unincorporated business organization and this was

20    just a very rapid and, by paper, transaction of the option,

21    they didn't really know -- and they really didn't know.  They

22    felt it was okay, as far as the foreigner was not owning the

23    real estate, and they couldn't go any further than that, as

24    he goes to say, estate or gift, state, or other tax issues.

25          So, it really sounds like a disclaimer in here in a


          D. Leveto - Cross(By Mr. Voracek)          142


1  general nature.

2  Q    But, you don't recall specifically, sir, whether or not

3  you specifically instructed this law firm not to give you any

4  advice on tax implications of the transaction?

5  A    I have no idea on this particular thing.  This may have

6  even conduited through Russ and it may have come back from

7  Taxay from something Russ had told him.  So, I am not sure.

8  Q    Dr. Leveto, let's move on.  The sale of the land was, in

9  fact, consummated, was it not?

10  A    That's correct.

11  Q    M.C.F. purchased the land, didn't they?

12  A    Yes.

13  Q    And at closing of this land sale, some federal tax was

14  withheld, was it not?

15  A    That's correct.

16  Q    And I believe it's called something with an acronym of

17  FERPTA(Sp), a FERPTA tax, correct, sir?

18  A    I really don't know.

19  Q    Well, sir, did you recall -- do you recall an instance

20  where, because Center Company is a foreign entity that has

21  sold real property in the United States, that tax at, I

22  think, 10 percent of the sale price has to be withheld at the

23  time of closing?

24        Does that sound -- does that refresh your

25  recollection of what happened, sir?


            D. Leveto - Cross(By Mr. Voracek)        143


1   A    There is some type of withholding with a foreigner in a

2   transaction.  This transaction, I don't believe, was supposed

3   to have a foreigner owning property or selling any property,

4   and I believe that's an important distinction in what I was

5   told back then.

6        But, I am not -- to the best of my recollection,

7   that's true.

8   Q    Sir, I direct your attention to Government Exhibit 128.

9   Do you have that in front of you?

10  A    Yes.

11  Q    And, sir, Government Exhibit 128 is a letter that was

12  sent to you from an associate or a member of FAR, correct,

13  back in December, 1993?

14  A   It looks like it, yes.

15  Q   It says:

16      Dear Dan Leveto, I just returned from Grand Turk

17  and am happy to inform you that the tax refund was waiting

18  for me there.  Do you see that, sir?

19  A   That's correct.

20  Q   Sir, the tax refund that was waiting for him is, in

21  fact, the tax refund that pertains to all the tax that was

22  withheld on that land transaction, was it not, Dr. Leveto?

23      I mean, look at the very second page.  Do you see

24  that, sir?  It's a Form 1099.  Do you have that in front of

25  you?

            D. Leveto - Cross(By Mr. Voracek)        144

1  A   Yes

2  Q   And it's proceeds from a real estate transaction,

3  correct?

4  A   Yes.

5  Q   And the transfers and the seller's name is Center

6  Company, Turks and Caicos Islands, correct?

7  A   Yes.

8   Q    And that land that was sold was subdivisions in the

9   Vernon Township, Crawford County, Pennsylvania, that pertains

10  to the land that was owned by either you or your family at

11  one time, wasn't it?

12  A    Oh, okay.  We are talking about two totally different

13  transactions here.

14  Q    Okay.

15  A    The other thing we were speaking of was our old

16  homestead out on 322 and that was an option type of thing.

17  Okay?

18         I am not sure if this was done through option or

19  not, but this was something very close to the practice that

20  this was withheld.

21  Q    But, Dr. Leveto, do you deny that your family or you had

22  an interest in this property at one time?

23  A    Oh, yes.  I mean, I don't deny that.

24  Q    And that Center Company entered into a real estate

25  transaction selling that property, correct?


                  D. Leveto - Cross(By Mr. Voracek)        145


1   A    That's correct, yes.

2   Q    And that there was tax that was withheld from that

3   transaction, correct?

4   A    That's correct.  My understanding was that there is

5   always that tax held regardless of the tax status of the

6   company at the year end.  It's a reconciliation at year end.

7   Q    And that this tax that was withheld was refunded to you,

8   was it not, sir?  It was sent back to you?

9   A    I don't believe it was sent back to me.  I believe that

10  it was sent to Center Company, and -- as it should have been,

11  and I am sure that is what it was.

12        It probably would have gone to be included and gone

13  by the way of the movements of other funds that they had

14  gotten in a profit sense.

15  Q    Well, according to Government Exhibit 128, the letter

16  that was dated December 3rd, 1993, the face amount of the

17  refund was $15,582.00, correct?

18  A    Yes, that's correct.

19  Q    And, sir, I'll have you look at Government Exhibit 584.

20  It's a chart.  I don't have it in front of you, but I will

21  put it on the monitor so that you can see it, sir.

22        It says that there was a check or a transfer made

23  out of Barclays Bank, Vericon Bank account, in March of 1994

24    in the amount of $15,500.00.  Do you see that?

25  A    Yes


                    D. Leveto - Cross(By Mr. Voracek)          146


1   Q    And do you see that amount being sent to Barclays Bank

2   Box Elder, and that approximately three weeks later a check

3   in the amount of almost five -- $15,000.00 went to the

4   Holding Account, correct, sir?

5   A    Yes, that's what the chart says.

6   Q    Does the chart reflect that this tax refund ultimately

7   came back to the Holding Account?

8   A    I am not sure if that was the same funds or not.  There

9   is really not a way for me to know that.  There is no doubt

10   that what the chart says here that amount of money came back,

11   but I am not so sure if that was the whole balance or what it

12   was, or that was a single time loan and that amount came out.

13   I can't tell that.

14   Q    Well, should that tax refund have come back to Center

15   Company?

16   A    No.  No.  The tax refund went to Center Company in the

17   Turks and Caicos Islands.  The tax refund certainly would

18   have been distributed and would have ended up in Box Elder,

19   there is no doubt about that, probably through Vericon or

20   Newbury or ASTCO, or whatever, whoever the intermediary was

21   at the time.

22          So, yes, that certainly was by design.  Yes.  But,

23   I can't tell balances from your flow charts.  Your flow

24   charts only tell so much.

25   Q    Sir, I just have a small amount left here.


              D. Leveto - Cross(By Mr. Voracek)          147


1          Sir, I believe in your direct examination this

2    morning you talked about how, in 1997, you zeroed out your

3    1040 tax returns for the prior years, correct?

4    A    Yes.

5    Q    And I believe you said that in or about 1997 that you

6    believed, I guess, based on something that you read that you

7    are not required to report income anymore to the federal

8    government and pay taxes on income, is that --

9    A    At that time, I had gone to an Irwin Schiff seminar in

10   Las Vegas, Nevada, and I had acquired quite a lot of research

11   to that degree.

12          At that time, when I filed those, that's basically

13   what I believed, that attachment was made by him and that is

14   what I believed regarding my personal return.

15   Q    In that seminar that you went to, Irwin Schiff, you were

16   told that basically that the federal income tax laws are

17   illegal?

18   A    No, I wasn't told that at all.  I believe that the

19   federal income tax laws are just what they are.  I believe

20   they are being implemented improperly, but I certainly don't

21   believe they are illegal.

22   Q    Well, do you know that Mr. Schiff went to jail for tax

23   fraud?

24   A    Yes, I am aware of that.

25   Q    Dr. Leveto, how about the writer of that book, Donald

D. Leveto - Cross(By Mr. Voracek)          148

1   Turner, do you know much about his background, sir?

2   A    He's very forthright with his background in the book.

3   Q    Does he mention that he was ever convicted, sir?

4   A    Absolutely.  He spells it out very, very clearly and

5   within the book, yes.

6   Q    What was Donald Turner convicted of, sir?

7   A    I am not -- I don't think I can recollect that now.

8   Q    Was it a --

9   A    Certainly had something to do with taxes or churches, or

10   something, but I am not -- I don't believe that it was --

11   Q    So, the author of the book, Government Exhibit 43 --

12   A    Yes.

13   Q    -- was convicted of a tax offense against the United

14   States?

15   A    I am not so sure if it was a tax offense, but I believe

16   it was.  I'm not sure.

17   Q    And you believe that he may have been?

18   A    Yes.  Yes.  I mean, he didn't make any bones about

19   talking about his past.

20   Q    And yet, Dr. Leveto, it's your testimony, I guess, that

21   even though an individual who got a history of being

22   convicted, possibly for tax offense, that you should and

23   could rely on such an individual preparing such a book that

24   states, you know, how to stop paying taxes like the super

25   rich?

D. Leveto - Cross(By Mr. Voracek)          149

1   A    Well, this book is a work with research in it and I

2    don't take anything for face value, including from Irwin

3    Schiff, unless I do my own due diligence.

4         So, through history, from Christ to Galileo, many,

5    many people went to jail.  It doesn't necessarily mean that

6    they did something wrong.

7    Q    No.  But, Dr. Leveto, you're a smart individual.  You

8    have an accountant working for you at the time, correct?

9    A    Well, he was working on a very limited basis.

10   Q    Well, you have a CPA in the area, Jim Scarpitti, that

11   you could go to for advice from time to time, couldn't you?

12   A    Absolutely.

13   Q    Well, when this book first popped up on your radar

14   screen and you saw it and you started thinking about getting

15   involved in this program, did you walk down the street and

16   discuss it with CPA Jim Scarpitti?

17   A    No.  I really discussed it with other counsel and other

18   accountants that were more aware of it and there were names

19   of those that were made available.

20        Many times if one wanted to allow their counsel or

21   their accountant to become educated, you know, it may take

22   months and a lot of work before they can really get a grasp

23   on things or understand things.

24        So, no, I didn't do that with my own accountant.

25   Q   How about your attorney, Russ Schetroma?


              D. Leveto - Cross(By Mr. Voracek)          150


1   A   Russell, I did give the book to and I think it's in the

2   government's evidence that he did sign a non-disclosure

3   document which I know really bothered him a lot, but he made

4   enough fill-ins on it and put things in between the lines to

5   satisfy him.  He had the book for quite a long time and he

6   ended up telling me at one meeting that he really, really

7   just doesn't have the time, and that was it.

8        So, that was another thing that I think inspired me

9   to say I better go to some people that are recommended that

10  know about it.

11  Q   So, in other words, you didn't get any advice from

12  either your accountant, Jim Scarpitti, or your attorney,

13  Russell Schetroma, regarding the propriety of you entering

14  into the FAR program?

15  A   That's exactly right.  I sought professionals that knew

16  more about it already.

17  Q   And you also relied upon Don Turner, himself, who wrote

18   the book?

19   A    To a degree, yes.  Like I say, the book is a research

20   reference that it takes you to the books and to what you can

21   do.  You must do kind of your own due diligence.

22   Q    Well, sir, Jim Scarpitti was preparing your tax returns

23   throughout the 1980's, was he not?

