1          IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

_____

3

UNITED STATES OF AMERICA

4
                    Plaintiff

5
        vs.          Criminal Action No. 01-06ERIE

6

DANIEL J. LEVETO

7
                    Defendant

8  _____

9

                    PROCEEDINGS

10
        Transcript of Jury Trial commencing on Tuesday,

11  May 31, 2005, United States District Court, Erie,
    Pennsylvania, before Honorable Maurice B. Cohill, Jr.,

12  District Judge.

13  APPEARANCES:

14  For the Government:      For the Department of Justice
                    By:  Rita Calvin, Esq.

15                    By:  Thomas Voracek, Esq.

16  For the Defendant:      Pro Se
                    Stephen Misko, Esq.(Standby)

17
                    Reported by:

18                    Michael D. Powers, RMR
                    Official Court Reporter

19                    Room 5335 USPO & Courthouse
                    Pittsburgh, Pennsylvania 15219

20                    (412) 208-7572

21

22
   Proceedings recorded by mechanical stenography.  Transcript
23  produced by computer-aided transcription.

24

25

2

1           I N D E X

2   GOVERNMENT WITNESSES    DIRECT  CROSS  REDIRECT  RECROSS

3   BARBARA ROBERTS

4    By Ms. Calvin        3
       By Mr. Leveto               11
5
     KIMBERLY IDDON
6
       By Mr. Voracek     12         132
7    By Mr. Leveto         118        136

8   OPENING STATEMENT BY DEFENDANT - PAGE - 145

9   CHARGE CONFERENCE - PAGE 159

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


Roberts - Direct(By Ms. Calvin)          3


1          P R O C E E D I N G S

2  (Court reconvened on Tuesday, May 31, 2005, at 9:05 a.m.)

3          THE COURT:  Good morning.

4  (The jury entered the courtroom.)

5          THE COURT:  Good morning.  Be seated, please.

6          Hope you all had a nice weekend, and I appreciate

7  your showing up on time today.

8          Okay, Ms. Calvin.

9          MS. CALVIN:  The government calls Barbara Roberts.

10      THE COURT:  Would you come forward and be sworn,

11  please?

12      THE CLERK:  Would you raise your right hand.

13          * * * * *

14      BARBARA ROBERTS, having first been duly sworn,

15  testified as follows:

16      THE COURT:  Would you have a seat up here, please,

17  and give us your name and spell your last name.

18      THE WITNESS:  Barbara Roberts.  R-o-b-e-r-t-s.

19      THE COURT:  Thank you.

20          DIRECT EXAMINATION

21  BY MS. CALVIN:

22  Q   Now, Miss Roberts, where do you reside, city and state?

23  A   Linesville, Pennsylvania.

24  Q   And are you currently employed?

25  A   Yes.


            Roberts - Direct(By Ms. Calvin)          4


1  Q   Where are you employed?

2  A   Meadville Veterinary Clinic?

3  Q   Now, do you know the defendant, Dan Leveto?

4   A   Yes, I do.

5   Q   How do you know Dan Leveto?

6   A   Well, I worked for him.

7   Q   When did you start working for Dr. Leveto?

8   A   Oh, March of 1995, I believe.

9   Q   Now, when you are started working for Dr. Leveto in 1995

10   were you part time or full time?

11   A   Part time.

12   Q   Did you eventually go and become a full-time employee?

13   A   Yes.

14   Q   And during your employment with Dr. Leveto, what was

15   your position?

16   A   I was an assistant to him, holding animals and assisting

17   in surgery.

18   Q   What were some of your other responsibilities?

19   A   Cleaning the kennels and taking care of the animals.

20   Q   Now, were you working at the clinic in December of 2001?

21   A   Yes.

22   Q   And who else was working at the clinic at that time?

23   A   Deborah Trace.

24       THE COURT:  I didn't hear your answer.

25       THE WITNESS:  Deborah Trace.  T-r-a-c-e.

Roberts - Direct(By Ms. Calvin)          5

1  Q    And anyone else?

2  A    Kristin Renninger.(Sp)

3  Q    And how many veterinarians were at the clinic at that

4  point?

5  A    Just Dr. Leveto.

6  Q    I am going to ask you if you could speak into the mike a

7  little bit more.  I'm having difficulty hearing you.  I'm

8  sorry.

9  A    Yes.

10  Q    Now, in December of 2001, where was Dr. Leveto living?

11  A    There was an apartment up above the hospital and he was

12  living there.

13  Q    On the second floor?

14  A    Yes.

15  Q    Was he living there full time?

16  A    Yes.

17  Q    And what type of vehicles did Dr. Leveto have?

18  A    He drove a truck.

19  Q    Now, would you describe that truck a little more fully?

20  A    A white -- I think it was a Ford.

21  Q    Did it have a camper?

22  A    Yes.

23  Q    Was it a vehicle like somebody could actually go camping

24  in?

25  A    Yes.


                Roberts - Direct(By Ms. Calvin)          6


1   Q    Were you working on December 11th, 2001?

2   A    Yes.

3   Q    And did something out of the ordinary happen on

4   December 11th, 2001?

5   A    It was a day like any other.  Dr. Leveto was there and

6   we did surgery, and he left his normal time like he always

7   did.  And then someone from up front, one of the

8   receptionists, came and told me that Dr. Leveto -- that an

9   indictment had come down and Dr. Leveto was going to be

10  indicted.

11        MS. CALVIN:  Your Honor, we would ask the Court to

12  take judicial notice of the fact that this indictment was

13  unsealed on December 11th, 2001.

14        THE COURT:  We'll grant that motion.

15   Q    Did you come into the clinic the next day, December 12,

16   2001?

17   A    Yes.

18   Q    And when you pulled into the parking lot, did you notice

19   anything unusual?

20   A    His vehicle wasn't there.

21        THE COURT:  Excuse me.  What date was that?

22        THE WITNESS:  Wednesday, the twelfth, I believe.

23   Q    Now, had you seen an article regarding Dr. Leveto being

24   charged in this case?

25   A    That morning when one of the other secretaries came in.

Roberts - Direct(By Ms. Calvin)          7

1   Q    I am going to hand you what's been marked as Government

2   Exhibit No. 427 and ask if you recognize it.

3   A    Yes, I do.

4   Q    What is that Government Exhibit 427?

5   A    Pardon me?

6   Q    What is Government Exhibit 427?

7   A    It's the article that appeared in the Meadville Tribune

8   on Wednesday, Meadville couple charged in tax case.

9         MS. CALVIN:  Your Honor, we would move for the

10   admission of Government Exhibit 427.

11         THE COURT:  427 is admitted.

12   Q    So, on the morning that this appeared in the newspaper,

13   you drove to work, it was a day like any other day for you,

14   is that correct?

15   A    Yes.

16   Q    When you arrived in the parking lot, the vehicle was

17   gone?

18   A    Yes.

19   Q    Was Dr. Leveto usually in the clinic at the time that

20   you arrived for work?

21   A    Yes.

22   Q    So, when you noticed that his vehicle wasn't there, this

23   would have been unusual?

24   A    Yes.

25   Q    And when -- did you unlock the door?  Was it you who

                Roberts - Direct(By Ms. Calvin)          8

1   opened up the clinic that morning?

2   A    Yes.

3   Q    When you opened the clinic, did you notice anything

4 unusual at the clinic?

5 A Not right away I didn't.

6 Q And as the day wore on, did patients start to come?

7 A Yes.

8 Q And did Dr. Leveto appear?

9 A No.

10 Q And after you noticed that the day was going on and

11 patients were coming and Dr. Leveto wasn't there, then did

12 you notice anything missing around the clinic?

13 A I noticed his computer was gone from his desk.

14 Q Any other things that you noticed missing at that time?

15 A Not that I am aware of.  Dr. Leveto liked to collect

16 things, so there was a lot of items in the clinic.

17 Q Did you notice whether boxes in the lunchroom were

18 missing?

19 A No.

20 Q Now, did you come to work for the rest of the week?

21 A Yes.

22 Q And did Dr. Leveto come to work the rest of the week?

23 A No.

24 Q Did he leave any instructions for what to do in his

25  absence?

                    Roberts - Direct(By Ms. Calvin)        9


1  A   Not that I am aware of.

2  Q   Did he tell you how long he would be gone?

3  A   No.

4  Q   And how much longer did you work?

5  A   Til the end of the week.

6  Q   And why did you decide to quit at that point?

7       You did decide to quit?

8  A   Yes.  I left a letter on his desk saying I was leaving,

9  and basically I didn't know whether we were going to get paid

10  or not, and we were kind of in limbo really, didn't know what

11  was going to happen to the clinic.

12  Q   Now, at the time that you worked at the clinic from the

13  time you started in 1994 until you left in 2001, who made all

14  the business decisions?

15  A   Dr. Leveto.

16  Q   Who did you think owned the practice?

17  A   Dr. Leveto.

18  Q   Did you ever meet anybody from a company called Center

19  Company?

20  A   No.

21  Q   Now, after you quit working at the veterinary clinic, at

22  some point did you go back and begin working again at the

23  clinic?

24  A   Yes.

25  Q   Would you explain to us how that happened?

Roberts - Direct(By Ms. Calvin)          10

1   A   I believe it was in January, Mrs. Leveto called me and I

2   had been collecting unemployment at the time.

3   Q   This was 2002?  January of 2002?

4   A   Yes.

5   Q   Okay.

6   A   And she wanted to know if I wanted to come back to work.

7   Q   And did you?

8   A   Yes, I did.

9   Q   And what was it that Mrs. Leveto wanted you to do when

10  she hired you?

11  A   Basically be a receptionist, answer the phone, assist

12  the new veterinarian that she hired to work for her.

13  Q   And why was Mrs. Leveto making these decisions instead

14  of Dr. Leveto, if you know?

15  A    Oh, she showed me a court document that said that she

16  was -- she had taken over the business.

17  Q    And how long did you work there?

18  A    Til March.

19  Q    And who else was working at the clinic at that time?

20  A    There was -- Mrs. Leveto was there, Mr. Morandini(Sp)

21  and Mrs. Morandini.

22  Q    Are those Mrs. Leveto's father and mother?

23  A    Parents, yes; and Becky Leveto and Amy Leveto.

24  Q    Now, to the best of your knowledge, did Daniel Leveto

25  ever return to the veterinary clinic after December 11th,

11

1  2001?

2  A    No.

3        MS. CALVIN:  Thank you.  I have no further

4  questions.

5                    CROSS-EXAMINATION

6  BY MR. LEVETO:

7  Q    Just a couple of things.  Good morning, Barbara.

8        Barbara, did I speak with you about the ownership

9   of the practice?

10   A    No.

11   Q    Would I have reason to speak with you about personal

12   issues like that?

13   A    No.

14   Q    So, did we really even talk personally about the

15   business?

16   A    No.

17   Q    Okay.

18        MR. LEVETO:  That is all, Your Honor.

19        MS. CALVIN:  Nothing further, Your Honor.

20        THE COURT:  Thank you, ma'am.

21        THE WITNESS:  You're welcome.

22   (Thew witness was excused.)

23        MR. VORACEK:  Your Honor, the United States calls

24   Kimberly Iddon.

25        THE COURT:  Stand here and be sworn, please.


                              12


1         THE CLERK:  Raise your right hand, please.

2                    * * * * *

3          KIMBERLY IDDON, having first been duly sworn,

4    testified as follows:

5          THE COURT:  Would you have a seat up there, please?

6          THE WITNESS:  Certainly.

7          THE COURT:  Give us your name and spell your last

8    name?

9          THE WITNESS:  It's Kimberly Iddon.  I-d-d-o-n.

10         THE COURT:  Thank you.

11         MR. LEVETO:  Your Honor, I object to Miss Iddon as

12   a witness.  Maybe we can go to sidebar.

13         THE COURT:  All right.

14   (Sidebar discussion.)

15         MR. LEVETO:  Maybe I should come over there by him.

16         Your Honor, I don't believe that Miss Iddon's

17   testimony would be properly admitted in that it contemplates

18   summarizing and presenting issues that would be very, very

19   prejudicial to me.

20         THE COURT:  Well, excuse me.  Let's have an offer

21   on Miss Iddon.

22         MR. VORACEK:  Yes, Your Honor.  Miss Iddon would

23   testify about several summaries that she reviewed for

24   accuracy prior to --

25        THE COURT:  Is she an IRS employee?


13


1        MR. VORACEK:  Yes.  She prepared summaries that is

2   based upon the admitted documentation.  It is to assist the

3   jury in looking at the voluminous records.

4        THE COURT:  Sure.  This is standard procedure in a

5   tax case.

6        MR. LEVETO:  Well, the thing is, Your Honor, I

7   think it's particularly important here because many of the

8   government's allegations that the jury has the information,

9   the jury is smart enough to look at the information and think

10   of the information.

11        THE COURT:  I don't think anybody is smart enough

12   to look through five hundred documents plus the subsets.

13        MR. LEVETO:  But, the thing is, what we are

14   actually looking at and what is in the charging document in

15   the indictment, they have had many backgrounds, okay, and

16   properly so, much background, many, many documents.  They

17   have been inundated with documents.  Just like in United

18   States versus Taylor, where the Court held that -- it's a

19  Fifth Circuit case -- the Court held that while the

20  government chart did not accurately reflect the underlying

21  testimony, it allowed the government to assume that which it

22  was required to prove beyond a reasonable doubt.  It was not

23  harmless.

24       In this situation, we have a number of these charts

25  that the underlying testimony has not shown them all to be in

                Iddon - Direct(By Mr. Voracek)          14

1  relationship with each other, and now we are asking the jury

2  to make another whole decision on whether the summary charts

3  are an accurate reflection of the testimony.

4       THE COURT:  I am going to let the jury decide that.

5  So, we'll overrule the objection.

6  (End of sidebar.)

7            DIRECT EXAMINATION

8  BY MR. VORACEK:

9  Q   Miss Iddon, would you please give us your residence,

10  simply city and state, please?

11  A   Jeannette, Pennsylvania, Westmoreland County.

12  Q   Are you employed?

13  A   Yes, I am.

14  Q    Where are you employed?

15  A    With the Internal Revenue Service, Monroeville,

16  Pennsylvania.

17  Q    How long have you been with the Internal Revenue

18  Service?

19  A    It will be seventeen years the end of this week.

20  Q    What is your current position with the IRS?

21  A    I'm an Internal Revenue agent.

22  Q    As an Internal Revenue agent, what are some of your

23  duties?

24  A    My main duty is to determine the correct tax liability

25  of tax returns that are assigned to me, to do examinations or

                Iddon - Direct(By Mr. Voracek)          15

1  by conducting interviews with taxpayers, their

2  representatives, be it an attorney an accountant, and any

3  third party contacts, via banks or vendors that they do

4  business with.

5          And, in essence, after doing the interviews and

6  looking at the third-party contact information, to determine

7  their correct tax liability for that return that's been

8    assigned to me.

9    Q    Now, have you been an Internal Revenue Service --

10    Revenue Agent for the entire seventeen years?

11    A    For the last two and a half years, I have been assigned

12    to the Special Enforcement Program Group, which basically we

13    concentrate on fraudulent areas of income tax, of the

14    Internal Revenue Code.

15        So, I concentrate on returns that have fraudulent

16    potential.  They have either been referred by the Criminal

17    Investigation Division or possibly an informant.

18    Q    And that's for the past two and a half years?

19    A    Correct.

20    Q    So, prior to that time, you spent your time as a general

21    Revenue Agent?

22    A    Right, where I have done criminal investigations of

23    corporation and partnership type returns.

24    Q    Miss Iddon, could you please describe your educational

25    background?


                Iddon - Direct(By Mr. Voracek)            16


1    A    Yes.  I have an accounting degree, Bachelor's of Science

2    from Robert Morris University, Pittsburgh, Pennsylvania.

3   I've -- through the Internal Revenue Service, I have been

4   able to attend several training classes every year.  We go to

5   continuing education classes forty hours a week for once a

6   year.  And I have been trained in a one-week long offshore

7   credit card program, and I have had a two-week Special

8   Enforcement Program Training Class.

9   Q    Would you describe your education as on a continuing

10  basis?

11  A    The CPE credits every year?

12  Q    Yes.  Any of your education.

13  A    The continuing education classes, normally they are

14  self-study type courses where you get to pick your topic.

15  Normally, I concentrate obviously on tax law, so I will take

16  a tax law course, auditing courses.  I have taken some

17  internal fraud awareness courses over the seventeen years of

18  selecting topics to take.

19  Q    Now, Miss Iddon, in examining an individual or a

20  business' returns, you indicated that you look at several

21  things, including, I believe you said, third parties?

22  A    Right.  A third party is -- could be a bank, any type of

23  lending institution.  It could be any type of business that

24   the taxpayer would deal with.

25       Let's just say it's a grocery store.  So, a third

Iddon - Direct(By Mr. Voracek)          17

1   party would be a supplier that supplies them possibly their

2   electrician, their maintenance crew.  Anybody to whom that

3   individual taxpayer does business with would be a third

4   party.

5   Q   Now, along with contacting the third parties, are you

6   also looking at records provided by the third parties?

7   A   Absolutely, right.

8   Q   And so with regard to, let's say, a bank as a third

9   party, what types of records would you be looking at?

10  A   Their bank statements, their -- usually we ask for their

11  signature cards, copies of any contracts, any loan documents

12  that they have, deposit tickets, cancelled checks.

13       If -- many times somebody will make copies of all

14  their deposit items that they -- before they deposit them

15  into the bank.

16       So, all of that stuff or all those documents are

17  things that we look at, that I look at.

18  Q   So, in your time as a Revenue Agent in examining

19   individual's returns, you are looking at bank statements.

20          Are you able to do calculations based on the bank

21   statements?  Are you proficient in that regard?

22   A   Yes, sir.  I have had several courses over the seventeen

23   years of being trained, and there are indirect methods in

24   which we can determine the income from a -- from third

25   parties, from bank information and other living standards

                 Iddon - Direct(By Mr. Voracek)            18

1   that they use to come up with the correct income that should

2   be found in the tax return, and we compare that then with the

3   income that's been reported on the tax return of the

4   taxpayer.

5   Q   Now, Miss Iddon, I believe you testified that you have

6   spent several years examining an individual's tax liability

7   for their tax returns.

8          I assume that's on a 1040?

9   A   Yes, sir.

10   Q   But, I think you also indicated that you are also aware

11   and you have examined businesses?

12   A   Yes, I have done corporations, which would file a form

13   1120, S corporations that would file an 1120 S and

14   partnerships that file Form 1065.

15   Q    If an individual is in business for themselves, what

16   does the IRS call that type of business?

17   A    You're a self-employed proprietor and you file a 1040

18   with a Schedule C attachment to that 1040.

19   Q    Now, as a Revenue Agent in the past fifteen, seventeen

20   years, have you examined that type of individual's tax

21   liabilities who owns their own business?

22   A    Most definitely I have.

23   Q    Can you give us an estimate of how often you have done

24   that?

25   A    I would say probably fifty returns a year.  So, probably

Iddon - Direct(By Mr. Voracek)          19

1   about two hundred returns at least.

2   Q    Now, when you examine an individual's returns who own

3   their own business, do you also have an opportunity to

4   examine that individual's books and ledgers?

5   A    Yes.  One of the requirements is that, when we send out

6   an appointment letter to the taxpayer, that we ask them to

7   provide their books and records that they have used and

8   required to maintain and keep, that they provide those at the

9   initial appointment so that we can review them and compare

10  them to the information that was recorded and reported on the

11  Schedule C 1040.

12  Q    Now, does every business prepare the exact same type of

13  ledgers and books, or are there differences?

14  A    There are vast differences, yes.  There is no set

15  standard of books and records that need to be kept in the

16  eyes of the Internal Revenue Service.

17          All we ask is that you keep books and records of

18  some type of accounting of your business.

19  Q    That leads me to the next question then.

20          The books and records that we talked about are for

21  an accounting of the business.  Could you explain the types

22  of information that a business should have on their books and

23  records?

24  A    Yes.  Um, a business is required to keep track of their

25  income, their cost of goods sold and any expenses that they

Iddon - Direct(By Mr. Voracek)          20

1   have that they have generated in the course of doing

2    business.

3         Some people have come in with shoe boxes filled

4    with receipts and, quite honestly, if that's a reflection and

5    they can explain to me how that has been reported on their

6    Schedule C, we get through the examination, but -- if in that

7    box is contained how they have arrived at their income and

8    how they have arrived at their expenses, and that's basically

9    the point, that they have to be able to provide and show that

10   they have kept a recording of their income and their expenses

11   and that they can document that to me.

12   Q    Is it fair to say that your basic rule as a Revenue

13   Agent is to look at a individual's tax return, a corporation

14   or partnership or sole proprietorship, and compare it with

15   the books and records available to you and the bank records

16   for accuracy?

17   A    Yes, that is.

18   Q    Is that, in a nutshell, what you are doing?

19   A    Yes.  In a nutshell, that is, I guess, what I do.

20   Q    Now, Miss Iddon, you have been present in court every

21   day during trial?

22   A    Yes, sir.

23   Q    And you have heard all the testimony presented?

24  A   Yes, sir.

25  Q   Have you also reviewed all the documentation that's been


                Iddon - Direct(By Mr. Voracek)            21


1   admitted into the record?

2   A   Yes, sir, I have.

3   Q   Now, based upon the evidence that you have seen and

4   heard during the trial in this matter, have you had an

5   opportunity to review summaries for accuracy?

6   A   Yes, I did.

7   Q   Miss Iddon, I believe you have in front of you what's

8   been marked as Government Exhibits 445 through 570.

9           Again, the numbers would be 445 through 570.

10  A   Yes, I have them.

11  Q   Do you recognize those documents, Miss Iddon?

12  A   Yes, I do.

13  Q   What are they?

14  A   These are summaries that -- of the veterinary business

15  receipts from the time period September of 1991 through

16  December of 1991, 1994 and 1995.

17          Also, there are summaries of deposits into the

18  various bank accounts that we've discussed and have been

19  entered into evidence for the Center Company operating

20  account for the same time periods 1991, 1994 and 1995.

21  Q    Miss Iddon, let me ask you generally -- we will be going

22  over them more specifically -- but, generally, do those

23  represent summaries of the documents and evidence in this

24  case that you reviewed for accuracy?

25  A    Yes. I am sorry. Yes, they are summaries, that the

                    Iddon - Direct(By Mr. Voracek)        22

1  information that was entered into evidence is quite

2  voluminous at times.

3          And basically what we have done is, we have just

4  summarized it and put it into a format in which we can just

5  easily look at it and get information from it.

6  Q    Now, when you reviewed these summaries, are there

7  exhibit numbers actually on the summaries themselves?

8  A    Yes, sir. They are cross-referenced to -- for example,

9  Government Exhibit 445 is cross-referenced to Government

10  Exhibit 31-A, and that's the veterinary business receipts.

11          And if I do recall, that exhibit was a long ledger

12  in which it was cross-referenced by category. And what we

13  have simply done here is, we picked each date of that month,

14  September of 1991, and listed the total for the day, the

15  total sales or receipts.

16  Q    So, is it fair to say that the summaries that you

17  reviewed from 445 to 570 have information taken from the

18  documents submitted in evidence and the corresponding exhibit

19  number?

20  A    Absolutely, yes, sir.

21  Q    Now, Miss Iddon, I am going to specifically direct your

22  attention to Government Exhibits 445 to 474.

23  A    Yes, sir.

24  Q    And what are those summaries, in general?

25  A    Again, these, in general, are the veterinary business

                    Iddon - Direct(By Mr. Voracek)          23

1  receipts for the years 1991, September through December, all

2  of 1994 and all of 1995.

3  Q    Now, Miss Iddon, you mentioned the word "receipts."

4        Is that a term of art for the IRS, or what do you

5  mean when you say "receipts"?

6  A    The income that was taken in by the business or the

7   revenue that they received.

8   Q   Now, in preparing Government's Exhibits 445 to 474, what

9   types of evidence or -- but, in reviewing for accuracy those

10  summaries, what types of evidence did you examine?

11  A   I looked at exhibit -- Government Exhibit 31-A, which

12  were the daily ledger sheets of Dr. Leveto's veterinary

13  business for the time periods September through December of

14  1991, all of 1994 and 1995.

15  Q   Are you satisfied that those exhibit numbers accurately

16  reflect the admitted evidence?

17  A   Yes, sir.  I read through each date and cross-referenced

18  it and made sure that the totals were the same on the

19  Exhibit 31-A with the long ledger sheets and that they were

20  recorded and picked up properly on this government exhibit.

21       MR. VORACEK:  Your Honor, the government moves for

22  admission of the summaries, Government Exhibits 445 to 474.

23       THE COURT:  445 to 474 are admitted.

24  Q   Miss Iddon, I direct your attention specifically to the

25  very first document, Government Exhibit 445.

                    Iddon - Direct(By Mr. Voracek)          24


1        Do you have that in front of you?

2   A    Yes, I do.

3   Q    Now, does this document indicate, as noted in the title,

4   veterinary business receipts for one month, September, 1991?

5   A    Yes, it does.

6   Q    And, again, where was this information taken from?

7   A    This was taken from the Government Exhibit 31-A, which

8   was the ledger sheet that was utilized by -- I believe the

9   bookkeeper's name was Karen Jeannerett.

10          She said that they used the ledger sheets to record

11   the veterinarian daily business receipts.  So, they would

12   record any supplies used, any surgeries.  Each column had its

13   own total of the breakdowns for the day, and then this total

14   would then be the total of the columns across the spread

15   sheet.

16   Q    So, this represents, if you look at the very first entry

17   September 3rd, 1991, the amount of $3,910.87, does that

18   represent the entire receipts brought in by the veterinary

19   clinic on that day as reflected by the ledgers?

20   A    That's exactly what it reflects, yes.

21   Q    Now, after you were able to -- after you were able to

22   index all of the receipts for every day, were you able to

23  calculate an amount of veterinary business receipts for the

24  month of September, 1991?

25  A   Yes.

          Iddon - Direct(By Mr. Voracek)          25

1   Q   And what was that amount?

2   A   That amount was $51,476.81.

3   Q   Now, Miss Iddon, would it be your testimony that the

4   other exhibits regarding veterinary business receipts,

5   Government Exhibit 446 through 474, are very similar type

6   summaries with regard to the business receipts as reflected

7   by the business ledgers?

8   A   Yes, sir.

9   Q   And they just pertain to different time periods?

10  A   That's correct.  Each government exhibit in these

11  summary category that we have just entered reflects a

12  specific month and year.

13         And, again, it's the same pattern that I used.  And

14  the same steps that I took in September of '91, I did for the

15  other years, compared each day to the totals that were listed

16  on the spread sheets that were kept by the business.

17  Q   So, if we just very briefly go through a few of these.

18  What would be the total amount of veterinary business

19  receipts for say October 1991?

20  A    $53,721.47.

21  Q    And if we go to 1994 -- January, 1994, Government

22  Exhibit 451, what was the amount of business receipts in that

23  month?

24  A    $35,444.48.

25  Q    And Government Exhibit 457, I believe, is for July of

                Iddon - Direct(By Mr. Voracek)          26

1  1994.

2        What would be the total amount of veterinary

3  receipts for that month?

4  A    $47,113.56.

5  Q    And the business receipts for January, 1995, as

6  reflected in Government Exhibit 463, what would be the total

7  receipts?

