1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

_____

3

UNITED STATES OF AMERICA

4
                    Plaintiff

5

         vs.        Criminal Action No. 01-06ERIE

6

DANIEL J. LEVETO

7
                    Defendant

8  _____


9

                 PROCEEDINGS

10

         Transcript of Jury Trial commencing on Thursday,
11  May 26, 2005, United States District Court, Erie,
    Pennsylvania, before Honorable Maurice B. Cohill, Jr.,
12  District Judge.


13  APPEARANCES:


14  For the Government:      For the Department of Justice
                       By:  Rita Calvin, Esq.
15                       By:  Thomas Voracek, Esq.


16  For the Defendant:      Pro Se
                       Stephen Misko, Esq.(Standby)

17
                       Reported by:
18                       Michael D. Powers, RMR
                       Official Court Reporter
19                       Room 5335 USPO & Courthouse
                       Pittsburgh, Pennsylvania 15219
20                       (412) 208-7572

21

22
   Proceedings recorded by mechanical stenography.  Transcript
23   produced by computer-aided transcription.

24

25


                              2


1                I N D E X

2   GOVERNMENT WITNESSES    DIRECT  CROSS  REDIRECT  RECROSS

3   MANUEL GONZALEZ

4     By Mr. Leveto              5

5   MARK CURLEY

6     By Mr. Voracek        17

7   MARGARET LEVETO

8     By Ms. Calvin        23
                        64
9     By Mr. Leveto              81

10   ROBERT MEYER

11     By Mr. Voracek        56            63
       By Mr. Leveto              61
12
     MILDRED CUSTARD
13
       By Ms. Calvin        85
14
     SUSANNAH WEIS-FRIGON

15
    By Mr. Voracek        91
16    By Mr. Leveto            105

17

18

19

20

21

22

23

24

25


                                    3


1         P R O C E E D I N G S,

2    (Court reconvened on Thursday, May 26, 2005, at 9:00 a.m.)

3         THE COURT:  Good morning.  Before the jury comes

4    in, I had a couple of things.

5         Number one.  If we can stop today at one-thirty or

6    so, that will be good, if that suits everybody.  And then

7    Nancy told me the government expects to finish on Tuesday.

8         MR. VORACEK:  Yes, Your Honor.  Depending on how it

9    goes today, I believe we may be down to one short witness

file:///A|/LEVETO-7.TXT

10  Tuesday morning, then a summary witness that will take two

11  hours.  Then we should finish our case.

12      THE COURT:  Assuming the government finishes on

13  Tuesday, and depending on how much day is left, Mr. Leveto,

14  if you are going to put in any kind of a defense, why, you

15  should be prepared to go.

16      MR. MISKO:  Your Honor, he had a question about

17  Agent Lapina, whether he needs to be subpoenaed.

18      THE COURT:  No.  He's under court jurisdiction.  If

19  you want Agent Lapina back, just let the government know.

20      MR. VORACEK:  Right now, I think Agent Lapina is

21  out of town.  He took a little vacation to Chicago, but we

22  can make an attempt to have him here.

23      THE COURT:  He'll have to come back because

24  Mr. Leveto indicated he was going to call him again.

25      MR. VORACEK:  I understand, Your Honor.  Thank you.

4

1       THE COURT:  But, I mean, don't call him and then

2  have him come back and then don't use him.

3       MR. VORACEK:  Should we have him here on Tuesday?

4          MR. MISKO:  Wednesday.

5          MR. VORACEK:  Wednesday?

6          MR. MISKO:  Yes.

7          THE COURT:  Anyway, the Leveto defense, other than

8   Lapina, if there is anything else, why, then it will start

9   Tuesday.  And then --

10          MR. MISKO:  Your Honor, Dr. Leveto also wanted to

11   address you about another witness in the issue of reciprocal

12   discovery.  Go ahead, doctor.

13          MR. LEVETO:  Yes.  I would like to call a witness,

14   subpoena a witness now, Russ Schetroma, who was an attorney

15   on my case, and I wanted to know if that would be permitted.

16          THE COURT:  Well, sure.

17          MR. MISKO:  The documents that this attorney has,

18   Your Honor, aren't necessarily discovery because Dr. Leveto

19   doesn't have them.  He would be under a subpoena duces tecum.

20          THE COURT:  Yes.

21          MR. MISKO:  So, we really don't have anything to

22   provide --

23          THE COURT:  You better get them to him as quickly

24   as possible.

25          MR. MISKO:  I intend to personally serve the

Gonzalez - Cross                5

1  attorney tomorrow.

2        THE COURT:  All right.

3        Okay, Rich, you can bring the jury in.

4        MS. CALVIN:  Your Honor, could I inquire as to what

5  time we might receive the documents?

6        MR. MISKO:  I would say probably Tuesday.

7        THE COURT:  Whenever he gets them from the

8  attorney, I guess.  Probably, Tuesday?  I guess probably

9  Tuesday.

10  (The jury entered the courtroom.)

11        THE COURT:  Good morning.  Be seated, please.

12        Okay, Mr. Voracek.

13        MR. VORACEK:  Your Honor, the government has no

14  further questions of Mr. Gonzalez.

15        THE COURT:  Cross-examination.

16              CROSS-EXAMINATION

17  BY MR. LEVETO:

18  Q   Good morning, Mr. Gonzalez.

19  A   Good morning.

20  Q    Mr. Gonzalez, could you tell me if you had told

21  Agent Lapina or if you had said to Agent Lapina that I had

22  said to you that the entire thing that I was doing was

23  illegal and a sham?  Did I tell you that?

24  A    I don't remember.  I'd have to look at the tapes.  I

25  mean, I have to look at the -- did I tell you or did I

                    Gonzalez - Cross                6

1  tell --

2  Q    Did you tell Agent Lapina that?

3  A    I don't remember.  I mean, he had access to the

4  information.  He had access to the transcripts and the tapes

5  and he reviewed the tapes.

6  Q    Did you review the tapes back at the time they were

7  made?

8  A    No, I did not.

9  Q    When tapes are made by the Internal Revenue Service, you

10  know, in an undercover operation, what security steps are

11  taken to maintain that evidence and that chain of evidence?

12  A    Generally, the tech agent takes the tape and puts it in

13  a secure location.

14  Q    So, they just go to a secure location?

15  A   Right.  In this particular case, I had no -- I have no

16  knowledge of how that was handled.  That was Special Agent

17  Lapina's area.  I just handed the recorder over to a tech

18  agent and that was it.

19  Q   Okay.  So, you handed the recorder to the tech agent?

20  A   Yes.

21  Q   And the tapes went to a secure place?

22  A   Well, when I say "secure," I'm assuming, but I don't

23  know.  I -- you know, I have no personal knowledge where

24  those tapes went.

25  Q   Okay.  And after that, you had -- did you have any

                    Gonzalez - Cross              7

1  discussions with Agent Lapina regarding what was on the

2  tapes?

3  A   Yes.  Generally, what happened, he reviewed the tapes

4  and he would make some notes and we would -- you know, we

5  would discuss some of the things that were on the tape.

6  Q   So, he might sometimes use your information, but

7  basically he would be backed up with the tapes, is that

8  correct?

9  A   Right.  Generally, it was the other way around.  He

10  reviewed the tapes.  Most of the time, he was hearing the

11  conversation as we were speaking if the quality was good

12  enough.

13        But, after the meeting was over, he would take a

14  copy of the tape, or whatever, and listen to it because he

15  had notes on it.  I did not review the tapes until the start

16  of this trial.

17  Q   I see.  Okay.  Do you remember telling Agent Lapina that

18  I -- the target had debit cards in banks, in the Cayman

19  Islands banks in the Turks and Caicos Islands and banks in

20  the Channel Islands?

21  A   I don't remember.  I know that Special Agent Lapina and

22  I had a discussion about the debit cards.  I recall a

23  conversation that you and I had about the Channel Islands,

24  but --

25  Q   So, you do recall the Channel Islands?

                    Gonzalez - Cross              8


1  A   I recall the Channel Islands.

2  Q   Okay.

3  A   But, that came up in a conversation that we had -- that

4  you and I had about a debit card in the Channel Islands.

5  Q    Yes.  So, you do remember that you and I specifically

6  did talk about that?

7  A    I thought, yes.

8  Q    It's been a while?

9  A    Yes, it has.

10  Q    Did you read the book?

11  A    Yes, I did.

12  Q    Do you know the distinction or can you tell us what a

13  colato is?

14          We have heard a lot about colatos, and really it's

15  just another point here that makes things a little out of

16  context and needs to be brought into context.

17          Do you know what that is?

18  A    Not really, beyond the fact that it's a device or an

19  entity that this group was promoting to put a corporation in.

20  I don't -- I really don't.

21          I'm not in a position to give definitions regarding

22  that book or legal terms or even accounting terms.

23  Q    Sure.  Could it be that it's a common law trust

24  corporation?

25        In other words, an acronym for that, maybe if you

Gonzalez - Cross            9

1  perhaps refresh your recollection a little bit --

2        MR. VORACEK:  Your Honor, I object.  I believe that

3  this is really outside the scope of the direct.

4        THE COURT:  Are you an attorney, Mr. Gonzalez?

5        THE WITNESS:  No, Your Honor.

6        THE COURT:  Okay.  He doesn't need to answer any

7  legal question.

8        MR. LEVETO:  Okay.  I was asking for merely a

9  definition, but I understand.  I understand.

10  BY MR. LEVETO:

11  Q    Could you tell me, Mr. Gonzalez, if you told

12  Agent Lapina, regarding the foreign relationships that I

13  have, that within a fireproof safe in my home there existed

14  something to unwind it all?

15  A    As I recall, that was in the transcripts when I

16  refreshed my memory, that the transcript -- I think that you,

17  you know, told me that during our discussions.  I don't

18  recall having a discussion with Rob Lapina about that

19  specific thing.

20        He may have asked me about it after he reviewed

21  that, but I can't recall.

22        MR. LEVETO:  Could I consult with standby counsel,

23  please?

24        THE COURT:  Sure.

25        MR. LEVETO:  Sorry for the delay.


                Gonzalez - Cross            10


1  Q   Mr. Gonzalez, you are aware of the search warrants that

2  were executed in this case?

3  A   Yes.

4  Q   Kind of the launching pad for the case.

5        Did you have any role at all in the preparation of

6  documents concerning that?

7  A   No.

8  Q   You are familiar with an application and affidavit of

9  probable cause, is that correct?

10  A   Yes.  Because I think some of the information -- I think

11  Special Agent Lapina, I think, used some of the information

12  from the undercover operation, some of the tapes.  Some of

13  the information from the undercover operation, I believe he

14  told me that some of that might be in there.

15  Q   Okay.

16  A   But, I didn't read the application for search warrant.

17  Q   So, that was going to be my next question.

18      So, you had no role in it?  You didn't read it?

19  A   I think he took the excerpt out and read to me, you

20  know, the part that came from the tapes, or whatever,

21  discussions that you and I had on, you know, the evidence

22  that was gathered during the undercover operation that he was

23  using in the search warrant.

24      You know, I didn't read the application.

25  Q   So, as Agent Lapina swore to the affidavit, if he said

                    Gonzalez - Cross              11

1  that you had said something, you never reviewed the document?

2      MR. VORACEK:  Your Honor, I object.  This --

3  Dr. Leveto's line of questioning appears to be relitigating

4  an issue that the Court has already decided.

5      THE COURT:  Well, I was going to wait to see how it

6  plays out, but we have already ruled on the search warrant.

7      MR. LEVETO:  Yes, Your Honor.  This goes more to

8  credibility and some future discussions.

9        THE COURT:  Okay.

10  BY MR. LEVETO:

11  Q    So, you really had no part in putting it together, you

12  may have spoken with Agent Lapina, but you didn't see it, you

13  didn't see the search warrant affidavit, is that correct?

14  A    I believe what happened is, he put information in there

15  concerning taped conversations that you and I had and he told

16  me that a search was going to take place and this was the

17  application.  And he read -- either read to me or read the

18  excerpt that he was using based on my knowledge of the

19  information that was being put in there.

20        The other parts of the search warrant, I -- you

21  know, he didn't give me the application and say, do you want

22  to read this and check it over?  Because I had nothing to do

23  with the investigation, other than the undercover part of it.

24  Q    Sure.  Okay.  Thank you.

25        So, basically you didn't have anything to do with


                    Gonzalez - Cross                12


1  putting it together.  I understand that.  But, the

2  information he took that he may have discussed with you would

3    have been pretty much from the tape-recording, is that

4    correct?

5    A    Right.  He had discussed -- as the tapes were being

6    played, as we had meetings, he would read the tapes and he

7    would discuss, not the whole thing, but he would discuss

8    salient portions in the tapes that were important

9    evidentiary-wise.  And we had discussions all along up to the

10   end and he took notes, and so forth.

11          So, the information that he put in there was pretty

12   much, you know, I was kind of aware of.

13   Q    Mr. Gonzalez, as a Special Agent over your years of

14   experience, you're aware of different types of evidence, is

15   that correct?

16   A    Yes.

17   Q    In other words, if we speak of hearsay evidence versus

18   direct evidence or smoking gun types of evidence, you're

19   aware of differences in those, is that correct?

20   A    Yes.

21   Q    Is it customary if, say as a Special Agent, you were

22   going to file an official document or you were going to put

23   together an affidavit, especially an affidavit that's going

24   to possibly turn lives upside-down or institute criminal

25   proceedings such as a search warrant may do, is it customary

Gonzalez - Cross                13

1   to choose evidence of perhaps hearsay evidence versus

2   evidence on tapes?

3   A   I think in a search warrant -- application for search

4   warrant, you can use hearsay evidence.  I mean, you can

5   because a search warrant is probable cause that a federal

6   crime -- the fruits of a federal crime are in a particular

7   location or a federal crime is going to be committed.

8         So, you know, under the rule -- I think under the

9   rules -- now I am not an attorney.  I'm an agent.  But, I

10  think you can use -- if someone --

11        THE COURT:  Excuse me.  I'll answer the question.

12  Hearsay evidence may be used in obtaining a search warrant.

13        MR. LEVETO:  Yes.  Thank you, Mr. Gonzalez, and

14  Your Honor.

15  Q   But, my question was:

16        Would it be customary to use hearsay evidence over

17  other kinds of evidence?  Or I am aware that it is important

18  to know that hearsay evidence is admissible.

19          But, would it be customary to use that over, say,

20   if you were presenting this information to a Magistrate

21   Judge, would it be important to use the best evidence that

22   you have or the most direct evidence that you have?

23          Would you say that as a general rule -- I know you

24   are not an attorney -- but as a Special Agent?

