1         IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

   _____

3

  UNITED STATES OF AMERICA

4           Plaintiff

5       vs.     Criminal Action No. 01-06ERIE

6      DANIEL J. LEVETO

7           Defendant

8    _____

9           PROCEEDINGS

10
     Transcript of Jury Trial commencing on Wednesday,
11    May 25, 2005, United States District Court, Erie,
  Pennsylvania, before Honorable Maurice B. Cohill, Jr.,
12    District Judge.

13    APPEARANCES:

14    For the Government:    For the Department of Justice
         By:  Rita Calvin, Esq.
15             By:  Thomas Voracek, Esq.

16    For the Defendant:   Pro Se
         Stephen Misko, Esq.(Standby)

17
         Reported by:
18             Michael D. Powers, RMR
         Official Court Reporter
19             Room 5335 USPO & Courthouse
         Pittsburgh, Pennsylvania 15219
20             (412) 208-7572

21

22
  Proceedings recorded by mechanical stenography.  Transcript
23  produced by computer-aided transcription.

24

25


                                    2


1                    I N D E X

2  GOVERNMENT WITNESSES    DIRECT  CROSS  REDIRECT  RECROSS

3  KAREN JEANNERETT

4    By Mr. Voracek        4          108
     By Mr. Leveto              99          108
5
  JAMES SCARPITTI
6
     By Ms. Calvin        110          156
7    By Mr. Leveto              147

8  MANUEL GONZALEZ

9    By Mr. Voracek        160
     By Mr. Leveto
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1        P R O C E E D I N G S

2   (Court reconvened on Wednesday, May 25, 2005, at 9:05 a.m.)

3        THE COURT:  Good morning.  Be seated, please.

4        Mr. Leveto, did you have an opportunity to hear the

5   CD?

6        MR. LEVETO:  I heard most of it, Your Honor.  I did

7   have the opportunity to review the transcript, and I have to

8   object.  I have to object to the CD and this summary being

9   admitted because I believe it would be highly prejudicial to

10  myself in that the excerpts excised from the tapes and the --

11  as the transcripts were voluminous, there were a lot of

12  tapes, it would be prejudicial to have it excised without my

13  having really the ability to look at the transcripts, figure

14  and calculate and discern my way to cross-examine the

15  preceding and following information that was spoken to.

16      THE COURT:  I'm inclined to agree.  I think it's a

17  dangerous thing to permit a -- just a record full of

18  excerpts, as this appears to be.

19      So, I would advise the government that if you want

20  to introduce any of the transcripts into evidence, they will

21  have to be played entirely for the benefit of the jury.

22      So, I'll leave that to your discretion, what you

23  want to do about that.  I realize it will probably prolong

24  the trial, but I just don't think it would be fair to have

25  bits and pieces of various conversations presented in that

4

1  way.

2      So, we are going to sustain his objection to that.

3      MR. VORACEK:  Your Honor, the government would ask

4    though, that since Mr. Gonzalez is on the witness stand at

5    the present time --

6        THE COURT:  Right.

7        MR. VORACEK:  -- perhaps we could recall him a

8    little bit later in the trial and just proceed with the next

9    witness.

10       THE COURT:  Sure.  That will be all right.

11       MR. VORACEK:  Thank you, Your Honor.

12       THE COURT:  Okay.

13       MR. VORACEK:  Your Honor, the United States calls

14   Karen Jeannerett.

15       THE CLERK:  Would you raise your right hand?

16           * * * * *

17       KAREN JEANNERETT, having first been duly sworn,

18   testified as follows:

19       THE COURT:  Would you have a seat up here, please,

20   give us your name and spell your last name.

21       Are those intended for her, all those things that

22   are up there?

23       MR. VORACEK:  No.  No, Your Honor.

24       THE WITNESS:  Karen Jeannerett.

25   J-e-a-n-n-e-r-e-t-t.

Jeannerett - Direct(By Mr. Voracek)          5

1          THE COURT:  Okay, Mr. Voracek.

2          MR. VORACEK:  Thank you.

3                    DIRECT EXAMINATION

4   BY MR. VORACEK:

5   Q.  Mrs. Jeannerett, where do you live, city and state,

6   please?

7   A.  Saegertown, Pennsylvania.

8   Q.  Are you employed currently?

9   A.  Yes.

10  Q.  Where do you work?

11  A.  For a general surgeon in Meadville.

12  Q.  What do you do there?

13  A.  Medical billing.

14          THE COURT:  I think I will be able to understand

15  you a little better if you just talk directly into that

16  microphone.

17          THE WITNESS:  Okay.

18  Q.  And how long have you had this job?

19  A.  Since 2000.

20  Q.  Prior to working where you are now, were you employed by

21  Langdon and Leveto Veterinary Clinic?

22  A.  Yes.

23  Q.  When were you employed there?

24  A.  From 1985 to 1997.

25  Q.  And what was your position at the veterinary clinic?


Jeannerett - Direct(By Mr. Voracek)          6


1   A.  I started out as a receptionist and then I was an office

2   manager.

3   Q.  When did you become the office manager?

4   A.  I believe in the early nineties.  I am not sure of the

5   exact year.

6   Q.  What is your educational background?

7   A.  I'm just a high school graduate; took business courses.

8   Q.  You have taken some business courses after high school?

9   A.  No.  In high school.

10  Q.  In high school.

11       Have you had any other training with regard to

12  bookkeeping?

13  A.  No.

14  Q.  As office manager over at Langdon and Leveto, what were

15  some of your duties?

16  A.  I waited on customers, answered the phone, scheduled

17  appointments, did bookkeeping as far as accounts payable,

18  accounts receivable, purchasing supplies.

19  Q.  Did you know Dr. Leveto before you began working for

20  him?

21  A.  No.

22  Q.  Have you known him in any other capacity other than just

23  as the bookkeeper at Langdon and Leveto?

24  A.  Yes.

25  Q.  You've also known him personally?  Did you socialize

Jeannerett - Direct(By Mr. Voracek)          7

1  with him?

2  A.  Just worked for him.

3  Q.  Just worked for him?

4  A.  Yeah.

5  Q.  Have you had any contact with him since he left his

6  business?

7  A.  No.

8  Q.  Where is the Langdon and Leveto Veterinary Clinic

9  located?

10  A.  On Conneaut Lake Road, Meadville.

11  Q.  Do you know the address?

12  A.  18200 maybe.  I am not sure.

13  Q.  You worked there for about twelve years?

14  A.  Yes.

15  Q.  Was it all in the same location?

16  A.  Yes.

17  Q.  What type of business was the veterinary clinic?

18  A.  It was a veterinary hospital.  Took care of animals.

19  Q.  Animals were taken care of there?

20  A.  Yes.

21  Q.  Were there any other services that were performed at the

22  veterinary clinic other than just taking care of animals?

23  A.  No.

24  Q.  Any products sold at the veterinary clinic?

25  A.  Oh, yes.  Pet supplies.


            Jeannerett - Direct(By Mr. Voracek)          8


1  Q.  What was sold?

2  A.  Pet supplies.

3  Q.  Would you say that the veterinary clinic actually had a

4   store full of veterinary supplies?

5   A.   Yeah.  It was in our waiting room.  There was, like, a

6   little store, yeah.

7   Q.   What type of supplies?

8   A.   Oh, your typical pet supplies; leashes and collars, and

9   anywhere from shampoo to basic pet supplies.

10  Q.   Did you actually assist in working with the animals or

11  were you just up front?

12  A.   Up front in the office.

13  Q.   How many employees were there at the veterinary

14  practice?

15  A.   A few up front, and then there was a technician in the

16  back along with another doctor.  I don't know exactly how

17  many.

18  Q.   Well, how many veterinarians were at the practice?

19  A.   Just Dr. Leveto and Dr. Fox.  At one time, we had a

20  doctor come up from Mercer County fill in.  I am not sure of

21  the name.  Dr. Sanders,(Sp) I think.  I am not sure of the

22  name.  And way back when this started, there was, of course,

23  Dr. Langdon and there was Dr. Huff, H-u-f-f.

24  Q.   By 1990, were the veterinarians at the clinic basically

25  just Dr. Leveto and Dr. Fox?

Jeannerett - Direct(By Mr. Voracek)        9

1  A.  I believe so.

2  Q.  And were they the only two veterinarians at the clinic

3  that were actually performing services on animals?

4  A.  Yes.

5  Q.  Now, were all the animals actually brought to the

6  clinic, or were there times where the veterinarians would

7  have to travel to perform services on animals?

8  A.  Not very often.  They would do house calls, but not very

9  often.  And then we did, at one time, have a veterinary

10  clinic in Cambridge Springs and they would travel there to

11  that office.

12  Q.  And how far is Cambridge Springs from Meadville?

13  A.  Probably ten miles.

14  Q.  Did you also work at the Cambridge Springs office?

15  A.  Yes, at one time.

16  Q.  Was your primary place of work, though, in the Meadville

17  office?  Is that where you primarily worked?

18  A.  Yes.

19  Q.  What types of animals were they?  Dogs, cats, birds?

20  A.  Yes, dogs, cats and birds.

21  Q.  Did Dr. Leveto have any particular specialty?

22  A.  No.

23  Q.  How about big animals?

24       You mentioned that, from time to time, he would go

25  out and work on animals.


            Jeannerett - Direct(By Mr. Voracek)          10


1  A.  Well, at the very beginning, they did farm calls.  They

2  would go to the farms for cows and horses.  That was early in

3  the eighties, I believe, but then that stopped.

4  Q.  Would you say by 1991, most of the animals that they

5  performed veterinary services on were done in the hospital?

6  A.  Yes; small animals at the hospital.

7  Q.  Now, we just said hospital.

8       Are there also kennel facilities there at the

9  veterinary practice?

10  A.  Yes, in the back for boarding.

11  Q.  For boarding animals that needed care?

12  A.  Yes.

13  Q.  How about on a regular basis, if people went on

14  vacation, would they just bring their dogs?

15  A.  Sure.

16  Q.  Can you think of any other types of services that the

17  clinic would provide other than the veterinary services for

18  the sick animals, the kennel services and selling supplies?

19  A.  No.

20  Q.  Miss Jeannerett, I am going to pass you a stack of

21  documents.

22       I ask you to look at what's been marked as

23  Government Exhibit 30.  Do you have that in front of you?

24  A.  Yes.

25  Q.  What was Government Exhibit 30?

Jeannerett - Direct(By Mr. Voracek)      11

1  A.  These are daily logs.

2  Q.  Are you familiar with that document?

3  A.  Yes.

4  Q.  How do you recognize this document, Government

5  Exhibit 30?

6  A.  This is a log we kept daily for when a client would come

7  in with their pet and had services rendered, such as an

8  office visit or a surgery, the patient, the client's name was

9   written down with the total amount of their bill that was

10  broken down into the categories.

11  Q.   Government Exhibit 30, does that pertain to a single day

12  or multiple days?

13  A.   It's a single day.

14  Q.   Did you physically make notes or make writings on

15  Government Exhibit 30?

16  A.   I myself, yes.

17  Q.   Was that part of your duties as the office manager?

18  A.   No.  This is -- anybody could.  For whoever took care of

19  a client, they would write the client's name in.  If someone

20  else did it, they would do it.  If they take care of them, if

21  they helped them at the counter, they would come back and

22  write their names down.

23  Q.   Now, does Government Exhibit 30, does that represent one

24  day's receipts at the veterinary practice?

25  A.   Yes.

                Jeannerett - Direct(By Mr. Voracek)           12

1   Q.   Now, could you describe the process of billing a patient

2   after services are rendered by the doctor?

3          Is the staff given a bill to indicate how much to

4   charge the patient?

5   A.   Yes.  Say, for instance, a client came in and they are

6   picking their pet up for surgery, they would be given a bill,

7   they would pay for it, or else if, for some reason, they

8   couldn't afford to pay for it, we would bill them monthly.

9   Q.   How would you know how much to bill a patient?

10          Would you be receiving instructions from the

11   veterinarian as to what services were performed?

12   A.   Well, there is a sheet that the doctors, themselves,

13   would circle and write the amount in, and it's just totalled

14   up and given to the client.

15   Q.   So, after services were performed on an animal, you

16   would then get a sheet from one of the doctors indicating the

17   procedures that were done on that animal?

18   A.   Correct.

19   Q.   So, you were familiar then with the handwriting by both

20   Dr. Fox and Dr. Leveto?

21   A.   Yes.

22   Q.   How often would you see notes and writings by

23   Dr. Leveto?

24   A.   Oh, daily.

25  Q.  Several times a day?

Jeannerett - Direct(By Mr. Voracek)        13

1  A.  Oh, yes.

2  Q.  Now, Government Exhibit 30 indicated that there are

3  names on that document.

4       Do you recognize some of those names as patients of

5  the veterinary practice -- or not patients, but people who

6  brought their animals in for services?

7  A.  Yes.

8       MR. VORACEK:  Your Honor, the United States moves

9  for the admission of Government Exhibit 30.

10      THE COURT:  30 is admitted.

11  Q.  And Miss Jeannerett, I have asked you to look at the

12  first column.  I believe those are the names of the customers

13  of the practice.

14  A.  That's correct.

15  Q.  What is related in the second column?

16  A.  That's the total amount of the bill.

17  Q.  The total amount of the bill.

18      But, does this also reflect the amounts that were

19  actually received by the veterinary practice?

20  A.  Yes.

21  Q.  So, in other words -- well, how was payment made?

22  A.  They paid by cash, check or credit card.

23  Q.  And after payment would be made by cash, check or credit

24  card, would the amounts that the business received be

25  reflected in the second column of that sheet?


            Jeannerett - Direct(By Mr. Voracek)          14


 1  A.  Yes.

 2  Q.  Now, is there also a breakdown with regard to what makes

 3  up that entire payment?

 4  A.  Yes.

 5  Q.  And I see that there are several categories there.

 6       Did you make the determination as to how to break

 7  down the receipt?

 8  A.  Did I make the determination?

 9  Q.  Yes.

10  A.  No.  I mean, if you have a bill in front of you, you

11  would have a -- it says pharmacy, surgery on the bill, and so

12  it is pretty self-explanatory where to break it down then

13  from the bill.

14  Q.  Now, for what purpose did your business keep a running

15  total of the receipts of the business?

16  A.  For what purpose?

17  Q.  Yes.

18  A.  Well, at the end of the day, they total it up and

19  they -- whoever closes that day would make a deposit ticket

20  and --

21  Q.  Now, I see on the second page of Government Exhibit 30

22  there is a total written.  Do you see that?

23  A.  Yes.

24  Q.  Would that reflect the one-day receipts by the

25  veterinary practice for services provided by the veterinary

                    Jeannerett - Direct(By Mr. Voracek)        15

1  clinic?

2  A.  Yes.

3  Q.  And that amount for that one day is what?

4  A.  $1,721.34.

5  Q.  Now, you indicated then at the end of the day that I

6  believe you or another office person would make deposits.  Is

7  that what you indicated?

8   A.   No.  The person that closes out the day would total the

9   day sheet and then add up the cash and checks that they

10  received.  Of course, they should match.  And then they would

11  make the deposit ticket out and then it would be put in the

12  safe.  And then I would go to the bank maybe twice a week

13  with those single deposits, daily deposits.

14  Q.   And you would physically then deposit the cash, the

15  checks and the charge card statements?

16  A.   Yes.

17  Q.   Miss Jeannerett, I now ask you to look at what's been

18  marked as Government Exhibits 31-A, 31-B and 31-C.

19       Do you have them in front of you?

20  A.   Yeah.  I couldn't find them here.

21  Q.   What is 31-A, if you recognize that?

22  A.   This is a log that we keep.  It's a monthly log of the

23  income that's taken from the day sheet, the daily log.

24  Q.   And are there dates reflected in Government

25  Exhibit 31-A?

                 Jeannerett - Direct(By Mr. Voracek)         16


1   A.   Dates?

2   Q.   Yes.

3   A.  Yes.

4   Q.  And what are the dates?

5   A.  The one I am looking at is January, 1991.  Then looks

6   like the whole year 1991 actually.

7   Q.  So, is your testimony that Government Exhibit 31-A is a

8   reflection of the receipt from the veterinary practice for

9   the entire year of 1991?

10   A.  Yes.

11   Q.  And you're familiar with this document?

12   A.  Yes.

13   Q.  Did you work with it on a daily basis?

14   A.  Yes.

15        MR. VORACEK:  Your Honor, United States moves for

16   the admission of Government Exhibits 31-A.

17        THE COURT:  31-A is admitted.

18   Q.  And 31-B and 31-C, are those similar ledgers reflecting

19   receipt from the veterinary practice?

20   A.  Yes.

21   Q.  And for what years are 31-B and 31-C reflective of?

22   A.  The year 1994 and the year 1995.

23   Q.  Is 31-B the 1994 receipt from the veterinary practice?

24  A.  Yes.

25  Q.  And is 31-C the 1995 receipt from the veterinary

Jeannerett - Direct(By Mr. Voracek)          17

1  practice?

2  A.  Yes.

3       MR. VORACEK:  Your Honor, the United States moves

4  for admission of Government Exhibits 31-B and 31-C.

5       THE COURT:  31-B and 31-C are admitted.

6  Q.  Miss Jeannerett, if you have 31-B in front of you, I ask

7  you to open that up and look at the first page.

8       Do you have that?

9  A.  Yes.

10  Q.  And I see that there on the very top is the month of

11  January, 1994.

12  A.  Um-hum.

13  Q.  And you have to answer either yes or no.

14  A.  Oh.  Yes.

15  Q.  I also see that in the first column is a number of

16  numbers, and I believe they go from 1 through 31.

17       What is that reflective of?

18  A.  That's the date.  For instance, January 3rd on the third

19  line, that is the amount we brought in that day on

20  January 3rd.

21  Q.   Now, the first column under the heading small, what is

22  that reflective of?

23  A.   That's the daily deposit that -- that's the daily income

24  that was brought in on that day.

25  Q.   Does that signify the entire receipts that were brought

Jeannerett - Direct(By Mr. Voracek)          18

1  in by the veterinary practice on that day?

2  A.   Yes.

3  Q.   Now, I also see several other columns that are -- and

4  are those the breakdowns of what those receipts --

5  A.   Yes.

6  Q.   -- would actually pertain to?

7  A.   Yes.

8  Q.   Now, how exactly then would Government Exhibit 31-B be

9  prepared?

10       Would it be prepared based on that -- on the daily

11  sheet which you just testified to?

12  A.   Right.  It is just transferred from the daily sheet onto

13  this monthly sheet.

14  Q.  So, thirty -- the 31 series of the monthly sheets is

15  taken from Government Exhibit 30, which was the daily sheet?

16  A.  Correct.

17  Q.  And I ask you if you look down at the bottom of the

18  page, is there a total amount of receipts that were brought

19  in by the veterinary practice for the month of January, 1994?

20  A.  Yes.

21  Q.  And what is that amount, if you can read it?

22  A.  $35,444.48.

23  Q.  I ask you also to look at the breakdown.

24      I see there are several categories on there for

25  different types of services that were rendered by the

Jeannerett - Direct(By Mr. Voracek)        19

1  veterinary practice.  Do you see them?

2  A.  Yes.

3  Q.  It says pharmacy.  Are those medicines that are sold by

4  the practice?

5  A.  Yes.

6  Q.  And professional services, are those the actual care for

7  the animals?

8   A.  Yes; office, visits.

9   Q.  Surgery?

10  A.  Yes.

11  Q.  Now, where would the supplies, the pet supplies that are

12  actually sold by the business, where would they be?

13  A.  They are listed under pharmacy as well.

14  Q.  Under pharmacy?

15  A.  Yes.

16  Q.  Can you read the total amount that was brought in under

17  pharmacy for the month of January, 1994, if you can read it?

18  A.  $8,232.11.

19  Q.  Now, I believe you testified that the total amount of

20  the receipts were 35,000.  Was that your statement?

21  A.  Yes.

22  Q.  And the pharmacy items then amount to about 8,000?

23  A.  Yes.

24  Q.  Is that the same type of percentage of the veterinary

25  practice that you're familiar with, about roughly one-fourth

Jeannerett - Direct(By Mr. Voracek)          20

1   that was taken in from pharmacy items?

2         Does that sound about right?

3   A.   Yes.

4   Q.   I ask you now to look at the second page of 31-B.  What

5   is that reflective of?

6   A.   That looks like the weekly total.

7   Q.   Is the second page of 31-B just taken strictly from the

8   first page of 31-B?

9   A.   Yes.

10  Q.   And it's totalling out the receipts that the veterinary

11  practice brought in for that month?

12  A.   Yes.

13         MR. VORACEK:  Your Honor, if I may have one moment?

14         THE COURT:  Sure.

15  Q.   Miss Jeannerett, I have handed you a number of exhibits.

16         Could you please look at what's been admitted into

17  evidence as Government Exhibit 11-B-2.

18         Do you have that in front of you?

19  A.   Yes.

20  Q.   What is 11-B-2?

21  A.   That's the bank statements.

22  Q.   The bank statements for what account?

23  A.   Center Company doing business as Langdon and Leveto.

24  Q.   And what was the date of that statement?

25  A.   10-31-91.


Jeannerett - Direct(By Mr. Voracek)          21


1   Q.   Miss Jeannerett, as the office manager at the veterinary

2   practice, are you familiar with that bank account?

3   A.   Yes.

4   Q.   And how are you familiar with that account?

5        Did the veterinary practice do its banking at that

6   account that's reflected on 11-B-2?

7   A.   Yes.

8   Q.   And you, as the office manager, I think you testified

9   you would make deposits?

10  A.   Yes.

11  Q.   Deposits of the veterinary receipts?

12  A.   Yes.

13  Q.   Into what account would you make those deposits of

14  veterinary receipts?

15  A.   The Center Company doing business as Langdon and Leveto.

16  Q.   Is it the account that's reflected in Government Exhibit

17  11-B-2?

18  A.  Yes.

19  Q.  And when you would make the deposits, I believe you

20  testified that you would have a sack of the cash, checks and

21  credit card statements?

22  A.  Um-hum.

23  Q.  Is that yes?

24  A.  Yes.

25  Q.  Would you also then make a deposit ticket?

Jeannerett - Direct(By Mr. Voracek)          22

1  A.  For just the check and the cash.  The credit cards went

2  automatically to, I guess, the account.

3  Q.  All right.  And then at the end of every day, would you

4  then physically take the deposit items and the tickets to the

5  bank, or would you do that every two or three days?

6  A.  Just two days a week usually.  I didn't go every day,

7  no.

8  Q.  Now, at the end of the month, would you review the bank

9  statement that's reflected in 11-B-2?

10  A.  Yes.  When the bank statement came, I would do my

11  checkbook.

12  Q.  All right.  What do you mean by doing your checkbook?

13  A.  Make sure it comes out right.

14  Q.  And what are you comparing, if you are comparing

15  anything, the bank statement with?

16  A.  That the -- I would look at the checking account to see

17  the number that was deposited, see that the deposit amount or

18  from these sheets here --

19  Q.  By "these sheets," do you mean Government Exhibits

20  31-A B and C?

21  A.  Right.

22  Q.  The monthly deposit sheets?

23  A.  Um-hum.

24  Q.  Does the accounting -- or as a bookkeeper, do you have

25  a -- are you familiar with the word reconciliation?


            Jeannerett - Direct(By Mr. Voracek)        23


1  A.  Yes.  That is the word I was looking for.

2  Q.  What is reconciliation?

3  A.  Checking your checkbook with the bank statement and

4  making sure that it reconciled.

5  Q.  Now, you indicated that there are Visa, Master card

6  slips, too?

7   A.  Yes.

8   Q.  Did that make your job easier or harder?

9   A.  No.  That was harder.  Like I said, you didn't put those

10  on the deposit.  On the deposit tickets was just the cash and

11  checks, and the credit cards went automatically to a merchant

12  account and then it was deposited into lump sums.