24   A    I believe I may have started with Powers(Sp) in

25   Meadville and Jim came probably '86 or '87.  I am not sure

D. Leveto - Cross(By Mr. Voracek)        151

1   just when he did my first work.

2   Q    Well, did Mr. Scarpitti prepare the Leveto family 1991

3   tax return?

4   A    I am sure he did, yes.

5   Q    Sir, I direct your attention to Government

6   Exhibit 1-C-2.  And this is an Amended U.S. Income Tax Return

7   for 1991, is it not, Dr. Leveto?

8   A    That's correct.

9   Q    And, Dr. Leveto, if we look at that return, I believe

10   all income and all other items that were on your return were

11   zeroed out, correct?

12   A    That's correct.

13  Q    And I believe at the end of the line that you were

14  requesting a refund from the United States of $30,559.00,

15  correct, sir?

16  A    That was what was written there, yes.

17  Q    And, sir, I note that there is no preparer noticed on

18  Government Exhibit 1-C-1, correct?

19  A    That's correct.

20  Q    You prepared this return yourself, right?

21  A    Yes.

22  Q    So, even though Mr. Scarpitti prepared the first 1991

23  return based on his review of the Leveto family finances, you

24  didn't go to Mr. Scarpitti to ask him to amend your return,

25  did you?


        D. Leveto - Cross(By Mr. Voracek)          152


1  A    No, I didn't.

2  Q    Why didn't you?

3  A    Well, I think I explained that.  I had developed some

4  knowledge on my own based on some of what I had spoken about

5  in that letter today, the seminar I had gone to in Las Vegas

6  and the research.  I think that this should have had an

7    amendment as a part of it explaining it more.

8         But, I explained that to you.

9    Q    Well, sir, when you read this material on your own, did

10   you go walking with that material down to Mr. Scarpitti's

11   office and sit down with him and say, Mr. Scarpitti, you got

12   it all wrong, we don't have to pay tax on this, let's do an

13   amended return?  Did you tell him that?

14   A    No, I didn't.

15   Q    You knew, Dr. Leveto, that if you went into

16   Mr. Scarpitti's office and presented him with this

17   information, that he was going to say, Dr. Leveto, that's not

18   the law?  You knew that, right, Dr. Leveto?

19   A    Well, I just -- let's just say that I didn't recruit his

20   support for this.

21        Jim is a pretty conservative guy, and I certainly

22   did not.

23   Q    Well, let's look at the second page of this document,

24   sir.  This doesn't provide the reason why you have zeroed out

25   your return, correct?

                    D. Leveto - Cross(By Mr. Voracek)         153

1    A    No.  I believe there is an amendment that's supposed to

2  be with this just like the other ones.  The amendment is what

3  explains really in detail what is supposed to be on here.

4  Q    I believe some of the subsequent returns do have that

5  amendment.  But, let's look at the 1991 return that you have

6  in front of you on the second page.  Do you see that, sir?

7  A    Yes.

8  Q    What's written next to number one, as far as -- and this

9  is an explanation as to why you are now zeroing out your

10  returns.  Can you read what you say by number one?

11  A    Number one says:  The 1040 form fraudulently induced me

12  to report sources of income as income itself.

13  Q    So, you are saying, sir, that based on your review of

14  materials, that you have now determined in your mind that

15  that 1040 is fraudulently inducing me to report things that I

16  don't need to report anymore?

17  A    That's what I said there, but it's better explained

18  within the addendum that should be here.

19  Q    And then I am not going to belabor it, Dr. Leveto, but

20  suffice it to say, that you did file amended returns for

21  later years zeroing out all your income?

22  A    Right.

23   Q    And requesting refunds for any taxes that you paid?

24   A    I think this was the only one that had any taxes.  I

25   never -- I never wrote again and I never got any, I don't

154

1   believe.

2   Q    But, if the IRS would have taken this amended return and

3   sent you a refund for $30,000.00, would you have kept it?

4   A    I am not sure.  I probably would have if that was my

5   belief at that time, and I have to tell you, in 1997 that was

6   my belief at that time.

7           But, without the addendum, I wouldn't think -- it

8   is very difficult for me to defend my actions without the

9   research that led me to that and that's what the addendum had

10   on it.

11   Q    And I believe some of the subsequent returns do have an

12   addendum?

13   A    I am sure they do, and that should also because they

14   were all done at one time, I believe.

15           MR. VORACEK:  No further questions, Your Honor.

16           THE COURT:  Thank you, doctor.  You can step down.

17   (The witness was excused.)

file:///A|/LEVETO10.TXT

18        MR. LEVETO:  Your Honor, I wanted to make sure that

19   the Book News, Defendant's Exhibit B, was entered.  I don't

20   know if it was or not.

21        THE COURT:  I think I did, but if not, B is

22   admitted.

23        Okay.  Does the government have any rebuttal?

24        MR. VORACEK:  No, Your Honor.

25        THE COURT:  Well then, let's take a break and we'll

                                155

1   hear the arguments.

2        We will reconvene in fifteen minutes, at twenty of

3   three.

4   (The jury left the courtroom.)

5   (Court recessed at 2:25 p.m.)

6   (Court reconvened at 2:45 p.m.)

7   (The jury entered the courtroom.)

8        THE COURT:  Be seated, ladies and gentlemen.

9        Well, as you can see, things are reaching an end

10   here.  What's going to happen now is you are going to have an

11   opportunity to hear arguments from both sides as to why they

12  believe you should reach the verdict that they want you to

13  reach.  And under our Federal Criminal Rules, the way it

14  works is, the government gets to give their argument first,

15  then the defendant gives his argument and then the government

16  is permitted to give a rebuttal.

17       After that, I will give you a charge on the law and

18  then the verdict will be in your hands.  I don't know about

19  the timing on this thing.  My guess is that you will be back

20  tomorrow.  I am not going to keep you past five o'clock

21  tonight unless, for some reason, you let me know that you

22  want to work longer.

23       So, that's the way it is going to work from here on

24  out.  Okay.

25       MR. VORACEK:  May it please the Court, Dr. Leveto,

156

1  ladies and gentlemen of the jury.

2       This whole case is about control and ownership and

3  what the difference is between them.  To Dr. Leveto, the

4  difference between ownership and control means everything and

5  nothing.  The difference means everything when it comes to

6  reporting your income and paying your taxes.  And when it

file:///A|/LEVETO10.TXT

7   comes to enjoying the benefit of your business, your money,

8   your cars, your home, the difference between ownership and

9   control means nothing.  Make no mistake about it, ladies and

10   gentlemen, Dr. Leveto is a man with control; over his

11   business, over his assets, over his money.

12         The United States submits he has control over all

13   these things, only we would also call it ownership.  For you

14   to find Dr. Leveto not guilty of these crimes, you would have

15   to find that he gave up all control over these things; his

16   business, his assets, his money.  But, the United States

17   submits that the evidence clearly shows, overwhelmingly shows

18   otherwise.

19         Now, Dr. Leveto has been charged with three crimes

20   in this case.

21         The first charge is that he conspired with others

22   to impede and impair the lawful functions of the IRS, and by

23   doing so, he defrauded the United States.

24         He's also been charged with falsifying his 1994 tax

25   return and that he falsified his 1995 tax return.  The United

157

1    States has presented substantial proof that he's committed

2    all these crimes.

3        Proof beyond a reasonable doubt.  With regard to

4    the false returns, Dr. Leveto failed to report his business,

5    the vet clinic, on his 1994, 1995 tax returns.

6        Now, Dr. Leveto may have -- may want you to believe

7    that he didn't have to report the business activities from

8    the vet clinic because he sold the business.

9        Now, I am sure we'd all agree -- I know I would

10   agree -- that if an individual actually sells his business,

11   doesn't have to report the business activity any more.  To me

12   that's pretty obvious.  You are not obligated to do that.

13   You sell your business, it is not yours.  It's gone.

14        But, this is really what this case is all about

15   when it boils all down it to.  When you look at the elaborate

16   steps Dr. Leveto went through, the elaborate steps that he

17   did that he took to convince the government that he, in fact,

18   sold his business, the elaborate steps.

19        It wasn't just a simple closing where you got the

20   buyer and you got the seller and they got the business and

21   they run the business.  It was not that way at all.

22        There is a lot of smoke.  When the smoke clears,

23  it's evident that the only man standing as the owner of the

24  vet clinic, the one with total control over every aspect of

25  the business, including the money, including the money, is

158

1  Dan Leveto.  He never relinquished control.

2       The alleged sale to Center Company was a sham, a

3  ruse.  It was done simply to convince the government that he

4  no longer had an interest in it.  That's all.  For that

5  purpose.  To hide it, to hide it from the United States, and

6  Dan Leveto knew exactly that.

7       It's important that you find that he knew that

8  because willfulness is an element in this crime and for this

9  case.  You have to find that Dan Leveto had the specific

10  intent to commit these crimes.  He knew it.  He knew it was a

11  sham.  He intended to take that business out of his name for

12  one reason alone; for taxes; to save tax money.

13       He didn't want to report it to the United States

14  anymore.  He didn't want to pay taxes on that income anymore.

15  Dr. Leveto is not an ignorant man, by no stretch of the

16  imagination.  He's a smart guy.  And he's someone that, you

17  know, that worked hard, that went to vet school, started

18  his -- you know, bought this practice, worked long hours,

19  built a good business.  He's someone that should be admired

20  for doing these things.

21        But, Dr. Leveto is also enough sophisticated enough

22  that he would never take anybody's word for something.  That

23  is not Dr. Leveto.  We submit that we've never seen anything

24  where Dr. Leveto would just take somebody's word for.  He's

25  his own man.  Makes up his own mind.  He's smart.  He knows

159

1  what he's doing.  Summa cum laude from vet school.  Summa cum

2  laude from undergrad school.  Built his business

3  substantially.

4        We saw the amounts of money that the business was

5  making.  Over a half million to $600,000.00 a year in gross

6  receipts all the way through.  He's a good businessman.  Does

7  that -- does Dr. Leveto sound like a person who lets himself

8  get talked into things?

9        No, ladies and gentlemen.  Dr. Leveto knew what was

10  going on here.  His reason for doing it, there is only one

11  logical one.  Again, so that he wouldn't have to report it to

12    the government because he didn't want to pay tax on it.

13          We saw, ladies and gentlemen, the taxes that

14    Dr. Leveto paid in 1990.  He paid about $30,000.00.  He

15    submitted that in April, 1991.  He knew his obligation to

16    file tax returns.  He admitted that from the witness stand.

17    No problem at all.  He knows Schedule E.  He even told his

18    accountant, Jim Scarpitti, you know, I think you made an

19    error there.