8  A    The total receipts for January of 1995 would be

9  $44,891.44.

10  Q    And Government Exhibit 467, for May of 1995, the total

11  amount of receipts, please?

12  A   $50,216.36.

13  Q   And, finally, for December, 1995, the total amount --

14  and that's reflected in Government Exhibit 474 -- the total

15  amount of veterinary receipts as reflected by the business

16  ledgers, please?

17  A   $40,633.21.

18  Q   Now, Miss Iddon, based upon your review of the evidence

19  in this case and the testimony that you have heard, and as

20  part of your job as a Revenue Agent, when you look at

21  business ledgers, do you track monies, where the monies go?

22  Is that part of your job?

23  A   Yes, sir.

24  Q   And in this case, where did the business receipts go by

25  what you have heard from the witness stand and also by the

                    Iddon - Direct(By Mr. Voracek)          27

1  documentation?

2  A   The business receipts were deposited into Center

3  Company's Operating Account.

4  Q   And have you had an opportunity to look at Center

5  Company's Operating Account bank records?

6  A   Yes, sir, I have.

7   Q    What was the exhibit number of that Operating Account

8   bank record, do you recall?

9        Let's look at Government Exhibit 475.

10  A    Okay.

11  Q    Do you have that in front of you?

12  A    Yes, sir.

13  Q    What is Government Exhibit 475?

14  A    Government Exhibit 475 is a summary sheet that has been

15  prepared and that I reviewed for accuracy of all deposits for

16  September of 1991 that were deposited into Center Company's

17  Operating Account, and I'm sorry, it was Exhibit 11-B-1 that

18  I should have -- that I utilized to do this.

19        So, those would have been the bank statements from

20  September of 1991.

21  Q    And I believe you testified that, based on your review

22  of the evidence, the business receipts were deposited into

23  the operating account?

24  A    That is correct.

25  Q    And the operating account is found in Exhibit 11?

                Iddon - Direct(By Mr. Voracek)        28

1    A    11, right.

2    Q    Have you had an opportunity, prior to trial, to examine

3    all of Government Exhibit 11?

4    A    Yes, sir, I have.

5    Q    To review it for accuracy?

6    A    Correct.  I did that.

7    Q    Now, as part of your job as a Revenue Agent, when you

8    have ledgers and you have bank records, is there some sort of

9    function that you perform to compare them?

10    A    Yes.  We do -- I call it a cross-reference where I

11    compare -- I take the taxpayer's individual records -- in

12    this case, I would have taken the general ledger sheets, and

13    I would have compared those to the deposits that were made

14    into the bank account.

15         Sometimes there is more than one bank account.

16    Sometimes taxpayers may deposit payroll into a different

17    account.  I would utilize all of their bank records and do a

18    comparison between what was reported on the taxpayer's

19    records in comparison to what was deposited into the bank

20    account.

21    Q    Now, in reviewing the admitted documentation in this

22    case, did you make such a comparison?

23  A    Yes.  I took the ledger sheets, the veterinarian

24  business receipts, and I compared those ledger sheets to the

25  Operating Account deposits that were in there.

Iddon - Direct(By Mr. Voracek)          29

1  Q    Did you also hear any testimony from any individuals

2  about where the business receipts were deposited?

3  A    Yes.  We did hear that they deposited cash and checks

4  that were received directly into the Operating Account, and

5  that there was a merchant's account where the charge card

6  receipts would first go and be processed.  And from there,

7  then there would be a direct transfer back to the Operating

8  Account.

9       So, those charge receipts from the merchant account

10  came in at varying times throughout the month.  But, we did

11  hear from the bookkeeper that the cash and checks, usually

12  the deposits were made twice a week.

13  Q    Now, due to the amounts that were flowing through the

14  merchants account, the credit card sales, did that give you

15  any -- did that present you with any trouble in reconciling

16  the business ledgers with the bank records?

17  A   Yes, sir, it gave me some trouble, in that it wasn't as

18  simple to take, for instance, September 4th of 1991, if I

19  went back to the daily receipts of September 4th, 1991, in

20  the ledger sheets, it may or may not be the same amount.

21          And what I was able to do, by a very tedious

22  process, was determine that not only was it the daily

23  receipts of September 4th of 1991 of the veterinary business

24  of the business ledger, but it also was possibly a deposit

25  from the merchant account that happened sporadically

                    Iddon - Direct(By Mr. Voracek)          30

1  throughout that month as well.

2  Q   So, you would say that when you would look at the

3  receipts for a given day from the business ledgers, you

4  didn't necessarily find that exact amount being deposited

5  into the Operating Account?

6  A   That's correct.

7  Q   And it was due to, as you explained, some credit card

8  sales from a merchant account?

9  A   Correct.

10  Q   Were those deposited at a later time?

11  A   Yes.  Normally, the processing time may be two to three

12   days and you would see those come out, the -- excuse me.  The

13   charge cards would sporadically be deposited into Center

14   Company's Operating Account maybe two to three days after

15   being processed.

16   Q    Now, Miss Iddon, I direct your attention to Government

17   Exhibits 475 to 504.

18        Do you have them in front of you?

19   A    Give me one second.  Yes, I have them all.

20   Q    Now, I believe you have already testified concerning

21   Government Exhibit 475, that those were deposits that were

22   made into the Center Company Operating Account for September,

23   1991?

24   A    Yes, that's correct.

25   Q    Would the subsequent exhibits, 476 to 504, also reflect

                    Iddon - Direct(By Mr. Voracek)          31

1    deposits into the Center Company Operating Account but for

2    different time periods?

3    A    Yes, that is correct.

4    Q    So, what time periods would Government Exhibits 475

5    through 478 pertain to?

6   A   Those pertain to September of 1991 through December of

7   1991.

8   Q   And Government Exhibit 479, what would that pertain to?

9   A   That's for the time period of the entire year for 1992.

10  Q   Now, when you look at Government Exhibit 479,

11  Miss Iddon, I notice that there is not specific breakdowns

12  per date.  Do you have an explanation for that?

13  A   I believe, from my recollection of the review of the

14  Government Exhibit 11-C, that we had the bank information,

15  but I don't think we had the taxpayer's ledger sheets for

16  that time period to do the comparison on a day-to-day basis.

17  Q   So, these amounts, as reflected on Government

18  Exhibit 479, are they total amounts for the months?

19  A   Oh, absolutely, yes.  I looked at each bank statement

20  that was available from National City Bank and then those

21  totals reflect the entire month January, February, all the

22  way through December.

23  Q   And Government Exhibit 480, what time period does that

24  summary pertain to?

25  A   That would be the time period of 1993, January through

Iddon - Direct(By Mr. Voracek)          32

1   December.

2   Q    And Government Exhibits 481 through 492, what time

3   period does that pertain to?

4   A    That's going to be January of 1994 through December of

5   1994.

6   Q    And 493 through 504, what time period does that pertain

7   to?

8   A    January through December of 1995.

9        MR. VORACEK:  Your Honor, the United States moves

10  for admission of Government Exhibits 475 through 504.

11       THE COURT:  475 through 504 are admitted.

12  Q    Now, Miss Iddon, just very briefly, let's just look at

13  Government Exhibit 475 for one moment.

14       Do you have that in front of you?

15  A    Yes, I do.

16  Q    And based upon this summary, were you able to determine

17  the total amount of deposits into the Center Company

18  Operating Account for September, 1991?

19  A    Yes, I was.  The total deposits for September of 1991

20  into the Operating Account were $60,475.56.

21  Q    And if we look at Government Exhibit 479, Miss Iddon,

22   what was the total amount that was deposited into the Center

23   Company Operating Account for the entire year of 1992?

24   A    $663,340.97.

25   Q    And the total amount that was deposited into the Center

Iddon - Direct(By Mr. Voracek)          33

1    Company Operating Account for 1993?

2    A    $696,017.58.

3    Q    I am sorry.  That was reflected on Government Exhibit

4    480?

5    A    Yes.  Exhibit 480.

6    Q    And for 1994, just as an example, what was reflected as

7    the government receipts -- I mean, as the deposits into the

8    Center Company account on Government Exhibit 481 for January,

9    1994?

10   A    The deposits into the Center Company Operating Account

11   for January of 1994 totalled $46,711.25.

12   Q    And going way to the end, Government Exhibit 504, for

13   December, 1995, what were the total deposits into the Center

14   Company Operating Account?

15   A    Those totalled $45,124.66.

16   Q    Now, Miss Iddon, you also have in front of you what's

17   been marked as Government Exhibits 505 through 509.  I ask

18   you to look at those documents, please.

19   A   I have them.  Thank you.

20   Q   And, generally, what are Government Exhibits 505 through

21   509?

22   A   These are the -- this is a summary or a recap of the

23   veterinary business receipts for 1991, '92, '93, '94 and 1995

24   that have been cross-referenced to exhibits that have been

25   entered into evidence.

                    Iddon - Direct(By Mr. Voracek)          34

1         MR. VORACEK:  Your Honor, the United States moves

2   for admission of Government Exhibits 505 through 509.

3         THE COURT:  505 through 509 are admitted.

4   Q   Now, if we look at Government Exhibit 505, Miss Iddon.

5   A   Yes, sir.

6   Q   I see months and amounts and exhibit numbers.

7         What is that Government Exhibits No. 31-A and 34-A?

8   A   31-A were the veterinary business ledger receipts or the

9   long column journals that were kept for 1991.

10        And 34-A was very similar to that.  It was an -- I

11  believe it was used as a synopsis in the veterinary business

12  on a ledger sheet that also had the total business receipts

13  for 1991.

14  Q    So, you were able to use two separate ledger sheets for

15  1991 to verify the amounts of the veterinary receipts?

16  A    Yes.

17  Q    Now, when you look at the veterinary business receipts

18  for 1991, were you able to calculate the total amount of such

19  receipts for that year?

20  A    Based on a review of those exhibits and the comparison,

21  those numbers, yes, I was able to come up with a total

22  number.

23  Q    What was the total number?

24  A    $640,233.78.

25  Q    Now, Miss Iddon, for an individual who owns their own

                    Iddon - Direct(By Mr. Voracek)          35

1  business, a sole proprietorship, I believe you mentioned

2  earlier that a Schedule C should be prepared?

3  A    That is correct.

4  Q    What is a Schedule C?

5  A    A Schedule C is a schedule or a form that's attached to

file:///A|/LEVETO-8.TXT

6   Form 1040.  Schedule C's are used by anybody who is in the

7   business of making a profit.  They must report all their

8   income, their cost of goods sold and their expenses, and

9   report their gain or loss on that schedule.  And then the

10  profit or loss on the Schedule C simply flows through to the

11  face of the front page of the 1040.

12  Q    Now, is one of the items of information that needs to be

13  reflected on a Schedule C are a business' sets for a

14  particular year?

15  A    Absolutely.  I believe it's line one.

16  Q    Now, are all businesses required to file a Schedule C,

17  or does a business have to have a certain amount of income

18  before they even have that requirement?

19  A    No, sir.  All businesses should file a Schedule C

20  because, as I mentioned, it's a profit or loss.  So, even

21  though a business may have $600.00 or $1,000.00 worth of

22  income, they may generate a loss, and that loss may be

23  deductible against other income on their tax return.

24  Q    Now, Miss Iddon, every year the IRS sends out packages,

25  1040's, and instructions to individuals to prepare their

Iddon - Direct(By Mr. Voracek)          36

1  coming year's taxes?

2  A    Yes, we do.

3  Q    Is the Schedule C, and instructions for the Schedule C,

4  is that part of the package that's sent to the individual?

5  A    Generally, it is, yes.

6  Q    And there are instructions with the Schedule C that are

7  sent?

8  A    Yes, there is.

9  Q    Miss Iddon, I ask you to look at what's already been

10  admitted into evidence as Government Exhibit 1-C-1.

11          And have you had an opportunity to review

12  Government Exhibit 1-C-1?

13  A    Yes, I have.  It's Daniel and Margaret Leveto's personal

14  income tax -- I'm sorry -- personal federal income tax for

15  the tax year 1991.

16  Q    For the year 1991?

17  A    Yes, sir.

18  Q    Now, on the 1991 income tax return, was there a

19  Schedule C attached?

20  A    Yes, sir, there was.

21  Q    And now we were talking about receipts of a business.

22  And I think you indicated that line one was the place where

23  an individual is to report business receipts?

24  A   Correct.  Gross income or sales, line one.

25  Q   Now, with regard to Government Exhibit 1-C-1, the 1991

Iddon - Direct(By Mr. Voracek)          37

1  tax return of Daniel Leveto, were there receipts from the

2  veterinary business reported on line one?

3  A   Yes, sir, there were.

4  Q   And what was the amount that was reported by Dr. Leveto

5  as receipts on line one for 1991?

6  A   $404,127.00.

7  Q   And, again, Miss Iddon, if you would just refer back to

8  Government Exhibit 505.

9      Based on the ledgers that you reviewed, what were

10  the business receipts for 1991?

11  A   Again, they were $640,233.78.

12  Q   Miss Iddon, I now ask you to look at Government

13  Exhibit 506.  What is Government Exhibit 506?

14  A   506 is a summary of the veterinary business receipts for

15  the year 1992, and they are actually broken down by the

16  month, January through September.

17      Then we have October, November and December by

18  themselves.  And not only are they broken down by month, but

19  for January through September, we broke them down by

20  category, the category in which the ledger sheets were

21  titled.

22  Q    Now, I notice that the receipts, as reflected on

23  Government Exhibit 506, seems to be broken down differently

24  than you testified regarding 505.

25      Was there a reason for that, Miss Iddon?


                Iddon - Direct(By Mr. Voracek)          38


1  A    Um, I believe it was the way that the books were kept

2  and that the ledgers became available to us and that I was

3  able to review for that time period.

4      They were actually -- I think all we had available

5  for October, November, December, were just totals by -- for

6  the whole month, not by categories.

7  Q    You've exhibited numbers 34-B and 137 to Government

8  Exhibit 506.

9      Were those business ledgers, records and ledger

10  sheets that were prepared by the veterinary practice as you

11    heard in court?

12    A    Oh, yes.  Yes.  I'm sorry.

13    Q    And for 1992, what was the total amount of receipts for

14    the veterinary business?

15    A    $506,825.28.

16    Q    Now, Miss Iddon, I ask you to look at what's been

17    admitted as Government Exhibits 1-D-1.

18    A    I have that.

19    Q    Do you have Government Exhibit 1-D-1 in front of you?

20    A    Yes, I do.

21    Q    What is Government Exhibit 1-D-1?

22    A    That is the 1992 Individual Federal Tax Return for

23    Daniel and Margaret Leveto.

24    Q    Was there a Schedule C reporting a sole proprietorship's

25    financial activity attached to Dan Leveto's 1992 Federal

                    Iddon - Direct(By Mr. Voracek)            39

1    Individual Income Tax Return?

2    A    Just give me one moment.  There is nothing reported on

3    line twelve where it should flow through to, but I just want

4    to scan through and make sure.

5        No, sir, there is no Schedule C.

6  Q    Was there any other documentation that was attached to

7  the 1992 return that you reviewed for Dan Leveto which

8  provided the financial accounting for the veterinary

9  practice?

10  A   I do not see anything.

11  Q    And, again, referring to Government Exhibit 506, what

12  were the total amounts of receipts for 1992?

13  A   For 1992, the total receipts were $506,825.28.

14  Q    Miss Iddon, you mentioned that when an individual has

15  finalized their Schedule C, do they determine whether or not

16  the business is profitable or has a loss?

17  A   Yes, sir.  The bottom line of the Schedule C will

18  determine whether there is profit or loss from that business

19  that they are running.

20  Q    Now, when an individual is preparing their return, they

21  prepare the Schedule C and they come up with a profit or loss

22  amount.

23        Did you indicate that they are to put that amount

24  on the front page of the 1040?

25  A   Yes, sir.  The instructions for the Schedule C clearly

1   state that once they arrive at their profit or loss, not only

2   does that amount stay there reported on the Schedule C, but

3   then it must be then listed on line twelve of the Form 1040,

4   itself, so that it can be combined with all the other forms

5   of income that they have, be it wages, interest, dividends,

6   on the face of the 1040.

7   Q    Well, I apologize for jumping around, Miss Iddon, but if

8   we could just go back to Government Exhibit 1-C-1 for one

9   moment, please.

10  A    Certainly.

11  Q    1-C-1, I believe as you testified, is the 1991 return?

12  A    Yes, it is.

13  Q    Of Daniel and Margaret Leveto?

14  A    Yes, sir.

15  Q    And I believe you said that there was a Schedule C that

16  was filed for that year?

17  A    That is correct.

18  Q    And what did the Schedule C reflect as the profit for

19  1991?

20  A    The Schedule C for 1991's profit was $142,121.00.

21  Q    And that's after adding -- that's after all the receipts

22  and all the expenses, an individual comes to the bottom line

23  profit?

24  A    That is correct.

25  Q    So, with the $142,121.00 profit for the 1991 veterinary

Iddon - Direct(By Mr. Voracek)          41

1  practice, where does that now go on an individual's 1040?

2  A    It goes to line twelve on the very front page of the

3  Form 1040.  And line twelve says business income or loss, and

4  then it says attach the Schedule C.

5  Q    And was the amount of that profit on that reflected on

6  the front page of the 1040?

7  A    Yes, it clearly was, sir.

8  Q    Now, if we look at the 1992 tax return for Dr. Leveto,

9  Government Exhibit 1-D-1, I believe you indicated there was

10  no Schedule C attached to that return?

11  A    No, sir, there is nothing attached and nothing listed on

12  line twelve either.

13  Q    That was my next question.

14       So, on the 1992 1040, as reflected on Government

15  Exhibit 1-D-1, the business income on line twelve is left

16  blank.  Is that your review of the tax return?

17  A   Yes, sir.

18  Q   Now, Miss Iddon, I ask you to examine Government

19  Exhibit 507.  And, again, what does 507 reflect?

20  A   507 is the summary that was prepared and that I reviewed

21  for its accuracy based on review of Exhibits 33-A, 34-C for

22  1993, January through December, of the business receipts for

23  the veterinarian practice.

24  Q   And based on your review of the evidence of record, what

25  was the total amount of business receipts for 1993 by the

Iddon - Direct(By Mr. Voracek)          42

1  veterinary practice?

2  A   They totaled $553,535.71.

3  Q   Now, I ask you to look at Government Exhibit E-1 -- or

4  1-E-1.

5  A   Yes, sir.

6  Q   And what is Government Exhibit 1-E-1?

7  A   That is the Form 1040 Individual Federal Tax Return for

8  1993 for Daniel and Margaret Leveto.

9  Q   Was there a Schedule C attached to the 1993 return

10   reflecting the business activities of the veterinary

11   practice?

12   A   There is nothing listed on line twelve.  Just let me

13   look.  No, sir there is no Schedule C attachment.

14   Q   Was there any other accounting in Dr. Leveto's 1040

15   regarding the veterinary practice for 1993?

16   A   Nothing attached, sir.

17   Q   Now, Miss Iddon, I'll have you look at Government

18   Exhibit 508.  What is Government Exhibit 508?

19   A   Again, it's a summary in which I reviewed Exhibit 31-B

20   and Exhibits 451 through 462 of the veterinarian business

21   receipts for January through December of 1994.

22   Q   Is Government Exhibits 451, 462, are those summaries to

23   which you already testified?

24   A   Yes, sir.

25   Q   And those are summaries of business receipts?

                Iddon - Direct(By Mr. Voracek)          43

1   A   Yes.  Yes, they were summaries of the -- yes.  Those

2   were broken down by -- daily for each month, yes.

3   Q   So, based on your review of all the documents that were

4   admitted into evidence, what was the total amount of

5   veterinary business receipts for the year 1994?

6   A   The total for that year is $547,265.55.

7   Q   And I ask you to look at Government Exhibit 509.  I'm

8   sorry.  Government Exhibit 1-F-1.

9   A   Okay.

10   Q   What is Government Exhibit 1-F-1?

11   A   1-F-1 is the Form 1040, the United States Federal Income

12   Tax Return for 1994 for Daniel and Margaret Leveto.

13   Q   For the year 1994?

14   A   Yes.

15   Q   Was there a Schedule C reflecting the veterinary

16   business accounting for the year 1994 attached to that

17   return?

18   A   Again, there is nothing listed for line twelve where the

19   profit and loss would be shown.  And there are no -- there is

20   no attachment, Schedule C, or anything that reflects a

21   reporting of the income.

22   Q   Miss Iddon, I will have you look at what's been marked

23   as Government Exhibit 509.  Do you have that?

24   A   Yes, sir, I do.

25   Q   And what is 509?

Iddon - Direct(By Mr. Voracek)          44

1  A    509 is a summary or a recap of the veterinarian business

2  receipts for 1995 that has been prepared using Exhibits 31-C

3  and 463 through 474.

4  Q    And based on your review of the documents that have been

5  admitted into evidence, what was the total amount of

6  veterinary business receipts for the year 1995?

7  A    $581,824.19.

8  Q    I ask you to look at Government Exhibit 1-G-1,

9  Miss Iddon.

10  A    Yes, sir.

11  Q    What is 1-G-1?

12  A    Again, it's the form 1040 or the Individual Federal

13  Income Tax Return for Daniel and Margaret Leveto for 1995.

14  Q    And was there a Schedule C attached to Dr. Leveto's 1995

15  federal tax return?

16  A    There is nothing listed on line twelve where the profit

17  and loss should be shown and there is no Schedule C attached

18  to this return.

19  Q    Is there any accounting for the veterinary business

20  practice in Dr. Leveto's 1040 for 1995?

21   A   No, sir, nothing is attached.

22   Q   Miss Iddon, before we move on, I did want to explore

23   just one other area.

24        If you could please look at Government Exhibit

25   1-C-1 again.


                Iddon - Direct(By Mr. Voracek)          45


1   A   That's the 1991 Form 1040?

2   Q   How about the 1-D-1 for 1992.  I'm sorry.

3   A   That's the 1992 1040.

4   Q   Miss Iddon, I ask you to look at the second page of the

5   1992 tax return filed by Dr. Leveto.

6   A   Yes.

7   Q   Do you have that in front of you?

8   A   Yes, I do.

9   Q   Were there any payments that were made for 1992 as

10   reflected by the tax return?

11   A   The payments that are listed between lines 54 and 60,

12   sir?

13   Q   Yes.

14   A   The only payment that is listed there is the Earned

15  Income Credit of $768.00.

16  Q     What is an Earned Income Credit?

17  A     The Earned Income Credit is a credit that's made

18  available to be those individuals who qualify based on income

19  thresholds.

20          Basically, what it is, if your income level is low

21  enough or it meets those thresholds, you could qualify to get

22  a credit, which is called the Earned Income Credit, and it is

23  based on earned income.  So, you have to either have wages or

24  income from self-employment to be able to qualify for this

25  credit.  And in this particular case, it reduced Mr. and

                    Iddon - Direct(By Mr. Voracek)            46

1  Mrs. Leveto's tax liability by $768.00 or the amount of the

2  Earned Income Credit.

3  Q     You mentioned threshold amounts.  You mean people that

4  were over that amount or under that amount can take the

5  Earned Income Credit?

6  A     If you have earned income over a certain dollar amount,

7  and that changes every year -- and I apologize for not

8  knowing the dollar amounts, but they are in the instructions

9  for Earned Income Credit -- but, if you are over that, that

10   amount for the earned income, you cannot qualify for the

11   Earned Income Credit.

12   Q    So, it is only people that earn less than a threshold

13   amount that can qualify for an Earned Income Credit?

14   A    That's correct.

15   Q    Miss Iddon, I now ask you to look at what's been marked

16   as Government's Exhibits 510 and 511.

17   A    Yes, sir, I have them.

18   Q    Do you have them?  Do you recognize those documents?

19   A    Yes, sir.  This is a summary that was prepared and that

20   I reviewed based on a review of Exhibit 33-A, which are book

21   sales that were recorded for 1993 and 1994 on the veterinary

22   practice ledger sheets.

23   Q    Is Government Exhibits 33-A and B, were they admitted

24   into evidence?

25   A    Yes, they were.

Iddon - Direct(By Mr. Voracek)          47

1   Q    Was that the long annual --

2   A    Yes.

3   Q    -- reflecting --

4  A    Yes.  It was actually the long ledger sheets that were

5  broken down by columns.  And I believe that we heard

6  testimony that there was a column for book sales.

7        And so these -- these were the book sales that were

8  recorded on those ledger sheets by month, January through

9  December, for '93 and '94.

10        MR. VORACEK:  Your Honor, the United States moves

11  for the admission of Government Exhibits 510 and 511.

12        THE COURT:  510 and 11 are admitted.

13  Q    Now, based on your review of the documentation,

14  Miss Iddon, what was the total amount of book sales for the

15  year 1993?

16  A    For 1993, the total book sales were $68,883.00.

17  Q    Now, do you still have Government Exhibit 1-E-1 before

18  you?  And I believe that that's the tax return for 1993.

19  A    Yes, I do.

20  Q    And I ask you, Miss Iddon, based on your review of that

21  document, whether or not the book sales for 1993 were

22  reflected on Dan Leveto's 1993 tax return?

23  A    There is nothing listed.  There is no Schedule C

24  attached, which is what an individual would file if he was --

25  if he had a business operation.  And the only other place

Iddon - Direct(By Mr. Voracek)          48

1  that I would think that you could report it would be other

2  income, line 22, and there is nothing there as well.

3  Q    Now, Miss Iddon, I ask you to look at Government?

4  Exhibit 511.

5  A    Yes, sir.

6  Q    And what is Government Exhibit 511?

7  A    Again, it's a summary sheet based on my review of

8  Exhibit 33-B, which was the long ledger sheets that recorded

9  the book sales for 1994.

10  Q    And how much are book sales for 1994?

11  A    For 1994, $22,576.00.

12  Q    And in reviewing Government Exhibit 1-F-1, Dr. Leveto's

13  1994 return, were you able to determine whether or not those

14  book sales were reported?

15  A    Again, there is no Schedule C attached, nor is there any

16  type of income listed in the other income section or any type

17  of attachment to the '94 return that would show the book

18  sales.  I'm sorry, the book sale income.

19  Q    Miss Iddon, I now ask you to look at Government Exhibits

20  520 through 524.

21  A    I have those.  Thank you.

22  Q    And, in general, what are Government Exhibits 520

23  through 524, if you recognize them?

24  A    Yes, I do.  Actually, they are the summary of deposits

25  into the Center Company's Holding Account for the tax period

Iddon - Direct(By Mr. Voracek)          49

1  1991, 1992, '93, 1994 and 1995.

2  Q    Now, I believe you previously testified about Center

3  Company's Operating Account.

4  A    That is correct.

5  Q    And I believe you have also testified that you

6  determined that the Operating Account was used by the

7  veterinary practice to put all of their receipts?

8  A    Correct.

9  Q    Now, are you testifying about something called a Center

10  Company Holding Account?

11  A    That's correct.

12  Q    So, this is a different account than the Operating

13  Account?

14  A    Yes, sir, it is.  It's a different account number, and

15   they have their own statements, their own deposit tickets,

16   their own checks and it was an account standing alone from

17   the regular Operating Account.

18   Q    And prior to trial, have you gone through all those

19   documents in the Center Company Holding Account in possession

20   of the government?