25   A    I think that has to be on a case-by-case basis.  I mean,

                    Gonzalez - Cross              14


1    I can't just say you use the absolute best evidence.  I mean,

2    I don't know.  I'm not in a position to make that call --

3    Q    Okay.

4    A    -- on it.

5    Q    Okay.

6          MR. LEVETO:  Your Honor, I would like to -- the

7    last tape that was played yesterday, I believe was 64-B.  And

8    I would like to talk about the transcript of that a little

9    bit on page eighteen.

10          Now, do we --

11          THE COURT:  I think the jury has turned their

12   transcript -- is that something that you can talk about

13   without having them read it?

14          MR. LEVETO:  Well, I believe that we can.  I

15    believe that we can at this juncture.  It's going to be read,

16    but it might be a good idea to be able to see it, if it would

17    be available.

18          Is it possible to supply the jury with that?

19          MR. VORACEK:  Your Honor, is the Court instructing

20    the government to provide that information to the jury?

21          THE COURT:  Well, I don't know.  I'm not sure how

22    he wants to use it.

23          Do you want the jury to see that transcript again?

24    It's going to be hard to pick it up off the tape again, to

25    find that place in the tape.


                   Gonzalez - Cross            15


1           MR. LEVETO:  All right.

2           MR. MISKO:  Your Honor, if I can make a suggestion?

3           THE COURT:  Yes.

4           MR. MISKO:  Maybe he can put it on the screen.

5           MR. LEVETO:  Oh, that's a good idea.  That's a

6     great idea.

7           THE COURT:  You mean that page of the transcript?

8          MR. MISKO:  Yes.

9          MR. LEVETO:  Yes.  I have it here.  We will use

10   that.  Is that light enough?  Can you read that?

11          THE COURT:  Can you see that on your screen there?

12          THE WITNESS:  Not clear.

13          THE COURT:  No.  Mine is not so good either.

14          Can the jury see that all right?

15          MR. LEVETO:  That's pretty good just for now.

16   BY MR. LEVETO:

17   Q    Mr. Gonzalez, what is your educational background?

18   A    I have a Bachelor of Science Degree in accounting.

19   Q    And your nationality?

20   A    I'm a U.S. citizen.  You mean my descent?

21   Q    Yes.

22   A    My parents are of Hispanic descent.

23   Q    Okay.  I would like to go to an area of the transcript.

24   This is page eighteen at twelve.  And I would like to read

25   something that I had said on the transcript, on the tape,


                                16


1    starting at twelve, and then we can discuss it a little bit.

2          "DR. LEVETO:  He doesn't even have the foggiest

3    idea what I'm doing.  But it's legal the way it's being done.

4    He doesn't have the foggiest idea.  And if I did not truly

5    give up what I tell you is necessary to give up, it's all a

6    sham, it's all illegal and it's --"

7        That's the end of that paragraph.

8        Mr. Gonzalez, I'll leave it up so in case you want

9    to see it.

10        How would you interpret that paragraph?  Could you

11   give me -- as a Special Agent, say you brought that forth and

12   somebody was going to confirm it with you or talk to you

13   about it, what does that paragraph mean to you?

14        MR. VORACEK:  Your Honor, I object.  This calls for

15   some speculation.  Agent Gonzalez was an undercover agent who

16   tape-recorded some conversations.  The jury has listened to

17   that tape.  I believe that evidence speaks for itself.

18        I believe this is outside the scope of this

19   witness' knowledge.

20        THE COURT:  We'll sustain the objection.

21        MR. LEVETO:  Okay.  I have no further questions,

22   Your Honor.

23        THE COURT:  Any redirect?

24        MR. VORACEK:  No, Your Honor.  Thank you.

25        THE COURT:  Thank you, sir.  You may step down.


17


1  (The witness was excused.)

2        MR. VORACEK:  Your Honor, the United States calls

3  Mark Curley to the witness stand.

4        THE COURT:  Would you come forward and be sworn,

5  please?

6        MR. LEVETO:  Your Honor, I would like to ask for an

7  offer of proof for this witness, please.

8        THE COURT:  Okay.  We'll swear him and then get it.

9  Come on up and be sworn, please.

10        THE CLERK:  Will you raise right hand?

11              * * * * *

12        MARK CURLEY, having first been duly sworn,

13  testified as follows:

14        THE COURT:  Would you have a seat up there, please,

15  give us your name and spell your last name.

16        THE WITNESS:  My name is Mark Curley.  C-u-r-l-e-y.

17        THE COURT:  Thank you.  Now I will see you at

18  sidebar.

19  (Sidebar discussion.)

20       MR. VORACEK:  Your Honor, Mr. Curley, would

21  identify documents 393-C and D.  Mr. Curley was an employee

22  of the bank which generated these documents.  He is the

23  personal banker for Patrick O'Hara.  Patrick O'Hara is a

24  Cleveland doctor who purchased a plane from Center Company in

25  May of 1995 for, I believe, around $60,000.00

                Curley - Direct(By Mr. Voracek)          18

1        That would be the essence of his testimony.

2        MR. LEVETO:  I don't believe that I received notice

3  of this.

4        MR. VORACEK:  Your Honor, Mr. Leveto has received

5  all of the government's exhibits as of April 20, 2004.

6        THE COURT:  Including this one?

7        MR. LEVETO:  As a witness.  I mean as -- his name

8  as a witness.  Did I receive that?

9        MR. VORACEK:  Your Honor, I don't believe that we

10  provided specifically Mark Curley's name, but --

11  Patrick O'Hara was unavailable.  But, Mark Curley is just the

12  banking representative with regard to these documents.

13        THE COURT:  He can testify.

14   (End of sidebar.)

15                      DIRECT EXAMINATION

16   BY MR. VORACEK:

17   Q    Mr. Curley, are you employed, sir?

18   A    Yes.

19   Q    Where are you employed?

20   A    I am employed at the McDonald Financial Group, which is

21   an affiliate of Key Corp.

22   Q    And how long have you been part of that organization?

23   A    Almost thirty years.

24   Q    And what's your current position?

25   A    I'm a bank officer on the banking side at McDonald's

                Curley - Direct(By Mr. Voracek)          19

 1   Financial.

 2   Q    Now, you indicated that at some point you were an

 3   employee of Key Bank?

 4   A    Yes.

 5   Q    During 1995, what was your position?

 6   A    It was the same.  I was a bank officer at Key Bank

 7   private banking group.

8    THE COURT:  Is that K-e-y?

9    THE WITNESS:  Yes.

10   Q    And as a bank officer, what were some of your duties and

11   responsibilities?

12   A    I do mostly client service and transactional work for

13   clients specifically in our private client group, and I do

14   loan administration as well.

15   Q    Now, during 1995, was one of your clients a gentleman by

16   the name of Patrick O'Hara?

17   A    Yes.

18   Q    And do you know Patrick O'Hara as a doctor in the

19   Cleveland area?

20   A    Yes, that's correct.

21   Q    Mr. Curley, we've tendered to you what's been marked as

22   Government Exhibits 393-C and 393-D.

23        Do you have those documents in front of you, sir?

24   A    Yes.

25   Q    And do you recognize those documents?

Curley - Direct(By Mr. Voracek)          20

1    A    Yes.

2  Q   And what are they?

3  A   These are standard documents, receipts we call them,

4  that were sent from our operations, sent upon completion of

5  transactions that we request on behalf of clients.

6  Specifically in this case, these are wire transfers.

7  Q   Are these documents which are generated and maintained

8  in the ordinary course of your business?

9  A   Yes.

10  Q   And with regard to this document, does it indicate what

11  has been transacted?

12      You indicated that there were wire transfers?

13  A   Yes.  This indicates the bank where the money was sent,

14  of course, and the dollar amount, the date, the beneficiary,

15  that is, the entity receiving the money, as well as the

16  remitter; in this case, Patrick O'Hara.

17  Q   And who was the beneficiary as reflected on this

18  document?

19  A   Center's Holding on -- the first one on 393-C.  And

20  Franklin Aircraft Sales on 393-D.

21  Q   And was this document generated on or about May, 1995?

22  A   Yes.  Close.

23      MR. VORACEK:  Your Honor, the United States moves

24  for the admission of Government Exhibits 393-C and 393-D.

25          THE COURT:  393-C and D are admitted.


                Curley - Direct(By Mr. Voracek)          21


1  Q   Now, with regard to 393-C, Mr. Curley, I believe you

2  indicated that this is a wire transfer confirmation?

3  A   That's correct.

4  Q   And I believe you indicated the amount was $57,900.00?

5  A   That's correct.

6  Q   Now, I see an account name of Patrick O'Hara.  That is

7  your client, Dr. O'Hara?

8  A   Yes.

9  Q   Now, is the $57,900.00 coming out of Dr. O'Hara's

10  account or going into Dr. O'Hara's account?

11  A   Oh, no.  It is coming from his account.

12  Q   Coming from Dr. O'Hara's account?

13  A   Yes.

14  Q   And it was being wired to what bank?

15  A   Integra Bank in Meadville.

16  Q   And, again, who was the beneficiary one more time,

17  please?

18  A    On this one, Center's Holding.

19  Q    Now, I show you what's been marked as Government

20  Exhibit 393-D.

21        Do you know if this is a related document to 393-C?

22  A    They are separate transactions.

23  Q    Did you know what Dr. O'Hara was wiring the monies for?

24  A    Yes.  He informed me at the time that he was purchasing

25  an airplane.

22

1  Q    And are these documents that you have in front of you as

2  393-C and D, are they related to the purchase of an airplane

3  from Center?

4  A    Yes.  That is my understanding, yes.

5  Q    Now, if I ask you to look at 393-D, do you see a

6  beneficiary named, sir?

7  A    Yes.  Franklin Aircraft Sales.

8  Q    And I ask you to look at the reference.

9        Can you read that line, sir?

10  A    Yes.  Would you like me to read it?

11  Q    Yes.

12  A    For deposit on PA-235.  Patrick O'Hara.

13  Q    Do you know what PA-235 is?  Is that a plane, or do you

14  know?

15  A    No, I don't know.

16  Q    And was this wire transfer actually completed?

17  A    Yes.

18  Q    The monies were actually taken out of Dr. O'Hara's

19  account?

20  A    Yes.

21        MR. VORACEK:  We have no further questions, Your

22  Honor.

23        THE COURT:  Any questions, Mr. Leveto?

24        MR. LEVETO:  I don't have any questions, Your

25  Honor.


            Mrs. Leveto - Direct(By Ms. Calvin)        23


1         THE COURT:  Thank you, sir.  Would you give the

2   exhibits back to the clerk?

3         THE WITNESS:  Sure.

4   (The witness was excused.)

5         MS. CALVIN:  Your Honor, may we have one moment to

6   see if one of our out-of-town witnesses has arrived?

7        THE COURT:  Sure.

8        MS. CALVIN:  Your Honor, the government calls

9   Margaret Leveto.

10        THE COURT:  Would you come forward and be sworn,

11   please?

12        THE CLERK:  Would you raise your right hand?

13              * * * * *

14        MARGARET LEVETO, having first been duly sworn,

15   testified as follows:

16        THE COURT:  Have a seat up here, please, give us

17   your name and spell your last name.

18        THE WITNESS:  Margaret Leveto.  M-a-r-g-a-r-e-t,

19   L-e-v-e-t-o.

20        THE COURT:  Thank you.

21              DIRECT EXAMINATION

22   BY MS. CALVIN:

23   Q    Now, Mrs. Leveto, you know the defendant, do you not?

24   A    Yes.

25   Q    How do you know him?


              Mrs. Leveto - Direct(By Ms. Calvin)        24


1   A    He is my ex-husband.

2  Q  And how long were you married to him?

3  A  Approximately twenty-eight years.

4  Q  Now, did you meet -- how old were you when you met him?

5  A  Nineteen.

6  Q  Were you a student?

7  A  Yes.

8  Q  And was Dr. Leveto a student?

9  A  No.

10  Q  Was he already a veterinarian?

11  A  No.

12  Q  Did he go to school after you got married?

13  A  Yes.

14  Q  And where did he go to school?

15  A  He went to Gannon University, and then following the

16  University of Pennsylvania.

17  Q  Now, when he was a student at Gannon University, was he

18  a pretty good student?

19  A  Yes.

20  Q  Do you know where he graduated in his class?

21  A  I think he graduated second, summa cum laude.

22  Q  And how long -- do you know what his degree is in?

23  A   I believe Bachelor of Science in biology.

24  Q   And how long did it take him to get that degree?

25  A   Two and a half years.

Mrs. Leveto - Direct(By Ms. Calvin)        25

1  Q   And then when he went on to the University of

2  Pennsylvania Medical School, did he do pretty well there?

3  A   Yes.

4  Q   Do you know where he was in that class?

5  A   I believe also he was second in his class, summa cum

6  laude.

7  Q   And when were you divorced?

8  A   Excuse me?

9  Q   When were you divorced?

10  A   December, 2002.

11  Q   Now, you are testifying today pursuant to a subpoena, is

12  that correct?

13  A   That's correct.

14  Q   And you have -- you were charged in the indictment that

15  is about this case, is that also correct?

16  A   Yes.

17  Q   And you are testifying here today, you pled guilty?

18  A   Yes.

19  Q   And what did you plead guilty to?

20  A   Signing a tax return that was incorrect.

21  Q   Failed to supply information?

22  A   Yes.

23  Q   What kind of information did it fail to supply?

24  A   I believe the incorrect income.

25  Q   Is it safe to say that you pled to signing a return that

Mrs. Leveto - Direct(By Ms. Calvin)        26

1   didn't reflect all the income that you had?

2   A   Yes.

3   Q   And that you did that?

4   A   Yes.

5   Q   And as part of your plea agreement, did you agree to

6   cooperate with the government?

7   A   Yes.

8   Q   And is that why you're here today under subpoena?

9   A   Yes.

10  Q   I would ask you, Mrs. Leveto, where do you reside?

11  A   Excuse me?

12  Q    Where do you reside?  I will speak up.  Sorry.

13  A    388 Edgewood Drive in Meadville, Pennsylvania.

14  Q    When did you buy that house?

15  A    In November of 1984.

16  Q    And have you lived there ever since?

17  A    Yes.

18  Q    And was that where the defendant resided?

19  A    Yes.

20  Q    And did he -- how long did he reside in that house?

21  A    Until December 25th, 2000.

22  Q    What happened that day?

23  A    He left the residence permanently.

24  Q    Now, after you bought the house, had you made any

25  improvements to the house?

Mrs. Leveto - Direct(By Ms. Calvin)          27

1  A    Yes.

2  Q    Would you describe both the house and the improvements

3  for us, please?

4  A    We put in a swimming pool and a deck and also a sun room

5  with an awning, did some improvements within regarding

6  carpeting, wallpaper, bathroom, one bathroom remodeled and

7   also purchased an extra lot which aligns to our home.