13        Say there were four or five credit card that day,

14  you just get the total of that credit card and you had to

15  break it down and find out.  It was very hard to reconcile.

16  Q.  But, to the best of your ability, you were able to

17  reconcile the veterinary practice receipts?

18  A.  Yes.

19  Q.  Did you determine that from the years 1991 to 1995, that

20  the veterinary receipts were deposited into that account

21  that's reflected in 11-B?

22  A.  Yes.

23  Q.  But, they don't always match up dollar for dollar?

24  A.  Right.  Because of the --

25  Q.  Because of the credit card?

Jeannerett - Direct(By Mr. Voracek)          24

1   A.  Right.

2   Q.  Miss Jeannerett, I now will have you put that aside and

3   pick up what's been marked as Government Exhibit 32-A.

4          Do you have 32-A in front of you?

5   A.  Yes.

6   Q.  What is 32-A?

7   A.  It looks like a monthly ledger of the checkbook ledger.

8   Q.  Are you familiar with that document?

9   A.  Yes.

10  Q.  Was that a document that, or a ledger that you used as

11  an office manager at the veterinary practice?

12  A.  Yes.

13  Q.  How often would you use that?

14  A.  Oh, actually I just prepared them.  I didn't use it

15  personally.  I mean, I didn't use it for anything.

16  Q.  Could you please explain how you prepared it?

17  A.  Um, well at the end of the month, I had write down the

18  month and the year, the total checks paid out, and it looks

19  like I broke them down to different categories and I prepared

20  that monthly and this was given to Dr. Leveto.

21  Q.  Are you looking at 32-A?

22  A.  Yes.  Oh, I'm sorry.

23  Q.  That is mine.

24  A.  Sorry.  Oh, you gave me too much stuff.  Sorry about

25  that.  This is the checkbook ledger.


            Jeannerett - Direct(By Mr. Voracek)        25


1  Q.  32-A is the checkbook ledger?

2       Are you familiar with 32-A?

3  A.  Yes.

4  Q.  Was that used in your duties as an office manager at the

5  veterinary practice?

6  A.  Yes.

7  Q.  And did you prepare any of the entries on the checkbook

8  ledger?

9  A.  Yes.

10  Q.  How often?

11  A.  Daily, whenever a check needed to be written out;

12  sometimes daily; whenever they needed a check written out.

13  Q.  Is this checkbook ledger that's reflected in Government

14  Exhibit 32-A, is that the same type of a document as an

15  individual would have as a check register for their own

16  individual bank account?

17  A.  Yes.  Well, other than -- I am not sure what you are

18  saying.

19  Q.  Well, would the date of the check be reflected on this

20  document?

21  A.  Yes.

22  Q.  And would the payee, the person receiving the money,

23  would that be reflected?

24  A.  It has the check, the date and who the check is written

25  out to.


             Jeannerett - Direct(By Mr. Voracek)          26


1   Q.  And who the check is written out to?

2   A.  Yes.

3   Q.  Does it also include the amount of the check?

4   A.  Yes.

5   Q.  And is it your testimony then that whenever you were

6   making a payment from the veterinary practice, a check

7   payment, that you would make an entry on Government

8   Exhibit 32-A?

9   A.  Yes.

10  Q.  Now, I see there are several pages on Government

11  Exhibit 32-A.

12          Do you have that or do you just have one page, the

13   very first page?

14   A.   Yes.

15   Q.   Is there -- is it stapled?

16   A.   Yes.

17   Q.   And there are other pages stapled to it?

18   A.   Yes.

19   Q.   Is this the way that the checkbook ledger was actually

20   physically prepared over at your veterinary practice, or

21   would it just be one long sheet?

22   A.   It's one long sheet.

23   Q.   So, the staples on the first section of Government

24   Exhibit 32-A, is that long sheet broken down?

25   A.   Yes.


              Jeannerett - Direct(By Mr. Voracek)         27


1   Q.   Well, if you look at the second sheet of the first

2   stapled group, you will see several columns.

3          Do you see those columns?

4   A.   Yes.

5   Q.   And what do those columns signify?

6   A.   They are broken down, such as supplies, equipment,

7   utilities.  That's where, once I write the check out, I would

8   put them in their category where they belong.

9   Q.   You said you put them in the category where they belong.

10       You are writing checks out on behalf of the

11  veterinary practice?

12  A.   Yes.

13  Q.   And are you categorizing the type of expenses in these

14  columns?

15  A.   Yes.

16  Q.   Now, when you categorize the type of expenses, is that

17  something that you are doing off the top of your head based

18  on your knowledge of the clinic, or at somebody's direction?

19  A.   Dr. Leveto told me where things were broken down into,

20  where to put them.

21  Q.   Now, after a while, I assume that when people would buy

22  or when you would make a payment out that you know was for

23  pharmaceutical items, you did it on your own?

24  A.   Correct.

25  Q.   Were there ever times, though, when you would receive a

Jeannerett - Direct(By Mr. Voracek)        28

1  bill to be paid by the practice and you had a question?

2  A.  Yeah, there were times when I didn't know where to put

3  it.  If he was around, available, I would ask him and, if

4  not, I would put it under miscellaneous just because I didn't

5  know where to put it.

6  Q.  So, you would either ask Dr. Leveto or you would put it

7  in a miscellaneous category?

8  A.  Yes.

9      MR. VORACEK:  Your Honor, United States moves for

10  admission of Government Exhibit 32-A.

11      THE COURT:  32-A is admitted.

12  Q.  And if I can have you look at 32-B and 32-C.

13      I would ask you if you recognize those documents?

14  A.  These are also checkbook ledgers.

15  Q.  Checkbook ledgers to what you just previously testified

16  in 32-A?

17  A.  Correct.

18  Q.  Same type of document?

19  A.  Yes.

20  Q.  And you prepared or at least assisted in preparing these

21  documents?

22  A.  Yes.

23  Q.  On a daily basis?

24  A.  Yes.

25  Q.  At the veterinary practice?


            Jeannerett - Direct(By Mr. Voracek)          29


1  A.  Yes.

2  Q.  Does 32-B pertain to a different year than 32-A?

3  A.  Yes.  This is the year 1994.

4  Q.  And 32-C, is that also a different year?

5  A.  1995.

6       MR. VORACEK:  Your Honor, the United States moves

7  for admission of Government Exhibits 32-B and 32-C.

8       THE COURT:  32-B and C are admitted.

9  Q.  Miss Jeannerett, I am going to ask you to put those two

10  aside for the moment and grab back 32-A, 32-A that you just

11  had.

12  A.  Okay.

13  Q.  Do you have 32-A in front of you?

14  A.  Yes.

15  Q.  I believe you testified that that was the checkbook, the

16  check register for the veterinary practice for the year 1991?

17  A.  Yes.

18  Q.  When 1991 began, what was the name of the business that

19  you worked at?

20  A.  At one point, Langdon and Leveto Veterinary Hospital.

21  And then, I am not sure what year, but it was changed to

22  Center Company.

23  Q.  The name of the business was changed to Center Company?

24  A.  Yes.

25  Q.  You don't recall specifically when that was?

                Jeannerett - Direct(By Mr. Voracek)          30

1   A.  No.

2   Q.  I ask you to look at Government Exhibit 31, or sorry,

3   32-A.

4   A.  Okay.

5   Q.  The checkbook.  And can you go down to the entries that

6   began in September of 1991?

7   A.  Okay.

8   Q.  Do you see the entry that's reflective of the date

9   September 5th, 1991?

10  A.  Yes.

11  Q.  And I believe the next column is the recipient of the

12  check from the veterinary practice, correct?

13  A.  Yes.

14  Q.  And who is that check made payable to?

15  A.  Center Company.

16  Q.  And I see, if you go down that same column, are there

17  other checks made payable to the Center Company?

18  A.  Yes.  Several.

19  Q.  Miss Jeannerett, is that your handwriting, Center

20  Company?

21  A.  Yes.

22  Q.  Do you know the purpose of those checks that were

23  written to Center Company out of the veterinary practice?

24  A.  Other than this may be the old Langdon and Leveto

25  checkbook ledger and things were being transferred over to

                Jeannerett - Direct(By Mr. Voracek)          31

1  Center Company.  I'm not sure.

2  Q.  Were these items expensed anyway?

3  A.  I am sorry?

4  Q.  If you look at the second page that's stapled together,

5  can you determine how these checks were expensed?

6        Do you see any particular category that the checks

7   to Center Company were expensed to such as supplies,

8   pharmaceuticals?

9   A.   No.

10   Q.   You don't have expense for a particular category?

11   A.   Not on this sheet.  I mean, I have -- they are not

12   marked expenses.

13   Q.   What are they marked as?

14        THE COURT:  I am not sure she understands what you

15   mean by "expensed."

16        MR. VORACEK:  I'm sorry.

17   Q.   When you were testifying earlier about the checkbook

18   ledger, there were categories that you had, columns, and the

19   columns, the supplies --

20   A.   Correct.

21   Q.   -- and pharmacies.  I was using the word expensed items.

22   I'm sorry.

23   A.   Okay.

24   Q.   But, for these checks that were written to Center

25   Company do you see those same types of headings, supplies,

Jeannerett - Direct(By Mr. Voracek)        32

1  pharmaceuticals?

2  A.   No.  They are Center Company, personal, Magdan, and I am

3  not sure what that one says, but it doesn't look like they

4  are broken down.

5  Q.   Just going back to the first page for a moment.

6        These checks to Center Company all began, I believe

7  around September, 1991?

8  A.   Yes.

9  Q.   You indicated that the name of the business changed at

10  some point?

11  A.   Correct.

12  Q.   Is September, 1991, does that sound about an approximate

13  time that the business name may have been changed, to the

14  best of your recollection?

15  A.   It may have.  I just don't know the exact date.

16  Q.   Well, if you can look at the very next stapled group of

17  documents after the ones that begin September 5th.  Look at

18  the ones that begin September 24th.

19  A.   Okay.

20  Q.   Do you have them in front of you?

21  A.   Yes.

22  Q.  Do you also see check numbers there?  What are some of

23  the check numbers?

24  A.  9187 through 9189.

25  Q.  And who are these checks made payable to?


Jeanneret - Direct(By Mr. Voracek)        33


1  A.  A couple of PennBank and mostly Center Company, and one

2  to Margaret Leveto.

3  Q.  Now, I ask you to look at the very next group, the very

4  next stapled group.  Do you have that?

5  A.  Yes.

6  Q.  And what is the dates of those checks?

7  A.  '93.  '91.

8  Q.  What is the check number for that first check written?

9  A.  1001.

10  Q.  Miss Jeannerett, are you aware, was a different account

11  being used at that time with regard to the veterinary

12  practice?

13  A.  Probably, this may be the Center Company doing business

14  as Langdon and Leveto account.

15  Q.  To the best of your recollection, could this explain why

16  it appears that there are two separate entities for the month

17   of September in the same check register?

18   A.  Yes.

19   Q.  And these checks that are reflected beginning

20   September 3rd, do those appear to you to be expenses or

21   expenses of the veterinary practice?

22   A.  Yes.

23   Q.  Miss Jeannerett, you stated that the business -- that

24   the name changed?

25   A.  Yes.


                Jeannerett - Direct(By Mr. Voracek)          34


1   Q.  And the name change that it used to be, Langdon and

2   Leveto Veterinary Practice --

3   A.  Yes.

4   Q.  -- was that the name on the sign of the building?

5   A.  Yes.

6   Q.  And is that the name in the phone book?

7   A.  Yes.

8   Q.  And your customers, did they know that that's where they

9   were taking their pets to?

10   A.  Yes.

11  Q.  Now, while it was Langdon and Leveto, the veterinarians

12  that actually worked there included Dr. Leveto?

13  A.  Yes.

14  Q.  In fact, in 1995 when you began working there, was

15  Dr. Leveto there at that time?

16  A.  Yes.

17  Q.  What was his position there at that time?

18     Was he an employee?

19  A.  In 1995?

20  Q.  Yes.

21  A.  He was employer, yeah.  He was the boss.

22  Q.  He was the boss?

23  A.  He was the boss.

24  Q.  Did you know him to actually own the business?

25  A.  Of Center Company?  He was --

                Jeannerett - Direct(By Mr. Voracek)          35

1  Q.  In 1985, when you began working there.

2        THE COURT:  You said 1995 before.

3        MR. VORACEK:  Sorry, Your Honor.

4  Q.  In 1985, when you began working there, did you know

5  Dr. Leveto to be the owner of the veterinary practice?

6  A.  Yes.

7  Q.  Did he hire you?

8  A.  Yes.

9  Q.  And are you aware of other people that were hired at the

10  veterinary practice during the 1980's?

11  A.  Yes.

12  Q.  Who would hire them, if you know?

13  A.  Dr. Leveto.

14  Q.  And who would set the times of the business, whether or

15  not it was going to be open on Monday through Friday at

16  various times, whether or not it was going to be open on

17  Saturday?  Who would make that decision?

18  A.  Dr. Leveto.

19  Q.  And who would make the decisions over what type of

20  services and supplies would either be furnished or sold at

21  the business during the 1980's?

22  A.  Dr. Leveto.

23  Q.  Did you ever have -- during the 1980's, did you ever

24  have staff meetings?

25  A.  Yes.

Jeannerett - Direct(By Mr. Voracek)          36

1   Q.   And who would conduct the staff meetings at the

2   veterinary practice?

3   A.   Dr. Leveto.

4   Q.   Would it be your testimony that during the 1980's,

5   Dr. Leveto controlled the business?

6   A.   Yes.

7   Q.   Now, in 1991, or approximately 1991, you have testified

8   that around September, 1991, you see through the ledgers that

9   payments are made to Center Company?

10   A.   Yes.

11   Q.   And you also know that the name changed from Langdon and

12   Leveto to Center Company?

13   A.   Yes.

14   Q.   But, you are not clear of exactly when that happened?

15   A.   Correct.

16   Q.   But, I think you testified that it could have been

17   around September, 1991?

18   A.   Yes.

19   Q.   Do you recall specifically any discussions that

20   Dr. Leveto had at the time that the business name was

21   changed?

22  A.  Yes.  He came to us, I believe in a staff meeting, and

23  told us that he had sold the business to Center Company, but

24  everything would remain the same and he would be the general

25  manager of the company.

Jeannerett - Direct(By Mr. Voracek)          37

1   Q.  So, you had one of your staff meetings, is that your

2   testimony?

3   A.  Yes.

4   Q.  Was there other people there other than just yourself

5   and Dr. Leveto?

6   A.  Yes.

7   Q.  Who was there?

8   A.  The other employees.

9   Q.  Some of the other receptionists?

10  A.  Yes.

11  Q.  The technicians?

12  A.  Yes.

13  Q.  And Dr. Leveto said -- he held a meeting.  Was it

14  specifically to address this issue?  Do you remember?

15  A.  I believe so.

16  Q.  He said that nothing else would change?

17  A.  Yeah.  He said everything would remain the same.  It's

18  just the name would change and he would be the general

19  manager of the business.

20  Q.  He said just the name would change?

21  A.  Yes.

22  Q.  Now, would -- the sign outside the veterinary practice,

23  did that change?  Did that then say Center Company?

24  A.  That did not.  It stayed the same, Langdon and Leveto.

25  Q.  How about in the phone book, did that stay the same?


            Jeannerett - Direct(By Mr. Voracek)          38


1  A.  That stayed the same, I believe.

2  Q.  Langdon and Leveto?

3  A.  Yes.

4  Q.  The bank account?

5  A.  That changed.

6  Q.  That changed?

7  A.  Yes.

8  Q.  Prior to the time that the name changed, was the bank

9  account Langdon and Leveto?

10  A.  Yes.

11  Q.  After the name changed, what was the name of the bank

12  account?

13  A.  Center Company, doing business as Langdon and Leveto

14  Veterinary Hospital.

15  Q.  And was it a different account number or a different

16  account?

17  A.  Yes.

18  Q.  Now after 1991, you worked there through 1997?

19  A.  Yes.

20  Q.  You worked there another six years after the name

21  changed to Center Company?

22  A.  Yes.

23  Q.  During that time after the name changed, until you left,

24  who controlled the day-to-day operations of the practice?

25  A.  Dr. Leveto.


            Jeannerett - Direct(By Mr. Voracek)        39


1  Q.  Who controlled all the firing -- all the hiring and

2  firing decisions, made all those decisions?

3  A.  Dr. Leveto.

4  Q.  Who bought and sold products for the company?

5   A.   I am not sure what you are asking.

6   Q.   Well, from time to time, your company would have to buy

7   products, would they not?

8   A.   Yes.

9   Q.   Did you make some of those purchases?

10  A.   Yeah.

11  Q.   Would they be at Dr. Leveto's direction?

12  A.   Yes.

13  Q.   And after the name changed, who set the office hours for

14  the business?

15  A.   I think it remained the same.  Dr. Leveto.

16  Q.   Office policy, who made that decision?

17  A.   Dr. Leveto.

18  Q.   Did it appear to you, as a regular employee at the

19  veterinary practice, that Dr. Leveto had a boss?

20  A.   I don't believe so.

21  Q.   Did you see anybody physically at the practice that

22  Dr. Leveto had to answer to?

23  A.   No.

24  Q.   Now, you stated that the -- that you were aware that the

25  business name had changed?

1  A.  Yes.

2  Q.  Did Dr. Leveto also indicate to you that the business

3  was sold?

4       Did he use that word at all, sold, or did he just

5  say the name was changed?  Do you remember?

6  A.  No, I don't recall.  I don't know if he said it was sold

7  or if the name was just going to change.

8       I believe he said it was sold, he sold the

9  business, I believe.

10  Q.  To the best of your recollection?

11  A.  To the best of my recollection.

12  Q.  Did Dr. Leveto ever tell you who the new owners of the

13  business were?

14  A.  Just Center Company.  No names, no.

15  Q.  Now, you worked there at the time that the name changed

16  and the business was sold.

17       Do you ever recall a time where new people came

18  into the business inquiring about purchasing the business?

19  A.  No.

20  Q.  And you're up front there at the practice?

21  A.  Yes.

22  Q.  You are meeting people as they come in?

23  A.  Yes.

24  Q.  And you don't recall a time where somebody came in and

25  said, you know, we need to meet with Dr. Leveto, we are

Jeannerett - Direct(By Mr. Voracek)        41

1  interested in buying the clinic?

2  A.  No.

3  Q.  Did you ever encounter anybody who purported or stated

4  that they were now the new owners of the business?

5  A.  No.

6  Q.  During the time you were there, did you answer the phone

7  calls?

8  A.  Yes.

9  Q.  On a regular basis?

10  A.  Yes.

11  Q.  During the time that you were there from 1991 to 1997,

12  did you ever receive a phone call from anyone who advised you

13  that they were the owners of Center Company?

14  A.  No.

15  Q.  Did you also, as part of your duties, open

16  correspondence or letters to Center -- to the veterinary

17  practice?  Was that part of your duties?

18  A.  We'd get the mail in and separate the payments, and the

19  rest of the mail would go to Dr. Leveto.

20  Q.  Do you ever recall receiving any correspondence from

21  anybody who purported themselves to be the new owner of the

22  business?

23  A.  No.

24  Q.  Did you notice any change at all in the operations of

25  the veterinary practice after the business was sold, other

Jeannerett - Direct(By Mr. Voracek)        42

1  than the name change?

2  A.  No.

3  Q.  Miss Jeannerett, I would like to direct your attention

4  again to the payments that were made from the business.

5       I believe you testified to them.  You were looking

6  at a check register?

7  A.  Yes.

8  Q.  And that was one of your duties, to make payments from

9  business?

10   A.   Yes.

11   Q.   Could you explain the process of how you would decide

12   whether or not the business should make a payment?

13   A.   Well, he would give me the mail of bills to do and I

14   would look at the date when they are due and pay them

15   accordingly.

16   Q.   Who would give you the bills?

17   A.   Dr. Leveto.

18   Q.   Did you ever pay any bills on your own without

19   Dr. Leveto giving them to you?

20   A.   No.  They all came from him.

21   Q.   So, all the bills that you made payable from the

22   business were presented to you by Dr. Leveto?

23   A.   Yes.

24   Q.   Was that on a daily basis or every other day, or it just

25   depended?


                Jeannerett - Direct(By Mr. Voracek)          43


1   A.   It just depended, I guess, what mail he had and how

2   often he gave it to me.  I don't know if it was daily or not.

3   Q.   Now, as the office manager, you know how the business --

4   the manner that the business would make payments for the

5   products that they were purchasing?  Was it by cash?

6        Did the business pay cash for their expenses?

7   A.  No.

8   Q.  Did they pay by check?

9   A.  Yes.

10  Q.  Did they pay by credit card?

11  A.  No.

12  Q.  Were there any other ways that the business would pay

13  for expenses other than by check?

14  A.  No.

15  Q.  Would you say that you would have a bill to look at

16  before a check would be written?

17  A.  Yes, I would have a bill in front of me.

18  Q.  And that bill would either be for some type of pet

19  supplies, such as dog food or medicine?

20  A.  Yes.

21  Q.  And you were familiar with those types of bills?

22  A.  Yes.

23  Q.  And you knew that those were the types of bills that

24  were purchasing things that the veterinary clinic needed to

25  operate?

Jeannerett - Direct(By Mr. Voracek)          44

1  A.  Yes.

2  Q.  And you knew how to expense those types of bills pretty

3  much?

4  A.  Yes.

5  Q.  And, Miss Jeannerett, I ask you to look at Government

6  Exhibit 32-B again.

7       Do you have 32-B in front of you?

8  A.  Yes.

9  Q.  And 32-B, I believe you testified, was the check

10  register for the expenses paid by the business for the year

11  1994?

12  A.  Yes.

13  Q.  And the ledger is broken down by check number?

14  A.  Yes.

15  Q.  Miss Jeannerett, I ask you to find check number 4712.

16  A.  Okay.

17  Q.  Do you see 4712?

18  A.  Yes.

19  Q.  And does 4712 indicate that that check was written from

20  the business?

21  A.  Yes.

22  Q.  Who was that check made payable?

23  A.  To Calvary Baptist Christian Academy.

24  Q.  What was the amount of that check?

25  A.  $225.00.

Jeannerett - Direct(By Mr. Voracek)        45

1  Q.  Now, Miss Jeannerett, as the office manager, for what

2  purpose, what business purpose was that check written?

3  A.  That, I believe, was a check written for -- that's where

4  his daughter went to school.

5  Q.  Whose daughter went to school?

6  A.  Dr. Leveto.

7  Q.  Now, did you pay this check on your own?

8  A.  It was given to me.

9  Q.  Given to you by who?

10  A.  Dr. Leveto.

11  Q.  How was this particular check expensed?  Under which

12  column was it broken down?

13  A.  Miscellaneous.

14  Q.  Did you categorize it as a miscellaneous expense on your

15 own, or would that have been at Dr. Leveto's direction?

16 A.  That I don't recall.  Like I said, sometimes he would

17 tell me what the categories were, and if I didn't know, I

18 would put it under miscellaneous.  This one, I don't recall.

19 Q.  But, many of the bills that the business received, like

20 for pet food and pharmaceuticals, you knew where to expense

21 them?

22 A.  Yes.  Yes.

23 Q.  And so if a check is under the miscellaneous category,

24 would it be your testimony that you were unclear as to how to

25 expense that type of item?

Jeannerett - Direct(By Mr. Voracek)        46

1 A.  Correct.

2 Q.  I now ask you to look at, if you can find it, check

3 number 4811.

4 A.  Okay.

5 Q.  Do you have 4811?

6 A.  Yes.

7 Q.  And who received check 4811?

8 A.  I am sorry?

9 Q.  To whom was check 4811 made payable to?

10  A.  Kaufmann's.

11  Q.  And what is Kaufmann's?

12  A.  A department store.

13  Q.  In this area?

14  A.  In Erie.

15  Q.  In Erie?  And how much is that check made payable for?

16  A.  $932.80.

17  Q.  Now, as the office manager, do you ever recall receiving

18  a bill from Kaufmann's with pet food on it or medicines for

19  pets on there?