20          Dr. Leveto, he got his eye on the dollar.  He knows

21    where the money is.  And in April, 1991, when he found out

22    that he had $30,000.00 due and owing to the United States

23    Government, the United States submits that Dan Leveto

24    determined that he wanted to reduce that amount

25    substantially.

160

1          Now, Dr. Leveto talked about this book, talked

2    about tax savings.  Ladies and gentlemen, that's not what the

3    book is all about.  It's not about -- Dr. Leveto talked about

4    some books that he said you could buy at Borders or Barnes

5    and Nobles where you could go in and get some advice on

6  saving a little with your taxes.

7        That's not this baby.(Indicating).  That is not

8  this baby.  This baby is tax free, free, free from taxes.

9  This isn't about saving a little bit of taxes.  This is tax

10  free, about no more taxes.  It is not how to reduce, it's --

11  we are talking about an entirely different animal here.

12        And then you look at the next tax returns.  You

13  look -- the business was operating 1991, 1992.  After

14  Dr. Leveto got involved in this program with FAR, we looked

15  at his individual tax returns for those later years, we saw

16  what was happening.  The amount of taxes that he owed in 1992

17  moves down to a few thousand.  In later years, he was down to

18  nothing.

19        Ladies and gentlemen, here, his business is the

20  same.  He's operating it the same way.  He is bringing in the

21  same money; the services, everything is the same.  Nothing

22  has changed; lifestyle, same.  You know, he got a nice house,

23  nice cars, takes good vacations.  He's done all that.  In

24  1991, he enters this program here.  Does that change his way

25  of living?  No.

161

1      We heard from Mrs. Leveto.  She indicated that, if

2   anything, their standard of living went up.  So, the standard

3   of living stayed the same.  Everything stayed the same.

4      One thing changed.  One big thing changed.  The tax

5   return, that changed.  The amount he was paying, 1998, paid

6   thirty grand.  Later years, he was down to -- it went down to

7   virtually nothing.  That's what changed.  That's what this

8   program is about.

9      Dr. Leveto can talk about entering into FAR and say

10  that there were other estate plan tools involved in that.

11  The United States submits that's a ruse.  The true import of

12  this program of First America Research was to be tax free.

13  No taxes.

14      Now, since the United States has charged conspiracy

15  in this case, it's important for us to prove an agreement,

16  that Dr. Leveto didn't do this on his own.  And, again, the

17  evidence submits that, or proves, establishes that Dr. Leveto

18  didn't do this on his own.

19      July, 1991, August, 1991, when we see a flurry of

20  letters going back and forth between Don Turner, Paul Harris

21  and himself giving him advice on how to implement this

22    program.  And Dr. Leveto bought into it and he did implement

23    the program.  These people told him how he could set up

24    foreign bank accounts, move the money around.  Purchased the

25    program for $10,000.00.

162

1          Well, Dr. Leveto may want you to believe that he

2    believed that everything about this was legitimate, that he

3    relied on Don Turner.  And he mentioned that he also talked

4    with other people, too, but we didn't hear any names, just

5    that he talked with some other people.

6          But, I asked him if he ever talked with his

7    accountant, Jim Scarpitti.  I mean, this is a tax issue here.

8    Did he ever sit down and discuss this program with

9    Mr. Scarpitti, the CPA down the street?

10          What about red flags?  What about red a -- alarms

11    that might go off in your head when you are going into a

12    program like this?  Shouldn't some bells and whistles have

13    gone off in Dr. Leveto's head that, hey, I am not sure about

14    the legitimacy here.

15          Let's just go back and think about how it all began

16    here.  The letters back and forth between him and Don Turner.

17  Don Turner saying come out to Denver.  Where did they meet at

18  in Denver?  Did they meet at Don Turner's business?  No.

19  They net in a hotel room.

20        Was it secret?  Yes, it was secret.  Did he have

21  cash?  Yeah, he had cash.  He had $10,000.00.  That is how it

22  all began.  That's how this supposed legitimate thing began,

23  in somebody's hotel room where $10,000.00 in cash is

24  exchanged.

25        You think they didn't want somebody to know about

163

1  it?  How about the United States?  Is there enough red flags

2  there to make Dr. Leveto think, you know, something is not

3  quite right about this.  I should go talk with somebody,

4  somebody who knows something about this.  And did he?

5        And the first thing that -- one of the first things

6  that Dr. Leveto did after the program was implemented was to

7  make sure that everything goes out of his name.  So, he

8  changes the name to Center Company.  He knows that he can't

9  keep it in the name of, you know, his bank accounts in the

10  name of Langdon and Leveto anymore.  He knows how easy it

11   would be for the United States to find that.

12          I mean, here this man, he is operating this

13   business throughout the 1980's using one bank account,

14   Langdon and Leveto.  And all of a sudden, he stops, starts

15   two new bank accounts in the same name of Center Company and

16   now starts conducting all of his business through these two

17   accounts in an entirely different name, Center Company.

18          The purpose?  Dr. Leveto would say, well, I sold

19   the business.  But, when you look at who is controlling all

20   the money in and out, it is still Dr. Leveto.  The United

21   States submits he's changed the name to make it harder for

22   the IRS to find it.

23          Business always operated the same.  He controlled

24   everything.  But, Dr. Leveto is now trying to tell the United

25   States that the vet clinic in Meadville wasn't his anymore.


                                164


1   See, it is not my name, and I think he began to call himself

2   an employee.  Yeah, he's an employee of the business.

3          The money?  Dr. Leveto would have you believe that

4   the money in the Center Company's bank accounts was no longer

5   his, that he was the agent.  The United States submits that

6 the evidence is clear. Dr. Leveto had full, total control

7 over the money, everything that went in and out.

8       We showed you plenty of charts indicating that, you

9 know, we have funds going out of the Operating Account and

10 they were all controlled by Dr. Leveto. He always kept his

11 eye on the dollar.

12       I noticed that was one of the things that

13 Dr. Leveto brought up. What really matters is the funds. I

14 agree with Dr. Leveto on that point. I agree entirely. You

15 follow the funds. They all end up, no matter where they go,

16 they all end up right here with Dr. Leveto. Even the monies

17 that were sent to try to conceal this whole thing to try to

18 legitimize the scheme, if you really follow it through, you

19 will still see that all the money still comes back to

20 Dr. Leveto.

21       So, we have Dr. Leveto getting involved in this

22 program, Tax Free, and then a few months later, Dr. Leveto

23 claims that he sells the business to this company called

24 Center Company. Is this an arm's length transaction between

25 a buyer and a seller? Who is Center Company? Are they even

165

1  there?

2        This sale didn't take place in a room with a seller

3  and a buyer and attorneys on both sides and documents going

4  back and forth as how it should be done.  We don't see that

5  at all.  This sale was done in Dr. Leveto's mind.  Yeah, he

6  had advice from other people and, yeah, there was documents

7  from foreign places, and that that come back and forth all to

8  try to legitimize it.

9        But, in reality, the sale was a sham.  No money

10  changed hands.  Dr. Leveto, he maintained control of

11  everything.  He even told his staff that we heard from, a

12  couple of his bookkeepers, Miss Jeannerett, Millie Custard,

13  Dr. Leveto told them after the sale, nothing is going to

14  change, and nothing did change.  Only the name changed.  His

15  control over the business, control of the money stayed

16  exactly the same.  The sale, it was all done with mirrors

17  designed purely to conceal from the United States.

18        And I think in that tape-recording where Dr. Leveto

19  sat down with Agent Gonzalez, Dr. Leveto called it a paper

20  tiger.  That's what this is.  A paper tiger.  It's a tiger

21  with no teeth.  It didn't really happen.  A buyer with no

22   control over what he's purchased.  That's what Dr. Leveto

23   would have you believe.

24         I think he testified on cross-examination that this

25   business that he's built up, that he worked so hard for, that

166

1   he would sell to this man in the Turks and Caicos Islands who

2   knows nothing about him whatsoever, Jack Williams, and that's

3   going to be his new boss there, knows nothing about him, that

4   Dr. Leveto would give him full control over his business,

5   enabling him to fire Dr. Leveto?

6         Ladies and gentlemen, is that credible, a smart

7   individual like Dr. Leveto to truly turn over his whole

8   business to this person who is also a cab driver in the Turks

9   and Caicos Islands?

10        This is about names, about changing your names.

11   How easy it would be to just put something in somebody else's

12   name.  It is no longer yours then.  It doesn't matter if you

13   continue to drive the car or use the money or fly the plane.

14   Total control over it.  All they have to say is, hey, it is

15   not mine, it is not my name.  But, you know what?  I get to

16   enjoy the benefit from it.  Even the money, I get to control

17   the benefit from it.

18          Think about that.  Wouldn't that be great.  Being

19   able to have 150,000 and enjoy the benefit from that, spend

20   it for whatever you want, but never have to worry about

21   reporting it to the government because you can just tell the

22   government, hey, it's not my name.

23          That's what happened here.  There is nothing fancy

24   about it.  That is what happened here.  Dr. Leveto got advice

25   from a couple of guys, bought this book, got into this

167

1    program.  $10,000.00 to get into this program.  1991, spent

2    $10,000.00.

3          But, when you think about the tax money that was

4    saved, I think it's a bargain.  He reduced his taxes from

5    thirty grand to virtually nothing.  That sounds like a good

6    deal to me, especially when you are able to control all the

7    benefits from it.  Your lifestyle doesn't change at all;

8    still get to take the nice vacations.  Control every aspect

9    of the business.

10          I mentioned before that there was something a

file:///A|/LEVETO10.TXT

11  little bit complex about this.  We have this entity in Turks

12  and Caicos called Center Company.  And Dr. Leveto claims, you

13  know, that Center Company is now going to report the business

14  receipts on their tax return.  I think we saw that return.

15  It was called an NR return, non-resident return.  And, in

16  fact, we saw some returns that were sent in by Center

17  Company.

18        But, when you look at the bottom line, we don't see

19  any tax being paid on this money.  Instead, whatever profit

20  they had went to another foreign entity, and Dr. Leveto

21  talked about that a little bit on cross-examination.

22        So then, that entity, I think it was called

23  Newbury, could then file a trust return and tell the United

24  States we didn't get any money from any United States source.

25  We got ours from this company in the Turks and Caicos so we

168

1  don't have to pay any tax.

2        What a scam.  The money was earned in Meadville,

3  Pennsylvania, sent to a company in Turks and Caicos, and then

4  goes off to another company in a foreign land, distributed to

5  them, and now that other company could say, well, we got our

6  money from the place in Turks and Caicos, and they didn't

7  have to pay any tax on it and Dr. Leveto, he knew that.  He

8  knew that that's how the arrangement was and no one was going

9  to pay tax on this money at all.

10      In fact, it's interesting -- what's interesting is

11  to really try to -- it was all done to try to convince the

12  United States that it was legitimate.  But, if you really

13  follow the money, if you keep your eye on the dollar, you can

14  see that all it really was was a scam.