21   A    Yes, sir, I have.

22   Q    Which exhibit number was that found at?

23   A    Those exhibit numbers were 12 -- 12 -- Exhibit 12-B, and

24   I believe each year's, C through -- or I'm sorry, 12-B

25   through five.

                    Iddon - Direct(By Mr. Voracek)          50


1         MR. VORACEK:  Your Honor, the United States moves

2   for the admission of 520 and 524.

3         THE COURT:  520 through 524 are admitted.

4   Q    Now, if you can, for a moment, Miss Iddon, with regard

5   to Government Exhibit 520, I see several headings on that

6   summary sheet.

7         Can you describe those headings for us?

8   A    Certainly.  There is a date of deposit, the source, the

9    amount, and then the reference to the exhibit number in which

10   what was reviewed.

11   Q    And what specifically do you mean by "source"?

12   A    The source was actually a photocopy that the bank

13   provided of the document in which what was actually deposited

14   into the holding account.

15         So, in other words, let's look at the first one.

16   The source was cash and there was actually an offset or a

17   photocopy of a cash-in ticket that I was able to look at to

18   determine where the deposit originated from.

19   Q    All right.  Let's look at the very next entry,

20   October 11, 1991.

21   A    Okay.

22   Q    What was -- and I see there was a deposit made on that

23   day?

24   A    That's correct.

25   Q    And what was the source of that deposit?

                    Iddon - Direct(By Mr. Voracek)          51


1    A    The source of that deposit actually came from the Center

2    Company's Operating Account, which was account No. 1012229.

3    Q    And what was the documentation that you looked at to

4  insure that that's where it came from?

5  A    There would have been a photocopy of the actual check

6  and the deposit ticket from the Center Company.  So, there

7  would have been a cancelled check or a photocopy of the check

8  from Center Company and a deposit ticket from the Holding

9  Account.

10  Q    And what was the amount that was deposited from the

11  Center Company Operating Account on October 11th, 1991, into

12  the Holding Account?

13  A    That would have been for $15,000.00.

14  Q    And what was the total amount that was deposited into

15  the Holding Account for the year 1991?

16  A    That would be $33,400.00.

17  Q    I ask you to look at Government Exhibit 521.

18        Is Government Exhibit 521 similar to the Government

19  Exhibit 520 to which you just testified?

20  A    Yes, sir.

21  Q    Is it for a different time period?

22  A    Yes, sir.  It's for 1992.  And the exhibit numbers that

23  I would have looked at were the 12-C series.

24  Q    And these are the deposits into the Holding Account?

25  A   They would have been the deposits that were made into

Iddon - Direct(By Mr. Voracek)        52

1  the Holding Account, correct.

2  Q   And what was the total amount that was deposited into

3  the Holding Account for 1992?

4  A   That totalled to $252,665.29.

5  Q   And, Miss Iddon, I ask you to look at Government

6  Exhibit 522.

7       Is Government Exhibit 522 a similar type of summary

8  to which you just testified in 520 and 521?

9  A   Yes, sir.  It just simply reflects the 1993 deposits

10  that were made into the Holding Account and I used the

11  exhibits of -- the 12-D series.

12  Q   And for 1993, were you able to determine, based on

13  looking at all the government's exhibits, the total amount

14  that was deposited into the Holding Account for 1993?

15  A   Yes, sir, I was.

16  Q   What was that amount?

17  A   $174,738.32.

18  Q   And please turn to Government Exhibit 523, please.

19       And what is 523?

20  A    Again, it's the summary that reflects the deposits that

21  were made into the Holding Account for 1994 that were

22  prepared using Exhibit 12-E series.

23  Q    So, this is a similar document to which you just

24  testified, but just for a different period?

25  A    Absolutely.

                Iddon - Direct(By Mr. Voracek)          53

1   Q    This is for the 1994 year?

2   A    Correct.

3   Q    And what was the total amount of deposits made into the

4   Center Company Holding Account for 1994?

5   A    $164,632.19.

6   Q    And, finally, Government Exhibit 524.

7         Is that a similar type of document to which you

8   just previously testified regarding Government Exhibits 520

9   to 523?

10  A    Yes, sir, it's similar.  The only difference is that

11  this reflects the 1995 deposits.  And I used the 12-F series

12  of exhibits to prepare this.

13  Q    And in 1995, what were the total amount of deposits made

14  into the Holding Account?

15  A    They totalled $211,384.70.

16  Q    Now, Miss Iddon, I ask you to look at Government

17  Exhibits 525 through 539, please.

18        And in general, what are those documents, if you

19  recognize them?

20  A    These are amounts that were -- from Center Company's

21  Operating Account that were deposited into the Holding

22  Account.

23  Q    All right.  Miss Iddon, I ask you to look at the entire

24  series of Government's Exhibits 525 through 539.

25        Do those reflect the deposits into the Holding

              Iddon - Direct(By Mr. Voracek)          54

1  Account broken down by payor?

2  A    Yes.  I am sorry.  As I get deeper into the exhibits,

3  they are not only deposits from the Operating Account but, as

4  you stated, they are actually -- it's a breakdown of

5  everything that went into the Holding Account from the

6  different payors.

7        So, they are broken down by money orders,

8  traveler's checks and the various payors that went into the

9   Holding Account, yes.

10  Q   Now, you just testified about Government Exhibits 520

11  through 524, about all the deposits that went into the

12  Holding Account?

13  A   Correct.  Those were the totals, and now these were

14  merely -- we pulled them to even summarize them further to

15  break them down to show the various amounts that came from

16  each individual payor.

17       MR. VORACEK:  Your Honor, the United States moves

18  for the admission of Government Exhibits 525 through 539.

19       THE COURT:  525 through 539 are admitted.

20  Q   Looking at Government Exhibit 525, Miss Iddon, what does

21  that document reflect?

22  A   These are the amounts of money that were deposited into

23  the Holding Account for 1991 that came directly from the

24  Operating Account.

25  Q   And what was the total amount that came from the

                    Iddon - Direct(By Mr. Voracek)          55

1   Operating Account into the Holding Account for 1991?

2   A   $33,000.00.

3    Q    And, again, Miss Iddon, in reviewing the Operating

4    Account, what went into the Operating Account again?

5    A    Into the Operating Account were all of the daily

6    receipts that were received through the veterinarian

7    practice.

8    Q    And then those monies went into the -- some of those

9    monies went into the Holding Account?

10   A    These were the amounts that -- for 1991 that were

11   deposited directly to the Holding Account.

12   Q    And Government Exhibit 526, what does that reflect?

13   A    Again, this is a reflection of the amounts of deposits

14   that were made directly to the Holding Account that we were

15   able to show based on source documents or copies of the

16   checks from the Center Company's Operating Account.

17        So, these monies came from the Operating Account

18   and were deposited into the Holding Account for 1992.

19   Q    And I ask you to look at, on April 7th, 1992, how much

20   went from the Operating Account to the Holding Account?

21   A    On April 7th, 1992, I show a deposit of $10,000.00.

22   Q    And on April 28, 1992, how much went from the Operating

23   Account to the Holding Account?

24   A    Again, there is a deposit of $10,000.00 on that date.

25   Q    And in total, how much was deposited into the Holding

               Iddon - Direct(By Mr. Voracek)          56


1   Account from the Operating Account for 1992?

2   A    That totals $103,861.91.

3   Q    Miss Iddon, I ask you to look at Government Exhibit 527.

4         Is Government Exhibit 527 a similar type of summary

5   to which you just testified to in 525 and 526, except for a

6   different year?

7   A    Yes.  It reflects 1993.

8   Q    1993 deposits into the Center Company Holding Account

9   from the Operating Account?

10  A    Absolutely, right.

11  Q    And what was the total amount that was deposited in 1993

12  into the Holding Account from the Operating Account?

13  A    That totals $89,275.64.

14  Q    Now, Miss Iddon, Government Exhibit 528.  And, again, is

15  that a similar type of summary to which you just testified

16  regarding the deposits from the Operating Account into the

17  Holding Account, but for a different year, 1994?

18  A    Correct.

19  Q   Miss Iddon, how much was deposited from the Operating

20  Account into the Holding Account on September 2nd, 1994?

21  A   There is actually two deposits on September 2nd of 1994.

22  One is $15,000.00 and the other is for $297.00.

23  Q   I see several amounts of $297.00, Miss Iddon.

24      Did you hear any testimony regarding that amount?

25  A   Yeah.  I believe the testimony from the bookkeeper,

                Iddon - Direct(By Mr. Voracek)          57

1  Karen Jeannerett, said that the books were $297.00.  And I

2  believe Mr. Gonzalez also stated that was what he paid for

3  the book when he purchased it.

4  Q   I ask you to look at the entries on November 4th, 1994.

5  Could you just please read those amounts?

6  A   Certainly.  There are two.  One deposit of $12,000.00

7  and one deposit of $594.00.

8  Q   And the total amount that was deposited into the Center

9  Company Holding Account in 1994 from the Operating Account?

10  A   The total amount for 1994 is $85,874.00.

11  Q   Now, Miss Iddon, I ask you to look at Government

12  Exhibit 529.

13  A   Yes, sir.

14  Q   And, again, is that a similar type of summary of monies

15  deposited into the Holding Account from the Operating

16  Account, but for a different year, 1995?

17  A   Correct.  It is for 1995.

18  Q   And in total for 1995, how much money went from the

19  Operating Account to the Holding Account?

20  A   That totalled $65,959.00.

21  Q   Now, Miss Iddon, with regard to Government Exhibit 530,

22  do you have that in front of you?

23  A   Yes, sir, I do.

24  Q   What does that document reflect?

25  A   This is a summary of all money orders and traveler's

                    Iddon - Direct(By Mr. Voracek)          58

1  checks that were deposited into the Center Company's Holding

2  Account for the time period 1991 through 1995.  And it was

3  prepared using the use of Exhibits 12-C, D, E and F.

4  Q   And you verified that for accuracy based upon the

5  documents that were admitted into evidence?

6  A   Yes, sir.

7  Q   In total, for that five-year period of 1991 through

8    1995, how much in money orders and traveler's checks were

9    deposited into the Holding Account?

10   A    $16,401.00.

11   Q    Miss Iddon, I now ask you to look at Government

12   Exhibit 531.

13   A    Yes, sir.

14   Q    What is 531?

15   A    Again, this is a summary of which, in this particular

16   case, they are bank checks or cashier's checks that were

17   deposited into the Center Company's Holding Account for the

18   time period 1991 through 1995.

19         And I utilized Exhibits 12-C, D, E and F to review

20   and prepare this summary.

21   Q    Did we hear some testimony during trial about cashier's

22   checks and what they are from the bank custodian?

23   A    Yes.  She brought up what a cashier's check is.  I

24   believe her definition was, it was guaranteed money.

25   Q    So, for that five-year period there from 1991 through

                    Iddon - Direct(By Mr. Voracek)          59

1    1995, what was the total amount of bank checks and cashier's

2    checks which were deposited into the Holding Account?

3   A   $82,059.00.

4   Q   And Government Exhibit 532.  Do you have that in front

5   of you?

6   A   Yes, sir, I do.

7   Q   What does that reflect?

8   A   Again, this is a summary.  But, in this particular case,

9   this exhibit clearly reflects the amounts from foreign bank

10  accounts that were deposited directly into the Center

11  Company's Holding Account for the time period 1991 through

12  1995.

13  Q   And the exhibit numbers that you used to -- in verifying

14  this summary, do they reflect what types of documentation?

15  A   They are correspondence from the bank accounts for

16  Barclays and First Home Banking to reflect the -- either wire

17  transfers and the deposit tickets that were deposited into

18  this account, Holding Account.

19  Q   Well, it says under exhibit number, Exhibit 12, is that

20  the records from the Center Company Holding Account?

21  A   Oh, I'm sorry, yes.  Those -- that 12-C and D and E

22  series, those are still the Center Company's Holding Account

23  bank statements and any deposit tickets that went along with

24   them.

25   Q    And in, for example, the very first one on December 2nd,

Iddon - Direct(By Mr. Voracek)          60

1    1992, what was deposited into the Holding Account from a

2    foreign bank account?

3    A    On December 2nd, there was $32,000.00 deposited from

4    First Home Banking on that date.

5    Q    And that's reflected in Government Exhibit 12-C-12?

6    A    Correct.

7    Q    What is on 12-C-12, to the best of your recollection?

8    A    To the best of my recollection, I would assume it was a

9    copy of whatever was -- what the bank made to show that --

10   the deposit actually from First Home Banking into the Center

11   Holding Account.

12   Q    It would be some type of monetary instrument, be it a

13   check or a wire transfer?

14   A    Correct.  It would be a copy of a check, either from

15   First Home Banking directly or a wire transfer.

16   Q    Now, Miss Iddon, I note that the title of this summary,

17   this summary of amounts from foreign bank accounts, then we

18   have the source, First Home Banking, Barclays Box Elder.

19      Did we hear any testimony at trial to indicate that

20   those sources were foreign banks?

21   A   Yes, we did.

22   Q   And where did we hear that testimony, if you recall, or

23   what type of documentation did you see?

24   A   Well, the documentation that I saw, and I believe the

25   testimony came from -- I believe it was Mr. Lapina, that they

                Iddon - Direct(By Mr. Voracek)          61

1   got records during the search, that there was correspondence

2   between Dr. Leveto and Barclays Box Elder and First Home

3   Banking and letters and documentation asking for amounts to

4   be taken out, sent here, just basically directives to these

5   banks.

6   Q   Did you see any, any indication on the documents that,

7   indeed, First Home Banking and Barclays Box Elder were not

8   located in the United States?

9   A   There were references to the Conneaut Lake address and

10   also the P.O. Box address that was discussed and during

11   earlier testimony.

12   Q   But, how about where the banks were located?

13   A   The banks were located in the Turks and Caicos Islands.

14   Q   And that was reflected in the testimony or the exhibits

15   or both?

16   A   Both.  It was on the document, the letterhead from the

17   banks, itself, where the address was Turks and Caicos, and

18   also in the testimony that we heard.

19   Q   Miss Iddon, I now ask you to look at Government

20   Exhibit 533.  What is 533?

21   A   Again, this is a summary.  In this particular case, it's

22   of the Index Futures that were deposited directly into the

23   Holding Account from 1991 through 1995.

24   Q   And the total amount?

25   A   $46,781.54.


                    Iddon - Direct(By Mr. Voracek)          62


1   Q   And Government Exhibit 534?

2   A   This is a summary of the cash deposits that were made

3   directly into the Holding Account from 1991 through 1995.

4   Q   So, the total amount of cash for that five-year period

5   was $500.00 based upon your review of the evidence?

6   A   Based upon the evidence that was entered, yes.

7   Q   And Government Exhibit 535?

8   A    This is the summary of the amounts that came directly

9   from M.C.F. Land that were deposited into the Center

10  Company's Holding Account between the year 1991 and 1995.

11  Q    And did we hear any testimony at trial regarding M.C.F.

12  Land?

13  A    Yes, we did.  I believe his name was Mr. Meyer, and he

14  was one of the partners that was in a contract with

15  Dr. Leveto that had purchased some land and he was making

16  monthly payments to the Holding Company.

17  Q    Mr. Meyer was part of M.C.F. Land?

18  A    Yeah.  I believe he stated he was one of three partners

19  that was in a contract or a deal in which they purchased the

20  land from Dr. Leveto and his parents, I believe.

21  Q    And the purchase of the land, was that set up, as far as

22  your recollection of the evidence, on a monthly payment

23  basis?

24  A    Yeah.  I believe he may have said an installment sale,

25  or which was a set standard of regular payments, and they

Iddon - Direct(By Mr. Voracek)          63

1   would have been monthly, yes.

2   Q    And what was the total amount that was deposited from

3   M.C.F. Land into the Holding Account?

4   A    For this year -- or I'm sorry -- for the total -- The

5   total for the years 1991 to 1995, it was $6,150.72.

6   Q    I now ask you to look at Government Exhibit 536.

7   A    Yes, sir.

8   Q    And what is 536?

9   A    536 is a summary of the amounts that came directly from

10  Par Breakers that were deposited into Center Company's

11  Holding Account between the year 1991 through 1995.

12  Q    And did we hear any testimony at trial about Par

13  Breakers?

14  A    Yes.  Again, from Mr. Meyer, I believe, was the

15  gentleman whose testimony relating to, and he stated that

16  again this was for -- I believe it was a business that they

17  were trying to open on the land.

18  Q    All right.  Well, if we look at the amounts in 535 and

19  536, do we see any comparison?

20  A    Yes.  The monthly payments are $384.42, and they are the

21  same from M.C.F. Land and from Par Breakers.

22  Q    Does this reflect payments made in purchase of the land

23  on an installment basis?

24  A    Yes.

25  Q    What was the total amount that was deposited from Par

Iddon - Direct(By Mr. Voracek)          64

1   Breakers into the Holding Account?

2   A    $11,110.92.

3   Q    Miss Iddon, I ask you to look at Government Exhibit 537.

4   What is 537?

5   A    537 is a summary.  In this particular case, it's from

6   Peltec Publishing, and they were all the checks from Peltec

7   Publishing that were deposited into the Center Company's

8   Holding Account for 1991 through 1995.

9   Q    And what was the total amounts deposited from that

10   source for that period?

11  A    $23,582.74.

12  Q    And I ask you to look at look at Government Exhibit 538,

13   please.

14  A    Yes, sir.

15  Q    And what is 538?

16  A    Again, a summary.  In this particular instance, it is

17   amounts that were personal checks from individuals.  So,

18  there were various receipts that were deposited into the

19  Center Company's Holding Account for the time period 1991

20  through 1995.

21  Q    Now, Miss Iddon, after reviewing this summary,

22  Government Exhibit 538, do you see any commonalty of amounts

23  that were deposited?

24  A    Yes, sir.  The deposits are usually either multiples or

25  the exact amount of $297.00, which is the cost of the book.


                Iddon - Direct(By Mr. Voracek)           65


1  Q    Which book was that, Miss Iddon?

2  A    Tax Free, How the Super Rich Do It, I believe is what

3  the title was.

4  Q    What was the total amount of deposits from personal

5  checks for the time period 1991 through 1995 into the Holding

6  Account.

7  A    $25,869.54.

8  Q    And, finally, Miss Iddon, Government Exhibit 539.

9  A    Yes, sir.

10  Q    What is that?

11  A    Again, it's a summary.  These amounts were miscellaneous

12  sources that were deposited into the Center Company's Holding

13   Account for 1991 through 1995.

14   Q    What was the total amount of miscellaneous sources

15   deposited into that account for that period?

16   A    $151,161.75.

17   Q    Miss Iddon, I draw your attention to an entry on

18   May 31st, 1995.  Do you see that?

19   A    Private Banking is the source listed.

20   Q    What was the amount that was listed from Private Banking

21   into the Holding Account on May 31st, 1995?

22   A    $57,900.00.

23   Q    Miss Iddon, did we hear any testimony regarding Private

24   Banking?

25   A    Yes.  I believe we heard testimony in regards to -- I

                    Iddon - Direct(By Mr. Voracek)          66

1   believe that was the plane purchase for Dr. Leveto.

2   Q    Miss Iddon, I now ask you to look at Government Exhibits

3   540 through 544.

4   A    Yes, sir.

5   Q    And what's reflected in Government Exhibits 540 through

6   544?

7  A   These are the amounts that were debited from the Center

8  Company's Holding Account for 1991 through 1995.

9       And what I mean by "debited" is, these amounts came

10  out of or were taken from the Center Company's Holding

11  Account.

12  Q   And these summaries were based on your review of all the

13  admitted evidence in this case?

14  A   Exhibit 12-B through, I believe, F.  12-B through F.

15  Q   And Government Exhibits 540 through 544 then have

16  classified every amount that was taken out of the Holding

17  Account for this five-year period?

18  A   Yes, sir.

19       MR. VORACEK:  Your Honor, the United States moves

20  for the admission of 540 through 544.

21       THE COURT:  540 through 544 are admitted.

22  Q   And very briefly, Miss Iddon, in 1991, how much was

23  withdrawn or debited from the Center Company Holding Account

24  for that year, 1991?

25  A   $27,000.00.

                Iddon - Direct(By Mr. Voracek)          67

1  Q   Now, I see if we looked at Government Exhibit 540 in a

2  little bit more detail, we see several categories.  We see a

3  date, a payee.  What is reflected by payee?

4  A   That's to whom the payment was made or who received the

5  funds.

6  Q   And then the second -- then the next column is payment

7  method or check number?

8  A   Correct.

9  Q   Them the amount and then the exhibit number.

10       Now, on 12-2, 1991, there appears to be reflected

11  an amount of 25,000 debited from the Holding Account.

12       Do you see that?

13  A   That's correct?

14  Q   And I believe the payee is PennBank.

15       Do you know, have you heard any testimony or seen

16  any documentation regarding that debit?  Do you recall?

17  A   Um, I recall seeing the information that would be on

18  12-B-3 that would be reflective of that payment.

19  Q   Now, I believe we heard some testimony from

20  Miss Swaney from in the City Bank concerning amounts that are

21  paid to PennBank or Integra Bank --

22  A   Oh, I'm sorry.  Yes, that's true.

23  Q    -- in large amounts?

24  A    National City was called Integra.  And before Integra,

25  they bought PennBank, that's correct.


Iddon - Direct(By Mr. Voracek)          68


1   Q    Do you recall if Miss Swaney offered any opinion as to

2   what may have been purchased in large amounts that were paid

3   to the bank?

4   A    She did talk about purchasing a cashier's check or an

5   official check that would be guaranteed funds.  In other

6   words, you knew the money was there and it was guaranteed.

7   Q    Now, Miss Iddon, I ask you to look at Government

8   Exhibit 541.  Do you have that in front of you?

9   A    Yes, I do.

10  Q    What is 541?

11  A    541 is, again, the summary of the amounts that were

12  debited from or paid to individuals or other companies that

13  the money was taken out of the Holding Account for 1992.

14  Q    All right.  And what was the total amount that was taken

15  out of the Holding Account for the year 1992?

16  A    $220,329.79.

17  Q    Now, again, Miss Iddon, the Holding Account is separate

18  from the Operating Account?

19  A   Correct.

20  Q   The Operating Account, I believe you testified, is where

21  the business receipts went in?

22  A   That's correct.

23  Q   And then we also -- I think you testified that you saw

24  amounts from the Operating Account to the Holding Account?

25  A   That's correct.


            Iddon - Direct(By Mr. Voracek)          69


1  Q   And now these documents indicate amounts from the

2  Holding Account paid to other sources?

3  A   Right.  They are going into other sources.

4  Q   Well, let's look at Government Exhibit 542, Miss Iddon.

5  What is reflected on that document?

6  A   Again, this is the summary or the total amounts that

7  were taken out of the Holding Account -- I am sorry -- the

8  Holding Account for Center Company and for 1993.

9        So, these amounts were transferred or sent to

10  different payees.

11  Q   And what was the total amount that was taken out of the

12  Holding Account during 1993?

13  A  $194,744.16.

14  Q  And Government Exhibit 543, what's reflected there?

15      Is it the same type of summary that you just

16  testified to about amounts withdrawn from the Center Company

17  Holding Account, except for a different year?

18  A  Yes.  It's reflective of the 1994 year, and it is the

19  same.

20  Q  And, in total, how much was taken out of the Holding

21  Account for the 1994 year?

22  A  $167,435.74.

23  Q  And Government Exhibit 544, is that a similar type

24  summary to which you just testified regarding amounts

25  withdrawn from or debited to the Holding Account, except for

Iddon - Direct(By Mr. Voracek)          70

1  a different year, 1995?

2  A  That's correct.

3  Q  And what was the total amount that came out of the

4  Holding Account?

5  A  $193,658.00.

6  Q  Now, Miss Iddon, the summaries to which you just

7  testified, Government Exhibits 540 through 544, those list

8  all the amounts that were withdrawn from the Holding Account

9  for the years 1991 through 1995?

10  A   That's correct.

11  Q   Did you then review summaries that break down the

12  recipients of those monies from the Holding Account?

13  A   Yes.

14  Q   Now, I ask you to look at Government's Exhibits 545 and

15  555.  Do you have them?

16  A   Yes, I do, sir.

17  Q   And, in general, what are Government Exhibits 545 to

18  555.

19  A   This is the breakdown of the amounts that were

20  transferred out or debited from the Center Company's Holding

21  Account to their individual sources.

22       So, as we broke down the deposits into this from

23  payees, is, this is a breakdown of how they were dispersed or

24  how the funds were dispersed from the Center Company Holding

25  Account from 1991 to 1995.

Iddon - Direct(By Mr. Voracek)          71

1  Q   So, the information that's reflected in these summaries,

2  545 to 555, were also reflected on 540 to 544, except now we

3  are showing it by the recipient of the monies?

4  A   Correct.

5      MR. VORACEK:  Your Honor, the United States move

6  for the admission of to 545 to 555.

7      THE COURT:  545 to 555 are admitted.

8  Q   And looking at Government Exhibit 545, Miss Iddon,

9  what's reflected by that document?

10  A   545 is a summary of all of the amounts that were wire

11  transferred from the Center Company's Holding Account to the

12  various foreign bank accounts from 1991 through 1995.

13  Q   And, in total, how much was wire transferred from the

14  Holding Account to foreign bank accounts during that

15  five-year period?

16  A   The total amount of wire transfers were $90,188.00.

17  Q   Now, the exhibit numbers that you reviewed in verifying

18  that summary, are those the actual wire transfers or what

19  type of documents were you looking at?

20  A   I believe that the information that was submitted were

21  copies of wire transfers, if available and, if not, there may

22  be some correspondence directing the bank to wire a certain

23  amount to a certain bank on such and such a date.

24  Q   But, did you verify, though, by looking at the

25  documentation, did you verify that these amounts were, in

Iddon - Direct(By Mr. Voracek)          72

1  fact, wired from the Holding Account to these other accounts?

2  A   Oh, and in addition to the information regarding the

3  wire transfer, right, the bank statement for the Holding

4  Account clearly reflect a debit or amount taken out of that

5  bank account on that particular date, yes.

6  Q   So, on March 30, 1992, how much was wire transferred on

7  that day?

8  A   On that day, there was $33,671.00 wire transferred to

9  the Barclays Bank in the Turks and Caicos Islands from the

10  Center Company Holding Account.

11  Q   Now, I see another column on that summary called account

12  name.  What is reflected under that column?

13  A   That account name would be the account in which, in this

14  case it's ASTCO, Limited, and that's -- I believe we talked

15  or we heard testimony that each account holder specifies a

16  name in which is on that account.

17  Q    Well, the amount of $33,671.00 wire transferred on

18  March 30th, 1992, is that amount going to that particular

19  account?

20  A    Yes.  Indirectly, it is going to Barclays Bank in the

21  Turks and Caicos islands, and the beneficiary would be the

22  account holder for ASTCO, Limited.

23  Q    Now, let's look at the entry on August 7th, 1992.

24        What was wire transferred on that day?

25  A    On that day, it was -- $5,500.00 was wire transferred to

                    Iddon - Direct(By Mr. Voracek)          73

1  the TSB Bank in the Channel Islands.