8   Q    And did you have it landscaped?

9   A    Yes.

10  Q    And during the time that you were married to Dr. Leveto,

11  did you have someone caring for the yard?

12  A    Yes.

13  Q    Now, I would like to switch to Dr. Leveto's business.

14       You know him to be a veterinarian.  Do you know

15  whether he owned the practice or whether he worked for

16  somebody else?

17  A    He owned the practice from 1984 until the early

18  nineties; 1991, I believe.

19  Q    And do you know who he bought the business from?

20  A    Dr. Arthur Langdon.

21  Q    Now, at some point, did you know the defendant to become

22  associated with an individual by the name of Donald Turner?

23  A    Yes.

24  Q    Can you explain to us how he became involved?

25  A    My best recollection of that timeframe would be when

Mrs. Leveto - Direct(By Ms. Calvin)        28

1   Dr. Leveto saw an article in the Wall Street Journal

2   regarding some sort of how not to pay tax issues, and then

3   followed up with a trip to Colorado with a large sum of cash

4   to meet Don Turner initially.

5   Q    Did he tell you what the purpose of that meeting was?

6   A    To belong to some sort of organization in this country

7   led by Don Turner regarding tax issues.

8   Q    Do you know the name of that organization?

9   A    I believe it was FAR.  First America Research.

10   Q    And do you know if there were others involved in FAR, or

11   with this organization?

12   A    I believe so.

13   Q    Do you know any of the names?

14   A    I believe it was a Paul Harris and a Les Retherford, and

15   that's about probably all that I know.

16   Q    What did Dr. Leveto tell you about this meeting that he

17   had out in Colorado?

18   A    Basically, it was held in a hotel room, that

19   doctor -- that Don Turner was there.  I don't recall if

20   anyone else was there.  I believe there was -- I don't know

21   who.

22        And, secondly, there was cash paid.  I don't

23  remember -- I don't remember the amount, but it was a large

24  sum of money, and that it was a secret meeting.

25  Q   Did he mention the word colato to you?


Mrs. Leveto - Direct(By Ms. Calvin)        29


1  A   Yes.

2  Q   And did he explain what that was?

3  A   Yes.

4  Q   What did he tell you?

5  A   I exactly don't know what it still is, to this day know

6  what a colato is.  I never did grasp the concept behind that.

7  Q   Did he talk about putting assets anywhere?

8  A   Sometimes.

9  Q   What did he tell you about that?

10  A   Um, assets -- financial assets?

11  Q   Yes.

12  A   Basically that -- the only thing I knew about was the

13  Channel Islands.

14  Q   Now, Mrs. Leveto, during the period of your marriage,

15  did you work outside the home?

16  A   No.

17  Q    And are you working now?

18  A    Yes.

19  Q    What are you doing now?

20  A    I'm a home healthcare aide.  I take care of elderly

21  people in their homes.

22  Q    And during the course of your marriage, were you deeply

23  involved in many of the financial decisions that were made?

24  A    No.

25  Q    Now, at some point in 1991, did the defendant tell you

Mrs. Leveto - Direct(By Ms. Calvin)        30

1  that he was going to sell the veterinarian practice?

2  A    Yes.

3  Q    What did he tell you about it?

4  A    Yes.  Basically, that he was involved with Russ

5  Schetroma, who was conducting the sale, and that it was going

6  to be owned by someone in the Bahamas and that he would be

7  then manager of and named the new, whatever it was, of Center

8  Company.

9  Q    Did he tell you he was going to no longer have the

10   profits of the company but would draw a salary?

11  A    Yes.

12  Q    Then you were aware that he was calling himself the

13  general manager of Center Company?

14  A    Yes.

15  Q    I am going to hand you what's been marked Government

16  Exhibits 89 and 90 and ask if you recognize them.

17       THE COURT:  You said 89 and 90?

18       MS. CALVIN:  89 and 90.  They are in evidence, Your

19  Honor.

20  Q    What is Government Exhibit 89?

21  A    Yes.

22  Q    What is that?

23  A    Affidavit of General Manager's Powers.

24  Q    Have you seen that document before?

25  A    Yes, I have.


              Mrs. Leveto - Direct(By Ms. Calvin)           31


1  Q    And do you know what this document purports to be?

2  A    That on this day of September -- September 24th, 1991,

3  Daniel J. Leveto, VMD, became general manager of Center

4  Company.

5  Q    And what is Government Exhibit 90?

6   A   Yes.

7   Q   What is that document?

8   A   Affidavit of Co-General Manager's Powers.

9   Q   Now, is that your signature?

10  A   It is not.

11  Q   Did you stand in front of Karen Jeannerett and sign

12  that?

13  A   Excuse me?

14  Q   Were you in front of Karen Jeannerett -- you notice that

15  it is notarized?

16  A   No, I did not.

17  Q   Did you know that you were to be the co-general manager?

18  A   Yes.

19  Q   Was it explained to you what your responsibilities would

20  be?

21  A   No.

22  Q   But, you did not sign this document?

23  A   No.

24  Q   I am going to hand you what's been marked as Government

25  Exhibits 108-A and 108-B.

Mrs. Leveto - Direct(By Ms. Calvin)        32

1          Do you recognize that document?

2    A    No.

3    Q    You haven't seen the Affidavit of Associate Manager's

4    Powers for Daniel Grego?

5    A    No.

6    Q    Do you know Daniel Grego?

7    A    No.

8    Q    You don't know a Daniel Grego, who is an associate

9    manage --

10   A    No.

11   Q    That document was signed on October 10th, 1992, is that

12   correct?

13   A    That's correct.

14   Q    What is 108-B?

15   A    Affidavit of Associate Manager's Powers.

16   Q    Also signed on October 10th, 1992?

17   A    Correct.

18   Q    And whose affidavit of Associate Manager's Powers does

19   that purport to be?

20   A    It's supposed to be Margaret A. Leveto.  But, once

21   again, that's not my signature.

22  Q   That is not your signature?

23  A   It is not.

24  Q   Now, when it was explained to you that the business was

25  being sold and that Dr. Leveto was going to be the general

Mrs. Leveto - Direct(By Ms. Calvin)          33

1   manager and you were going to be the co-general manager, was

2   it explained to you whether or not you would still have

3   control over all the business assets?

4   A   It was suggested that it would definitely be controlled,

5   but not owned.

6   Q   What was the distinction between controlled and owned?

7   A   I really don't know the answer to that.

8   Q   Was that an expression you heard a lot?

9   A   Excuse me?

10  Q   Was that an expression that you heard a lot?

11  A   Yes.

12  Q   Now, during the course of the sale of the business and

13  throughout the period that Center Company purportedly owned

14  the business, were you asked to sign a lot of papers?

15  A   Occasionally.

16  Q   Did you always read those papers?

17  A   Not usually.

18  Q   What do you know about the actual operation of Center

19  Company?

20  A   Very little, if anything.

21  Q   Did the defendant explain to you that he would still

22  have total control of the veterinary practice?

23  A   Absolutely, yes.

24  Q   And did he tell you that Center Company could buy things

25  for his use or your use?

Mrs. Leveto - Direct(By Ms. Calvin)          34

1  A   Yes.

2  Q   Would you tell us a little bit about what he explained

3  to you?

4  A   Basically perhaps buying an aircraft or, you know, and

5  putting it under Center Company's name.

6  Q   Did he tell you that one of the things that you would

7  start doing would be to have foreign accounts?

8  A   Not to my knowledge.  I don't know.

9  Q   Well, did you ever have a bank account abroad before

10  1991?

11  A   No.

12  Q   Did you have --

13  A   Not to my knowledge.

14  Q   Did you have a bank account after 1991?

15  A   The only one that I know about, once again, is the one

16  in Channel Islands.

17  Q   I am going to hand you what's been marked as Government

18  Exhibit 194.

19  A   Okay.

20  Q   And I will ask you if you recognize that document?

21  A   Yes.

22  Q   What is that document?

23  A   It's a TSB Bank card application located in the Channel

24  Islands.

25  Q   Now, did you sign this document?

              Mrs. Leveto - Direct(By Ms. Calvin)          35

1   A   No, I did not.

2   Q   That's not your signature?

3   A   No.

4   Q   But, you did know that you had an account --

5   A   Yes.

6   Q   -- in the Channel Islands?

7        And how did you know that?

8   A   Because I carried around a TSB Debit Delta Card.

9   Q   Now, did Dr. Leveto ever explain to you the many ways

10   that you could use that card?

11   A   A few ways, yes.

12   Q   Did he tell you that you could use that card to draw

13   money out or cash out?

14   A   Yes.

15   Q   If you would need it?

16   A   Yes.

17   Q   Did he ever explain to you that you could use that card

18   to draw cash out and put it in your bank account?

19   A   Yes.

20   Q   Did he ever talk to you about the maximum amount of

21   money that you could keep in that account?

22   A   Yes.

23   Q   What did he tell you?

24   A   Up to but under $10,000.00 at any one time.

25   Q   Now, you are aware of -- there were tax charges here and

Mrs. Leveto - Direct(By Ms. Calvin)          36

1  they involved your tax returns for basically the years 1991

2  through 1995, is that correct?

3  A   That's correct.

4  Q   Those are joint returns?

5  A   Yes.

6  Q   And were you aware that in 1990 -- in the late 1990's,

7  that those tax returns were amended?

8  A   Yes.

9  Q   And I am going to hand you what's been marked as

10  Government Exhibits 1-C-2, 1-D-3, 1-E-2, 1-F-2 and 1-G-2.

11      Looking at Government Exhibit 1-C-2, an amended

12  return for 1991.

13  A   Yes.

14  Q   Do you see that that amends the return asking for a

15  $30,000.00 refund?

16  A   Yes.

17  Q   Did you sign that return?

18  A   No.

19  Q   Have you seen that return?

20  A   Recently.

21  Q   But, you didn't see that at the time?

22  A    No.

23  Q    Well, were you aware of the fact that in 1991 that you

24  had jointly more income than zero dollars?

25  A    Yes.

Mrs. Leveto - Direct(By Ms. Calvin)          37

1   Q    I am going to ask you to look at Government Exhibit

2   1-D-3.

3        Is Government Exhibit 1-D-3 an amended return for

4   the year 1992?

5   A    That's correct.

6   Q    And you see that it says total income, all the income is

7   zero.  Did you sign that return?

8   A    I did not.

9   Q    Were you aware that you had more income than zero

10  dollars for the year 1992?

11  A    Yes.

12  Q    I am going to ask you to look at Government Exhibit

13  1-E-2, an amended return for the year 1993.

14  A    Yes.

15  Q    And it shows all the income as zero?

16  A    Correct.

17  Q    Did you sign that?

18  A    No.

19  Q    Were you aware that you, as a family, had more income

20  than zero dollars?

21  A    Yes.

22  Q    That particular return has an attachment to it.

23        If you look at page two, you see the reason for

24  amending the return?

25  A    Yes.

                Mrs. Leveto - Direct(By Ms. Calvin)          38

1  Q    What does it say?

2  A    Reason for amending our 1993 income tax return.  Quote.

3  Overstatement of income in error and misunderstanding.  End

4  quote.  See attachment which is an integral part of this

5  amended return.

6  Q    And is there an attachment?

7  A    That's correct.

8  Q    I would like you to read a little bit of that.  I would

9  ask you to read paragraph 3 and paragraphs 3-A and B.

10  A    In addition to the above, I am filing even though the,

11   quote, Privacy Act Notice, end quote, as contained in a 1040

12   booklet clearly informs me that I am not required to file.

13   It does so in at least two places.

14        A.  In one place, it states that I need only file a

15   return for, quote, any tax, unquote, I may be, quote, liable,

16   unquote, for.  Since no Code Section makes me, quote, liable,

17   unquote, for incomes taxes, this provision notifies me that I

18   do not have to file incomes tax return.

19        B.  In another place, it directs me to Code Section

20   6001.  This section provides, in relevant part, that, quote,

21   Whenever in the judgment of the Secretary it is necessary, he

22   may require any person by noticed served upon such person; or

23   by regulations, to make such returns, render such statements,

24   or keep such records, as the Secretary deems sufficient to

25   show whether or not such person is liable for the tax under


         Mrs. Leveto - Direct(By Ms. Calvin)          39


1    this title.  Since the Secretary of the Treasury did not

2    serve me with such, quote, notice, unquote, and since no

3    legislative regulation exists requiring anyone to file an

4    income tax return, I am again informed by the, quote, Privacy

5    Act Notice, unquote, that I am not required to file an income

6    tax return.

7    Q    Mrs. Leveto, there is water in front of you.

8    A    Yes, I need some water.

9    Q    I am going to ask you to look at Government

10    Exhibit 1-F-2.

11    A    Yes.  I have it.

12    Q    That's an amended return for 1994?

13    A    Correct.

14    Q    Again, changing the amount of income to zero?

15    A    Correct.

16    Q    Did you sign that return?

17    A    No.

18    Q    In fact, if you look at that signature line, does it

19    appear that somebody else almost started to write their name?

20    A    It appears that there is a D under the M, correct.  Did

21    as in Daniel and M as in Mary.

22    Q    Here again, the reason for the amended return?

23    A    Again -- would you like me to read that?

24    Q    No.  Is it the same reason as you read before?

25    A    Yes.

1  Q   And it says there is an attachment.  Is it the same

2  attachment?

3  A   Yes.

4  Q   I would ask you to look at Government Exhibit 1-G-2.

5       Is that an amended return for the year 1995?

6  A   Yes.

7  Q   Again, changing everything to zero?

8  A   Yes.

9  Q   Is that your signature?

10  A   No.

11  Q   Were you asked to sign these returns?

12  A   No.

13  Q   Did you know that that's what the returns were going to

14  say?

15  A   No.

16  Q   I would like to talk to you a little bit about the

17  lifestyle that you had both before and after the sale of

18  Center Company.

19       Did you live in the same house before and after?

20  A   Yes.

21  Q    And would you describe for us the kind of vacations that

22  you took both before and after the sale of Center Company?

23  A    We usually took two vacations a year.  One at the Jersey

24  Shore in the summertime, and usually in the winter probably

25  an island, sort of beach vacation.

Mrs. Leveto - Direct(By Ms. Calvin)          41

1  Q    And what kind of cars did you drive?

2  A    We had two BMW's and we had a Volvo and we had a Ford

3  van, and we had a -- two Subarus, not all at the same time,

4  but that occasional Ford vehicle.

5  Q    And after the sale of Center Company, were you still

6  able to maintain that type of automobile?

7  A    Yes.

8  Q    Did either you buy yourself jewelry or Dan buy you

9  jewelry on a fairly regular basis?

10  A    Usually Dan bought me jewelry.  Occasionally, I would

11  buy something for myself, but usually Dan would buy me

12  jewelry.