20  A.  No.

21  Q.  How did you come about making a check payable from the

22  business to Kaufmann's?

23  A.  Dr. Leveto gave it to me.

24  Q.  How did you expense that item?

25  A.  That one is listed under supplies.

                    Jeannerett - Direct(By Mr. Voracek)          47

1  Q.  Now, would you, on your own, have put that check payment

2  under the supply category?

3  A.  No.

4   Q.   At whose direction did you put that check payment to

5   Kaufmann's under the supply category?

6   A.   Dr. Leveto.

7   Q.   I ask you to look at check No. 4718.

8   A.   Okay.

9   Q.   Who is the check number 4718 made payable to?

10   A.   First Card.  F-i-r-s-t, C-a-r-d.

11   Q.   And what was the amount of that check?

12   A.   $2,498.61.

13   Q.   And what supplies or other type of items did the

14   business purchase from the entity First Card, if you know?

15   A.   None.

16   Q.   Well, what is First Card, to the best of your knowledge?

17   A.   I believe it's a credit card company.

18   Q.   And did you pay this, make this check payable for

19   $2,498.00 to First Card on your own as the office manager?

20   A.   He had given me a bill and then I made the check out.

21   Q.   Who gave you the bill?

22   A.   Dr. Leveto.

23   Q.   I ask you to look at 4737.  I believe it's on the next

24   page.  Do you have that?

25   A.   Yes.

Jeannerett - Direct(By Mr. Voracek)        48

1  Q.  And who is that check made payable?

2  A.  To First Card.

3  Q.  What was the amount of that check?

4  A.  $3,982.07.

5  Q.  Is this a 1994 checkbook that we are looking at?

6  A.  Yes.

7  Q.  Do you know if the business, while you were working

8  there, made checks payable to other -- to credit cards other

9  than Kaufmann's and First Card?

10  A.  Other credit cards?

11  Q.  Yes.

12  A.  Yes.

13  Q.  Would it be one or more than one?

14  A.  Oh, more than one.

15  Q.  And every time that the business made a check payable to

16  a credit card, did you do that on your own or were you

17  directed to do it by somebody else?

18  A.  He directed me to pay the bill, the credit card.

19  Q.  And who directed you?

20  A.  Dr. Leveto.

21  Q.  Prior to coming into trial today, Miss Jeannerett, have

22  you had an opportunity to review this check register that you

23  are looking at now?

24  A.  Yes.

25  Q.  And can you tell us what other checks were made payable

Jeannerett - Direct(By Mr. Voracek)          49

1  to credit cards for credit card bills, or for the Calvary

2  Baptist Christian Academy, during the months of January

3  through March of 1994?  Can you recall that?

4  A.  No.

5  Q.  Do you have anything with you that would help you

6  refresh your recollection?

7  A.  Yes.

8       MR. VORACEK:  Your Honor, may the witness refer to

9  a document that categorizes those type of expenses?

10      THE COURT:  She may.

11  Q.  Miss Jeannerett, during January through March of 1994,

12  how many checks were made payable to the Calvary Baptist

13  Christian Academy during that three-month period from the

14  business account?

15  A.  Four.

16  Q.  What were the amounts of those checks?

17  A.  $225.00, except for one, which was $175.00.

18  Q.  And were there also checks made payable to Kaufmann's?

19  A.  Yes.

20  Q.  How many checks?

21  A.  Three.

22  Q.  Were there checks made payable to Chemical Bank?

23  A.  Yes.

24  Q.  What was the amount of the check to Chemical Bank

25  referenced to check No. 4820?

Jeannerett - Direct(By Mr. Voracek)        50

1  A.  $1,440.22.

2  Q.  And how many total checks were made payable to First

3  Card?

4  A.  Four.

5  Q.  And how many checks were made payable to Montgomery

6  Ward?

7  A.  Three.

8  Q.  What was the amount of the check No. 4818 made payable

9   to Montgomery Ward?

10  A.  $466.29.

11  Q.  Were there also checks made payable to American Express?

12  A.  Yes.

13  Q.  How many?

14  A.  Two.

15  Q.  Were there also checks made payable to AT & T Universal

16  Card?

17  A.  Yes.  Two.

18  Q.  How many?

19  A.  Two.

20  Q.  Were there checks made payable to Chase?

21  A.  Yes.

22  Q.  Were there checks made payable to Chase Gold Visa?

23  A.  Yes.

24  Q.  Were there checks made payable to the Credit Card

25  Department?

                Jeannerett - Direct(By Mr. Voracek)        51

1   A.  Yes.

2   Q.  Were there checks made payable to First U.S.A. Master

3   Card?

4   A.   Yes.

5   Q.   Were there checks made payable to Nations Bank?

6   A.   Yes.

7   Q.   What was the amount of check No. 4840 made payable to

8   Nations Bank?

9   A.   $1,013.75.

10   Q.   Were there checks made payable to Private Issue?

11   A.   Yes.

12   Q.   Do you know Private Issue to be a credit card?

13   A.   That I don't know.

14   Q.   You don't know?

15       Were there also any checks made payable to out of

16   that -- out of the business account in the first three months

17   to any flying association?

18   A.   Yes.

19   Q.   And who was that check made payable to?

20       What was the name of the entity to which the check

21   was made payable to?

22   A.   Pennsylvania Flying Association.

23   Q.   What was the amount of that check?

24   A.   $500.00.

25  Q.  Now, did you know the veterinary business to own a


Jeannerett - Direct(By Mr. Voracek)          52


1  plane?

2  A.  Dr. Leveto owned a plane.

3  Q.  How do you know that Dr. Leveto owned a plane?

4  A.  He told us.

5  Q.  Did you ever fly in the plane with him?

6  A.  No.

7  Q.  Did he ever tell you for what uses he made of the plane?

8  A.  No.  He -- I just think he enjoyed flying.

9  Q.  Did you know him to ever use the plane for any -- to go

10  make a veterinary house call in another area?

11  A.  No.

12  Q.  Did he ever tell you any specific places where he may

13  have flown the plane?

14  A.  Um, I think he flew mostly around the area.  I believe

15  he has gone to New Jersey to the ocean.  And then I know one

16  time he went to Virginia to pick his daughter up at college.

17  Q.  Were there also any checks made payable from the

18  business to any automobile company for any automobile type

19  purchase or lease?

20  A.  Automobile, yes, lease.

21  Q.  Were there checks made payable to GE Capital Auto Lease?

22  A.  Yes.

23  Q.  And this is just during the period January through March

24  of 1994, is that true, or were you aware of checks from

25  January through March of 1994 being made payable to

               Jeannerett - Direct(By Mr. Voracek)          53

1  GE Capital Auto Lease?

2  A.  Yes.

3  Q.  How many checks were made payable to that organization

4  or that entity?

5  A.  Well, on this sheet, January through March, there is two

6  here.

7  Q.  What were the amounts of the checks?

8  A.  $980.86.

9  Q.  Were both the checks in the same amount?

10  A.  Yes.

11  Q.  Now, did the business have an automobile?

12  A.  Yeah, there was a wagon at the business.

13  Q.  Station wagon?

14  A.  Yes.

15  Q.  In the year 1994, is this a brand new wagon or is this

16  an older wagon?

17  A.  This was an older wagon.

18  Q.  Do you remember what type it was?

19  A.  No.

20  Q.  An older wagon?  What was the wagon used for?

21  A.  Well, when we had an office in Cambridge Springs, it was

22  used to travel back and forth.

23  Q.  As the office manager, were you aware of any other

24  vehicle, other than the wagon, that the business used for

25  business purposes?

                 Jeannerett - Direct(By Mr. Voracek)          54

1  A.  No.

2  Q.  Were you aware of what type of vehicles Dr. Leveto drove

3  himself?

4  A.  The only ones I am aware of is a BMW.

5  Q.  Now, Miss Jeannerett, have you also had an opportunity

6  to review Government Exhibit 32-C, the check register for the

7  year 1995?

8  A.  Yes.

9   Q.   And specifically with regard to the first three months

10  of 1995, were there checks made payable from the business to

11  Calvary Baptist Christian Academy for that year?

12          And if there is something that helps you refresh

13  your memory, you may use that document.

14          Miss Jeannerett, I focus your attention to check

15  No. 6216 in that ledger.

16  A.   Oh, okay.  Yes.

17  Q.   And who was that check made payable to?

18  A.   Calvary Baptist Christian Academy.

19  Q.   And is this for the year 1995?

20  A.   Yes.

21  Q.   And what was the amount of that check?

22  A.   $240.00.

23  Q.   And, Miss Jeannerett, in your review of the -- your

24  check register prior to trial, did you notice checks made

25  payable to credit card companies, flying associations, other

            Jeannerett - Direct(By Mr. Voracek)        55

1   car companies for the period of January through March of

2   1995?

3   A.   Yes.

4   Q.   And do you have a document up there that would help you

5   refresh your memory with regard to those type of payments?

6   A.   Yes.

7   Q.   Do you have that in front of you?

8   A.   Yes.

9   Q.   During January through March of 1995, how many checks

10   were made payable to the Calvary Baptist Christian Academy?

11   A.   Three.

12   Q.   In what amounts?

13   A.   $240.00.

14   Q.   How many checks were made payable to GE Capital Auto

15   Lease?

16   A.   Two.

17   Q.   In what amounts?

18   A.   $980.86.

19   Q.   Were there also checks made payable to Subaru American

20   Credit?

21   A.   Yes.

22   Q.   How many checks?

23   A.   Three.

24   Q.   What were the amounts of the checks?

25  A.  $569.78.


Jeannerett - Direct(By Mr. Voracek)        56


1  Q.  All three of the checks were in that amount?

2  A.  Yes.

3  Q.  Now, did you know the business to own a Subaru?

4  A.  No.

5  Q.  Did you know Dr. Leveto to own a Subaru?

6  A.  I believe so.

7  Q.  Did you know him to use that Subaru in his -- as part of

8  his practice?

9  A.  No.

10  Q.  I believe you testified earlier that most of the pets

11  were seen at the clinic?

12  A.  Yes.

13  Q.  In 1995, were there house calls made to horses or other

14  animals?

15  A.  No, unless there was a house call; but very seldom got a

16  house call.

17  Q.  Were there checks made payable to Browns Flying Service?

18  A.  Yes.

19  Q.  Were there checks made payable to City of Meadville

20  Airport?

21  A.  Yes.

22  Q.  This is out of the business account?

23  A.  Yes.

24  Q.  What were some of the amounts of those checks made

25  payable to the City of Meadville Airport?


                Jeannerett - Direct(By Mr. Voracek)          57


 1  A.  $252.90, $29.75 and $252.66.

 2  Q.  Were there checks made payable to Franklin Airport

 3  Services?

 4  A.  Yes.

 5  Q.  In what amounts?

 6  A.  $324.16, $135.15 and $67.31.

 7  Q.  Were there checks made payable to Kaufmann's?

 8  A.  Yes.

 9  Q.  How many checks?

10  A.  Three.

11  Q.  Were there checks made payable to Chemical Bank?

12  A.  Yes.

13  Q.  What was the amount of check No. 6225?

14  A.  $1,477.81.

15  Q.  What was the amount of check 6458?

16  A.  $828.20.

17  Q.  During that three-month period January through March of

18  1995, did the business also make payments to First Card?

19  A.  Yes.

20  Q.  How many checks were made payable to First Card in those

21  three months?

22  A.  Six.

23  Q.  What was the amount of check No. 6240?

24  A.  $1,524.26.

25  Q.  What was the amount of check No. 6377?


                Jeannerett - Direct(By Mr. Voracek)        58


1  A.  $1,612.81.

2  Q.  What was the amount of check No. 6507?

3  A.  $937.45.

4  Q.  Now, Miss Jeannerett, we discussed earlier, with regard

5  to 1994, that you would make checks payable from the business

6  for credit cards at the direction of Dr. Leveto?

7  A.  Yes.

8  Q.  Did the same thing also hold true for the year 1995?

9  A.  Yes.

10  Q.  During January to March of 1995, were there checks made

11  payable to Montgomery Ward?

12  A.  Yes.

13  Q.  How many checks?

14  A.  Two.

15  Q.  Checks made payable to American Express?

16  A.  Yes.

17  Q.  How many?

18  A.  Two.

19  Q.  Checks made payable to Chase Gold Visa?

20  A.  Yes.

21  Q.  How many?

22  A.  Three.

23  Q.  Checks made payable to the Credit Card Department?

24  A.  Yes.

25  Q.  How many checks?


Jeannerett - Direct(By Mr. Voracek)        59


1  A.  Three.

2  Q.  Checks made payable to Nations Bank?

3   A.   Yes.

4   Q.   How many?

5   A.   Two.

6   Q.   What was the amount of check No. 6239 made payable from

7   the business to Nations Bank?

8   A.   $1,802.93.

9   Q.   Now, during that same period of January through March of

10   1995, did the business make checks payable to Private Issue?

11   A.   Yes.

12   Q.   How many?

13   A.   Three.

14   Q.   What was the amount of check No. 6226 made payable to

15   the Private Issue?

16   A.   $1,526.42.

17   Q.   And during those same three months, did the business

18   make checks payable to MBNA?

19   A.   Yes.

20   Q.   How many checks?

21   A.   Three.

22   Q.   What was the amount of check No. 6338?

23   A.   $2,693.76.

24  Q.  What about check No. 6479?

25  A.  $3,382.95.

Jeannerett - Direct(By Mr. Voracek)        60

1   Q.  Were there checks made payable to First U.S.A. Bank

2   during that same period?

3   A.  Yes.

4   Q.  What was the amount of check No. 6192?

5   A.  $1,133.87.

6   Q.  And checks made payable to J.C. Penney?

7   A.  Yes.

8   Q.  How many checks?

9   A.  Two.

10  Q.  Miss Jeannerett, I ask you to look at Government Exhibit

11  32-C.  Do you have that?

12  A.  Yes.

13  Q.  I ask you to find check No. 6474.

14  A.  6474?

15  Q.  Yes.

16  A.  I got it.

17  Q.  To whom is check No. 6474 made payable to?

18  A.  Center's Holding Account.

19  Q.  In what amount?

20  A.  8,000.

21  Q.  And when was the date of that check?

22  A.  3-9-95.

23  Q.  Now, for what business product was the veterinary

24  service purchasing from Center's Holding Account?

25  A.  What was it purchasing?

Jeannerett - Direct(By Mr. Voracek)        61

1  Q.  Yes.

2  A.  I don't know.

3  Q.  In what category was that check expensed?

4  A.  Miscellaneous.

5  Q.  And would you have put that amount under the category

6  miscellaneous on your own or would that have been at the

7  direction of another individual?

8  A.  Like I said before, it could have been on my own, or

9  else Dr. Leveto may have directed me to put it there.  I

10  don't recall.

11  Q.  And what about check No. 6561?  Do you have that in

12  front of you?

13  A.  Yes.

14  Q.  And this is another -- does this represent another check

15  made from the veterinary practice?

16  A.  Yes.

17  Q.  And to whom is check No. 6561 made payable to?

18  A.  Center's Holding Account.

19  Q.  And what was the amount of that check?

20  A.  $10,000.00.

21  Q.  And, again, do you know the business purpose on --

22  purpose of that check?

23  A.  No.

24  Q.  At whose direction did you make that check payable?

25  A.  Dr. Leveto.


Jeannerett - Direct(By Mr. Voracek)        62


1  Q.  Did you recall receiving a bill from Center's Holding

2  Account?

3  A.  No.

4  Q.  Center's Holding Account, are you familiar with that?

5  A.  I think that's a checking account that he had.

6  Q.  Was that a different account other than the account

7  that's reflected in the ledgers that you are looking at right

8  now?

9  A.  Yes.

10  Q.  There was -- so, are you testifying that there was an

11  additional account, to the best of your recollection?

12  A.  To the best of my recollection, yes.

13  Q.  Did you have access or were you a signature authority on

14  the Center Company's Holding Account?

15  A.  No.

16  Q.  What about --

17  A.  You mean did I sign the checks?

18  Q.  Yes.

19  A.  No.

20  Q.  Well, what about the account that the veterinary

21  practice is using to put all their money in and to make all

22  payments out, the one that's reflective in these documents

23  32-A, 32-B and 32-C, the main operating account of the

24  business, did you have signature authority over that account?

25  A.  No.  I used a stamp, his signature stamp.

Jeannerett - Direct(By Mr. Voracek)          63

1  Q.  Whose stamp?

2   A.   Dr. Leveto.

3   Q.   Were there other checks made payable -- in your review

4   of the government's evidence, are you aware of other checks

5   made payable out of the business to Center Company's Holding

6   account for the first few months of 1995?  And, if so, is

7   there a document that would help you refresh your memory?

8   A.   Yes, I have something.

9   Q.   Do you have that in front of you, Miss Jeannerett?

10  A.   What year are you looking at?

11  Q.   For January through March of 1995.

12  A.   Yes, I got that one.

13  Q.   And were there checks made payable from the business

14  operating account to Center Company's Holding account during

15  that three-month period?

16  A.   Yes.

17  Q.   How many checks were made payable to the Holding Account

18  during that period?

19  A.   Ten.

20  Q.   What was the amount of check No. 6358?

21  A.   $1,782.00.

22  Q.   And the amount of check No. 6536?

23  A.   $2,079.00.

24  Q.  All right, Miss Jeannerett, we'll move on to a different

25  area now.


        Jeannerett - Direct(By Mr. Voracek)        64


1  A.  Thank you.

2  Q.  Miss Jeannerett, I ask you to find up there Government

3  Exhibit 33-A.

4  A.  Got it.

5  Q.  Do you have it?

6  A.  Yes.

7  Q.  What is Government Exhibit 33-A?

8  A.  This looks like a breakdown of the monthly -- from the

9  -- taken from the -- it looks like just a ledger of the

10  monthly expenses paid out, I believe, for the year 1993.

11  Q.  Is this a document that you're familiar with,

12  Miss Jeannerett?

13  A.  Yes.

14  Q.  Did you prepare this document?

15  A.  Yes.

16  Q.  Does this document reflect the financial activity from

17  the veterinary practice for the year 1993?

18  A.  Yes.

19  Q.  Is this a document that would be prepared at the end of

20  the year?

21  A.  Yeah.  I think I would write down after every month, or

22  it could have been done at the end of the year.  I am not

23  sure if I did it -- monthly broke it down or waited until the

24  end of the year.  I don't recall.

25  Q.  At whose direction did you make this document?

                Jeannerett - Direct(By Mr. Voracek)          65


1  A.  Dr. Leveto.

2  Q.  Do you know for what purpose the document was made?

3  A.  No.

4  Q.  But, this is a document that was created in the ordinary

5  course of your job functions as the office manager?

6  A.  Yes.

7  Q.  And you are familiar with that document?

8  A.  Yes.

9  Q.  And was it maintained at the veterinary practice in the

10  ordinary course of its business?

11  A.  Yes.

12  Q.  Did you have it in a file cabinet that you maintained?

13  A.  Yes.

14  Q.  And it is reflective of the receipts and expenses for

15  the year 1993 of the veterinary practice?

16  A.  Yes.

17       MR. VORACEK:  Your Honor, the United States moves

18  for the admission of Government Exhibit 33-A.

19       THE COURT:  33-A is admitted.

20  Q.  Miss Jeannerett, I ask you to look a little closer at

21  Government Exhibit 33-A, and I see in the first column that

22  there are months.  Do you see that?

23  A.  Yes.

24  Q.  And I believe all twelve months of 1993 are reflected

25  there?

                Jeannerett - Direct(By Mr. Voracek)          66

1  A.  Yes.

2  Q.  I ask you now to look at the next column in which there

3  is writing.  Do you see that?

4  A.  Yes.

5  Q.  What is reflected in that column?

6  A.  Looks like book sales.

7   Q.   And what was -- is there a total for the amount of book

8   sales?

9   A.   Yes.

10  Q.   For that year?

11  A.   Yes.

12  Q.   What was the amount?

13  A.   $68,883.00.

14  Q.   Now, Miss Jeannerett, are you familiar with books being

15  sold by the veterinary practice?

16  A.   Yes.  I knew of that, yes.

17  Q.   Are these books giving people instructions on how to

18  take care of their dogs and cats?

19  A.   No.

20  Q.   What type of books are you familiar with that are sold

21  at the practice?

22  A.   It was a book called Tax Free.  I don't even know the

23  name of it.

24  Q.   It was a tax free book?

25       MR. VORACEK:  Your Honor, if I may, for a moment,

                Jeannerett - Direct(By Mr. Voracek)          67

1   show the witness an exhibit?

2          THE COURT:  Okay.

3    Q.   Miss Jeannerett, we hand you what's been marked as

4    Government Exhibit 43.  Do you recognize that document?

5    A.   It's the book, Tax Free, How The Super Rich Do It.

6    Q.   Have you seen that document before?

7    A.   Yes.

8    Q.   Or that book?

9    A.   Yes.

10   Q.   Is that the book that was sold by the practice or at the

11   practice?

12   A.   Well, at the practice.

13   Q.   Sold at the practice?

14   A.   Yes.

15   Q.   Is it the sales of those books that are reflected in the

16   column, book sales, in Government Exhibit 33-A?

17   A.   Yes.

18   Q.   Do you know how much that book was sold for?

19   A.   I believe at one time it was around $1,200.00, but then

20   it dropped down to, I am not even sure, under $400.00.

21   Q.   Did you sell the book yourself?

22   A.   No.

23  Q.  Do you know who sold the book?

24  A.  Dr. Leveto.

25  Q.  Did he sell it from the practice?


Jeannerett - Direct(By Mr. Voracek)        68


1  A.  From the practice?

2  Q.  Or from the clinic?

3  A.  Yeah.

4  Q.  So, the books were physically present at the clinic?

5  A.  Yes.

6  Q.  How were books purchased?  Did customers come in or call

7  in?

8  A.  They weren't our customers -- veterinary customers, no.

9  Q.  They weren't the regular customers who bring pets in?

10  A.  No.

11  Q.  Well, did other people unfamiliar to the practice come

12  in and request to buy this book?

13  A.  No.

14  Q.  Well, do you know how or do you know who these customers

15  were, how they purchased these books?

16  A.  No.

17  Q.  Was that part of your job responsibility?

18  A.  No.

19  Q.  Do you know whose job responsibility it was over at the

20  veterinary practice?

21  A.  I assume Dr. Leveto.

22  Q.  Was there anybody else over at the veterinary practice

23  that assisted Dr. Leveto in selling these books?

24  A.  Yes.

25  Q.  Who was that?


           Jeannerett - Direct(By Mr. Voracek)       69


1  A.  Beverly Stevens.

2  Q.  Who is Beverly Stevens?

3  A.  She was an employee of Dr. Leveto.  Receptionist.

4  Q.  And you were aware of some of her job functions, as

5  well?

6  A.  Yes.

7  Q.  And you said one of her job functions was to assist in

8  selling this book?

9  A.  Well, not necessarily assisting in selling it.  I think

10  her part was just packaging them up and sending them out to

11  whoever bought them.

12  Q.  In referring back to Government Exhibit 33-A, after the

13  book sale column, we have another column.

14        Could you explain what's reflected in that column?

15  A.  That looks like the total checks that were paid out.

16  Q.  And the total amount of checks paid out, can you read

17  that?

18  A.  Um, it looks like six hundred and -- $686,102.07.

19  Q.  So, out of the business checking account or the total

20  amount of $686,102.00 from the business during the year 1993?

21  A.  Yes.

22  Q.  The next column over, what does -- what is that

23  reflective of?

24  A.  I am not sure if that is the income that was brought in.

25  Q.  Do you know what that column is reflective of?


            Jeannerett - Direct(By Mr. Voracek)        70


1  A.  It may be the income coming in.  There is no heading at

2  the top, so I think it is the income that was brought in.