15      Dr. Leveto, we talked about on cross-examination

16  how, in March of 1996, Dr. Leveto sent some monies as the

17  profit from the veterinary practice to Global Scope.  And we

18  can see, ladies and gentlemen, if you follow the money, as

19  Dr. Leveto suggests we do, the money goes to Box Elder at

20  Barclays Bank, and we know who got control over that.

21      The wire transfers.  Saw plenty of documentation.

22  Dr. Leveto can direct all the ins and outs out of these bank

23  accounts.  How can he say that it was -- what did he call it?

24  Permissive authority?  I can move money in and out.  I have

25  permissive authority.  They are his bank accounts; got his

1   address on it.  The bank statements come to him.

2        Leonard Adler.  It's him.  He's got a stamp with

3   Leonard Adler in his office.  Bank statements come to him.

4   Box Elder and Leonard Adler are Dr. Leveto.  It was set up

5   like they got involved with Don Turner and Paul Harris.  They

6   all set it up.  That was how it was supposed to be.  Use

7   different names.  Move the money around.

8        Why?  Why would you do that?  Well, so the United

9   States can't find it.  That's why we see all these monies

10   going to Box Elder and Leonard Adler.  That's why we see

11   foreign banks involved.  I mean, if it was really legitimate,

12   if this was a real legitimate program that you could go down

13   to Barnes and Noble and save a little money on your taxes,

14   you think that they would be suggesting to do all these

15   things?  No.  This is tax free.  This is allow not to pay tax

16   at all on anything, send it offshore.

17        What did Dr. Leveto say about that, about sending

18   the money offshore?  You don't think he knew how this worked?

19   You don't think that -- what did he tell Agent Gonzalez about

20   sending money offshore?

21          Well, on November 1st, 1995, Dr. Leveto talked a

22   little bit about that.

23          He says:  But, the whole thing is, you know, Uncle

24   Sam comes to me and says, hey, what's this business?  And I

25   say, well, hey, I work for da, da, da, da, da.  Well, you

                                   170

1    think they are going to go to the Turks and Caicos Islands

2    and audit them?

3          Agent Gonzalez says no, I doubt they are going to

4    do that.

5          And Dr. Leveto says:  You doubt that very strongly.

6          He knew exactly what was going on.  He knew why he

7    was using these foreign bank accounts.  So the United States

8    couldn't find the money.  He knew why he was using Box Elder

9    and Leonard Adler.  He took it out of his name.

10          You know, it's kind of interesting on that land

11   sale.  This was -- there was a piece of land that the Leveto

12   family had had for a while, and right before it was sold,

13   somehow, all of a sudden, it became Center Company's

14   property.  There was some tax withholding on that and the tax

15   withholding went offshore.  And, finally, as we saw, it

file:///A|/LEVETO10.TXT

16  finally came back to the Center Company Holding Account.

17          We asked Mr. Meyer on the witness stand about

18  Dan Leveto and Center Company and why the checks were written

19  the way they were.  And I think Mr. Meyer said something to

20  the effect that, you know, Dan Leveto said he wanted to make

21  some money for himself.

22          But, again, ladies and gentlemen, the real focus on

23  the case is, should Dr. Leveto have seen red flags in this

24  program, have realized that this program wasn't legit?

25          The United States submits the evidence, it is

171

1  overwhelming.  But, you know, Government Exhibit 74, I think,

2  it's pretty clear.  This is from both Don Turner and Paul

3  Harris, the co-conspirators, and they are writing Dr. Leveto

4  and they tell him about, you know, we saw a lot about secret,

5  how this is all secret, and Dr. Leveto said, well, there are

6  trade secrets.  We don't want anybody to know this because we

7  want everybody to pay.

8          I can understand that you don't want to give

9  anything away free.  But, it was secret for a bigger reason

10   than that, and I think the co-conspirators told Dan Leveto

11   right here, this letter right here, August 10th, 1991, this

12   is protection for each one of us against the jealous and

13   nosey state.

14          He is not talking about the State of Pennsylvania.

15   He's talking about the United States.  He's talking about

16   taxes.  You think that when Dr. Leveto, he was trying to

17   think about getting involved in this program, when he got

18   this letter from these guys in Denver, saying we wanted to

19   keep it away from the jealous and nosey state, you think some

20   bells would have gone off at that time, hey, is this legit?

21   I'm starting to get a little worried now.  A smart guy like

22   this, like Dr. Leveto, do you think he should have said,

23   geez, what are they telling me here, keep it away from the

24   jealous and nosey state?

25          Does that sound like a real legitimate thing,

172

1    ladies and gentlemen, a real legitimate tax planning thing,

2    keep it away from the jealous and nosey state?  Jealous and

3    nosey.  Jealous and nosey.  Jealous?

4          Then we have some handwritten notes.  And, ladies

5  and gentlemen, you will be able to take a look of these

6  notes.  You will be able to take all of them that were

7  admitted into the evidence back to the jury room with you.

8  But, if you look at these notes -- he said it wasn't his

9  handwriting, but we asked the bookkeeper if she recognized

10  whose handwriting it was.  She knew.  She said that that was

11  Dr. Leveto's handwriting.

12        When you look at some of the notes that he was

13  writing to himself, you can see -- you can see right through

14  this.  Secret P.O. Box.  My name.  In phony name.  In phony

15  name.  This is all part of the program Dr. Leveto said.  It

16  is all part of the program.  In phony name?

17        Box Elder and Leonard Adler, yeah, they are a phony

18  name.  That's exactly what they are.

19        Well, here's about Box Elder.  This is what

20  Dr. Leveto wrote to himself as part of a note about Box

21  Elder.  No one is to know about B E, Box Elder.

22        Further on down, this is a secret account, not to

23  be discussed with anyone but Don and Paul.  In his own words,

24  he knows what's going on, ladies and gentlemen.  He knows.

25  Dr. Leveto knows that this is all -- all done for secrecy

1   sake to keep it you out of the government's eyes.  That

2   that's really the -- that's what the case is all about, you

3   want to conceal it from the United States.

4        He got the stamp, Leonard Adler, in his office safe

5   that he could use.  And Dr. Leveto may want to tell you that,

6   well, he was an agent for Leonard Adler.  He may want you to

7   believe that.  But, when you look at the other documentation,

8   the bank documentation, Dan Leveto opened up an account for

9   Leonard Adler at the PaineWebber bank, or at least he made

10  sure that all the statements came from PaineWebber to his

11  house and he was able to direct funds in and out of

12  PaineWebber to his.  Totally secret.

13       These are all red flags that an intelligent person

14  would have told and -- said there is something wrong with

15  this.  Dr. Leveto knew.  He knew this wasn't legitimate.

16  Actually, there were several ways that Dr. Leveto actually

17  used this setup to get money.

18       I mean, we saw, through Margaret Leveto on the

19  witness stand, how he paid a lot of his personal bills with

20  business funds, you know, and he expensed them, supplies, or

21    miscellaneous.

22          We heard Karen Jeannerett testify that they had

23    $200,000.00 worth of supplies in one year at the vet clinic

24    where they are doing service on animals.  They are not a

25    grocery store.  You know, $200,000.00 worth of supplies for


174


1    500,000 in receipts.  The supplies were credit card bills.

2    They were categorized there.

3          Margaret Leveto says -- she took the stand and

4    said, yeah, these credit cards bills are us.  That's our

5    family vacation, jewelry, all paid by the business.

6          That is income, ladies and gentlemen.  None of that

7    appears on his tax return.  But, that wasn't the only way

8    that Dan Leveto was able to get the money.  We saw another

9    account in the name of Center Company called the Holding

10    Account.  And, yeah, it's a pass-through account.  That's

11    really all it was, was a pass-through account.  There is no

12    other purpose for it.

13          We have all these monies coming in, including a

14    substantial amount of his business receipts, almost 400,000.

15  And out of that account, when you start looking at who gets

16  the benefit of it, we see money going to Margaret Leveto and

17  PennBank and Integra and that included some payments for, as

18  Dr. Leveto said, for an airplane.

19        Jack Carl futures, that's the investment account,

20  foreign account, box Elder, Leonard Adler, we know who

21  controls the money in and out of those accounts.  It is

22  Dr. Leveto.  That was another way for him to get the money.

23        Then he got money out of the foreign accounts.

24  Dr. Leveto, with the assistance of Don Turner, established

25  accounts in the Turks and Caicos, Channel Islands and Grand

175

1  Cayman.  Why those places?  If this was a legal program and

2  the sale of Center Company was legal, then why funnel all

3  these monies to foreign countries, and why these countries?

4  Well, it's a great way to conceal because these countries

5  have no tax laws.

6        So, Dr. Leveto established Leonard Adler, used

7  Leonard Adler to receive funds.  Box Elder, Wayne Co.,

8  basically admits it.  I mean, the monies -- you know, the

9  address is the same as his.  The funds going in and out of

10    those accounts are all directed by him.  The only thing that

11    Dan Leveto was counting on was that the United States wasn't

12    going to trouble with him.

13         So, ladies and gentlemen, to sum up, Dr. Leveto

14    never lost any control of these funds.  You know, when we ask

15    ourselves, did he really get good, solid, decent advice from

16    people that he could have?  The answer is no.

17         I mean, he relied on Don Turner.  He said he

18    knew -- he said he even knew Don Turner was convicted of some

19    tax crimes.

20         Lifestyle stayed the same all the way through.  The

21    only thing he did was reduce his tax liability.

22         Now, there is some elements I just want to go over

23    with you briefly on the indictment.

24         Tax returns, the falsity.  The United States

25    alleged that he failed to report his business activities.  He

176

1    knew he had that duty to before, and this is why it was set

2    up this way so he could conceal it from the government.

3         If you look at the '94, '95 tax returns, you won't

4    see a Schedule C on there.  You won't see any gross receipts.

5    You won't see any business activity.  Dr. Leveto didn't

6    report any of that to the United States in those years.  You

7    got to find that he signed those returns under penalties of

8    perjury, and you will see that from the tax returns

9    themselves easily.

10         Now, we have also alleged in the alternative, that

11    you can also find that he should have checked that box saying

12    that he had control over a foreign account.  I think that was

13    clear yesterday.

14         You, know when we had Kimberly Iddon on the witness

15    stand and we saw that Box Elder account from Barclays Bank,

16    you know, and in the Grand Cayman Islands and we showed her

17    that letter directing that monies go out of that account,

18    that was from Dan Leveto.  He had enough authority over it to

19    be able to direct money in and out.  He had control over the

20    monies.

21         And we also have shown that Dr. Leveto knew about

22    that requirement.  I mean, I think he said today that, with

23    that TSB Bank, he specifically knew that I can't keep 10,000

24    in it, and he told his wife that and he tried -- now, he was

25    concerned about that one for one reason, because that account

file:///A|/LEVETO10.TXT

177

1   was in his own name.  That was the only account that he was

2   worried about, but he knew as long as I kept that below

3   10,000, I am okay, and he did.