2  Q    And into which account as beneficiary?

3  A    The beneficiary being Daniel and Margaret Leveto.

4  Q    Miss Iddon, I now ask you to look at Government

5  Exhibit 546.  And what's reflected on 546?

6  A    This is a summary of amounts that were paid from the

7  Holding Account, the Center Company Holding Account to Jack

8  Carl Futures from 1991 through 1995.

9  Q    Do you know what Jack Carl Futures is?  Did we hear any

10  testimony about that, to the best of your recollection?

11  A    Honestly, I believe that we did hear testimony, but I

12 can't remember at this time who said it. I'm sorry.

13 Q    All right. Well, the exhibit numbers that you verified

14 or that you looked at in verifying this summary, what's

15 reflected in the exhibit numbers?

16 A    What's reflected on the exhibits that I looked at to

17 review this summary were copies of wire transfers or the

18 check numbers that actually were written that were actually

19 paid to Jack Carl Futures.

20 Q    So, in sum, based on your review of the documents, how

21 much came out of the Holding Account to Jack Carl Futures

22 during that five-year period?

23 A    The total for that is $110,000.00.

24 Q    Miss Iddon, I now ask you to look at Government

25 Exhibit 547.

                    Iddon - Direct(By Mr. Voracek)          74

1        Now, does Government Exhibit 547 reflect another

2 recipient of funds from the Holding Account for the 1991

3 through 1995 period?

4 A    Yes, sir. The recipient in this particular case was

5 Margaret Leveto, and these were amounts that she received.

6   And the information that I looked at showed check numbers

7   that were written from the Center Company's Holding Account

8   and paid to Margaret Leveto from 1991 through 1995.

9   Q    And in total, how much was paid from the Holding Account

10   now to Margaret Leveto during that period?

11   A    The total is $61,000.00.

12   Q    And I ask you to look at Government Exhibit 548.

13        Do you have that in front of you?

14   A    Yes, I do.

15   Q    What's reflected on Government Exhibit 548?

16   A    These were the amounts that were paid to PennBank or

17   Integra Bank from 1991 through 1995 from the Center Company's

18   Holding Account.

19   Q    And in total, how much was paid from the Holding Account

20   to Integra Bank or PennBank during that period?

21   A    $238,629.66.

22   Q    And your summary for that that's reflected in Government

23   Exhibit 548 only reflects a total of, I believe, eight

24   separate documents, does it not?

25   A    The exhibits?

Iddon - Direct(By Mr. Voracek)          75

1  Q   Yes.

2  A   Yes, sir.

3  Q   Eight separate transactions which come up to a total of

4  238,000?

5  A   Correct.  That is correct.  There were only eight

6  transactions that totalled that amount.

7  Q   And is this the same type of payments to a bank that you

8  previously testified that Miss Swaney from National City Bank

9  talked about?

10  A   Correct.  Official check, cashier's checks.

11  Q   That that was a possible purchase?

12  A   Right.  That that would be a possible explanation for

13  it, correct.

14  Q   And Government Exhibit 549.  What is 549?

15  A   This is a summary of all the amounts that were paid to

16  Langdon and Leveto from 1991 through 1995 from the Center

17  Company's Holding Account.

18  Q   Did we hear any testimony about Langdon and Leveto?

19  A   Yes.  That was the name of the practice prior to

20  changing to Center Company.  And I believe Dr. Langdon was

21  the gentleman that Dr. Leveto had purchased the business

22  from, from the testimony we heard.

23  Q    Did Langdon and Leveto have their own bank account?

24        Was there a bank account in evidence that was

25  entitled Langdon and Leveto, if you recall?


                Iddon - Direct(By Mr. Voracek)          76


 1  A    Um, I -- honestly, I can't recall with all the bank

 2  statements that I looked at at this point.  I am sorry.

 3  Q    Well, the amounts that are reflected on this summary,

 4  Government Exhibit 549, what are they from?

 5  A    I believe the exhibit numbers in this particular case

 6  are the Center Company's Holding Account, and they would be

 7  the bank statements and the deposit tickets and checks

 8  written from the Center Company's Holding Account to Langdon

 9  and Leveto.

10  Q    So, these are representative of checks?  I see one of

11  your headings is check number.

12  A    Correct.  This would be a check out of the Center

13  Company's Holding Account that was written directly to

14  Langdon and Leveto.

15  Q    And in sum, what was the amounts -- what was the total

16  amount that was paid from the Holding Account to Langdon and

17  Leveto for 1991 through 1995?

18  A   $127,888.70.

19  Q   And Government Exhibit 550.  Do you have that?  What is

20  reflected there?

21  A   Again, this is a summary.  And these are -- excuse me --

22  a summary of amounts paid from Center Company's Holding

23  Account to Magdan from 1991 through 1995.

24  Q   What was the total amount paid to Magdan?

25  A   $14,300.00.

Iddon - Direct(By Mr. Voracek)          77

1  Q   And Government Exhibit 551?

2  A   These were amounts -- a summary of the amounts paid to

3  Edge Co. from the Center Company's Holding Account from '91

4  through '95.

5  Q   And the total amount paid?

6  A   $16,626.50.

7  Q   And Government Exhibit 552?

8  A   This is a summary of cash payments that were paid from

9  Center Company's Holding Account for 1991 to 1995.

10  Q   The total amount, please?

11   A    $8,075.00.

12   Q    And Government Exhibit 553?

13   A    These are summaries -- this is a summary of the amounts

14   that were paid to Center Company from the Center Company's

15   Holding Account for 1991 through 1995.

16   Q    And what was the total amount that was paid to Center

17   Company?

18   A    $130,159.83.

19   Q    Now, in your review of the evidence, Miss Iddon, these

20   checks that are made payable to Center Company, where did

21   they end up?

22   A    They were deposited back to the Center Company's

23   Operating Account.

24   Q    So, I believe you testified earlier, we have amounts

25   coming from the Operating Account to the Holding Account?


                    Iddon - Direct(By Mr. Voracek)          78


1    A    Correct.

2    Q    So, you are testifying that this amount of $130,159.00

3    went back to the Operating Account?

4    A    Correct.

5    Q    And Government Exhibit 554, what is reflected in that

6  document, please?

7  A    These were amounts that were paid to ASTCO at the

8  Barclays Bank from 1991 through 1995 that were paid out of

9  the Center Company's Holding Account.

10  Q    And what was the total amount that were wire transferred

11  to ASTCO from the Holding Account?

12  A    The total amount wire transferred in this particular

13  case is $53,716.00.

14  Q    And Government Exhibit 555.  What's reflected there,

15  please?

16  A    These are amounts that were paid to Vericon and Barclays

17  Bank that were made via wire transfer out of the Center

18  Company's Holding Account from '91 through '95.

19  Q    And the total amount of wire transfers to Vericon during

20  that time period?

21  A    $30,972.00.

22  Q    Miss Iddon, I now ask you to --

23        THE COURT:  Excuse me.  I think this would be maybe

24  a good time to take our break.  So, we'll recess until

25  eleven-fifteen.

Iddon - Direct(By Mr. Voracek)          79

1  (Court recessed at 11:00 a.m.)

2  (Court reconvened at 11:20 a.m.)

3  (The jury entered the courtroom.)

4       THE COURT:  Be seated, please.

5  BY MR. VORACEK:

6  Q    Miss Iddon, you have before you what's been marked as

7  Government Exhibits 560 through 564.  Do you recognize them?

8  A    Yes, sir, I do.

9  Q    What's reflected, in general terms, in Government

10  Exhibits 560 through 564?

11  A    These are the summary of deposits that were made into

12  Margaret Leveto's bank account.

13  Q    For what time period?

14  A    I'm sorry.  1991 through 1995.

15       MR. VORACEK:  Your Honor, the United States moves

16  for the admission of Government Exhibits 560 through 564.

17       THE COURT:  560 through 564 are admitted.

18  Q    Miss Iddon, I ask you to look at Government's Exhibit

19  560.  Do you have that in front of you?

20  A    Yes, sir.

21  Q    And what's reflected in Government Exhibit 560?

22  A    Again, this is a summary of all the deposits that were

23  made into Margaret Leveto's bank account for 1991.

24  Q    All right.  And I see a heading called source?

25  A    Yes.

Iddon - Direct(By Mr. Voracek)          80

1  Q    What's reflected under the source?

2  A    The source would be, in this particular case, to whom

3  the check was deposited into her account, was payable from.

4  Q    And I see under the heading source, a lot of L and L's.

5  And who is L and L?

6  A    L and L is Langdon and Leveto.

7       THE COURT:  Is what?

8       THE WITNESS:  L and L is Langdon and Leveto.

9  BY MR. VORACEK:

10  Q    Would these be items that had come specifically from

11  Langdon and Leveto that were deposited into Margaret Leveto's

12  account?

13  A    Correct.

14  Q    And what was the total amount that was deposited into

15  Margaret Leveto's account in 1991?

16  A    $49,490.45.

17  Q    And I see an entry on December 20, 1991.

18        Do you see that, Miss Iddon?

19  A    Yes, I do.

20  Q    And what was the source of those monies that are

21  deposited into Margaret Leveto's account?

22  A    On this particular deposit, the source was the Center

23  Freedom or the Holding Account.

24  Q    I was going to ask you that before.  You said Holding

25  Account before on Government Exhibit 12.


                Iddon - Direct(By Mr. Voracek)          81


1        Did you find any evidence that that was also known

2  as the Freedom Account?

3  A    Yes.

4  Q    I am going to ask you to examine Government Exhibit 561.

5        Are these also deposits into Margaret Leveto's bank

6  account, except for a different time period?

7  A    Yes.  For the time period 1992.

8  Q    And what was the total amount that was deposited into

9  Margaret Leveto's account in 1992?

10  A    $36,200.00.

11  Q    And are there amounts that were deposited into her

12  account that came from the Center Freedom --

13  A    Yes, sir.  I believe there are four in 1992.

14  Q    I also draw your attention, Miss Iddon, to cash amounts

15  on January 21st, 1992, February 11th, 1992, February 27,

16  1992.

17       Do you see that reflected on this summary?

18  A    Yes, I do.

19  Q    And how much in cash was deposited into her account on

20  those dates?

21  A    Oh, January 21st, it was $1,000.00.  On February 11th,

22  it was $1,500.00.  And I believe the other you mentioned was

23  February 27th, and that was $1,000.00 also.

24  Q    Now, Miss Iddon, did we see any documents or hear any

25  testimony during trial with regard to cash that may have been

                Iddon - Direct(By Mr. Voracek)          82

1  deposited into Margaret Leveto's account and the source of

2  the cash?

3  A    Yes.  I believe the representative from National City

4  Bank stated that there were available debit card transfers.

5    In other words, you could take a cash advance against your

6    Master Card or use it like a debit card and get cash out.

7    Q    And did we actually see documents of the charge receipt

8    or the credit card receipt?

9    A    Yes.  There was also documentation showing an invoice or

10    a voucher of the debit card withdrawals.

11    Q    Did we hear any testimony or see any evidence about the

12    debit card and which bank that was from?

13    A    Yes.  I believe it was from the bank that was in the

14    Turks and Caicos islands, and that I believe it was a Master

15    Card was used to take monies out of that foreign bank

16    account.

17    Q    And those monies, the documents reflect, were then just

18    deposited into Margaret Leveto's account on the -- all at the

19    same day?

20    A    That is correct.

21    Q    So, when we go through your summary, Government

22    Exhibit 561 and we see cash being deposited into Margaret

23    Leveto's account, the source of that cash may be from the

24    debit card based on your review of all the testimony and

25    evidence?

1  A    Correct.  The documents that I reviewed were around

2  about, if not the exact same date of those cash deposits.

3  Q    And Government Exhibit 562, what is that reflective of?

4  A    Again, it's a reflection of the deposits made into

5  Margaret Leveto's bank account for 1993.

6  Q    And, in total, what was the amount that was deposited

7  into her account for 1993?

8  A    $36,362.50.

9  Q    Now, Miss Iddon, I also see, even for 1993, the source

10  of the deposits, I see a lot of L and L's.

11  A    Langdon and Leveto.

12  Q    Is this a separate account from the Center Company

13  account?

14  A    Yes, it is.  Landgon and Leveto was a separate account,

15  bank account that was utilized.

16  Q    Was the L and L account used in 1993 for the veterinary

17  practice's receipts and expenses?

18  A    The veterinarian receipts and practices were deposited

19  into the Center Company Holding -- I am sorry -- the Center

20  Company Operating Account.

21  Q    Prior to the Center Company Operating Account starting,

22  were the veterinary receipts deposited into the Langdon and

23  Leveto account?

24  A    I believe for the earliest part of 1991, the Langdon and

25  Leveto account was used for the deposits, yes.


                    Iddon - Direct(By Mr. Voracek)        84


1  Q    After the Center Company Operating Account came into

2  existence in 1991, do see we still see evidence that the

3  Langdon and Leveto account is still opened?

4  A    Yes, it still is, and it's being utilized to write out

5  checks to Mrs. Leveto.  That is the source of these deposits.

6  Q    I am sorry if I have already shown you this one, but

7  Government Exhibit 563, that pertains to the deposits for the

8  1994 year into the Margaret Leveto account?

9  A    Yes.  This is exact same thing, except it's for the time

10  period 1994, and the total is $45,150.19.

11  Q    And based on your -- based on reviewing your summary,

12  what's the primary source of the deposit into the Margaret

13  Leveto account for 1994?

14  A    I would say it's the Center Company Holding Account.

15  Q    And, finally, Government Exhibit 564.  Is this also a

16   summary of deposits into Margaret Leveto's bank account, but

17   for a different time period?

18   A    Yes.  This is for 1995.

19   Q    And what was the total amount that was deposited into

20   Margaret Leveto's account for the 1995 year?

21   A    $34,800.00.

22   Q    And I see, Miss Iddon, an entry for a deposit on

23   February 17th, 1995.

24        What was the source of that deposited amount?

25   A    Box Elder, PaineWebber account.


                Iddon - Direct(By Mr. Voracek)          85


1    Q    Did we hear any testimony or see any evidence regarding

2    an account at PaineWebber?

3    A    Yes.  It was a representative of PaineWebber that

4    verified those accounts.

5    Q    And Box Elder, was that the account name, or what was

6    that?

7    A    I believe that Box Elder was the account name on the

8    PaineWebber account, yes.

9    Q    And Government Exhibit 565, do you have that in front of

10   you?

11   A   Yes, sir.

12   Q   And what is reflected there?

13   A   This is a summary of the deposits that were made into

14   Daniel or Margaret Leveto's escrow account for 1991 through

15   1994.

16        MR. VORACEK:  Your Honor, the United States moves

17   for the admission of Government Exhibit 565.

18        THE COURT:  565 is admitted.

19   Q   And, in total, what were the amounts of the deposits

20   made into Daniel and Margaret Leveto's escrow account for

21   1991 through 1994?

22   A   The total for that is $107,000 -- I'm sorry --

23   $107,081.41.

24   Q   Now, Miss Iddon, were you also able to, or did you

25   review bank documentation that came from a bank outside the

                    Iddon - Direct(By Mr. Voracek)            86

1   United States?

2   A   Yes, I did.

3   Q   Was it more than one account outside the United States,

4   or was it just the one account?

5   A   I believe there was more than one.

6   Q   I ask you to look at Government Exhibits 566 through

7   570.  Do you have them in front of you?

8   A   Yes, I do.

9   Q   And, in general, what is Government Exhibits 566 through

10  570 reflective of?

11  A   This is actually the banking activity for the bank

12  accounts that were located outside of the United States.

13  Q   And in what name were these accounts?

14  A   Box Elder, Limited, Leonard Adler, Dr. D.J. and

15  Mrs. M.A. Leveto.

16  Q   Now, when you reviewed the foreign -- or the bank

17  documentation from foreign bank accounts, were you able to

18  associate those account names of Box Elder and Leonard Adler

19  with the defendant, Daniel Leveto?

20  A   I believe the addresses that were listed on the bank

21  statements were that of the P.O. Box and the Conneaut Lake

22  Road address.

23       MR. VORACEK:  Your Honor, the United States moves

24  for the admission of Government Exhibits 566 through 570.

25       THE COURT:  566 through 570 are admitted.

1  Q    Now, let's look at Government Exhibit 566, Miss Iddon.

2  And essentially what is reflected in that summary?

3  A    This is the summary of all account activity for the Box

4  Elder, Limited account that was located at the Barclays Bank

5  from 1992 through 1996.

6          It shows deposits, withdrawals and any interest

7  that also was accrued.

8  Q    Now, I see the first column says EXH, period.  I assume

9  that means exhibit?

10  A    Correct.  That's the exhibit to which it's referenced

11  that I was able to review to verify this summary.

12  Q    Were those exhibits for foreign records or domestic

13  records?

14  A    To my recollection, I believe it was a little bit of

15  both.

16  Q    Okay.  And you have basically all the activity that you

17  were able to look at concerning both deposits into and

18  withdrawals out of that bank account?

19  A    Correct.

20          THE COURT:  Excuse me.  I am not sure you had

21  offered 566 through 570.

22      MR. VORACEK:  I'm sorry, Your Honor.  Yes.  We

23  offer 566 through 570 into evidence.

24      THE COURT:  They are admitted.

25  Q    And I believe you testified now on here it's a Box

Iddon - Direct(By Mr. Voracek)          88

1  Elder, Limited account.

2      Was there some connection between Box Elder,

3  Limited, and Barclays Bank and Daniel Leveto?

4  A    I believe, yes, we heard testimony that said that's the

5  name, plus there was evidence entered into that Box Elder,

6  Limited, mail was coming to either the P.O. Box or the

7  Meadville address.

8  Q    Now, I direct your attention to an entry on May 17th,

9  1993.  Do you see that?

10  A    Yes.

11  Q    What banking activity was done at the Box Elder,

12  Limited, on that date?

13  A    On May 17th, there was a deposit of $38,475.00.

14  Q    May 17th, 1993?

15  A   May 17th, 1993.

16  Q   Yes.  1993.

17      And about nine days later, on May 26, 1993, do we

18  see another entry with regard to the Box Elder, Limited,

19  account?

20  A   Yes, sir.  We see a withdrawal of $38,070.60 payable to

21  Center's Freedom Account.

22  Q   So, Center's Freedom Account then received that amount,

23  $38,070.00?

24  A   That's absolutely correct.

25  Q   And I see, if we just jump a little bit, March 22nd,

                    Iddon - Direct(By Mr. Voracek)          89

1  1993, we see an amount that's deposited from ASTCO,

2  $18,117.00?

3  A   Correct.

4  Q   And on less -- about a month later, do we see an amount

5  withdrawn?

6  A   On April 21st of 1993, we see a withdrawal of $17,552.85

7  payable to Center's Freedom.

8  Q   Now, I direct your attention to March 7th, 1994.

9      What banking activity occurred in the Box Elder,

10  Limited, account on that day?

11  A    March 7th, 1994?

12  Q    Yes.

13  A    He earned interest on this account of $11.52.

14  Q    How about the entry right above the interest amount?

15  A    The $15,500.00 deposit from Vericon?

16  Q    Yes.  When was that deposited?

17  A    March 7th of 1994.

18  Q    $15,500.00?

19  A    I'm sorry, yes.  $15,500.00 was deposited on March 7th,

20  1994.  The source was Vericon.

21  Q    Barclays Bank.  This bank account you indicated was a

22  foreign account?

23  A    Correct.

24  Q    An account that you have seen documentation to that was

25  not documentation from a United States bank?

                   Iddon - Direct(By Mr. Voracek)          90


1  A    Correct.

2  Q    And Box Elder, Limited, you have associated with Daniel

3  Leveto?

4  A    Through correspondence and documentation that's been

5  entered in, yes, we have.

6  Q    Miss Iddon, I now ask you to look at Government Exhibit

7  1-F-1.  I believe you have that.

8  A    1-F-1 is a copy of the 1994 Federal Income Tax Return.

9  Q    Miss Iddon, if an individual has a foreign bank account,

10  must they report that to the Internal Revenue Service on

11  their 1040?

12  A    Yes, sir.  It's reportable on the Schedule B, and

13  Schedule B is actually an interest and dividend income form

14  that they utilize.

15          And in Part III of the Schedule B, there is a

16  section entitled Foreign Accounts and Trusts.  And at that

17  time in 1994, it stated:

18          If you had over $400.00 of interest or dividends or

19  had a foreign account or were a grantor of, or transferor to,

20  a foreign trust, you must complete this part.

21          And there are two questions.

22          At any time during 1994, did you have an interest

23  in or a signature or other authority over a financial account

24  in a foreign country, such as a bank account, securities

25  account, or other financial account?

Iddon - Direct(By Mr. Voracek)          91

1  Q    And is there check boxes by that line?

2  A    Yes, there are.

3  Q    Now, you got Government Exhibit 1-F-1, the income tax

4  return for Dr. Leveto for 1994.

5        What box was checked?

6  A    The no box was checked, sir.

7  Q    Now, Miss Iddon, anybody who has a foreign bank account

8  at all, must they check the yes box, or are there specific

9  instructions to review, maybe amount requirements?

10  A    There are some further exceptions to the dollar amounts

11  in the instructions to the Schedule B.

12  Q    So, when you are preparing your tax returns, you may

13  have to refer back to the instructions for Schedule B?

14  A    Yes.  I'm sorry.  I did quit reading, but it says:

15        See page B-2 for exceptions and filing requirements

16  for an additional form, TD F 90-22.1.

17  Q    Now, for the year 1994, Dr. Leveto's 1994 tax returns

18  reflected in Government Exhibit 1-F-1, do you know what that

19  dollar amount was in order for an individual to have to

20  report their control over a foreign account?

21  A    I believe I do, but I do have the instructions here if I

22  could actually --

23  Q    Yes.  Do you have something that would refresh your

24  memory?

25  A    Yes, I do.


                    Iddon - Direct(By Mr. Voracek)            92


1  Q    And what is that?

2  A    It's simply the instructions for the Schedule B for

3  1994.

4  Q    And do you have it for 1995 as well?

5  A    Yes, sir.

6        MR. VORACEK:  Your Honor, may the witness refresh

7  her recollection based on documents?

8        THE COURT:  The witness may.

9  Q    Again, Miss Iddon, in refreshing your memory over the

10  requirements concerning a foreign bank account on a person's

11  1040 for 1994, is there any dollar limitation that someone

12  must reach in order to have to -- which would require them to

13  check the yes box?

14  A    Yes, sir.  In the instructions to Schedule B on page

15  B-2, it clearly reflects you have to go to -- it says you

16  must check the yes box -- you must check the yes box on line

17  11-A if you own more than fifty percent of the stock in any

18  corporation that owns one or more foreign bank accounts, or

19  at any time during the year you had an interest in or

20  signature or other authority over a financial account in a

21  foreign country.  The exceptions, the combined value of the

22  account was $10,000.00 or less during the whole year.

23         There is also two other -- I'm sorry -- three other

24  exceptions, if you are interesting in me reading those.

25  Q   Well --

Iddon - Direct(By Mr. Voracek)          93

1  A   That's the only one that's based on a dollar criteria.

2  Q   So, by -- in your reading of those instructions, does

3  that indicate that if a person never had more than $10,000.00

4  in a foreign bank account during a given year, they could

5  legitimately check the no box?

6  A   If that value of all the total of all the accounts that

7  you have in foreign countries never ever exceeded $10,000.00,

8  once, never exceeded it once, then you could legitimately

9   check the no box.

10  Q    And, conversely, if you had ten thousand at any time in

11  a foreign bank account, you would have to check the yes box?

12  A    Correct.

13  Q    Now, let's look at part -- at Schedule B, Part III,

14  Foreign Account and Trust, in a little bit closer inspection,

15  Miss Iddon.

16       And I believe you mentioned this, under 11-A, could

17  you just read that first question again right by 11-A?

18  A    At any time during 1994, did you have an interest in or

19  a signature or other authority over a financial account in a

20  foreign country, such as a bank account, securities account,

21  or any other financial account?

22  Q    So, that question just doesn't particularly pertain to

23  somebody who necessarily has a signature authority over that

24  account, it could be anybody who has any interest at all or

25  any authority at all over a foreign account?

                    Iddon - Direct(By Mr. Voracek)          94


1   A    Yes.

2   Q    And, if so, if they had such a control, such an

3   interest, then they would be required to check the yes box,

4    assuming they had at least $10,000.00 in that account as its

5    cumulative value during the year?

6    A    That is correct.

7    Q    And looking back again at Government Exhibit 566.

8    A    Yes, sir.

9    Q    On March 7th, 1994, what was deposited into the Box

10   Elder, Limited, account at Barclays Bank?  How much?

11   A    $15,500.00.

12   Q    And I see another deposit into the Barclays Bank account

13   on May 27th, 1994.  How much was deposited at that point?

14   A    $13,000.00.

15   Q    I see later that same year on December 15th, 1994, a

16   withdrawal?

17   A    I am sorry.  That was December 15th of 1994, correct?

18   Q    Yes.

19   A    And the withdrawal now is $10,556.75, and the payee was

20   Box Elder at PaineWebber.

21   Q    And I think you testified earlier, we saw some

22   documentation regarding PaineWebber?

23   A    That's correct.

24   Q    Was that a PaineWebber account that was in Erie,

25   Pennsylvania?

Iddon - Direct(By Mr. Voracek)          95

1   A    I believe the PaineWebber account for this particular

2   case was the one that was opened in -- I believe it was --

3   was it Virginia?  Maryland?  I'm sorry.  It was the D.C.

4   area.

5   Q    And the account name on that PaineWebber account I see

6   as Box Elder?

7   A    Correct.

8   Q    Did you hear any testimony or see any evidence that

9   associated that Box Elder account with Daniel Leveto?

10  A    Yes.  We heard testimony and we saw evidence that there

11  was some correspondence that listed Box Elder as using the

12  Meadville P.O. Box address.

13  Q    Now, let's look at an entry on May 23rd, 1995.

14         What was deposited into the Box Elder, Limited,

15  account at Barclays Bank on May 23rd, 1995?

16  A    $14,520.00.

17  Q    Now, I ask you, Miss Iddon, if you could, to look at

18  Government Exhibit 1-G-1.

19         And is 1-G-1 the 1995 tax return for Daniel Leveto?

20   A   Yes, it is.

21   Q   And I direct your attention to Schedule B of 1-G-1,

22   which would be the section for interest and dividend income.

23   A   Yes, sir.  Schedule B.

24   Q   And I go down to Part III of the 1995 return where it

25   says foreign accounts.


            Iddon - Direct(By Mr. Voracek)          96


1    A   Correct.

2    Q   Is that the same type of language on this return for

3    1995 regarding signature authority or interest in or other

4    authority over a foreign bank account to which you just

5    testified regarding 1994?

6    A   Yes.  The verbiage is the same.

7    Q   And in reviewing the instructions for 1995, would we

8    find similar instructions, as long as a person had some

9    authority over a foreign bank account and it had an amount of

10   $10,000.00 value at some point during the 1995 year, that

11   person would be required to check the yes box?

12   A   That's correct.  1995 law, the instructions are stated

13   the same.

14  Q    And what box was checked on the 1995 return by

15  Dr. Leveto?

16  A    The no box was checked.

17  Q    And going back to Government Exhibit 566 just

18  momentarily, Miss Iddon, on May 23rd, 1995, there was an

19  amount deposited into the Barclays account, correct?

20  A    Correct.

21  Q    What was that amount?

22  A    On May 23rd, 1995, the amount was $14,520.00 deposited

23  into that account.