13  Q    And that is both before and after the sale?

14  A    Yes.

15  Q    Now, you continued to live in the same house.

16      Did you, at any point, start looking for another

17   house?

18   A   Yes.

19   Q   Now, would this have been a less expensive house or a

20   more expensive house?

21   A   More.

22   Q   What was the timeframe where you were looking for

23   this -- another house?

24   A   1997 to 1999.

25   Q   And what price range house were you looking at?

Mrs. Leveto - Direct(By Ms. Calvin)        42

1   A   Various price ranges.  I'm going to average, you know,

2   the price around four to $500,000.00.

3   Q   And you still continued to take trips?

4   A   Yes.

5   Q   I'm going to show you what's been marked as Government

6   Exhibits 400 and 401 and ask you if you recognize these?

7       What are Government's Exhibits 400 and 401?

8   A   They appear to be several charges as a result of travel.

9   Q   What kind of travel?

10  A   It appears to be the U.S. Virgin Islands.

11  Q   And when were these charges?

12  A   1997.

13  Q   And looking at Government Exhibit 400 at the top.

14  A   Of 1995.  I'm sorry.

15  Q   And you recognize these?

16      Did you take a trip to the Virgin Islands in 1995?

17  A   Yes.

18  Q   Do you recognize these documents?

19  A   Yes.

20      MS. CALVIN:  Your Honor, the government would move

21  for the admission of 400 and 401.

22      THE COURT:  400 and 401 are admitted.

23  Q   Would you tell us about Government Exhibit 400?

24  A   There are -- appears to be hotel charges and restaurant

25  charges on this statement.


            Mrs. Leveto - Direct(By Ms. Calvin)         43


1   Q   And where are they from?

2   A   Saphire Beach Resort in St. Thomas.

3   Q   Is that where you stayed?

4   A   Yes.

5   Q   Looking at Government Exhibit 401, what is that?

6   A   It appears to be a sales slip from a jewelry store.

7   Q   Do you remember getting jewelry while -- where is this

8   from?

9   A   Imperial Jewelers in St. Thomas.

10   Q   And do you remember getting any jewelry from Imperial

11   Jewelers?

12   A   Yes.

13   Q   Can you describe that vacation?

14   A   It was a family vacation.

15   Q   And was this jewelry for you?

16   A   There was actually a piece for my three daughters each

17   and something for me.

18   Q   What was the amount -- the total amount of that jewelry?

19   A   It appears to be $3,050.00.

20   Q   Thank you.  Now, did you know Dan to fly an airplane?

21   A   Yes.

22   Q   Did you know him to own an airplane?

23   A   Yes.

24   Q   During the course of the 1990's, how many airplanes did

25   he own?

Mrs. Leveto - Direct(By Ms. Calvin)        44

1  A   I am going to say three to four.

2  Q   And do you know where his airplanes were kept?

3  A   Port Meadville.

4  Q   Did you ever fly with him?

5  A   Yes.

6  Q   Where did you go?

7  A   Usually the Jersey Shore or occasionally to dinner at

8  the Franklin Airport.  Once a trip to Liberty University to

9  transport my daughter to Lynchburg.

10  Q   Was anybody else but Dr. Leveto allowed to fly those

11  airplanes?

12       Were those airplanes anybody else's but his?

13  A   Yes.

14  Q   They were his?

15  A   Yes.

16  Q   Nobody else flew them?

17  A   Not to my knowledge.

18  Q   Did you know him to fly them for any business purpose?

19  A   Not to my knowledge.

20  Q   Did you know him to take friends on trips other than

21  just family trips?

22  A    Yes.

23  Q    Did you have any other vehicles -- other than the cars

24  that you talked about and the airplanes, were there other

25  vehicles that the Leveto family owned?

Mrs. Leveto - Direct(By Ms. Calvin)          45

1  A    In what time period are you talking about?

2  Q    In 1990's.  Roughly 1991 through 1996 and seven.

3  A    No.

4  Q    Now, do you know whether or not there were personal

5  expenses paid out of the office?

6  A    Yes, there were.

7  Q    I am going to show you what's been marked as Government

8  Exhibits 22-A-1, 22-A-2 and 22-A-3.

9        Generally, what are those documents?

10  A    They are credit card statements.

11  Q    Whose credit card statements?

12  A    It would be mine.

13  Q    From Chemical Bank?

14  A    Chemical Bank, Master Card.  Yes.

15  Q    And what timeframe do Government Exhibits 22-A-1, A-2

16  and A-3 cover?

17  A    1992, 1993, and I don't know if it goes any further than

18  that; appears to be 1992, 1993.

19  Q    I would ask you to look at the last page of Government

20  Exhibit 22-A-3.

21  A    1994.  January, 1994.

22        MS. CALVIN:  We move for admission of Government

23  Exhibits 22-A-1, A-2 and A-3.

24        THE COURT:  22-A-1, 2 and 3 are admitted.

25  Q    Now, this Chemical Bank charge card, do you know whether

                Mrs. Leveto - Direct(By Ms. Calvin)          46

1  that was paid out of the home or out of the office?

2  A    Probably both.

3  Q    I am going to ask you to look at page one of Government

4  Exhibit 22-A-1.

5        Was that paid out of the office or out of the home?

6  A    It appears to be paid out of the office.

7  Q    And how do you know that?

8  A    Because the office had a system where the person would

9  circle the amount and write the number sign and the check

10  number and the date.

11  Q   I would like you to look at the next page.

12  A   And, I'm sorry, there are initials also on here.

13  Q   And that tells you that it was paid out of the office?

14  A   Yes.

15  Q   I would ask you to look at the next page, which is a

16  billing date of 1-18-93.

17  A   Yes.

18  Q   And looking at some of the charges, I see them for the

19  GAP, Ross-Simons?

20      What's Ross-Simons?

21  A   That's a catalog jewelry store.

22  Q   And what is the amount of that bill, the total monthly

23  bill?

24  A   $1,327.47.

25  Q   And how was that bill paid?

Mrs. Leveto - Direct(By Ms. Calvin)       47

1  A   It appears to have been paid from the office.

2  Q   I would like you to look at the bill that would be

3  ending 7-19-93.

4   A   Okay.

5   Q   Was that paid out of the home or the office?

6   A   It appears to have been paid out of the office.

7   Q   I see a charge there for IBN Meadville Industrial for

8   $9,000.00.  Do you know what that's for?

9   A   No, I don't.

10   Q   Looking at a monthly bill ending on 8-17-93.

11        Do you see that?

12   A   Yes.

13   Q   Again, Ross-Simons.  Again, jewelry?

14   A   Yes.

15   Q   And the monthly bill is how much?

16   A   $849.07.

17   Q   Was that paid by the home or the office?

18   A   It appears to have been paid from the office.

19   Q   I would ask you to look at Government Exhibit 22-A-2.

20   What are some of the things that were charged there?

21   A   At the GAP, Spiegel, Kaufmann's, F.A.O. Schwartz.

22   Q   And looking at the second page of that, can you tell us

23   what the total bill was?

24   A   $982.85.

25   Q   Who paid this bill?

Mrs. Leveto - Direct(By Ms. Calvin)          48

1    A    It appears, once again, to have been paid from the

2    office.

3    Q    I would ask you to look at the bill that ends 4-18-94.

4    That's two pages.

5          Was that paid out of the office or the home?

6    A    Are you on page eight?

7    Q    The bill that ends 4-18-94, two-page statement.

8    A    4-18-94.  Yes.  That, once again, was paid from the

9    office.

10   Q    Would you look on that same exhibit at the bill that

11   ends 8-17-94?

12   A    Okay.

13   Q    What are some of the charges on that bill?

14   A    The GAP, the Foot Locker, the Marquis De Lafayette,

15   Eddie Bauer, Wal-Mart, Ross-Simons, Carlisle's, Hoss'.

16   Q    Was this paid out of the house or the office?

17   A    The office.

18   Q    I would ask you to look at Government Exhibit 22-A-3,

19   the statement ending 4-18-95.

20        I see some charges there that appear to be for

21  beach, St. Thomas?

22  A   Correct.

23  Q   Vacation?

24  A   Correct.

25  Q   Expenses?


          Mrs. Leveto - Direct(By Ms. Calvin)        49


1  A   Yes.

2  Q   And how much is that bill?

3  A   $2,181.41.

4  Q   And who paid that, the home or the office?

5  A   The office.

6  Q   Ask you to look at the statement that ends 6-16-95.  And

7  what are the charges there?

8  A   $3,479.73.

9  Q   And what were some of the items that were charged?

10  A   Henmann(Sp) Manufacturing, which would be -- I believe

11  is an awning.

12  Q   An awning for where?

13  A   For the sun room on the house.

14  Q   Okay.

15  A   Palmer Pools, Kings jewelry.

16  Q   Now, Palmer Pools, what pool might that be?

17  A   That's a pool that we have in the back of our yard.

18  Q   And who paid this bill?

19  A   The office.

20  Q   I would ask you to look at the bill that is ending

21  9-19-95.

22       Where are some of the charges from there on that

23  bill?

24  A   There is USAir charges.  There is a car rental charge.

25  There is a GAP charge, and a couple of telephone call

Mrs. Leveto - Direct(By Ms. Calvin)        50

1  charges.

2  Q   Now, would that have been another vacation?

3  A   Yes.

4  Q   And who paid that bill?

5  A   The office.

6  Q   I am going to hand you what's been marked as Government

7  Exhibits 22-B-1, B-2, B-3 and B-4.

8       Do you recognize those documents?

9   A   No.

10   Q   You don't recognize -- I would ask you to look through

11   and see, did you know whether or not you had a First Card?

12   A   I believe he did.

13   Q   You don't know whether -- you didn't personally have

14   that?

15   A   I could have.  I'm not sure.

16   Q   Let me ask you to look at the first page in Government

17   Exhibit item 22-B-1.  Do you recognize that handwriting?

18   A   Yes.

19   Q   And whose handwriting is that?

20   A   It would be Dr. Leveto's.

21   Q   And did you know him to have that First U.S.A. Card?

22   A   I believe he did.

23   Q   And I would ask you to look through the statements on

24   that and see if you recognize some of the charges on that

25   card?

Mrs. Leveto - Direct(By Ms. Calvin)         51

1   A   Yes, I do.

2   Q   And I would ask you to look at 22-B-4 and see if you

3   recognize some of those charges?

4    A    Yes.

5    Q    Now, would some of those charges have been family

6    charges that you had?

7    A    Yes.

8        MS. CALVIN:  Your Honor, we would move for the

9    admission of Government Exhibits 22-B-1 through B-5.

10        THE COURT:  22-B-1 --

11        MS. CALVIN:  22-B-1 through B-5.

12        THE COURT:  22-B-1 through B -- I only go up to

13    B-4.

14        MS. CALVIN:  I'm sorry.  B-4.

15        THE COURT:  22-B-1 through B-4 are admitted.

16    Q    Now, looking at the first page, that appears to be an

17    application.  Is that Dr. Leveto's handwriting?

18    A    Yes.

19    Q    And when was this signed at the bottom by the signature?

20    A    5-17-93.

21    Q    And when it asks length of time with employer, what does

22    he say?

23    A    Length of time with present employer?

24    Q    Yes.

25  A   Self, dash, nine years.


Mrs. Leveto - Direct(By Ms. Calvin)        52


1  Q   Self-employed nine years?  Okay.

2        I'm going to ask you to look at Government

3  Exhibit 22-B-3.  Do you recognize some of those charges?

4  A   Yes.

5  Q   Nordstrom, Perfume Salon in Nassau, Coral World in

6  Nassau.  I'm sorry.  I didn't give you a page number on that.

7  Ending 4-12-94.

8  A   I don't believe that I have that.  Oh, yes, I see it.

9  Okay.  Yes, I recognize the charges.

10  Q   And were those personal or were those business?

11  A   Personal.

12  Q   And who paid that bill?

13  A   The office.

14  Q   Well, I would ask you to look at Government

15  Exhibit 22-B-4 and the statement that ends 12-12-94.

16        Do you recognize those charges?

17  A   Yes.

18  Q   What is Kraynak's?

19  A   It's a -- like, a Christmas store kind of place.

20  Q   And Ross-Simons is jewelry?

21  A   Yes.

22  Q   Kaufmann's, personal?

23  A   Yes.

24  Q   What about aircraft, Spruce and Fullerton, does that

25   mean anything to you?


Mrs. Leveto - Direct(By Ms. Calvin)         53


1  A   No.

2  Q   Now, who made paid this bill?

3  A   The office.

4  Q   I am going to hand you what's been marked as Government

5  Exhibits 22-C-1 and C-2, and I am going to ask you to look

6  through those and see if you recognize those charges.

7  A   Some of them, I do.

8  Q   Do you know those to be charges for things that were

9  used for the family?

10        Specifically, look at whether there are airline

11   tickets, anything of that nature, Saphire Beach Hotel?

12  A   I don't think I'm on the right page as you are.

13  Q   Do you have 22-C-1 and C-2

14  A   Yes.  Yes.  Airline tickets.

15  Q   I would ask you to look at a statement that has a

16  closing date of 9-14-95 and see if you recognize those

17  charges?

18  A   Yes.

19       MS. CALVIN:  Your Honor, the government would move

20  for admission of Government Exhibits 22-C-1 and C-2.

21       THE COURT:  22-C-1 and two are admitted.

22  Q   Okay.  Looking at Government Exhibit 22-C-2.  These are

23  going to be charges for what?  I will let you tell me.

24  A   They appear to be airline tickets for the five of us to

25  go to St. Thomas.

Mrs. Leveto - Direct(By Ms. Calvin)        54

1  Q   Do you remember that trip?

2  A   Yes.

3  Q   What's the total for this bill?

4  A   $3,382.95.

5  Q   And who paid that?

6  A   It appears to be the office.

7  Q   I would ask you to look at the bill that closes on

8  4-14-95.  What type of charges do you see there?

9   A   They are vacation charges.

10   Q   And who paid that?

11   A   Excuse me?

12   Q   Who paid for these?

13   A   The office.

14   Q   I would ask you to look at the bill that closes 9-14-95.

15   A   Okay.

16   Q   And Virginia Aviation, do you know who that is?

17   A   No, I don't know.  It appears to be perhaps a fueling

18   charge near Liberty University.

19   Q   Now, I see something there on Liberty University.

20   What's that amount?

21   A   It appears to be tuition for my oldest daughter's

22   college at Liberty University.

23   Q   Is that where she went to school?

24   A   Yes.

25   Q   And did you know the defendant to fly to Lynchburg?

55

1   A   Yes.

2   Q   And how much was that tuition payment?

3    A    $4,975.00.

4    Q    And who paid that?

5    A    The office.

6         THE COURT:  Why don't we go ahead and take a

7    fifteen-minute break now.  We'll reconvene at a quarter to

8    eleven.