3  Q.  The income brought in?

4  A.  To the veterinary hospital.

5  Q.  Was that -- are the receipts, also reflective on this

6  document Government Exhibit 33-A, what the business actually

7    brings in for services rendered?

8    A.  Yes, I believe that's the column.

9    Q.  That's that column?

10        What was the total amount of that column?

11   A.  $553,535.79.

12   Q.  Miss Jeannerett, I now ask you to look at what's been

13   marked as Government Exhibits 33-B and 33-C.

14   A.  Okay.

15   Q.  What is 33-B, if you recognize it?

16   A.  It's exactly the same as the other one, only it's the

17   year 1994.

18   Q.  Generated and maintained in the same manner as you

19   testified with regard to 33-A?

20   A.  Yes.

21   Q.  Except for a different year?

22   A.  Right.

23        MR. VORACEK:  Your Honor, the United States moves

24   for the admission of Government Exhibit 33-B.

25        THE COURT:  33-B is admitted.

Jeannerett - Direct(By Mr. Voracek)        71

1  Q.  Now, during 1994, again, examining the documents, the

2  first, the second column, does that again indicate book sales

3  during 1994?

4  A.  Yes.

5  Q.  Are you able to read the total amount of book sales, or

6  is that kind of unclear?

7  A.  It's unclear.

8  Q.  Is it safe to say that the amounts next to each month

9  for 1994 are reflective of the amounts that are brought in

10  from the sale of books?

11  A.  Yes.

12  Q.  The column, the next column over, for the year 1994

13  again, what does that column indicate?

14  A.  That's the total expenses.

15  Q.  What were the total expenses for the year 1994?

16  A.  It a little hard to read, but I think it says

17  $531,698.25.

18  Q.  The next column over, what would that be?

19  A.  It's the total income.

20  Q.  And total income, by that, are those the receipts that

21  the veterinary practice is receiving for services rendered or

22  products delivered?

23  A.  Yes.

24  Q.  And what was the total amount of receipts that the

25  veterinary practice brought in for the year 1994?

Jeannerett - Direct(By Mr. Voracek)          72

1  A.  $547,265.56.

2  Q.  Now, if we examine that column, Miss Jeannerett, and

3  based on your experience in working there on a daily basis

4  during 1994, did it seem to you that the business stayed

5  productive thought 1994?

6       Was there a drop off in business, an add on in

7  business, or was it pretty much the same?

8  A.  Pretty much the same.

9  Q.  And you were there as early as 1985?

10  A.  Yes.

11  Q.  And you were there through 1997?

12  A.  Yes.

13  Q.  And, again, the same type of question:

14       Did the business have any drop-off or substantial

15  increase during that period, or did it day pretty much the

16  same?

17  A.  I think pretty much the same.

18  Q.  So, if we look at a total income of $547,000.00 for the

19  entire year of 1994, that same amount would be expected or

20  brought in during the other years that you worked there?

21  A.  Yeah.

22  Q.  About that same, approximately?

23  A.  Approximately.

24  Q.  So, even during the later years after the business name

25  changed to Center Company, there were still veterinary

Jeannerett - Direct(By Mr. Voracek)        73

1  services provided at the clinic to the same degree that they

2  were provided prior to the name change?

3  A.  Yes.

4  Q.  There wasn't a significant change, was there?

5  A.  No.

6  Q.  And was Dr. Leveto still providing veterinary services

7  at the practice after the name change?

8  A.  Yes.

9  Q.  Still doing surgery and office visits?

10  A.  Yes.

11  Q.  That didn't change at all?

12  A.  No.

13  Q.  Miss Jeannerett, I ask you to look at Government Exhibit

14  33-C.  What is 33-C?

15  A.  The same document, only the year 1995.

16  Q.  I'm sorry.  This document was also generated and

17  maintained in the same manner as to which you just testified

18  in 33-A and 33-B?

19  A.  Yes.

20  Q.  Except for a different year, 1995?

21  A.  Yes.

22  Q.  Standard part of your practice as the office manager to

23  prepare this type of documentation?

24  A.  Yes.

25       MR. VORACEK:  Your Honor, the United States moves

                Jeannerett - Direct(By Mr. Voracek)          74

1  for admission of Government Exhibit 33-C.

2       THE COURT:  33-C is admitted.

3  Q.  Now, Miss Jeannerett, in looking at this document, does

4  this document also reflect that books were sold during 1995?

5  A.  No.

6  Q.  How about the column right after the months, do you see

7  anything in writing there, if you can read it?  Can you read

8  it?

9  A.  The total expenses?

10  Q.  No.  Right before that, I see some writing.

11  A.  Oh.  He has here, books sold.

12  Q.  Is there any amount written underneath that?

13  A.  Looks like $10,098.00.

14  Q.  And the next column over, what is reflected in that

15  column?

16  A.  Total expenses.

17  Q.  And can you read what was the total expenses for the

18  veterinary practice during 1995?

19  A.  I can't read it all, but it looks like $613,000.00, and

20  I can't make out the rest.

21  Q.  $613,000.00 something?

22  A.  Yes.

23  Q.  And the next column over, the total income?

24  A.  Yes.

25  Q.  What is reflected in that column as the total receipts

Jeannerett - Direct(By Mr. Voracek)        75

1   brought in by the practice during 1995?

2   A.   It looks like $581,824.14.

3   Q.   I believe it was your testimony earlier,

4   Miss Jeannerett, when we were talking about some of the

5   expenses paid from the business, you mentioned that there

6   were some business expenses that we talked about that were

7   expensed to the category supplies?

8   A.   Yes.

9   Q.   Do you remember what those expenses were again?

10        Were they credit cards?

11   A.   Credit cards, and we talked about that.

12   Q.   I ask you to look at Government Exhibit 33-C,

13   Miss Jeannerett.

14        Are the expenses broken out there for the

15   veterinary practice for 1995?

16   A.   Yes.

17   Q.   How much in supplies were paid by the veterinary

18   practice during the year 1995?

19   A.   $198,438.70.

20   Q.   Now, as someone that worked there every day during 1995,

21   Miss Jeannerett, were you aware of the business receiving

22  $198,000.00 for supplies during that year?

23  A.  No.

24  Q.  Does that number seem high or low?

25  A.  High.


Jeannerett - Direct(By Mr. Voracek)       76


1  Q.  Very high or just somewhat high?

2  A.  I don't know.  High.

3  Q.  Miss Jeannerett, you spoke about the book earlier,

4  Government Exhibit 43, I believe, that you have up there?

5  A.  Yes.

6  Q.  And you were aware that that was the book that was sold

7  at the practice?

8  A.  Yes.

9  Q.  Do you know who wrote that book?

10  A.  Well, the name Don Turner is here, but I don't know if

11  he was the author or --

12  Q.  Do you know Don Turner?

13  A.  No.

14  Q.  While you were there from 1985 to 1997, did you ever

15  meet Don Turner?

16  A.  No.

17  Q.  He never -- as far as you know, he never came to the

18  veterinary practice when you were there?

19  A.  No, I never met him.

20  Q.  Did you ever speak with Don Turner?

21  A.  Yes.  He would call in and he would ask to speak with

22  Dr. Leveto or Beverly.

23  Q.  How often did Dr. Turner -- or did Donald Turner call

24  into Dr. Leveto's office?

25  A.  I don't know.


Jeannerett - Direct(By Mr. Voracek)          77


1  Q.  Was it on a weekly basis, monthly basis?

2  A.  Maybe weekly.  I don't know.

3  Q.  Did you have any detailed conversations with him besides

4  him just asking to speak with either Dr. Leveto or Beverly?

5  A.  No.  If Dr. Leveto wasn't available or Beverly wasn't in

6  the office, he would just give me the name of someone

7  interested in purchasing the book and I would take that

8  information.

9  Q.  Someone who was interested in purchasing the book,

10  Government Exhibit 43?

11 A.  Yes.

12 Q.  Now, Miss Jeannerett, I ask you to turn to Government's

13 Exhibits 34-A.

14       THE COURT:  Excuse me.  I think this is a good time

15 to take out break.  So, we'll reconvene at eleven o'clock.

16       MR. VORACEK:  Okay.

17 (The jury left the courtroom.)

18 (Court recessed at 10:45 a.m.)

19 (Court reconvened at 11:05 a.m.)

20       THE COURT:  Be seated, please.  Okay, Mr. Voracek.

21       MR. VORACEK:  Thank you, Your Honor.

22            DIRECT EXAMINATION

23 BY MR. VORACEK:

24 Q.  Miss Jeannerett, I ask you to look at what's been marked

25 as Government Exhibits 34-A, 34-B, 34-C and 34-D.


            Jeannerett - Direct(By Mr. Voracek)        78


1       Do you have them in front of you?

2 A.  Yes.

3 Q.  What is 34-A?

4 A.  It looks like an expense ledger for the year 1991.

5 Q.  Are you familiar with that document?

6  A.  Yes.

7  Q.  Did you prepare it?

8  A.  Yes.

9  Q.  Does it relate to the veterinary practice?

10  A.  Yes.

11  Q.  What is reflected with regard to 1991 on Government

12  Exhibit 34-A?

13  A.  It looks like the total expenses for each of the months

14  of 1991.

15  Q.  Only the expenses, or is revenue also reflected?

16  A.  I am sorry?

17  Q.  Is revenue also reflected on that document or just the

18  expenses?

19  A.  Yes.

20  Q.  Revenue, as well?

21  A.  Yes.

22  Q.  And was this document prepared on your own or was it

23  prepared at someone's direction?

24  A.  No.  It was prepared by -- Dr. Leveto asked me to

25  prepare this.

Jeannerett - Direct(By Mr. Voracek)        79

1    Q.   And it's a document that is maintained in the ordinary

2    course of the practice?

3    A.   Yes.

4         MR. VORACEK:  Your Honor, the United States moves

5    for admission of Government Exhibit 34-A.

6         THE COURT:  34-A is admitted.

7    Q.   And 34-B, is that the same type of document?

8    A.   Yes.

9    Q.   Except for a different year?

10   A.   Yes.

11   Q.   And which year is 34-B reflective of?

12   A.   1992.

13   Q.   And 34-C, is that the same type of document?

14   A.   Yes.

15   Q.   It's reflective of the revenue and the expense for the

16   veterinary practice for another year?

17   A.   Yes.  1993.

18   Q.   And 34-D, is that a similar document reflecting the

19   revenue and expenses of the veterinary practice except for

20   another year?

21   A.   Which number?

22  Q.  34-D.

23  A.  Yes.

24  Q.  And which year would that be?

25  A.  1994.

Jeannerett - Direct(By Mr. Voracek)        80

1       MR. VORACEK:  Your Honor, the United States moves

2  for the admission of Government Exhibits 34-B, 34-C and 34-D.

3       THE COURT:  34-B, C and D are admitted.

4  Q.  Miss Jeannerett, I also ask you to look at Government

5  Exhibit 35.  Do you recognize that document?

6  A.  Yes.

7  Q.  Did you prepare it?

8  A.  Yes.

9  Q.  What is Government Exhibit 35?

10  A.  It looks like all the different checking accounts that

11  he had and, um, looks like the balances on certain dates.

12  Q.  Did you prepare this on your own or at Dr. Leveto's

13  direction?

14  A.  Dr. Leveto's direction.

15  Q.  Do you know for what purpose this document was prepared?

16   A.   No.

17   Q.   The document has dates on it, columns and numbers.

18          Do you know what the columns are reflective of?

19   A.   It looks like what the checkbook balance would be for

20   that certain date, it looks like to me.

21   Q.   And what are the dates of Government Exhibit 35?

22          What do they start from and end at?

23   A.   June, '92.  I guess it goes all the way to '95.

24   3-21-95.

25          MR. VORACEK:  Your Honor, the government moves for


          Jeannerett - Direct(By Mr. Voracek)          81


1   admission of Government Exhibit 35.

2          THE COURT:  35 is admitted.

3   Q.   Miss Jeannerett, if we could just examine this document

4   for a minute.

5          You indicated there were several columns on

6   Government Exhibit 35?

7   A.   Yes.

8   Q.   And what's reflective in the first column?

9   A.   The balance of the checking account, Center Company.

10   Q.   And the second column?

11  A.  Langdon and Leveto checkbook.

12  Q.  Langdon and Leveto checkbook?

13  A.  Yes.

14  Q.  Are you familiar about that account?

15  A.  I am assuming that's the old Langdon and Leveto account

16  before it was Center Company account.

17  Q.  Is the Langdon and Leveto account, was that the account

18  that was used for the business receipts and expenses prior to

19  the name change?

20  A.  Yes.

21  Q.  So, if we look at the first line, June 9th, 1992, we see

22  an amount under the Center Company, then we see a amount

23  under Langdon and Leveto.

24      And it is your testimony that that's reflective of

25  the amount that's in that account on that day?

Jeannerett - Direct(By Mr. Voracek)          82

1  A.  I'm assuming that it is.

2  Q.  And what's the next column after Langdon and Leveto?

3  A.  Magdan.

4  Q.  Are you familiar with Magdan?

5   A.   It was another checking account.

6   Q.   Did you have signature authority over Magdan?

7   A.   No.

8   Q.   What's the next column reflective of?

9   A.   Escrow.

10   Q.   And did you know that to be an account?

11   A.   Yes.

12   Q.   Did you have any authority, signature authority over

13   that account?

14   A.   No.

15   Q.   And what's reflective of the next column?

16   A.   Center's Freedom.

17   Q.   Are you familiar with Center's Freedom?

18   A.   This is another account.

19   Q.   Another bank account?

20   A.   Yes.

21   Q.   Now, when you were preparing this sheet here, were you

22   looking at any other documentation in order to prepare it?

23   A.   Probably from a checkbook so to break the amount down.

24   Q.   So, there were checkbooks for Center, L & L, Magdan,

25   Escrow and Center Freedom?

1  A.  Yes.

2  Q.  And --

3  A.  Yes.

4  Q.  And the last column, what is that?

5  A.  Another account called Edge Co.

6  Q.  And did you have signature authority over that account?

7  A.  No.

8  Q.  Miss Jeannerett, you previously testified that you

9  worked in the office for about twelve years, from 1985 to

10  1997?

11  A.  Yes.

12  Q.  And I believe during your testimony regarding how much a

13  patient would be charged for a service, I think you indicated

14  that the veterinarians would make notes on documents to tell

15  you what services they performed?

16  A.  Yes.

17  Q.  And I think you testified that you saw those type of

18  notes written by doctors on a daily basis?

19  A.  Yes.

20  Q.  And during that twelve-year period that you worked in

21   the office, did you gain a familiarity with the handwriting

22   of Dr. Leveto?

23   A.   Yes.

24   Q.   Have you had an opportunity to review the government's

25   exhibits prior to trial?

            Jeannerett - Direct(By Mr. Voracek)          84

1   A.   Yes.

2   Q.   And were you able to identify Dr. Leveto's handwriting

3   on any of those exhibits?

4   A.   Yes.

5   Q.   And did you indicate on the exhibits whether you were

6   able to identify Dr. Leveto's handwriting on any of the

7   documentation?

8   A.   Yes.

9   Q.   What did you do?

10   A.   Initialed them.

11   Q.   Did you actually initial the document itself or did you

12   initial a folder?

13   A.   The folder in which it was in.

14   Q.   So, if your initials are on a folder, does that indicate

15   that you were able to identify Dr. Leveto's handwriting as

16  included on some of the documents within the folder?

17  A.  Yes.

18  Q.  Did you place your initials on any folders where you

19  were not able to identify Dr. Leveto's handwriting?

20  A.  I did not put my initials on the ones that I did not

21  recognize.

22  Q.  Now, prior to trial again, did you go through all the

23  folders again to see which folders contained your initials?

24  A.  Yes.

25  Q.  Are you able to recall which government's exhibits did

Jeannerett - Direct(By Mr. Voracek)          85

1  contain Dr. Leveto's handwriting?

2  A.  Yeah.

3  Q.  Can you recall off the top of your head or do you need a

4  document to assist you?

5  A.  I need a document to assist me.

6  Q.  Do you have something there that would refresh your

7  memory over which documents did contain Dr. Leveto's

8  handwriting?

9  A.  Yes.

10  Q.  What do you have in front of you?

11  A.  It's exhibits identified as containing Dr. Leveto's

12  handwriting by myself.

13      MR. VORACEK:  Your Honor, may the witness use that

14  document?

15      THE COURT:  Yes, she may.

16  Q.  Miss Jeannerett, if you may, would you please just read

17  from that document which exhibits that you have identified as

18  containing Dr. Leveto's handwriting?

19      THE COURT:  Excuse me.  Don't do it too fast

20  because our Court Reporter has to write it down as you say

21  it.

22  A.  Do you want me to read all of them?

23  Q.  Yes, please.

24  A.  70 through 82.  84 and 85.  87, 89, 91 and 92.  94 and

25  95.  97 and 98.  100.  103 and 104.  111, 113 and 114.  120,

            Jeannerett - Direct(By Mr. Voracek)        86

1  122, 125 and 126.  133 and 134.  136, 140, 148 and 150.  152

2  and 153.  161 through 163.  165-A and 165-B.  166-A.  167 and

3  168.  169-B and 169-D.  170.  171-A and 171-B.  172-A and

4  172-B.  174-A and 174-C.  175 and 176.  180 and 182.  187.

5   191.  194.  196 through 198.  200.  202.  204.  206.  210.

6   222.  225.  230 through 250.  252 through 287.  290 through

7   303.  305 through 312.  314 through 317.  319 through 329.

8   332.  334.  340-A.  340-B.  340-C.  341-B.  341-C.  341-E.

9   341-H.  341-I.  342 through 344.  350 through 353.  355.

10  362.  364.  390 through 393.  400 and 401, and 410 through

11  412.

12  Q.  Miss Jeannerett, you testified that as the office

13  manager, you performed banking services on behalf of the

14  veterinary practice?

15  A.  Yes.

16  Q.  You would make deposits and write checks?

17  A.  Yes.

18  Q.  Did you provide any other banking services?

19  A.  Yes.

20  Q.  What types of service?

21  A.  He would ask me to transfer money.  He would have on a

22  piece of paper the account number of which account it was to

23  come out, and then it was written down as to where it was to

24  be transferred.

25  Q.  And "he," who are you referring to?

Jeannerett - Direct(By Mr. Voracek)        87

1  A.  Dr. Leveto.

2  Q.  Now, these transfers, were they in any particular form

3  or manner?

4       Were they done by check, wire or another --

5  A.  They were wire transfers.

6  Q.  They were wire transfers?

7       Is it your testimony that you performed wire

8  transfers on behalf of Dr. Leveto?

9  A.  Yes.

10  Q.  Did you say that you transferred monies from one account

11  to another?

12  A.  He would have it written on piece of paper like what

13  account -- the amount and what account, which checking

14  account it was going to come out of and where it was going,

15  and then I would take it to the bank.

16  Q.  Do you recall where the wire transfers were going,

17  generally?

18  A.  I don't recall specifically.

19  Q.  Do you recall whether or not that these transfers of

20  wires were going into other accounts in the United States or

21  into accounts in foreign countries?

22  A.  I believe foreign countries.

23  Q.  Miss Jeannerett, I now ask you to at Government

24  Exhibit 383.  There is 383-A and 383-B.

25      Do you recognize Government Exhibit 383-A?


        Jeannerett - Direct(By Mr. Voracek)        88


1  A.  Yes.

2  Q.  What is that?

3  A.  It looks like a -- some type of receipt given from the

4  Post Office.  He had me open a Post Office box.

5  Q.  Who had you open the Post Office box?

6  A.  Dr. Leveto.

7  Q.  And is there a date on that document?

8  A.  12-3 of '91.

9  Q.  And what was the name of the Post Office box that you

10  opened?

11  A.  Wayne Co.

12  Q.  And if you look at 383-B, is that another document

13  associated with that same Post Office box?

14  A.  Yes.

15  Q.   And you're familiar with that?

16  A.   Yes.

17        MR. VORACEK:  Your Honor, the United States moves

18  for admission of Government Exhibits 383-A and 383-B.

19        THE COURT:  383-A and B are admitted.

20  Q.   Now, in looking at Government Exhibit 383-A, you

21  indicated that the name of the Post Office Box would be in

22  the name of Wayne Co.?

23  A.   Yes.

24  Q.   And were you directed to use the name Wayne Co. by

25  Dr. Leveto?


              Jeannerett - Direct(By Mr. Voracek)          89


1  A.   Yes.

2  Q.   Do you know Wayne Co.?

3  A.   No.

4  Q.   Is Wayne Co. an employee of the veterinary practice?

5  A.   No.

6  Q.   Did you ever recall speaking with Wayne Co.?

7  A.   No.

8  Q.   And a box number was opened.

9        Can you tell -- determine from that form what the

10   number of the box was that -- the Post Office box that was

11   opened?

12   A.  54.

13   Q.  And you signed for this document or to open this box?

14   A.  Yes.

15   Q.  And now when you open a Post Office box, does the Post

16   Office give you anything in return for making an application?

17        You fill out the application for the Post Office

18   box?

19   A.  Yes.

20   Q.  Do you make payment in order to have a Post Office box?

21   Do you recall?

22   A.  I believe you do, but I don't recall.

23   Q.  Well, does the Post Office box give you a key?

24   A.  Yes.

25   Q.  And the key is for what purpose?

                    Jeannerett - Direct(By Mr. Voracek)          90

1   A.  To get your mail out of the Post Office box.

2   Q.  After you opened the Post Office box, what did you do

3   with the key?

4    A.   I gave it back to Dr. Leveto when I returned.

5    Q.   There is an address under Wayne Co., and that's 95 West

6    View Avenue.  Are you familiar with that address?

7    A.   I believe it's Mrs. Leveto's parents' address.  I

8    believe.

9    Q.   If you look at the second page, which is marked and

10   admitted as Government Exhibit 383-B, the name of the

11   applicant is Karen Jeannerett.  Did you sign that?

12   A.   Yes.

13   Q.   The second line says Wayne Co.  Did you also sign that?

14   A.   Yes.

15   Q.   And is there another name under Wayne Co.?

16   A.   Leonard Adler.

17   Q.   Did you sign that name?

18   A.   No.

19   Q.   Do you know Leonard Adler?

20   A.   No.

21   Q.   Is Leonard Adler an employee at the veterinary practice?

22   A.   No.

23   Q.   Did you ever speak with Leonard Adler over the phone?

24   A.   No.

25   Q.   Did you know whether or not there was a stamp at the

Jeannerett - Direct(By Mr. Voracek)          91

1   veterinary clinic with Leonard Adler's name on it?

2   A.  No, I didn't know that.

3   Q.  Under the name Leonard Adler, is there another name?

4   A.  Dan Leveto.

5   Q.  Did you sign that?

6   A.  Yes.

7   Q.  And if you go further down, I see one additional name.

8       Who was that?

9   A.  Andrew Morandini.

10  Q.  And who is --

11      THE COURT:  I didn't hear your answer.

12      THE WITNESS:  Andrew Morandini.

13  Q.  Who was that?

14  A.  That was Mrs. Leveto's father.

15  Q.  Miss Jeannerett, I now ask you to look at what's been

16  marked as Government Exhibit 96.  Do you have that?

17  A.  Yes.

18  Q.  Government Exhibit 96 has already been admitted into

19  evidence.  Do you recognize that document?

20  A.  No.

21  Q.  It has a name on the first page of the document.

22       Do you see that name?

23  A.  Yes.

24  Q.  Whose name is that?

25  A.  Mine.


           Jeannerett - Direct(By Mr. Voracek)        92


1  Q.  Did you write your name on that document?

2  A.  No.

3  Q.  Is that your handwriting?

4  A.  No.

5  Q.  Do you know anything about this document at all?

6  A.  No.

7  Q.  Miss Jeannerett, I now ask you to look at Government

8  Exhibit 80.  That document has been admitted into evidence.

9       Are you familiar with that document?

10  A.  Yes.

11  Q.  How are you familiar with it?

12  A.  I just recognize it because of my signature.

13  Q.  I see the first part of the document states ALT. Minute

14  No. 6 of Edge Co., A Colato.

15        Does that mean anything to you, Miss Jeannerett?

16   A.   No.

17   Q.   Had you ever heard the word colato before?

18   A.   I've heard of it before, but I don't know what it is or

19   what it means.