4         But, these other accounts he didn't.  These other

5   accounts that he controlled that he had an interest in,

6   directed money in and out of these foreign accounts, no, they

7   were over 10,000 in those years.  We saw the money.  I am not

8   going to go into that again.  We saw the monies.  But, he

9   checked the no box.  And we have to prove that -- we will

10  have to prove to you that his conduct was willful, you know,

11  that he had that specific intent to do this.

12        Use of aliases to hide his ownership of the

13  business.  Use of aliases to hide his money in accounts not

14  in his name but of which he had total control.  Use of

15  foreign countries to flow the money back to him to conceal it

16  from the United States.  Use of his business to secretly pay

17  his personal expenses and the fact that Dr. Leveto knew his

18  duty from his previous filings and that he's a smart man.

19        The United States submits that we've proved

20    willfulness in this case, ladies and gentlemen, that

21    Dr. Leveto can't, can't hide behind this.  He can't hide.  He

22    can't put this (Indicating) up in front of him and say, hey,

23    I was just following what this book told me to do.

24        There is too many red flags that should have --

25    there is too much here that would have caused anybody to say

178

1    something is not right about this, about people who are

2    talking about keeping it out of the nosey and jealous state,

3    that have meetings in hotel rooms,

4        What it all comes down to, when you really think

5    about it, are those amended returns that Dr. Leveto filed in

6    1997.  When you start thinking about Dr. Leveto's intent at

7    the time, think about those returns.

8        Now, it wasn't so long after this that he started

9    zeroing out all his income.  He amended all those prior

10    returns.  He zeroed them out.  He said he read something and

11    he determined that he didn't have to report this anymore.

12    And Dr. Leveto says it had nothing to do with this program.

13    Nothing to do with this program?  Tax Free.

14        The fact that in 1997, Dr. Leveto, he is now

15   zeroing out his tax returns, that he doesn't -- that he's

16   read something that has convinced him that he doesn't have to

17   report this anymore to the United States and pay any tax, and

18   Dr. Leveto is telling us that that had nothing to do with Tax

19   Free.

20        The United States submits that it did, submits that

21   that is what was in Dr. Leveto's mind all the time.  From day

22   one in 1991 after he paid that huge tax bill to the United

23   States, that's what he was thinking about, how do I get out

24   of it for good, bow out of the system totally?

25        And then, with regard to the conspiracy, as I said,

179

1   we have to prove to you an agreement to conspire.

2        The United States submits that there is plenty of

3   evidence there.  You will see the correspondence back and

4   forth for years actually beginning in 1991 all the way

5   through, giving advice, implementing this program.

6   Dr. Leveto even agrees, he even states that he entered into

7   an agreement with them.  Don Turner and Paul Harris, he

8   entered into an agreement.

9          The goal of the conspiracy?  To impede and impair

10   the lawful functions of an agency of the United States, the

11   Internal Revenue Service.

12          And how did he impede?  Well, Agent Lapina was on

13   the witness stand and we asked him some questions about how

14   some of this conduct would -- what effect that would have on

15   the IRS?  You know, using aliases and nominees and foreign

16   accounts, taking things out of your name, how does that

17   affect the IRS?

18          Dramatically.  Yeah, it makes it a lot harder for

19   them to find if you don't have a bank account in your name

20   and the IRS sees something wrong with your return and they

21   want to investigate it, they are not going to find it if it

22   is not in your name.  If it is sent to another country that

23   doesn't have tax laws and you can't get any information on

24   it, like the Turks and Caicos Islands, how is the United

25   States going to find that?

180

1          So, the United States takes a look at Dr. Leveto's

2   returns, knows he is in operation running a veterinary clinic

3   in 1992, 1993, doesn't see it anywhere on his return and then

4   starts thinking, let's take a look, let's maybe investigate

5   this a little bit.

6       Where are they going to look?  When they go looking

7   for the Langdon and Leveto bank account that Dr. Leveto used

8   to use, the money is not there anymore.  It is in the name of

9   another account, Center Company.  So, how can they find it

10  there?

11      To impede and impair?  The government submits that

12  definitely this is done to impede and impair the government,

13  making it harder for them to find.  Foreign bank accounts,

14  uses nominees and aliases, Box Elder and Leonard Adler.

15      Of course, the United States alleged several overt

16  acts in the conspiracy that you will see, and really all you

17  have to do is find that one of them applies.  But, the United

18  States submits that we put on every single one of those overt

19  acts.

20      Dr. Leveto may contend that he really believed that

21  this was legal.  But, when you look at the program, itself,

22  the totally secret, don't disclose, red flags, does it really

23  look legitimate?  If it's legit, what is of the point of

24  keeping the secret?

25      And what about the CPA, Jim Scarpitti, did he ask

181

1   him?  What Dr. Leveto did was, he really, really took things

2   into his own hands here.

3       As I said when I started here, he's a man in

4   control.  He didn't like it.  He didn't like paying the tax.

5   He took care -- he made sure that he wasn't going to have to

6   do that anymore, that he would bow out of the system, and he

7   agreed with these guys, Don Turner and Paul Harris, kind of

8   an elaborate set up, but he went along with it.

9       No, ladies and gentlemen, this isn't about a man

10  who believed that this program was legal.  This is about a

11  man who wanted all of his income without having to give any

12  of it to the United States, pure and simple.  Took elaborate

13  steps to insure that the government didn't find out.  And

14  even if they did, it would be so difficult for the United

15  States to entangle, that they would forget about him.

16      And the United States submits, ladies and

17  gentlemen, that that's why Dr. Leveto did this.  And that is

18  why the United States asks you to return a verdict of guilty

19  on all counts.  Thank you.

20        THE COURT:  Dr. Leveto.

21        MR. LEVETO:  Yes.  Good afternoon, ladies and

22   gentlemen of the jury.

23        I think that it's important to focus on many of the

24   things that have come in front of you over the last week, and

25   there has been a lot of evidence and a lot of faxes and a lot

182

1   of numbers, and I am being accused of trying to defraud the

2   government.  And the bottom line is that basically the United

3   States contends that my whole reason for doing everything

4   that I did was to defraud the government, even almost as a

5   secondary way of saving taxes, but to defraud the government.

6        I maintain to you that really that's a long

7   distance away from the truth.  I think a lot of the things

8   that we will talk about now, as you familiarize yourself with

9   some of the other evidence, and certainly perusing the book

10   itself, Tax Free, the way the Super Rich Do IT, is a book

11   that speaks about many, many ways of reducing, and it is not

12   just about ending taxes.

13        It's a situation where, as you look at it, you are

14  going to be able to see that without me having to

15  characterize it.  But, keep in mind one thing, and I think it

16  is very important, the openness by which I was selling the

17  book.  The openness of myself and my transactions have to be

18  very, very important here.

19        The government contends that because there is a

20  foreign bank account and because there are certain numbers of

21  these things that are true, that automatically makes anything

22  that I was doing illegitimate, and that's just simply not

23  true.

24        The Internal Revenue service has many, many ways --

25  and, again, the transparency really was the fact that

183

1  accounts that had money coming in and out of them, those

2  could always be looked at.  Center Company was Center Company

3  doing business as Langdon and Leveto Veterinary Hospital.

4  All of these things would be very easy to examine on audit.

5        There was nothing really secretive about it because

6  even the wire transfers coming in or loans coming in, or

7  anything that I was doing, really was very, very observable.

8  Okay?

9          Now, the primary thesis and the primary theory of

10   the government's case revolves around the fact that since I

11   had control, that it's impossible for me to have done what

12   the paperwork says was done.  And I maintain that that, in

13   itself, strains the imagination.

14          First of all, I would be foolish to tell you that I

15   would want to sell and not have at least enough authority to

16   feel comfortable and maintain some sort of lifestyle, even if

17   I had on the horizon something that was going to produce a

18   windfall and profit, which I counted on the commodity trading

19   to do that, even if I had that on the horizon and I felt that

20   I could use credit and borrow money, I felt very, very

21   comfortable in doing it, yes, maintaining management

22   capabilities in the practice, and that's something common in

23   every-day America.  Corporations and very high officials in

24   many, many companies have very, very outreaching and very far

25   discretion in what they do with their companies.


184


1          Yes, this didn't change very much.  I wouldn't have

2   had it any other way.  That was part of the whole situation.

3   It is not what we are talking about is the problem in the

4   program.  We are actually talking about what -- FAR being

5   finders, that we can have like-minded people that were

6   interested in returns on investment realities, in businesses

7   being transferred, or realities in those types of things and

8   having common goals and things that we desire.

9           So, because it ends up in the way that I was doing

10  it, that those years certainly didn't change my taxable

11  income does not automatically mean that I was involved in a

12  scam or a sham.  That's an assumption that's very much

13  unwarranted, especially as you begin to peruse this

14  publication and really see how I was not at all doing

15  anything but being very public and not secretive about what I

16  was doing and even selling the book.

17          So, the government's position almost asserts that

18  anything that looks too good to be true must be that way in

19  the world of taxes.

20          I think it's another very important thing to think

21  about.  Even now if you look in the newspapers, you will find

22  very frequently tax amnesty programs for many, many drug

23  companies and large corporations that have got offshore

24  components and the government is inviting oftentimes to bring

25  these things in.  So -- at a greatly reduced tax.


185


1          So, I am just saying that to do and to work

2  offshore and to do some offshore things is not unusual, even

3  though it does carry a stigma with it many times that is

4  somewhat unwarranted.

5          It's not just the book and it's not just the idea

6  of, gee, would a reasonable person have red flags?  As I

7  said, and as you will see for yourself, without anybody

8  putting any spin on it, this book, I believe part of the

9  value-added component is as a marketing component, helping

10  you to believe or helping the buyer to believe that they have

11  something other people don't have; that is, a very big part

12  of the secrecy end of it.

13          Also, when we talk about privacy, I think we all

14  need to continually worry about our privacy.  I think it's a

15  very important thing that we are gradually losing.  But, not

16  only that -- yes, did the introductory letters raise flags

17  with me?  Did some of the correspondence raise flags with me?

18  Did some of the notes that I wrote that, of course, I don't

19  know the context that I was saying things in, but do those

20  thing raise flags?

21      Well, I have to tell you that it is really improper

22  to talk about flags, because to stand out as a third party

23  now, perhaps if I was audited and people talked to me about

24  it and we discussed things and had different positions,

25  reasonable people can disagree.  There is no doubt about

186

1  that.  I am sure you would agree with that.

2      But, the idea is that everything I did was

3  considered examining the law and walking within the law at

4  all the steps.  You will see in the book that's recommended,

5  but also even the flow chart I gave you, if you look at that

6  flow chart today, I don't feel it is less lawful than it was

7  back then.