24  Q    And approximately two weeks later, on June 6, 1995, was

25  there a withdrawal out of that same account?

Iddon - Direct(By Mr. Voracek)          97

1  A    Yes, sir.  There was a withdrawal made to the

2  PaineWebber Box Elder account of $15,068.00.

3  Q    And in 1996, on April 24th, was there a financial

4  transaction made with regard to the Box Elder, Limited,

5  account at Barclays Bank?

6  A    Yes, sir.  On April 24th of 1996, $14,142.50 was

7  deposited into the Barclays Bank.

8  Q    And by going down further on your summary, was there

9   another transaction that occurred five days later?

10  A   On April 29th of 1996, $16,000.00 was withdrawn from the

11  Barclays Bank account and made -- and deposited to

12  PaineWebber, Box Elder.

13  Q   Miss Iddon, I now ask you to look at Government

14  Exhibit 567.  What is reflected on Government Exhibit 567?

15  A   567 is a summary of the account activity for Leonard

16  Adler account with First Home Banking from 1992 through 1995.

17  Q   And did we hear any testimony or see any evidence that

18  associated the name Leonard Adler with Daniel Leveto?

19  A   Yes, we did.  I believe there was a stamp with that name

20  found on -- in his drawer during the search.  And there was

21  also letterhead that was reviewed by myself and entered into

22  evidence that showed Leonard Adler's address as being that of

23  the Meadville address.

24  Q   And I see a First Home Banking on your summary sheet.

25      Is that a bank in America or in a foreign land?

                Iddon - Direct(By Mr. Voracek)          98

1   A   It's not domestic.  It's foreign.

2   Q   Now, I see an entry on May 26, 1992.

3        What happened with regard to the Leonard Adler

4   account on that day?

5   A    On 5-26 of 1992?

6   Q    Yes.

7   A    There was a deposit of $31,663.00 from ASTCO.

8   Q    And approximately six months later, in November of 1992,

9   do we see another entry with regard to the Leonard Adler

10   account?

11   A    Yes, sir, we do.  We see that $32,015.00 was withdrawn

12   from the Leonard Adler First Home Banking, and the payee was

13   Leonard Adler.

14   Q    And Government Exhibit 566 -- 568, what's reflected on

15   that document, please?

16   A    This is the account activity of the bank statements for

17   Mr. D.J. and Mrs. M.A. Leveto at the TSB Bank, Channel

18   Islands, Limited, for the years 1991 through 1995.

19   Q    And what's reflected on your summary there?

20   A    This is basically all the deposits and the withdrawals

21   and any interest earned on the TSB Bank account in the

22   Channel Islands.

23   Q    Let's go down the headings there.  I see deposits,

24   amount, pounds in one column.  Can you see that?

25  A   Yes.

Iddon - Direct(By Mr. Voracek)          99

1   Q   Can you describe that?

2   A   Yes.  On -- many of the transactions that were listed on

3   the bank accounts were in pounds, and then there was an

4   exchange rate, and the exchange was then transferred over to

5   American, but I believe this statement is all in pounds.

6   Q   Now, Government Exhibits 569 and 570, are those

7   breakdowns of specific deposits and withdrawals from that

8   same account, Mr. and Mrs. Leveto's account at TSB Bank in

9   the Channel Islands?

10  A   Yes, it is.

11  Q   And what's reflected on Government Exhibit 569, please?

12  A   On 569, these were the deposits for 1991 through 1995

13  for Dr. D.J. and Mrs. M.A. Leveto into the TSB Bank, Channel

14  Islands, Limited, account, and it lists the source, shows the

15  pounds and the conversion to American dollars.

16  Q   These are all the deposits into the account?

17      I see on December 23rd, 1991 an entry.  Can you

18  explain what was deposited on that day?

19  A   On December 23rd of 1991, we had American Express

20  Traveler's Checks deposited that were 800 pounds.

21  Q   And it appears a couple weeks later on January 8 of

22  1992, there was another deposit.  And who made that deposit?

23  A   January 8, 1992?

24  Q   Yes.

25  A   The source was Wayne Co.


                Iddon - Direct(By Mr. Voracek)            100


 1  Q   And on August 11, 1992, was there a deposit made at that

 2  time?

 3  A   On August 11th of 1992, there was a deposit of

 4  $5,500.00.

 5  Q   Now, I see with regard to that entry under your exhibit

 6  column, Exhibits 210, 211 and 12-C-8.

 7      What is 12-C-8?

 8  A   May I refer to my exhibit list?

 9  Q   Yes.

10  A   12-C-8 is the Center Company Holding Account for August

11  of 1992.

12  Q   Now, why do you have 12-C-8 exhibited next to that

13  entry?

14   A   We were able to follow the money that was deposited into

15   this account out of the Center Company Holding Account for

16   1992.

17   Q   So, the $5,500.00 that went into the TSB, Channel

18   Islands account came from the Center Company Holding Account

19   on August 11th, 1992?

20   A   Correct.

21   Q   And, finally, Miss Iddon, Government Exhibit 570 is

22   reflective of what, the withdrawals out of the TSB Bank?

23   A   Yes.  I am sorry.  These were all the withdrawals that

24   came out of the TSB Bank account for '91 through '95.

25   Q   Now, I see next to the entry on 12-9, 1991, VISPB,

                Iddon - Direct(By Mr. Voracek)          101

1   Meadville, and there is a pound amount there.

2         Do you know, based on your review of all the

3   documents, what is that reflective of?

4   A   I assume, and based on my information that I have

5   reviewed, is that there was a withdrawal from the Channel

6   Islands bank account, and on December 13th, '91, it was made

7   payable to Langdon and Leveto.

8  Q    All right.  Now, if we go down a little bit further,

9  January 21st, 1992, I see an amount of $1,000.00 being

10  withdrawn to a payee, Margaret Leveto.

11        Based on your review of the evidence, how was that

12  transfer of funds made?

13  A    I believe that was a use of a debit card.

14  Q    Well, if we look at Exhibit 207-B, what would we see?

15  A    207-B was actually Visa Card advance receipt dated

16  January 21st of 1992, and that is what I have the liberty of

17  looking at.

18  Q    So, the other 207 exhibit numbers on this summary,

19  Government Exhibit 570, those are all reflective of Visa

20  charge receipt advances?

21  A    Correct.  207-A through, I believe, L, 207-L, were all

22  Visa Card cash advance receipts dated from 1991 through 1994.

23  Q    And these are amounts coming out of the TSB account?

24  A    That is correct.

25  Q    That are going to Margaret Leveto?


                Iddon - Direct(By Mr. Voracek)          102


1  A    That is correct also.

2  Q    Now, Miss Iddon, I ask you to look at a group of

3   documents, Government Exhibits 580 through 593.

4        Do you have them?

5   A   Yes, sir, I do.

6   Q   And what are Government Exhibits 580 through 593?

7   A   They are charts that I have reviewed for accuracy that

8   show the flow of income into Center Operating Account to the

9   various other banks that we have discussed today.

10   Q   Your charts of 580 through 593, are they based upon all

11   the documentation that was admitted into evidence and any

12   other testimony that you may have heard during the trial?

13   A   Absolutely, yes.

14        MR. VORACEK:  Your Honor, the government moves for

15   admission of 580 through 593.

16        THE COURT:  580 through 593 are admitted.

17   Q   Now, with regard to Government Exhibit 580, do you have

18   that in front of you?

19   A   Yes, sir, I do.

20   Q   On the very far left side, what do you have reflected

21   there?

22   A   What's reflected there shows that veterinarian practice

23   business receipts were first deposited into Integra Bank

24  Center Company Operating Account.

25  Q   Let me stop you there.


Iddon - Direct(By Mr. Voracek)          103


1       Is that based on your testimony that the receipts

2  went into the Operating Account?

3  A   That is correct.

4  Q   Okay.  Then we can then follow the -- your chart.

5       What happened on August 3rd, 1992?

6  A   On August 3rd of 1992, there was a transfer of $8,000.00

7  that left Center Company's Operating Account and was

8  deposited into the Center Company Holding or the Freedom

9  Account.

10  Q   And four days later on August 7th, what happened?

11  A   At that point, on August 7th of 1992, there was

12  $5,500.00 that was transferred or taken out of the Center

13  Company Holding Account and deposited into the TSB Bank with

14  the bank holder's name Daniel and Margaret Leveto.

15  Q   And on August 11th, four days later, what happened then?

16  A   On August 11th of 1992, we'll see that there was a

17  $1,500.00 Visa cash advance that was taken out by

18  Margaret Leveto.

19  Q    And what ultimately becomes of the $1,500.00?

20  A    On August 17th of 1992, we will see that the $1,500.00

21  was then deposited into the Integra Bank account, with

22  Margaret Leveto the bank account holder.

23  Q    And Government Exhibit 581, please.

24  A    Again, this is the chart that shows the flow, that the

25  veterinarian business receipts were first deposited into the

Iddon - Direct(By Mr. Voracek)          104

1  Center Company's Operating Account and that this clearly

2  reflects, I believe four in this particular case, of

3  withdrawals that were taken on January 2nd, 1992, of

4  $2,700.00, February 18th of 1992 of $6,000.00, March 3rd,

5  1992 of $6,000.00, and March 30th, 1992, $4,236.91.

6       These amounts were then deposited into the Center

7  Company's Holding or the Freedom Account.

8  Q    And then subsequent to that on March 30th, 1992, do we

9  see amounts coming out of the Holding Account?

10  A    Yes, we do.  We see the amounts of $33,671.00 coming out

11  of the Holding Account and going into the Barclays Bank,

12  ASTCO.

13        And then on 5-26 of 1992, $31,663.00 are withdrawn

14   from the Barclays Bank and deposited into the First Home

15   Bank, with the account holder Leonard Adler.

16   Q    Now, that Leonard Adler First Home Bank, that was a

17   foreign account that you testified to?

18   A    Correct.

19   Q    All right.  And then subsequently on November 19th, what

20   happens then?

21   A    On November 19th, $32,000.00 was then withdrawn from the

22   First Home Bank, the foreign bank account with the name

23   Leonard Adler and deposited into the Integra Bank Center

24   Holding Company Freedom Account.

25   Q    So, if we follow the entire flow here, beginning in

                    Iddon - Direct(By Mr. Voracek)          105

1   March of 1992, do we see amounts coming out of the Holding

2   Account of approximately 33,000?

3   A    That's correct.

4   Q    And then eight months later, we see monies going back

5   into the Holding Account for an amount of 32,000?

6   A    That's correct also.

7   Q    Government Exhibit 582, please.

8          What is that reflective of?

9   A   It's titled Chart C.  But, once again, it is the flow of

10  money from the veterinarian business receipts.  And we show

11  that the deposit was made into Integra Bank Center Company

12  Operating Account on 2-8-93 of $4,932.00.  That money was

13  then deposited into Integra Bank Center Company Holding

14  Account.

15  Q   And was there withdrawals made out of the Holding

16  Account about that timeframe?

17  A   Yes.  I am sorry.  On March 17th of 1993, you will see

18  that $19,095.00 was withdrawn from the Center Company Holding

19  Account and deposited into the Barclays Bank, account holder

20  ASTCO.

21  Q   And five days later, was there an -- another transaction

22  made?

23  A   Yes, sir.  The money then went from the Barclays Bank

24  ASTCO on March 22nd of 1993 in the amount of $18,117.00 and

25  was deposited to the Barclays Bank Box Elder account, and

            Iddon - Direct(By Mr. Voracek)          106

1   then from there on -- I am sorry -- May 3rd, 1993, $17,500.00

2    was deposited into the Integra Bank Center Company Holding

3    Freedom Account.

4    Q    So, again, as you just testified regarding summary 581,

5    we show amounts that left the Holding Account in March of

6    1993 in the approximate amount of 19,000, and by May of '93,

7    not even two months later, we show 17,500 come back to the

8    Holding Account?

9    A    Yes, it came back right in.

10   Q    Government Exhibit 583, please.

11   A    This is entitled Chart D.  And what we show is that on

12   5-17 of 1993, there was an amount of $38,475.00 that was

13   deposited into the Barclays Bank Box Elder account.

14          And then on June 24th, 1993, $38,000.00 was

15   withdrawn from the Barclays Bank and deposited into the

16   Integra Bank Center Company Holding account.

17   Q    And is summary Exhibit 584, is that very similar to the

18   one you just testified but for a different time period?

19   A    Yes, sir.  It's reflective of a deposit that was made on

20   March 2nd, 1994, in the amount of $15,500.00 from the

21   Barclays Bank Vericon account to the Barclays Bank Box Elder

22   account.

23          And then on March 25, 1994, $14,988.00 was then

24  deposited into the Integra Bank Center Company Holding

25  Account.


Iddon - Direct(By Mr. Voracek)          107


1  Q    And Government Exhibit 585.

2  A    Again, this shows the flow of money that was made on

3  March 28, 1994, leaving the Integra Bank Center Company

4  Holding Account of $12,060.00 deposited into the Barclays

5  Bank Vericon account.

6          And we see then that on 5-27 of 1994, $13,000.00

7  was taken out of that account and deposited into the Barclays

8  Bank Box Elder account.

9          And then on December 14th of 1994, $10,500.00 was

10  taken from the Box Elder account and deposited to PaineWebber

11  Box Elder.

12  Q    So, there is two separate Box Elder accounts?

13  A    Correct.

14  Q    And where are these accounts?

15  A    There is a Box Elder account at the Barclays Bank, which

16  is a foreign account.  And then there is a Box Elder account

17  at PaineWebber, which is a domestic or a U.S. account.

18  Q    And do both the Box Elder accounts, were they associated

19  with Dr. Leveto in any fashion?

20  A    Yes.

21  Q    How?

22  A    We have documentation that shows that all the

23  correspondence was mailed to his Meadville address.

24  Q    And Government Exhibit 586, what does that reflect?

25  A    This is Chart G and, again, the veterinarian business


                Iddon - Direct(By Mr. Voracek)          108


1   receipts that were first deposited into the Integra Bank

2   Center Company Operating Account, and we show on three

3   different dates in 1995; on 3-8, '95, $891.00; on 3-9 of '95,

4   8,000; and on 3-14 of '95, $891.00 were all withdrawn and

5   deposited into the Integra Bank Center Company Holding

6   Account.  And then --

7   Q    And on March 14th, 1995?

8   A    $14,529.00 was withdrawn from the Holding Account and

9   deposited into the Barclays Bank Vericon account.

10         And then from there on 5-23-95, $14,520.00 was then

11  withdrawn and deposited into the Barclays Bank Box Elder

12  account.

13        And the final flow of money shows on June of this

14   of that same year, 1995, $15,000.00 was then deposited into

15   the PaineWebber Box Elder account.

16   Q    Now, this last flow that you just described, the monies

17   going from the Barclays Bank account Vericon to Barclays

18   account Box Elder to the PaineWebber Box Elder account, was

19   that similar to the same flow of monies that you just

20   testified to in 1994 in Government Exhibit 585?

21   A    Yes, sir.

22   Q    Except now we are talking about 1995 now in Government

23   Exhibit 586?

24   A    Correct.

25   Q    And for Government Exhibit 587, do we show a similar

                    Iddon - Direct(By Mr. Voracek)         109

1    flow, except for the year 1996?

2    A    Correct.  The dates are reflective of the 1996.  The

3    flow of the money shows Integra Bank Center Company Holding

4    Account on March 29th, 1996, of $14,276.00 was withdrawn and

5    deposited into Global Scope.  From there on April 24th, 1996,

6    $14,142.50 was then deposited into Box Elder Barclays Bank,

7   and then from there 16,000 was deposited into PaineWebber Box

8   Elder.

9   Q    And, again, the Holding Account, that's here in

10   Meadville?

11   A    That's correct.

12   Q    So, the monies left and they went to Global Scope and

13   then they went to Barclays Bank and Box Elder, and that's

14   where --

15   A    That's -- I believe that's the one that's in the Turks

16   and Caicos Islands.

17   Q    And then the last flow shows monies coming back from

18   PaineWebber?

19   A    And that's a domestic U.S. account.

20   Q    In Maryland or Virginia?

21   A    I believe, yes.  I can't remember what office it was

22   opened, but it's U.S. Account.

23   Q    Government Exhibit 588, have you had an opportunity to

24   look through all of the summaries that you prepared regarding

25   the Holding Account records, the Holding Freedom Account

Iddon - Direct(By Mr. Voracek)          110

1   records?

file:///A|/LEVETO-8.TXT

2    A    Yes, sir.

3    Q    And did you prepare this or did you review this flow

4    chart for accuracy based on those summaries?

5    A    Yes, I did.

6    Q    And did you find it accurate?

7    A    Yes, I did.

8    Q    Now, with regard to the Center Company Operating Account

9    for the business receipts, the veterinarian business receipts

10    are put into, how much in total went in the Operating Account

11    to the Holding Account for that five-year period?

12    A    You will see that the deposits that were made into the

13    Center Company Holding Account from the Operating Account

14    totalled $377,971.00.

15    Q    And were there other amounts deposited into the Holding

16    Account?

17    A    Yes, sir.  You will see that there is money orders here

18    that were deposited in the total of $16,401.00.  There were

19    bank and cashier checks deposited of $82,059.00.  And you

20    will also see that we have deposits from foreign accounts

21    that were made into the Center Company Holding Account

22    totalling $102,488.00.

23  Q    And these foreign accounts, are these foreign accounts

24  to which you previously testified from Barclays First Home

25  Banking and TSB in the Channel Islands?

Iddon - Direct(By Mr. Voracek)        111

1  A    Correct.

2  Q    Now, does your chart here also show amounts that come

3  out of the Holding Account?

4  A    Yes, sir.  If you follow the arrows, you will see that

5  the amounts coming out of the Center Holding Company -- I'm

6  sorry -- the Center Company Holding Account, you will see

7  $130,159.00 were transferred back to the Operating Account.

8        You will also see that $238,629.00 were deposited

9  into PennBank and Integra.

10  Q    Now, you said deposited into PennBank and Integra.

11        Were they actually deposited there or made payable?

12  A    I'm sorry.  They would be made payable -- they don't

13  necessarily -- they weren't to pay Integra.  They could have

14  been, as we heard testimony earlier, to buy an official check

15  or a cashier's check.

16  Q    All right.  Please continue.

17  A    Also from the Center Company Holding Account, you will

18  see that there are Jack Carl Futures that were purchased in

19  the amount of $110,000.00.

20      We will also see that $127,888.00 were deposited

21  into the Langdon and Leveto bank account.

22  Q   Let me stop you for a moment.  The Langdon and Leveto

23  account, is that the account that used to be the account for

24  the veterinary practice receipts and expenses prior to Center

25  Company?

Iddon - Direct(By Mr. Voracek)        112

1  A   Correct.

2  Q   But, that account remained open during this period?

3  A   Correct.

4  Q   And you see that based on your review of all the

5  documentation?

6  A   Correct.

7  Q   So, from the Center Company Holding Account, you saw

8  127,000 going into the Langdon and Leveto account.  And what

9  became of those monies at Langdon and Leveto?

10  A   Well, if we follow the flow of the flow chart here, you

11  will see that from the Langdon and Leveto account, $77,600.00

12    of that money from the Langdon and Leveto account were

13    payable to Margaret Leveto and deposited into her bank

14    account.

15    Q    And were there other amounts that went to Margaret

16    Leveto from the Holding Account?

17    A    Indirectly or directly?

18    Q    Directly from the Holding to Margaret Leveto.

19    A    Yes.  Directly from the Center Holding Account, you will

20    see that $61,000.00 was deposited into Margaret Leveto's

21    account.

22    Q    So, if we add those two numbers up, the $77,600.00 and

23    the $61,000.00, we come up with about 138,000 or so?

24    A    Yes.

25    Q    That came either directly or indirectly from the Holding

Iddon - Direct(By Mr. Voracek)          113

1    Account to Margaret Leveto?

2    A    That's correct.

3    Q    And what else does your document reflect?

4    A    It also reflects that the foreign accounts, from the

5    foreign accounts, $16,000.00 of that money was then

6    transferred to Margaret Leveto's account, and from the

7    foreign bank accounts, well, that $41,500.00 was sent to the

8    Box Elder PaineWebber account here in the United States.

9         And I believe the last transaction that's reflected

10   on this flow is that there was $18,332.00 that went from the

11   Center Company Operating Account directly to Margaret

12   Leveto's bank account.

13   Q    Government Exhibit 589, what is shown by your chart

14   there?

15   A    It is very similar to the ones that we have gone over so

16   far.  It simply shows the flow of money.  But, in this

17   particular case, it's simply showing the flow of money into

18   the foreign bank accounts from the Center Company Operating

19   Account, deposits of $377,971.00 deposited into the Center

20   Company Freedom Holding Account.

21   Q    And what became of some of that money from the Holding

22   Account?

23   A    We show that $84,688.00 then went to the ASTCO Vericon

24   Barclays Bank account, and $5,500.00 of it went to Daniel and

25   Margaret Leveto's TSB Bank account.

Iddon - Direct(By Mr. Voracek)          114

1  Q   And what became of the monies that went to the Barclays

2  Bank account, ASTCO Vericon, Barclays Bank account?

3  A   We will see that half of it, or roughly half of it,

4  $47,817.00 went to the Box Elder Barclays Bank account.

5      The remainder, $31,663.00, went to the Leonard

6  Adler First Home Bank account.

7  Q   And were there also transactions out of the Box Elder

8  Barclays Bank account?

9  A   Yes, sir.  You will see that $41,500.00 was then sent to

10  Box Elder PaineWebber here in the United States.  And that

11  $70,691.00 was then sent to the Center Company Holding

12  Account or Freedom Account back here in the United States.

13  Q   And what became of the monies that were sent to the

14  Leonard Adler First Home Banking?

15      Do we also see transactions out of that account?

16  A   We see a withdrawal of $32,015.00, and that was

17  deposited into Center Company Freedom Holding Account, and

18  the check was made payable to Leonard Adler.

19  Q   And, then again, we also see monies going to a TSB Bank

20  account in the name of Daniel and Margaret Leveto?

21  A   That's correct.  And we see a withdrawal of $16,000.00

22  payable and deposited into Margaret Leveto's bank account.

23  Q   Is that those debit cards?

24  A   I believe that's what they totalled.  All those debit

25  card totalled $16,000.00, yes.


Iddon - Direct(By Mr. Voracek)          115


1  Q   Government Exhibit 590, what is that reflective of?

2  A   This is the primary deposits and the withdrawals from

3  the Center Company Holding Account.  So, we showed the

4  primary deposits on the left-hand side.  So, we see that the

5  Center Company Operating Account deposited -- or from that

6  account, there were $377,971.55 deposited into the Holding

7  Account.

8       We also show that the foreign accounts, there was

9  transfers or deposits from those foreign accounts of

10  $102,488.00 that were deposited into the Holding Account.

11       There were money orders deposited of $16,401.00

12  into the Center Company's Holding Account.  And there were

13  bank checks totalling $82,059.00 deposited into the Center

14  Company's Holding Account.

15  Q   So, we have this amount of money, looks like about a

16  half a million dollars going into the Holding Account from

17    these four sources during that five-year period?

18    A    That's correct.

19    Q    And then out of that half a million dollars, now we show

20    amounts that are paid to what entities from that Holding

21    Account during that same period?

22    A    Well, we have $90,188.00 paid to foreign accounts,

23    $110,000.00 payable to Jack Carl Futures, $127,888.00 payable

24    to L and L, or Langdon and Leveto.

25    Q    And I believe, with regard to that amount, that


                    Iddon - Direct(By Mr. Voracek)          116


1    $127,888.00 to Langdon and Leveto, I think you testified

2    earlier that some of those amounts were then payable to

3    Margaret Leveto?

4    A    That's correct.

5    Q    Please continue.

6    A    And then $238,629.00 payable to PennBank or Integra.

7    And $61,000.00 payable directly to Margaret Leveto.  And

8    $130,159.00 were deposited into the Center Company's

9    operating account.

10    Q    And Government Exhibit 591.  What's reflected on that

11    flow chart?

12  A    These are the primary deposits and withdrawals or debits

13  of the foreign accounts from 1991 through '95.  And we will

14  see that there were American Express Traveller's Checks of

15  $2,132.68 deposited into the foreign accounts.  And that

16  there were withdrawals from the Center Company's Holding

17  Account payable to foreign accounts of $90,188.00.

18         And then we will see that from those foreign

19  accounts, there were disbursements made.  $41,500.00 were

20  payable to the PaineWebber Box Elder account in Maryland,

21  that $102,488.00 were payable to Center Company's Freedom

22  Holding Account in Meadville, Pennsylvania, and that there

23  were $16,000.00 out of the foreign accounts payable to

24  Margaret Leveto in Meadville, Pennsylvania.

25  Q    And Government Exhibit 592, what does that chart

Iddon - Direct(By Mr. Voracek)        117

1  reflect?

2  A    These are the primary deposits that were made into

3  Margaret Leveto's account from 1991 through 1995.  And you

4  will see that they came up from the Center Company's

5  Operating Account, the Center Company's Freedom Holding

6  Account, Langdon and Leveto, L and L, and foreign accounts.

7  Q    Is that approximately a hundred and sixty to $170,000.00

8  from those four sources?

9  A    Yes, sir.

10  Q    And, finally, Government Exhibit 593. What is reflected

11  there?

12  A    What's reflected here is the flow of funds on an

13  aircraft sale and purchase. And you will see that Patrick

14  O'Hara with Private Banking on May 31st of 1995 transferred

15  money of 50,000 -- I'm sorry -- $57,900.00 to the Center

16  Company Holding Freedom Account.

17         And then on June 14th of 1995, $67,000.00 was then

18  transferred to Studio Management.

19  Q    Was that for the purchase of another airplane?

20  A    Yes, sir.

21  Q    And that occurred approximately two weeks after the sale

22  of the first airplane?

23  A    That's correct.

24         MR. VORACEK: The United States has no further

25  questions, Your Honor.

Iddon - Cross            118

1       THE COURT:  I think this is a good time to stop for

2   lunch, ladies and gentlemen.  So, we will recess now and we

3   will reconvene at one-thirty.

4   (The jury left the courtroom.)

5       THE COURT:  Are you going to have any more

6   witnesses, Mr. Voracek?

7       MR. VORACEK:  No, Your Honor.

8       THE COURT:  Thank you.

9   (Court recessed at 12:20 p.m.)

10  (Court reconvened at 1:35 p.m.)

11      THE COURT:  Good afternoon.  Be seated, please.

12  (The jury entered the courtroom.)

13      THE COURT:  Cross-examine, Dr. Leveto.

14      MR. LEVETO:  Yes, sir.

15              CROSS-EXAMINATION

16  BY MR. LEVETO:

17  Q   Good afternoon, Miss Iddon.

18  A   Good afternoon, Dr. Leveto.

19  Q   I just have a few questions for you.

20      Regarding foreign accounts, you have said that you

21  looked over a lot of the documentation here within the case,

22   or at least those that were used in the summary accounts or

23   the summary charts.

24   A   The information that was entered in as exhibits that I

25   looked over?

                    Iddon - Cross                    119

1   Q   Yes.

2   A   Yes.

3   Q   Did you see any open documents with my name on them

4   other than perhaps the TSB documents?

5   A   I can't honestly answer that without possibly having a

6   chance to look at those again.