9         MS. CALVIN:  Thank you.

10   (The jury left the courtroom.)

11        THE COURT:  As I understand, the government has

12   some witness that would only take about ten minutes,

13   Mr. Leveto.

14        Would you have any objection to putting him on for

15   the ten minutes and then we would go back to Mrs. Leveto?

16        MR. LEVETO:  No problem, Your Honor.

17        MS. CALVIN:  Thank you, Your Honor.

18   (Court recessed at 10:15 a.m.)

19   (Court reconvened at 10:35 a.m.)

20   (The jury entered the courtroom.)

21        THE COURT:  The government has a witness that's

22   only going to take about ten minutes and they asked if it

23   would be all right to put that witness on, and then we'll

24   have Mrs. Leveto get back on and continue her testimony.

file:///A|/LEVETO-7.TXT

25    So, I said that was all right.


Meyer - Direct(By Mr. Voracek)        56


1      MR. VORACEK:  Yes, Your Honor.  The United States

2  calls Robert Meyer to the witness stand.

3      THE COURT:  If you would come forward and be sworn,

4  please.

5      THE CLERK:  Please raise your right hand.

6            * * * * *

7      ROBERT MEYER, having first been duly sworn,

8  testified as follows:

9      THE COURT:  Have a seat up here, please, give us

10  your name and spell your last name.

11      THE WITNESS:  My name is Robert Meyer.  M-e-y-e-r.

12      THE COURT:  Thank you.

13         DIRECT EXAMINATION

14  BY MR. VORACEK:

15  Q   Mr. Meyer, where do you reside, just city and state,

16  please?

17  A   I reside in Bethel Park, Pennsylvania.

18  Q   Are you employed, sir?

19  A   Yes.

20  Q   Where are you employed?

21  A   Valley Brook Country Club.

22  Q   And what do you do there?

23  A   I'm a golf professional there.

24      THE COURT:  Which country club was it?

25      THE WITNESS:  Valley Brook.


Meyer - Direct(By Mr. Voracek)          57


1  BY MR. VORACEK:

2  Q   Is that out in the Pittsburgh area?

3  A   It's in McMurray, Pa.

4  Q   Mr. Meyer, I have handed you what's been marked and in

5  evidence as Government's Exhibits 352 and 354, and I ask you

6  to look at Government Exhibit 352.

7      Do you have that in front of you, sir?

8  A   Should it be here?  Should I be looking in here?

9  Q   Do you recognize that document, sir?

10  A   Looking at the bottom of 352 reminds me of the amount of

11  money we paid each month to Center Company.

12  Q   Are you looking at Government Exhibit 352?

13  A   Yes.

file:///A|/LEVETO-7.TXT

14  Q   What is 352?  Do you recognize it?

15  A   I am just trying to read through this.

16  Q   Sir, let me ask you, were you involved in a corporation

17  called M.C.F.?

18  A   I was.  I was one of the partners.

19  Q   How many other partners were there?

20  A   Two others.

21  Q   And did you have this partnership around 1992?

22  A   That's correct.

23  Q   And during -- as part of your partnership in 1992 with

24  M.C.F., did you have an opportunity to negotiate the purchase

25  of some land?

Meyer - Direct(By Mr. Voracek)          58

1  A   Yes.

2  Q   And where was the land located that you were negotiating

3  to purchase?

4  A   Route 322 between Meadville and Conneaut Lake.

5  Q   And do you recall who the seller was of that land?

6  A   Well, the owners were Helen and Chester Leveto, but we

7  negotiated with Mr. Leveto.

8   Q   Mr. Leveto.  You mean Daniel Leveto?

9   A   Yes.

10   Q   Did you meet Daniel Leveto?

11   A   I did.

12   Q   And did you negotiate personally with him to purchase

13   that land?

14   A   I did not.  My two partners, we had a lawyer and it was

15   basically through them.

16   Q   What type of land was it?  Was this a big parcel of

17   land?

18   A   It was approximately a hundred and fifteen acres.  It

19   was a farm, piece of farm land.

20   Q   And for what purpose was M.C.F. Land interested in

21   making that purchase?

22   A   Well, we were looking to do both sort of a sports

23   complex, a driving range, and then add on several other

24   things, maybe, you know, miniature golf, batting cages, that

25   type of thing.  So, that was our intent.


Meyer - Direct(By Mr. Voracek)          59


1   Q   And was the land actually purchased?

2   A   Yes.

3  Q   And do you remember sitting down at the closing for the

4  land purchase?

5  A   I was not at the closing.  My other two partners and the

6  lawyer were.

7  Q   Does this document, Government Exhibit 352 and the other

8  document, Government Exhibit 354, relate to that purchase of

9  land which you just described?

10  A   Yes.  352 does. 354 also does.

11  Q   Now, with regard to what's been admitted into evidence

12  as Government Exhibit 352, the very first paragraph indicates

13  that there was an assignment.

14       Can you read that very first sentence on the very

15  first paragraph, sir?

16  A   Do you want me to read it out loud?

17  Q   Yes, please.

18  A   For value received, receipt and adequacy of which is

19  hereby acknowledged, Center Company, an unincorporated

20  business organization with its principal office at P.O. Box

21  155, Grand Turks, Turks and Caicos Islands, British West

22  Indies, hereinafter assignor, and M.C.F. Land Corporation, a

23  Pennsylvania close corporation, hereinafter assignee, agree

24  as follows.

25  Q    That's enough, Mr. Meyer.


Meyer - Direct(By Mr. Voracek)         60


1        Mr. Meyer it's indicated that Center Company has

2   its business organization in the Turks and Caicos Islands,

3   British West Indies.

4        Did you know, prior to this sale being consummated,

5   that the seller of the property was a foreign entity?

6   A    No.

7   Q    During the negotiations for the property, who did you

8   believe to be the actual seller?

9   A    Well, I thought the land was owned by Helen and

10  Chester Leveto, but I thought their son, Daniel, was selling

11  the land for them.

12  Q    And pursuant to the land purchase, were payments then

13  made by your organization on a monthly basis to the seller of

14  the property?

15  A    Yes.

16  Q    And from whom would those payments have been made,

17  M.C.F. Land?

18  A    Right.

19  Q   Did your business also use another name?

20  A   Well, we were an S Corp called M.C.F., but the driving

21  range we built was Par Breakers.

22  Q   And do you know if either -- if the payments that were

23  made for the purchase of the land were made by either M.C.F.

24  Land or Par Breakers or both?

25  A   They were made by M.C.F. Land.


                    Meyer - Cross                61


1  Q   So, any payments that we see from M.C.F. Land made

2  payable to the Center Company would be for the purchase of

3  the land?

4  A   Correct.

5       MR. VORACEK:  I have no further questions, Your

6  Honor.

7       THE COURT:  Cross-examine.

8                 CROSS-EXAMINATION

9  BY MR. LEVETO:

10  Q   Hi, Mr. Meyer.

11  A   Hello.

12       MR. LEVETO:  Could you have 352 back up there,

13  possibly?

14       MR. VORACEK:  He has it.

15       MR. LEVETO:  352?

16  Q   Mr. Meyer, let me see if I understand you correctly.

17  You had said that you were not aware, that you thought you

18  were buying the property off of Helen and Chester Leveto, and

19  you were not aware you were buying it off of a foreigner?

20  A   I was not.

21  Q   Yes.  Well, were you aware -- you weren't there at the

22  closing, were you?

23  A   That's correct.

24  Q   This assignment, okay, this assignment is actually -- or

25  were you aware that this assignment is actually assigning an

                    Meyer - Cross              62

1   option from myself to Center Company to allow the option to

2   be exercised?

3        I mean, were you aware that you did buy the

4   property off of Chester and Helen Leveto?

5   A   That's what I thought.

6   Q   Yeah.  Well, did you mail Chester and Helen Leveto a

7   payment monthly until the property was paid off?

8   A   I did.

9   Q   Yes.  So, I just wanted, for clarification purposes, I

10   am not sure if perhaps memories fail or what it is, but there

11   was a two-step process taken there, it was actually Center

12   Company that had the option and Chester and Helen Leveto sold

13   the property.

14        So, once you executed the option, then you did buy

15   the property off of them, is that correct?  You didn't buy

16   the property off of Center Company?

17   A   I can tell you that I am just a little confused and we

18   did have a lawyer involved in this, the M.C.F. Land.  I made

19   two mortgage payments every month.  One to Chester and Helen

20   Leveto and one to Center Company.

21   Q   Okay.  I don't have all the documentations here.

22        MR. LEVETO:  If I could have one minute, Your

23   Honor?

24   Q   Okay.  Let me see if this clarifies the issue a little

25   bit.  If we go down to agreement.  In number two.

                    Meyer - Cross                63


1        In consideration of the assignment price and the

2   undertakings of the assignee herein stated, the assignor does

3   hereby assign, transfer and set over unto the assignee all of

4   the assignor's right, title and interest in and to the

5   option.

6        In consideration for this assignment herein made,

7   assignee shall pay an assignment price to assignor as

8   follows:

9        And then it goes on to speak of how the costs are

10  broken down.

11       So, the assignment basically -- here we go.  Here's

12  another thing in the background.  It does explain the

13  assignor is the owner of and optionee in a certain option

14  agreement affecting land in Vernon Township.

15       So, I would like to clarify that, does that kind of

16  refresh your recollection a little bit?  Center Company was

17  the option holder and basically, was there somewhat of a

18  paper transaction that they had the option and you bought the

19  property exercising that option?

20  A   I assume that's correct.  I mean, I'm not a lawyer.  All

21  that --

22  Q   Okay.

23       MR. LEVETO:  No further questions, Your Honor.

24        MR. VORACEK:  Your Honor, I just have one other

25   question.


Mrs. Leveto - Direct(By Ms. Calvin)        64


1            REDIRECT EXAMINATION

2   BY MR. VORACEK:

3   Q    Mr. Meyer, were you provided with any reason from

4   Dr. Leveto as to why the purchase agreement would indicate

5   the name of Center Company, as opposed to Chester and Helen

6   Leveto?

7   A    In recollecting with my partners, um, Dr. Leveto made

8   the statement somewhere along the line that he wanted to make

9   some money for himself in this deal.

10        MR. VORACEK:  No further questions, Your Honor.

11        THE COURT:  Thank you, and you are excused.

12        THE WITNESS:  Thank you.

13   (The witness was excused.)

14        THE COURT:  You can resume the stand, Mrs. Leveto.

15            * * * * *

16        MARGARET LEVETO, having first been duly sworn,

17   testified as follows:

18                    DIRECT EXAMINATION

19  BY MS. CALVIN:

20  Q    Mrs. Leveto, I believe when we left off, we were talking

21  about expenses that were personal in nature that were made

22  out of the business.

23          I would like to ask you about a few more of those.

24  You had a lawn service.  Was that paid for by the home?

25          Did you have a lawn service in the home?


                Mrs. Leveto - Direct(By Ms. Calvin)          65


1  A    Yes.

2  Q    Do you know who paid for that, the home or the office?

3  A    The office.

4  Q    And Dr. Kellogg, who was that?

5  A    That was my dentist.

6  Q    Do you know whether he was paid for out of the office or

7  the home?

8  A    Both.

9  Q    Did your daughter have a horse?

10  A    Yes.

11  Q    And where was it stabled?

12  A    Actually, three places.  It would be Tenney's Farm and

13   it would be Hobbs Hollow and also J. Martin.

14   Q    And do you know whether that was paid for out of the

15   home or the office?

16   A    The office.

17   Q    And did she have an instructor?

18   A    Yes.

19   Q    And who would that be?

20   A    Lee Craft.

21   Q    And do you know whether that was paid for out of the

22   home or the office?

23   A    The office.

24   Q    I am going to hand you what's been marked as Government

25   Exhibits 23-A-1 through 23-C.  I am going to ask you if you

Mrs. Leveto - Direct(By Ms. Calvin)         66

1   recognize Dr. Leveto's handwriting on some of these

2   documents, specifically 23-A-1 and 23-B-2.

3        Did you find them?

4   A    Yes.

5   Q    Do you recognize Dr. Leveto's handwriting on those

6   documents?

7  A   Yes.

8  Q   And one of them is an application for commodities

9  trading.

10       Did you know -- or for Carl Futures.

11       Did you know him to have an account there?

12  A   Yes.

13       MS. CALVIN:  Your Honor, we would move for the

14  admission of Government's Exhibits 23-A-1 through 23-C.

15       THE COURT:  Did you say all of those?

16       MS. CALVIN:  Yes, please.

17       THE COURT:  23-A-1 through 23 --

18       MS. CALVIN:  C.

19       THE COURT:  23-C?  Including 23-C?

20       MS. CALVIN:  Yes, Your Honor.

21       THE COURT:  Those are all admitted.

22  Q   I would like you to look at the first page, the Customer

23  Application Form.  Do you recognize that document?

24  A   No.

25  Q   Do you recognize the handwriting on it?


           Mrs. Leveto - Direct(By Ms. Calvin)          67


1  A   Yes.

2   Q   And is that Dr. Leveto's handwriting?

3   A   Yes.

4   Q   I would like you to look at Government Exhibit 23-B-2,

5   the first page.  Do you recognize that document?

6   A   No.

7   Q   Do you recognize the handwriting?

8   A   Yes.

9   Q   This appears to be an application for an account -- an

10   account application, is that correct?

11   A   Yes.

12   Q   Do you see where it asks financial information in about

13   in the middle of the page after employment information?

14   Government Exhibit 23-B-2.

15   A   Customer account number?

16   Q   Yes.

17   A   Yes.  Okay.

18   Q   And what date was that signed?

19   A   1-30-92.

20   Q   And do you see where it asks for financial information?

21   A   Yes.

22   Q   And it asks for annual income?

23   A   Yes.

24   Q   And how much does Dr. Leveto tell American Futures Group

25   his annual income is in 1992?


               Mrs. Leveto - Direct(By Ms. Calvin)          68


1   A   Over one hundred thousand.

2   Q   Thank you.  Now, Mrs. Leveto, I am going to ask you a

3   few questions about a lien on your home.

4        I am going to show you what's in evidence as

5   Government's Exhibits 360, 361, 362, 363 and 364.

6        Do you recognize those documents?

7   A   Yes.

8   Q   What is Government Exhibit 360?

9   A   This is the original deed where we purchased the house

10  initially.

11  Q   When did you buy the house?

12  A   In November of 1984.

13  Q   What is Government Exhibit 361?

14  A   It would be the purchase of the property -- the deed for

15  the purchase of the property next to our home.

16  Q   And that's still undeveloped?

17  A   Excuse me?

18  Q   That's undeveloped?  That's just land adjacent to your

19  home?