20   Q.   Who did you hear it from?

21   A.   Probably through these documents, I guess, when I look

22   at it, the word colato.

23   Q.   Did you read this document before you signed it?

24   A.   No.  Nope.

25   Q.   When was this document dated?


            Jeannerett - Direct(By Mr. Voracek)        93


1   A.   August 23rd, 1991.

2   Q.   Now, you said that you see your name signed to that

3   document?

4   A.   Yes.

5   Q.   And there is also other writing underneath your name.

6   What is that?

7   A.   Notary public.

8   Q.   Were you a notary public at the time?

9   A.   Yes.

10   Q.   And as a notary public, what was your function, to

11   authenticate names or signatures, or what was it?

12   A.   To witness signatures.

13   Q.   To witness signatures?

14   A.   Yes.

15   Q.   And I see other names above your name, Karen Jeannerett.

16       Were those the individuals for whose names you

17   witnessed?

18   A.   I don't recall if, like, for instance, Mary Jo

19   Morandini, I don't recall her -- witnessing her signature,

20   no.

21   Q.   At whose request did you sign this document?

22   A.   Dr. Leveto.

23   Q.   I ask you, Miss Jeannerett, to look at Government

24   Exhibit 90 admitted into evidence.

25       Are you familiar with that document?

Jeannerett - Direct(By Mr. Voracek)       94

1   A.   Other than my signature is on it.

2   Q.   Is this another document that you signed as a notary

3   public witnessing somebody else sign that instrument?

4  A.  Yes.

5  Q.  And who did you witness sign that document?

6  A.  Margaret Leveto.

7  Q.  Did you read this document?

8  A.  No.

9  Q.  Miss Jeannerett, I now ask you to look at Government

10  Exhibit 225 admitted into evidence.

11       Do you have it before you?

12  A.  Yes.

13  Q.  Do you recognize that document?

14  A.  Other than my signature is on it.

15  Q.  This says -- it's entitled Letter of Deposit to the TSB

16  Bank, Channel Islands, Limited.

17       Do you see that on the top?

18  A.  Yes.

19  Q.  Did you read this document at all before you signed it?

20  A.  No.

21  Q.  Did you sign this document, again, as a notary

22  witnessing signatures?

23  A.  I do not believe I witnessed Leonard Adler's signature.

24  I don't even know who he is.

25  Q.  Did you sign this document on or around June 18th of

Jeannerett - Direct(By Mr. Voracek)        95

1  1992?

2  A.  Yes.  That's my handwriting.

3  Q.  And you signed as a notary?

4  A.  Yes.

5  Q.  But, you don't specifically recall signing it witnessing

6  Leonard Adler's signature?

7  A.  No.

8  Q.  At whose direction did you sign this document?

9  A.  Dr. Leveto.

10  Q.  During your time over at the veterinary practice, did

11  you ever hear the term Box Elder?

12  A.  I've heard of it.  I don't know what it is or what it

13  stands for.

14  Q.  Did you ever see anything in writing with Box Elder on

15  it?

16  A.  I don't recall.

17  Q.  Now, you stated that you worked for Dr. Leveto for about

18  twelve years, from 1985 to 1997.

19       And I believe you indicated there was a name change

20  in the business around 1991, about half way through the time

21  that you knew him?

22  A.  Yes.

23  Q.  During that time, did you know where Dan Leveto resided?

24  A.  Yes.

25  Q.  Now, where did he reside?

Jeannerett - Direct(By Mr. Voracek)          96

1  A.  Edgewood Drive, Meadville.

2  Q.  Had you been to his house before?

3  A.  Yes.

4  Q.  You have been to his neighborhood?

5  A.  Yes.

6  Q.  Can you describe Dan Leveto's house and neighborhood?

7  A.  It's a very nice house in a very nice neighborhood.

8  Q.  To your knowledge, did Dan Leveto live at that same

9  house from 1985 through 1997?

10  A.  Yes.

11  Q.  There was no change in residence during that time?

12  A.  No.

13  Q.  And I believe you mentioned a couple of vehicles that

14  Dr. Leveto drove. I think you mentioned a BMW?

15  A.  Um-hum.

16  Q.  Is your answer yes?

17  A.  Yes.

18  Q.  Was there also a -- did you also mention a Subaru that

19  he may have driven?

20  A.  Yes.

21  Q.  Do you know of any other vehicles that Dr. Leveto drove?

22  A.  No.

23  Q.  Now, you noticed Dr. Leveto before and after the

24  business name changed.

25      Did you notice any change in the types of vehicles


Jeannerett - Direct(By Mr. Voracek)       97


1  that Dr. Leveto was driving?

2  A.  I don't recall what he had when I first started there,

3  but then, like I said, I know of the BMWs; him and his wife

4  each had one.

5  Q.  Doctor Leveto and his wife each had a BMW?

6  A.  Yes.

7  Q.  Was this after the name was changed?

8  A.  I believe so. I'm not sure.

9  Q.  Did you know Mrs. Leveto, Margaret Leveto?

10  A.  Yes.

11  Q.  Did you just know her through working at the veterinary

12  practice?

13  A.  Yes.

14  Q.  Did Mrs. Leveto actually work at the business?

15  A.  No.

16  Q.  Do you know whether or not Mrs. Leveto worked at all?

17  A.  She did not work at all.

18  Q.  Did you meet with her socially at all?

19  A.  Christmas parties.

20  Q.  Did you notice whether or not Mrs. Leveto was -- had any

21  jewelry, dressed -- how would you describe her general

22  appearance?

23  A.  She was a very well-dressed lady.  I mean, nothing real

24  fancy, or anything like that.  She was always well-dressed.

25  Q.  Any jewelry?

Jeannerett - Direct(By Mr. Voracek)        98

1  A.  Yeah.  But, nothing more than the usual or --

2  Q.  Did you notice any change in her appearance after the

3   business was sold?

4   A.   No.

5   Q.   Do you know whether or not the Levetos took any

6   vacations during the time that you worked there?

7   A.   Yes.

8   Q.   Was this based on what Dr. Leveto told you?

9   A.   Yes.

10   Q.   Where did Dr. Leveto and his family vacation, to the

11   best of your recollection?

12   A.   I think they went to one of the islands at one time,

13   St. Thomas, I believe.  I don't know if they took Florida

14   trips.  I don't recall.  I know they went over to New Jersey.

15   Q.   Did you know if Dr. Leveto owned any land, any real

16   property other than where his residence was?

17   A.   I think at one time he had land at 322 Conneaut Lake

18   Road.

19   Q.   Are you familiar with that property?

20   A.   No.

21   Q.   Do you know what's located at that property, if

22   anything?

23   A.   No.

24   Q.   And I believe you testified that you did see

25  doctor -- or that Dr. Leveto talked about a plane?

               Jeannerett - Cross                99

1  A.  Yes.

2  Q.  And was the plane, was that after the name change in

3  1991?

4  A.  Yes.

5  Q.  Now, during the entire time that you knew Dr. Leveto

6  from 1985 to 1997, did you notice whether or not Dr. Leveto's

7  lifestyle had gotten any worse or better during that period,

8  or did it stay about the same?

9  A.  Well, I would say it got better only because he owned a

10  plane, I guess.

11      MR. VORACEK:  Your Honor, I have no further

12  questions.

13      THE COURT:  Cross-examine.

14      MR. LEVETO:  Yes.

15          CROSS-EXAMINATION

16  BY MR. LEVETO:

17  Q.  Hi, Karen.  Nice to see you today.

18  A.  Hi.

19  Q.  I just have a few questions.

20        I would like to go back to when you remembered the

21  staff meeting that we had.

22  A.  Um-hum.

23  Q.  Did we have the staff meeting to discuss a name change?

24  A.  Yeah, I believe it was.  I vaguely recall that you

25  brought everybody together to say that, you know, the Center

                  Jeannerett - Cross                100

1  Company -- that you sold the business to Center Company, but

2  everything would remain the same and you would still be the

3  general manager.

4  Q.  So, basically I called the staff meeting to tell the

5  staff that the business was sold and it was sold to Center

6  Company, is that correct?

7  A.  Yes.

8  Q.  Okay.  And the name essentially, as far as clients, as

9  far as the signage, the name really didn't change, is that

10  correct?

11  A.  No.  Right.

12  Q.  A point about your notary work that you did, and did for

13  me.

14          When you signed documents, are you required as a

15   notary to read the documents, or are you just witnessing

16   signatures?

17   A.   Well, I'm sure you have to read the document and witness

18   the signature.  But, as you recall, you asked me to become a

19   notary because you would have several documents that you

20   would need notarized, and so I went ahead and did so.

21   Q.   Yes.  That question wasn't inferring anything.  It was

22   just a question.

23          Did I talk with you over the years that you worked

24   for me about personal business issues?

25          In other words, did you know the deal between


                    Jeannerett - Cross              101


1   Dr. Langdon and I business-wise?  Did you know the details of

2   that deal?

3   A.   The details?

4   Q.   Yes.

5   A.   No.

6   Q.   So, generally speaking, we had a professional

7   relationship of a boss and an office manager?

8   A.  Yes.

9   Q.  Okay.  And the meeting that we had, the staff meeting

10  that we had back in 1991, how would you characterize that,

11  the reason for doing that?

12      I mean, was there fears to allay, or what would you

13  say about that meeting?

14  A.  I am not sure what you are asking.

15  Q.  Did there seem to be a primary reason to bring the

16  employees together?

17  A.  No.  I think you just wanted to reassure everybody that

18  nothing was going to change.  Their job wasn't going to be

19  jeopardized, or anything like that.

20  Q.  Thank you.  Thank you.

21      Let's talk a little bit about paying bills of the

22  practice.  You collected or brought in the mail each day, is

23  that correct?

24  A.  Yes.

25  Q.  And in that mail, did I take all of the mail and give

                   Jeannerett - Cross               102

1   you the bills to pay, or how did that work?

2   A.  No.  I think I sorted the bills that you could tell were

3   payments and give you the rest.

4   Q.   So, payments that you could identify or companies that

5   you could identify, you extracted those and paid those bills,

6   is that correct?

7   A.   Yes.

8   Q.   And --

9   A.   Add up the bills you said?

10  Q.   What's that?

11  A.   No, the bills I did not take out.  I just meant the

12  payments.

13  Q.   You mean payments from people?

14  A.   Yes.

15  Q.   You didn't take out drug company bills for Pfizer --

16  A.   I may have done that.  I may have, knowing that they

17  were --

18  Q.   And I would often give you bills or give you slips and

19  perhaps take money out of the petty cash, or something like

20  that, and I would give you information as to what was

21  purchased with that, is that correct?

22  A.   Yes.

23  Q.   Now, this is a very important saying that I would like

24   to talk about with you, and that is a little bit of a

25   discussion about how the practice paid the bills.  Okay?


Jeannerett - Cross            103


1        You had stated that they were only paid by check?

2   A.  Um-hum.

3   Q.  And I would like --

4        THE COURT:  You have to say yes or no.

5        THE WITNESS:  Yes.

6   Q.  I would like you to perhaps think back at that time on

7   your bulletin board in your office and over where -- do you

8   remember where the Drug Pharmacy was?

9   A.  Yes.

10   Q.   The Drug Pharmacy, sometimes orders would be placed

11   there, is that correct?

12   A.  Yes.

13   Q.   And many times you would place the orders from your

14   office also?

15   A.  Yes.

16   Q.  I would like you to think back and consider the fact

17   that on your office bulletin board, and perhaps in the drug

18   area where you would order, can you remember some credit

19  cards that were posted that had to be renewed every time the

20  companies needed new credit cards, numbers that we would give

21  certain companies to have on file and issued and dates of

22  when they ran out?

23      In other words, where you sat in your office, I

24  would like you to think back to the bulletin board on your

25  right as you sat at your desk and I would also like you --

Jeannerett - Cross          104

1  Pardon me?

2  A.  You have a better memory than I do.

3  Q.  Well, I would like you to think about this, and in the

4  drug -- in the pharmacy area, that little desk where we

5  ordered drugs, you know, there were these post-its there, and

6  where that information was, I would like you to really

7  examine that in your memory because this is a very important,

8  very important issue.

9      Do you recall anything like that?  Do you recall

10  any of the companies that required -- or did any companies

11  require a credit card on file that we called and ordered by

12  telephone?

13  A.  Dr. Leveto, I just don't recall.  It's so many years

14  ago.  There may have been.  There may not.  I don't recall.

15  Q.  I understand.  Sure.  I understand.  Okay.

16      And the ledger, let's see, that was exhibit --

17  let's refresh your memory by the ledger with all the

18  different accounts and balances on it.

19      Okay.  You surely remember that.  That's an easy

20  one to remember, although the numbers perhaps may not be.

21  That was a running total of numerous accounts, is that

22  correct?

23  A.  Yes.

24  Q.  So, it was just dated with balances to those accounts?

25  A.  Right.


                    Jeannerett - Cross              105


1  Q.  When you made transfers sometimes, is it correct that

2  you would make transfers checking account to account?

3  A.  Yes.

4  Q.  Or perhaps wire transfers, if I directed you to do that?

5  A.  Yes.

6  Q.  So, you did do quite a lot of wire transferring, didn't

7  you?

8  A.  Yes.

9  Q.  As a matter of fact, you probably did all of the wire

10  transferring?

11  A.  Probably.

12  Q.  And you did that at my behest, is that correct?

13  A.  Yes.

14  Q.  I mean, it was something that I didn't go down to the

15  bank nefariously or behind the scenes and do things like

16  that, you did that right out in the open, is that correct?

17  A.  Right.

18  Q.  At my direction?

19  A.  Right.

20  Q.  That's very important.

21      Let's talk a second about the Post Office Box.

22      Do you remember anything about Wayne Co.?

23  A.  No.

24  Q.  And when you opened up that box, it was certainly at my

25  direction that you brought the key back to me, right?


Jeannerett - Cross              106


1      We had certain people that could pick up things

2   from that box, is that correct?

3   A.  I don't know who picked up from that box.

4   Q.  I basically had the key, but you were instrumental in

5   opening it up?

6   A.  To be honest with you, I don't recall going back and

7   opening it up, but I may have.  I just don't recall.

8   Q.  But, I am talking about the paperwork.  That was your

9   writing on the paperwork?

10  A.  Oh, yes.  Yes.

11  Q.  Okay.  And do you have remember getting the mail there

12  for me?

13  A.  No.

14  Q.  When I had you do things like that that you didn't

15  understand, was I pretty open with you about it at least, or

16  just ask you to do things?

17  A.  Yes.

18  Q.  Nothing secretive?

19  A.  No.  No.

20  Q.  That's right.  Okay.  Let me see here.

21        So, when it comes to ordering by telephone, you

22  don't remember any of the companies that may have required a

23  credit card on file, any companies like Henry Shine,(Sp),

24  like if I can bolster your recollection, Clipper

25  Specialties(Sp) you know, where --

Jeannerett - Cross                107

1   A.   There may have been, but I just don't recall.  Most of

2   them were paid by check.

3   Q.   To perhaps help a clarification, there were -- and I

4   don't have the exhibit numbers, the summaries of expenses

5   for, like, January to March of 1994, 1995, at the end there

6   were Center Company Holding Accounts, and all of these

7   deposits or transfers out of the checking account.

8        Those seem to be multiples -- they were certain

9   amounts of money, but there were also multiples of $297.00.

10       Does that refresh your recollection perhaps on what

11  those checks may have been?  If we wrote or if you wrote a

12  check out of the Center Company operating account to another

13  account, $297.00, does that remind you of anything, or do you

14  feel that you would know anything about that, or perhaps

15  instead of 297, $594.00 dollars on a particular day?

16  A.   Was that from the books then?  Income from the books and

17  it was taken out, is that what you --

18  Q.  Would that make sense to you?

19        In other words, did they come into the Center

20  Company, the regular account to our merchant account, the

21  credit card merchant account sometimes?

22  A.  Yes.  And it was taken back out.  It was taken back out

23  of the Center -- the regular account into another account.

24        MR. LEVETO:  I believe that is all I have.

25        THE COURT:  Any redirect?


                Jeannerett - Recross              108


1         MR. VORACEK:  Just very few, Your Honor; very few.

2                  REDIRECT EXAMINATION

3  BY MR. VORACEK:

4  Q.  Miss Jeannerett, when Dr. Leveto gave you a specific

5  direction, did you act at his direction or did you question

6  him as to why he was asking you to do something?

7  A.  No.  I just did as he asked.

8  Q.  And Miss Jeannerett, based on your personal experience,

9  have you been to Kaufmann's and Montgomery Ward and J.C.

10  Penney?

11  A.  Yes.

12  Q.  What are those institutions?

13  A.  They are clothing stores and appliance stores and --

14  Q.  Do you know whether Kaufmann's, Montgomery Ward and

15  J.C. Penney sells pharmaceuticals for pets?

16  A.  No, they do not.

17       MR. VORACEK:  No other questions, Your Honor.

18       THE COURT:  Thank you.  You may step down.

19       MR. LEVETO:  I have -- Your Honor, could I have

20  another --

21       THE COURT:  All right.

22       MR. LEVETO:  -- couple questions just based on the

23  redirect?

24            RECROSS-EXAMINATION

25  BY MR. LEVETO:


                        109


1  Q.  Kaufmann's.  Karen, you said that they have appliances

2  and clothing?

3  A.  Clothing.  I don't know about appliances, but I know

4  that Montgomery Ward did, and Sears.

5  Q.  Furniture perhaps?

6  A.  Kaufmann's?  That I don't know.  I don't shop there.

7   Q.   Do you remember the furniture in my office?

8   A.   Yes.

9   Q.   A couch and a chair?

10   A.   Yes.

11   Q.   What were they made out of?

12   A.   Leather.

13   Q.   Nice furniture?

14   A.   Yes.

15       MR. LEVETO:  That is all.  Thank you

16       THE COURT:  You may step down.

17   (The witness was excused.)

18       THE COURT:  This is a good time to stop for lunch,

19   or do you want to call another witness at this time?

20       MS. CALVIN:  The government would like to call

21   James Scarpitti, Your Honor.

22       THE COURT:  I'm sorry?

23       MS. CALVIN:  The government would like to call its

24   next witness.

25       THE COURT:  Okay.


              Scarpitti - Direct(By Ms. Calvin)          110


1        MS. CALVIN:  The government calls James Scarpitti.

2          THE COURT:  We'll go until twelve-thirty.

3          Would you stand here and be sworn, please?

4          THE CLERK:  Raise your right hand.

5                    * * * * *

6          JAMES SCARPITTI, having first been duly sworn,

7   testified as follows:

8          THE COURT:  Have a seat up here, please, give us

9   your name and spell your last name.

10         THE WITNESS:  My name is James Scarpitti.

11   S-c-a-r-p-i-t-t-i.

12         THE COURT:  Thank you.

13                    DIRECT EXAMINATION

14   BY MS. CALVIN:

15   Q.  Mr. Scarpitti, would you give us the city and state

16   where you reside?

17   A.  Edinboro, Pennsylvania.

18   Q.  And what is your educational background?

19   A.  I have a BA in accounting from Mercyhurst College.

20   Q.  And are you a practicing accountant today?

21   A.  Yes, I am.  I am also a certified public accountant

22   practicing in Pennsylvania.

23  Q.  Where in Pennsylvania do you practice?

24  A.  I practice in Edinboro.

25  Q.  Do you have your own firm?


            Scarpitti - Direct(By Ms. Calvin)          111


1  A.  I have a firm with three other partners.  We have

2  offices in Erie, Edinboro and Corry.  We have about thirteen

3  employees, and my three other partners.

4  Q.  And would you describe for us what kind of accounting

5  work your particular practice is?

6  A.  We do many things, but I personally primarily focus on

7  small businesses, individuals and taxation.

8  Q.  Preparing tax returns?

9  A.  Quite a few.  I am responsible for a couple hundred

10  individual returns and probably seventy, seventy-five

11  partnership business returns.

12  Q.  Is that per year?

13  A.  Per year.

14  Q.  And do you happen to know the defendant, Daniel Leveto?

15  A.  Do I know him?  Yes.

16  Q.  And how is it that you know him?

17  A.  I met Dr. Leveto, I believe, very early on in my

18  practice.  In the mid-eighties, I believe I was introduced to

19  him, I think, by a financial planner type person.

20  Q.  Did he eventually become a client of yours?

21  A.  Yes, he did.

22  Q.  And do you know him to be a veterinarian?

23  A.  Yes.

24  Q.  And what was the name of his veterinarian practice when

25  you started working with him?

Scarpitti - Direct(By Ms. Calvin)          112

1  A.  I believe it was Langdon and Leveto Veterinary Practice.

2  Q.  Now, do you know what role Dr. Langdon had in Langdon

3  and Leveto at that time?

4  A.  None.  I believe he acquired it from Dr. Langdon.

5  Dr. Leveto was a sole proprietor and ran the business by

6  himself.

7  Q.  And when you first started doing work for him, what type

8  of tax entity was Langdon and Leveto?

9  A.  It was a sole proprietor.  That means that he prepares a

10  Schedule C as part of his tax return, which is like you might

11  receive a W-2 from your employer and reports that on your tax

12   return.  He would fill out a schedule that would report his

13   income and expenses, and that's how he would claim his

14   income.

15   Q.  So, Schedule C, in essence, declares what the business

16   activity is, its gross receipts any expenses, its profit.

17        Then what happens to any profit or loss for the

18   business?

19   A.  The profit or loss flows through the front page along

20   with any other sources of income that you might have.

21   Q.  And this would be called other income or business --

22   A.  Actually, there is a line for a Schedule C.

23   Q.  And how long did you work for Dr. Leveto?

24   A.  A number of years.  I would say probably ten or so,

25   from -- again, let me get my dates right.  Mid-eighties --

Scarpitti - Direct(By Ms. Calvin)          113

1   wait a minute.  We started, yes, mid-eighties to

2   mid-nineties, yes.

3   Q.  Now, when you first started working with Dr. Leveto,

4   what type of work did you do for him?

5   A.  We did quite a bit of detailed work.  Accountants do

6   many things.  Sometimes we simply prepare someone's tax

7  returns.  And other times, in Dr. Leveto's case, we actually

8  compiled all of his accounting information.

9        His office would -- he would -- mostly he would, I

10  think, but generated checks, print checks and they get all

11  the internal type things.  But, they would give us, on a

12  regular basis, might have been monthly at first, but I know

13  at least quarterly, that information.

14        When I mean they would give us their checks, that

15  they wrote a summary of what money they took in and we would

16  compile that in the form of a financial statement.  A

17  financial statement is something businesses use to analyze

18  how well they are doing from one period to the next.  And,

19  oftentimes, they will provide it to banks, and so forth.

20  Q.  Did you also have regular meetings with the defendant?

21  A.  I did.  And I recall that only because his office was

22  one-half hour exactly from my house, and we would always meet

23  early in the morning.

24  Q.  At his house or your office?

25  A.  At his office in Meadville.

Scarpitti - Direct(By Ms. Calvin)          114

1  Q.  Would it be fair to say that was -- with all these

2  documents that you are describing, that you got an awful lot

3  of detail which you used?

4  A.  Early on, very much so.  In fact, we even reconciled his

5  bank account.  So, we had enough information in order to do

6  that.

7  Q.  Would you say essentially you were doing the bookkeeping

8  in the early years?

9  A.  Yes.  Yes.  We call it compilation service.  We would

10  compile his numbers and put them in the form of a financial

11  statement.  But, bookkeeping would be correct.

12  Q.  And how long did you receive these very detailed -- this

13  detailed financial information from Dr. Leveto?