8      In other words, if I was an individual that

9  traveled to one of these Islands and say I set up with my

10  uncle or someone else down there to be an investor that

11  actually could, within the laws of that jurisdiction, have

12  money come into that jurisdiction and him derive benefit and

13  I derive benefit and comport with the Internal Revenue laws

14   as they are here as well, in other words, when we talk about

15   effectively connected income, those are concepts that are

16   real.  They come from the Internal Revenue Code.  Not trying

17   to skirt the law.  That's foolish.  Taking advantage of the

18   law.  That's the whole thing.  Taking advantage of what you

19   can do to operate within the law.  And that's the issue here.

20   That really is the issue.

21        The government's theory cannot survive unless there

22   is the assumption that I knew that there was a nefarious deed

23   that I was committing and I was willful about it and my

24   intent was to violate a known legal duty.  I can assure you

25   that's not what it was, ladies and gentlemen.


187


1        Control?  Any business can mean a lot of things.

2   Generally speaking, men are free to make contracts and

3   appoint people to do virtually what they like to do.  A good

4   deal or a good business decision, perhaps if I was selling

5   the practice to a corporation of a relative in this country

6   that gave me virtually full discretion to do what I wanted to

7   do, may not be unusual at all.

8          I may have virtually all the things without the

9    ownership, and much of the profits in the practice may pass

10   into that corporation and that corporation may have the

11   choice of paying taxes or passing it on to shareholders,

12   wide-range decisions that people can -- within businesses

13   could reach.

14          But, you know, it's always been said that there

15   must be economic substance, there must be mutual benefitting

16   from it.  It can't be for the only reason of evading taxes or

17   avoiding taxes, which one is legal and one is not.  It can't

18   be for the only reason of doing that.

19          But, ladies and gentlemen, let's be very real about

20   this.  Many business decisions certainly have that as a large

21   component in their decisions and mine were like that to a

22   degree, not as the only thing, because I was also interested

23   in limited liability and all the other things that you get

24   from either having a corporation or another entity that we

25   are talking about now.


188


1          You have now seen evidence and heard testimony as

2    to some of the things about the core of the onshore business

3    here.

4          Yes, I had considerable latitude in borrowing

5    money.  Yes, I had a business that was paying me $2,198.00 a

6    month.  The business itself, I had a line of credit.  These

7    things are really not to be challenged unless one is to

8    believe that they were absolutely fake, and they are not a

9    fake.  The paper trail shows you that.  And because I exert

10   control and because I tallied them and because I keep track

11   of them, because I do those things does not mean that they

12   are wrong and it does not mean that they are fake.  That's

13   very important.

14         The government talks about all of these receipts in

15   the Schedule C.  I think that we have shown that disappearing

16   from one tax return and going to another one that,

17   unfortunately, the fatal flaw in the government's theories is

18   that it should not do that because the business wasn't sold,

19   and that is absolutely wrong.  There was a Schedule C being

20   prepared for the business, and when money disappeared, the

21   documentation existed and the Schedule C appeared somewhere

22   else.

23         But, when we talk about the several years of gross

24   receipts, certainly the government has not proved that I have

25   had control or I have had benefit in all of those years of

189

1   gross receipts.  That's a very important issue.

2         When it comes to these foreign bank accounts, which

3   are really a kind of a point that we have sparred back and

4   forth about them, the authority, permissive authority versus

5   another authority, nominee names, it is easy to try to put me

6   in a position of, these things were opened up by myself.

7         But, I maintain to the jury, please, understand,

8   the TSB account was the only account that was opened by

9   myself, and my wife and I had discretionary control over that

10   account.  All of the other issues that we have talked about,

11   if we talk about Leonard Adler for a couple of years, if we

12   talk about the Box Elder account and where it's moved, all of

13   those things that we are talking about, it must be understood

14   that there is not a document that says that I opened those

15   accounts, and I did not, or that I had ownership in them.

16         And when I speak of permissive authority, even

17   though the government does not like to hear that, and

18   obviously one of the prongs of what they are trying to

19  convict me of is that I knew, well, that I needed to x that

20  box, well, I think that I've brought at least testimony here

21  to tell you why that I didn't believe I needed to x it, nor

22  do I believe now it needs x'd.

23      When we have a situation that someone can operate,

24  as my office manager did, with a stamp, okay, a stamp to

25  endorse or a stamp to take control, and broad wiring

190

1  authority, if it's permissive authority, and she had to get

2  permission from me each time, as I had to get permission from

3  actually people that were in authority over that account each

4  time I did it.

5      So, it's a very important thing. And just because

6  circumstances point to, well, if you know what's in the

7  account, or if you get a statement, that must mean ownership,

8  that's not at all true.

9      The PaineWebber account opening. Well, we didn't

10  see the account-opening information. I can't remember, was

11  it Mrs. Weis, the PaineWebber -- I believe that the young

12  lady that testified, we heard testimony to the PaineWebber

13  information that had me as one of the people that would

14  receive statements on that account. Okay? Which doesn't

15  mean that nobody else was. Nobody else was.

16          But, as she testified, that was not an

17  account-opening application. I think that's a very important

18  thing. It's extremely important because there, the inference

19  that because I see statements or because I give investment

20  advice or because things come to my house that I own them is

21  not proper, and it's not correct. But, it is part of what

22  the government's theory has to hang on.

23          So, those accounts, even though I had a connection

24  on how successful they might be, it was, in no way, my

25  monies. It was for them to invest, them to gain interest

191

1  where they were, or if I found an investment or if I wanted

2  to borrow and pay interest on it, I could do that.

3          Again, the TSB account, I was fully aware of and,

4  again, sure, I was aware of the $10,000.00 limit. Is it

5  something that because someone does not want to make it go

6  over $10,000.00 that I am trying to, again, to hide a

7  nefarious deed? No, that doesn't mean that at all.

8        That means that I am knowledgeable of that law,

9  taking advantages of it and feeling comfortable doing it.  I

10  am not trying to hide anything.  And, of course, those

11  receipts who are those pieces of information were all freely

12  seen in bank accounts at the practice and my wife's account,

13  and things like that.  There was nothing hidden.

14        I maintain, again, that really all transactions

15  were transparent.  There is no doubt about that.  If we talk

16  about land and we talk about aircraft, we talk about any of

17  the things that I did to try to make good business monies or

18  good business moves that were totally transparent.  There was

19  nothing hidden.

20        I must say that, like I had said before, even

21  though I was a part of a lot of this -- and when I say "a

22  part of a lot of this" obviously I was at the helm, making a

23  lot of directions, but the numbers have been very confusing,

24  and to summarize many of these ways, you need to keep in

25  perspective that businesses move money, and sizable

192

1  businesses transfer and move money, and flow charts don't

2   always tell you intent behind things.  That is extremely

3   important.

4         So, the investments that I made to help Center

5   Company out, the other things that I did, there was nothing

6   at all wrong with that.  That helped to cement and guarantee

7   my position as I was doing a good job.  And I think that is

8   very, very important.

9         Control had continually come up as an issue.  And I

10  guess I wouldn't know what is acceptable control and what's

11  not acceptable control.  And I really guess that if someone

12  would have audited me or asked me and there would have been a

13  blueprint or a backdrop to know what I said at a certain

14  time, and then perhaps if a criminal investigation turned up

15  something different, one might say, well, that person alleged

16  one thing and we found out something different.

17         Well, I was never asked that.  And I still stand by

18  the affidavit of general manager's powers.  They have them

19  there.  And it was expanded for commodities trading and

20  investments, and things like that.  And I certainly make no

21  apologies for giving up control, and there is not a bright

22  line for giving up control.  The government's theory rests

23  upon the fact that I didn't give up enough where they would

24  never say it was a transaction.

25      I say again that is something reasonable people can

193

1  disagree on that, and I believe there is too much emphasis

2  put on that.  The elaborate transaction is, there really

3  weren't elaborate transactions.  Presenting six years of kind

4  of a lousy bookkeeper and too many checking accounts numbers,

5  makes anyone think that, well, it is kind of confusing and

6  what was going on?  Like I said, I was there and a lot of

7  this was really straining me to put it in perspective

8  because, again, perspective is everything.

9      So, I just think that it is very difficult, and to

10  make assumptions is very difficult on intent when I was not a

11  part of discussions or putting things together and it was all

12  taken from a theory that needed to be implemented.

13      Remember the puzzle analogy, the picture that

14  needed to be put together.  And that picture, even though

15  there were hundreds and hundreds and thousands of pieces of

16  evidence after five years, they finally were pounded together

17  and forged into a picture that the government wanted.

18          I never alleged that I was duped into thinking

19   things were proper and right in this book.  I certainly would

20   not allege that at all.  I pride myself in doing my homework.

21   I pride myself in feeling comfortable on my own that I am

22   doing the right thing.

23          I examined the court cases.  I examined the law as

24   I can find it.  I am not a lawyer so I can't make decisions

25   on the law, but I was satisfied when I did this.  There is no

194

1   way that I felt I was duped.

2          As a matter fact, as you see when you peruse

3   through the book, the law is not something that is cast aside

4   within the book.  If a person really wants to research what's

5   happening and what's being presented, there is a lot of

6   reference, and the bottom of each page is just packed -- or

7   many pages are packed with footnotes to allow you to do some

8   of your own research.

9          So, I make no apologies about that.  I certainly

10   was not duped into anything.  And the book is a very large

11   work with a lot of information in it, but I just think it's

12   information that is used or can be used by most everyone.

13          Someone desiring a domestic trust for estate

14   planning, someone desiring a domestic trust as a business

15   which has great tax advantages, and someone going light years

16   beyond that and associating and trying to get matched up with

17   people overseas.  So, there is a lot in there.

18          Should I have seen red flags?  I maintain, ladies

19   and gentlemen, I don't see red flags right now unless I spin

20   everything in the way that the government would have you see

21   it.

22          That flow chart I gave you today is as legal or

23   lawful, I will say, as I believe it was in 1991.  Now, I have

24   to say that tax laws, I believe, have changed since 1991 so I

25   can't really say for sure if everything is the same, but I

195

1   can speak now that I am not saying that, gee, I thought it

2   was because I am here.  I don't.  No.  I still believe in

3   that program because the program is very simple.  The program

4   is people being met up with companies on a tax haven island,

5   and that tax haven island, that is a great part of their

6   economy.

7          And if the laws of that tax haven island are

8   followed and everybody has economic gain and everybody has

9   economic benefit in it and there is agreement among parties,

10  our Constitution says that we certainly do have a right to

11  make those contracts.  And just because the government

12  alleges certain intent in doing that doesn't make the law any

13  different.  I maintain that's as lawful today as it was back

14  then.  But, I can't say that with the authority I did back

15  then because I did do the research, and my intent was always

16  to walk within not only the spirit but the letter of the law.