7   Q   When we speak of a financial authority or a financial

8   interest in an account, would that include, say, a permissive

9   authority or an authority that an investment advisor might

10   see on an account or be watching an account when we talk

11   about authorized pursuant to Schedule B?

12   A   Um, unless you would like me to read again the

13   definition from the Schedule B.  I think that would probably

14   be an area in which a lawyer would have to answer as far as

15   authority.

16       I'm assuming you mean just over the instructions of

17  the Schedule B's from where we talked about the signature

18  authority?

19  Q    Right.  Right.  Or a financial interest.

20         In other words, within Schedule B, you talked quite

21  a lot about Schedule B and it would seem to me that you were

22  speaking of some type of an authority or an ability for a

23  person to be making judgments about those accounts.

24  A    You want me to -- Can I look at the instructions again

25  for that?

                    Iddon - Cross              120

1  Q    Sure.

2  A    At any time during the year, you had an interest in or

3  signature or other authority over a financial account in a

4  foreign country, I am assuming by -- you mean permissive

5  authority, is what you are referring to as other authority?

6  Q    Well, if there is no authority there, if it's something

7  that you are monitoring or looking at, I guess I am just

8  asking you, could reasonable people disagree on what

9  authority is versus actually an interest or ownership in an

10  account?

11   A   I would assume that you -- anybody could read into that

12   differently, yes, but I would read into it, if you had an

13   interest in or a signature or other authority over a

14   financial account at any time, that you fit this description.

15   Q   Okay.  Perhaps I can clarify it a little bit.

16        My office manager had an account, or the practice,

17   say any of the accounts that she was presiding over, she had

18   a stamp with my name on it, not particularly like the stamp

19   that I had with Leonard Adler's name on it.

20        In that way, would you call that authority interest

21   signatory authority over the account for my office manager?

22   A   I would say in that particular case, you do not have, or

23   she did not have an interest in your foreign bank account or

24   signature authority in your foreign bank account.

25   Q   Well, I was talking about the practice account, even the


                    Iddon - Cross              121


1    account at the veterinarian hospital where she routinely

2    stamped checks.

3        So, you would say that's not a signatory interest

4    or interest or other authority?

5    A   Correct.

6  Q   Because primarily it was by my permissiveness, is that

7  correct?

8  A   Correct.

9  Q   I think the rule on Schedule B, though, does allow for a

10  little bit of interpretation of it, but I think that that

11  is -- I think the rule we talked about --

12        THE COURT:  Just ask a question, Dr. Leveto.

13        MR. LEVETO:  Okay.

14  Q   If we go to Exhibit 505 and compare it with 1-C-1 again,

15  as we had done on -- as we had done previously.

16  A   Could you give me a moment to get those out?

17  Q   Sure.

18  A   505?

19  Q   Yes.  I believe it's 505.  The year matches with the

20  return.  That is the main thing.

21  A   Yes.  I have the 1991 Form 1040, and Government Exhibit

22  505 are the 1991 veterinary business receipts.

23  Q   Okay.  And there was a discrepancy between the

24  veterinary business receipts that year and the 1040 form, is

25  that correct?

Iddon - Cross          122

1  A    There was a difference in the total of gross receipts or

2  sales reported on your Schedule C, line one, and the total

3  dollar amount that's recorded on the Exhibit 505.

4  Q    Okay.  When we look at the return, was there anything

5  else about the return that may have explained that, or was

6  the IRS -- or, in your opinion, would the IRS have just said

7  that, well, that's okay?

8  A    You are asking me to compare any other items on the

9  Schedule C that may have been an explanation as to where this

10  additional income is from?

11  Q    Right.  Was there anything in the 1-C-1 tax return that

12  might clue you in as to why the gross receipts are different

13  than those receipts in your summary chart?

14  A    Nothing directly.

15  Q    Let's go to an easier one.  Maybe Exhibit 506, 1-D-1,

16  please.

17  A    The 1992 tax return or the 1992 business receipts from

18  the veterinarian business?

19  Q    Yes, I believe that's correct.

20  A    Okay.

21  Q    Now, on that one, the Exhibit 506, the summary of

22   receipts shows the total veterinary practice receipts, is

23   that right?

24   A    For 1992, that is correct.

25   Q    1992.  I'm sorry.  And the 1-D-1, the income tax return

                      Iddon - Cross                123

1   does not show those receipts, does not show a Schedule C?

2   A    That's correct.  There is no Schedule C and there is

3   nothing written on line twelve.

4   Q    Are there any documents within that tax return that

5   might clue you in as to why the income has disappeared, the

6   gross receipts?

7   A    The only thing -- are you referring to the installment

8   sale, sir?

9   Q    I am referring to any evidence that the Internal Revenue

10   Service might have gotten that the business was sold.

11   A    There are installment sale forms, the Form 6252 that

12   were attached both to the 1991 and the 1992 return.  The

13   description of the property is goodwill, and I believe an

14   employment agreement.

15   Q    So, we won't go over all of these because I believe they

16  are all the same, but the difference between the reporting of

17  the veterinary receipts part way through 1991 up and through

18  the period in question here, if one looks at those tax

19  returns, there is also information there showing that the

20  business was sold, or at least providing the information to

21  the IRS telling them that it was sold, is that correct?

22  A   The installment sale shows that goodwill and an

23  employment agreement were sold in 1991, and in 1992, you were

24  continuing to receive installment sale income.

25  Q   Okay.  Thank you.


                    Iddon - Cross                124


1         So, if you see that there is evidence of a sale on

2   the income tax returns, that hasn't seem to come out here

3   today, but would it be fair to say that just simply looking

4   at the return and the lack of a Schedule C versus veterinary

5   receipts, it's just advancing the government's theory --

6   A   I am sorry?

7   Q   -- that the practice wasn't sold?

8         I mean, if one says that there are veterinary

9   receipts and they weren't turned in on the Schedule C, is it

10  not true that some of this summary testimony is basically

11   advancing the government's theory, it's not just summarizing

12   evidence?

13   A   I am sorry.  I am not sure I quite still understand your

14   question.  Are you --

15   Q   If one were to say to you, Miss Iddon, that this

16   business stopped reporting receipts, could it be inferred if

17   the entire return wasn't looked at and the entire piece of

18   evidence wasn't considered, could it be inferred that a

19   person just stopped reporting receipts for no particular

20   reason, advancing the government's theory?

21   A   By looking at your returns, it appears that the

22   Schedule C stopped in 1991 and no longer was filed with your

23   1992 returns and on.

24   Q   That's correct.  But, there is, in addition to the

25   return, it would infer that the practice is sold?

                    Iddon - Cross              125

1   A   There is information included on the '91 and '92 return

2   regarding an installment agreement, correct, but it doesn't

3   reference the Schedule C.

4        More questions would have to be asked.  As a

5    Revenue Agent, I would be asking additional information and

6    asking for additional information to show the relativeness

7    between the installment sale and that Schedule C business.

8    Q    I see.  So, are there any provision in the Code that

9    would make one believe that the seller of the business

10   maintains a Schedule C and the buyer of the same business

11   maintains a Schedule C?  Or does it make sense that the

12   Schedule C would disappear if the practice was sold?

13   A    If the Schedule C business was, in fact, sold, then it

14   would no longer be required to be filed with your tax return,

15   that's correct.

16   Q    Thank you.  Miss Iddon, is it unlawful to write a

17   business check for a personal expense?

18   A    I don't believe it is unlawful to write a business check

19   for a personal expense.

20   Q    Is it not really how, at the end of the year when the

21   Schedule C is synthesized and when things are brought into

22   order, whoever is putting together the Schedule C, isn't that

23   the real time that you know if it's proper for not?

24   A    You mean whether personal expenses would then be not

25   included?

1  Q    Right.  If it is expensed at all or how it is handled at

2  the end of the year.

3        In other words, would you say it is not unusual for

4  people to pay personal expenses out of the business?

5  A    I wouldn't think it's a practice to pay personal

6  expenses out of a business, but I have seen it, yes,

7  occasionally happen.

8  Q    I guess to get back to my other question, I guess what I

9  am saying is, that the actual writing of the check and paying

10  the money really is not unlawful at all, you really have to

11  go to where the Schedule C and the filing and the

12  reconciliation of that at year's end to see how it was

13  expensed to know anything about that, right?

14  A    Yes.  I would go back to the expenses that were deducted

15  on the return and ask for a recalculation or a recompilation

16  of those and I would look through those expenses to determine

17  whether or not they were business related or personal related

18  at that time.

19  Q    Yes.  Fine.  Thank you.

20        When it comes to discrepancies in income and

21  lifestyles staying very similar, if one decreases their

22  income, one's tax, tax returns, generally speaking, since you

23  are a Revenue Agent, can you give us reasons why, or is there

24  only one reason?

25  A    No.  There is multiple reasons.  So, you basically want

                    Iddon - Cross              127

1  to know what could possibly happen if somebody is showing a

2  reduced amount of income on a return?

3  Q    And maintaining a lifestyle.

4  A    And maintaining that lifestyle?

5  Q    Yes.

6  A    What would I look at as a Revenue Agent?

7         I would look to see if there were any inheritance,

8  any loans, lottery winnings.  I would look at the interest

9  income levels on the tax returns to see if there is a

10  decrease.  Possibly that there was savings that were invested

11  that they are now living off of.  Capital gains, meaning

12  stock sales, that possibly the individuals have sold stock

13  and they are living from the proceeds from that, any other

14  new business entities or filings that would flow through to

15  the face of the 1040.

16  Q    Okay.  Thank you.  Thank you.

17         So, what you are actually saying is that there are

18  a lot of reasons, and certainly loans are one of them?

19  A    Yes.

20  Q    And loans, what can you tell me about the tax ability of

21  loans?

22  A    Loans are not taxable, to the best of my knowledge.

23  Q    Would it be safe to say that in your testimony about the

24  returns, I believe this is proper, that those returns, '91

25  through '95, if someone were just to give the story or the

                    Iddon - Cross                128

1  information, could it be possible that just saying gross

2  receipts disappeared, without looking at the rest of the

3  return, would it be possible to say that that's really

4  slanting and simplifying things towards the government's

5  theory?

6  A    I'm sorry, Dr. Leveto, could you --

7  Q    Without looking at the whole return --

8  A    Okay.

9  Q    Okay.  And you testified to these returns today?

10   A    Correct.

11   Q    And it's like -- could you perhaps look at that return,

12   as you have looked at it, and said that the gross receipts

13   weren't there and they weren't there?

14   A    That's correct.

15   Q    Is it perhaps in the summary reports or in the summary

16   discussions a little bit slanted to not look at that return

17   and look at the explanation why and the explanatory factors

18   within the return?

19   A    As a Revenue Agent doing an examination of that return?

20   Q    Yes.

21   A    I would ask further questions.

22   Q    Would that return in 1991 put up a flag for an audit,

23   generally?

24   A    It's very hard for me to say that it would or would not

25   put up a flag because even with seventeen years of experience

Iddon - Cross                    129

1   with the Internal Revenue Service, I have never been

2   privileged to know the ins and outs of how a return is

3   selected for an examination.

4   Q    Most citizens aren't either, I don't think.

5   A   Well, no.

6   Q   But, could it be said that a change like that, a

7   significant change, or like in '92, a significant change like

8   that could be a reasonable person's belief that that would

9   trigger an audit, or was there enough information in that tax

10  return perhaps to satisfy the Internal Revenue Service as to

11  what was happening there?

12  A   You are actually asking me to make a decision on what

13  normally is done by a computer.  Our Internal Revenue Service

14  selection of returns are done simply by analysis of all

15  returns filed nationwide and each return filed is then judged

16  against those numbers.

17       So, for me to be able to sit here and say, yes, a

18  computer would have selected it for exam or would not have, I

19  don't think that that is fair.

20  Q   You wouldn't want to give me an opinion on it?

21  A   I have seen returns selected for every single reason,

22  from an increase itemized deduction to a Schedule C

23  disappearing.

24       So, in all likelihood, it could or could not have

25  been selected for an examination.

1 Q   You've testified quite a lot about the foreign accounts

2 today and the foreign money.

3       I am going to ask you, and perhaps you'll not have

4 the background to know this, but my ex-wife was indicted with

5 me, and she was not believed to be one to be charged with a

6 foreign bank account in a foreign country.

7       Would you be able to comment on the factors that

8 you have examined that perhaps show that I am at a different

9 position, or can you comment perhaps on the TSB account?

10 A   Are you asking me a question?

11 Q   Okay.  Regarding the TSB account --

12 A   Okay.

13 Q   -- would you say that account, for all intents and

14 purposes, after you examined the funds flow and everything,

15 for all intents and purposes, would it be safe to assume that

16 since I was the only one indicted with that particular

17 addition to 26, 7206, with a foreign account, is it safe to

18 assume then that the TSB account conformed with the less than

19 $10,000.00 and conformed with the thing that would have

20 allowed my wife -- obviously, she was shown as getting money

21  from this, too -- would have allowed my wife not to have the

22  allegation of somewhat deceptively having foreign accounts?

23  A    I mean, other than going back and looking at the TSB

24  account, I do believe that the balance was over $10,000.00.

25  Q    You do believe it was over $10,000.00?

                    Iddon - Cross              131

1   A    Can we pull that exhibit and take a look at it?

2   Q    Yes.

3   A    Do you have the exhibit number there?

4   Q    Oh.  Let me take a quick check.  Excuse me, please.

5   A    I believe it's -- if I'm looking -- the deposits from

6   1991 through 1995 to where -- the TSB Bank, Channel Islands

7   limited account.  It would be Government Exhibit 569.

8   Q    Yes, that looks like it.  The problem there is that,

9   without a doubt, there was more than $10,000.00 deposited and

10  there was more than $10,000.00 withdrawn, but I believe

11  Schedule B says that the balance never gets to $10,000.00.

12  I'm sure it was never $10,000.00.

13          But, if you say that your summary report inferred

14  that it was, I am very interested in that because perhaps it

15  could point again to the difficulty with these summaries.

16  A    Exhibit 569 does not show balances per se at the end of

17  each year.

18        But, what it does have are the significant -- or

19  not "significant" -- a summary of all account deposits that

20  remain into that TSB account.

21  Q    There was not a summary made, I don't believe -- and

22  perhaps you could help me out -- I don't believe -- I don't

23  believe there was a summary made of any kind of balances, or

24  anything like that, that would have to take into account

25  those with the dates to be really able to do that, unless I'm

            Iddon - Redirect(By Mr. Voracek)        132

1  mistaken about that.

2  A    There is one Government Exhibit, 568, I believe, shows a

3  summary of account activity for Mr. D.J. and Mrs

4  M.A. Leveto, TSB Bank, Channel Islands, Limited, from '91

5  through '95, and there is -- and there is a balance because

6  it is in pounds.

7  Q    And that makes it a little bit more difficult.  I don't

8  have that exhibit.

9        Is there ever a pounds that approaches 4,000 or

file:///A|/LEVETO-8.TXT

10  forty-five hundred pounds?

11  A    At the end of '92, we approached 4,993 pounds.

12  Q    Okay.  I would have to look at that.

13       Of course, back at that time, I believe the pound

14  was only $1.88, so I do believe that we don't have a summary

15  with it converting it into dollars.

16  A    Unless it's in this stack, and I'm just not finding it

17  at the time.  I apologize.

18  Q    I don't believe we do have one.

19       MR. LEVETO:  I believe that is all I have, Your

20  Honor.

21       THE COURT:  Redirect?

22       MR. VORACEK:  Yes, Your Honor.  One moment, please.

23            REDIRECT EXAMINATION

24  BY MR. VORACEK:

25  Q    Miss Iddon, I ask you to look at Government Exhibit 566.

                Iddon - Redirect(By Mr. Voracek)          133

1  A    Yes, sir.

2  Q    Now, what is reflected in Government Exhibit 566?

3  A    566 is the summary of the account activity for the

4    Box Elder, Limited, account at the Barclays Bank from 1992

5    through 1996.

6    Q    And that Barclays Bank account is a foreign bank

7    account, not an account in the United States, correct?

8    A    Correct.

9    Q    And I specifically draw your attention to the March 7th,

10    1994 transaction.

11            What happened on March 7th, 1994?

12    A    There was a deposit made of $15,500.00 from Vericon.

13    Q    Into the Box Elder, Limited, account at Barclays Bank?

14    A    That's correct, into the Box Elder, Limited, in Barclays

15    Bank.

16    Q    I ask you now to look at what's been handed to you as

17    Government Exhibits 169-A, B, C and D, if you have them in

18    front of you?

19    A    Yes, I do.

20    Q    And specifically ask you to look at Government

21    Exhibit 169-B.

22    A    B as in boy?

23    Q    Yes.  B as in boy.  I'm sorry.

24    A    Yes, sir.

25    Q    And that appears to be a letter written March 23rd,

Iddon - Redirect(By Mr. Voracek)          134

1  1994, to Mr. Sanford Lightbourne at Barclays Bank, Grand

2  Turk, Turks and Caicos Islands, isn't that?

3  A    Correct.

4  Q    And I draw your attention specifically to the verbiage

5  in the first paragraph.

6         Please perform the following wire transfer as soon

7  as possible.  Debit account No. 4061682.  (Account name,

8  Box Elder, Limited) for the amount of U.S. $15,000.00.

9         Do you see that written there?

10  A    Yes, sir, I do.

11  Q    And the account No. 4061682.  I am going to ask you now

12  to refer back to Government Exhibit 566.

13         Do you see that account number on that summary

14  sheet?

15  A    Yes, sir.  It's account 4061682.

16  Q    So, the account that's reflected on that letter of 169-B

17  refers to that same account that is on summary Exhibit 566?

18  A    Yes, sir, it is.

19  Q    Now, going back to 169-B, I see that the -- that an

20   individual at the Barclays Bank in the Grank Turk, Turks and

21   Caicos Islands, is being asked to perform a wire transfer out

22   of that account, the Box Elder account, correct?

23   A   That's correct.

24   Q   Now, I would assume that a person who has the authority

25   to direct the bank to make a wire transfer out of an account


                Iddon - Redirect(By Mr. Voracek)          135


1   has some sort of an interest or control over that account?

2   A   That's correct.  I would assume that.

3   Q   Is that -- based on your knowledge of going over bank

4   documentation for seventeen years as a Revenue Agent, would

5   you agree that that's true, that only the person that has

6   authority over that account can direct a bank to wire

7   transfer funds out of that account?

8   A   Right.  It's more you need that to have authority.

9   Q   You need to have that -- to have the authority?

10   A   Right.  A bank is not going to just wire transfer money

11   because an employee says to do so.

12   Q   Well, let's look at who this letter is from.

13        Government Exhibit 169-B.  The letter is written to

14   Barclays Bank --

15  A   It's --

16  Q   -- asking them to wire transfer monies out of that

17  account.  Who is that letter from?

18  A   It's from Daniel J. Leveto, V.M.D.

19  Q   And Government Exhibit 169-C, do you have that?

20  A   Yes, sir.

21  Q   What is Government Exhibit 169-C?

22      What does that appear to be, based on your

23  experience in looking at bank documentation?

24  A   It appears to be an internal bank document from the

25  Barclays Bank, Grank Turk, dated March 24th of 1994,

                    Iddon - Recross           136

1  regarding a foreign trade, and it states, in regards to your

2  letter dated the 23rd of March, 1994, for a wire transfer

3  plus our charges, the amount of $15,068.00.  And it's to Box

4  Elder, Limited, in care of Dan Leveto, 316 Conneaut Lake Road

5  in Meadville, Pennsylvania, and the account number is

6  4061682.

7  Q   So, it's not just a letter from Dr. Leveto to Barclays

8  Bank telling them to wire transfer monies out of that account

9    but, in fact, Barclays Bank did, in fact, make that transfer

10   to that account?

11   A    Yes, sir.  This is their internal transaction showing

12   that transaction went through.

13   Q    And based on your experience as a Revenue Agent, that a

14   bank is not going make such a transfer out of there unless

15   that person really does have authority over that account?

16   A    That's correct.

17        MR. VORACEK:  I have no further questions, Your

18   Honor.

19        MR. LEVETO:  Just a brief recross.

20        THE COURT:  All right.

21              RECROSS-EXAMINATION

22   BY MR. LEVETO:

23   Q    Miss Iddon, you've heard me speak of my office manager

24   with the stamp for my checking account, is that correct?

25   A    I'm sorry.  Your staff and the checking account?


                    Iddon - Recross                137


1    Q    Yes, that's correct.

2    A    Okay.

3    Q    Could I take that one step further -- and I can't bring

4   it up in the government's exhibits -- but is it possible for

5   a bank to give carte blanche to a person known to be a part

6   of the business to wire funds?

7   A   Quite honestly, I can't say.  I've never been employed

8   by a bank and a lending institution, and all my dealings

9   through the Internal Revenue Service as a Revenue Agent have

10   simply been reviewing bank documents and the internal

11   documents for transactions.

12        I can't say that I've ever worked for a bank and

13   get into the legalities of who can and can't be given those

14   privileges.

15   Q   Okay.  Is it reasonable to say that, or could you

16   believe if I told you that my receptionist, who did all of my

17   wire transfers, had one release from me at the bank and did

18   them for years without ever having to do anything other than

19   having sent her there?

20        Is that unacceptable to you or do you believe that

21   reasonably could be true?

22   A   Well, I think it's unacceptable, but I believe that it

23   could be reasonably true.

24   Q   So, again, people could disagree about things like this

25  as far as -- I mean, she had absolutely no authority over

138

1  the --

2          THE COURT:  You're testifying, doctor.  Just ask

3  questions.

4          MR. LEVETO:  That's it, Your Honor.

5          MR. VORACEK:  Thank you, Your Honor.

6          THE COURT:  Okay.  Thank you, Miss Iddon.

7          THE WITNESS:  Thank you.

8  (The witness was excused.)

9          MR. VORACEK:  Your Honor, the United States rests.

10          THE COURT:  All right, ladies and gentlemen, I've

11  got a couple of things to go over here before we resume.

12          So, we will ask you to recess and we'll call you

13  right back as soon as we're ready.

14  (The jury left the courtroom.)

15          THE COURT:  Now, where are we going from here,

16  Dr. Leveto?

17          MR. LEVETO:  I will have an opening statement.

18          THE COURT:  Well, I shouldn't let you make one.

19  You attempted to make one before and got talking about no

20  lawyer, and that's when I stopped you.

21         But, since you are pro se, I'll let you make an

22  opening statement, but I will caution on you two things:

23         Number one.  There will be no more talk about not

24  having a lawyer.  You waived that clearly in June of 2004.

25         And number two.  I caution you also this is not

139

1  argument and it's not testimony.  You can tell the jury what

2  you expect to be able to prove through your presentation of

3  your side of the case, but no testimony, no argument, and no

4  reference to lawyers.

5         MR. LEVETO:  Well, Your Honor, if I might, could I

6  reference the government's trial brief on page sixty-two?

7         THE COURT:  I don't have it up here, I don't think.

8         I have it on my desk.  Okay.  Here, I've got it.

9         All right.  What are you talking about?

10         MR. LEVETO:  If you see the first full paragraph,

11  Your Honor, after Feretta vs. California, there is a

12  sentence, of course, a defendant who has previously waived

13  the right to counsel may be allowed to withdraw the waiver

14    and reassert the right, with numerous Circuits cited.

15           THE COURT:  You never withdrew.

16           MR. LEVETO:  I never withdrew what?

17           THE COURT:  You never withdrew your choice of

18    proceeding pro se.

19           MR. LEVETO:  When I told you I wanted to be

20    represented by a lawyer?

21           THE COURT:  The day of the trial?  Or -- no.

22           MR. LEVETO:  There were other extenuating

23    circumstances, Your Honor.

24           THE COURT:  Well, that's too bad.

25           MR. LEVETO:  All right.


                              140


1            THE COURT:  I gave each, the government and you, a

2     copy of the transcript.  Judge McLaughlin conducted the

3     hearing since I was unavailable.  You had already had two

4     scheduled for you about waiving your right to counsel.  They

5     were presided over by me.  Then at your request, we

6     continued.

7            Then Judge McLaughlin, he couldn't have been more

8     clear or gone through the steps more clearly on June, I think

9   it was 7th, 2004, about whether or not you wanted to proceed

10  without a lawyer.

11        And he also said to you -- I don't have the

12  transcript.  I got the transcript in my office.  But, I

13  remember him distinctly saying you can't put one foot in the

14  representation boat and the other foot representing yourself.

15        MR. LEVETO:  I understand that, Your Honor.  But,

16  the two hearings before that were for conflict of interest,

17  and I couldn't get anyone to do it with me, and on that day,

18  I absolutely agree that I did waive my right, and I was not

19  aware that there was a time limit on reasserting the right if

20  there were other extenuating circumstances that came to pass.

21        THE COURT:  Mr. Misko was present on that June 7th

22  hearing and Judge McLaughlin said that, I am inclined to give

23  you and Mr. Misko more time to chat, really directed the

24  issue as to whether or not it is your desire to proceed with

25  or without counsel.

141

1         And then he took a half-hour break and then he

2   asked you if you wanted to proceed pro se with Mr. Misko

3    acting in an advisory standby capacity, or do you want to

4    proceed with full appointed counsel in the person of

5    Mr. Misko.

6         And you say, I have decided to proceed pro se with

7    Mr. Misko as standby counsel.

8         MR. LEVETO:  Your Honor, I don't refute that at

9    all.  That was a year ago.  And with all due respect, I have

10   an action against you.  I filed a motion for cause

11   challenging you being the Judge.

12        I have spent nine and a half months incarcerated

13   after this case was essentially over, and today here I am,

14   and when I asked you for counsel, I was formally reasserting

15   the right.

16        THE COURT:  And I am formally denying it.

17        Under the circumstances of this case, I can't

18   imagine stopping now and appointing Mr. Misko or anyone else

19   to represent you and prepare to defend a case like this.  You

20   can't do it.  You can't operate that way.

21        MR. LEVETO:  I'm aware of that, Your Honor.  That

22   is, why before it started, I reasserted the right and I filed

23   the action against you a week before the trial.

24        THE COURT:  That's got nothing to do with this

25  case.  That's a separate matter.

142

1        What are you going to do now?

2        MR. LEVETO:  I don't believe I understand.

3        THE COURT:  I mean, are you going to make an

4  opening statement?

5        MR. LEVETO:  Yes, I told you I had an opening

6  statement.

7        THE COURT:  Yes.  But, I am telling you what you

8  can't put in the opening statement.

9        MR. LEVETO:  Well, I am going to try to stay within

10  those bounds, and I believe that I can, and I will respect

11  the Court if you tell me that I'm going off of the berm of

12  the road.

13        THE COURT:  Okay.  Then the second question is, are

14  you going to present testimony?

15        MR. LEVETO:  The only witness I will have is

16  Agent Lapina.

17        THE COURT:  Okay.

18        MR. LEVETO:  And myself.

19        THE COURT:  All right.  Okay.  Then we'll have the

20  jury come back in and you can make your statement.

21        MR. LEVETO:  We need a sidebar discussion about the

22  summary witness before --

23        THE COURT:  About what?

24        MR. LEVETO:  The summary witness.

25        THE COURT:  Who is the summary --

143

1        MR. LEVETO:  Miss Iddon, who just testified.

2        THE COURT:  You mean Miss Iddon?

3        MR. LEVETO:  Yes.  Miss Iddon.

4        I am going to request that you give the jury a

5  warning about -- kind of the standard warning about the

6  summary evidence.