20  A   Yes.

21  Q   I'd ask you to look at what's been admitted in evidence

22  as Government Exhibit 362 and ask you if you recognize that

23  document?

24  A   No.

25  Q   Have you ever seen that document before?

            Mrs. Leveto - Direct(By Ms. Calvin)          69

1  A   No.

2  Q   Do you see that that document is a mortgage on your home

3  for $200,000.00?

4  A   Yes, I see that.

5  Q   And that the mortgage is Five Flags Global Services?

6  A   Yes

7  Q   With an address in Littleton, Colorado?

8  A   Yes.

9  Q   And what is the date that that mortgage was placed on

10  your home?  This is on your home, correct?

11  A   I believe so.

12  Q   And what date was that?

13  A   September 1st, 1996.

14  Q   Now, Mrs. Leveto, that document appears to have your

15  signature on it.

16      Did you sign that document?

17  A   That does appear to be my signature.  However, having

18  said that, I don't recall ever seeing this document.

19  Q   Now, Mrs. Leveto, knowing that somebody placed a lien

20  for $200,000.00 on your home, did you think back to see if

21  there was any time when you were having money problems in

22  1996 where somebody -- there was an influx of $200,000.00?

23  A   No.

24  Q   Did Dan ever tell you that he was going to borrow

25  $200,000.00 on the house?

                Mrs. Leveto - Direct(By Ms. Calvin)          70

1  A   No.

2  Q   Did you see any evidence of a loan of $200,000.00 on the

3  house?

4  A   No.

5  Q   And do you see that there is a satisfaction of that

6  mortgage on 5-23, 1997, stamped on the front of that mortgage

7  document?

8  A   Yes.

9  Q   Are you aware, at any point, where Dan said to you, gee,

10  I got this $200,000.00 loan.  I got to pay it off.  We got to

11  tighten our belts?

12  A   No.

13  Q   Is this the same period where you were looking for more

14  expensive homes?

15  A   Yes.

16  Q   When did you first learn that that -- of that lien being

17  put on your house?

18  A   When I saw the document handed to me from Jamie Mead.

19  Q   And that is your attorney?

20  A   Yes.

21  Q   I am going to ask you to look at Government Exhibit 363,

22  and ask you if you recognize that document?

23  A   No.

24  Q   Do you know that to be associated with the satisfaction

25  piece with your home?

Mrs. Leveto - Direct(By Ms. Calvin)        71

1    A    That's what it says on the top, satisfaction piece.

2    Q    And who is that to have satisfied the lien on that

3    house, took the lien off?

4    A    Five Flags Global Services, Ltd.

5    Q    And who was their agent --

6    A    I don't know.

7    Q    -- by looking at --

8    A    Oh.  Paul D. Harris.

9    Q    And what was the date that that loan was satisfied?

10    A    May 19th, 1997.

11    Q    And you see when it was filed up at the top?

12    A    I am sorry.  It's only dated May 19th, 1997.

13    Q    I am going to ask you to look at what's been marked as

14    Government Exhibit 364.  Do you recognize that document?

15    A    Yes.

16    Q    What is that document?

17    A    It appears to be the deed transferring the house from

18    Daniel and Margaret to Chester and Helen.

19    Q    And when was that filed or signed, made?

20    A    May 23rd, 1997.

21    Q    So, it was transferred immediately after the

22    satisfaction of the loan?

23  A   Yes.

24  Q   Now, Mrs. Leveto, did you sign that document?

25  A   I believe that's my handwriting.


        Mrs. Leveto - Direct(By Ms. Calvin)          72


1   Q   And were you aware that you were going to transfer the

2   title of your home to Chester and Helen Leveto?

3   A   Yes.

4   Q   Who are Chester and Helen Leveto?

5   A   Dr. Leveto's parents.

6   Q   Now, why would you transfer the title of your home to

7   your in-laws?

8   A   Because we were fearful of the home and the contents

9   being taken.

10  Q   Taken by whom?

11  A   IRS.

12  Q   Now, why did you have some concern that the IRS -- was

13  this something that Dr. Leveto told you?

14  A   Yes.

15  Q   And was this a way of keeping the home away from the

16  IRS?

17  A   Yes.

18  Q   How much was that home worth?

19  A   Um, probably around -- between three hundred and

20  350,000, including the lot.

21  Q   Now, Mrs. Leveto, you testified that you are divorced

22  from the defendant.

23      And are you aware that at some point, he left the

24  area?

25  A   Yes.


Mrs. Leveto - Direct(By Ms. Calvin)        73


1  Q   How are you aware of that?

2  A   I believe it came from his office.

3  Q   And was this during the period that you were getting a

4  divorce?

5  A   Yes.

6  Q   And when he left the area, what provision were made for

7  taking care of his office?

8  A   Could you repeat that, please?

9  Q   Yes.  At the time that he left, what provisions had he

10  made for taking care of the veterinary clinic?

11  A   I don't know of any.

12  Q   At some point, did it fall upon you and your family to

13  clean out the contents of the veterinary clinic or -- and

14  clean it up?

15  A   Yes.  By court order, I had permission to enter the

16  veterinary hospital, only me solely, and my family to assist

17  me in cleaning up the veterinary hospital.

18  Q   And at the point where the office was being cleaned out,

19  did a tape-recording labeled colato surface?

20  A   Yes.

21  Q   And did you recognize the handwriting on that tape?

22  A   Yes.

23  Q   And did you play the tape?

24  A   Not for several weeks after we found it.  But, yes, we

25  did.


                Mrs. Leveto - Direct(By Ms. Calvin)          74


1  Q   And did you recognize the voice on the tape?

2  A   Yes.

3  Q   And whose voice was that?

4  A   Dr. Leveto's.

5  Q   And did it concern the situation of the colato?

6   A   Yes.

7   Q   I'm going to hand you what's been marked as Government

8   Exhibit 65.

9        Is that the tape that you found?

10  A   Yes.

11  Q   And did you have an opportunity to listen to it before

12  you came into court?

13  A   Yes.

14  Q   And that tape is in substantially the same condition as

15  it was when you first heard it?

16  A   Yes.

17       MS. CALVIN:  Your Honor, I would move for admission

18  of Government Exhibit 65.

19       THE COURT:  55 is that?

20       MS. CALVIN:  65.

21       MR. LEVETO:  Your Honor, I object to that, the

22  admission of that tape.  I am not aware of that tape.

23       MR. VORACEK:  Your Honor --

24       MR. LEVETO:  Or a transcript thereof.

25       MR. VORACEK:  Your Honor, on July 21st, 2004,

Mrs. Leveto - Direct(By Ms. Calvin)        75

1  Dr. Leveto requested this tape.

2       On August 27th, 2004, the United States sent that

3  tape to the standby counsel, Stephen Misko, and also cc'd

4  Daniel Leveto.

5       MS. CALVIN:  It was sent via Federal Express to

6  Stephen Misko.  Dr. Leveto was sent a copy of the letter that

7  we sent to Stephen Misko to inform him that we had sent the

8  tape and we have had no further requests for it.

9       MR. LEVETO:  Your Honor, my standby counsel did not

10  receive the tape, nor did I receive the tape.

11       THE COURT:  Well, I am going to let them play it.

12  We'll overrule.  I'm satisfied that they sent it.  How did

13  you get it back or when did you get it back?

14       MS. CALVIN:  We sent a copy, Your Honor.

15       THE COURT:  Oh, a copy?

16       MS. CALVIN:  Yes.  Your Honor, I'd ask Agent Adams

17  if he would step out and attempt to work with the

18  tape-recorder and I will continue with my questioning of this

19  witness.

20       THE COURT:  Sure.

21  BY MS. CALVIN:

22 Q   Mrs. Leveto, I am going to ask you if you recognize

23 certain names.

24      The name Leonard Adler, does that mean something to

25 you?

Mrs. Leveto - Direct(By Ms. Calvin)          76

1 A   I have heard and seen the name before.

2 Q   Who is Leonard Adler?

3 A   I have been told by Dr. Leveto that originally that he

4 was a person located in the Cayman Islands, and then

5 subsequently was told that that person did not exist.

6 Q   Did he tell you that?

7 A   Yes.

8 Q   Who is Wayne Co.?

9 A   Um, I believe that was during a period of time where

10 property was being sold by a person named Wayne Allen from

11 Dan and his father, and that was labeled Wayne Co. for that

12 reason.

13 Q   How about Jack Williams?

14 A   Yes, I have heard that name.

15 Q   Do you know who Jack Williams is?

16 A   No.

17  Q    And what about the name Box Elder?

18  A    No.  I've seen it printed, but I don't know what it

19  means.

20       MS. CALVIN:  Your Honor, at this time, the tape is

21  ready to be played.

22       THE COURT:  Okay.

23  (The tape was played.)

24  (End of tape.)

25  BY MS. CALVIN:


          Mrs. Leveto - Direct(By Ms. Calvin)          77


1  Q    Mrs. Leveto, I am going to hand you what's been marked

2  as Government Exhibit 222.

3       Have you seen this document before?

4  A    No.

5  Q    Now, this appears to be a bank card application for

6  Mr. Leonard Adler.  Do you recognize that handwriting?

7  A    Yes.

8  Q    Whose handwriting is that?

9  A    Dr. Leveto's.

10  Q    All of it?

11  A   Yes.

12  Q   Even the Leonard Adler signature?

13  A   That's questionable.

14  Q   Now, Mr. Leonard Adler has a Post Office Box 54.

15      Do you notice anything familiar about his birthday?

16  A   It's my birthday, and it says that Dr. Daniel Leveto is

17  the employer.  Excuse me.

18  Q   Do you see where it asks for employer's name and

19  address?

20  A   Yes.

21  Q   And who was the employer of this Leonard Adler?

22  A   Dr. Daniel Leveto.

23  Q   And what address is that, 316 Conneaut Road?  What sits

24  there?

25  A   That's Langdon and Leveto Veterinary Hospital.


            Mrs. Leveto - Direct(By Ms. Calvin)        78


1   Q   Now, I noticed on the tape Dr. Leveto mentioned that he

2   had opened -- I believe it was a Post Office Box at West View

3   Avenue.  Was that --

4   A   95 West View.

5   Q   Does that address mean something to you?

6  A   That is my parents' address.

7  Q   I am going to show you a few more documents -- I am

8  going to hand you what's been marked as Government

9  Exhibit 1-J.  Is that a tax return?

10  A   Yes.

11  Q   1998?

12  A   1997.

13  Q   1-J?

14  A   Yes.  It has 1040 U.S. Individual Income Tax, 1997, but

15  it says received May 19th, 1998.

16  Q   How much income is declared on that tax return?

17  A   Appears to be zero.

18  Q   All zeros?

19  A   Yes.

20  Q   Did you sign that tax return?

21  A   No.

22  Q   Were you asked to sign that tax return?

23  A   I don't believe so.

24  Q   Now, Mrs. Leveto, I would like to turn your attention to

25  the period after which Dr. Leveto was no longer at the

Mrs. Leveto - Direct(By Ms. Calvin)          79

1  practice.

2        Do you know approximately when he left?

3  A   I believe it was December 13th, but I'm not certain,

4  2000.  2001.  I'm sorry.

5  Q   And I think we asked whether there were provisions made

6  for the running of Langdon and Leveto Veterinary Hospital,

7  and you implied there was not.

8        So, what happened to the practice?

9  A   I came in with a court order given to me by Judge

10  Verdaro(Sp) on December 20, 2001, and asked his receptionist,

11  who was sitting at the desk, to leave and I found a

12  veterinarian and he knew how to manage and run the veterinary

13  hospital, and I was the veterinary technician there for two

14  and a half years, and subsequently the hospital was sold.

15  Q   Now, did I understand you to say that you both ran and

16  worked at the hospital for two and a half years?

17  A   Yes.

18  Q   After Dr. Leveto left?

19  A   Yes, that's correct.

20  Q   And did you have access to the receipts that came in?

21  A   Yes.

22  Q   Were you responsible for either paying or making sure

23  that the expenses got paid?

24  A   Yes.

25  Q   And during the two and a half years that you ran this

Mrs. Leveto - Direct(By Ms. Calvin)          80

1  company, did you ever send any money to Center Company?

2  A   No.

3  Q   Did you ever receive any money from Center Company?

4  A   No.

5  Q   What about payment for the sale of the business, any

6  interest payments?

7  A   No.

8  Q   Did you ever receive any correspondence from Center

9  Company?

10  A   No.

11  Q   Did you ever receive any telephone calls from Center

12  Company?

13  A   No.

14  Q   Have you heard from Jack Williams?

15  A   No.

16  Q    Have you heard from anybody at Center Company to this

17  day?

18  A    No.

19  Q    And what is the condition of the business at this time?

20  A    The business was sold and subsequently demolished.

21  Q    The building was demolished?

22  A    Yes.

23  Q    And did you sell the business?

24  A    I sold -- I did not sell the veterinary part of the

25  business.  The goodwill, I sold the building and the

                    Mrs. Leveto - Cross            81

1  property.

2  Q    And no one ever asked you any questions about your

3  handling of Center Company or the veterinary practice, or

4  anything like that, after Dr. Leveto left?

5  A    No.

6        MS. CALVIN:  I have no further questions of this

7  witness.

8        THE COURT:  You may cross examine.

9                    CROSS-EXAMINATION

10  BY MR. LEVETO:

11  Q    Good afternoon.  I just have a couple of questions.

12        I've noticed that you testified during the time of

13  allegedly not knowing about any kind of second mortgage on

14  the home from approximately September of '96 to May of '97,

15  that that was the time that we were actively looking for

16  newer, larger and more expensive homes, is that correct?

17  A    That's correct.

18  Q    Perhaps I can refresh your recollection.  Maybe I'm a

19  little confused on that point because it was at the time that

20  we were getting divorced and I was moved out and we weren't

21  even living together during that time when I was at the Day's

22  Inn and when we had the mortgage sent, the mortgage payments

23  on the house, there were never any funds, or anything, but it

24  was basically held up --

25        MS. CALVIN:  Your Honor --

                    Mrs. Leveto - Cross              82

1         THE COURT:  This is not proper, Dr. Leveto, for you

2   to be testifying.  You can ask her questions.

3         MR. LEVETO:  Okay.

4   Q    Would it be unreasonable to say that at that time was

5   when the first divorce was filed against me?

6   A   Yes.

7   Q   So, would it be reasonable to say that perhaps at that

8   time, we weren't out looking at newer and larger houses?

9   A   I don't know that that is not correct.  I would have to

10   go back and review the letter that we have from Terry

11   Wiegle(Sp) suggesting the dates that we did look at homes.

12   Q   I see.  Okay.  You were also indicted on -- I have to

13   assume that the government explained the nature and the types

14   of charges against you, and you ended up pleading guilty to a

15   misdemeanor.