14  A.  For many years, I believe.  I think, from looking at

15  some of the information recently, at least the beginning of

16  '91, or so.

17  Q.  And at some point, did you find that the defendant was

18  doing a lot of work himself?

19  A.  Well, we just -- what happened -- and we often encourage

20  this because we charge a fee -- is, we went from a stage

21  where we were doing a lot of the detail work to a point where

22  he was compiling a lot of the information himself.  And I

23   believe at the very end, we actually just received summaries

24   that we would plug right into the tax return.

25   Q.   Now, I would like to go into the background of when you

Scarpitti - Direct(By Ms. Calvin)          115

1    prepare a tax return generally, if you would describe the

2    process that you really do if you are going to prepare an

3    individual return.

4    A.   Sure.  Sure.  We, as many first do have, an organizer,

5    it's a form that we use to gather the information and to make

6    sure that we have accounted for everything.

7         The organizer, once we have helped -- a client has

8    previous information in the children's names, birthdays, what

9    kind of income they had the year before, and it allows us to

10   be sure that we have gathered everything that we knew of, at

11   least in the past.

12        It also prompts us to ask questions, makes us think

13   about things that might save them money, which is hopefully

14   what we'll do.

15   Q.   If you have any questions after your client has filled

16   out the organizer and you have concerns, questions, did you

17  contact the client and find out --

18  A.  Yes.  In our case, too, in almost all of our situations,

19  and this was true in Dr. Leveto's, he would actually complete

20  the organizer based on information he would provide me with,

21  he would either give me original documents or wrote down

22  notes and tell me things I would transfer into our organizer.

23      Our organizer is our proof of where we got the

24  information.

25  Q.  And you referred to, you would discuss it with

                Scarpitti - Direct(By Ms. Calvin)        116

1  Dr. Leveto when you were receiving information that you were

2  going to use for the preparation of the tax return.

3      Did you receive information from anyone else?

4  A.  I don't believe so.  Dr. Leveto was very much on top of

5  his business.  He was very good at what he did, I thought,

6  and I pretty much worked just with him.

7      I may have on occasion called his office and asked

8  for a bank statement, or something of that nature, but pretty

9  much, he provided me all the details.

10  Q.  Now, in your practice, do you prepare tax returns for a

11  number of professions?

12   A.   Yes.  I have the privilege of doing that, yes, ma'am.

13   Q.   And how would you describe Dr. Leveto's knowledge and

14   understanding of the finances and tax matters, as compared to

15   the general professional that you deal with?

16   A.   I have to compliment him and say he is a very, very good

17   businessman.  Most -- I have had a chance to help many

18   veterinarians.  Most of them are great lovers and treaters of

19   dogs and cats, but I wouldn't want to get them anywhere near

20   anything business oriented.

21        And Dr. Leveto, I thought his reputation as a

22   veterinarian was outstanding, and my involvement with him as

23   a businessman, he was very smart.

24        In fact, one of the things I remember distinctly --

25   not a good thing at the time -- was that I generated a

                   Scarpitti - Direct(By Ms. Calvin)        117

1   financial statement that had a mistake in it and Dr. Leveto

2   found the mistake, and that may seem odd, but we do make

3   mistakes, obviously, but most of the time we find our own

4   mistakes.  I can almost count on one hand -- well, it might

5   be two now since I have been in practice a long time -- the

6   number of times a client has found a mistake before we had

7   found it.

8   Q.   So, were you under the impression that, with the

9   documentation that you provided to him, that he went over it

10   very, very carefully and was aware of the contents?

11   A.   Very much so.

12   Q.   Now, did you prepare the Individual Income Tax Returns

13   for Dr. Leveto from 1989 to 1995?

14   A.   Yes.

15   Q.   And where did you prepare those tax returns?

16   A.   I would have prepared them out of our Edinboro office.

17   Q.   I would like to hand you what's in evidence as

18   Government's Exhibits 1-A and 1-B.

19        Do you recognize those documents?

20   A.   Exhibit 1-A is his 1989 tax return that we prepared for

21   him.

22        And Exhibit 1-B is his 1990 Individual Income Tax

23   Return that we prepared.

24   Q.   And the 1989 tax return, did you sign that as the

25   preparer?

Scarpitti - Direct(By Ms. Calvin)        118

1  A.  Yes.

2  Q.  Does that tax return have the statement, see attached,

3  to it?

4  A.  Yes, it has the statement, see attached.

5  Q.  Now, looking at the Schedule C, you described it as a

6  form for sole proprietorship that described the income of the

7  business for that year.

8      Would you describe for us what's reflected on that

9  Schedule C for 1989?

10  A.  Sure.  Again, Schedule C is, as the screen shows, is a

11  summary of his business activity.  It lists his gross

12  receipts, approximately $530,000.00.

13      Then it lists various expenses that, as deductions,

14  and it ends up he ended up making $137,000.00 that year.

15  Q.  And then I believe it was your testimony that that

16  figure, that is transferred to the front?

17  A.  That number carries forward to the front page of the

18  1040 on line twelve, business income, attach Schedule C.

19  Q.  I would ask you to look at what's in evidence as

20  Government Exhibit 1-B.  That's a 1990 tax return?

21  A.  Yes.

22  Q.  Did you sign that return as the preparer?

23  A.  Yes.

24  Q.  That also had a Schedule C attached to it?

25  A.  Yes, it does.

Scarpitti - Direct(By Ms. Calvin)         119

1  Q.  What does that Schedule C reflect?

2  A.  That Schedule C shows income of about $567,000.00, or

3  gross receipts of 567, with a net profit of $177,000.00

4  roughly.

5  Q.  And does that figure of $177,000.00 transfer to the

6  front of the 1040?

7  A.  It does.

8  Q.  Line twelve?

9  A.  Line twelve.

10  Q.  Now, when you were preparing these tax returns, what

11  type of documentation were you receiving?

12  A.  I believe at that time we were again compiling detailed

13  information, or information from Dr. Leveto.  Again, it would

14  have to have been enough detail to at least reconcile the

15  banks accounts where we would have known what checks he

16  wrote.

17          I don't think we ever got detailed deposits, or

18   anything like that.  Dr. Leveto would make all of his

19   deposits internally and then would give us a summary.

20          But, again, enough detail to reconcile his bank

21   account so we would have known every deposit that he made.

22   Q.  Now, in 1991, did you talk with Dr. Leveto about the

23   sale of his business?

24   A.  I believe I did, yes.

25   Q.  And would you describe the nature of the conversation

                 Scarpitti - Direct(By Ms. Calvin)          120

1   that you had with Dr. Leveto?

2   A.   Yes.  It was a fairly memorable conversation because, I

3   believe, in a regular morning meeting with Dr. Leveto, he

4   mentioned to me that he had done some research or had found

5   out something in the tax law that would allow him not to pay

6   taxes, and it was called a UBO.

7          One of the reasons I distinctly remember that is, I

8   had no idea what a UBO was.

9          THE COURT:  Are you saying UB as in baker?

10          THE WITNESS:  Yes.  U as -- UB, as in baker, O,

11   yes.

12        And I believe I asked him -- I think it stood for

13   unincorporated business organization.  And two reasons I

14   remember this so well is, I never heard of it.  And the

15   second reason was, he indicated to me that when he went to

16   the bank to open up a bank account, the signature account

17   didn't have a box.

18        Usually, you have to check whether you are a

19   partnership or individual or corporation, and there was no

20   box for UBO.  There wasn't one.

21   Q.   Did he also ask you to review the agreement of the sale?

22   A.   Yes.  Yes.  Well, let me -- I should back --.  I think

23   we should back up and say, because I was uncomfortable with

24   the concept of a UBO, I kind of declined at that point to

25   proceed, which was fine.


                Scarpitti - Direct(By Ms. Calvin)          121


1         He was very -- you know, he said, fine.  Don't.  I

2    will be able to handle that part of things.  And it was

3    actually subsequent to that then that he asked me to review

4    the sale of his practice to Center Company.  I don't believe,

5    although I may have known at the time, I know I didn't

6   remember until 2000, until the year 2000 that I knew that was

7   the UBO.  In fact, I think it was.

8   Q.  Did you happen to tell him whether or not you wanted to

9   be involved in anything with the UBO?

10  A.  No.  And, again, only because we really try to do only

11  things that we are very good at.

12       Having never done a UBO, I wasn't -- I just wasn't

13  going to be capable of helping.

14  Q.  But, at the time you were reviewing the sales agreement,

15  you weren't aware that --

16  A.  I don't think that I was.  But, even if he was -- if he

17  was selling it -- if he was selling his practice, it

18  didn't -- it would not matter to me, if I represented

19  Dr. Leveto, who or what I was selling it to.  As long as we

20  reported the sale correctly on Dr. Leveto's return, I would

21  be comfortable.

22  Q.  Now, for what reason would you be reviewing a sales

23  contract, not for legal advice, or anything of that nature?

24  A.  No.  We get called in to review a sale because it is

25  very -- there is -- you can pay a significant -- there can be

Scarpitti - Direct(By Ms. Calvin)        122

1   a significant difference in tax based on how a selling price

2   is allocated.

3         If you sell your business to somebody for

4   $200,000.00, how you break out that $200,000.00 will

5   significantly affect how much tax you pay.  You can pay

6   anywhere, ballpark, from 30,000 to $70,000.00 in tax on the

7   same selling price, depending on how you break out the sale.

8         So, as accountants, we are brought in there to try

9   and break it out into our client's advantage.

10        Now, unfortunately -- or I guess not

11  "unfortunately --" but, if it's to the seller's advantage, if

12  the seller is going to pay his tax by breaking it out a

13  certain way, usually the buyer doesn't get as good a

14  write-off.

15        So, what's good for the seller is usually bad for

16  the buyer, and that requires some negotiations.

17  Q.   And your role is to look it over to see if it would be

18  beneficial from the standpoint of Dr. Leveto?

19  A.   Right.  I was representing Dr. Leveto as a seller of his

20  practice.

21  Q.   I am going to hand you what's been marked as Government

22  Exhibit 340-C and Government Exhibits 92, which is in

23  evidence, and ask you if you recognize these documents?

24  A.  Yes, I do.

25  Q.  What is Government Exhibit 340-C?

          Scarpitti - Direct(By Ms. Calvin)       123

1  A.  340-C is a draft agreement to sell, agreement between

2  Dr. Leveto and Center Company, and it just says Center

3  Company.

4        THE COURT:  Excuse me.  What number is that?

5        THE WITNESS:  340-C, as in cat.

6        THE COURT:  Okay.

7  Q.  Is this the agreement that you reviewed?

8  A.  Yes.  And the reason that I know that is, there is a

9  worksheet attached to this that was taken from our

10  workpapers, I believe, that indicates questions that I wrote

11  and indicates that I talked with Dr. Leveto on November 7th

12  and made some suggestions pertaining to this agreement.

13        MS. CALVIN:  Your Honor, we would move for

14  admission of Government Exhibit 340-C.

15        THE COURT:  340-C is admitted.

16  Q.   Now, after reviewing that particular document, did you

17  have some recommendations as to changes that would be more to

18  Dr. Leveto's advantage?

19  A.   Yes, I did.  This document had a large portion of the

20  selling price being allocated to furniture and equipment.

21  And that's one of those items that as a seller, if you have

22  to, if you receive a lot for your furniture and equipment,

23  that you probably will be writing off, from a tax standpoint

24  you pay a lot higher tax than if you received -- if you

25  allocate that price towards a category, for instance,

Scarpitti - Direct(By Ms. Calvin)        124

1  goodwill, a technical term, but it's a lower tax.

2        So, I suggested to Dr. Leveto that we allocate that

3  price differently lowering how much was assigned to equipment

4  and raising how much was assigned to goodwill and this would

5  save him money.

6  Q.   And did you express to him that this would be your

7  recommendation, but it might not be acceptable to the buyer?

8  A.   I can't specifically remember, but I am sure that I

9  think that I did.

10       Well, you know, when I think about it, I do

11  remember that now, because when we explain to people that

12  this is how we like you to do it but, you know, the buyer is

13  going to be unhappy with it, he had indicated that the buyer

14  wouldn't care.

15       Now, that is not a weird statement because if a

16  buyer is buying something at the right price, the buyer isn't

17  going to care.  All right.

18       So, if I have -- if I could acquire a McDonald's

19  for $10.00, I wouldn't care how much -- how it got allocated.

20  Q.  But, as far as this particular allocation goes, is it

21  safe to say it was very much in Dr. Leveto's favor?

22  A.  Yes.

23  Q.  And looking at the agreement, who does it say was going

24  to be looking at background -- I recognize the fact that you

25  were only doing the financial aspect.  But, do you see where

              Scarpitti - Direct(By Ms. Calvin)        125

1  it says in the first paragraph, background, who are going to

2  be the United States Consultants for this particular

3  business?

4  A.  Well, the first paragraph -- and this is when I should

5    have realized, if I didn't at the time, what this UBO was all

6    about.  It says that Center is an unincorporated business

7    organization with its principal office in Box 155, Grand

8    Turk, Turks and Caicos Islands, British West Indies, and with

9    Don Turner and Paul Harris and Alvin Kuntz(Sp) as the United

10   States Consultants.

11   Q.   But, at the time, you weren't aware?

12   A.   Again, and maybe it's a fault on our part, but when we

13   would review legal documents, we don't -- I don't look at the

14   legal stuff because that's what attorneys are for.  I look at

15   the accounting portion of it.

16   Q.   And what was the sale price for --

17   A.   The sale price was $230,000.00.

18   Q.   And how much money was the defendant to receive as a

19   downpayment?

20   A.   I believe zero.

21   Q.   Did you ever meet the buyer or talk with him?

22   A.   No, not to my knowledge.

23   Q.   Do you -- sometimes when a small business is being sold,

24   are you part of the negotiations?

25   A.   Very much so.  Again, because of this concept of, what

1  is good for one is bad for the other, we are often a part of

2  that.  We will often talk with the seller's attorney or

3  mediate with the seller's -- excuse me -- buyer's attorney.

4  And in this case, I don't even think I spoke with the buyer's

5  attorney.

6  Q.  Is that unusual?

7  A.  It is not unusual, no.

8  Q.  Do you sometimes, you know, even go so far as go to

9  closings?

10  A.  Yes.  Yes.  Yes.

11  Q.  Did you do so here?

12  A.  No.

13  Q.  As far as not receiving any downpayment whatsoever, how

14  many sales of small businesses would you say you have been

15  involved in over the years?

16  A.  A hundred or more.

17  Q.  Have you ever seen another sale of a small business

18  without a downpayment?

19  A.  The only -- maybe one, maybe from a father to a son, but

20  that would be very, very uncommon.  It would be uncommon for

21    two reasons.

22        There are, of course, taxes associated with the

23    sale even if there is no payment received.  So, you want to

24    get some money to pay your taxes.

25        And then, secondly, there is risk involved, what if

                Scarpitti - Direct(By Ms. Calvin)        127

1    you sell your business and before you get any money, the

2    seller, you know, makes a mess of it.

3    Q.   Now, after the sale of a small business, who controls

4    the business income or receipts?

5    A.   The buyer would be -- after the sale, everything is the

6    buyer's.

7    Q.   And you have seen businesses where a business is sold

8    and the prior owner stays on as a general manager?

9    A.   Yes.  Yes.  In fact, part of the selling price, I

10    believe, included an arrangement for Dr. Leveto to stay on.

11    Q.   And but when that happens, that person could still have

12    some use of the bank account, is that correct?

13    A.   It wouldn't be uncommon for -- again, if we are using

14    this example for Dr. Leveto to be -- to act in a fiduciary

15    responsibility, that is, to take in the money just as he

16    always did and deposit it and pay bills, and so forth.

17         But, all of that information would, at that point,

18    get reported on the buyer's financial statements and on the

19    buyer's taxes.

20    Q.   Now, you used a term there, that he would have a

21    fiduciary responsibility to the buyer.

22         Would you describe that a little bit?

23    A.   Well, none of that money would be his at that point.  It

24    would all -- all that activity, when we looked at the

25    Schedule C earlier and show the revenues and compensations,

              Scarpitti - Direct(By Ms. Calvin)         128

1    that would no longer show up on his return.  That would all

2    show up on the buyer's return.

3    Q.   But, what would happen to the actual receipts after the

4    bills are paid?

5    A.   Whatever profit was left would end up in the buyer's

6    pocket, I guess.

7    Q.   So, to use an example, I believe, say of McDonald's,

8    that you can sell it, but what happens to the money?

9    A.   Oh, sure.  Yeah.  I mean, yeah, all the activity that

10  happens at McDonald's when you go in, all kinds of people

11  handle the money and cash registers, the whole nine yards.

12        But, when it is all done, the corporation gets the

13  net result.

14  Q.  And it would not be up to somebody working there to put

15  the money in their pocket?

16  A.  No.  That would be bad.

17  Q.  Would that be against the fiduciary responsibility?

18  A.  Yes.

19  Q.  If you were to learn that someone never relinquished

20  control or use of the monies, what would that tell you about

21  the sale?

22  A.  This -- well, this would either tell me that there

23  wasn't a sale or that that person was stealing from the

24  buyer.

25  Q.  I would like to flush out the UBO aspect just a little

                    Scarpitti - Direct(By Ms. Calvin)        129

1  bit more, that discussion.

2        When he first brought it up and you said you didn't

3  know anything about it, what was his response?

4  A.  I don't remember it being bad.  He indicated to me -- I

5    probably questioned it first and said, are you sure?  And he

6    said yes.

7           And I -- there was some discussion that it was --

8    it was -- I said, how come everybody doesn't do it?  And he

9    said, it's just not something that everybody knows about.

10   But, he was very nice, nice guy.

11   Q.   And have you heard about a UBO since then, other than in

12   this document?

13   A.   No.

14   Q.   Did you ask any of your partners if they had ever heard

15   of it?

16   A.   I sure did because it sounded interesting, to say the

17   least.  And, you know, a number of my partners were aware of

18   it, and I believe I even made calls outside our firm because

19   in the area of our firm, I'm the tax guy, so it didn't -- you

20   know, I just wanted to make sure that it wasn't something

21   that they had heard of.

22   Q.   Does the term colato mean anything to you?

23   A.   Colato?

24   Q.   C-o-l-a-t-o.

25   A.   No.

1   Q.   Never heard of it?

2   A.   No.

3   Q.   Never discussed it with Dr. Leveto?

4   A.   No.

5   Q.   Now, after the sale of the practice, did you continue to

6   prepare tax returns for Dr. Leveto?

7   A.   Yes, I did.

8   Q.   And did you prepare the 1991 tax return?

9   A.   Yes, I did.

10  Q.   Would it have been your practice to maintain work pages?

11  A.   Yes.

12  Q.   I am going to hand you what's been marked as Government

13  Exhibit 340-H.

14        I will ask you to review it and ask you if you

15  recognize that document?

16        THE COURT:  What number was that?

17        MS. CALVIN:  340-H.

18  A.   340-H is -- looks like many, many of the workpapers from

19  our files for his 1991 tax return.  It includes the return,

20  itself, and the organizer that we used to compile the

21  information, as well as a number of documents that Dr. Leveto

22  generated for us or provided us with, as well as the

23  accounting data that we gathered through the year for him.

24  Q.   And did you prepare that tax return?

25  A.   Yes.

Scarpitti - Direct(By Ms. Calvin)          131

1  Q.   And does that have a Schedule C?

2  A.   Yes.

3        MS. CALVIN:  If I can have one moment.

4        MR. LEVETO:  I'm sorry.  What number was that?

5        MS. CALVIN:  340-H.

6        MR. LEVETO:  Thank you.

7  Q.   Now, I am going to hand you what's been marked as

8  Government Exhibit 1-C, which is in evidence.

9        Now, did you prepare that tax return?  Is that the

10  one that you prepared?

11  A.   Yes.  This is the 1991 1040 which we prepared.  I

12  prepared.

13  Q.   Does that have a Schedule C?

14  A.   Yes.

15  Q.  What were the gross receipts for that year?

16  A.  1991 gross receipts were $404,000.00.

17  Q.  And net profit?

18  A.  $142,000.00.

19  Q.  Now, does that Schedule C cover the entire year or just

20  part of the year?

21  A.  I believe just part of the year because the business,

22  based on other information in this return, was sold that year

23  on July 31st.

24  Q.  And as a result, this only covered the first half of the

25  year?

Scarpitti - Direct(By Ms. Calvin)        132

1  A.  This only reflected seven months.

2  Q.  And did he also declare a wage income that year?

3  A.  There are wages that year of $1,334.00.

4  Q.  Now, is all the information that you used to prepare

5  this return, did that come from Dr. Leveto?

6  A.  Yes.

7  Q.  And was that information contained in 340-H?

8  A.  Yes.

9  Q.  Did he provide you with a summary of those documents so

file:///A|/LEVETO-5.TXT

10  that you could prepare that return?

11  A.   Well, there were pieces that we had generated because we

12  had done a bookkeeping, as you called it, for the first part

13  of the year.

14       But, then for July, for instance, at that point, we

15  weren't doing anything bookkeeping-wise so he provided us

16  with a summary of July's information.  And we -- we added up

17  July's, added it to the information that we previously had,

18  and prepared his -- well, gathered other information and

19  prepared his tax return.

20  Q.   Now, did he ask you to help him get the information

21  ready so that Center Company could prepare a tax return?

22  A.   He did.  For at least a couple of years, we -- we -- I

23  mean, the earlier that we use an organizer to prepare

24  returns -- well, Center Company's accountants used an

25  organizer as well, so he would give us information and we

                Scarpitti - Direct(By Ms. Calvin)        133

1  would put it in the organizer in a way that would make it

2  easier for Center Company's accountants to prepare the taxes.

3  Q.   I am going to hand you what has again been marked as

4   Government Exhibits 340-G-1 and 2.

5        THE COURT:  Were you offering 340-H?

6        MS. CALVIN:  Yes, Your Honor.  We offer it.

7        THE COURT:  340-H is admitted.

8        THE WITNESS:  340-G-1 and 2 is Center Company's

9   organizer and a note from Dr. Leveto telling me to do what I

10  can do with the numbers, that he needed to wire the funds and

11  send the organizer to the accountant by March 14th.

12        MS. CALVIN:  We'd offer into evidence Government

13  Exhibits 340-G-1 and G-2.

14        THE COURT:  340-G-1 and 2 are admitted.

15  Q.  You mentioned a letter from Dr. Leveto.

16  A.  Um-hum.

17  Q.  And a 1991 tax organizer for Center Company?

18  A.  Yes.

19  Q.  And where were you to send this, or where was the

20  information to be sent?

21  A.  I don't know.  I was just to -- I returned it to

22  Dr. Leveto.

23  Q.  Looking at the worksheet for that tax return, is that

24  your writing on page three?

25  A.  Page three is the page of the organizer that has most of

Scarpitti - Direct(By Ms. Calvin)          134

1   the financial numbers on it, and that is my writing, yes.

2   Q.   When you completed this, what did you do with the

3   document?

4   A.   I would have either mailed it or faxed it to Dr. Leveto.

5   Q.   Did you do anything with the organizer, other than put

6   information into it that had been provided to you?

7   A.   No.

8   Q.   Were you asked to provide any financial advice regarding

9   the 1991 organizer?

10  A.   For Center Company?

11  Q.   Yes.

12  A.   No.

13  Q.   Merely fill in -- put it in a usable form?

14  A.   Yes.

15  Q.   Now, did you also do the 1992 individual tax return?

16  A.   We did Dr. Leveto's individual tax return, but, yes.

17  Q.   And did you do workpapers in preparation of that return?

18  A.   For 1992?

19  Q.   Yes.

20  A.  I can say yes, only because we have support for every

21  tax return we've ever prepared.