17  It's very important.

18          You also have to think about, when we talk about

19  intent, and even if I did give lip service, at times, secrecy

20  and privacy, or if I jumped on the telephone and took a note

21  off of somebody else out of the FAR organization, I mean, I

22  don't know the context of a lot of these notes, and things

23  like that.

24          I may have been told things or I may have written

25  things down that I didn't agree with.  You know, when you


                                196


1   look at probably eight years or five years of handwritten

2  notes, my golly, there are a lot of them.  I can't say that I

3  knew, and I think it is hard to put intent or structure

4  really to what they mean without knowing something about

5  them.

6          But, the thing is, I can't say what those -- what

7  some of those notes meant that the government has presented

8  to you, but I did feel that privacy was very important, and I

9  did feel that I respected the secrecy, the trade secrecy, and

10  anything else that they said that should have made me think

11  of red flags.

12          Well, I believe today that our privacy rights are

13  certainly being usurped and reduced.  I believe that we all

14  need to be thinking about the privacy and secrecy even, and

15  privacy do not make someone an outlaw.  Our founding fathers

16  believed in privacy, and privacy was a commodity that was

17  present back then so people didn't have to think about

18  secrecy.

19          So, that is a very important thing, especially when

20  our Bill of Rights was first put together.

21          But, did I openly sell the book?  I openly talked

22  about it.  Although some of the context of Mr. Rivera and

23  myself, oftentimes I was badgered to a point that it was

24  difficult to look at what was said.  But, the whole thing is,

25  I think it's important to understand that my open selling of

197

1  the book and espousing of the book, in other words, there is

2  so much in there, it is not that I am saying there is a

3  paragraph in there, that's not the way it is, and you will

4  see that when you look at the book.  It is not at all as

5  simple as the government would contend that it is of telling

6  someone to break the law.  That is kind of a given that I am

7  sure you will see.

8          I would like you to really consider the jury

9  instructions carefully and look at everything when it comes

10  to intent and willfulness.  I won't say I was duped.  I'll

11  make no excuse like that.  I do my due diligence much too

12  closely to do that.

13          But, I will say that I did my best to follow the

14  letter and the spirit of the law.  That's very important.

15  Because my actions, regardless of what the government wants

16  to spin my actions into being, my actions were always aimed

17  at trying to stay within the letter and the spirit of the

18    law.

19         And I think that it's important when you read the

20    charges and you look at the information regarding willfulness

21    and intent and good faith and beliefs, I think that I would

22    like you to really consider that, remember, especially the

23    conspiracy charge, the conspiracy charge makes an assumption

24    or as an element of that crime says that I and those people

25    that I associated with actually with intent did this to

198

1    defraud the government.

2         And I think that when you look at all the facts,

3    the intent, of course, when I went and spent $10,000.00 to

4    have First America Research do finding jobs for me or be a

5    facilitator offshore, because I certainly couldn't do it,

6    believe me that intent was that I was doing the right thing

7    or something that I felt good about.

8         So, please consider that.  I think that it's very

9    important in the overall -- your overall deliberations, and I

10    urge you to look at intent and willfulness as being key to

11    this entire -- this entire charge.  All three charges, there

12  are components of willfulness and intent.  There are other

13  components within them, but with the conspiracy charge, there

14  is almost -- there is not much of a threshold because there

15  were sure the things done that were said, but you have to go

16  back and make the assumption that the original thesis is

17  correct, that I did it for bad cause and I did it to defraud

18  the government.  So, that's really important.

19        I urge you to find me not guilty.

20        Thank you very much.

21        THE COURT:  Mr. Voracek or Ms. Calvin.

22        MS. CALVIN:  May it please the Court, Mr. Leveto,

23  members of the jury.

24        Abraham Lincoln once asked the question, if you

25  call a tail a leg, how many legs does a lamb have?  The


                                199


1  answer is still four.  Because calling a tail a leg doesn't

2  make it one.  He might have been talking about this case.

3  Calling it a sale doesn't make it one.  And did Dr. Leveto

4  really believe that he was selling his business?  Let's look

5  at what the evidence is.

6        We'll start out with the agreement, the agreement

7    that he says was signed 10, October, of '91.  Closing and

8    effective date.  Closing will be held October 10th, 1991, at

9    the offices of Culbertson, Weis, Schetroma & Schug in

10   Meadville at eleven o'clock in the morning.

11          One year later, September 21st, 1992, Dr. Leveto is

12   sent a letter by Russell Schetroma.

13          On a parting note, I must again remind you that our

14   file concerning your dealings with Denver and Center ends

15   with the submission of unsigned draft documents for your

16   attention.  We have no evidence of the conclusion of any

17   relationship between you and Center or of any closing

18   documentation.  You should have your new counsel immediately

19   review such matters to be certain that he or she is

20   comfortable with the relationship and documentation and is in

21   a position to protect your interest as may be necessary.

22          A year later, Mr. Schetroma notes nothing about the

23   finalization of the sale.

24          What else tells you there was no real sale here?

25   Mr. Scarpitti spoke about the sale to Center Company.  He had

200

1   been told by the defendant that he sold his business in

2   late -- 1991.  And the question was asked, when you sell your

3   business, a business is sold, who owns the gross receipts?

4   And the answer was, the new owner owns the gross receipts.

5   If he doesn't own the gross receipts, there is no sale.

6         Millie Custard testified.  The defendant called her

7   into the office and told her he sold the business and he told

8   her it was for tax purposes.

9         And Mrs. Leveto testified that after she and the

10  defendant divorced and the defendant left his veterinary

11  practice in a hurry, she never heard from Center Company.

12  She never sent them anything.  They never sent her anything.

13  Nobody ever called.  No one was even looking for a repayment

14  of the loans; nothing.

15         This proposed sale to Center Company allowed the

16  defendant to hide the fact that he owned a business that was

17  generating significant gross receipts.

18         If you look at Exhibit 23, where he applied for an

19  investment account during the prosecution period, they asked

20  how much he made annually?  He checked the box he made over

21  $100,000.00 annually, and it would be the government's

22  contention, indeed, he did.

23          And if you look at the flow chart, you look at what

24   happened to the money, who owned those gross receipts?  The

25   defendant owned those gross receipts.  He spent them.  Every

201

1   time there was money going offshore, you see it coming right

2   back.  And where does it go?  It goes to an entity controlled

3   by the defendant.

4          The defendant spoke of loans.  There is no evidence

5   of any loans here, or any loan repayments here.  The

6   defendant said that he was able to take money in the form of

7   loans because he was working on commodities trading for

8   Center Company.

9          Well, what do we know about his commodities

10   trading?  I'd ask you to look at Government Exhibit 134.

11   That is the information which was provided to Mr. Scarpitti

12   for the preparation of the 1992 personal income tax returns.

13          What does it show?  Futures loss for year.  He lost

14   $4,250.20.  In 1992, he is still learning commodities and yet

15   he would have you believe that Center Company was willing to

16   lend him hundreds of thousands of dollars for a commodities

17  program.

18          I would ask you to look at the tax returns that

19  this man filed.  The tax returns that Center Company filed.

20  See if there is some profit being made in the commodities

21  trading.  I would submit to you that this was while the

22  defendant did trade in commodities and he did enjoy it, that

23  when he speaks of benefit to himself and benefit to Center

24  Company, generally when a company is looking for benefit,

25  they are looking for profit, and he's telling his accountant

202

1  I lost money on.  I lost money.  I'm still learning.

2          The defendant told us, as well, that he was --

3  could buy and fix up airplanes, assuming that he could do

4  this for Center Company.  The FAA records are in.  They came

5  in without a witness because they were certified documents,

6  but they are in evidence.

7          The FAA records.  What will you see if you look at

8  them?  You will see that the defendant bought and sold

9  airplanes which were registered to Center Company and

10  himself.

11          What is our evidence on those airplanes?  You heard

12    from several witnesses, including office workers and

13    Mrs. Leveto that the only person who flew these planes was

14    Dr. Leveto.  There was no veterinary reason for him to be

15    flying it.

16          Where did he go?  He took vacations.  He took his

17    daughter to school.  He took friends for flights.

18    Mrs. Leveto said sometimes they took it and went out to

19    dinner and then came home.  But, there is no evidence that he

20    was making a profit selling airplanes for Center Company

21    either.  There is no evidence of that.

22          The evidence is to the contrary, that the defendant

23    was using veterinary receipts to purchase these airplanes for

24    his own pleasure.  You heard a lot about Leonard Adler and

25    you have seen a stamp.  That's Exhibit 229.  The letterhead,

203

1    Exhibit 251.  The note that says I give permission for my --

2    for Dr. Leveto to get information about this account.  That's

3    Exhibit 241.  You see the application for the TSB Bank

4    account.  It's Exhibit 194.

5          Mrs. Leveto looked at that, said it was the

6    defendant's handwriting.  I believe he admitted that today.

7    He says that his employer is Dr. Leveto.  He has an

8    interesting birthday.  Mrs. Leveto testified that's hers.

9    And, again, the address associated with the defendant.

10          And what do we know about Leonard Adler?  The

11    defendant claims he is a real person, someone who works for

12    him.  No one in that office ever heard from him.

13          And Mrs. Leveto told you that he told her it isn't

14    a real person.  That would be the government's contention.

15    Look at 221, a letter of indemnity.  Exhibit 222.  Exhibit

16    104, handwritten note.  He has been associated with me in my

17    practice.  Something you would expect someone to be able to

18    remember whether or not they had been associated with someone

19    in their practice.

20          There is not one shred of evidence that Leonard

21    Adler is anyone other than the defendant.

22          There is Wayne Co.  Look at 282.  Sole purpose to

23    hold a secret Post Office box.  98, AAA for Wayne Co. with a

24    note that Wayne Co. and Leonard Adler can get mail at P.O.

25    Box 54.  What do we know about that?  That it was opened in

204

file:///A|/LEVETO10.TXT

1    the name of Wayne Co. at the direction of the defendant.

2         What about the land transactions?  The seller

3    withheld $16,000.00 because they thought they were selling to

4    a foreign corporation.  At 341-H, the defendant wrote a note

5    to Mr. Scarpitti saying Center Company would apply for a

6    refund.

7         At note 233, the defendant makes a note to ask

8    about the refund for Center Company.  Exhibit 2B, Center

9    Company applies for a refund, and they receive it.  128, the

10   letter which we showed you from Paul Harris saying the refund

11   is here, it is going to be deposited.  It goes to a bank

12   account controlled by the defendant.

13        And what happens?  It comes back to the United

14   States into an account controlled by the defendant.  And so

15   it is with the funds, the limited funds that are going

16   offshore.  They find their way back to this country and they

17   find their way back to accounts controlled by the defendant.