7        THE COURT:  That would be in the charge to the

8  jury.

9        MR. LEVETO:  Okay.  And I am also going to request,

10  due to some of that evidence, that it not be allowed into the

11  jury room as printed evidence.

12        THE COURT:  Well, you'll have -- we can go over

13  that sort of thing when we have the charge conference.

14          MR. VORACEK:  Your Honor, if I may, I must note

15   that we had asked for reciprocal discovery in this case and

16   we have received none.

17          I don't know if Mr. Leveto was going to refer to

18   documents on the witness standing today, or if he is going to

19   show some to Mr. Lapina, but I just wanted the Court to know

20   that we have not received any documentation as far as

21   reciprocal discovery.

22          MR. LEVETO:  There are two issues to address there.

23          First of all, I understand that Mr. Lapina will not

24   be here until tomorrow, is that correct?

25          MR. VORACEK:  Your Honor, last Thursday we asked


                               144


1   the defense when they wanted the government to have

2   Mr. Lapina present and they specifically directed us to have

3   him here at nine o'clock tomorrow morning.  He will be here

4   at that time.

5          THE COURT:  Okay.

6          MR. LEVETO:  The next, with reciprocal discovery, I

7   have a problem at the prison.  One box of evidence has

8  disappeared.  I can do my opening statement today.  I counted

9  on being able to have Mr. Lapina here after that, and

10  everything finished out a little better today than I thought

11  because --

12      THE COURT:  Well, what we'll do is, we will have

13  your opening statement, then I will excuse the jury, we'll

14  have our charge conference today, and then if anything should

15  come up tomorrow that should be amended to the charge

16  conference for any reason, we can talk about that tomorrow.

17      But, I want to get the charge conference out of the

18  way so we can, as quickly as possible, move into the closings

19  and my charge to the jury.

20      MR. LEVETO:  And as far as exhibits go, I have very

21  few that I believe the government will not have a difficult

22  time examining at that time.

23      MR. VORACEK:  Well, I would only request if

24  Dr. Leveto has them at this time, perhaps we can see them now

25  prior to him testifying tomorrow.

145

1      THE COURT:  Yes, that will be all right.

2      MR. LEVETO:  The problem is, it's with the material

3   that's lost and I believe that it's going to be found

4   tonight.

5        THE COURT:  Okay.  All right.  Richard, do you want

6   to get the jury?

7        MR. WILLIAMS:  Sure.

8   (The jury entered the courtroom.)

9        THE COURT:  Please be seated.

10        Okay, Dr. Leveto.

11        MR. LEVETO:  Good afternoon, ladies and gentlemen,

12   of the jury.

13        I must say that even to myself, who has witnessed

14   all of this and looked at all of this evidence, it's a bit

15   overwhelming even to me because, and I was even a part of it,

16   to be looking at it now and seeing some of my sloppy

17   bookkeeping habits and several bank accounts, and things like

18   that, that does make it somewhat difficult to interpret.

19        I am going to try to, through this opening

20   statement to you at least, put a little bit of context in a

21   place where you can fit some of this together.  Because this

22   is, unfortunately, what happens when an agency chooses not to

23   audit someone and, instead, takes hundreds of thousands of

24  documents over many, many years.  And I guess I have to tell

25  you that developing a theory for this with all of those

                                    146

1  documents would be like having a crossword puzzle dumped on

2  your floor of hundreds of thousands of pieces without the box

3  and the picture.

4        My opening today will provide just kind of an

5  overall perspective of what mostly my testimony and some

6  testimony from Agent Lapina will show you over the next day.

7  We probably will get finished with it tomorrow easily.

8        But, I would like you to keep something in mind,

9  because I don't believe there could be much more transparency

10  in anything that was being done at the veterinary practice.

11        The government's theory necessitates cloak and

12  dagger, mysterious things and difficult things to figure out

13  mostly because, standing from the outside, as I can even see

14  that now, it's very difficult to ascertain sometimes what's

15  going on; money moving around, money changing hands.  And I

16  think that, for the same reason, that we have so many

17  religions in the world, small parts and small chapters of the

18  Bible and versus are taken out of context without the whole

19  picture. So, that whole picture is what I am hoping to

20  provide for you.

21      You are also going to see, some of it is going to

22  be testimony from me and some perhaps from Agent Lapina, that

23  there is going to be a lot, a lot of venom in this case that

24  originated from a number of things, but it's got to be

25  brought out in the open because it speaks to the issue of my

147

1  leaving the jurisdiction December 11th, 2001.

2      The government has chosen to bring that into the

3  picture, and I'm more than happy to expound upon it because I

4  think it's something very important to understand.

5      But, for right now, like I said, it's one time that

6  I'm really a sorry person for how lousy a bookkeeper I was

7  and how somewhat sloppy I got sometimes just in moving monies

8  around because a lot of what you have seen has been

9  transferring for different reasons that are totally unrelated

10  to anything, but now it makes it look very, very confusing.

11      And I also would like you to keep in mind, because

12  we are talking also about a book, I would like you also to

13  keep in mind intent, and what my intent seems to be.  And

14  when I talk about transparency, imagine a person that is

15  trying to do things in a nefarious way but, at the same time,

16  is advertising a book that has many of the salient features

17  right out in the open, selling that book, selling that book

18  for a lot of money with the guarantee of anything in it

19  that's found to be illegal or untrue, to get a full refund.

20      That's an issue that you need to again look through

21  the prism with that in your mind.

22      Interestingly enough, I think as we go through

23  things, you are going to be able to see that it's actually

24  probably simpler than many of you believe, and I'm sure that

25  it's simpler than the government has ever implied even

148

1  through the theory that they have presented.

2      So, today I'm just going to try to provide you that

3  blueprint.  Bear with me a little bit.  I'm not a public

4  speaker, but what I have to say to you comes out of my heart.

5      First, I would like to talk a little bit about the

6  book.  The book first was brought to my attention when I

7  was -- when I had just finished being sued --

8          THE COURT:  You are testifying, doctor.

9          MR. LEVETO:  Okay.  We'll talk about the book.  And

10   the book, Tax Free, How the Super Rich Do It, sold for

11   anywhere from $300.00 to $1,275.00.  It was a book that I

12   sold because I believed in it and it was also a book that

13   people would find it strange if I were to sell a book to show

14   you how to reduce your taxes and lower your standards of

15   living.  People don't need to pay for books to do that.

16          If one goes to Barnes and Noble today or Waldon

17   Books, you find a myriad of books that basically are

18   extolling the virtues of reducing taxes.  And clear back in

19   1935, a Supreme Court case of Gregory Helvering basically

20   told us that the ability or the --

21          Is this thing whistling out here or is it okay?

22   I'm getting a little feedback.

23          -- the ability or the permissiveness for a person

24   to reduce down or to totally eliminate the taxes that he pays

25   is without question if it's done within the law.


149


1          We are going to take this journey and we are going

2    to talk about these things.  I have told you about the

3    money-back guarantee, and we'll touch on even some of the

4    advertising and some of the areas that it was done in and

5    some of the places that it was given to for their refereeing

6    of the book.  I think that's very important because it has

7    been perused and examined by some very prominent people.

8            Now, when we talk about the book, it's very, very

9    important to talk about what the book had in it and it was --

10   I don't want to belabor you with details, but there was an

11   awful lot within Tax Free, How the Super Rich Do It.

12   Probably the majority of the book revolved around privacy

13   issues, revolved around the ability to protect assets and

14   trusts, and colato is basically an acronym for common law

15   trust organization, but it is not the standard type that one

16   would see today.

17           But, the majority of the book was revolving around

18   domestic colatos, things that most people would have uses for

19   in protecting their assets, protecting their heir estates,

20   passing their estates onto their heirs with a much better and

21   safer way than doing it with the typical wills and probates

22   and other vehicles that are used.

23           The other part of the book, a smaller part, but

24  certainly an important part, speaks to foreign entities and

25  foreign colatos and other things that can be done.

150

1          Now, I talked to you a little bit about venom in

2   this case, and there is some that has transpired because of,

3   one, selling a book that was not very popular, and not very

4   popular with some agencies and, number two, a lawsuit that

5   was filed back in 1998 against many of the agents that took

6   part in the initial investigations here.

7          During that time, there was a lot -- there was

8   quite -- there was quite a bit of litigation and quite a bit

9   of animosity between many of us.

10         We are going to also talk about, as we talk about

11  the foreign entities, we are going to talk about some of

12  these mysterious things that you have only gotten bits and

13  pieces of regarding accounts and what these accounts meant,

14  whose these accounts were.  We'll just talk about them

15  generally and then very much more specifically.

16         It's going to be somewhat of a large task for

17  myself.  This has been many, many years ago, but to put this

18  together so we can all -- you know, we can all talk about it

19  and I can help you to gain an understanding is very, very

20  important because what's been presented here, there is an

21  awful lot and without a blueprint to plug it into is very,

22  very difficult.

23      Like I said, I was instrumental in, and it is very

24  daunting just to see the amount of paperwork, but we'll talk

25  about my flight, the history of litigation with the Internal

151

1  Revenue Service, the relationship with that to a very bad

2  divorce I was going through, and basically it's going to

3  allow you to understand more why I took the actions that I

4  did and it took a little longer to be able to begin taking

5  care of this than I anticipated.

6      But, I do ask you that to view this through the

7  prism of my intent.  I think my intent comes through very

8  much of the time here.

9      Okay.  A little bit about the litigation just

10  briefly.  We'll get into it more.

11      I had alleged in 1998 that there was some

12  outrageous conduct that occurred, some people being less than

13   truthful and some people coming after me for vendettas and

14   things connected with this book.

15          We are going to learn a little bit more about it

16   with testimony that we'll hear tomorrow.  We'll develop a

17   little bit more of that.  But, essentially in the year 2001,

18   the litigation was coming to a head and I sustained some

19   threats, and some of this has to do with that.

20          And, again, to address the flight issue, I think

21   that it's very important to understand the whole picture that

22   was going on between a divorce, litigation, and my choice on

23   what to do to not only protect myself, but to protect my

24   family at that time.

25          So, suffice to say that the indictment was unsealed

152

1   in December of 2001.  The government contends that it was

2   unsealed because of trying to find the third person named on

3   the indictment.  I believe that that's a little bit

4   far-fetched in that it was only about ten days before that my

5   appeal rights to take the case to the Supreme Court, the

6   litigation ran out, and I think that's more likely to have

7  more to do with it.  But, the retribution, I think, will

8  become a little bit obvious as we move along.

9        We are also going to consider briefly some of the

10  things that I think you need to look at when it comes to

11  thinking about, was the practice sold?  The things that I

12  did, the ability and the rights of a person to contract and

13  to keep things, to keep privileges that they contract with a

14  boss as having a right to do that as having the ability to

15  manage, and have broad powers, manage after all.  Keep in

16  mind the book sold for over $1,200.00.  The techniques that

17  we are going to get into, you can't get them off of an H & R

18  Block manual.  They are a bit more advanced.

19        We will talk a little bit about the agreement and

20  what I tried to do, and the people that I recruited tried to

21  help me, and even though they weren't deeply involved in many

22  of the things of it.  I think that you should know about my

23  attempts at least to do that and my intent of doing that, and

24  when it is all said and done, when it comes to knowledge of

25  the things that the courts speak of and the Internal Revenue

153

1  Service speaks of for sham entities, they are very easy and

2   very inexpensive to take part in.

3       There was a case back in 1983.  I believe it is

4   Dahlstrom v. U.S., that at that time people were going

5   offshore, and I know that they are still doing it, and they

6   are putting trusts together and they are pretending things

7   are certain ways and using things that are somewhat legal, in

8   and of themselves, but used in an illegal way.  Those things

9   are kind of sage in the trust industry and I think what most

10  people have heard of them.  And this situation with me is

11  much, much simpler than that, and I think you will see that

12  tomorrow.

13      We will also pay the zero returns a visit because I

14  think that, for the sake of at least talking about them and

15  for the sake of at least you understanding more than is even

16  in the attachments, I have an exhibit, if I'm able to get

17  prison officials to find it for me, that will show a little

18  bit that I wasn't some kind of a kuke.

19      I think that you are going to see that now in 2004,

20  you are beginning to see some people -- it was out of the

21  Florida Attorney General's office that this exhibit comes

22  from.  I think that you are going to begin to see that more

23  people are looking at some of these things, and you are going

24  to see the factual basis for what I did, I think that very

25  important not then it's particularly germane here, but the

154

1  government has brought it in so I think it is important for

2  me to address that so I think that you can understand my

3  position.

4        We are also going to briefly visit a little bit

5  about aircraft and my flying, which is something that we'll

6  talk about.  And in my testimony, you will learn that I do

7  like to do that.  I even like to buy and sell airplanes and

8  fix them up.  That was something I was doing, and not very

9  many people in their right mind buys three or four airplanes

10  in a year or year and a half without having almost an

11  airplane garage mentality to try and fix things and sell

12  them.

13        And at the same time, we are talking about the

14  business and pleasure ends of both of them and we can't turn

15  this testimony into an audit because a lot of these thing are

16  so factually intensive that a person would have to speak of,

17  but we are just going to -- I would just like you to

18  understand a little bit about that so you can plug it into

19  this whole picture of all of these mysterious expenses.

20      I believe one of the government's problems in

21  taking years and years of paperwork like they did, and

22  everything was somewhat subject to conjecture.  If the

23  numbers didn't show something for sure we seem to want to go

24  to and ask people that I knew, and that makes the assumption

25  that I talked to everybody about my personal business.  I

155

1  don't tell someone that I like to fly, I like to fly for

2  business expense, or if I like to fly, I like to do this or

3  that.

4      So, I think that you'll learn a little bit about

5  that today also, or that will be actually tomorrow.

6      Briefly, when we talk about proceeds from the

7  practice -- and I believe that this is really important.  The

8  program had a way and what was supposed to be happening was

9  happening.  On the face of what you see with the numbers, for

10  me to supply you with a blueprint and the background, you are

11  going to understand what was going on.

12       You are going to also understand what First America

13   Research was.  First America Research, one can look at it as

14   a facilitator or a finding group.  And what they did were

15   things that I could have done, I could have done it if I had

16   the time to go to offshore places and talk to people with

17   businesses and investors.  But, certainly my time was best

18   spent treating animals and not going to islands to find

19   people.

20       But, I think that you are going to learn a little

21   bit about that, and I think it's very important to see the

22   overall picture with them involved to know just what was

23   happening and what they were facilitating.

24       Overall, I think that one way one can look at it is

25   the coalition or the comparison of a company U.S.A. and a

                              156

1   company international, not that we had delusions of grandeur,

2   but if you think of Toyota, U.S.A. and Toyota International,

3   or a company that has offices here and internationally, there

4   can be connections, but they can certainly also be very

5   separate.

6       So, we'll talk about what was happening there also,

7    and when we talk about proceeds tomorrow, we will talk a

8    little bit about, we will kind of take a trip with the dollar

9    bill and we'll see what was actually happening, because right

10   now, what we have are many, many charts and many transfers

11   and a lot of money moving around with allegations and

12   theories.  Whereas, there really is quite good documentation

13   to allow you to see really what was supposed to be happening,

14   and knowing what was happening can make it all make a lot

15   more sense for you.

16          As you heard Miss Iddon testify to -- and I think

17   this is very important -- there was a huge amount made about

18   personal expenses out of the business, and I think that it is

19   very important to keep in mind that I think you will be hard

20   pressed to find a business person that doesn't pay any

21   personal expenses out of their business, but it's all what's

22   done with, at the end of the year, with those that count.

23   Okay.  It it's very, very important.

24          You are going to learn a little bit about trusts in

25   my testimony.  I think trusts have been a whipping boy for

157

1  many, many years.  I've always believed that many attorneys

2  didn't particularly like them because it moved many people

3  out of probate and into a place where moving your estate to

4  another generation was much, much more simple.

5        But, generally speaking, there are trusts in the

6  backgrounds of many businesses that you wouldn't even know

7  about, and there are some very nice trusts that do a lot of

8  good things, that probably the largest one around here that

9  you are all familiar with, and it's probably the number one

10  reason that this great organization is still here, is that

11  Erie Business Exchange, insurance exchange is a trust.  And

12  because it is, even though there are people at this time, as

13  I understand it, that are trying to work it in a corporate

14  way, the trust make-up of it actually is what is germane and

15  really instrumental in keeping it here in Erie.

16        So, that's an important thing.  But, trusts are

17  very handy business entities.  They are very handy entities

18  to protect and to really help out your estate planning.  And

19  colatos are just a particular hybrid breed of trusts.  And

20  that's why we will talk about -- like I said, we will talk

21  about the domestic ones and we will also talk about the

22  foreign ones, and we are going to take away a lot of the

23  mystery about Leonard Adler, Box Elder, Box Elder

24  PaineWebber, and all of these things that right now make so

25  little sense.

158

1          I think that you also have to understand that the

2  government, at this time, speaks of a lot of tax losses or of

3  a lot of gross receipts, losses with basically a mountain of

4  assumptions.  Miss Iddon and I touched on a few of them, but

5  I want you to be particularly watchful as to look at all the

6  information here, all the information that was presented.

7          If we are talking about a tax return, does that tax

8  return have the information on it to give you some

9  information on what's going on?

10          And if gross receipts aren't there, is there

11  something else there that tells you why they are not?  And

12  it's just not a good thing to make an assumption off of a

13  chart with numbers because many times it can look as though

14  one thing can look like something else.

15          We are going to attempt to put it into context, and

16  as I made the analogy of the pieces, the many, many pieces of

17   a puzzle, I wish that back in 1996 when I offered the

18   government for me to sit down and lay the whole thing out

19   before them, we could have done that.  But, it wasn't about

20   to be and it had to continue on to this.

21        Like I told you -- and I would just like to close

22   in saying that a lot of this had to do with retribution,

23   retribution for selling a book and retribution for having the

24   courage to sue and stand by my convictions.

25        Thank you.


                                159


1        THE COURT:  Okay.  Well, ladies and gentlemen,

2   because of scheduling with another witness that Dr. Leveto is

3   going to call, we are going to recess for the day.  I am

4   going to meet with the lawyers and we'll go over my charge to

5   you.

6        I would expect all of the testimony to be finished

7   tomorrow and that the case will be in your hands before the

8   end of the day.  That's the schedule that we will have.

9        But, we'll excuse you now until 9:00 o'clock

10   tomorrow morning.

11   (The jury left the courtroom.)

12          THE COURT:  Okay.  I'll see you in chambers in

13    about ten minutes.

14    (Court recessed at 2:45 p.m.)

15    (Court reconvened at 2:55 p.m in chambers.)

16          THE COURT:  This gentleman is a law clerk from

17    another Judge's office and he asked if he could sit in, so I

18    said that was okay.

19          Okay.  I think Nancy gave everybody a copy of the

20    charge last week.  I went over it with her.  And the

21    government had submitted some things, and some of the stuff

22    they submitted may be there.  Some of it may not be.  Some of

23    it may be in slightly different verbiage than the way they

24    submitted it.  But, I think in most cases, the thrust of the

25    meaning of the charge is still there.


                              160


1          So, I'd say we'll just start at the beginning, and

2    anybody that has any problem, let me know as we go through

3    it.

4          Does the government have any problems?  The first

5    part, of course, is pretty much housekeeping like I do in

6  every criminal case.  But, I wondered if there are any

7  problems in the first --

8        MS. CALVIN:  I don't know how you are going, but on

9  page seven, credibility, law enforcement witnesses, Mary

10  Somma, her name is not mentioned.  She is not really law

11  enforcement, but she is an IRS employee.

12        THE COURT:  You have heard the testimony of former

13  IRS Special Agents.  Okay.  And what is her name?

14        MS. CALVIN:  Her name was Mary Somma.  She was the

15  Service Center representative.

16        MR. WILLIAMS:  (Law Clerk)  IRS Service Center

17  representative.

18        THE COURT:  So, we'll spell her name out, and

19  whatever.

20        MR. WILLIAMS:  (Law Clerk)  Will you say her name

21  again, please?

22        MS. CALVIN:  Mary Somma.  S-o-m-m-a.

23        THE COURT:  Okay.  We'll plug her in on page seven

24        Any problems up until page seven, Dr. Leveto?

25        MR. LEVETO:  I don't have any problems.

161

1          THE COURT:  Okay.  Just speak up, anybody that has

2   got a problem as we page through.

3          MR. WILLIAMS:  (Law Clerk)  Well, page nine has

4   defendant's election not to testify.

5          THE COURT:  Oh, yes.

6          MR. WILLIAMS:  (Law Clerk)  He's indicated that he

7   is going to testify.

8          THE COURT:  Well, assuming Dr. Leveto testifies

9   tomorrow, that will be taken out.

10          MR. MISKO:  Do you insert your standard on

11   defendant's testimony?

12          THE COURT:  What's that?

13          MR. MISKO:  Do you insert the standard on

14   defendants testifying, Judge?

15          THE COURT:  Why, if we do, we'll put it in.

16          MS. CALVIN:  Judge, we have on --

17          MR. VORACEK:  Page thirty?

18          MS. CALVIN:  Thirty.

19          MR. VORACEK:  I don't know if you have that there.

20          THE COURT:  I'm just there.

21          MS. CALVIN:  Okay.

22        MR. VORACEK:  The last paragraph, Your Honor, talks

23  about, if you find the defendant omitted or failed to

24  disclose gross receipts from a business activity, you may

25  find he filed a false income tax return.

162

1          We did allege in the indictment an alternative

2  falsity that he knew and believed that he had an interest in

3  or signature or other authority over a financial account in a

4  foreign country.

5          MS. CALVIN:  We actually believe we submitted -- in

6  our proposed jury instructions, I think there was a separate

7  one, and I believe that the law is that you charge in the

8  conjunctive and prove in the disjunctive, so either or --

9          THE COURT:  Wait a minute until I find your

10  submissions.

11          MR. VORACEK:  Here is jury instruction number

12  twenty-one.  That is what we submitted.

13          THE COURT:  Her note was, deleted, there is no

14  legal point here.  I don't know what she meant by that one.

15          MR. WILLIAMS:  (Law Clerk)  Let me see what she

16  says here.  She says, what's the instruction on the law that

17  you are trying to get across here, I guess.

18      MS. CALVIN:  Okay.  The indictment alleged that the

19  1994 and 1995 tax returns were false as to a material matter.

20  And we alleged two material matters.  One, that he failed to

21  disclose gross receipts of a business activity, and the other

22  material matter was that he failed to disclose the signature

23  authority or other authority in a foreign bank account.

24  Either one would constitute a materially false tax return.

25      MR. WILLIAMS:  (Law Clerk)  Do you think, in

163

1  looking at your number twenty-one, what's missing is the --

2  what I think she thinks is missing because she says where is

3  the instruction here, is that you need a final sentence to

4  say, thus, if you find --

5      MS. CALVIN:  Okay.  That if you find that --

6      MR. WILLIAMS:  (Law Clerk)  Do you know what I

7  mean?  Because, as you read it, it reads as a statement, the

8  indictment says this, but the one that you are pointing to on

9  page thirty does the same thing, but at the end it says,

10  thus, if you find, if you instruct the -- what would be the

11  instruction that you want here?

12       MR. VORACEK:  It would be No. 20.

13       MS. CALVIN:  What I believe he is saying is, that I

14  don't have a final sentence on twenty-one.  Is that what we

15  need on this point --

16       THE COURT:  If you find that --

17       MS. CALVIN:  Thus, if you find that the

18  defendant --

19       MR. WILLIAMS:  (Law Clerk)  I guess that is what

20  she means.

21       MS. CALVIN:  -- omitted or failed to disclose

22  signature or other authority in a foreign -- what is the

23  language of the indictment?  Do you have it?

24       THE COURT:  I think that's on Nancy's desk, the

25  indictment.


                              164


1        MR. VORACEK:  I have a copy of it right here.

2        MS. CALVIN:  Signature or other authority over a

3   financial account in a foreign or other country.

4        MR. VORACEK:  So, do you want to say, or failed to

5   disclose?  You could read either -- or under Omission of

6  Gross Receipts.  The category here is Omission of Gross

7  Receipts.  But, we are also talking about the failure of --

8  failure to disclose authority over or -- that he had a

9  signature authority over a financial account in a foreign

10  country.

11        MS. CALVIN:  So, that final sentence could be added

12  to this one or -- which probably for clarity would be better

13  than tacking it on here.

14        MR. WILLIAMS:  (Law Clerk)  I was assuming that you

15  were saying this was omitted and you wanted this whole thing

16  back in.

17        MS. CALVIN:  Right.  As amended with the final

18  sentence.

19        MR. WILLIAMS:  (Law Clerk)  Yeah.  But, I thought

20  like it would be a whole separate page, that you wouldn't

21  have to change this one?

22        MS. CALVIN:  Exactly.

23        MR. WILLIAMS:  (Law Clerk)  Is that it?

24        MS. CALVIN:  That would be fine.

25        MR. WILLIAMS:  (Law Clerk)  I'm sorry.  I just

165

1  don't quite understand what the sentence would say because I

2  am not up to speed on it.

3      MS. CALVIN:  Thus, if you find that he had an

4  interest in or a signature or other --

5      MR. VORACEK:  If you find that he failed to

6  disclose.

7      MS. CALVIN:  Yes.  Failed to disclose that he had

8  an interest in or a signature or other authority over a

9  financial --

10      THE COURT:  Not too fast.  We are just reading

11  right from the indictment.  We are saying, thus, if you find

12  that he failed to disclose.

13      MR. WILLIAMS:  (Law Clerk)  Okay.  Count 2.

14      I suppose you should read it into the record.  If

15  you want to finish reading it into the record, I can get it

16  from there.  You don't have to go slow now.

17      MR. VORACEK:  Well, the government would submit

18  that instructions read:

19      Thus, if you find that the defendant, Daniel

20  Leveto, failed to disclose that he had interest in or a

21  signature -- signature or other authority over a financial

22  account in a foreign country, you may find that he filed a

23  false income tax return.

24        THE COURT:  And you got their proposal?

25        MR. WILLIAMS:  (Law Clerk)  Yes.  I got the

166

1  proposal here and I know where to get that language.

2        THE COURT:  Okay.

3        MR. WILLIAMS:  (Law Clerk)  Just to clarify, there

4  will be, Omission of Gross Receipts, this instruction on page

5  thirty, and then a new instruction with this heading, Failure

6  to Report Control of a Bank Account.

7        MR. VORACEK:  That sounds fine for the government.

8        MS. CALVIN:  Financial account, please.  Financial

9  account.

10        MR. WILLIAMS:  (Law Clerk)  Do you want to change

11  what your proposal is?

12        MS. CALVIN:  Yes.  That is marked -- okay.

13        MR. WILLIAMS:  (Law Clerk)  Maybe it is good that I

14  don't know as much about the details.

15        THE COURT:  A little knowledge is a dangerous

16   thing.

17        MS. CALVIN:  Okay.  I initialed that, and then I

18   will read just what I titled it.  Failure to Report Authority

19   Over a Financial Account in a Foreign Country.

20        THE COURT:  Okay.  Moving right along.

21        MR. LEVETO:  I have something for thirty-three.

22        THE COURT:  Okay.

23        MR. LEVETO:  I would like to insert Cheeks into

24   there and in two places.  Would you make --

25        A is here and B is here.  I would like to insert

167

1   these.