16          Was this in exchange for any kind of testimony

17   against me, or anything?

18   A   No, it was not.  It was strictly for cooperation.

19   Q   Did that cooperation have anything to do with testifying

20   against me?

21   A   When I pled to the misdemeanor, I did read over the

22   misdemeanor plea agreement, and I don't know for certain if

23   that was stated in there.  You weren't here.

24   Q   Okay.

25          MR. LEVETO:  Your Honor, could I have a document

1  identified?

2      THE COURT:  Sure.

3      MS. CALVIN:  May I see it?

4      MR. LEVETO:  Oh, sure.  Sorry.

5      MS. CALVIN:  Okay.

6      THE COURT:  That will be marked as Defendant's A.

7      MR. LEVETO:  If you could just identify it and

8  identify if that's your signature on it and what the document

9  is.

10  A   It's the U.S. Department of Justice.  It's a letter to

11  Attorney Mead.  And you wanted the date?

12  Q   No.  I really would just like to know what the document

13  is?

14  A   It's a plea agreement, a not -- not a final one.

15  Q   What was the second thing you said?  I'm sorry.

16  A   Oh, it is the final one.  I really haven't gone over

17  these documents so thoroughly.  My attorney has it.  5-24-04.

18  It appears to be my plea agreement.

19  Q   That is your signature on it?

20  A   Yes.

21  Q   Okay.  Thank you.  Could I get it back, please?

22        Are you aware generally what is in the plea

23  agreement?

24  A   Generally, yes.

25  Q   And as No. 2 here, it says U.S.A. law enforcement

Mrs. Leveto - Cross            84

1  agencies and investigating Title 26 violations committed by

2  myself, allegedly committed by myself and Don Turner

3  hereinafter called the investigation --

4        MS. CALVIN:  Excuse me.  Objection, Your Honor.

5  The plea agreement that you are reading from said allegedly

6  perpetrated by you.

7        MR. LEVETO:  Yes.  I think I said allegedly but --

8  okay.

9  Q   So, you are aware of agreeing to that, is that correct?

10  A   Yes.

11  Q   And you are aware that part of your agreement was that

12  you will, when requested, testify at trials, grand juries,

13  pretrials, sentencing, post-conviction in this district and

14  elsewhere, is that correct?

15  A   Yes.

16  Q   Have you been sentenced yet, Mrs. Leveto?

17  A   No.

18  Q   Are you familiar, within your agreement, those things

19  that will have a substantive effect on your sentencing as far

20  as a -- does a 5K.1 or Rule 35(b) mean anything to you?

21  A   I've heard them.  I didn't understand just what they

22  mean.

23  Q   Okay.  So, would it be safe to assume or could you

24  verify that, dependent on your degree of cooperation and your

25  testimony, things like that will have a direct bearing on

Custard - Direct(By Ms. Calvin)          85

1  what the government will recommend for your sentencing, is

2  that correct?

3  A   Yes.

4      MR. LEVETO:  That's all I have, Your Honor.

5  Thanks.

6      THE COURT:  Redirect?

7      MS. CALVIN:  No, Your Honor.

8      THE COURT:  Thank you, ma'am.  You may step down.

9  (The witness was excused.)

10          MS. CALVIN:  Your Honor, the government calls

11  Mildred Custard.

12          THE COURT:  Would you come forward and be sworn,

13  please?

14          THE CLERK:  Would you raise your right hand?

15                    * * * * *

16          MILDRED CUSTARD, having first been duly sworn,

17  testified as follows:

18          THE COURT:  Have a seat up here, please.  Will you

19  give us your name and spell your last name, please?

20          THE WITNESS:  My name is Mildred Custard.

21  C-u-s-t-a-r-d.

22          THE COURT:  Thank you.

23                  DIRECT EXAMINATION

24  BY MS. CALVIN:

25  Q   Mrs. Custard, would you tell us where you reside, city


                Custard - Direct(By Ms. Calvin)          86


1  and state, please?

2  A   I reside in Saegertown, Pennsylvania.

3  Q   Are you currently employed?

4  A   Yes, I am.

5   Q   Where are you employed?

6   A   I'm employed at the State Correctional Institution in

7   Cambridge Springs.

8   Q   What is it that you do there?

9   A   I'm a secretary.

10   Q   How long have you been a secretary there?

11   A   Um, this is going on my -- it will be twelve years this

12   year.

13   Q   Now, do you know the defendant, Daniel Leveto?

14   A   Yes, I do.

15   Q   And how is it that you know the defendant?

16   A   He used to be my employer.

17   Q   Now, was that at Langdon and Leveto Veterinary Hospital?

18   A   Yes, it was, and also the Cambridge Area Veterinary

19   Clinic.

20   Q   And how long did you work for him?  When did you start?

21   A   Approximately ten years.

22   Q   From what period to what period?

23   A   I believe it was '83 or '84 until 1994.

24   Q   And what was your position when you started working for

25   Dr. Leveto?

1  A   When I started working for him, I was a receptionist.

2        And then when he opened the satellite clinic in

3  Cambridge Springs, I became the office manager at Cambridge

4  Springs.

5  Q   And what were some of your responsibilities there?

6  A   At Cambridge Springs or --

7  Q   At both places.

8  A   We were all responsible for booking appointments, doing

9  what we had to get the clients in and out, taking care of the

10  money, you know, keeping the books straight.

11        At the end of the day, the papers had to match what

12  the cash register said.

13  Q   Did you have the authority to write checks or decide

14  which bills got paid, or anything of that nature?

15  A   At one time, I did.  For a short period of time, I was

16  doing that.  He had opened another business called Sam and

17  Sam's(Sp) and some of my responsibilities at the veterinary

18  hospital were taken away because I was working up there.

19        Then when I came back, I would help with the books

20  and write the checks.

21  Q   For his signature?

22  A   Yes.  Pardon?

23  Q   For his signature?

24  A   Yes.

25  Q   Now, do you happen to recall a time when Dr. Leveto told


                    Custard - Direct(By Ms. Calvin)        88


1   you that the business had been sold to Center Company?

2   A   Yes, I do.

3   Q   And do you remember the events surrounding that?

4   A   Well, I knew something was happening because the girls

5   from the Meadville office would keep me informed in

6   Cambridge, and I knew that there was something going on

7   because he was calling them in to talk to them.

8        And he had told me that he was thinking of closing

9   the Cambridge Springs office.  And at the time, it was -- I

10  really needed my job and I was really kind of worried.  And

11  so he called me down at Cambridge and he said, I want you to

12  stop in tonight when you get out of work.  He says, we are

13  going to have to have a talk.

14       So, he informed me that he had sold his business.

15  Q    Now, do you remember exactly what happened when you went

16  into the office and he told you that, Millie?

17  A    Yes.  He was very kind.  He knew I needed my job.  My

18  husband and I had just separated and I just was -- at the age

19  I was then, it was really important for me to have a job.

20  And he was very kind and told me that he was selling the

21  company to someone in the West Indies and it was going to

22  be -- and I don't understand business -- but, it was going to

23  be, like, a colato, or something like that.  It was going to

24  be called the Center Company.

25        And he says, now, Millie, I know that you are

Custard - Direct(By Ms. Calvin)        89

1  worried, and everything like that, but he says, I don't want

2  you to be worried about this.  He said you are still going to

3  have a job.  I am still going to be running the business.  I

4  am only selling the business for tax purposes.

5  Q    And did he use that same gesture when he told you he had

6  sold the business?

7  A    Yes, he did.  Yes, he did.  He said tax purposes.

8  Q    How about when he said sold --

9  A    Yes.

10  Q    Yes?

11  A    Yes.  I am sorry.

12  Q    He used the expression that looks like quotation marks,

13  I sold the business?

14  A    Right.

15  Q    What did that mean to you when he said, I sold the

16  business?

17  A    Well, of course, I was still naturally worried about it.

18  But, with the way he was, the way he was with me, I believed

19  him, that he was still going to be running the business, that

20  it was still going to be -- I am still going to have a job.

21       When he said tax purposes, I wasn't really, really

22  sure about that, other than I thought that he was going to

23  get some kind of a break on this.

24       When he came back after this, he asked us to have

25  people -- our clients write their checks out to the Center

90

1  Company.  But, he made it very clear that if they didn't, it

2  was still okay to write it to Langdon and Leveto.

3  Q    Do you know anyone by the name of Jack Williams?

4  A   The name is familiar.  Personally, no, I don't.

5  Q   Do you know anyone named --

6  A   There were several names being spoken around.  There

7  were people that would call in, and Dr. Leveto had always

8  been adamant that unless things were an emergency or unless

9  it was his wife, that he was not to be disturbed when he was

10  in with a client.

11      But, there were some names that -- that he told us

12  that he was to be interrupted for if they called in.

13      MS. CALVIN:  Okay.  Thank you.  I have no further

14  questions for this witness.

15      MR. LEVETO:  I have no questions, Your Honor.

16      THE COURT:  Thank you, ma'am.

17  (The witness was excused.)

18      MR. VORACEK:  Your Honor, we have a witness that's

19  on her way right now.  It's a bank witness.  She should be

20  here momentarily.

21      THE COURT:  Okay.  Let's have our second break

22  then.  Well, just let us know when she is here.

23      MR. VORACEK:  Thank you, Your Honor.

24      MS. CALVIN:  Thank you, Your Honor.

25  (Court recessed at 12:05 a.m.)

Weis-Frigon - Direct(By Mr. Voracek)        91

1  (Court reconvened at 12:25 p.m.)

2       THE COURT:  Be seated, please.  Okay, Mr. Voracek.

3       MR. VORACEK:  Thank you, Your Honor.  The

4  government calls Susannah Weis-Frigon.

5       THE COURT:  Would you come forward to be sworn,

6  please?

7       THE CLERK:  Would you raise your right hand?

8            * * * * *

9       SUSANNAH WEIS-FRIGON, having first been duly sworn,

10  testified as follows:

11       THE COURT:  Have a seat up here, please, give us

12  your name and spell your last name.

13       THE WITNESS:  My name is Susannah Weis-Frigon.

14  S-u-s-a-n-n-a-h, W-e-i-s-F-r-i-g-o-n.

15       THE COURT:  You better give me the last one again.

16  Weis hyphen?

17       THE WITNESS:  Frigon.  F, frank, R-i-g-o-n.

18       THE COURT:  Oh.  F-r-i-g-o-n.  Thanks.

19            DIRECT EXAMINATION

20  BY MR. VORACEK:

21  Q    Ms. Weis-Frigon, are you employed?

22  A    Yes, I am.

23  Q    Where do you work?

24  A    UBS Financial Services.

25  Q    How long have you been so employed?


            Weis-Frigon - Direct(By Mr. Voracek)        92


1  A    Eighteen years.

2  Q    And what's your position?

3  A    I am the branch manager, corporate VP.

4  Q    What are some of your job functions?

5  A    Supervision of financial advisors, staff, client

6  advisory services.

7  Q    Now, the organization that you work for, were they also

8  affiliated with PaineWebber?

9  A    Yes.  UBS purchased PaineWebber in 2000.

10  Q    And since they purchased PaineWebber in 2000, are you

11  familiar with the bank documentation that was generated by

12  PaineWebber?

13  A    Yes.

14  Q    And is that documentation maintained at your company?

15  A   Yes, it is.

16  Q   And are you familiar with such documentation?  Have you

17  worked with it on a daily basis?

18  A   Yes.

19  Q   You have in front of you some Government Exhibits, and

20  I'll ask you to pick up what's been marked as Government

21  Exhibit 21-A-1 and I ask you to look at that document,

22  please.

23        Do you recognize that document as one of the

24  PaineWebber documents?

25  A   Yes, I do.


                Weis-Frigon - Direct(By Mr. Voracek)        93


1  Q   What is that?

2  A   It is a Resource Management Account Application which is

3  the form that would generate a money market account.

4  Q   And you have seen such documents before?

5  A   Yes, I have.

6  Q   Is such documents, are they generated and maintained by

7  PaineWebber in the ordinary course of its business?

8  A   Yes.

9  Q    Now, with regard to the specific document here, is there

10  an account title?

11  A    Yes.  The title of the account is Box Elder, Limited.

12  Q    And when somebody opens up an account, are they also

13  required to sign this document, this application form?

14  A    Yes.

15  Q    And are there application signatures on this form?

16  A    Yes, there are.

17  Q    And who are those?

18  A    There are several.  Daniel Leveto, Margaret Leveto, Jack

19  Williams and Arthur Acinbbo.

20  Q    And when was this International Resource Management

21  account opened?

22  A    October of 1994.

23        MR. VORACEK:  Your Honor, the United States moves

24  for the admission of Government Exhibit 21-A-1.

25        THE COURT:  21-A-1 is admitted.


            Weis-Frigon - Direct(By Mr. Voracek)        94


1  Q    I ask you to look at that document, Miss Weis-Frigon.

2        It states it's an International Resource Management

3  Account Application and Account Agreement.

4        Can you explain exactly what type of account is

5    being opened here in more detail, please?

6    A    Yes.  Now, this is not the document that actually opened

7    the account.

8    Q    Okay.

9    A    This document would have been used for existing

10    accounts, to add a money market function, and it would appear

11    that it was based internationally because this was -- the

12    form is specific to that.

13    Q    All right.  Does it also indicate whether or not there

14    is any Master Card set up?

15    A    Yes, it does.  Yes, it does indicate Master Cards.

16    Q    How many -- how many cards?

17    A    Looks like two cards.

18    Q    And who are those two cards issued to?

19    A    To Box Elder.  Both in the name of Box Elder, with

20    Leveto as general manager.  And it looks like the second one

21    was Leveto as manager.

22    Q    Now, under Section 3, can you explain what's required

23    under that section?

24    A    Yes.  That is verifying where the master address for the

25  account is.

Weis-Frigon - Direct(By Mr. Voracek)        95

1  Q   And where was the master account for this address?

2  A   It looks to be based in Turks and Caicos -- Grand Turk,

3  Turks and Caicos.

4  Q   And who ultimately signed this document, at the very

5  end, as the agent?

6  A   Daniel Leveto.  Appears both Daniel and Margaret Leveto

7  have signed it.

8  Q   Is there an account number associated with this

9  application?

10  A   Yes.

11  Q   What is the account number?

12  A   BA, which designates the branch office in which the

13  account was opened, 13417.

14  Q   Miss Weis-Frigon, I now ask you to look at Government

15  Exhibit 21-A-2.  Do you recognize that document?

16  A   Yes, I do.

17  Q   Is this another banking document to which you are

18  familiar that was generated or maintained in the ordinary

19  course of PaineWebber's business?

20   A   Yes.

21   Q   And was this document associated with the document to

22   which you just testified in 21-A-1?