22        MS. CALVIN:  If I can have a moment.

23  Q.  I would ask you to look at what's been marked as

24  Government Exhibit 341-B and what's in evidence as Government

25  Exhibit 1-D-1.


                Scarpitti - Direct(By Ms. Calvin)          135


1        Do you recognize those documents?

2  A.  Yes.  341-B, as in boy, is the information we were given

3  to fill out the organizer for Center Company's 2002 tax

4  return, and it includes a reconciliation that I did to make

5  sure that the information that I put on the organizer was

6  reconciled to what information Dr. Leveto gave me.

7        And I am not sure, is it Exhibit 1-D-1?

8  Q.  Is in evidence.

9  A.  Is in evidence.  That is his 2002 personal income tax

10  return.

11        MS. CALVIN:  Your Honor, at this time, we would

12  move for admission of Government Exhibit 341-B.

13        THE COURT:  341-B is admitted.

14  Q.  Now, looking at Government Exhibit 1-D, that's a tax

15  return which was filed.  Does that return have a Schedule C

16  on it?

17  A.  It does not.

18  Q.  And how much income is declared by Dr. Leveto for that

19  year?

20  A.  There is a line on the front page of the tax return that

21  says total income of $2,812.00.

22  Q.  And did he owe any tax for this year?

23  A.  He did not.

24  Q.  Did he?

25  A.  Excuse me.  I'm sorry.  There was no income tax -- there

                   Scarpitti - Direct(By Ms. Calvin)          136

1  were -- there were -- there were additional taxes.  There

2  were -- there were two -- two taxes that he owed.  He -- he

3  took out of -- some money out of a retirement account and

4  there was a penalty associated with that, and then he paid

5  some self-employment tax because he reported -- there was

6  certain income he received from Center Company that was

7  subject to self-employment tax.

8  Q.  And did he declare a salary for that year?

9   A.   He did, yes.  He received -- there is a W-2 attached.

10   He received $5,000.00 from Center Company.

11   Q.   Now, on that tax return, there is also a line, other

12   income, Center Company, $12,394.00.

13   A.   Yes.

14   Q.   Do you know the source of that?

15   A.   Yes, I do.  When we filled out the organizer for Center

16   Company, Dr. Leveto had pointed out that Center Company had

17   made his personal car payments and had also made, I believe,

18   a loan payment, some loan payments to an individual that

19   weren't Center Company's loan, it was Dr. Leveto's loan.

20        And so, since we were aware that Center Company was

21   showing that as a deduction on their return and I am

22   preparing his personal return, we showed it as income on his

23   personal return, because if somebody pays your bills for you,

24   you need to claim it as income.

25   Q.   Now, did you discuss this with Dr. Leveto, that if your

                Scarpitti - Direct(By Ms. Calvin)        137

1   company pays personal expenses for you, it's income?

2   A.   I assume that I would have because I wouldn't be adding

3   numbers to his tax returns without telling him.

4   Q.   Now, you said you helped prepare the organizer for

5   Center Company for 1992, is that correct?

6   A.   For 1992, that is correct.

7   Q.   I am going to hand you what's been marked as Government

8   Exhibit 341-C.

9        THE COURT:  It is twelve-thirty.  So, we'll break

10  for lunch now and we will reconvene at a quarter of two.

11  (The jury left the courtroom.)

12  (Court recessed at 12:30 p.m.)

13  (Court reconvened at 1:55 p.m.)

14  (The jury entered the courtroom.)

15       THE COURT:  Good afternoon.  Be seated, please.

16       All right, Ms. Calvin.

17              DIRECT EXAMINATION

18  BY MS. CALVIN:

19  Q.   Mr. Scarpitti, before we broke for lunch, I believe we

20  were speaking about the 1992 tax year, and I was about to

21  direct your attention to the tax organizer?

22       But, before I do that, I would like to hand you

23  what's been marked as Government Exhibit 341-E and 341-D, and

24  ask you if you recognize them?

25  A.   Yes.  341-E is the -- is our file organizer and tax


Scarpitti - Direct(By Ms. Calvin)        138


1  return for the 1992 individual return for Dr. and

2  Mrs. Leveto.

3        And 341-D are copies of all the documents that

4  are -- excuse me -- of documents that Dr. Leveto provided us

5  to prepare that return.

6        MS. CALVIN:  I would ask for admission of

7  Government Exhibits 341-E and D.

8        THE COURT:  Just a minute.  I don't know if my --

9  that page got misplaced on my exhibit list or because I don't

10  have -- my exhibit list at the moment stops at page

11  sixty-nine, and I don't know if I could have misplaced it

12  while shuffling this stuff up.

13        Do you have another one, by any chance, Ms. Calvin?

14        MS. CALVIN:  One moment, Your Honor, and I'll

15  check.

16        THE COURT:  Hold it.  Okay.  I found it.  Wait.

17  No.  341.  So, I presume that would be on page seventy of

18  the -- yes, I don't have it.

19        MR. VORACEK:  You don't have it?

20      THE COURT:  I'll just keep track of the -- get me

21   one eventually and I'll just keep track of the exhibits that

22   we're admitting on here.  Could you give me that again,

23   Ms. Calvin?

24      MS. CALVIN:  341-D.

25      THE COURT:  341-E.


            Scarpitti - Direct(By Ms. Calvin)          139


1      MS. CALVIN:  And D.

2      MR. VORACEK:  And D.

3      THE COURT:  341-D and 341-E are admitted.

4   BY MS. CALVIN:

5   Q.  Would it be safe to say that all the documentation in

6   those exhibits came from -- all the information came from

7   Dr. Leveto?

8   A.  It would be safe to say that, yes.

9   Q.  And those were the materials that you relied upon to

10   prepare the 1992 return?

11   A.  Yes.

12   Q.  Now, I believe you stated that you did assist in the

13   preparation of a tax organizer on behalf of Center Company

14  for the year 1992, is that correct?

15  A.  I believe I did, yes.

16  Q.  I'm handing you what's been marked as Government's

17  Exhibit 341-C and ask if you recognize these documents?

18  A.  Yes.  This is the organizer for Center Company for 1992,

19  as well as a fax cover letter that I sent to Dr. Leveto when

20  I sent him the organizer.

21      MS. CALVIN:  Your Honor, we would move for

22  admission of Government Exhibit 341-C.

23      THE COURT:  341-C is admitted.

24  Q.  Looking at page three of that document, is that the

25  information that you provided -- is this the document that

            Scarpitti - Direct(By Ms. Calvin)        140

1  you prepared based on information provided by Dr. Leveto?

2  A.  Yes.

3  Q.  Now, when you completed your assistance with the

4  organizer, did you feel if you were preparing the return, you

5  would have enough information?

6  A.  No.  In fact, my cover letter, which I think you just

7  brought up on the screen, said that if I were preparing the

8  tax return, I would ask for additional information or

9   details.  Please let me know how I can provide any additional

10  help.

11  Q.  Now, did you prepare the 1993 tax return for Dr. Leveto?

12  A.  Yes, I did.

13  Q.  I'm going to hand you what's been marked as Government

14  Exhibit 342-A for identification and ask if you recognize

15  these documents?

16  A.  Yes.  This is a copy of Dr. and Mrs. Leveto's 1993

17  personal return as well as our organizer.

18  Q.  Now, was everything in this -- in your workpapers, did

19  that come from Dr. Leveto?

20  A.  Yes.

21  Q.  And for the year 1993, what did your workpapers show as

22  Dr. Leveto's income?

23  A.  His total income from page one of his tax return was

24  $25,355.00.

25  Q.  And did you also help him prepare his 1995 Federal

Scarpitti - Direct(By Ms. Calvin)          141

1   Income Tax Return?

2        THE COURT:  I don't think you moved 341-A.

3          MS. CALVIN:  All right.  Your Honor, we would move

4   for Government Exhibit 341-A to be admitted.

5          THE COURT:  341-A is admitted.

6          THE WITNESS:  1995, I believe that I did, yes.  I

7   don't have it yet.

8   Q.  I'm handing you what's been marked as Government Exhibit

9   343-A.

10  A.  This is actually his 1994 tax return.  Yes, I prepared

11  it.

12  Q.  I'm sorry.  I skipped a page here.  And you prepared

13  that, his tax return?

14  A.  Yes.

15  Q.  And are all the documents contained in 343-A workpapers

16  that you used for the preparation of that return?

17  A.  Yes.

18  Q.  And did that information come from Dr. Leveto?

19  A.  Yes.

20         MS. CALVIN:  We would move for admission 343-A.

21         THE COURT:  343-A is admitted.

22  Q.  Now I'll get to the 1995 tax return.  Handing you what's

23  been marked as Government Exhibit 344-A for identification.

24  A.  344-A is the 1995 tax return which I prepared and all of

25  our supporting documentation.


Scarpitti - Direct(By Ms. Calvin)          142


1  Q.  And, once again, did all of that information come from

2  Dr. Leveto?

3  A.  Yes.

4       MS. CALVIN:  We would move for admission of

5  Government Exhibit 344-A.

6       THE COURT:  344-A is admitted.

7  Q.  Now, to summarize, would it be fair to say that every

8  year that you prepared tax returns for Dr. Leveto, you got

9  the information from him?

10  A.  Yes.

11  Q.  While you were preparing tax returns for Dr. Leveto, at

12  any point did he tell you he had signature authority over a

13  bank or other financial account in a foreign country?

14  A.  In a foreign country?

15  Q.  Yes.

16  A.  No.  I believe there used to be a question, I am not

17  sure if there still is, but you would have to say that if you

18  knew that on a tax return.

19  Q.  At any point, did Dr. Leveto advise that you Center

20  Company was paying for many of his personal expenses?

21  A.  No, other than the one year when we claimed them on his

22  tax return.

23  Q.  Did Dr. Leveto tell you that at all times he maintained

24  control of the veterinary receipts?

25  A.  He maintained --


                    Scarpitti - Direct(By Ms. Calvin)         143


1  Q.  Control of the veterinary receipts.

2  A.  After selling the company?

3  Q.  Yes.

4  A.  No.

5  Q.  Did he tell you that the business paid for expenses

6  associated with an airplane which he flew?

7  A.  No.

8  Q.  Did he tell you that the business paid for his

9  daughter's private school?

10  A.  No.

11  Q.  Did he tell you that the business paid, at least in part

12  or in whole, for family vacations?

13  A.  No.

14  Q.  At some point, did you become aware that Dr. Leveto

15  wanted to file amended returns?

16  A.  Yes.

17  Q.  Would you explain to us when and how that occurred?

18  A.  Um, if I remember correctly, I had been -- is it

19  interrogated?  Is that the right word?  Questioned.  Inter --

20  Q.  Interviewed?

21  A.  Interviewed.  By the internal -- by somebody -- by the

22  government.  And shortly thereafter, or there around,

23  Dr. Leveto called me and indicated that some of what was

24  going on was unfair, or something, and he would like a copy

25  of an amended -- he would like a blank amended return so that

                    Scarpitti - Direct(By Ms. Calvin)          144


1   he could file or correct his return.

2          An amended return is a return you file if you filed

3   the first one incorrectly.

4          So, we faxed that to him and I was -- yeah, we

5   faxed that to him.

6          MS. CALVIN:  If I may have a moment?

7   Q.  Mr. Scarpitti, I am going to hand you what's been marked

8    as Government Exhibits 1-C-2, 1-D-3, 1-E-2, 1-F-2, 1-G-2 and

9    1-H-1 and ask you to take a look at them.

10   A.   Do you want me to identify each one or --

11   Q.   I will ask you a few questions about them.

12        What is Government Exhibit 1-C-2?

13   A.   1-C-2 is an amended tax return for 1991 for Dr. and

14   Mrs. Leveto.  On this return, Dr. Leveto, apparently because

15   we did not prepare this, reported his income as originally

16   filed and then said that he had no income.

17   Q.   And you didn't prepare this return?

18   A.   We did not prepare this.

19   Q.   I would ask you to look at what's Government Exhibit

20   1-D-3.

21   A.   This is an amended return for 1992 where, again,

22   whatever income was reported was subtracted, and we did not

23   prepare this return.

24   Q.   I would ask you to look at Government Exhibit 1-E-2.

25   A.   This is a 1993 amended return, again, amending the 1993

                Scarpitti - Direct(By Ms. Calvin)          145


1    return and giving -- doing away with all the income, or

2    whatever, and we did not prepare that return either.

file:///A|/LEVETO-5.TXT

3  Q.  Are these all amended returns that you had previously

4  prepared, is that correct?

5  A.  These are all amended returns we had not prepared.

6  Q.  But, amending returns that you had previously --

7  A.  Yes.  We filed the original returns and we looked at

8  those earlier.

9  Q.  I would ask you to look at 1-F-2.

10  A.  I had not verified that the original numbers that he had

11  placed on here matched with the returns that we filed, but we

12  did review earlier the earlier returns.

13      1-F-2 is a 1994 amended return, again, bringing all

14  of his income to zero.

15  Q.  Now, what reason did he give for 1994 for amending those

16  returns?

17  A.  1994, the reason, which you have to state a reason when

18  you amend a return, says, reason for amending our 1994 income

19  tax return, overstatement of income in error and

20  misunderstanding.  See attached which is an integral part of

21  this amended return.

22      And there is an attached document that I don't know

23  what it is.

24  Q.   You have never seen something like this, the reason

25  for --

Scarpitti - Direct(By Ms. Calvin)        146

1  A.   No, I have never seen --

2  Q.   That I am submitting this as part --

3  A.   Let me read it, but I don't think so because --

4        Nothing in here, as I glance through it, seems

5  familiar with anything I've ever seen.

6  Q.   I would ask you to look at Government Exhibit 1-G-2.

7  A.   1-G-2 is an amended tax return for 1995, again, taking

8  away all the income that was previously reported and saying

9  that there was no income that year.

10  Q.   And what reason did he give for amending the 1995 income

11  tax return?

12  A.   The same reason as the earlier, that there was an

13  overstatement of income in error and misunderstanding, and

14  that he has an attachment, which looks like it's the same

15  thing.

16  Q.   And, again, 1995.  For 1995, did Dr. Leveto ever tell

17  you that you had misstated, overstated his income?

18  A.   No.  No.  No.  In fact, when I was called for the

19  amended return, I pretty much thought at the time maybe he

20  was going to add income based on my questioning that I had

21  gotten.

22      MS. CALVIN:  If I may have one moment?

23  Q.  If he had asked you to file amended returns that looked

24  like that, would you have prepared those?

25  A.  No.


                    Scarpitti - Cross            147


1  Q.  And why is that?

2  A.  Because he had provided earlier documentation that

3  showed that he had income and there would be no logical

4  reason to amend that return.

5  Q.  Thank you.

6      MS. CALVIN:  I have no further questions of this

7  witness.

8      THE COURT:  Thank you.  Cross examine.

9      MR. LEVETO:  Yes.

10          CROSS-EXAMINATION

11  BY MR. LEVETO:

12  Q.  Good afternoon, Mr. Scarpitti.  Nice to see you today.

13   A.   Nice to see you, doctor.

14   Q.   I just have a few questions.  You had taken part in

15   assisting myself and attorneys with the decisions about the

16   purchase and sale to Center Company, is that correct?

17   A.   Sale, yes, I believe I did.

18   Q.   And, generally speaking, you were saying that you would

19   take part in something like that oftentimes to help

20   negotiations increasing or decreasing tax treatment of

21   different parties, whoever your client was?

22   A.   That's correct.

23   Q.   So, your ultimate goal is to reduce as much as you can,

24   is that correct?

25   A.   Reduce -- if I represent the seller, to reduce their tax

                    Scarpitti - Cross              148

1   liability as much as possible.

2   Q.   Well, the seller or the buyer, you are looking to do

3   that, aren't you?

4   A.   That's true.  If I represent the buyer, there wouldn't

5   be current tax liability.  But, I am going to try to reduce

6   future taxable income, that's correct.

7   Q.   So, it is very important then in your line of work, I am

8   sure you're often called on to do this, so it is very

9   important then to reduce taxes as much as you can?

10  A.   Yes.

11  Q.   To within where the law allows you, is that correct?

12  A.   To?

13  Q.   To within where the law allows you to do it?

14  A.   That's correct.

15  Q.   That's one of your functions?

16  A.   That's what we get paid for.

17  Q.   And many people make business decisions, is that

18  correct, along those lines?

19  A.   Based on the tax liability?

20  Q.   Yes.

21  A.   Absolutely.

22  Q.   Now, you had also filed for us, and just verify, if you

23  would, all the appropriate documents after this sale had

24  transpired to insure that the Internal Revenue Service on the

25  seller's end had that appropriate documentation, is that

Scarpitti - Cross              149

1   correct?  Whatever was supposed --

2  A.  Within yours and your wife's personal return, you mean?

3  Q.  Yes.

4  A.  Yes.  As the seller of the company, we included

5  everything, yes, that we believed needed to be included.

6  Q.  So, generally speaking, if we say that if we are

7  speaking of a Schedule C and, of course, in this case, we are

8  speaking of gross receipts, is it in your experience, is it

9  pretty safe to assume, that as a Schedule C disappears on

10  this person's tax return, who is the seller, that it would

11  likely, if the business continues, appear on another tax

12  return, which is the buyer?

13  A.  Absolutely not necessarily as a Schedule C -- if the

14  buyer is a corporation, there wouldn't be a Schedule C, but

15  the income would be reflected on the buyer --

16  Q.  In other words, the gross receipts would move from one

17  to the other?

18  A.  That's correct.

19  Q.  There is no provisions that you know of that two people

20  are to report them?

21  A.  That they would report the same gross receipts?

22  Q.  Right.

23  A.  No, that's correct.

24   Q.   When you worked, I -- I remember receiving a bill for

25   review, a claim of sales agreement, okay.


                    Scarpitti - Cross                150


1            In other words, during the time there were

2    negotiations going on and you worked with an attorney that

3    was helping me out, and I don't know, would that have been

4    Cohen and Grigsby or Russ Schetroma?

5    A.   Russ Schetroma rings a bell.  The other one doesn't ring

6    a bell.

7    Q.   Russ Schetroma was in Meadville.  You don't have to feel

8    bad about the UBO because we had to go all the way to Cohen

9    and Grigsby in Pittsburgh, one of the larger firms, to get

10   someone versed in that to do it, but you think you worked

11   with Russ Schetroma, is that correct?

12   A.   Yes.

13   Q.   So, you helped him, and I -- and we worked kind of as a

14   team to put everything together so I would be treated as well

15   and we could take care of some of the idiosyncrasies of this,

16   is that correct?

17   A.   I would say, yes.  I have to qualify and just say that I

18  would have been concerned with your tax liability and how the

19  selling price was allocated, yes.

20  Q.  Okay.  And you did help with that, the allocation?

21  A.  Yes.  In fact, I believe there was a change on your

22  workpapers suggesting that the original draft -- and I may

23  have said this earlier -- had numbers in a way different than

24  the ultimate sale agreement showed and I am hoping I was a

25  participant in that because it was to your advantage.


                    Scarpitti - Cross              151


1  Q.  Yes.  And today, there were a number of exhibits showing

2  income change and where there were capital gains and interest

3  income, you know, after the second half of 1991 reflecting

4  those things that you helped me to negotiate, is that

5  correct?

6  A.  Right.  I believe most of your income in those

7  subsequent years were simply your receiving payments on that

8  sale.

9  Q.  From the Center Company, is that correct?

10  A.  From Center Company.

11  Q.  When a -- when a return -- in your mind and in your

12  experience, when a tax return shows a significant decrease in

13  income, that must mean only one thing, right, or can it mean

14  other things?

15  A.  Oh, it could mean a variety of things.

16  Q.  Could you share a few with us?

17  A.  Of what it could mean?

18  Q.  Sure.

19  A.  It could mean that business is down and, therefore,

20  people going through hard times.  Maybe an account didn't

21  pay, or something of that nature.

22      It could mean that someone has decided to quit

23  working; decided to retire.  Income drops substantially when

24  many people retire.  It could mean that people aren't

25  reporting their income anymore.

Scarpitti - Cross          152

1      Those would be three examples.

2  Q.  How about if someone was, say, living off of savings,

3  borrowing money, would you say those are also --

4  A.  I'm sorry.  That would be a very good example.  In fact,

5  I believe there is a note in the file -- I know this just

6  from going through this stuff in preparation a little bit for

7   today -- where I had even wrote to you at one point and said,

8   you know, how you doing in this?  How are you getting by?

9          And that was your response, that you had -- you

10  were living off of gifts from your folks or from your wife's

11  parents.

12  Q.   And also would you find in those notes something to the

13  effect of borrowed money?

14  A.   Could have.  I don't recall, but that is definitely

15  another way in which to live, yes.

16  Q.   By the way, when you receive information from people for

17  filing their tax returns, isn't it generally true that you

18  get information from them to file their tax returns?

19  A.   I really -- I wouldn't know of any other way.

20  Q.   I just wanted to clarify that point.

21          You have known me and the business up until the

22  last five years or so.  We worked together quite a lot, and

23  you were my accountant and, yes, you did take a changing role

24  over those years.

25          But, you have talked with me many times.  You've --

                    Scarpitti - Cross              153

1   we've talked economics and business savvy and senses, and

2  things like that.

3      Was it your understanding, after talking with me,

4  after dealing with attorneys that were involved with this

5  somewhat exotic species of negotiating with the UBO, sales

6  agreement and other discussions with me, was it your

7  understanding that somebody other than myself controlled

8  Center Company?

9  A.  Yes.

10  Q.  Okay.  And as far as economically and financially over

11  the many years we've known each other, our discussions would

12  point to and be sourced in a lot of paperwork, at least to be

13  able to talk about things, in other words, tax organizers

14  year to year and, of course, I realize you weren't part of

15  the analysis because that was taking place by someone else.

16      But, generally speaking, it was clearly true that

17  Center Company was controlled by someone other than me, is

18  that correct?

19  A.  Yes.  I guess I never thought of that of being another

20  possibility because you had sold your company to Center

21  Company.

22  Q.  Right.  Now, in these days of reducing taxes to what one

23  can do legally and lawfully, you may think that you assume

24  that I did not because that is what I told you, and you would

25  assume that I did the right thing.


                    Scarpitti - Cross                154


1           But, isn't there a way that you wouldn't even need

2   to do all these things?  All of this material that's being

3   presented, it would be a lot simpler that you, as an

4   accountant, know about that, if you wanted to sell your

5   business and virtually go to zero taxes, do you believe that

6   there is a way that, you know, of within the Internal Revenue

7   Code that would allow you to do that?

8   A.  If you wanted to sell your business and say zero taxes,

9   sure, you could sell your business for nothing.  Yes, I could

10   sell my McDonald's for ten cents.

11  Q.  Let me perhaps refresh your recollection a little bit

12  from some grand jury testimony from March 14th of 2000.

13  A.  Yes.  Okay.

14  Q.  I will just read a few lines here.

15           Was it your understanding that someone other than

16  Dr. Leveto controlled Center Company?

17           Answer:  Oh, clearly.

18          Question:  Would that have been significant to you

19   in going over the sales agreement?

20          Answer:  Well, I would just assume because why

21   would you -- why would you sell if you were to sell something

22   to a company who controlled, there are provisions, I mean, in

23   the Tax Code that talk about not having to pay tax.  There is

24   a provision in the Tax Code wherein you sell and if you set

25   it up right, you don't have to pay any tax.


                    Scarpitti - Cross              155


1          If I own a little store by myself as a sole

2   proprietor, I want to incorporate and make that a

3   corporation, I can do that without paying any tax, and if I

4   do it right, okay, but I would never --

5          And then you ended the sentence.  But, then you

6   said:

7          But, I mean, the actual -- in actuality, I would

8   never sell it to the corporation.

9   A.  Right.

10   Q.  So, could you explain that to me?

11   A.  Sure.  That's a good point, doctor.

12        And you can take a sole proprietorship and you can

13   incorporate it and there are provisions in the Code that

14   allow that to be what's called a tax free exchange or

15   transaction, meaning that you would take your assets and you

16   transfer them to a corporation, which is a legal, separate

17   entity or a separate legal entity, and there is no tax

18   consequences to you, the individual on that transaction.  All

19   right?