18        Ladies and gentlemen, the evidence is overwhelming,

19   there was no sale.  And if there was no sale, the defendant,

20   who continued to operated the company, the veterinary

21   practice, who continued to get the gross receipts of the

22  veterinary practice, who continued to use the receipts from

23  the veterinary practice, was obligated to put it on his tax

24  return and he was obligated to account for those monies.

25        I think the evidence is overwhelming that the

205

1  defendant had no sale of this company.  He was obligated to

2  report the business receipts of his practice and he didn't do

3  so, that he had had assistance.  There is a lot of evidence

4  here, the letters, the notes back and forth, Paul Harris,

5  Don Turner; others.  It will show you that he didn't act

6  alone.  These letters and notes, they proceed throughout the

7  period of the conspiracy.

8        The defendant has spoken about the fact that this

9  was very straightforward and it was right out in the open.

10  That, of course, is a jury question whether or not opening

11  bank accounts in nominee names, opening Post Office boxes in

12  other names, having money offshore which you have wired off

13  and bring back, is straightforward and in the open.

14        Here's his version of where a dollar

15  goes.(Indicating.)  Straightforward?  This is the way the

16  system is supposed to work?  It's a jury question.

17          I would submit to you that that is not an

18    uncomplicated program.  In this, he said the money goes

19    offshore to Center Company, Jack Williams.  $1.00 in

20    company -- they have a choice here, according to both my

21    recollection of the testimony and his version -- $1.00 in

22    company.  They can file a 1040 nonresident return and pay tax

23    on it or they can have a K-1 distribution.  In other words,

24    they can pay how much tax they would like on it.

25          Well, we know how much tax they would like to pay

206

1    because we have got Exhibit 134, Exhibit 134 signed by the

2    defendant.  This is his tax organizer for 1993.  This says

3    you have a number of loans you can put here on income and

4    expenses in an unincorporated business organization.  Income

5    and expenses from rental real estate, interest in

6    partnership, interest in dividend income, any gains and

7    losses, you have net at this, at this, at this, there being

8    no figures on there, but we do know what the bottom line is

9    going to be because it's pre-printed.  Your bottom line after

10    net income from all sources, whatever it is, less

11   distribution, whatever it is, is going to be zero.  That is

12   the choice that Center Company has.

13          Dr. Leveto would have you believe that he relied on

14   advice and his own reading to come to the conclusion that he

15   has, but he had the opportunity to consult with any attorney

16   or his CPA here.  He had an opportunity to see Mr. Scarpitti

17   who prepared the tax returns.  He didn't know all of the

18   things that the defendant was involved in.

19          But, you did see about the land transaction which

20   we discussed earlier.  He could have gone to Cohen & Grigsby.

21   Did he ask for advice there?

22          While our firms have been -- and this is cc'd to

23   Russell Schetroma.

24          While our firms have been requested to handle the

25   documentation of the transfer, you have specifically

207

1   instructed both of us not to render any advice on the tax

2   implications of the transaction.

3          Two law firms at his disposal and he wasn't asked

4   for -- well, a CPA and a law firm and another law firm, and

5   he still didn't ask for any tax advice.

6          I would ask you to look through the records at all

7     of the secrecy, the number of times that the defendant is

8     cautioned, at all times keep no more than three month's worth

9     of records.  This is totally secret.  This bank account,

10    Leonard Adler, I would like to look at Exhibit 111.

11          If I may have just one moment to pull 111.  This is

12    a letter from one of the co-conspirators talking about bank

13    accounts.  He is talking about during the past six months --

14    this is in November of 1992 -- the rules have tightened even

15    more now.  Each signatory must now provide two bank

16    references from accounts that have been seasoned at least two

17    years and they must be original letters addressed

18    specifically to that specific bank.  No more copies.  We

19    would be short-sighted if we reject the real possibility that

20    the investor shall soon have to provide photo I.D.  Afterall,

21    that is the minimum requirement for every new bank customer

22    in virtually all other jurisdictions.  Think for a minute of

23    all the reasons why we will not, cannot provide such items to

24    a bank and you will appreciate why we accepted the challenge

25    of developing new technology.

1          There is a reason for this secrecy, ladies and

2    gentlemen, and the secrecy for all of this is to create a

3    confusing trail that the defendant and his co-conspirators

4    thought the government would never be able to follow.

5          We submit that all of these actions -- and many of

6    them are alleged in the testimony, were done for the specific

7    reason to defraud the United States.

8          The evidence is also fairly clear that the

9    defendant did have control over these bank accounts in the

10    foreign countries and, as such, on his 1994 and 1995 tax

11    returns, he was obligated to tell the government, yes, I do.

12          You have heard the defendant tell you that he had

13    some other kind of authority, but the documentation is very

14    clear, he sends a fax asking for the money and the money

15    comes and it's deposited into an account which is controlled

16    by the defendant.

17          Let's look at why we know the defendant knew what

18    he was doing was wrong.  I think the intelligence of this

19    defendant is beyond question.  His experiences similarly is

20    beyond the norm.  His accountant said that the defendant is

21    much more sophisticated than the average professional.  We

22    know how high he graduated, third in his college class, a

23    degree in biology, second in his class, graduating in two and

24    a half years.

25        If you look at the change to Exhibit 122, which is

209

1    a copy of the organizer which was seized at the defendant's

2    office, versus the tax organizer that was submitted to

3    Mr. Scarpitti for 1992, you will see that even after

4    Mr. Scarpitti worked on it, it was tinkered with a little bit

5    more.  By whom?  Someone who looked over the figures and knew

6    what he was looking for.  Another thing that you heard from

7    Mr. Scarpitti, which tells you two things.  One is that the

8    defendant knew what he was doing and also that there probably

9    wasn't a sale, is that all the personal expenses paid out of

10    the business.

11        Mr. Scarpitti testified that he saw that, when he

12    was helping the defendant fill out the 1992 organizer for

13    Center Company, that they had paid some of his personal

14    expenses to the tune of about $12,000.00, and he picked it up

15    as other income and that the defendant knew that if your

16  expenses were being paid by the company, it was income to

17  you.

18        The question was asked, well, you really don't have

19  to account for that until the end of the year?  No.  Maybe

20  not, but they didn't.  Nor the following years, there are no

21  personal expenses accounted for.  And why not?  Because it

22  was his company and you saw that he was booking them as

23  miscellaneous or other expenses, that he was running his own

24  personal expenses and they were substantially through the

25  company.

210

1        This defendant knew exactly what he was doing.  He

2  had the intent to disobey the law.  He conspired with others

3  to defraud the United States and he filed income tax returns

4  for 1994 and 1995 that did not account for the business

5  activity.

6        And you can think about the defendant's attitude

7  toward taxes.  Exhibit 71.  I certify that I am not a direct

8  nor indirect member of the IRS.  It's there for you to see.

9  Exhibit 73.  You are reminded not to keep more than three

10  months of records.  74.  There is protection against the

11  nosey government.  And it again reminds him not to keep

12  reports.  134.  The organizer with the pre-printed zero.  The

13  statement that he told Millie Custard that he sold the

14  business.

15        One other thing that we haven't really addressed

16  very much, but it is something to consider as well.  One of

17  the items that's alleged as an overt act is the transfer of

18  the house out of his own name into the name of his parents.

19  And Mrs. Leveto testified that this happened and he told her

20  they were going to do it for tax purposes, that he was afraid

21  that at this time, after the search warrant had occurred,

22  that the IRS might try to take the house, and he was

23  concerned.

24        He also admitted here today that he has followed

25  the advice of people who committed tax crimes.  These are not


                                211


1  the actions or thoughts of a person who honestly tried to

2  stay within the letter of the law.

3        And I would like to ask you to remember one thing

4  as you think about some of the information you have heard.

5          There are some things you heard from one source,

6    and one source only.  Many of these documents you have heard

7    the accountants speak about, you have seen the documents, you

8    have heard a number of witnesses, you have heard from the

9    bank custodian, and so on.

10          You have heard that Leonard Adler is a live person

11   somewhere -- offshore somewhere who got involved in

12   commodities trading with the defendant, and you have heard

13   that from one source, and that's the defendant, but there is

14   no evidence this is a real person.

15          You have heard from the defendant that he had

16   really no control over -- no actual control over Box Elder,

17   but that's really only from the defendant.  Your documents

18   will tell you differently.

19          The only person who is talking about knowing about

20   the consummation of the sale of the business is the

21   defendant.  His attorney doesn't know about it, as you can

22   see from the documentation.  He was taking loans because he

23   was going to do commodities trading, and you heard that only

24   from the defendant.

25          And you can see the documents that show there was

1  not a lot of money being made on these commodity trades.  You

2  heard that he fixed up airplanes and you heard that from the

3  same source.  You heard he left this area because he owed

4  people a lot of money and he was concerned for his safety,

5  and you heard that from only one source.

6        Ladies and gentlemen, we submit to you that the

7  evidence is not only beyond a reasonable doubt, it's

8  overwhelming that the defendant entered into a conspiracy, he

9  entered into an agreement with one or more other people to

10  defraud the United States, and that at least one of those

11  conspirators committed at least one of the overt acts in the

12  indictment, and he is guilty of conspiracy.

13        The evidence is also beyond a reasonable doubt that

14  the defendant owned that company, the practice.  He was

15  obligated to declare on his tax returns for 1994 and 1995

16  that Schedule C business and its receipts.  He did not do so

17  and it was a materially false tax return.

18        In the alternative, it was also materially false

19  because he was obligated, if he had signature authority over

20  a foreign bank account or other authority over a bank

file:///A|/LEVETO10.TXT

Case 1:01-cr-00006-MBC    Document 158    Filed 09/28/2006    Page 267 of 268

21  account, to report it to the government on his tax return.

22  And in 1994 and in 1995, the defendant checked the box no.

23      Ladies and gentlemen, we are going to ask you at

24  this time to return a verdict of guilty on Counts 1, 2 and 3

25  of this indictment.

213

1       THE COURT:  It is about four-thirty now, folks.  My

2  charge takes about forty-five minutes and we have had a long

3  day.  I think we ought to wait until morning before we do the

4  charge.

5       Could everybody get here by eight-thirty?  I don't

6  want to inconvenience anybody, but if you could, we could

7  start then.  Don't be afraid to put up your hand if that is

8  terribly inconvenient.

9       Well, let's shoot for eight-thirty.  I will not

10  hold you in contempt if you are here at eight thirty-five.

11  So, let's try to start at eight-thirty tomorrow and then the

12  case will be in your hands.

13  (The jury left the courtroom.)

14  (Court recessed on Wednesday, June 1st, 2005, at 4:30 p.m.)

15

16              * * * * *

17         I certify that the forgoing is a correct transcript

18    from the record of proceedings in the above-entitled matter.

19

20                        S/Michael D. Powers
                         Michael D. Powers
21                        Official Reporter

22      *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****

23

24

25