2        MS. CALVIN:  This is the only copy you have?

3        MR. MISKO:  Your Honor, this is United States

4   versus P-e-n-s-y-l, is that right, doctor?

5        MR. LEVETO:  It's basically right here, this

6   footnote.

7        MR. MISKO:  Footnote No. 1, is that correct?

8        MR. LEVETO:  Wait a minute.  I got some copies

9   here.

10        Did you see in the Omission of Gross Receipts, the

11   foreign bank account language in there on page thirty?  In

12   the first paragraph.

13        MS. CALVIN:  Yes.  Are you saying it's duplicative

14   or --

15        MR. LEVETO:  Well, it kind of is but, you know,

16   that's --

17        MS. CALVIN:  I think what we were discussing here,

18   if I may speak with you directly, Dr. Leveto, is that while

19   the beginning alleges two things, the ending alleges one, so

20   that we are looking for something that's the second part.

21        MR. LEVETO:  I see.

22        THE COURT:  Okay.  Now, the doctor submitted --

23   where do you want A to go?

24        MR. LEVETO:  Between the second and third

25   paragraph.

168

1        THE COURT:  Okay.  He proposes A between the second

2   and -- the second paragraph is:

3        The word willfully, as used in this statute, means

4   a voluntary, intentional violation of a known legal duty.  In

5   other words, the defendant must have acted voluntarily and

6   intentionally and with the specific intent to do something he

7   knew the law prohibited, that is to say, with intent either

8   to disobey or to disregard the law.

9        Now, he wants to put in there following:

10       That a defendant does not act willfully if he

11  believes in good faith that he is acting within the law or

12  that his actions comply with the law.  This is so even if the

13  defendant's belief was not reasonable as long as he held the

14  belief in good faith.

15       Does the government have any problem?

16       MS. CALVIN:  I don't think so.  Do you?

17       MR. VORACEK:  That's fine, Your Honor.

18       MS. CALVIN:  No, we don't have a problem.

19       THE COURT:  Okay.  Now, where do you want B?

20       MR. LEVETO:  Between the third and fourth

21  paragraph.

22       THE COURT:  What the instruction says immediately

23  before he wants B plugged in:

24       In determining the issue of willfulness, you are

25  entitled to consider anything done or omitted to be done by

1    the defendant and all acts and circumstances in evidence that

2    may aid in the determination of his state of mind.  It is

3    obviously impossible to ascertain or prove directly the

4    operations of the defendant's mind, but a careful and

5    intelligent consideration of the facts and circumstances

6    shown by the evidence in any case may enable one to infer

7    what another's intentions were in doing or not doing things.

8    With the knowledge of definite acts, we may draw definite

9    logical conclusions.

10        Then he wants to put this:

11        The reasonableness of a belief is a factor for the

12   jury to consider in determining whether the defendant

13   actually held a belief and acted upon it.  The more

14   far-fetched a belief is, the less likely it is that a person

15   actually held or would act on that belief.  If a person acts

16   without reasonable grounds for the belief that his conduct is

17   lawful, it is for the jury to decide whether the defendant

18   has willfully violated the law.  A defendant who knows that

19   the law -- who knows what the law -- I think you left

20   something out here.

21        MR. LEVETO:  Yes.  I think something is gone from

22   there.

23        THE COURT:  A defendant who knows what the law --

24   knows what the law is and disagrees with it, does not have a

25   good faith misunderstanding defense.

170

1        Neither a defendant's disagreement with the law nor

2   his personal belief that such a law is unconstitutional, no

3   matter how earnestly he holds those views, can constitute the

4   defense in good faith, misunderstanding or mistake.  It is

5   the duty of all citizens to obey the law whether they agree

6   with it or not.

7        MR. LEVETO:  That is kind of a whole standard.

8   Then it doesn't all have to be in there at the end, but

9   whatever -- that's what came out of that case.  Who has that

10   sheet?  There must be a piece that I fouled up here.

11        MS. CALVIN:  Do I have the sheet you are looking

12   for?

13        MR. LEVETO:  Oh, yes.  Did you see the mistake in

14   it?

15        THE COURT:  It looks like you left something out.

16  A defendant who knows that the law -- and then you got a

17  hyphen.

18        MR. LEVETO:  It's got is here and sic, s-i-c, N R

19  in brackets, and who disagrees with it.

20        MR. WILLIAMS:  (Law Clerk)  It's in the footnote?

21        MR. LEVETO:  Yes.  The second column on the right.

22        MR. WILLIAMS:  (Law Clerk)  Okay.  I see it.

23        MR. LEVETO:  That's where I just put a dash in

24  here.

25        MR. WILLIAMS:  (Law Clerk)  He has reproduced this


                                171


1  from a footnote in the case.  This is a quote from an actual

2  jury instruction.  So, we can fix that.

3        THE COURT:  How does it read, Rich?

4        MR. WILLIAMS:  (Law Clerk)  I think it should read:

5        A defendant who knows what the law is and who

6  disagrees with it.  I think that's how it's supposed to read

7  if you read this instruction.

8        THE COURT:  He had inserted those words before,

9  that a defendant who knows what the law --

10          MR. WILLIAMS:  (Law Clerk)  Right.  That is an

11   accurate quote of a Judge giving an instruction given from a

12   jury instruction.

13          I hate to say this, Your Honor, that sometimes

14   Judges misspeak.

15          THE COURT:  Does the government have any problems

16   with the rest of it?

17          MR. VORACEK:  We have no problem, Your Honor.

18          THE COURT:  Okay, Richard, go ahead and put that

19   in.

20          MR. WILLIAMS:  (Law Clerk)  Okay.

21          MR. LEVETO:  So, willfulness is not the same as

22   intent, right?  Or could willfulness be plugged in at all on

23   page twenty-one?

24          MR. MISKO:  He wants the same paragraph, top

25   paragraph, plugged into twenty-one.


                            172


1          MS. CALVIN:  What does he want?

2          MR. MISKO:  He wants this paragraph.

3          MS. CALVIN:  Is it the same one?

4          MR. MISKO:  Yes.

file:///A|/LEVETO-8.TXT

5          MS. CALVIN:  He wants it given twice?

6          MR. MISKO:  Yes.

7          MR. LEVETO:  For the different offense you want in

8   the --

9          MS. CALVIN:  Since you took the copy that has been

10  burned from me, there is a second one.

11          MR. LEVETO:  No.  Unfortunately, I thought I did.

12  You can have this.  I have copies of that somewhere in my

13  cell, but I think I can lay my hands on it.

14          MS. CALVIN:  Okay.  This is the one that copied --

15          THE COURT:  You want A from -- that we already

16  agreed would go in under willfulness to go in again under

17  concealment of facts?  Is that what you are saying?

18          MR. LEVETO:  Right.  And we are talking -- okay.

19  Yes, we are talking about the conspiracy on page twenty-one.

20  We put it into fraudulent return.  That's where we put it in

21  already.  This is putting it into the other -- I mean, it

22  connects with intent.  I know it probably is a little

23  different.

24          THE COURT:  Well, we can say, in determining this

25  issue --

1           MR. VORACEK:  Your Honor, I was going to say that,

2    in determining the defendant's intent in this case, the

3    standard they should be looking at is willfulness.  And we

4    clarify in a later jury instruction what willfulness is and

5    we add all that language in that part of that jury

6    instruction.

7           So, if the jury is properly following your

8    instructions, they are going to look at concealment of facts

9    concerning the defendant's intent, this is one aspect they

10   can take into -- but, the defendant's overall intent is

11   willfulness in this case, and I think it is more appropriate

12   to have the good faith instructions in discussing

13   willfulness.  I don't think it is necessary to have it in

14   twice.

15          MR. MISKO:  Also, unless you put a paragraph in

16   there concerning willfulness and it will be --

17          THE COURT:  I don't have a big problem with it.  I

18   think the way that -- let me see A again.

19          MR. LEVETO:  I think A is a good paragraph to have

20   there.  Even though it's a little bit repetitious, it is with

21  two different counts.

22      THE COURT:  The way it would read, as I see it, you

23  wouldn't say a defendant does not act willfully, you would

24  say:

25      In determining this issue, referring to concealment

174

1  of facts, say in determining this issue if he believes in

2  good faith he is acting within the law or his actions comply

3  with the law, this is so even if the defendant's belief is

4  not reasonable as long as he --

5      I think -- I just don't think it fits there, that

6  A.  Is the government objecting?

7      MS. CALVIN:  Yes.  Reading the elements of the

8  offense charged, which is that there was an agreement and

9  that he, with knowledge, deliberately joined the conspiracy

10  understanding what it was about and that -- and the overt

11  acts, I don't think that language really addresses the

12  elements of the conspiracy crime as it does the willfulness

13  for Cheeks in a tax arena.

14      THE COURT:  I agree.  We'll leave that out from

15  page twenty-one, the concealment instruction, but we will put

16  it in where, what is now page thirty-three, the willfulness

17  instruction.  Okay.  Anything else?

18          MR. LEVETO:  Do you have number thirty-five in

19  yours?

20          MS. CALVIN:  Thirty-five, deliberate ignorance.

21          MR. LEVETO:  Yes.  Thirty five, in your

22  instructions.

23          THE COURT:  Deliberate ignorance is thirty-five.

24          MR. MISKO:  I think some of the language, Judge,

25  that he is troubled with is, if you are convinced that the

175

1  defendant deliberately ignored a high probability that the

2  tax returns, it almost sets a different standard, a different

3  legal standard.

4          THE COURT:  She must have pulled that from one of

5  the -- maybe it was the government.

6          MR. LEVETO:  Yours is number twenty-five.  I think

7  it's word for word.

8          THE COURT:  Yes.  She says it's in page

9  thirty-five.  So, what is the government's basis for that

10    one?

11         MR. LEVETO:  I would like to strike it.

12         MS. CALVIN:  Pattern criminal jury instructions

13    from the Sixth Circuit as modified in Dykstra out of the

14    Eighth.

15         THE COURT:  Okay.  So, you just copied this

16    instruction from the Sixth Circuit?

17         MS. CALVIN:  I believe it's as modified.

18         THE COURT:  Okay.

19         MR. LEVETO:  Is this a generic thing or was this

20    specifically for this statute?

21         MS. CALVIN:  I believe in the -- not just this

22    statute.  But, the deliberate ignorance, we find in specific

23    intent crimes such as tax crimes.

24         MR. LEVETO:  That I deliberately ignored a high

25    probability.  But, that's really --


                              176


1          MR. MISKO:  That's almost usurping the beyond a

2    reasonable doubt standard by telling the jury by thinking --

3          THE COURT:  It says you must be convinced beyond a

4   reasonable doubt that there is a high probability.  That's a

5   little bit similar, my redundant --

6          MS. CALVIN:  We don't want to tell them that you

7   find by a reasonable doubt, you find --

8          MR. LEVETO:  I don't think they need to have the

9   possibility or probability.  The reasonable doubt is the

10   standard.

11          THE COURT:  Well, apparently not according to the

12   Sixth Circuit.  I mean, I don't have that -- that is right

13   out of their pattern, those specific words, do you know?

14          MS. CALVIN:  I'm not sure.  I don't think I have my

15   computer up here either because I have the pattern jury

16   instructions on my computer for the Sixth Circuit.

17          MR. WILLIAMS:  (Law Clerk)  I can see if we have

18   them.

19          THE COURT:  Do we have the Sixth Circuit?

20          MR. WILLIAMS:  (Law Clerk)  I'm going to go take a

21   look.

22          MR. LEVETO:  I think it really tangles up the clear

23   language most of these things have for the juries to decide.

24   It's kind of a twisted thing.

25          MR. MISKO:  What about the Third Circuit?  Does

1   that have a deliberate ignorance instruction?

2       THE COURT:  That's what this is called.

3       MR. MISKO:  Right.  The Third Circuit though --

4       THE COURT:  Oh, the Third Circuit.

5       Well, unfortunately, the Third Circuit doesn't have

6   pattern yet.  They are working on it, but we don't have it

7   yet.

8       MR. MISKO:  Sometimes we extrapolate the jury

9   instructions from the cases that they have.

10      MR. WILLIAMS:  (Law Clerk)  No.  We have fifth,

11   eighth, ninth and eleventh.

12      THE COURT:  Do we have anything on deliberate

13   ignorance?

14      MR. WILLIAMS:  (Law Clerk)  I'll take a look.

15      MS. CALVIN:  They sometimes used to call this a

16   willful blindness instruction also, but that was very

17   confusing using the willful and the willful on two

18   different --

19      MR. MISKO:  Well, the only other part that's

20  somewhat misleading is when it says carelessness or

21  negligence or foolishness on his part is not enough as

22  knowledge or not enough to convict but, on the other hand, it

23  doesn't talk about what if you are doing something you

24  believe is correct.  That's certainly not carelessness or

25  negligence or foolishness.


178


1       MR. LEVETO:  This kind of negates my Cheeks a

2  little bit.

3       MR. MISKO:  It does.

4       MR. LEVETO:  I think --

5       MR. MISKO:  Because basically you are saying that

6  if it's deliberate ignorance, unless the person is careless,

7  negligent or foolish, and it leaves everything else out, and

8  then the other issue is, the jury is left to define what the

9  term obvious is.

10      MS. CALVIN:  Now, Mr. Misko, obvious?  You really

11  think that is a word that would need an instruction, obvious?

12      MR. MISKO:  I think it is patently unclear.  No one

13  can avoid responsibility for a crime by deliberately ignoring

14  the obvious.

15    MR. LEVETO:  Sounds like someone arguing the

16    essential elements in the offense charged.  You know, that's

17    pretty clear.  And this deliberate ignorance, again, even

18    when you go to page twenty-five and read the elements, you

19    know, I just think it's a terrible instruction.

20    MR. WILLIAMS:  (Law Clerk)  I haven't looked at it

21    all, but it will probably have the Sixth Circuit in it.  Here

22    is the updated one.

23    THE COURT:  Okay.  This is Federal Jury Practice

24    and Instructions by O'Malley.

25    MR. WILLIAMS:  (Law Clerk)  That's the updated one,


179


1    Judge, but here's where it starts.

2    THE COURT:  They use high probability all the way

3    through.

4    MR. WILLIAMS:  (Law Clerk)  That is the Sixth

5    Circuit.

6    THE COURT:  Oh.  Here they use it apparently in the

7    Fifth Circuit, too.

8    MR. WILLIAMS:  (Law Clerk)  Here's the standard

9   O'Malley one.

10      MR. LEVETO:  It's even more dangerous in a tax

11   situation because people are obviously -- it's not like

12   another crime where they have no experience.

13      THE COURT:  You can take a look at page 653 here.

14   That looks pretty good to me.

15      This says the Ninth Circuit approved the Sixth

16   Circuit, but great caution should be exercised in the giving

17   of this instruction.  It says it's rarely -- that was United

18   States against Jewell in the Ninth, and it says here:

19      We emphasize again, as we have -- this is the Ninth

20   Circuit talking -- we emphasize again, as we have in the

21   past, that a Jewell instruction is rarely appropriate.  It

22   should be given only when the government presents specific

23   evidence showing that a defendant actually suspected he or

24   she might be involved in criminal activity, deliberately

25   avoided taking steps to confirm or deny these suspicions and

180

1   did so in order to provide himself or herself with a defense

2   in the event of a prosecution.

3      Any comment on that instruction?

4      MR. MISKO:  Yes, Judge.  I don't think it's that

5   much different from this instruction.  I think Mr. Leveto has

6   objections to deliberate --

7      THE COURT:  Let's see it again, Richard.

8      Do you have any comment on the one in here?

9      MS. CALVIN:  I have no comment on the instruction

10  in there.  It looks, as you pointed out, substantially

11  similar to what the government had seen in the Sixth Circuit.

12      MR. VORACEK:  Although I believe it doesn't have

13  the --

14      THE COURT:  It doesn't have the high probability,

15  which I think is kind of ambiguous.

16      MS. CALVIN:  Okay.

17      MR. LEVETO:  But, it still infers the knowledge and

18  it somewhat takes away from willfulness and good faith.  I

19  mean, I really do think that it creates a quagmire in my own

20  mind if I were looking and evaluating something like that.

21      MR. MISKO:  Almost to the point where he should

22  have known better, let's find him guilty.

23      THE COURT:  I am going to strike the deliberate

24  ignorance instruction that the government submitted at page

25  thirty, what is now page thirty-five, but I will approve


181


1  Section 17.09 of the Federal Jury Practice and Instructions

2  and we'll put that in.

3       You want to me to just stick that page in here,

4  Rich?

5       MR. WILLIAMS:  (Law Clerk)  Yes.

6       MR. LEVETO:  Could I get a copy of that, by any

7  chance?

8       MR. WILLIAMS:  (Law Clerk)  Sure.

9       THE COURT:  Oh, and here's the government's

10  proposed.  Okay.  Any other problems here?

11       MR. MISKO:  Your Honor, can Dr. Leveto's objection

12  and request that 17.09 be stricken be made part of the

13  record?

14       THE COURT:  It is.

15       MR. MISKO:  Okay.

16       THE COURT:  And his request is denied.

17       MR. LEVETO:  Thank you.

18       MR. VORACEK:  The government has no other

19  objections, Your Honor.

20          THE COURT:  Okay.  Do you have any further

21  objections?

22          MR. LEVETO:  No, not to this.

23          THE COURT:  Okay.

24          MR. MISKO:  Judge, yes.  He wanted to actually add

25  another cautionary instruction, right, Dr. Leveto?

182

1          MR. LEVETO:  Oh, that would go in here, that's

2  right.

3          MR. MISKO:  With reference to the summary witness.

4          MR. LEVETO:  Yes, the instruction that was even if

5  the government --

6          MR. VORACEK:  Yes, Your Honor.  The government

7  filed a motion of intent to use the summary witnesses, and

8  within that, we did put a cautionary instruction in there as

9  for the use of the summaries by the jury.

10          THE COURT:  Okay.  Is that --

11          MR. WILLIAMS:  (Law Clerk)  Was that in your

12  motion?

13          MR. VORACEK:  We filed a notice, we called it, that

14   we intended to use summaries.

15        THE COURT:  We may not have incorporated that then.

16   I mean, it wasn't in your proposed jury instructions, is that

17   what you are saying?

18        MR. WILLIAMS:  (Law Clerk)  Has Dr. Leveto seen it?

19        MR. VORACEK:  Yes, he has seen our notice.

20        MR. WILLIAMS:  (Law Clerk)  Is that the instruction

21   that you are thinking of?

22        MR. LEVETO:  What do you think of that instruction?

23        MR. VORACEK:  I know exactly where I have it.  If

24   you can excuse me for a moment.

25        MR. LEVETO:  I don't have all the documents you

183

1   guys do.  Well --

2        MS. CALVIN:  Well, we did serve you with a copy of

3   every single document, Dr. Leveto.

4        MR. LEVETO:  Right.  I was accused the other night

5   at two o'clock in the morning that I had a fire.

6        MS. CALVIN:  I just wanted to make the record

7   perfectly clear that the government has provided you with a

8   copy of every document.

9        MR. LEVETO:  You just didn't provide me with the

10  conference room that I needed.

11        THE COURT:  Nancy reminds me there is one ruling I

12  should make, too.

13        We had discussed this.  This doesn't go to the

14  jury, but just for purposes of the record, I am -- and there

15  is a case in the Third Circuit -- I don't have the citation.

16  It's Boujaily.  B-o-u -- I think it's J-a-i-l-y -- about the

17  declaration of co-conspirators, and I am saying that there is

18  sufficient evidence of a conspiracy that the statements of

19  Miss Leveto can go to the jury.

20        The way I do this, the government makes their

21  argument first, Dr. Leveto, then you make your argument and

22  the government then makes -- gets to make a rebuttal.

23        Now, as I indicated before in the -- before you

24  made your opening statement, if you start talking about not

25  having a lawyer, I am going to permit the government to use

184

1  the transcript from the hearing in front of Judge McLaughlin

2  any way they want to.  That is all I will say about that.

3    You each -- each side has copies of that hearing.

4          Is there anything else then?

5          MR. WILLIAMS:  (Law Clerk)  I got copies on this

6    cautionary instruction and I don't know if there was a ruling

7    that --

8          THE COURT:  Oh, the summary witness.  Am I missing

9    part of this?

10          MR. VORACEK:  It starts the very last sentence on

11    page five.

12          THE COURT:  I see.  Looks all right to me.

13          Okay.  We'll --

14          MR. WILLIAMS:  (Law Clerk)  Where would that

15    instruction go?  Maybe in the first part.

16          MS. CALVIN:  There is something on credibility of

17    witnesses, or something -- yes.  Credibility of witnesses.

18          THE COURT:  What page?

19          MS. CALVIN:  Four.

20          THE COURT:  Well, I think that's a little early in

21    the game.  I would rather get back to where we're talking

22    about the charges here.

23          MS. CALVIN:  Okay.  Yes.

24          MR. MISKO:  How about page thirty-three, before

25   thirty-three?

185

1        THE COURT:  Yes.  Maybe that could go in on page

2   thirty-four, just before the last paragraph.

3        Any problem with putting that on page thirty-four?

4        MR. VORACEK:  That is fine, Your Honor.

5        MR. MISKO:  Before the last paragraph on

6   thirty-four?

7        THE COURT:  Yes.

8        MR. MISKO:  I thought maybe after the last

9   paragraph.

10        MR. WILLIAMS:  (Law Clerk)  Yes, because --

11        THE COURT:  Yes.  Okay.

12        MR. LEVETO:  Do we need to, or is it premature to

13   discuss the charts going in or not?

14        THE COURT:  I always send -- I have the jury -- I

15   give the jury the charge before I even start and I have them

16   read it with me.

17        MR. LEVETO:  Charts.

18        THE COURT:  Oh, charts?

19          MR. LEVETO:  Charts.

20          THE COURT:  Yes, they will go in.  That's what that

21  instruction says.  It tells them how to look at them.

22          MR. LEVETO:  I kind of object to them going out,

23  the charts themselves.

24          THE COURT:  Well, I think --

25          MR. LEVETO:  Testimony is one thing -- what's that?


                              186


1          MR. MISKO:  Give the Judge your basis.

2          MR. LEVETO:  Well, the case I am looking at is

3  U.S. v. Goodley(Sp) Taylor.  And it was held there the use of

4  charts was pedagogical, is that right?

5          THE COURT:  Yes, that's right.

6          MR. LEVETO:  Devices intended to present the

7  government's version of the cases within the bounds of the

8  trial Court's discretion to control the presentation of

9  evidence under Federal Rule of Civil Procedure 611(a).  Such

10  demonstrative aids typically are permissible to assist the

11  jury in evaluating the evidence, provided the jury is

12  forewarned that the charts are not independent evidence.

13          And I just feel such charts should not be admitted

14    into evidence and should not go into the jury room absent

15    consent of the parties.

16        THE COURT:  Where did that come from?  What

17    Circuit?

18        MR. MISKO:  Sixth Circuit, Your Honor.

19        MR. LEVETO:  Fifth Circuit, 2000.

20        THE COURT:  Well, I think this -- I am not sure

21    what you mean by charts, though.  I mean, are you talking

22    about the arrows, you know, from one account to another?

23    That's what you mean by charts?

24        MR. MISKO:  I think all the exhibits that were --

25    for the most part, yes, I would say the charts because the

187

1    other ones were just summary of evidence about amounts, and

2    things of that nature.

3        I think he has objection to the charts.

4        MR. LEVETO:  Mainly the charts with the arrows that

5    had nothing on them other than numbers and documentations,

6    accounts.

7        I just think that they were prejudicial to me in

8    the way that -- in the perception they might give the jury.

9        MR. VORACEK:  Your Honor, the charts, as you know,

10    are just based upon the evidence.  I believe that the

11    documentation is so voluminous that it does aid the jury's

12    understanding of the flow.  And I believe that the cautionary

13    instruction really tells the jury that this is not the

14    evidence, that the evidence is the documents that are

15    admitted, but that they can use the chart to aid their

16    understanding of the documentation.

17        I believe the cautionary instruction is sufficient

18    to allay any fears that the defense might have.

19        THE COURT:  I don't think -- the Third Circuit

20    hasn't told me that it has to be with the consent of both

21    sides.  I am inclined to let it in.  We are interested in the

22    search for truth here and I think the search for truth is

23    assisted by those charts.

24        MR. LEVETO:  Just so my objection is to the record.

25        THE COURT:  Sure.


188


1        MR. MISKO:  Your Honor, I did do some research and,

2    unfortunately, everything I found is in a Circuit other than

3  the Third Circuit.

4      THE COURT:  Are you saying the majority of the

5  Circuits say it, or what?

6      MR. MISKO:  A majority of the Circuits talk about

7  it, but they don't necessarily say with the consent of the

8  parties.  But, they do talk about the issues of summary

9  witnesses.  The Third Circuit has very little case law on it.

10     THE COURT:  I think this is a good instruction and

11  we will use it and let the charts in.

12     As I started to say, I have the jury read along

13  with me while I'm giving them the charge, and then the charge

14  does -- each juror will have a copy.  They go out with the

15  jury.  It's just too much for anybody to comprehend,

16  especially a layman having no legal background.

17     Anything else?

18     MR. VORACEK:  Just a point of clarification on the

19  waiver of counsel, Your Honor.

20     It's my understanding that, unless Dr. Leveto would

21  refer to this issue again, the government should not speak to

22  that in closing?

23     THE COURT:  Correct.  You would use it in your

24  rebuttal if he talks about it in his closing.

25      MR. VORACEK:  What if it is brought up again during

189

1  the course of his testimony?

2      THE COURT:  Well, I'll leave that one open until

3  the problem comes up.

4      MR. VORACEK:  All right.

5      THE COURT:  Yes.

6      MR. VORACEK:  Thank you.

7      MR. LEVETO:  I don't totally understand that.

8  Maybe someone can --

9      THE COURT:  Well, when you -- I think what he means

10  is, when you are testifying in your own behalf, if it comes

11  up about not having a lawyer, in the first part of their

12  closing, they will be allowed to bring up that hearing before

13  Judge McLaughlin.  If you don't refer it to then, but you do

14  refer it to in your closing, then they can use it in their

15  rebuttal.

16      MR. LEVETO:  I just was not aware that you couldn't

17  relinquish it.  I know that I did it.  I am sure that

18  everybody knows that I did it here.

19    THE COURT:  But, you can't relinquish it the day of

20   the trial.  This has been pending for years.  This has been

21   pending for years and no lawyer could possibly go in and act

22   as a lawyer the day of the trial in a case like this without

23   preparation time.  And in the interest of justice, the thing

24   has to move along.  That is all.

25    MR. MISKO:  Judge, the jury doesn't take the

190

1   instructions with them to the deliberation room, do they?

2    THE COURT:  Yes.

3    MR. MISKO:  They do?

4    THE COURT:  Yes.  Okay.  Well, I guess that is it

5   for now, and we'll start at 9:00 o'clock tomorrow.

6   (Court recessed on Tuesday, May 31st, 2005, at 5:00 p.m.

7   in chambers.)

8

9                    * * * * *

10    I certify that the forgoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12

13                    S/Michael D. Powers
                      Michael D. Powers
14                    Official Reporter

15      *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****

16

17

18

19

20

21

22

23

24

25