23   A   Yes.  This would have been part of the account package.

24        MR. VORACEK:  Your Honor, the United States moves

25   for the admission of 21-A-2.

Weis-Frigon - Direct(By Mr. Voracek)        96

1         THE COURT:  21-A-2 is admitted.

2    Q   And Miss Weis-Frigon, could you explain anything that

3    you know about this document?

4    A   I'm not familiar with the specifics of this account, but

5    this form is used when an account holder is indicating that

6    they are, in fact, an offshore entity, and the form asks that

7    they verify same.

8    Q   I ask you to look at Government Exhibit 21-A-3.  And is

9    this an additional PaineWebber document that's associated

10   with the account to which you just previously testified?

11   A   Yes, it is.

12        MR. VORACEK:  Your Honor, the United States moves

13   for the admission of 21-A-3.

14    THE COURT:  21-A-3 is admitted.

15  Q    And what is this document, Miss Weis-Frigon?

16  A    This is a corporate resolution.

17  Q    And can you explain the purposes that PaineWebber would

18  use for this document?

19  A    Sure.  The form is -- tells PaineWebber who is

20  authorized to sign or take action on behalf of the account.

21  Q    And, again, what is the account title?

22  A    Box Elder, Limited.

23  Q    And who is authorized on this account?

24  A    It appears that Arthur Acinbbo, Jack Williams and Leroy

25  Meyers are authorized.

Weis-Frigon - Direct(By Mr. Voracek)        97

1  Q    And under No. 3 on that document, I see some signatures.

2  Can you read the signature?

3  A    Daniel Leveto and Margaret Leveto.

4  Q    And what is the purpose of these individuals signing

5  this document?

6  A    As managers, they are verifying that the above-named

7  individuals are also authorized to act on the account.

8  Q    And Government Exhibit 21-A-4.  Would you look at that

9  document, please?

10      Is this an additional document maintained at

11  PaineWebber in the ordinary course of its business that

12  relates to the same account to which you previously

13  testified?

14  A   Yes, it is.

15      MR. VORACEK:  Your Honor, the United States moves

16  for the admission of 21-A-4.

17      THE COURT:  21-A-4 is admitted.

18  Q   And what is this document, Miss Weis-Frigon?

19  A   This is the new account form to actually govern the

20  account.

21  Q   Now, under the information under general client

22  information, for what purpose does PaineWebber use that

23  information?

24  A   That is how the account is registered and titled.

25  Q   And what is titled and registered there?  Would you read

               Weis-Frigon - Direct(By Mr. Voracek)        98

1  the information underneath?

2  A   Box Elder, Limited.

3   Q   And can you read the writing right underneath that?

4   A   Sure.  Looks like the address of record was 388 Edgewood

5   Drive in Meadville, Pennsylvania.

6   Q   What do you mean by the "address of record," Miss

7   Weis-Frigon?

8   A   That would be the address to which all account documents

9   were sent and the address that we have registered on our

10  books as an account in Pennsylvania.

11  Q   And I believe you testified that this document is

12  associated with the same account to which you previously

13  testified in 21-A-1, 2 and 3?

14  A   Correct.

15  Q   So, all the documents related to that account had been

16  sent to 388 Edgewood Drive, Meadville, Pennsylvania?

17  A   That's correct.

18  Q   And, Miss Weis-Frigon, I ask you to look at 21-A-5.  And

19  what is 21-A-5?

20  A   It is a welcome letter signed by the investment

21  executive, who would have been the financial advisor on the

22  account.

23  Q   And who was this letter sent to?

24  A   To Daniel Leveto as general manager of Box Elder.

25   Q    What's the date of the letter?

Weis-Frigon - Direct(By Mr. Voracek)          99

1   A   December 6, 1994.

2        MR. VORACEK:  Your Honor, the United States moves

3   for the admission of 21-A-5.

4        THE COURT:  21-A-5 is admitted.

5   Q   Miss Weis-Frigon, I know that you stated that this is a

6   letter from PaineWebber and it's to the general manager,

7   Daniel Leveto, and I think you indicated welcoming him into

8   that account?

9   A   Correct.

10   Q   Now, PaineWebber has got many offices, do they not?

11   A   They do.

12   Q   Throughout the United States?

13   A   Right.

14   Q   All fifty states?

15   A   You got it.

16   Q   Where did this letter come from?

17   A   This came from Bethesda, Maryland.

18   Q   Does this indicate, Miss Weis-Frigon, that the account

19  was opened at PaineWebber's office in Bethesda, Maryland?

20  A    Yes.  Yes, it would indicate that.

21  Q    Now, if somebody opens an account in Erie, Pennsylvania,

22  would we still see the same type of letter with Bethesda,

23  Maryland, on it?

24  A    No.

25  Q    What would you see?


Weis-Frigon - Direct(By Mr. Voracek)         100


1  A    You would see -- in 1994, you would have seen a letter

2  very similar to this coming from the Erie, Pennsylvania

3  office.

4  Q    So, is it your testimony that this account was opened,

5  actually physically opened at the PaineWebber in Bethesda?

6  A    Yes.

7  Q    And if you go further down the letter, I note that the

8  address is Daniel Leveto, General Manager, Box Elder,

9  388 Edgewood Drive, Meadville, Pennsylvania.

10        And I think -- was it your testimony then that any

11   documents associated with this account would be sent to that

12   address?

13  A    Correct.  That would be the address of record.

14   Q    And if we go further down, I notice that we have some

15   writing under or federal wiring instructions.

16        What is meant by that, Miss Weis-Frigon?

17   A    Any time you wire money into PaineWebber from another

18   firm, from another bank, these are the instructions that

19   would enable that to happen.  It's all done through federal

20   funds transfer.

21   Q    I now ask you to look at what's been marked as

22   Government Exhibit 21-B.  What is 21-B?

23   A    It would appear to be, it is, PaineWebber account

24   statements.

25   Q    Account statements?

Weis-Frigon - Direct(By Mr. Voracek)       101

1   A    Correct.

2   Q    And are these for any particular date?

3   A    Yes.  The first one, it starts in December, 1994, and

4   appears to move through 1995 on a monthly basis.

5   Q    And what is the name of the account to which this

6   applies?

7   A    Box Elder, Limited.

8  Q   Is this -- the statements that are reflected in

9  Government Exhibit 21-B, does that pertain to the same

10  account to which you just testified in 21-A-1 to A-5?

11  A   Yes, it does.

12       MR. VORACEK:  Your Honor, the United States moves

13  for the admission of Government Exhibit 21-B.

14       MR. VORACEK:  21-B is admitted.

15  Q   And, again, if we look at Government Exhibit 21-B,

16  Miss Weis-Frigon, I notice that the address of the

17  PaineWebber is Bethesda, Maryland?

18  A   Right.

19  Q   And that these documents would have been mailed to what

20  address?

21  A   To 388 Edgewood Drive in Meadville.

22  Q   And does it indicate, in December, 1994, whether or not

23  any money went into that account?

24  A   Yes.  There was a $10,488.00 deposit made.

25  Q   Miss Weis-Frigon, I now ask you to look at the June

            Weis-Frigon - Direct(By Mr. Voracek)       102

1  statement, June, 1995.

2  A   Okay.

3   Q    Do you have that in front of you?

4   A    Yes, I do.

5   Q    And does it indicate -- does the June statement indicate

6   whether or not any funds were transferred into the

7   PaineWebber account of Box Elder in June of 1995?

8   A    There was a deposit made in the amount of $14,988.00.

9   Q    Miss Weis-Frigon, I now ask you to look at the October

10  statement, October, 1995.

11        Do you have that, Miss Weis-Frigon?

12  A    Yes, I do.

13  Q    Does the October statement reflect whether or not any

14  withdrawals were made from the PaineWebber account?

15  A    Yes.  There was a $10,025.00 withdrawal made.

16  Q    And, Miss Weis-Frigon, if you go down two more pages, I

17  am going to ask you some questions on that document.

18        Do you have that in front of you?

19  A    Yes, I do.

20  Q    What is this document?

21  A    This is also a statement, but it's what we call an

22  operation statement.  It's used internally, has the same

23  information on it, but the internal codes are on it as well.

24  Q    Does this document give any more explanation as to the

25  type of withdrawal that you just described?

Weis-Frigon - Direct(By Mr. Voracek)        103

1  A    Yes.  It's showing that there was a wire transfer made.

2  So, the 10,000 that left the account was sent via wire

3  transfer to credit Lyonnais Bank to the business.

4  Q    What is Lyonnais Bank, to the best of your knowledge,

5  Miss Weis-Frigon?

6  A    That is a bank.

7  Q    And where is Lyonnais Bank located?  Is that a bank that

8  is in the United States, or not, or elsewhere?

9  A    I believe it is based outside of the United States.

10  Q    Miss Weis-Frigon, I now direct your attention to

11  Government Exhibits 21-C and 21-D.

12         What is Government Exhibit 21-C?

13  A    21-C is a new account form.

14  Q    And who is the account holder on that account, 21-C?

15  A    It's a custodial account for the benefit of

16  Andrea Leveto.

17  Q    And who is the custodian of that account?

18  A    The custodian is Daniel Leveto.

19  Q    And when was that account opened, if you can tell from

20  that document?

21  A    The date is difficult to read.  I don't see it here.  On

22  the W-9, which is also part of the account opening document,

23  looks like it might have been 1990, but it's pretty blurry.

24  Q    1990?

25  A    Yes.


             Weis-Frigon - Direct(By Mr. Voracek)        104


1   Q    I ask you to look at Government Exhibit 21-D.

2          Is that the same type of document to which you just

3   testified in 21-C?

4   A    Yes, it is.

5   Q    But, is it for a different account?

6   A    It is.  It's also a custodial account.  Daniel Leveto is

7   the custodian, but this is for the benefit of Amy Leveto.

8   Q    And when was that account opened?

9   A    Also 1990.  January 26 of 1990.

10         MR. VORACEK:  Your Honor, the United States moves

11  for the admission of Government's Exhibits 21-C and 21-D.

12         THE COURT:  21-C and D are admitted.

13  Q   So, Miss Weis-Frigon, custodial accounts were opened by

14  Daniel Leveto at PaineWebber in December of 1990?

15  A   Correct.  December or January.

16  Q   December, 1990, or January, 1991, is that --

17  A   Actually, this account for Amy appears to have been

18  opened January of 1990.

19  Q   So, the accounts were opened in 1990?

20  A   That's right.

21  Q   Now, by looking at these forms as reflected in

22  Government's Exhibits 21-C and D, where were these accounts

23  opened, at which branch of PaineWebber?

24  A   These were opened in the Erie, Pennsylvania office.

25  Q   How can you tell that by looking at these documents?

                    Weis-Frigon - Cross              105


1   A   The account number on the top of the form begins with

2   the prefix PP, which indicates the Erie office.  Each office

3   within PaineWebber has a two-letter prefix designating them.

4   Q   So, these two accounts that were opened in 1990 were

5   opened at the Erie branch of PaineWebber?

6   A   Correct.

7          MR. VORACEK:  The United States has no further

8   questions, Your Honor.

9                      CROSS-EXAMINATION

10  BY MR. LEVETO:

11  Q   I just have a couple questions.

12  A   Sure.

13  Q   Could you go back to Exhibit 21-A-1, please, just so I

14  can reaffirm something that I believe you said?

15  A   Yes.

16  Q   What is that document entitled?

17  A   An International Resource Management Account Application

18  and Account Agreement.

19  Q   But, you said that was -- is it correct that you said

20  that that was not the original opening document?

21  A   Right.  This account is a money market application so it

22  adds the money market feature to an existing account.

23  Q   An existing account that was already opened?

24  A   Or it could have been opened at the same time.

25  Q   But, you don't have any documentation to that, or this

                              106

1   would not relate specifically to documentation of the opening

2    of it?  This is just an addition onto an account that exists?

3    A    Correct.

4    Q    And that was opened in Bethesda, Maryland, is that

5    correct?

6    A    That is correct.

7    Q    Or it was -- that was opened in Bethesda, Maryland?

8    A    Um-hum.

9    Q    Okay.  The custodial accounts referred to -- I am not

10   sure which number that was, 21 -- 21-C and 21-D?

11   A    Right.

12   Q    Do these -- okay.

13          Did the forms you have there appear to have

14   anything to do with the other account that we are talking

15   about here, the custodial accounts?

16   A    No.

17   Q    They are just totally different accounts, is that

18   correct?

19   A    Correct.

20          MR. LEVETO:  Thank you.  That is all I have.

21          MR. VORACEK:  No further questions, Your Honor.

22          THE COURT:  Thank you ma'am.

23          THE WITNESS:  You're welcome.

24  (The witness was excused.)

25      MR. VORACEK:  Your Honor, the United States, under

107

1  the circumstances, has no further witnesses at this time.  We

2  would request to proceed Tuesday morning.

3      THE COURT:  Okay.  Well, we're letting you out even

4  earlier from school than we thought we would.  But, anyway,

5  we hope you have a very nice weekend, and please be ready to

6  start at nine o'clock on Tuesday.  Drive carefully.

7      MS. CALVIN:  Your Honor, we have something we would

8  like to put on the record after the jury leaves.

9      THE COURT:  You don't need the jury?

10      MS. CALVIN:  No.

11      MR. VORACEK:  No.

12  (The jury left the courtroom.)

13      THE COURT:  Proceed.  Be seated, please.

14      MS. CALVIN:  Your Honor, we would like to put on

15  the record -- I believe there was some question earlier about

16  whether or not standby counsel had received the colato tape,

17  and I believe that Mr. Misko has indicated that it was

18  received at his office.

19      THE COURT:  Is that right, Mr. Misko?

20      MR. MISKO:  Yes, Your Honor.  My recollection of

21  this is, it was received at the time that I was in the

22  process of getting all the discovery materials from

23  Mr. Prather,(Sp) his former counsel, to Dr. Leveto at the

24  jail, and I had placed the tape in a Manila envelope, but at

25  the same time knew it was going to be next to impossible for

108

1  Dr. Leveto to hear it because there are no provisions in the

2  jail to listening to the tapes.

3      And basically that is how I left it.  And

4  apparently there was no transcript of that tape for

5  Dr. Leveto to review.

6      THE COURT:  Okay.  I'm still letting it in as

7  evidence.

8      Okay, folks.  See on you Tuesday.

9      MR. VORACEK:  Thank you, Your Honor.

10      MS. CALVIN:  Thank you, Your Honor.

11  (Court recessed on Thursday, May 26, 2005, at 12:45 p.m.)

12

13                    * * * * *

14          I certify that the forgoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16

17

18                         S/Michael D. Powers
                           Michael D. Powers
19                         Official Reporter

20        *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****

21

22

23

24

25