20        So, where I got confused is, you are really not

21   selling it to the corporation.  You are simply transferring

22   those assets to the corporation.  All right?

23        So, there wouldn't be an agreement to sell.  There

24   wouldn't be a -- you would never report that as a sale on

25   your tax return.  You would simply start filing as a

                Scarpitti - Redirect(By Ms. Calvin)        156

1   corporation and you would transfer those assets into the

2   corporation.

3   Q.   But, the corporation wouldn't pay taxes until it began

4   to run, is that correct?

5   A.   The corporation would not, on the first day, right.

6   But, the corporation would then report an income and expenses

7  and pay taxes accordingly.

8  Q.  Speaking of corporations, Mr. Scarpitti, isn't it

9  correct that every day in America -- and I don't have the

10  article with me.  Perhaps your expertise could help me out

11  with it -- the Wall Street journal said that 60 percent of

12  United States corporations do not pay income tax?

13  A.  I've had clients tell me that.  I don't know that to be

14  a fact.  I don't --

15  Q.  So, generally speaking, you -- a key part of your job is

16  to reduce tax liabilities as much as you can within the limit

17  and letter of the law?

18  A.  Yes, sir.

19        MR. LEVETO:  That is all I have.  Thank you.

20        THE COURT:  Redirect?

21        MS. CALVIN:  Yes.  Just a few questions, Your

22  Honor.

23               REDIRECT EXAMINATION

24  BY MS. CALVIN:

25  Q.  Mr. Scarpitti, you stated that it would be part of your

                Scarpitti - Redirect(By Ms. Calvin)        157

1   job to help your clients reduce their taxes as much as the

2   law allows, is that correct?

3   A.   That is correct.

4   Q.   And if there was a legitimate sale, you would expect to

5   see the receipts of that business that was sold going to the

6   corporation which bought it or the individuals that bought

7   it, is that correct?

8   A.   If there were a sale, I would expect the business

9   activity, the fee for services, et cetera, to go to the

10   corporation who bought it, or the business that bought it.

11   Q.   Yes.

12   A.   That's correct.

13   Q.   Now, if -- you were asked if it were a legitimate sale,

14   would you expect to see the Schedule C disappear from one tax

15   return and that corporation or company or Schedule C business

16   to appear on another tax return in another form, either

17   somebody else's Schedule C business or an 1120 corporation?

18   A.   Yes.  There are a number of ways to report business

19   income and it would have to show up on somebody's, yes.

20   Q.   And that's if there was a legitimate sale?

21   A.   Well, it has to show up on somebody's, regardless of

22   whether it was a sale or not, yes.

23   Q.   Now, you put on the tax return each year payments from

24   Center Company to Dr. Leveto which represented the proceeds

25   from the sale?

Scarpitti - Redirect(By Ms. Calvin)        158

1    A.   Yes, ma'am.

2    Q.   You got that information from Dr. Leveto, is that

3    correct?

4    A.   I believe an exhibit you gave me, there are letters from

5    Dr. Leveto that state I received his regular payments from

6    Center Company each of those years.

7    Q.   And you never saw any source documents for that

8    information?

9    A.   For those documents, meaning I never saw the actual

10   payments, or anything like that.

11   Q.   Anything that shows you he actually received --

12   A.   Though he had an amortization schedule that said he

13   received so much per month, kind of like meaning when you

14   make your monthly mortgage payment and he would report to me

15   that he had received the payment in accordance with the

16   amortization schedule.

17  Q.  Dr. Leveto also asked you whether or not he ever told

18  you that for some of those years he was living off savings?

19  A.  I remembered seeing that, yes.

20  Q.  Now, having just looked at his tax returns for prior

21  years, did he report any substantial gains that would suggest

22  that there were savings, substantial amounts of interest,

23  other than the business, major capital gains that would allow

24  him to live off savings?

25  A.  I don't believe that there are major capital gains, but

Scarpitti - Redirect(By Ms. Calvin)        159

1  he had a significant amount of income in those earlier years.

2  We looked at them, a hundred and fifty thousand, whatever the

3  number were.  I think there he could have saved that money.

4  Q.  Could have saved?

5  A.  I don't know what -- a tax return doesn't tell you what

6  one's living expenses were.

7  Q.  But, you didn't see large amounts of interest payments,

8  or any of those types of things?

9  A.  In those earlier returns, there was not significant

10  interest or dividend income to suggest that there were

11  savings available to him at that time.  That's it, yes.

12  Q.  And a final question as to incorporation, and that is:

13       If you transferred your business, in the

14  hypothetical that you and Dr. Leveto discussed, where you

15  took your own Schedule C business and incorporated it into a

16  sale, an 1120 business, which really wouldn't be a sale, was

17  that what you said?

18  A.  That would not be a sale.

19  Q.  But, at that point, the corporation would be obligated

20  to pay tax on any money that they earned, is that correct?

21  A.  Right.  If they are -- a corporation is not paying tax,

22  I presume they are not making any money.

23  Q.  As opposed to a UBO, which was based in a foreign

24  company?

25  A.  Yeah.  I'm still, to this day, not clear on what a UBO

                Gonzalez - Direct(By Mr. Voracek)         160

1  is.

2       MS. CALVIN:  Thank you.  I have no further

3  questions.

4       THE COURT:  Thank you, Mr. Scarpitti.

5  (The witness was excused.)

6          MR. VORACEK:  Your Honor, the United States recalls

7   Manuel Gonzalez to the witness stand.

8          THE COURT:  Mr. Gonzalez, you're already under

9   oath.  You can resume the witness stand.

10          THE WITNESS:  Yes, Your Honor.

11                    * * * * *

12          MANUEL GONZALEZ, having first been duly sworn,

13   testified as follows:

14          THE COURT:  And just for the record, will you state

15   your name again?

16          THE WITNESS:  My name is Manuel Gonzalez, Jr.

17          THE COURT:  Thank you.

18                    DIRECT EXAMINATION

19   BY MR. VORACEK:

20   Q.  Mr. Gonzalez, I believe you testified yesterday that you

21   participated in an undercover operation concerning

22   Dr. Leveto?

23   A.  Yes, sir.

24   Q.  And that pursuant to that investigation, that you were

25   monitored and recorded several conversations that you had

              Gonzalez - Direct(By Mr. Voracek)         161

file:///A|/LEVETO-5.TXT

1   with Dr. Leveto and/or one of his associates?

2   A.   Yes.

3   Q.   Agent Gonzalez, I now ask you -- I hand you what's been

4   admitted into evidence as Government Exhibit 52.

5         Does Government Exhibit 52 reflect a conversation,

6   the recorded conversation of a conversation that you had with

7   Dr. Leveto?

8   A.   Yes, sir.

9   Q.   On what date was that conversation?

10  A.   March 27th, 1995.

11  Q.   Where did that conversation take place?

12  A.   That was on my undercover telephone.

13  Q.   Did you place the call to Dr. Leveto or the other way?

14  A.   Yes, I did.

15  Q.   You placed the called to Dr. Leveto?

16  A.   Yes.

17  Q.   And, again, I believe you testified yesterday that you

18  had several areas of interest when you conversed with

19  Dr. Leveto?

20  A.   Yes.  Yes.

21  Q.   What were some of those areas again?

22  A.   One was to determine, you know, what his involvement is

23  in promoting the book, Tax Free, his -- what other

24  individuals were involved in the organization or the

25  organization that was promoting this, to determine his -- how

Gonzalez - Direct(By Mr. Voracek)          162

1  he used these colatos for his own transfer of business into

2  Center Company, identification of assets, the degree of

3  control that he had over his business and his assets.

4  Q.   Now, during your conversation on the telephone on?

5  March 27th, 1995, with Dr. Leveto, were some of these areas

6  discussed?

7  A.   Yes.

8        MR. VORACEK:  Your Honor, I request the Court's

9  permission to play tape 52.

10       THE COURT:  You may.

11       MR. VORACEK:  May I also request that we pass out

12  transcripts of tape 52 to the ladies and gentlemen of the

13  jury?

14       THE COURT:  Yeah.  While you are doing that, I'll

15  advise the jury, in this kind of a situation, sometimes

16  particularly with a body tape, sometimes it's difficult to

17   understand what was said, if clothing scratches against the

18   microphone, that kind of thing.

19        So, I want you to understand that they made a

20   transcript apparently of this, but you have to understand

21   that the testimony that you're going to hear is what you hear

22   on the tape.  If you see a discrepancy between what's in the

23   script you are getting or the transcription that you are

24   getting and what you hear, it's what you hear that is the

25   testimony.  Just keep that in mind.

Gonzalez - Direct(By Mr. Voracek)        163

1        MR. VORACEK:  Your Honor, I will be requesting that

2   a total of four tapes are played.  There are four transcripts

3   in each one of the binders, to save time, that we simply

4   pass --

5        THE COURT:  That's all right.  Just don't read

6   ahead.  Stick with the tape.

7        You don't have a transcript?

8        THE WITNESS:  No.  They took the transcript.

9        THE COURT:  I would like to get one, too.

10        MR. LEVETO:  Your Honor, could we have a sidebar

11   discussion, please?

12        THE COURT:  Yes.

13   (Sidebar discussion.)

14        MR. LEVETO:  One problem with these transcripts,

15   and I don't know how to handle that, is that numerous

16   transcripts were recorded by two people.  And one transcript

17   would say that I said something and one transcript would say

18   that another person said something, and they were clearly

19   showing the same thing and there were discrepancies a number

20   of times through these.

21        Now, that makes it difficult to know and it is

22   something that the transcript wouldn't point out to the

23   jurors.  And what they hear won't point out to the jurors

24   because they can't know and obviously the people transcribing

25   couldn't even tell from the two recordings.


            Gonzalez - Direct(By Mr. Voracek)          164


1        MR. VORACEK:  Your Honor, there were -- the tapes

2    that the government intends to play are Exhibit 52, which was

3    the phone call between the agent and Dr. Leveto.  Exhibits 59

4    to 60, which was phone calls between the agent and Donald

5    Turner, and Government Exhibit 64, which was a conversation

6    that the agent had with Dr. Leveto alone in his automobile,

7    are tapes that we --

8         THE COURT:  It is all one-on-one tapes, is that

9    what you are saying?

10         MR. VORACEK:  Yes.  The tapes that we intend to

11    play are only the one on ones.  There is nobody else

12    involved.

13         MR. LEVETO:  Okay.

14    (End of sidebar.)

15    BY MR. VORACEK:

16    Q.   Agent, are we ready to play the tapes?

17    (The tape was played.)

18    (End of tape.)

19    BY MR. VORACEK:

20    Q.   Mr. Gonzalez, did you, in fact, buy the book then from

21    Dr. Leveto?

22    A.   Yes, sir.

23    Q.   I hand you an exhibit, Mr. Gonzalez, Government

24    Exhibit 45.  Do you have that in front of you?

25    A.   Yes, sir.

Gonzalez - Direct(By Mr. Voracek)        165

1   Q.   Do you recognize that document?

2   A.   Yes, I do.

3   Q.   What is it?

4   A.   It's a letter dated October 12th, 1995, to Mr. Joe

5   Rivera, Rivera and Associates, 4885 McKnight Road, Pittsburgh

6   Pa., from Don Turner, founder, International Executive

7   Director.

8   Q.   And you did receive this letter?

9   A.   Yes, I did.

10  Q.   Are there also documents attached to the letter?

11  A.   Yes.

12  Q.   What do the documents reflect?

13  A.   There is a Statement in Interest of Membership.

14  Constitution, Article I, Declaration of Purpose, credit,

15  personal information verification, and a Verified Membership

16  Application.

17  Q.   A membership in what?

18  A.   A membership -- it says First International.

19  Q.   Is there a program that's associated at all with the

20  program that you were discussing with Dr. Leveto?

21  A.   Yes.

22        MR. VORACEK:  Your Honor, the United States moves

23   for admission of Government Exhibit 45.

24        THE COURT:  45 is admitted.

25   Q.  Would you please read the first paragraph of


              Gonzalez - Direct(By Mr. Voracek)          166


1   Government's Exhibit 45 from Don Turner?

2   A.  Dear Mr. Rivera:  Your name was submitted to me by Dan

3   Leveto as a qualified candidate for membership in the world's

4   most exclusive association.  If that sounds a bit heady,

5   please analyze the following materials very carefully.

6   Q.  Now, this document is not for the purchase of a book?

7   A.  No, it is not.

8   Q.  This is for the actual buying into the program?

9   A.  Yes.

10   Q.  Would you say that is the next step?  Is this the next

11   step?

12   A.  Yes.

13   Q.  I ask you to look at the second page of that document.

14        I would like you to read the third paragraph on the

15   second page.

16  A.  The current cost of membership --

17  Q.  I am sorry.  The paragraph following that, the third

18  full paragraph.

19  A.  You would wire transfer the membership fees to our

20  association escrow account immediately after your application

21  is accepted.  I would give you the instructions over the

22  phone as to how that is done, but it is usually wired to

23  Barclays Bank of Grand Turk, Turks and Caicos Islands.

24  British West Indies.  The funds are held in escrow until you

25  sign off on the resolution, which is enclosed.  Do not send

                    Gonzalez - Direct(By Mr. Voracek)          167

1  the resolution to us.  Keep it until the end of any

2  membership meeting.

3  Q.  Now, the documents that are attached to the letter, I

4  believe you indicated, are those actually the application

5  forms for the program?

6  A.  Yes.

7  Q.  The very next document, what is that entitled, the very

8  next page of Government Exhibit 45?

9  A.  In Interest of Membership.

10  Q.  And just read the first paragraph, if you would, please?

11  A.   For interest in the exclusive association -- First

12  International -- you will find enclosed a copy of your -- of

13  our constitution, Resolution Needs Analysis, and a membership

14  application.  If you should have any questions please do not

15  hesitate to call us.

16  Q.   Please go just a little bit further down and begin

17  reading the paragraph that starts members names?

18  A.   Members names are not disclosed and they will never be

19  offered for sight, sale, or trade.  Like the secret trust

20  they use, the members desire absolute anonymity, therefore

21  the member list is even held outside the United States of

22  America in a country where disclosure would mandate a lengthy

23  prison term.  You can thus understand that we value privacy

24  above the success of popularity and large numbers.

25  Q.   I would ask you to page down a little bit to the page

                Gonzalez - Direct(By Mr. Voracek)          168

1  that begins Verified Membership Application.

2        Do you see that in front of you, sir?

3  A.   No.

4  Q.   You don't have that in your document?

5   A.   Oh, I'm sorry.  Yes.

6   Q.   You do have that?

7   A.   Yes, sir.

8   Q.   Is that, if someone wanted to become a member, that is

9   the document that they would have to sign?

10   A.   Yes.

11   Q.   I would ask you to go to the second page of that

12   application and read the first sentence by the No. 7?

13   A.   I have received a copy of this document, parens, make

14   yourself a copy, parens, and I certify under oath that I am

15   neither a direct nor indirect employee of the revenue of any

16   government or government agency, nor a member of an

17   unauthorized practice of law committee or any Bar

18   Association, or that I have fully and completely disclosed

19   all such connections by an attachment hereto.

20   Q.   Did you sign this application, Agent Gonzalez?

21   A.   No.

22   Q.   Was that the reason why you didn't sign that

23   application?  Were you a member of the revenue of any

24   government?

25   A.   No.  I just never completed the application.

Gonzalez - Direct(By Mr. Voracek)            169

1   Q.   But, in order to become a member, apparently a person

2   has to attest that they are not an employee of the revenue of

3   any government?

4   A.   Right.  Correct.

5   Q.   Just go to the very last page where it says resolution.

6        Is this also a document that a person interested in

7   becoming a member of the program would have to sign?

8   A.   Yes.

9   Q.   And if you could read the paragraph by the No. 1.

10  A.   I shall keep as absolutely private the name of each

11  person I believe to be a member of the association, and that

12  I shall keep all fraternal secrets as the private and

13  privileged fraternal secrets of the members and association

14  only, and will not reveal the same to any non-member without

15  the written permission of one of the officers thereof.  I

16  understand that by signing this document I am waiving any and

17  all rights whatsoever for a refund of my member fees, and

18  that any offer to refund my membership fees is null and void,

19  paren, as though it never existed, end paren.  Period

20  Q.   Mr. Gonzalez, did you, in fact, contact Donald Turner?

21  A.  Yes, sir.

22  Q.  How were you put in touch with Donald Turner?

23  A.  During my discussions with Dr. Leveto, he suggested that

24  I call Don Turner to take the next step if I was interested

25  in purchasing one of these entities.

Gonzalez - Direct(By Mr. Voracek)        170

1  Q.  Did you get the telephone number from Dan Leveto of Don

2  Turner, or did you get the number --

3  A.  I think the number was in the book.

4  Q.  Was in the book that you purchased from Dr. Leveto?

5  A.  I think it was.  I'm not entirely sure.

6  Q.  When you called Donald Turner, was he expecting your

7  phone call?

8  A.  I'm not sure.  He wasn't surprised that I called.  He

9  seemed to know who I was, that I had an interest in the

10  program.  But, I am not positively sure.

11  Q.  Did you use your name or did you use a different type of

12  identification?

13  A.  I used the name Joseph Rivera.

14  Q.  Don Turner, was he expecting you to use a different type

15  of identity other than your name?

16  A.  Yeah.  I believe he asked me for a member number that

17  came with the book but, for some reason, I didn't have one.

18  Q.  Now, I ask you to look at Government Exhibit 59.

19      Do you have that?

20  A.  No, sir.

21  Q.  Do you have Government Exhibit 59, sir?

22  A.  Yes, sir.

23  Q.  And is that Government Exhibit 59 a tape and a

24  transcript that was admitted into evidence?

25  A.  Yes, sir.

Gonzalez - Direct(By Mr. Voracek)        171

1  Q.  And what is Government Exhibit 59?

2  A.  Government Exhibit 59 is a copy of a cassette

3  tape-recording labeled 10-11-95.

4  Q.  And what is on that tape?

5  A.  That is a telephone conversation that I had with Don

6  Turner on October 11th, 1995.

7  Q.  And, generally, what was discussed with Don Turner?

8  A.  Just -- it was an open-ended conversation regarding what

9  I had to do for this program or what the program was all

10    about.

11          MR. VORACEK:  Your Honor, the government requests

12    to play that tape.

13          THE COURT:  Yes.  I would like to have a copy of

14    that transcript.  I don't think it is in that notebook that

15    you gave me.

16          MR. VORACEK:  Your Honor, may I have a sidebar for

17    just a moment?

18          THE COURT:  Sure.

19          MR. LEVETO:  Dr. Leveto doesn't have it.

20          MR. VORACEK:  I was going to give him one.

21          THE COURT:  Okay.

22    (Sidebar discussion.)

23          MR. VORACEK:  Your Honor, if I may, I just -- I

24    just wanted to put on the record outside the hearing of the

25    jury that the government did supply Dr. Leveto with


            Gonzalez - Direct(By Mr. Voracek)          172


1    transcripts of all these tapes on April 20 of 2004.  He just

2    indicated to me, while the first tape was played, he didn't

3    have a transcript of it.

4          So, I am going to give him another transcript of

5    all the tapes we played.

6        THE COURT:  Okay.  Thank you.

7        And I will give this one back to you.

8    (End of sidebar.)

9    (The tape was played.)

10   End of tape.)

11   BY MR. VORACEK:

12   Q.  Mr. Gonzalez, did you have an additional conversation

13   over the telephone with Donald Turner?

14   A.  Yes.

15       THE COURT:  Why don't we go ahead and take our

16   afternoon break now.  We'll reconvene at four o'clock.

17   (The jury left the courtroom.

18   (Court recessed at the 3:45 p.m.)

19   (Court reconvened at 4:05 p.m.)

20       THE COURT:  I forgot my pen.  Let the jury come in.

21   I'll get my pen.  I will be right back.

22   (The jury entered the courtroom.)

23   (The Judge left and the re-entered.)

24       THE COURT:  Be seated, please.

25       All right, Mr. Voracek.

Gonzalez - Direct(By Mr. Voracek)          173

1  BY MR. VORACEK:

2  Q.  Mr. Gonzalez, did you have another conversation with

3  Donald Turner?

4  A.  Yes.

5  Q.  When was that conversation?

6  A.  October 22nd, 1995.

7  Q.  Now, you have before you what's been admitted into

8  evidence as Government Exhibit 60.  Do you see that, sir?

9  A.  Yes.

10  Q.  And what is that?

11  A.  That's a transcript of a telephone conversation between

12  myself and Don Turner on October 22nd, 1995.

13  Q.  Do you also have the tape of Government Exhibit 60?

14  A.  Yes, I do.

15  Q.  And during that conversation on October 22nd, 1995, what

16  did you discuss with Donald Turner in general?

17  A.  That program that I was anticipating purchasing from

18  him.

19      MR. VORACEK:  Your Honor, the United States

20  requests an opportunity to play Government Exhibit 60 for the

21  jury.

22       THE COURT:  You may.

23  (The tape was played.)

24  (The tape was stopped.)

25       THE COURT:  Is this supposed to be 60?  You got the

                Gonzalez - Direct(By Mr. Voracek)        174

1  wrong --

2       MR. VORACEK:  I think one more --

3  (The tape was played.)

4  (End of tape.)

5  BY MR. VORACEK:

6  Q.  Mr. Gonzalez, after the conversation that you had with

7  Donald Turner, did you have any additional contact with

8  Donald Turner, or was that the last one?

9  A.  No.  That was the last one.

10  Q.  After that conversation with Donald Turner, did you have

11  any more contacts with Dan Leveto?

12  A.  Yes.

13  Q.  How many?

14  A.  I had one meeting with him on November 1st, 1995.

15  Q.  Agent Gonzalez, where did that meeting take place?

16  A.  In Meadville, Pa.

17  Q.  And specifically was it at a restaurant?  House?  Where?

18  A.  It was at Dr. Leveto's residence.

19  Q.  And did you drive to Dr. Leveto's house?

20  A.  Yes.

21  Q.  And what was the purpose of your encounter with

22  Dr. Leveto on that day?

23  A.  Just to go over the program and discuss with him some

24  additional items.

25  Q.  Did you meet with Dr. Leveto at that time?


Gonzalez - Direct(By Mr. Voracek)        175


1  A.  Yes.

2  Q.  Did you meet in a house, or where did your meeting

3  occur?

4  A.  The meeting occurred in my car.  We discussed the -- we

5  had meeting in my car.

6  Q.  Did Dr. Leveto come out to the car?

7  A.  Yes.  He came outside of his residence and I was parked

8  in his driveway and both of us got in the car and we had the

9  meeting there.

10   Q.   Was anybody else in the car besides you two?

11   A.   No.

12   Q.   I ask you to look at what's been admitted into evidence

13   as Government Exhibit 64-B.

14          Is that the tape-recording of your final meeting

15   with Dr. Leveto on November 1st, 1995?

16   A.   Yes, it is.

17          MR. VORACEK:  Your Honor, I request permission to

18   play that tape.

19          THE COURT:  You may.

20   (The tape was played.)

21   (The tape was stopped.)

22          THE COURT:  I know we are running a little bit over

23   time, folks, but I think we ought to finish this this evening

24   and then we'll adjourn.

25   (The tape was played.)


              Gonzalez - Direct(By Mr. Voracek)          176


1   (End of tape.)

2          THE COURT:  Okay.  Well, we have had a long day and

3   you folks have been very patient.  Don't forget tomorrow is

4    going to be a short day for you.  We'll work through the

5    lunch hour, so bring a snack if you want to eat something.

6         I guess just leave the transcripts there.  They

7    will be picked up.

8    (The jury left the courtroom.)

9    (Court recessed on Wednesday, May 25, 2005, at 5:30 p.m.)

10

11              * * * * *

12         I certify that the forgoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14

15                   S/Michael D. Powers
                    Michael D. Powers
16                   Official Reporter

17     *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****

18

19

20

21

22

23

24

25