1       IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

   _____

3

   UNITED STATES OF AMERICA

4

              Plaintiff

5

        vs.        Criminal Action No. 01-06ERIE

6

   DANIEL J. LEVETO

7

              Defendant

8  _____

9

              PROCEEDINGS

10

        Transcript of Jury Trial commencing on Tuesday,
11  May 24, 2005, United States District Court, Erie,
    Pennsylvania, before Honorable Maurice B. Cohill, Jr.,
12  District Judge.

13  APPEARANCES:

14  For the Government:     For the Department of Justice
                     By:  Rita Calvin, Esq.
15                    By:  Thomas Voracek, Esq.

16  For the Defendant:     Pro Se
                     Stephen Misko, Esq.(Standby)

17
                     Reported by:
18                    Michael D. Powers, RMR
                     Official Court Reporter
19                    Room 5335 USPO & Courthouse
                     Pittsburgh, Pennsylvania 15219
20                    (412) 208-7572

21

22
   Proceedings recorded by mechanical stenography.  Transcript
23  produced by computer-aided transcription.

24

25

2

1          I N D E X

2  GOVERNMENT WITNESSES     DIRECT  CROSS  REDIRECT  RECROSS

3  DEBORAH SWANEY

4    By Mr. Voracek        3

5  ROBERT LAPINA

6    By Ms. Calvin        90
     By Mr. Leveto             163
7
   MANUEL GONZALEZ
8
     By Voracek        166
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          P R O C E E D I N G S

2    (Court reconvened on Tuesday, May 24, 2005, at 9:05 a.m.)

3          THE COURT:  Good morning.

4    (The jury entered the courtroom.)

5          THE COURT:  Good morning.  Please be seated.

6          I appreciate you folks trying to keep the train on

7    the track and being on time.

8          Okay.  The government may proceed.

9          MR. VORACEK:  Your Honor, the United States calls

file:///A|/LEVETO-3.TXT

10  Deborah Swaney.

11        THE COURT:  Will you come up here and be sworn,

12  please?

13        THE CLERK:  Would you raise your right hand.

14                    * * * * *

15        DEBORAH SWANEY, having first been duly sworn,

16  testified as follows:

17        THE COURT:  Would you have a seat up here, please?

18        THE WITNESS:  Sure.

19        THE COURT:  Are those papers up there something

20  that Miss Swaney is going to be using?

21        MR. VORACEK:  Yes, Your Honor.

22        THE COURT:  Would you have a seat, please, and give

23  us your name and spell your last name?

24        THE WITNESS:  My name is Deborah Swaney.

25  S-w-a-n-e-y.


                    Swaney - Direct            4


1         THE COURT:  Thank you.

2                    DIRECT EXAMINATION

3  BY MS. VORACEK:

4   Q.   Miss Swaney, where do you reside, just city and state,

5   please?

6   A.   California, Pennsylvania.

7   Q.   Are you employed?

8   A.   Yes, I am.

9   Q.   Where are you employed?

10  A.   National City Bank.

11  Q.   How long have you been with National City Bank?

12  A.   A little over thirty years.

13  Q.   What's your current position with them?

14  A.   Current position, I am branch operations manager for the

15  state of Pennsylvania

16  Q.   And as branch operations manager for the state of

17  Pennsylvania, does that -- that includes obviously every

18  branch in the entire state?

19  A.   Correct.

20  Q.   How many branches is that?

21  A.   I think we're 196 right now.

22  Q.   How long have you been in that position?

23  A.   Oh, let's see.  Five years.

24  Q.   And prior to holding that position, what position did

25  you have at the bank?

Swaney - Direct                5

1  A.   Prior to that position, I was still in branch

2  operations.  I was considered a branch operations

3  administrator.

4  Q.   And how long were you the administrator?

5  A.   Two years.

6  Q.   And prior to that?

7  A.   Retail help desk, which is a policy procedure help desk

8  for the bank.

9  Q.   Now, in the normal course of your activities with

10  National City Bank, did you have access to account

11  information?

12  A.   Sure.  Yes.

13  Q.   For how long?  The entire period?

14  A.   Oh, the entire thirty plus years.

15  Q.   And you worked with the account information on a regular

16  basis?

17  A.   Daily.

18  Q.   Now, is this individual accounts or business accounts,

19  or both?

20  A.  Both.

21  Q.  Now, you said you worked with National City Bank.

22      Has it been called National City Bank for the

23  entire thirty years?

24  A.  No.  Actually, I started with Gallatin National Bank and

25  through the many acquisitions, it is now known as National

                    Swaney - Direct            6

1  City.

2  Q.  What were some of the other names that -- or entities

3  that you worked for?

4  A.  That I personally worked for was just basically

5  Gallatin.  It became Integra Bank, then National City.

6  National City had acquired many other -- Integra had acquired

7  many other banks along the way, PennBank, McDowell, Keystone;

8  many others.

9  Q.  Now, those entities that you just mentioned, including

10  PennBank and Integra Bank, all of those account records are

11  now within the possession of National City Bank?

12  A.  Yes, they are.

13  Q.  And do you have some familiarity with regard to those

14  records, as well as National City Bank's records?

15  A.  That's correct.

16  Q.  Miss Swaney, right to your left is a stack of documents.

17  Could you please pick them up?

18  A.  Um-hum.

19  Q.  And the first document you have is Government

20  Exhibit 11-A.  Do you see that?

21  A.  Yes, I do.

22  Q.  And do you recognize that document?

23  A.  Yes.  It's a signature card that we used back when we

24  were Integra at the time.  And actually this is for a

25  non-personal or a commercial signature card.

                    Swaney - Direct              7

1  Q.  What is a signature card?

2  A.  It's actually a contract with a customer.

3  Q.  Okay.  Now, what use does the bank make of the signature

4  card?

5  A.  Well, basically we used signature cards to verify

6  signatures on items coming in and items that we are

7  processing for the individual or business.

8  Q.  Now, when somebody opens a bank account at National City

9    Bank or one of those other entities you mentioned, what is

10   the first thing they need to do?

11   A.   Well, obtain all the personal information, name and

12   address, Social Security number, et cetera, along with their

13   signature.

14        MR. LEVETO:  I object, Your Honor.  I object.  This

15   object is part of or will be part of fruits of the

16   unconstitutional search warrant.

17        THE COURT:  I've already ruled on that --

18        MR. LEVETO:  And the summonses.

19        THE COURT:  -- in that hearing, Mr. Leveto.  That's

20   on the record that the suppression motion was denied.

21        Go ahead.

22        MR. VORACEK:  Thank you, Your Honor.

23   Q.   So, you indicated that when somebody opens an account,

24   they need to file -- a signature card needs to be on file?

25   A.   Correct.

                    Swaney - Direct                 8


1    Q.   Now, is a signature card prepared by somebody at the

2    bank?

3    A.   Yes.

file:///A|/LEVETO-3.TXT

4  Q.  And what is it prepared based upon?

5        Is it the information that the individual provides?

6  A.  Yes.  Yes.

7  Q.  And when is the signature card prepared, at or about

8  that same time?

9  A.  At about the time of the account opening.

10  Q.  And how are signature cards maintained at National City

11  Bank?

12  A.  Currently?

13  Q.  Yes.

14  A.  Currently, they are scanned and then after so many days,

15  they are destroyed.  But, they are scanned and kept on file.

16  Q.  Now, how was the process done in 1995 at Integra Bank,

17  if you know?

18  A.  Actually, at that time, they were basically signed and

19  filed in alphabetical order.

20  Q.  Now, did National City Bank, and the entities that it

21  possessed, did they prepare and maintain these signature

22  cards in the ordinary course of its business?

23  A.  Yes.

24  Q.  Now, with regard to Government Exhibit 11-A, what is the

Swaney - Direct                9


1  A.  Center Company doing business as Langdon and Leveto.

2  Q.  And could you tell from that document the date that the

3  account was opened or the date of the signature card?

4  A.  Th date of the signature card is 9-27-95.

5       MS. VORACEK:  Your Honor, the government moves for

6  admission of Exhibit 11-A.

7       THE COURT:  11-A is admitted.

8  Q.  Now, with regard to the signature card in front of you,

9  I'll have you refer to that.  The account is in the name of

10  Center Company DBA.

11       Is there also an account number associated with it?

12  A.  Yes.

13  Q.  What's the number of that account?

14  A.  0101012229.

15  Q.  So, I also notice that there is an address on the

16  signature card.  Is that correct?

17  A.  That's correct.

18  Q.  For what purpose would the bank make of the address on

19  the signature card?

20  A.  Normally that's used for mailing purposes for the

21  statements for the account.

22  Q.  And where were these statements for the Center Company

23  account mailed to?

24  A.  388 Edgewood Drive, Meadville Pa., 16335.

25  Q.  I also notice on the signature card that an individual

Swaney - Direct                10

1  can check the type of account.  Do you see that?

2  A.  Yes.  Where you referring to, the type of product?

3  Q.  Yes.

4  A.  Okay.

5  Q.  And what was the type of account that was set up here?

6  A.  This was a business checking.

7  Q.  All right.  And can an individual describe if it's a

8  partnership or an unincorporated business organization or

9  sole proprietorship?

10  A.  Yes.

11  Q.  And what is this signature card?

12  A.  An unincorporated business organization for profit.

13  Q.  Are you familiar with unincorporated business

14  organizations for profit, Miss Swaney?

15  A.  Yes.

16  Q.  Now, what are the names reflected underneath that line?

17  A.  These are normally authorized signers for this account.

18  Q.  And who were the authorized signers?

19  A.  Looks like Daniel J. Leveto, Jack D. Williams, Margaret

20  A. Leveto.

21  Q.  Now, is an individual also required to sign the

22  signature card?

23  A.  Yes.

24  Q.  And do you see signatures next to those names?

25  A.  Yes, I do.

                    Swaney - Direct              11

1  Q.  And does the bank obtain those signatures at the time

2  that the account is opened?

3  A.  Normally, yes.  But, they are permitted to leave the

4  establishment.

5  Q.  Now, when the person opens an account and fills out a

6  signature card, are they also to provide some sort of

7  identification numbers?

8  A.  Yes.

9   Q.   And what type of identification numbers?

10   A.   We must have either their TIN or Social Security number.

11   Q.   What's a TIN?

12   A.   Tax identification number.  Those are normally spelled

13   out for businesses.

14   Q.   And in this case, what was the identification number

15   used for Center Company?

16         Was it a Social Security number or an employer

17   identification number?

18   A.   It was an employer identification number, and it was

19   980119216?

20   Q.   Now, I believe you indicated that the date of the

21   signature card was 9-27-95?

22   A.   Correct.

23   Q.   Is that what's reflected on the signature card?

24   A.   Yes, sir, that's correct.

25   Q.   Miss Swaney, I now ask you to look at what's been marked

                    Swaney - Direct               12


1   as Government Exhibits 11-B-1.

2         Do you have that in front of you?

3  A.  Yes, I do.

4  Q.  What is 11-B-1?

5  A.  This is a statement for Center Company doing business as

6  Langdon and Leveto.

7  Q.  Is there other documents attached to the statement or is

8  it just the statement?

9  A.  There are other documents.

10  Q.  And what type of other documents are there?

11  A.  They are deposit tickets for this account.

12  Q.  And can you describe for what purpose does the bank make

13  of a bank statement?

14  A.  Well, we are required to disclose any deposit

15  transactions that have occurred on this account.

16  Q.  And are you familiar with the process by which a bank

17  generates a bank statement?

18  A.  I can tell you the way that National City generates a

19  statement.

20  Q.  And how is that, please?

21  A.  Well, depending upon whether it's a personal or business

22  account, there are certain dates that they cut off for the

23  customer.

24      At that particular time, they gather all the

25   deposits that were made on the checks debits that were

Swaney - Direct                13

1   associated with the account, they gather that information and

2   they complete a statement and mail it to the customer.

3   Q.   So, all the banking activity for a particular period of

4   time is reflected on the statement?

5   A.   Yes.

6   Q.   Now, does the National City Bank do a monthly statement

7   for some other time period?

8   A.   For most of our checking accounts, which this is a

9   checking account, it's a monthly statement.

10   Q.   Now, does the bank then mail that statement to somebody

11   at the end of the month?

12   A.   As a normal course of business, yes.

13   Q.   And who was this statement mailed to?

14   A.   Center Company, doing business as Langdon and Leveto,

15   care of Dr. Daniel Leveto, 388 Edgewood Drive, Meadville,

16   Pa., 16335.

17   Q.   What was the date on that statement, 11-B-1?

18   A.   9-30-91.

19  Q.  Now, you indicated that there were other documents

20  attached to the statement, deposit tickets, deposit items.

21  Is that true?

22  A.  I only see deposit tickets.

23  Q.  Deposit tickets?

24  A.  Um-hum.

25  Q.  Are those the types of documents that were generated by

Swaney - Direct              14

1  National City Bank?

2  A.  We process them.  We do not print them.

3  Q.  And can you describe the processing?

4  A.  At this point in time when this deposit statement was

5  created, they actually went -- they were created at the

6  branch.  The branch processed those items via their

7  terminals, depending upon what type they had at that point in

8  time.

9        The work is then gathered.  Then goes to a central

10  processing place, goes to various different types of

11  machinery.  They punch the micro line, which is the black

12  numbers at the bottom of the tickets, gathers that

13  information and it is processed that evening and the customer

14  is given appropriate credit at that time.

15  Q.   And you said that same evening that they are processed?

16  A.   Yes.

17  Q.   So, in other words, those tickets are created pretty

18  much contemporaneously with when the transaction has actually

19  occurred, at or about the same time?

20  A.   They are processed, yes.

21  Q.   Now, with regard to the statements and those deposit

22  tickets that are attached to it, how are those maintained at

23  National City Bank?

24  A.   We actually have a -- we did have huge file rooms where

25  these were kept prior to going out to the customer

Swaney - Direct               15

1  statements.

2  Q.   You actually kept a hard copy?

3  A.   Yes.

4  Q.   Is that the same process that's employed now by National

5  City Bank?

6  A.   No.

7  Q.   What do you do now?

8  A.  Actually, now they are kept at the branch.  They stay at

9  the branch for one business day.  They leave the branch.

10  They go to another back room department, and then after

11  ninety days they are destroyed.

12  Q.  Now, was Government Exhibit 11-B-1, the statement and

13  the items attached thereto, were those generated in the

14  regular course of the normal business practice of National

15  City Bank or one of its entities?

16  A.  Yes.

17  Q.  And were they also maintained in the regular course of

18  the business?

19  A.  National City business?

20  Q.  Yes.

21  A.  Yes.

22      MS. VORACEK:  Your Honor, the government moves for

23  admission of Government Exhibit 11-B-1.

24      THE COURT:  11-B-1 is admitted.

25  Q.  Miss Swaney, you also have before you?

Swaney - Direct                16

1  Government Exhibits 11-B-2, B-3 and B-4.

2  A.  Yes.

3   Q.   Do you see those documents?

4   A.   Yes, I do.

5   Q.   And what are those?

6   A.   Again, they are more statements.  And, again, I see

7   deposit tickets, deposit tickets and deposit tickets.

8   Q.   Are those the same type of documents, the statements,

9   deposit tickets, to which you just testified regarding

10   11-B-1?

11   A.   Yes.

12   Q.   And those are also generated and maintained in the

13   ordinary course of National City Bank as 11-B-1?

14   A.   Yes.

15   Q.   And what were the dates of those documents again?  I'm

16   sorry.

17   A.   11-B-2 is for 10-30-91.  11-B-3 is for 11-30 of '91, and

18   11-B-4 is for 12-30-91.

19        MS. VORACEK:  Your Honor, the United States moves

20   for admission of Government Exhibits 11-B-2 through 11-B-4.

21        THE COURT:  11-B-2 through 11-B-4 are admitted.

22   Q.   Miss Swaney, I ask you to look at Government Exhibit

23   11-B-2 for one moment.

24  A.  Okay.

25  Q.  You have the statement in front of you?

Swaney - Direct                17

1  A.  Yes, I do.

2  Q.  Does the statement -- and for what time period is 11-B-2

3  again?

4  A.  Basically from 9-30 of '91 through 10-31-91.

5  Q.  So, it is for the month of October, 1991?

6  A.  Yes.

7  Q.  And it reflects all the banking activity for that

8  account?

9  A.  Yes.

10  Q.  In looking at that document, do you see if there are a

11  few deposits or many deposits made into that account?

12  A.  There are quite a few.  There are many.

13  Q.  Does it appear to you as if there are deposits being put

14  into that account on a daily basis?

15  A.  Looks to be.

16  Q.  Miss Swaney, does the bank on the bank statement total

17  the amount of deposits that are put into an account?

18  A.  Yes, it does.

19  Q.  And how many deposits were actually put into the Center

20  Company account in October of 1991?

21  A.  There were fifty-one deposits and credits.

22  Q.  Totalling what amount?

23  A.  $52,919.30.

24  Q.  Miss Swaney, do you have Government Exhibit 11-B-5 up

25  there as well?

Swaney - Direct                18

1  A.  Yes.

2  Q.  And what is Government Exhibit 11-B-5?

3  A.  These look to be checks drawn on Center Company.

4  Q.  For what time period?

5  A.  Once they are all in order, it appears to be from

6  September through December of 1991.

7  Q.  And are those checks related to the same account which

8  you just testified regarding 11-A and 11-B?

9  A.  Yes, they are.

10  Q.  Now, who can sign a check for a bank account?

11  A.  Any authorized signer from the signature card.

12  Q.  And so you have to be on the signature card in order to

13  sign checks?

14  A.  Yes.

15  Q.  And who signed -- if you can look at one check on

16  11-B-5, who signed the check, if you can read it?

17  A.  Doctor -- I am not sure of the name.  It's Dan, David,

18  Leveto, general manager.  Sorry.  I can't read the writing.

19  Q.  All right.  Now, I noticed, Miss Swaney, that the

20  accounts to which you just testified, 11-B-1 through 4, and

21  also now this check as in 11-B-5, relate to the 1991 year?

22  A.  Correct.

23  Q.  However, the signature card that we discussed in 11-A

24  related to an account dated not for 1995?

25  A.  Correct.

Swaney - Direct            19

1  Q.  Do you know if there was a signature card available for

2  this account for 1991?

3  A.  I can only assume.  I don't know for sure.

4  Q.  Do you know what happens to signature cards that are

5  dated maybe ten years old?

6  A.  Normally, if there is any change in authorized signers,

7  the new or most current date appears on the signature card,

8   as opposed to the previous date.

9   Q.   Are you saying that there could have been another or the

10   same account for the operating account, but just that there

11   must have been a change in 1995 and that is why this

12   signature card was generated?

13   A.   That would be my assumption, yes.

14   Q.   Now, with regard to old signature cards maintained by

15   the bank, what becomes of them?

16   A.   Actually, they are filed in a closed file, if you will.

17   After a certain length of time, they are sent to underground

18   storage, national underground storage.  There is actually a

19   mine, and they are kept in that particular location.

20   Q.   And are old signature cards easy for the bank to obtain?

21   A.   Oh, no.  We actually have to go through a process.  We

22   have a -- we outsource with a company and we actually have to

23   fill out particular forms.  They have to find that particular

24   box, and then they have to get into that particular box and

25   find the one item that we are looking for.

Swaney - Direct                20

1        So, it is a very tedious process.

2  Q.  Now, Miss Swaney, I ask you again to go back to 11-B-5.

3       I believe you testified that those were checks from

4  1991?

5  A.  Correct.

6  Q.  And I believe you testified that you could read a

7  signature on that check?

8  A.  Somewhat, yes.

9  Q.  And is it your testimony that an individual who signed

10  the check in 1991 had signature -- the signature authority

11  over that account?

12  A.  Correct.

13       MS. VORACEK:  Your Honor, the government moves for

14  the admission of Government Exhibit 11-B-5.

15       THE COURT:  11-B-5 is admitted.

16  Q.  Miss Swaney, prior to you testifying today, have you had

17  an opportunity to review the government exhibits relating to

18  National City Bank documentation prior to coming in?

19  A.  Yes, I have.

20  Q.  And were those documents reflected in Government's

21  Exhibits 11 through 20, to the best of your knowledge?

22  A.  To the best of my knowledge, yes.

23  Q.  When you looked at those documents, did you determine in

24  your mind whether or not those were the documents of National

25  City Bank or one of the entities that it possessed?

Swaney - Direct            21

1  A.  Yes, I did.

2  Q.  And in your mind, did you determine whether or not

3  those -- well, generally speaking, what were those types of

4  documents that you looked at?

5  A.  Basically the statements, deposits, items that made up

6  the deposits, checks that had cleared on the particular

7  accounts.

8  Q.  Were they -- were each one of the numbers, exhibits, a

9  different account?

10  A.  Yes.  And there were also different numbers within a

11  number that were for a particular month within a year.

12  Q.  All right.  And you reviewed every single document

13  related to Government Exhibits 11 through 20?

14  A.  Yes, I did.

15  Q.  And did you find whether or not those documents, those

16  bank documentations were also generated by your banking

17  institution in the regular course of its practice as to which

18  you just testified in 11-B?

19  A.  Yes, that's correct.

20  Q.  And were they also maintained in the same regular course

21  of business as to which you just testified regarding 11-B?

22  A.  That's correct.

23  Q.  If you found that to be true, did you mark the folder of

24  the particular bank documentation?

25  A.  Yes.  I have my initials on the file folders.


                    Swaney - Direct              22


 1  Q.  And your initials indicated what?

 2  A.  That I had reviewed and approved that these were truly

 3  National City or the predecessor documents.

 4  Q.  Now, Miss Swaney, I ask you if you reviewed Government

 5  Exhibits 11-C-1 through 11-C-12 prior to trial?

 6  A.  Yes.  I know I reviewed them.

 7  Q.  What were those documents?

 8  A.  In particular, I don't remember.

 9  Q.  Do you have any documentation with you that you brought

10  to the witness stand that would help you refresh your memory

11  as to what those particular documents were?

12  A.  Yes, I do.

13  Q.  And what type of statement or writing do you have in

14  that regard?

15  A.  It's actually a listing of each individual numbered item

16  along with a description of such.

17  Q.  And you reviewed that list and compared it to the actual

18  documentation?

19  A.  Yes, I did.

20  Q.  And that would help you remember what the government

21  exhibit was with relation to the description of that exhibit?

22  A.  Yes.

23       MR. VORACEK:  Your Honor, I ask that the witness be

24  allowed to review that document as a means to refresh her

25  memory concerning that documentation.


                    Swaney - Direct              23


1        THE COURT:  She may.

2        MR. VORACEK:  And I have a copy, if I may, for the

3  Court.  And I also provided defense with a copy.

4  Q.  Miss Swaney, what are Government's Exhibits 11-C-1

5  through 11-C-12?

6  A.  They are statements for the Center operating account

7    from January of 1992 through December of 1992.

8    Q.   Now, are they just statements or were there other

9    banking documentation included with the statements?

10   A.   There was other documentation there.

11   Q.   Such as what?

12   A.   Such as deposit tickets, checks cleared, et cetera.

13   Q.   I don't want to put words in your mouth, but is it safe

14   to assume that the documentation, such as the deposit items,

15   tickets and checks relate to that statement to which they are

16   attached?

17   A.   For that current timeframe, yes.

18   Q.   And were the documentation in Government Exhibits 11-C-1

19   through 11-C-12 generated and maintained by National City

20   Bank or one of its entities in the same manner as you

21   previously testified regarding 11-B-1?

22   A.   Yes, that's correct.

23        MR. VORACEK:  Your Honor, the United States moves

24   for admission of Government Exhibit 11-C-1 through 11-C-12.

25        THE COURT:  11-C-1 one through 12 are admitted.

                    Swaney - Direct              24


1    Q.   Miss Swaney, have you reviewed Government Exhibits

2  11-D-1 through 11-D-12?

3  A.  Yes.

4  Q.  And what are they?

5  A.  Those are actually the same types of documents,

6  statements for the Center operating account for the timeframe

7  of 1993, January through December.

8  Q.  So, is 11-D-1 through 11-D-12, are those the twelve

9  months of the year of 1993?

10  A.  Yes, sir, they are.

11  Q.  And were those documents also generated and maintained

12  in the same manner by National City Bank as to which you just

13  testified regarding 11-B-1?

14  A.  Yes.

15      MR. VORACEK:  The United States moves for admission

16  of Government Exhibits 11-D-1 through 11-D-12.

17      THE COURT:  11-D-1 through 11-D-12 are admitted.

18  Q.  Miss Swaney, I now ask you if you reviewed Government

19  Exhibits 11-E-1 through 11-E-12?

20  A.  Yes.

21  Q.  And what are those documents?

22  A.  Again, those are statements containing all the

23  appropriate documents for the year of 1994, January through

24  December.

25  Q.  For?


                    Swaney - Direct               25


1  A.  For the Center operating account.

2  Q.  And were those generated and maintained in the same

3  manner by National City Bank as those documents reflected in

4  11-B-1?

5  A.  Yes.

6        MR. VORACEK:  The United States moves for admission

7  of Government Exhibits 11-E-1 through 11-E-12.

8        THE COURT:  11-E-1 through 11-E-12 are admitted.

9  Q.  Miss Swaney, do you also -- have you had an opportunity

10  to review Government Exhibit 11-E-13?

11  A.  Yes, I have.

12  Q.  And what was Government Exhibits 11-E-13?

13  A.  They were actually checks that cleared for the Center

14  operating account for the year 1994.

15  Q.  And were those generated and maintained by National City

16  Bank in the same manner as those documents reflected in

17  11-B-1?

file:///A|/LEVETO-3.TXT

18  A.  Yes.

19        MR. VORACEK:  The United States moves for admission

20  of Government Exhibit 11-E-13.

21        THE COURT:  11-E-13 is admitted.

22  Q.  Miss Swaney, have you reviewed Government Exhibits

23  11-F-1 through 11-F-12 prior to trial?

24  A.  Yes, I have.

25  Q.  And what are those documents?


                    Swaney - Direct              26


1  A.  They are statements, again, for Center operating account

2  for the year 1995, January through December.

3  Q.  And Government Exhibit 11-F-13, what is that?

4  A.  Again, those are checks that have cleared on the Center

5  operating account for the year 1995.

6  Q.  For the entire year?

7  A.  Yes.

8  Q.  And were those documents generated and maintained by

9  National City Bank in the same manner as to which you

10  previously testified regarding 11-B-1 through 11-B-5?

11  A.  Yes, they are.

12          MR. VORACEK:  The United States moves for admission

13   of Government Exhibits 11-F-1 through 11-F-13.

14          THE COURT:  11-F-1 through 11-F-13 is admitted.

15          MR. VORACEK:  Your Honor, if I may hand the clerk

16   some additional documentation for Miss Swaney.

17   Q.   Miss Swaney, I ask you now if you can recognize what's

18   been marked as Government Exhibit 11 -- I'm sorry -- 12-A?

19   A.   Okay.

20   Q.   Do you recognize that document?

21   A.   Well, it's just a handwritten document explaining the

22   information that our photocopy legal area has found or not

23   found.

24   Q.   But, is there any account referenced on that document?

25   A.   Yes.  It states Center Company holding account

                    Swaney - Direct                27

1   No. 0101017764.

2   Q.   And do you recognize anything particular about

3   Government Exhibit 12-A?

4   A.   It says account closed, card not applicable in

5   storage-in U.S.

6          Again, this is the National Underground Storage

7  Company that we used where we maintain all of our closed

8  signature cards.

9  Q.  So, as someone who has been with National City Bank or

10  its entities for thirty years and you see a statement like

11  that, what does that indicate to you?

12  A.  That tells me that the card was not readily available

13  for any type of photocopying, that it's in storage in our

14  underground mines.

15  Q.  Miss Swaney, I ask you to examine what's been marked as

16  Government Exhibit 12-B-1.

17        Do you have that in front of you?

18  A.  Yes, I do.

19  Q.  What is that document?

20  A.  This is a statement for Center Company along with

21  National City deposits, and it looks like they are offsets.

22        And by that I mean, if there was cash or a check

23  enclosed in the deposit.

24  Q.  And what is the name of the account?

25  A.  This account is Center Company.

Swaney - Direct          28

1  Q.  And is there an address also associated with that

2  account?

3  A.  Yes.  388 Edgewood Drive, Meadville, Pa., 16335.

4  Q.  Miss Swaney, in looking at the account number, is that

5  the same account number as to which you just testified

6  regarding Government Exhibit 11?

7  A.  No.

8  Q.  This is a --

9  A.  This is a different account.

10  Q.  A different account?

11  A.  Yes.

12  Q.  And 12-B-1, again, those are the documentations for --

13  the bank documentations for what time period?

14      I am sorry if I missed it.

15  A.  12-B-1?

16  Q.  Yes.

17  A.  October of 1991 for -- it's for this same account that I

18  have in my hand right now.

19  Q.  Now, Miss Swaney, with regard to Government Exhibit

20  12-B-1, those bank statements and related documentation, were

21  they generated and maintained by National City Bank or one of

22  its entities in the same manner as to which you just

23   testified regarding the eleven series?

24   A.  Yes.

25        MR. VORACEK:  Your Honor, the United States moves


                    Swaney - Direct              29


1   for admission of Government Exhibit 12-B-1.

2        THE COURT:  12-B-1 is admitted.

3        Had you intended to offer 12-A as well?

4        MR. VORACEK:  Yes, Your Honor.

5        THE COURT:  All right.  12-A is admitted.

6        MR. VORACEK:  Thank you, Your Honor.

7   Q.  Now, in looking at Government Exhibit 12-B-1, were there

8   any checks in that exhibit?

9   A.  Yes.

10  Q.  And can you read the signature of anybody who signed a

11  check?

12  A.  Again, it's Dr. D. something, Leveto.

13  Q.  Now, Miss Swaney, you testified that the signature card

14  for the Government Exhibit 12 documentation was in storage?

15  A.  Correct.  The original, yes.

16  Q.  Is it your testimony, though, that if an individual

17  signs a check for an account, they do have signature

18  authority over that account?

19  A.  Yes.

20  Q.  I believe you already previously testified to that in

21  regards to Government Exhibit 11?

22  A.  Yes.

23  Q.  Is that something that when a person signs a check, that

24  the bank insures that that individual does have signature

25  authority over that account?

Swaney - Direct            30

1  A.  Yes.  I am saying that hesitantly because we do not look

2  at each and every item.

3  Q.  But, legally an individual can sign a check only if they

4  have signature authority over that account?

5  A.  That is correct.

6  Q.  Now, you also have before you, I believe, Government

7  Exhibits 12-B-2 and 12-B-3.

8       And can you look at them briefly, Miss Swaney?

9  A.  Um-hum.

10  Q.  Do you recognize those documents?

11  A.  Yes, I do.

12  Q.  And what are they?

13  A.  Again, these are statements along with a copy of an

14  individual deposit with its offset.

15      And this is a copy of a check.  On the -- these are

16  for just the Center Company account.

17  Q.  Is 12-B-2 and 12-B-3 also bank documentation with regard

18  to the same account to which you just testified in 12-B-1?

19  A.  Yes.

20  Q.  Now, for what time periods are 12-B-2 and 12-B-3?

21  A.  12-B-2 is for 11-30 of '91.  And 12-B-3 is for 12-31-91.

22  Q.  And those documents in 12-B-2 and 12-B-3, were they

23  maintained and generated by National City Bank or one of its

24  entities in the same manner in which you just testified

25  regarding 12-B-1?

                    Swaney - Direct              31


1  A.  Yes.

2      MR. VORACEK:  Your Honor, the government moves for

3  the admission of 12-B-2 and 12-B-3.

4      THE COURT:  12-B-2 and 12-B-3 are admitted.

5  Q.  And, Miss Swaney, have you also had an occasion prior to

6    trial to review Government Exhibits 12-C-1 through 12-C-12?

7    A.   Yes, I have.

8    Q.   And what are those documents?

9    A.   They are, again, statements for the Center holding

10   account for January, 1992, through December, 1992.

11   Q.   And were those documents generated and maintained in the

12   same manner by National City Bank as those documents to which

13   you just testified in 12-B?

14   A.   Yes.

15          MR. VORACEK:  Your Honor, the United States moves

16   for admission of Government Exhibits 12-C-1 through 12-C-12.

17          THE COURT:  12-C-1 through 12-C-12 are admitted.

18   Q.   Have you also reviewed Government Exhibits 12-D-1

19   through 12-D-12?

20   A.   Yes.

21   Q.   And what are those documents?

22   A.   Again, these are statements for Center holding account

23   January, 1993, through December, 1993.

24   Q.   For the 1993 years?

25   A.   1993.

Swaney - Direct                32

1  Q.  And were those documents generated and maintained by

2  National City Bank in the same manner to which you just

3  testified regarding 12-B?

4  A.  Yes.

5       MR. VORACEK:  Your Honor, the United States moves

6  for admission of Government Exhibits 12-D-1 through 12-D-12.

7       THE COURT:  12-D-1 through 12-D-12 are admitted.

8  Q.  And, Miss Swaney, have you prior to trial reviewed

9  Government Exhibits 12-E-1 through 12-E-12?

10  A.  Yes, I have.

11  Q.  And what are those documents?

12  A.  These, again, were statements for Center holding account

13  January, 1994, through December, 1994.

14  Q.  And were those documents generated and maintained by

15  National City Bank in the same manner as those documents that

16  you just testified to regarding 12-B?

17  A.  Yes.

18       MR. VORACEK:  Your Honor, the United States moves

19  for admission of 12-E-1 through 12-E-12.

20       THE COURT:  12-E-1 through 12-E-12 are admitted.

21  Q.  Miss Swaney, have you prior to trial reviewed Government

22  Exhibits 12-F-1 through 12-F-12?

23  A.  Yes.

24  Q.  What are they?

25  A.  These are statements for Center holding account January,

                    Swaney - Direct                33

1   1995, through December, 1995.

2   Q.  Were those generated and maintained in the same manner

3   by National City Bank as those documents to which you just

4   testified in 12-B?

5   A.  Yes.

6        MR. VORACEK:  Your Honor, the United States moves

7   for admission of Government Exhibits 12-F-1 through 12-F-12.

8        THE COURT:  12-F-1 through 12-F-12 are admitted.

9   Q.  Miss Swaney, have you also reviewed Government Exhibit

10  12-G?

11  A.  Yes, I have.

12  Q.  And what was 12-G?

13  A.  Again, it was a statement for Center holding account for

14  January, 1996.

15  Q.  And was that also maintained and generated by National

16  City Bank in the same manner as to which you just testified

17  in 12-B?

18  A.  Yes.

19        MR. VORACEK:  Your Honor, the government moves for

20  admission of Government Exhibit 12-G.

21        THE COURT:  12-G is admitted.

22  Q.  And, Miss Swaney, I ask you if you previously reviewed

23  Government's Exhibits 13-A and 13-B?

24  A.  Yes, I did.

25  Q.  And what are those documents?

                    Swaney - Direct                34

1  A.  13-A is a signature card for another Center holding

2  account with a different account number.

3        And 13-B is a statement for this account that I was

4  just referencing for 13-A, account No. 0101138904.

5  Q.  And were those generated and maintained in the same

6  manner to which you just testified regarding Exhibit 12-B?

7  A.  Yes.

8        MR. VORACEK:  Your Honor, the United States moves

9  for admission of Government Exhibits 13-A and 13-B.

10        THE COURT:  13-A and 13-B are admitted.

11          MR. VORACEK:  Your Honor, if I may provide

12  Miss Swaney with additional documentation?

13  Q.   Miss Swaney, I have handed you what's been marked as

14  Government Exhibit 12-C-3.

15          Do you have that in the folder in front of you?

16  A.   Yes, I do.

17  Q.   And I believe you have already testified -- this

18  document has been admitted into evidence -- that this

19  document was maintained by your business in the general

20  course of business of National City Bank?

21  A.   That's correct.

22  Q.   And what is the date of this document?

23  A.   3-31-92.

24  Q.   And what's the account name?

25  A.   Center Company.


                    Swaney - Direct                    35


 1  Q.   Is there anything else written under Center Company on

 2  the account?

 3  A.   In care of Daniel Leveto, general manager, or Margaret

 4  Leveto, co-general manager, along with the address.

 5  Q.   Now, does the statement, page one of Government Exhibit

6  12-C-3, indicate whether or not there were any wire

7  transfers?

8  A.  Yes.

9  Q.  And when would the wire transfers have occurred?

10  A.  There was a wire transfer on March 30th.

11  Q.  And in what amount was the wire transfer?

12  A.  $33,671.00.

13  Q.  And was that a wire transfer out of the Center Company

14  account or into the Center Company account?

15  A.  No.  It's a debit, so it went out of the account.

16  Q.  I ask you now to look at page fifteen of Government

17  Exhibit 12-C-3.

18      Do you have that in front of you?

19  A.  Yes, I do.

20  Q.  What is reflected on page fifteen of Government Exhibit

21  12-C-3?

22  A.  This is actually a report regarding the wire transfer

23  that is generated by National City.  This is -- normally,

24  this isn't something that the customer receives.

25  Q.  This is an internal banking document?

Swaney - Direct        36

1   A.   Yes, it is.

2   Q.   But, it's a document that's generated and maintained by

3   your business?

4   A.   That's correct.

5   Q.   Is this document generated at the time that the wire

6   transfer is made?

7   A.   Once it's sent.  Once it's processed.

8   Q.   Once it's sent?

9   A.   Yes.

10   Q.   Now, again, with regard to this document, on page

11   fifteen of 12-C-3, does this relate to the same wire transfer

12   to which you just testified that is reflected on the

13   statement on March 30th?

14   A.   Yes.

15   Q.   Now, which entity or which account was being debited?

16   A.   Center Company.

17   Q.   And what was the amount of the debit?

18   A.   $33,671.00.

19   Q.   And by "debit," again, you mean that monies are being

20   taken out of?

21   A.   Taken out of that account, yes.

22  Q.  Where do those monies go?  Is that reflected on page

23  fifteen?

24  A.  Yes.  It went to Barclays Miami.  Looks like it further

25  went to Turks and Caicos Islands.

Swaney - Direct                37

1  Q.  Miss Swaney, I now ask you to set aside Government

2  Exhibit 12-C-3.  I'm sorry.

3        Can you pick that back up again for a moment?

4  A.  Um-hum.

5  Q.  Is there an account at the Barclays Bank that that money

6  was sent to, a specific account?

7        Can you determine that from the --

8  A.  It looks like I can read it.  066010740.

9  Q.  Was there an account name on the account at Barclays?

10  A.  I don't see one.

11  Q.  But, again, I refer you to page fifteen.

12        Do you have that in front of you, Miss Swaney?

13  A.  I sure do.

14  Q.  On the second column, the first part of the page on the

15  second column, I see Barclays Bank, Grank Turk, Turks and

16  Caicos.  Do you see that?

17  A.   Yes, I do.

18  Q.   If you go down that same column, do you also see three

19  initials, BNF?

20  A.   Yes.  Benefit.

21  Q.   What does that mean, "benefit?"

22  A.   Normally, that's who is receiving the funds.

23  Q.   Who is receiving the funds at that account at Barclays

24  Bank in the Grank Turk, Turks and Caicos?

25  A.   Looks to be ASTCO, Limited, if I'm saying it correctly.

Swaney - Direct            38

1  Q.   Right underneath the BNF?

2  A.   Right underneath there.

3  Q.   That would be who is receiving, in this case, the

4  $33,671.00?

5  A.   Correct.

6  Q.   Miss Swaney, I now ask you to look at Government Exhibit

7  12-C-8.  Do you have that in front of you?

8  A.   Okay.

9  Q.   And the first page of that exhibit, does that also -- is

10  this also an account of Center Company?

11  A.  Yes, it is.

12  Q.  And for which time period is this account?

13  A.  This is for 8-31-92.

14  Q.  And do you notice on that page, that first page of

15  Government Exhibit 12-C-8, whether or not there were any wire

16  transfers related to that account?

17  A.  Yes.  There was a wire on August the 7th for $5,500.00.

18  Q.  And, again, was that a wire that came out of this

19  account or into this account?  Can you tell?

20  A.  No.  It's a debit.  So, it went out.

21  Q.  On August 7th?

22  A.  August 7th.

23  Q.  Now, I ask you to look at page six.

24  A.  Okay.

25  Q.  What is reflected on page six?

Swaney - Direct                39

1  A.  Again, this is our internal report of the transaction

2  that took place on that day, the wire transfer.

3  Q.  On that same date to which you just testified?

4  A.  That's correct.

5   Q.   In August of 1992?

6   A.   Um-hum.

7   Q.   And what was the amount that was wire transferred as

8   reflected on this document?

9   A.   I'm sorry?  The amount?

10   Q.   Yes, please.

11   A.   $5,500.00.

12   Q.   And that amount was being wired by whom?

13   A.   By Center Company.

14   Q.   Now, does that statement there reflect who received the

15   $5,500.00 that was wired out of Center Company?

16   A.   Yes.

17   Q.   Who received that money?

18   A.   Bank or individual?

19   Q.   Both.

20   A.   Went to the Bankers New York, Bankers Trust Company for

21   further benefit through the bank, Channel Islands, and

22   Dr. D.J. and Mrs. M.A. Leveto were the recipients.

23   Q.   Can you tell us what the name of the bank was there in

24   the Channel Islands?

25   A.   TSB Bank.

1  Q.  And does that documentation, page six, does that also

2  give the address of that bank?

3  A.  Place -- Branch 4709, P.O. Box 597, 8 David Place,

4  St. Helier Jersey, CI.

5  Q.  And, again, as you just testified regarding that other

6  wire confirmation statement, there is a BNF on there.

7       Again, what does that mean?

8  A.  Beneficiary.

9  Q.  Is that the person that receives the money?

10  A.  Correct.

11  Q.  And who is indicated as being the beneficiary of this

12  $5,500.00 wired out of Center Company?

13  A.  Dr. D.J. and Mrs. M.A. Leveto.

14  Q.  Now, does this documentation tell you whether or not

15  Dr. D.J. and Mrs. Mr. A Leveto have an account at TSB Bank in

16  the Channel Islands, or can't you tell that from this?

17  A.  I can only assume.  I don't know for sure.

18  Q.  But, the money was, in fact, actually transferred from

19  the Meadville bank account to a bank account in the Channel

20  Islands?

21  A.  Yes.

22  Q.  And the beneficiary of those monies were Dr. D.J. and

23  Mrs. M.A. Leveto?

24  A.  Yes.

25  Q.  Miss Swaney, I now ask you to look at Government Exhibit

                    Swaney - Direct              41

1  12-C-12.  Do you have that?

2  A.  Yes, I do.

3  Q.  And 12-C-12, that's also the Center Company bank

4  account --

5  A.  Yes, it is.

6  Q.  -- documentation?  And for what period is this?

7  A.  12-31-92.

8  Q.  Now, were there amounts deposited into this account

9  during December of 1992?

10  A.  Yes.

11  Q.  Does the statement reflect or detail out the actual

12  amount of the deposit into this account, the Center Company

13  account?

14  A.  Yes, it does.

15  Q.  And was there a deposit made on twelve -- on

16  December 2nd, 1992, into the Center Company account?

17  A.  Yes.  There were two.

18  Q.  What were the amounts of those deposits?

19  A.  $32,000.00 and $384.42.

20  Q.  Miss Swaney, I ask you now to look at the next page of

21  Government Exhibits 12-C-12, page two.

22  A.  Okay.

23  Q.  Do you have that in front of you?

24  A.  Yes, I do.

25  Q.  What is that document?

Swaney - Direct                    42

1  A.  This actually is an official check from First Home

2  Banking, Limited, actually drawn on Citibank.

3  Q.  Does that document indicate a location of First Home

4  Banking, Limited?

5  A.  Does it do what?  I'm sorry.

6  Q.  Does it indicate where that bank is located, First Home

7  Banking, Limited?

8  A.  Yes, ma'am.

9  Q.  Where is that bank located?

10  A.  Grand Cayman.

11  Q.  And what is the amount of that check?

12  A.  $32,000.00.

13  Q.  And what is the date of that check?

14  A.  November 19th, 1992.

15  Q.  And who was that check made payable?

16  A.  To Leonard Adler.

17  Q.  And was that check -- can you tell from that page, page

18  two of that document you are looking at, if that check, made

19  payable to Leonard Adler, was deposited into the Center

20  Company account in care of Daniel Leveto?

21  A.  Yes.

22  Q.  And how can you tell that, Miss Swaney?

23  A.  Well, I have a deposit ticket in front of me.

24  Q.  What does the deposit ticket reflect?

25  A.  The amount of the item.

Swaney - Direct              43


1  Q.  The amount of the item to which you just testified, that

2  thirty-two -- the $32,000?

3  A.  Um-hum.

4  Q.  And can you also tell from the statement, from that

5   first page, that that check, 32,000 made payable to Leonard

6   Adler from the First Home Banking account, was deposited into

7   the Center Company bank account?

8   A.   Yes.

9   Q.   Miss Swaney, I now ask you to look at Government Exhibit

10   12-C-12.

11   A.   Okay.  That's the same one I have.  Is that correct?

12   Q.   Oh, I'm sorry.  12-D-12.  Thank you.

13   A.   Okay.

14   Q.   Do you have 12-D-3 in front of you, Miss Swaney?

15   A.   Yes, I do.

16   Q.   And page one of 12-D-3, is that the bank statement for

17   the Center Company account?

18   A.   Yes, it is.

19   Q.   The same one to which we have just been talking about?

20   A.   Yes.

21   Q.   And what's the date of that account statement?

22   A.   This one is 3-31-93.

23   Q.   Now, does that bank statement indicate whether or not

24   there were any wire transfers related to that account?

25   A.   Yes.

Swaney - Direct              44

1  Q.  And does it give a date of a wire transfer?

2  A.  There are a couple here.

3  Q.  What were the dates and what were the amounts?

4  A.  We have a credit going into the account, a wire transfer

5  on March 17th for $19,095.00.

6       We have actually two wires going out of the

7  account.  One on 3-12 for $19,095.00.  Another one going out

8  on March 17th of $19,095.00.

9  Q.  Do you have any explanation, Miss Swaney, as to why we

10  have a credit wired for $19,095.00 on March 17 and two debit

11  wires for $19,095.00 on March 12 and March 17?

12       Do you have any explanation with regard to what

13  transpired there?

14  A.   Just basically from personal experience, that perhaps

15  the wire had gone out and the customer changed their mind or,

16  for some reason, the wire did not go on a particular day and

17  it needed to be re-sent.

18  Q.   Now, in fact, were there monies actually wired out of

19  this account in March of 1993?

20  A.   From what I can see in looking at this, yes.

21  Q.  And what amount was wired out of that account?

22  A.  The net figure would be $19,095.00.

23  Q.  Miss Swaney, I ask you to look at page nine of that

24  exhibit.  What is on page nine?

25  A.  Again, this is an internal report from National City,

Swaney - Direct                45

1  Integra at the time, regarding wire transfers.

2  Q.  And is this the transfer to which you just talked about

3  regarding the $19,095.00?

4  A.  Yes.  I'm just looking for the date.  Yes.

5  Q.  And what was the date of that transfer?

6  A.  March 17th, 1993.

7  Q.  And the money was being wired from what individual or

8  entity?

9  A.  Center Company.

10  Q.  And who received that $19,095.00?

11  A.  It went to Barclays Bank in Miami.  Further onto

12  Barclays Bank in British West Indies and Grand Turk.  The

13  beneficiary was, ASTCO, A-S-T-C-O, Limited, Trust Account.

14  Q.  Miss Swaney, I now ask you to look at Government Exhibit

15  12-D-5.

16  A.  Okay.

17  Q.  Do you have that in front of you?

18  A.  Yes, I do.

19  Q.  And what is 12-D-5?

20  A.  Again, a statement for Center Company for -- it looks

21  like May of '93.  Yes.

22  Q.  And does 12-D-5 indicate whether there were any deposits

23  made into that account?

24  A.  Yes, it does.

25  Q.  And when was the deposit made?

                    Swaney - Direct                46

1  A.  May 3rd of 1993.

2  Q.  What was the amount of the deposit into the Center

3  Company account?

4  A.  $17,884.42.

5  Q.  Miss Swaney, I ask you to look at now page two of that

6  same exhibit.

7        Do you have that in front of you?

8  A.  Yes, I do.

9  Q.  Is there a deposit ticket on page two of that exhibit?

10  A.  Yes, there is.

11  Q.  And what is the amount of the total deposit?

12  A.  $17,884.42.

13  Q.  And is there a -- something in writing indicating as to

14  which account that should be deposited into?

15  A.  Yes.  The account number is indicated on the item.

16  Q.  Is there also a description of that account?

17  A.  Yes.  The account name.

18  Q.  What is the account name?

19  A.  Center's Freedom Account.

20  Q.  And the $17,884.00, does that relate to the statement as

21  to the total deposit made into Center's Freedom Account?

22  A.  Yes.

23  Q.  And does the deposit ticket indicate how that $17,884.00

24  has been broken down?

25  A.  Yes.

Swaney - Direct                47

1  Q.  And how has it been broken down?

2  A.  There are two checks.  One, again, is an official check

3  or cashier's check from Barclays in Grand Turk for

4   $17,500.00.  An Integra Bank check for Par Breakers Golf

5   Range for $384.42.

6   Q.   And you have those checks in front of you on page two?

7   A.   Yes, I do.

8   Q.   Let's go to the very top check.

9         The one I believe you indicated was in Barclays?

10  A.   Yes.

11  Q.   Does it indicate where Barclays is located?

12  A.   The issuing office was Grand Turk.

13  Q.   On that check, does it indicate who is to receive the

14  $17,500.00?

15  A.   The check is payable to Center Company.

16  Q.   Under Center Company, the amount of the check has been

17  written out?

18  A.   Correct.

19  Q.   Underneath that line, is something else written there?

20  A.   Yes.  Normally, this is the remitter.

21  Q.   And what do you mean by "remitter"?

22  A.   The purchaser of the item.

23  Q.   The purchaser of the --

24  A.   Official check.

25  Q.   -- of this official check, $17,500.00?

Swaney - Direct                48

1  A.  Yes.

2  Q.  Who was the purchaser of the $17,500.00 check that was

3  deposited into the Center Company Freedom account?

4  A.  Box Elder, Limited.

5  Q.  Miss Swaney, I now ask you to look at Government Exhibit

6  12-D-6.  Do you have that?

7  A.  Yes, I do.

8  Q.  And, again, that is a statement from the same account to

9  which we have just been talking about, the Center Company

10  account?

11  A.  Yes, it is.

12  Q.  What is date on that statement?

13  A.  This one is June 30th, '93.

14  Q.  Now, were there deposits made into the Center Company

15  account during June, 1993?

16  A.  Yes, there were.

17  Q.  How many deposits were made?

18  A.  There were actually three individual deposits.

19  Q.  And what were the amounts of the deposits?

20  A.  384.42, 38,000, and 2254.

21  Q.  Those are monies that were deposited into the Center

22  Company account in June of 1993?

23  A.  Correct.

24  Q.  Miss Swaney, I now ask you to look at page three of

25  Government Exhibit 12-D-6.  Do you have that?


                    Swaney - Direct                    49


1  A.  Yes, I do.

2  Q.  What is reflected on page three of that exhibit?

3  A.  Again, we have a deposit going into the Center Freedom

4  account with an official check from Barclays for $38,000.00.

5  Q.  Okay.  By "official check," again, is that like a

6  cashier's check?

7  A.  That's correct.

8  Q.  And, again, with regard to the $38,000.00 check, who was

9  that check payable to?

10  A.  It's payable to Center Company.

11  Q.  And is there a remitter or purchaser of the $38,000.00

12  reflected on that check?

13  A.  Yes.  It's Box Adler, Limited.

14  Q.  So, by that documentation you can tell that -- that an

file:///A|/LEVETO-3.TXT

15  entity, or someone called Box Adler, Limited, purchased the

16  official check for $38,000.00 that was deposited into the

17  Center Company Freedom account?

18  A.  Yes.

19  Q.  That documentation reflects that?

20  A.  Yes.

21  Q.  Miss Swaney, I now ask you to look at Government Exhibit

22  12-E-3.

23      Do you have that in front of you?

24  A.  Yes.

25  Q.  What is 12-E-3?

Swaney - Direct              50

1  A.  Again, a statement for Center Company for March 31st,

2  1994.

3  Q.  And are there any wire transfers with regard to that

4  account during that month?

5  A.  Yes.  There were two.  One going into the account on

6  March 25th for $14,988.00.  One coming out of the account on

7  March 28 for $12,060.00.

8  Q.  So, on March 25th, when it says "credit wired," that

9   means monies coming into the account?

10  A.  That's correct.

11  Q.  And that's in the amount of what, $14,988.00?

12  A.  Correct.

13  Q.  Miss Swaney, I ask you to look at page seven of that

14  same exhibit.

15  A.  Okay.

16  Q.  What's reflected on page seven?

17  A.  Again, this is a copy of the internal report regarding a

18  wire transfer on March 25th.

19  Q.  In what amount?

20  A.  This one is in the amount of $14,988.00.

21  Q.  And who was the recipient?  Who received the $14,988.00?

22  A.  Center's Freedom account.  Center Company.

23  Q.  And can you tell by that page who sent that money to the

24  Center Freedom account?

25  A.  Looks like the originator was Box Elder, Limited.


                    Swaney - Direct                51


1   Q.  Does it indicate from which bank that that transfer was

2   made from?

3   A.  Barclays in Grand Turk.  BBPLC.(Sp)

4  Q.  And, Miss Swaney, I believe you also indicated that

5  there was also monies that were wired out of the Center

6  Company account in March, 1994?

7  A.  Yes.

8  Q.  I ask you to look at page eleven of that exhibit.

9      Do you have that in front of you?

10  A.  Yes.

11  Q.  What's reflected on page eleven?

12  A.  Again, this is an internal report or wire transfer that

13  occurred on March 28 of 1994.

14  Q.  In what amount?

15  A.  This one is for $12,060.00.

16  Q.  And who received those monies?

17  A.  The ultimate beneficiary was Vericon, Limited.

18  Q.  Does that form indicate which bank those monies were

19  wired to?

20  A.  Barclays Bank, Grand Turk, Turks and Caicos Islands.

21  Q.  And who actually wired the $12,060.00 out?

22      Does that indicate that, that document?

23  A.  Yes.  That came from Center Company.

24  Q.  Miss Swaney, I now ask you to look at Government Exhibit

25  12-F-3.

                    Swaney - Direct              52


1        Do you have that in front of you?

2  A.  Yes.

3  Q.  What is 12-F-3?

4  A.  Again, this is a statement for Center's Holding Account,

5  and this one is for March 31st of 1995.

6  Q.  This is the same account to which we have been talking

7  about?

8  A.  Yes.

9  Q.  Does this document indicate whether or not there were

10  any wire transfers made relating to this account?

11  A.  Yes.  This was one going out on March 14th in the amount

12  of $14,529.00.

13  Q.  When you say the wire was going out, do you mean out of

14  the Center Company account?

15  A.  That's correct.

16  Q.  I ask you to look at page fourteen of that same

17  document.

18  A.  Okay.

19  Q.  What's reflected on page fourteen?

20   A.   Again, this is an internal report regarding the wire

21   transfer.  It was for $14,529.00.

22   Q.   And this is monies which you just testified to that were

23   wired out of the Center Company bank account?

24   A.   That's correct.

25   Q.   And that was on March 14th, 1995?

Swaney - Direct          53

1   A.   Yes.

2   Q.   And who received those monies?

3   A.   Vericon, Limited.

4   Q.   And does that document tell you where Vericon, Limited,

5   is located?

6   A.   Again, the last benefitting bank was Barclays Bank,

7   Grand Turk.

8   Q.   You also have page nineteen in that same exhibit?

9   A.   Yes.

10   Q.   What is page nineteen?

11   A.   Page nineteen is a document notifying the customers of

12   the debit that was from this particular account, from the

13   Center Company account.

14  Q.  Is this a document that's sent to an individual or that

15  is given to an individual at the time of the transaction?

16  A.  It's mailed to the individual.

17  Q.  And where was this document mailed?

18  A.  388 Edgewood Drive, Meadville, Pa., 16335.

19  Q.  And what information was mailed to 388 Edgewood Drive,

20  Meadville, Pennsylvania?

21  A.  It's notifying the customer an advice of debit, which is

22  stating basically that we debited your account.  And it

23  indicates the account number 0101017764, that we debited

24  $14,529.00 from your account.

25  Q.  Does it also notify the individual who received that

                    Swaney - Direct                54

1  money, the $14,529.00?

2  A.  We do not do that, no.  National City does not do that.

3  Q.  Oh.  Well, under advice of debt on that document, it

4  says "BBK."  "BBK," what does that mean?

5  A.  Benefitting bank.

6  Q.  Does that indicate where the $14,529.00 was sent?

7  A.  Yes.

8  Q.  And this document was sent to 388 Edgewood Drive to

9   inform that individual that $14,529.00 was taken out of their

10  account and was sent to a benefitting bank of Barclays Bank,

11  Grand Turk?

12  A.   Correct.

13  Q.   And the BNF was Vericon?

14  A.   Correct.

15  Q.   BFN again is who?

16  A.   Beneficiary.

17  Q.   And BFN, again, is what, Miss Swaney?  Is that the

18  recipient of the monies?

19  A.   That is the benefactor, yes.

20  Q.   Miss Swaney, I ask you now to look at Government Exhibit

21  12-F-5.  What's 12-F-5?

22  A.   Statement for Center holding account for May 31st, 1995.

23  Q.   Is there any wire transfers relating to that account for

24  that month?

25  A.   For this month?

                    Swaney - Direct                55

1   Q.   Yes.

2   A.   I see a wire going into the account, being credited to

3   the account.

4   Q.   On what date?

5   A.   On May 31st.

6   Q.   And what amount was wired into the Center Company

7   holding account on that day?

8   A.   $57,900.00.

9   Q.   Miss Swaney, I ask you now to look at that same

10  Government Exhibit, but page ten.

11  A.   Okay.

12  Q.   What is reflected on page ten?

13  A.   Again, this is internal documentation for National City

14  for a wire that occurred on May 31st, 1995.

15  Q.   And what was the amount of that wire?

16  A.   $57,900.00.

17  Q.   And does that document tell you who received the

18  $57,900.00?

19  A.   Center Company.

20  Q.   Is there also a care of under Center Company?

21  A.   Care of Daniel or Margaret Leveto.

22  Q.   And does that document tell you who wire transferred

23  $57,900.00 to Center Company care of Daniel and Margaret

24  Leveto?

25  A.  I can't distinguish who that is.


                    Swaney - Direct                56


1   Q.  Well, on the first column of that document, I notice it

2   says Banking Client's Services.

3       Does that tell you anything?

4   A.  That is just a division of a bank.  We actually have a

5   division called Private Banking also.

6   Q.  Under the second column of that page, I believe you

7   indicated that that was the recipient of the money?

8   A.  Correct.

9   Q.  You just stated that it was Center Company care of

10  Daniel and Margaret Leveto?

11  A.  Correct.

12  Q.  Underneath that section, does it also state o-r-i-g to

13  BNF info?  Do you see that?

14  A.  I see that.

15  Q.  What does that mean?

16  A.  I have no clue.  It could be instructions.  There are --

17  we actually have space where we can have instructions.  So, I

18  am assuming this is an instruction to Center Company.

19  Q.  Is it safe to assume that information that's located on

20  that page that you have in front of you relates to the

21  $57,900.00 that went into the Center Company bank -- that

22  Center Company bank account?

23  A.  Yes.

24  Q.  It relates to that $57,900.00?

25  A.  Yes, it does.


                    Swaney - Direct                57


1  Q.  Could you read what it says underneath, for --

2  A.  Purchase, PA 235 aircraft.  Payment in full.  I am

3  assuming "pmt" is payment.

4  Q.  Miss Swaney, I ask you to look at Government Exhibit

5  12-F-6.

6       Do you have that in front of you?

7  A.  Yes.  And this is, again, a statement for Center's

8  Holding Account for June 30th, 1995.

9  Q.  Now, you just testified regarding May, 1995, the Center

10  Company holding account?

11  A.  Um-hum.

12  Q.  This is the -- you have to say either yes or no.

13  A.  Yes.

14  Q.   And so this statement that you are looking at now is the

15  very next month, June of 1995?

16  A.   Yes.

17  Q.   With regard to that same bank account?

18  A.   Yes.

19  Q.   Correct?

20  A.   Yes, it is.

21  Q.   Now, does that statement indicate whether or not there

22  were checks written out over the Center holding account in

23  June of 1995?

24  A.   Yes, there were.

25  Q.   Were there any checks written out --

Swaney - Direct                58

1        Well, what was the numbers of the checks that are

2  written out?

3  A.   There were six.

4  Q.   What was the first one?

5  A.   First one is for $1,680.00.

6  Q.   What's the check number?

7  A.   Check number is 344.

8   Q.   And the next one?

9   A.   345 in the amount of $5,000.00.

10  Q.   And the next one?

11  A.   Check No. 346 in the amount of $62,000.00.

12  Q.   Miss Swaney, I now ask you to look at page ten of that

13  document.

14  A.   Okay.

15  Q.   What is reflected on page ten?

16  A.   We have a check from Center's Holding Account in the

17  amount of $5,000.00 made payable to Integra Bank.

18  Q.   And the date of that check?

19  A.   June 7th, 1995.

20  Q.   And has that check been signed?

21  A.   Yes, it has.

22  Q.   And again, a person who signs the check has signature

23  authority over that account?

24  A.   Yes.

25  Q.   And that was June 7th?

                    Swaney - Direct            59


1   A.   June 7th.

2   Q.   I ask you now to look at page eleven.

3          What's reflected on page eleven?

4    A.   Again, it's a check from Center's Holding Account, check

5    No. 346, made payable to Integra Bank in the amount of

6    $62,000.00.

7    Q.   Now, Miss Swaney, as someone who has been with the bank

8    for thirty years, in your experience when you see checks made

9    payable to your own bank in the amount of $62,000.00, are you

10   able to determine what purpose that check has been made

11   payable for, or possible reasons that that check may be

12   payable?

13   A.   I can give possible reasons.

14   Q.   What are some of the possible reasons?

15   A.   This could be payment for a loan.  This could actually

16   be going into another account.  But, usually it's for payment

17   of a loan.

18   Q.   And now this check was made payable in the amount of

19   $62,000.00?

20   A.   Correct.

21   Q.   Was there any other type of instruments or transaction

22   that an individual could make payments by check to a bank

23   that you're familiar with?

24  A.   I mean, they can purchase an official check.  They

25  can -- or cashier's check they may have been called at that

Swaney - Direct                60

1  point in time.  They can deposit these into another account.

2  They can pay on a loan.

3  Q.   You mentioned official checks, cashier's checks.

4        What are those?

5  A.   They are actually checks drawn on -- at this point in

6  time, they were actually drawn on Integra.  So, they become

7  an official check.  They are signed by an officer of the

8  bank.

9  Q.   And what is the purpose of an official check or

10  cashier's check?

11  A.   They are guaranteed funds.

12  Q.   In your banking experience, is it common that when

13  people make large purchases, houses, whatever, that they may

14  purchase a cashier's check or a money order?

15  A.   That's correct.  They do.

16  Q.   Because those monies are guaranteed?

17  A.   That's correct.

18        MR. VORACEK:  Your Honor, if I may hand Miss Swaney

19   some official documentation?

20   Q.   Miss Swaney, I have handed you what's been marked as

21   Government Exhibits 14-A and 14-B-1.

22        Do you have them in front of you?

23   A.   Yes, I do.

24   Q.   What is 14-A?

25   A.   14-A is a copy of a signature card for Langdon and

                    Swaney - Direct            61

1   Leveto Veterinary Hospital Emergency Center.

2   Q.   And what was the date of that signature card?

3   A.   Looks like it was updated.  It says update 7-11-88.

4   Q.   Has that signature card been signed?

5   A.   Yes, it has.

6   Q.   By who?

7   A.   Looks like Daniel Leveto and Margaret A. Leveto.

8   Q.   And is 14-A the signature card generated and maintained

9   by your bank in the same manner to which you previously

10   testified regarding Government Exhibit 11-A?

11   A.   Yes.

12        MR. VORACEK:  Your Honor, the United States moves

13   for admission of Government Exhibit 14-A.

14        THE COURT:  14-A is admitted.

15   Q.  14-B-1, Miss Swaney, do you recognize that document?

16   A.  This is a statement for Langdon and Leveto Veterinary

17   Hospital Emergency Center for January 31st, '91, and it

18   appears to be all the statement items also.

19   Q.  And that is the same account to which you just testified

20   regarding 14-A, the signature card?

21   A.  Yes.

22   Q.  And 14-B-1, are those documents that were also generated

23   and maintained by National City Bank in the ordinary course

24   of its practice?

25   A.  Yes.


                    Swaney - Direct              62


1        MR. VORACEK:  Your Honor, the United States moves

2   for admission of Government Exhibit 14-B-1.

3        THE COURT:  14-B-1 is admitted.

4   Q.  Now, prior to coming in today, Miss Swaney, have you had

5   an opportunity to review Government's Exhibits 14-B-2 through

6   14-B-12?

7   A.  Yes.

8   Q.   And what were those documents?

9   A.   14-B-2 through 12, again, were statements for Langdon

10   and Leveto, veterinary account, February, 1991, through

11   December of 1991.

12   Q.   And 14-C, what is that document?

13   A.   Again, these are statements for Langdon and Leveto for

14   the year 1992.

15   Q.   And 14-D?

16   A.   Same thing, Langdon and Leveto veterinary account,

17   statements for the year 1993.

18   Q.   And 14-E?

19   A.   Langdon and Leveto veterinary account, statements for

20   1994.

21   Q.   And 14-F?

22   A.   Langdon and Leveto veterinary account.  They were

23   statements for 1995.

24   Q.   And are those documents to which you just testified,

25   Government Exhibits 14-B-2 through 14-F, were those all

Swaney - Direct                63

1   documents that were generated and maintained by National City

2   Bank or one of its entities in the same manner to which you

3   just testified regarding 14-B-1?

4   A.  Yes.

5        MR. VORACEK:  Your Honor, the United States moves

6   for admission of Government Exhibits 14-B-1 through 14-F.

7        THE COURT:  14-B-1 through 14-F are admitted.

8        MR. VORACEK:  Your Honor, if I may have just one

9   moment, please?  Sorry.

10  Q.  Miss Swaney, I have handed you what's been marked as

11  Government Exhibit 14-B-7.

12       Do you see that in front of you?

13  A.  Yes, I do.

14  Q.  And is 14-B-7 the documentation, the statements, the

15  documentation regarding the Langdon and Leveto bank account

16  for July of 1991?

17  A.  Yes, it is.

18  Q.  Can you hold that document up?  Is that a thick

19  document?

20  A.  Yes, it is.

21  Q.  About how thick would you say that that document is?

22  A.  Oh, it's a good three inches.

23  Q.  And is that the banking activity for Langdon and Leveto,

24  the name of Langdon and Leveto for July of 1991?

25  A.   That's correct.


                    Swaney - Direct                 64


1  Q.   14-B-10, do you have that document in front of you?

2  A.   Yes, I do.

3  Q.   What's 14-B-10?

4  A.   Again, this is a statement for Langdon and Leveto.  This

5  is October of '91.

6  Q.   Same account for Langdon and Leveto?

7  A.   Same account.

8  Q.   All the banking documentation for October, 1991, is in

9  that account.  And can you hold that account up, or those

10  documents?

11       And how thick would you say that documentation is?

12  A.   About half-inch, if that.

13  Q.   Significantly less banking activity than in October of

14  1991 in the Langdon and Leveto account as there was in July

15  of 1991?

16  A.   That's right.

17  Q.   Does that documentation indicate that to you?

18  A.  That's correct.

19      MR. VORACEK:  Your Honor, again, please.

20  Q.  Miss Swaney, I hand you now what's been marked as

21  Government Exhibits 15-A and 15-B.

22      Do you have that?

23  A.  Yes, I do.

24  Q.  And what's 15-A?

25  A.  15-A, again, is a signature card for Langdon and Leveto


                    Swaney - Direct            65


1  Veterinary Hospital and Emergency Center, and this card is

2  dated 6-19-1996.

3  Q.  And is that signature card generated and maintained in

4  the same manner to which you previously testified for 11-A?

5  A.  Yes, it is.

6  Q.  And 15-B, what is that?

7  A.  15-B is a statement -- these are statements for several

8  months.  Let me see the last date here.

9      These are for 1992, January through December, for

10  Langdon and Leveto Veterinary Hospital and Emergency Center.

11  This is their payroll account.

12  Q.  And is 15-B related to 15-A?  Is that the same account?

13  A.  Yes.  15-A is the signature card for this payroll

14  account.

15  Q.  And have you had an opportunity prior to coming to trial

16  to also review Government Exhibits 15-C through 15-F?

17  A.  Yes.

18  Q.  And what are those documents?

19  A.  15-C through 15-F are statements for 1993, 1994, 1995,

20  and also some statement activity for Center Company payroll

21  account.

22  Q.  And were Government Exhibits 15-A through 15-F all

23  generated and maintained by National City Bank or one of its

24  entities in the standard course of its practice?

25  A.  Yes.


                    Swaney - Direct              66


1       MR. VORACEK:  Your Honor, the United States moves

2  for admission of 15-A through 15-F.

3       THE COURT:  15-A through 15-F are admitted.

4  Q.  Miss Swaney, we now hand you what's been marked as

5  Government's Exhibits 16-A through 16-E.

6       Do you have them in front of you?

7   A.   Yes.

8   Q.   What is 16-A?

9   A.   These are -- let's see if this is one or multiple.

10        This is statements for Langdon and Leveto

11   veterinarians.  It's a merchant's statement regarding a

12   Master card, Visa, Master card.

13   Q.   In the course of your business, are you familiar with

14   this account called a merchant account?

15   A.   Yes.

16   Q.   For what use does the bank make of that type of account?

17   A.   Well, actually, we process -- a merchant accepts Master

18   card, Visa from a customer as payment of some sort.  We

19   actually process these items or retrieve those dollars from

20   the originating credit card, if you will.

21   Q.   So, a business that opens a merchant account is using --

22   or allows their customers to use credit cards, Visas, Master

23   charges?

24   A.   That's correct.

25   Q.   And a separate account is opened at that bank with

Swaney - Direct                67

1   regard those charges?

2  A.  A merchant's account, yes.

3  Q.  A merchant's account?

4  A.  That's correct.

5  Q.  And that's what's re-elected in Government Exhibits 16-A

6  through 16-E?

7  A.  Yes.

8  Q.  And is that from the time period 1991 through 1995?

9  A.  Yes.

10  Q.  And the name on that account, that's Langdon and Leveto?

11  A.  Langdon and Leveto, yes.

12       MR. VORACEK:  Your Honor, the United States moves

13  for admission of Government Exhibits 16-A through 16-E.

14       THE COURT:  16-A through 16-E are admitted.

15  Q.  Miss Swaney, I ask you to go back and look at Government

16  Exhibit 16-D, if you will, please.

17  A.  Okay.  I have it.

18  Q.  Now, on the second page of 16-D, is there a listing of

19  the type of charges that were processed through this account?

20  A.  Yes.  These are actual customer transactions.

21  Q.  Customer transactions?

22  A.  Yes.

23  Q.  Now, does the money physically come into the merchant

24  account from the credit card transaction, or how does that

25  work?


Swaney - Direct                68


1   A.  Well, the merchant accepts the customer's card as

2   payment for the item.

3        At this point in time, there were actually cards

4   that were signed charge cards, if you will, dispersement

5   forms that they sign at that particular time.

6        They process -- they sent those to the bank.  They

7   process those, just as they would any other check item, into

8   their own merchant account, and then National City, or

9   Integra at this point in time, would reimburse the customer

10  for those dollars.

11  Q.  And the customer in this case is the merchant?

12  A.  Yes.  This is the merchant's account.

13  Q.  So, the merchant here is Langdon and Leveto?

14  A.  That's correct.

15  Q.  So, the monies would run through the merchant account

16  but ultimately wind up with the actual merchant?

17        They don't stay in this account?  This is used for

18  processing?

19  A.  This is just used for processing, that's correct.

20  Q.  All right.  How is that usually handled for most

21  businesses?

22      Do these monies then get physically sent to the

23  merchant or deposited into another account?

24  A.  They receive immediate credit once they deposit their

25  assigned items from the customers.

                    Swaney - Direct              69


1  Q.  By "immediate credit," you mean it goes from one account

2  into another account?

3  A.  Yes.  Normally, it goes into their checking account.

4  Q.  Into their normal checking account?

5  A.  Yes.

6  Q.  If you look at the merchant bank statement for their

7  normal account, is there anything reflected on there to

8  indicate that that type of transfer has been made?

9  A.  Yes.

10  Q.  What is normally noted on there?

11  A.  It -- normally, it will say bank card statements,

12  merchant services; some type of verbiage.

13  Q.  So, when it says something like that, that tells the

14  customers that these are the Visa, Master charges that are

15  now deposited into their account?

16  A.  That's correct.

17  Q.  Just briefly, looking at page two of Government Exhibit

18  16-E, I see amounts on there.

19        What is the very first amount that is listed?

20  A.  $297.00.

21  Q.  And $297.00 reveals what, that there was a charge made

22  for $297.00?

23  A.  That's my assumption.  I am not that familiar with these

24  types of statements.

25  Q.  Do you also see other $297.00 reflected on that


                    Swaney - Direct              70


1  statement?

2  A.  Yes.

3  Q.  More than one?

4  A.  I see it more than once.  I see it -- a total of three

5  times it appears.

6  Q.  Miss Swaney, I now hand you what's been marked as

7   Government Exhibits 17-A and 17-B-1.

8        Do you have that in front of you?

9   A.   Yes, I do.

10  Q.   What is 17-A?

11  A.   17-A is, again, a signature card, and this is for a

12  Margaret A. Leveto.  It is dated 6-11, 1984.

13  Q.   And are there signatures related to that account?

14  A.   Yes, there are.

15  Q.   And can you read the signatures?  Are you able to?

16  A.   There is one signature.  Margaret A. Leveto.

17  Q.   And 17-B-1, what is that document?

18  A.   Statement from Margaret A. Leveto's account.  It appears

19  to be just for January, 1991.

20  Q.   Are there anything other than statements?  Are there

21  also items, deposited items, deposit tickets, checks, or any

22  other banking documentation?

23  A.   Appears to be deposited items.

24  Q.   And do the statements and items in 17-B-1, do they

25  relate to the signature card of 17-A?

Swaney - Direct          71

1  A.  Yes, they do.

2  Q.  And is 17-A and 17-B-1, were they generated and

3  maintained in the ordinary course of business of National

4  City Bank?

5  A.  Yes, they are.

6       MR. VORACEK:  Your Honor, the Unites States moves

7  for admission of Government Exhibits 17-A and 17-B-1.

8       THE COURT:  17-A and 17-B-1 are admitted.

9  Q.  Miss Swaney, have you had an opportunity prior to coming

10  into trial to review Government Exhibits 17-B-2 through

11  17-B-12?

12  A.  Yes, I have.

13  Q.  And what were those documents?

14  A.  They were statements from Margaret Leveto account,

15  February, 1991, through December, 1991.

16  Q.  And have you also reviewed Government Exhibits 17-C-1

17  through 17-C-12?

18  A.  Yes, I have.

19  Q.  And what are those?

20  A.  These are statements for Margaret A. Leveto account,

21  January, 1992, through December, 1992.

22  Q.  17-D-1 through 17-D-12, what are those documents?

23  A.  Again, these are from Margaret Leveto account.  These

24  are January, 1993, through December, 1993.

25  Q.  And 17-E-1 through 17-E-12, what are those?


                    Swaney - Direct                    72


1  A.  Margaret Leveto account, January, 1994, through

2  December, 1994.

3  Q.  And Government Exhibits 17-F-1 through 17-F-12?

4  A.  Again, Margaret Leveto account, January, 1995, through

5  December, 1995.

6  Q.  And Government Exhibit 17-G?

7  A.  Margaret Leveto account for January, 1996.

8  Q.  Now, the documents to which you just testified regarding

9  Government Exhibits 17-B-2 through 17-G, were those all

10  documents that were generated and maintained by National City

11  Bank in the ordinary course of its practice to which you just

12  previously testified regarding 17-B-1?

13  A.  Yes.

14          MR. VORACEK:  Your Honor, the United States moves

15  for admission of Government Exhibits 17-B-2 through 17-G.

16          THE COURT:  Exhibits 17-B-2 through 17-G are

17  admitted.

18  Q.  Miss Swaney, I now hand you what's been marked as

19  Government Exhibits 207-A through 207-L.

20      Do you have that in front of you?

21  A.  Yes, I do.

22  Q.  What is -- do you recognize 207-A through 207-L?

23  A.  These are actually cash advance disbursement forms.

24  Q.  And what are those?

25  A.  Anytime a customer would wish to advance dollars from

                Swaney - Direct                73

1  their credit card, you present these at the teller window,

2  the teller receives an approval, and the customer must sign

3  this particular cash advance disbursement form authorizing

4  the disbursement from the credit card.

5  Q.  Now, 207-A through 207-L, are you able to -- from those

6  documents, are you able to determine from which -- the name

7  of which account those monies are coming out of?

8  A.  I can see a credit card number, yeah.

9  Q.  How about a name associated with the credit card number?

10  A.  Most of them; not every one of them.

11  Q.  What is that name?

12  A.  Looks like a Mrs. M. Leveto.

13  Q.  And is there a credit card number that is associated

14  with that?

15  A.  Yes.  That appears to be consistent.  It is

16  4544354709035774.

17  Q.  Now, the documents in 207-A through 207-L, are those all

18  dated between December, '91, and January, 1994?

19  A.  Yes.

20  Q.  And these are documents, 207-A through 207-L, that are

21  used by National City Bank or one of its entities in the

22  ordinary course of its practice?

23  A.  Yes.

24  Q.  And an individual then with a credit card can come into

25  a bank -- and I believe you indicated this was a cash

Swaney - Direct          74

1  advance?

2  A.  Correct.

3  Q.  And they can actually take cash out from their credit

4  card?

5  A.  That's correct.

6  Q.  Are you also familiar with debit cards?

7  A.  Debit cards can be handled the same way.

8  Q.  What's a debit card?

9  A.  A debit card, the funds actually come from your checking

10  account, as opposed to a credit type account where interest

11  would be accruing.

12  Q.  So, an individual can take monies out of a credit or a

13  debit account at your bank and physically receive the amounts

14  in their hand?

15  A.  Yes.

16  Q.  And Government Exhibits 207-A through 207-L, I think you

17  indicated are all cash advances?

18  A.  Yes.

19      MR. VORACEK:  Your Honor, the United States moves

20  for admission of Government Exhibits 207-A through 207-L.

21      THE COURT:  207-A through 207-L are admitted.

22  Q.  Miss Swaney, with regard to 207-A, I ask you to look at

23  that.

24  A.  Okay.

25  Q.  How much of a cash advance was taken off of that credit

Swaney - Direct            75

1  or debit card at that time?

2  A.  $1,000.00.

3  Q.  And what was the date that that transaction was made at

4  your bank?

5  A.  12-2-91.

6  Q.  Miss Swaney, I'm going to ask you to look at what I hand

7  you as Government Exhibit 17-B-12.

8       Do you have 17-B-12 in front of you?

9  A.  Yes.

10  Q.  And 17-B-12, I believe you just testified, was Margaret

11  Leveto's bank account information for the statement date of

12  December 10th, 1991?

13  A.  That's correct.

14  Q.  Were there deposits made into Margaret Leveto's bank

15  account on that bank statement?

16  A.  Yes, there were.

17  Q.  Were there any deposits made into her account on

18  December 2nd of 1991?

19  A.  Yes.

20  Q.  What was the amount of that deposit?

21  A.  The amount was for $1,000.00.

22  Q.   Now, I believe you testified, Miss Swaney, that when a

23  person brings in a credit or debit card to get an advance,

24  they can physically receive that money in their hands?

25  A.   Yes, they can.


Swaney - Direct            76


1  Q.   Is there anything else that they can do other than take

2  home that thousand dollars, in your experience?

3  A.   They can put it into any one of their accounts with

4  National City.

5  Q.   And in that case, does a person actually get the

6  thousand dollars and turn it back to you and say, hey, put it

7  into another one of my accounts, or is this done all

8  automatically?

9  A.   There are paper, documents that are processed by the

10  branch to make that happen.  The money physically doesn't

11  cross the counter.

12        THE COURT:  I think this is a good time to break,

13  Mr. Voracek.

14        MR. VORACEK:  Very good.

15        THE COURT:  Okay, folks, we'll reconvene at eleven

16  o'clock.

17  (The jury left the courtroom.)

18  (Court recessed at 10:45 a.m.)

19  (Court reconvened at 11:05 a.m.)

20  (The jury entered the courtroom.)

21      THE COURT:  Be seated, please.

22      Okay, Mr. Voracek.

23      MR. VORACEK:  Thank you, Your Honor.

24          DIRECT EXAMINATION

25  BY MS. VORACEK:


            Swaney - Direct            77


1  Q.  Miss Swaney, you have right to your left a folder that's

2  been marked as Government Exhibits 18-A through 18-F.

3      Do you see that?

4  A.  I am sorry.  18-A through?

5  Q.  18-A through 18-F.

6  A.  Okay.

7  Q.  Do you have that in front of you?

8  A.  Yes, I do.

9  Q.  And what are those documents?

10  A.  These are statements for Daniel J. Leveto or Margaret A.

11  Leveto escrow account.  This is December, 1990, through 1991

12  is in 18-A.  18-B --

13  Q.  Miss Swaney, did you have a list that you prepared that

14  could refresh your memory?

15  A.  Yes.  18-B, they are customer deposit receipts.  They

16  are actual bank receipts.

17      18-C is statements for Daniel and Margaret Leveto

18  escrow account for -- statements for 1992.

19      Again, Daniel and Margaret Leveto escrow account

20  statements for 1993.

21      And E, 18-E is for Daniel and Margaret Leveto

22  escrow account statements for 1994.

23      And F is Daniel and Margaret Leveto escrow account

24  statements for 1995.

25  Q.  And, Miss Swaney, were these documents that are

Swaney - Direct                78

1  reflected in Government Exhibits 18-A through 18-F, were they

2  generated and maintained by National City Bank in the

3  ordinary course of its business?

4  A.  Yes.

5      MR. VORACEK:  Your Honor, the United States moves

file:///A|/LEVETO-3.TXT

6   for admission of Government Exhibits 18-A through 18-F.

7        THE COURT:  18-A through F are admitted.

8   Q.  Miss Swaney, I now ask you to look at what's been marked

9   as Government Exhibits 19-A through 19-F.

10       Do you have them?

11  A.  Yes, I do.

12  Q.  And what are those documents?

13  A.  These are statements for -- well, 18-A is actually a

14  signature card.

15       THE COURT:  You said 18-A.

16       THE WITNESS:  19.  I'm sorry.  A is for a signature

17  card for Edge Co.  E-d-g-e C-o.

18  Q.  And on the signature card, are there individuals who

19  signed that?

20  A.  Yes.

21  Q.  And who are -- who are some of the signatures on the

22  Edge Co. account?

23  A.  I only see one signature.

24  Q.  And who is that?

25  A.  I can't read the writing.

Swaney - Direct            79

1   Q.   The Edge Co. account, is there also an address that's

2   related to the Edge Co. account that's reflected on that?

3   A.   Yes, there is.

4   Q.   And what is the address?

5   A.   It is 388 Edgewood Drive, Meadville, Pa., 16335.

6   Q.   And 19-B through 19-F, what are those documents?

7   A.   These are actually statements regarding the Edge Co.

8   account, and they are for 1991 through 1995.

9   Q.   And are those documents contained in Government Exhibits

10  19-A through 19-F, are those all documents that were

11  generated and maintained by National City Bank in the

12  ordinary course of its business?

13  A.   Yes.

14       MR. VORACEK:  Your Honor, the United States moves

15  for admission of Government Exhibits 19-A through 19-F.

16       THE COURT:  19-A through 19-F are admitted.

17  Q.   Miss Swaney, I ask you to look at what's been marked as

18  Government Exhibits 20-A through 20-E.

19       Do you have that?

20  A.   Yes, I do.

21  Q.   What is 20-A?

22  A.  20-A is a signature card for an account entitled Peltec,

23  P-e-l-t-e-c, Publishing Company.

24  Q.  And what is the address affiliated with that account?

25  A.  This address is 316 Conneaut Lake Road, Meadville, Pa.,

Swaney - Direct                80

1  16335.

2  Q.  Are there signatures also related to that account?

3  A.  Yes, there are.

4  Q.  And who are they, if you can read them?

5  A.  For a Dr. Daniel J. Leveto and Frank Sarcona.

6  S-a-r-c-o-n-a.

7  Q.  And what are Government Exhibits 20-B through 20-E?

8  A.  These are actual -- 20-B is the merchant contract,

9  merchant services contract, which is the Master Card Visa

10  contract for Peltec Publishing Company.  And --

11  Q.  Excuse me.  When you said merchant contract, that

12  relates to the same type of merchant account to which you

13  previously testified in Exhibit 16 where there is a merchant

14  account set up?

15  A.  That's correct.

16  Q.  You may continue.

17      What is Government Exhibits 20-C through 20-E?

18  A.  I'm sorry.  20-C through 20-E, these are actual

19  statements for the Peltec Publishing Company for 1993 through

20  1995.

21      MR. VORACEK:  Your Honor, the United States moves

22  for admission of Government Exhibits 20-A through 20-E.

23      THE COURT:  20-A through 20-E are admitted.

24  Q.  Miss Swaney, I ask you now to look at what's been marked

25  as Government Exhibit 163.


                Swaney - Direct            81


1       What is contained in Government Exhibit 163?

2   A.  These are copies of wire transfer notifications to the

3   customer.

4   Q.  And which customer is listed on Government Exhibit 163?

5   A.  Center Company.

6   Q.  And is there an address related to Center Company?

7   A.  Yes.  388 Edgewood Drive, Meadville, Pa., 16335.

8   Q.  Are these documents that are generated by National City

9   Bank?

10  A.  Yes, they are.

11  Q.  Have you previously testified regarding the same type of

12  document?

13  A.  Yes, I have.

14  Q.  This document does what again?

15  A.  These actually notify the customers of either a debit or

16  a credit to your particular checking account, that a wire

17  transfer had occurred either going in or coming out of your

18  particular account.

19       MR. VORACEK:  Your Honor, the United States moves

20  for the admission of Government Exhibit 163.

21       THE COURT:  163 is admitted.

22  Q.  I ask you to look at Government Exhibit 195.

23       What is 195?

24  A.  This is actually from PennBank.  This is for a -- what

25  we call Morgan(Sp) Guarantee at the time.  We used to be able

                    Swaney - Direct            82

1  to draw funds to go internationally through Chase Manhattan

2  Bank.

3  Q.  Morgan Guarantee?

4  A.  Yes.  They are called Morgan Guarantees.

5   Q.  You also mentioned guarantees in your previous testimony

6   with regard to a cashier's check?

7   A.  Right.

8   Q.  Is this similar to a cashier's check?

9   A.  This is similar to a cashier's check.  The big

10  difference is, these funds can go international.  Normally,

11  your official checks were kept mostly domestic, within the

12  USA.

13  Q.  And who is the remitter of this money that's reflected

14  in Government Exhibit 195?

15  A.  Daniel J. and Margaret A. Leveto.

16  Q.  What is meant by remitter again?

17  A.  Again, the purchaser of the item.

18      MR. VORACEK:  Your Honor, the United States moves

19  for admission of Government Exhibit 195.

20      THE COURT:  195 is admitted.

21  Q.  On 195, who was this money paid to?

22  A.  TSB Bank, Limited.

23  Q.  Miss Swaney, I ask you to look at Government Exhibit

24  208-A.  And do you have that document?

25  A.  Yes, I do.

1  Q.   What is that document?

2  A.   This is actually the Morgan Guarantee that I was just

3  referring to.  The previous was just a branch of a bank

4  record, if you will.

5  Q.   This is essentially the same then or related document to

6  Government Exhibit 195?

7  A.   That's correct.

8        MR. VORACEK:  Your Honor, the United States moves

9  for admission of 208-A.

10       THE COURT:  208-A is admitted.

11  Q.   Miss Swaney, I now ask you to look at Government Exhibit

12  210.  What is 210?

13  A.   This is a form that the branch uses when they are

14  sending a wire.

15  Q.   You are familiar with this document?

16  A.   Yes.

17  Q.   How was this document prepared?

18  A.   Normally, the customer either comes in or calls over the

19  telephone, depending upon how they are set up.

20        At that point in time, the bank employee would

21   complete this based on the instructions received by the

22   customer.

23   Q.   What was the date of this wire transfer?

24   A.   This is dated August 7th, 1992.

25   Q.   And is there a beneficiary of this wire transfer?


                    Swaney - Direct              84


1   A.   Yes.  This is going to Dr. D.J. and Mrs. M.A. Leveto.

2   Q.   And this document is generated and maintained by your

3   bank in the ordinary course of its business?

4   A.   Yes, it is.

5         MR. VORACEK:  Your Honor, the United States moves

6   for admission of Government Exhibit 210.

7         THE COURT:  210 is admitted.

8   Q.   And, again, looking at Government Exhibit 210,

9   Miss Swaney, I believe you said that the beneficiary of this

10   money was Dr. D.J. and Mrs. M.A. Leveto?

11   A.   That's correct.

12   Q.   Can you determine by this document where this money was

13   actually wired to?

14   A.   It was going to a TSB Bank, the Channel Islands.  That

15   was the ultimate goal.

16        It first went to a Bankers Trust Company in New

17   York, then on to TSB Bank in the Channel Islands.

18   Q.   Now, I see it also says "account title."

19        What does that reflect?

20   A.   That would be the beneficiary's account title.

21   Q.   Does that indicate that those beneficiaries have an

22   account at the receiver bank?

23   A.   That would be my assumption.

24   Q.   You don't know that for a fact?

25   A.   No, I don't.


                    Swaney - Direct              85


1   Q.   Has this wire transfer for Government Exhibit 210 been

2   signed?

3   A.   Yes, it has.

4   Q.   And who signed such form?

5   A.   It appears to be a Daniel Leveto.

6   Q.   And which -- the bank obtains a signature in preparing

7   this form, do they not?

8   A.   That's correct.

9   Q.   Whose signature are they obtaining?

10   A.   The authorized signer from the account which is being

11   debited.

12   Q.   Is it the person who comes in that physically tells the

13   bank they want a wire transfer?

14   A.   It would have to be an authorized signer for that

15   particular account.

16   Q.   I ask you to look at what has been marked as Government

17   Exhibit 212.  Do you have that?

18   A.   Yes.

19   Q.   And the second page of 212, do you recognize that

20   document?

21   A.   This is actually a copy of a cashier's check from

22   Integra Bank.

23   Q.   Do you recognize this as a document that's generated and

24   maintained in the course of your business?

25   A.   Yes.

                    Swaney - Direct              86

1   Q.   And who is this check payable to?

2   A.   TSB.

3   Q.   And who was the remitter of this check?

4   A.   Daniel J. and Margaret Leveto.

5  Q.  And what was the date?

6  A.  January 11, 1993.

7      MR. VORACEK:  Your Honor, the United States moves

8  for admission of Government Exhibit 212.

9      THE COURT:  212 is admitted.

10  Q.  What was the amount of that check?

11  A.  This check is for $1,600.00.

12  Q.  And, again, it's payable to TSB?

13  A.  Correct.  TSB.

14  Q.  I ask you to look at what's been marked as Government

15  Exhibit 394.

16      Do you recognize that document?

17  A.  Yes.

18  Q.  What is 394?

19  A.  394 is a cashier's check from Integra Bank.  This one is

20  actually an original copy of an original check.

21  Q.  And who was the remitter of this check?

22  A.  The remitter of this check is Dr. D.J. Leveto.

23  Q.  And who was the beneficiary of this check?

24  A.  Dr. D.J. Leveto.

25  Q.  And what was the date of this check?

Swaney - Direct            87

1  A.  December 1st, 1994.

2       MR. VORACEK:  Your Honor, the United States moves

3  for admission of Government Exhibit 394.

4       THE COURT:  394 is admitted.

5  Q.  And, Miss Swaney, referring to Government Exhibit 394,

6  what was the date of that check?

7  A.  December 1st, 1994.

8  Q.  And I believe you said it was a cashier's check?

9  A.  That's correct.

10  Q.  And I believe you said that the remitter is the

11  purchaser of the cashier's check?

12  A.  That's correct.

13  Q.  How is payment made in the general course for a

14  cashier's check?

15  A.  For a cashier's check, it either has to be cash or

16  collected funds from your personal account, not your personal

17  account or business account.

18  Q.  And the amount of this cashier's check was what?

19  A.  $53,500.00.

20  Q.  And, again, who is which check made payable to?

21  A.  Dr. D.J. Leveto.

22  Q.  Now, when an individual or an entity receives a

23  cashier's check, does it have to have been endorsed?

24  A.  Yes.

25  Q.  Can you tell whether or not that check was endorsed?

88

1  A.  This check was endorsed, paid to the order of Eagle

2  Crest, and Daniel J. Leveto has signed it.

3  Q.  And the endorsement is found where on the cashier's

4  check?

5  A.  Just as it is on any other check, on the reverse side.

6  Q.  And the endorsement indicates to the bank that the

7  individuals who is endorsing it has received those funds?

8  A.  Yes.

9       MR. VORACEK:  Your Honor, the United States has no

10  further questions of Miss Swaney.

11       THE COURT:  Okay.  Cross-examine.

12       MR. LEVETO:  No, Your Honor.

13       THE COURT:  No questions?

14       MR. LEVETO:  No.

15          THE COURT:  Do you have another witness?

16          MR. VORACEK:  Your Honor, at this time, the United

17   States would introduce documents that are certified documents

18   under public seal.

19          THE COURT:  Okay.  Thank you, ma'am.  You may step

20   down.

21          THE WITNESS:  You're welcome.

22   (The witness was excused.)

23          THE COURT:  Are these in your exhibit inventory

24   here?

25          MR. VORACEK:  Yes, Your Honor.  Government's

89

1   Exhibits 360 through 364.

2          THE COURT:  Okay.  Wait a minute.

3          MR. VORACEK:  All right.

4          THE COURT:  All right.  364?

5          MR. VORACEK:  Government Exhibits 360 through 364.

6          THE COURT:  All right.  These are certified

7   documents?  Is that what you are saying?

8          MR. VORACEK:  These are domestic public documents

9   under seal under Rule 9021 of the Federal Rules of Evidence.

10          THE COURT:  Okay.

11          MR. VORACEK:  These are documents that relate to

12  property transactions, Your Honor.

13          We also have documents 370 through 379.

14          THE COURT:  370 through 379?

15          MR. VORACEK:  Yes, sir.

16          THE COURT:  Okay.

17          MR. VORACEK:  These are documents that are not

18  sealed, but they are certified copies of public records.

19          THE COURT:  Okay.

20          MR. VORACEK:  Of state-related income tax return

21  information.

22          THE COURT:  You said 379.  You mean both A and B?

23          MR. VORACEK:  Yes, Your Honor, 379-A and B.

24          Yes, Your Honor.

25          THE COURT:  All right.


90


1          MR. VORACEK:  And then Government Exhibits 390 --

2  390, 391 and 392.

3          THE COURT:  390, 391 and 392 are admitted.

4          MR. VORACEK:  And Government Exhibits 422, 423 and

5   424.  And those are domestic public documents under seal.

6          THE COURT:  422, 423 and 424 are admitted.

7          MR. VORACEK:  Your Honor, has the Court also

8   admitted Government Exhibits 360 through 364 and 370 to 379?

9          THE COURT:  Yes.  Wait a minute.  370?

10         MR. VORACEK:  370 through 379.

11         THE COURT:  I have 370.  Then the next one is 371,

12   yeah, down to 379-B.

13         MR. VORACEK:  Okay.

14         MS. CALVIN:  Your Honor, we call to the stand

15   Robert Lapina.

16         If I may have a moment to clear these materials.

17         THE COURT:  Just stand here to be sworn, please.

18         THE CLERK:  Would you raise your right hand?

19              * * * * *

20         ROBERT A. LAPINA, having first been duly sworn,

21   testified as follows:

22         THE COURT:  Have a seat up here, please, give us

23   your name and spell your last name.

24         THE WITNESS:  My name is Robert A. Lapina.  Last

25   name is spelled L-a-p-i-n-a.

Lapina - Direct            91

1        THE COURT:  Thank you.

2               DIRECT EXAMINATION

3   BY MS. CALVIN:

4   Q.   Mr. Lapina, what's your educational background?

5   A.   I have a Bachelor's Degree from Indiana University of

6   Pennsylvania, concentration in accounting.

7   Q.   And what is your current employment?

8   A.   I work for the United States Postal Service, Office of

9   Inspector General.

10  Q.   And what are your duties there with the Postal

11  Inspector?

12  A.   I'm a supervisor in charge of a group of Special Agents

13  who investigate allegations of fraud, waste, abuse and

14  misconduct with respect to the Postal Service or Postal

15  Service programs.

16  Q.   And how long have you held this position?

17  A.   Approximately fourteen months.

18  Q.   And what kind of work were you doing before you got this

19  position?

20  A.   Prior to being employed with the Postal Service of the

21  Inspector General's Office, I was employed by the IRS,

22  Criminal Investigation Division.

23  Q.   And what positions did you hold there?

24  A.   From 1987 to approximately 1988, I was a Special Agent.

25  And then from 1998 through 2004, I was a supervisor.


                    Lapina - Direct                92


1  Q.   And when you were a Special Agent, what did your

2  responsibilities and duties entail?

3  A.   My responsibilities were to investigate alleged criminal

4  violations of the Internal Revenue Code and related offenses.

5  Q.   And when you were serving in that position, were you

6  assigned the investigation of Daniel Leveto?

7  A.   Yes, I was.

8  Q.   And what information did you have at the time that you

9  began this investigation?

10  A.   Information from a couple different areas.

11         We had a referral from our Civil Section, the Audit

12  Section of the IRS with respect to Dan and Margaret Leveto's

13  tax liabilities, as well as we had information from witnesses

14  who had come forward.

15  Q.   And once this was assigned to you, what steps did you

16  take in the case?

17  A.   Well, a number of steps.

18       I had requested and reviewed tax returns, requested

19  and instituted mail covers on both Dan Leveto's veterinary

20  business as well as his residence.  Had checked the --

21  conducted checks with respect to public records as far as

22  property, vehicles, aircraft and other assets, conducted

23  surveillance, did drive-bys, interviewed witnesses,

24  eventually initiated an undercover operation and then

25  executed search warrants.

                   Lapina - Direct                93

1  Q.   When you say the "tax returns," before you initiated

2  the -- or executed the search warrants and initiated the

3  undercover, which tax returns did you review?

4  A.   I reviewed tax returns of Daniel and Margaret Leveto, as

5  well as an entity called Center Company.

6  Q.   What did you notice on the Center Company returns?

7  A.   The Center Company returns?

8  Q.   The Center Company returns.

9  A.  At that time, I had obtained a '91 and '92 1040

10  Nonresident Alien Tax Returns for an entity called Center

11  Company, which was located in the Turks and Caicos Islands.

12         And on those returns, I believe that they were

13  reporting the gross income, receipts and expenses, net profit

14  of the veterinarian business located at 316 Conneaut Lake

15  Road, Meadville.

16  Q.  And what did you notice was happening with the profits

17  from the veterinary clinic on the Center Company return?

18  A.  Those returns reflected that those profits were then

19  being distributed to another entity that was located in

20  Turks and Caicos Islands.  I believe there were two of them

21  from those returns.

22         One was an entity called ASTCO and I believe the

23  other was called Newbury.

24  Q.  And you said you did a drive-by of both the home and the

25  business?

                    Lapina - Direct              94


1  A.  Yes.

2  Q.  Now, why would you do that?

3  A.  Well, we had information that allegedly the veterinarian

4   business had been sold or transferred to another entity, so

5   we wanted to see if the veterinary business was in operation,

6   who was operating it and to assure that, you know, the

7   Levetos did reside at the address purported, 388 Edgewood

8   Drive, Meadville.

9   Q.  And what was the timeframe you were to conduct this

10  investigation, or began conducting it?

11  A.  I believe it started in late 1994, and I was involved

12  all the way up until 1998, when I became a supervisor.

13  Q.  And how was this undercover operation set up?

14  A.  Well, up until that point, you know, we had developed

15  and received information regarding a number of things.

16  Reflective upon the sale of the business, whether it was

17  legitimate or not.  Also some views relative to Dr. Leveto's

18  views as far as the government and tax system.  Information

19  had been developed which was indicative that his reported

20  taxable income was not commensurate with his lifestyle;

21  things of that nature.

22          So, we decided that we would probe -- try to probe

23  those areas through an undercover investigation, as well as

24  we had found that he was marketing, promoting the sale of a

25  book called Tax Free, How The Super Rich Do It, and he was

Lapina - Direct            95

1  soliciting others to buy this book.

2          So, we wanted to explore that area a little bit

3  further as well and see if possibly others were involved.

4  Q.  Now, what did you know about the book at that time?

5  A.  We had obtained, through a private investigator who saw

6  an advertisement for the book, we obtained the table of

7  contents from it and looked at some of the content there, as

8  well, and we knew from witnesses and from the mail covers

9  that it was apparent that there were a lot of communications

10  back and forth to Dr. Leveto's veterinarian business relative

11  to either the sale or promotion of this book.

12  Q.  And did you direct the undercover operation?

13  A.  Yes, I did.

14  Q.  And how did you set it up, as far as the individual

15  goes?

16  A.  We had a witness providing information.  There was an

17  associate of Dr. Leveto's and we felt that we could introduce

18  an undercover agent to communicate with Dr. Leveto relative

19  to those issues I discussed through this witness who was an

20  associate of his.

21  Q.  And did you provide him with information that you wanted

22  him to seek?

23  A.  Yes.  The undercover agent was given a background as to,

24  you know, what had transpired thus far in the investigation

25  and was directed to probe certain areas with Dr. Leveto.


Lapina - Direct                96


1  Q.  And after the conclusion of the undercover operation,

2  did you then seek search warrants?

3  A.  Yes.  Search warrants were executed at both the

4  veterinarian business and Leveto's residence on May 2nd,

5  1996.

6  Q.  And what type of evidence were you looking for in the

7  search?

8  A.  Evidence relative to income tax violations committed by

9  the defendant, which would be bank records, credit card

10  records, investment account, books and records relative to

11  the income and expenses of the business, evidence of assets,

12  liabilities, evidence of assets and liabilities possibly that

13  were in nominee name; things of that nature.

14          And then also we were looking for evidence of a

15    conspiracy to commit these violations by the defendant and

16    others.  And some of the evidence we were looking for was

17    correspondence and communications between these individuals,

18    whether it be letters, faxes, things of that nature, as well

19    as contact information, address information, phone numbers,

20    photographs; things of that nature.

21    Q.   When you used the term "nominee name," what do you mean

22    by that?

23    A.   A nominee name is usually indicative, if you have an

24    asset, or something of that nature, that you would basically

25    have in the name of another so to conceal the ownership of

                    Lapina - Direct              97

1    that asset.

2    Q.   And when you executed the search warrant, did you seize

3    a number of documents and other items?

4    A.   Yes, we did.

5    Q.   And do you have a list with you of items which were

6    seized?

7          If I ask you about the documents --

8    A.   Yes.

9        MS. CALVIN:  Your Honor, we have one for the Court,

10   as well, and one for the defendant.

11   Q.  I'm going to ask you if, during the search warrant, you

12   seized documents that were exhibit numbers 11-B-1 through 21?

13   A.   A number of these documents primarily here were seized

14   during the course of that search warrant.  Though when I did

15   go through them upon review, I noticed that mixed in there,

16   there were some documents that were actually received from

17   the third party, such as the bank or the credit card company,

18   because when they were seized they weren't seized in their

19   entirety, or not all the information was there.

20        So, we had to go to the institution to obtain the

21   balance of the information.

22   Q.  I should back up for a moment and say, did you have an

23   opportunity to go through these documents prior to trial?

24   A.   Yes.

25   Q.  And when you looked to see whether or not they were

                    Lapina - Direct              98


1   seized, did you initial the folders?

2   A.   Yeah.  I had initialed the folders containing these

3   exhibits, as well as I can tell whether or not they had been

4   seized because I put markings on these copies of these

5   exhibits either in pencil handwriting or with a stamp

6   indicating where they had been seized from.

7   Q.   And did you have an opportunity to review those

8   documents and compare it to the list that you have in front

9   of you?

10  A.   Yes.

11  Q.   And did you review that as recently as this morning?

12  A.   Yes.

13  Q.   So, I would ask you if you -- if Exhibit 22, were those

14  seized, 22-A, B and C?

15  A.   Yeah.  Primarily, these are credit card statements for

16  the years '93 up until February of '96.  They were either in

17  Dan and Margaret Leveto's name or Dan Leveto's name only.

18  Q.   Exhibits 23-A and 23-C, were those -- through C, were

19  those seized?

20  A.   Yeah.  For the most part, these were -- these exhibits

21  were seized and relative to Jack Carl Futures accounts

22  No. 48858 for the period -- looks like '92 and '93.

23          I believe there also was some correspondence there

24  having to do with the transfer of an account from American

25  Futures to Jack Carl Futures.

Lapina - Direct                    99

1  Q.  I would ask you what type of documents 30 through 36

2  are?

3  A.  These are copies of records that were maintained at the

4  veterinarian business having to do with daily receipts,

5  monthly receipts, check spread, year-end summary of expenses,

6  and also year-end summaries of revenue and expenses per

7  categories.  And this basically covered the time period of

8  1991 through 1995.

9  Q.  And documents 30 through 36 were seized?

10  A.  Yes.

11  Q.  I would ask you about documents 70 through 154.

12  Generally, what are those?

13  A.  Generally, these documents were documents that were

14  either dated or created during the time period 1991 through

15  1996, and contained a number of different types of

16  information.

17          Primarily, it would be correspondence, fax

18  transmissions, independent contractor agreement, Postal

19   Service mail receipts, applications, agreements, tax

20   organizers, handwritten notes, and things of that nature,

21   which basically were indicative of communications between

22   Don Turner, Dan Leveto, Paul Harris, Jack Williams, and

23   others, as well as reflected upon Dr. Leveto's

24   implementation, continuation with this program designed to

25   reduce or eliminate tax liabilities.


                    Lapina - Direct                    100


1   Q.   And what was the timeframe for these exhibits?

2   A.   1991 through 1996.

3   Q.   What about exhibit --

4   A.   You asked me about 70 through 154?

5   Q.   Yes.

6   A.   Yes.  I believe they were dated or created during the

7   time period '91 through '96.

8   Q.   I would ask you to look at 160 through 229.

9   A.   Okay.

10   Q.   What are those, generally?

11   A.   These are basically evidence relating to bank accounts

12   at Barclays Bank, TSB Bank and First Home and British Home

13   Bank located in either Grand Cayman Islands, Turks and Caicos

14  Islands or the Channel Islands.

15      And this information contains copies of passbooks,

16  credit and debit slips, bank statements, faxes from

17  Dr. Leveto to these banks directing the withdrawal of funds.

18      The account at Barclays Bank -- I am sorry -- at

19  Barclays Bank, there is an account here in the name of a

20  Box Elder, Limited, and the account at First Home Bank, and

21  it was subsequently British American Bank, I believe is what

22  it was, is in the name of Leonard Adler, and then the TSB

23  Bank information relates to an account in the name of Dan and

24  Margaret Leveto, as well as, I believe, Leonard Adler.

25  Q.   What is 229?

Lapina - Direct                101

1  A.   229 is a signature stamp of an individual named Leonard

2  Adler, which we found at the veterinarian business during the

3  course of the search.

4  Q.   And were all these items seized?

5  A.   Was it seized?

6  Q.   Were all these items seized?

7  A.   Yes.

8  Q.  I would ask you to look at what is 230 to 329.

9       What are those?

10  A.  230 to 329 are basically handwritten notes that were

11  seized during the course of the search warrants on May 2nd,

12  '96, that reflect a number of things; flow of funds, evidence

13  relative to nominee names, such as Box Elder, Limited, and

14  Leonard Adler, tax return preparations, wire transfers,

15  setting up of domestic and foreign bank accounts, notes of

16  conversations with Don and Paul, information relative to

17  setting up a Post Office box, transfers property to another's

18  name, opening up or obtaining a AAA membership; things of

19  those nature.

20  Q.  And were they seized?

21  A.  Yes.

22  Q.  And items 330 and 332?

23  A.  330 and 332?

24  Q.  Yes.

25  A.  AAA traveler's checks receipts dated 11-11-91, 12-12-91,

                    Lapina - Direct                102

1  1-8-92, and also an envelope from Littleton, Colorado,

2  addressed to Dan Leveto.

3    Q.    And those were seized?

4    A.    Yes.

5    Q.    Did you also seize 333-A through 334-B?

6    A.    333-B or 334-B?

7    Q.    I'm sorry.  333-B.

8    A.    Yeah, 333-A and B are Overland(Sp) Bank materials and

9    letters dated 8-16-91 and 8-28-91, which were seized.

10   Q.    And were items 336 and 337 seized?

11   A.    Yes, they were.  336 is a typed personal note which is

12   undated.  The other one is, it's a typed correspondence

13   titled, Dear Fellow Practitioners, is the way it starts out.

14   Q.    And items 350 to 356, what are those?

15   A.    These are documents relative to options, property

16   options, and then the subsequent sale of property which was

17   located out on Route 322 near Conneaut Lake, Pennsylvania.

18   Q.    Those were seized?

19   A.    Yes.

20   Q.    And Exhibit No. 400 and 401, what are those?

21   A.    400 is a Saphire Beach Resort, St. Thomas, Virgin

22   Islands, receipt dated March 20, 1995.

23         And 401 is a receipt from Imperial Jewelers,

24  St. Thomas, receipt dated March 18th, 1995.

25  Q.  Thank you.  I'm going to hand you specifically some

Lapina - Direct            103

1  exhibits and I am going to ask you what they are.

2       Handing you Exhibits 70 through 99-C.  Ask you if

3  you recognize those documents?

4  A.   Yes.  These documents were obtained during the course of

5  the search warrant.

6  Q.  And, generally, what are these documents?

7  A.  I mean, they contain correspondence, fax transmissions,

8  primarily correspondence and fax transmissions indicative of

9  communications between Don Turner, Paul Harris, Jack Williams

10  and Dan Leveto, as well as relative to his implementation of,

11  again, the program designed to reduce or eliminate tax

12  liabilities.

13  Q.  And what is the timeframe of these documents?

14  A.  I believe these were all dated or created during the

15  year 1991 primarily.

16       MS. CALVIN:  Your Honor, we would ask for admission

17  of Exhibits 70 through 99-C.

18       THE COURT:  99-C, is that what you said?

19          MS. CALVIN:  Yes.

20          THE COURT:  70 through 99-C are admitted.

21   Q.   Now, Mr. Lapina, I'm going to ask you to look at what's

22   been marked as Government Exhibit 71 and ask you what that

23   document is?

24   A.   Some of the documents are missing from the folder.  It

25   only goes up to 79.  This says 70 through 79.


                    Lapina - Direct                    104


1   Q.   Here is 80 through 99.

2   A.   I am sorry.  What was the exhibit number again?

3   Q.   71.

4   A.   Okay.  This is a letter from First America Research, Don

5   Turner, Executive Director, to Daniel Leveto, 316 Conneaut

6   Lake Road, Meadville, Pa., signed by Don Turner, dated

7   July 26th, 1991.

8   Q.   And is this a -- does this explain about membership in

9   FAR?

10   A.   Yeah.  It's basically has attachments relative to what

11   the fees were, interest of membership, basically what the

12   constitution of First America Research was, and verified

13  membership application at the very end signed by Daniel J.

14  Leveto, 8-1-91.

15  Q.  And is this the application for membership in the First

16  America Research?

17  A.  Yeah.  Membership for application to First America

18  Research.

19  Q.  Now, Dr. Leveto, his signature is on there.

20      Would you read for us, please, what he states

21  before the signature?

22  A.  Starting with No. 8 there?

23  Q.  Yes.

24  A.  I have received a copy of this document and I certify

25  under oath that I am neither a direct nor indirect employee

Lapina - Direct          105

1  of the IRS or any related government agency, nor a member of

2  an unauthorized practice of law committee or any Bar

3  Association, or that I have fully and completely disclosed

4  all such connections.  I further certify and acknowledge my

5  fraternal and contractual obligation to keep all information

6  concerning the Association, its trade secrets, et cetera, and

7  its members' identities in complete secrecy and good faith

8   confidence.  I understand other members and/or the

9   Association could sue me for real and potential damages for

10  my breach of this agreement.

11  Q.  Thank you.  Can you to look at Government Exhibit 72?

12  A.  Okay.

13  Q.  What is that?

14  A.  This is a fax message from First America Research,

15  Don Turner to Dr. Dan Leveto, dated July 27, 1991.

16  Q.  And what is this fax?

17  A.  It's relative to the books, sale of the books.  I

18  believe the book that Dr. Leveto was promoting and selling.

19  Q.  I would ask you to look at Government Exhibit 73?

20  A.  Okay.  This is a letter, again, from First America

21  Research, Don Turner -- signed by Don Turner, International

22  Executive Director, to Daniel Leveto, dated August 10, 1991.

23  Q.  And what is the nature of this letter?

24  A.  Basically, it said that:

25       After reviewing your application for membership

Lapina - Direct        106

1  into FAR, and having accepted you, it is also our very great

2  pleasure to inform you of your appointment as General Manager

3  of Center Company of a foreign Colato.  You should be very

4  pleased with such appointment as it constitutes a great deal

5  of personal trust in you.

6  Q.  Would you read the last paragraph, please?

7  A.  It says -- yes.

8      You are reminded not to have more than three months

9  of Center Company's business records in your possession at

10  any time, and failure to follow this rule, and to take care

11  of their business properly could result in your termination.

12  Q.  Would you look at Government Exhibit 74, please?

13  A.  This is another letter from First America Research, this

14  time signed by Don Turner and Paul Harris to Dr. Leveto,

15  dated August 10th, 1991.

16  Q.  And what's the nature of this letter?

17  A.  Basically welcomes him as a member of First America

18  Research, looking forward to working with him for a long and

19  prosperous adventure.

20      And also they want to take this opportunity to

21  remind him that each member is contractually charged with the

22  responsibilities to keep our trade secrets private and our

23  members' identities a secret.

24  Q.  I would ask you to look at Government Exhibit 75.

25  A.  This is an independent contractor agreement dated the

Lapina - Direct              107

1  10th day of August, 1991, between ASTCO, Limited, a Turks and

2  Caicos Islands, British West Indies Ordinary Corporation and

3  Trustee of Center Company, in paren, (Forcolato), a Turks and

4  Caicos Islands, Britihs West Indies Common Law Business Trust

5  Organization and Daniel Leveto, the duly appointed general

6  manager, paren, GM, end of paren, of said forcolato, referred

7  to hereinafter as GM.

8  Q.  I would like you to look at the last page of that

9  document, the signature page.

10  A.  Yes.

11  Q.  What is the address of this -- the parties to this, the

12  address?

13  A.  The second address at the bottom is P.O. Box 155,

14  Grand Turk, Turks and Caicos Islands, British West Indies,

15  U.S. Correspondence Center.  Then is indicated P.O. Box 2553

16  Littleton, Colorado, 80161.

17  Q.  I would ask you to look at Government Exhibit 85.

18  A.  85?

19  Q.  85.  What is Government Exhibit 85?  I'm sorry.

20  A.  85 is an SS-4, Application for Employer Identification

21  Number.  The applicant here is a Wayne Co., C-o.  And I

22  believe it's dated at the bottom September 12th, it appears,

23  1991.

24  Q.  And who applied for that employer identification number?

25  A.  Who applied for it?


                    Lapina - Direct              108


1  Q.  Or who is on the signature line?

2  A.  I believe that says Margaret Leveto.  It says care of

3  Margaret Leveto.

4  Q.  And what is the address for Wayne Co.?

5  A.  388 Edgewood Drive, Meadville, Pa.

6  Q.  I would like you to look at Government Exhibit 88.

7      What is Government Exhibit 88?

8  A.  This is a letter from American Security Trust Company,

9  Limited, dated September 23rd, 1991, signed by Jack D.

10  Williams, CEO, to Dr. Daniel Leveto, care of Don Turner of

11  FAR, P.O. Box 620592, Littleton, Colorado, 80162.

12  Q.  This is from American Securities Trust, and it's signed

13   by Jack Williams?

14   A.   Jack Williams.

15   Q.   I'd also ask you to read the paragraph beginning with

16   "The authority that you are entrusted with"?

17   A.   The authority you are entrusted with includes (without

18   limitation) the power to execute contracts -- I am sorry.

19        The authority you are entrusted with includes

20   (without limitation) the power to execute contracts of any

21   kind and description; to buy, sell and deal with and in

22   property of all kinds and descriptions, wheresoever located;

23   to direct and control the routine management of Center

24   Company, and you may sell, exchange, pledge, and convey the

25   assets, make investments in securities, commodities of any

                    Lapina - Direct                109

1   and all sorts and kinds, pay debts and obligations, and

2   negotiate commercial paper, borrow money, with or without

3   security, and perform any and all other acts or functions,

4   and in fact, you shall have full discretionary powers.

5   Q.   And the last sentence in the next-to-the-last paragraph

6   beginning with, "You are reminded".

7  A.  You are reminded not to have more than three months of

8  our business records in your possession at any time, and

9  failure to follow this rule could result in your termination.

10  Q.  I would ask you to look at Government Exhibit 89.

11      What is Government Exhibit 89?

12  A.  It's an Affidavit of General Manager's Powers, signed by

13  Daniel J. Leveto, general manager, dated 24th day of

14  September, 1991.

15  Q.  I would ask you to look at Government Exhibit 90.

16      What is Government Exhibit 90?

17  A.  This is an Affidavit of Co-general Manager's Powers,

18  dated the 25th day of September, 1991, signed by Margaret A.

19  Leveto, co-general manager.

20  Q.  I would ask you to look at Government Exhibit 92.

21      What is Government Exhibit 92?

22  A.  This is an agreement between Daniel J. Leveto and Center

23  Company relative to a number of issues, including the sale of

24  equipment, compensation of goodwill, management employment

25  agreement, equipment lease and service agreement,

Lapina - Direct                110

1  compensation to D.J.L., and a number of other things.

2  Q.  Government Exhibit 93.  What is Government Exhibit 93?

3  A.  This is a fax message from First America Research, Don

4  Turner, to Dan Leveto, dated October 11th, 1991.

5  Q.  I would ask you to look at Government Exhibit 94.

6       What is Government Exhibit 94?

7  A.  These are essentially handwritten notes that were seized

8  during the course of the search warrant.

9  Q.  Served on Center Company and Don Turner?

10  A.  Yeah.  It has a number of notations on here.  Talks

11  about the de facto accounts, L. Adler opening an account in

12  Denver, number of arrows back and forth.  The name Don is

13  listed there.

14  Q.  And is it dated?

15  A.  10-15-91 at the top.

16  Q.  I would ask you to look at what's been marked as

17  Government Exhibit 96.  What is that?

18  A.  These are receipts and travel check vouchers obtained

19  apparently at AAA.  Were received 11-11-91.  Looks like

20  monies were received of -- received of Karen Jeannerett for

21  $357.80.  The one dated 12-12-91 is also received of Karen

22  Jeannerett for $1,469.60.

23    And the one dated January 8, '92, is received of

24  Wayne Coe., only this time it's spelled C-o-e, for $305.28,

25   and it looks like these checks were purchased in pounds,

Lapina - Direct              111

1  sterling, not American dollars.

2  Q.   I would like you to look at Government Exhibit 97.

3  A.   97 is a contract and declaration of trust for the name

4  Wayne Co., C-o., and it says dated the 23rd day of November,

5  1991.

6  Q.   I would like you to go to page eighteen of that document

7  where it tells you Schedule B?

8  A.   Yeah.  Schedule B of Wayne Co., a colato, dated the 23rd

9  day of November 1991.

10    It has underlined "personal property."  Safe

11  deposit box and Post Office box.  And it has handwriting

12  there, P.O. Box 54, paren, L. Adler, parens,

13  Wayne Co., Meadville.  I can't make out what it says, the

14  last line.

15  Q.   I am going to skip over 99, and I am going to hand you

16  Government Exhibits 100 to 114.

17  A.   These documents here are documents which were primarily

18  created or dated during the year 1992.  Contain

19  correspondence, fax transmissions, handwritten notes, a tax

20  organizer, certified mail receipts, things of that nature,

21  which again are indicative of communications between

22  Don Turner, Paul Harris, Jack Williams and Dan Leveto, as

23  well as Dr. Leveto's continuation, implementation in this

24  program.

25      MS. CALVIN:  The government offers Exhibits 100 to

                    Lapina - Direct              112

1  114 into evidence.

2      THE COURT:  100 through 114 are admitted.

3  Q.  I would like you to look at Government Exhibit 100.

4  A.  Okay.

5  Q.  What is that document?

6  A.  This is a fax transmission to Don Turner from Dan

7  Leveto, dated 1-13-92.

8  Q.  And what does this concern?

9  A.  It concerns a number of things.  Questions that

10  apparently Dr. Leveto had was directing towards Mr. Turner.

11      First part of that was, how did you find the

12  agreement?  Second part has to do with clearing up cloudy

13  areas for year end relative to the tax situation.

14        And then last part of that is excess dollars, can,

15  question, can be shown as distribution to investors.

16        And it goes on in the next page to get into more

17  details.

18  Q.  I would ask you to look at Government Exhibit 101.  What

19  is that?

20  A.  This document is marked confidential, dated February,

21  1992, from J.D. Williams, president and CEO of ASTCO, to

22  general managers of colatos formed in and operating from the

23  Turks and Caicos Islands, British West Indies.

24  Q.  What is Government Exhibit 102?

25  A.  102 appears to be a memo dated February 24th, 1992, to

Lapina - Direct              113

1  FAR members, from Don and Paul relative to J.D. Williams'

2  letter.

3  Q.  Government Exhibit 103?

4  A.  This is a 1991 tax organizer from ASTCO, Ltd.  This time

5  there is an individual named Arthur B. Acinbbo, care of

6  Arthur B. Acinbbo.

7        And this document contains information relative to

8    the veterinarian business at 316 Conneaut Lake Road.

9    Business name, Center Company, DBA Langdon and Leveto

10   Veterinarian Hospital.  And this information appears to deal

11   with the gross income and receipts of the veterinarian

12   business, the net profit for a period of 1991 when this

13   alleged sale occurred.

14   Q.  I would ask you to look at Government Exhibit 104.

15        What is that?

16   A.  These appear to be handwritten notes dated March 6th,

17   1992.  At the top, it says talked to Don and Paul.  Again,

18   covers a number of issues.

19   Q.  I would ask you to look at Government Exhibit 111.  And,

20   just briefly, what is this?

21   A.  This is a letter directed towards FAR members, F-A-R,

22   First America Research, and it's signed by Paul Harris.  It

23   is handwritten.  Date is November 16, 1992.  I believe this

24   has to do with directions as far as bank accounts.

25   Q.  I am going to hand you what's been marked as Government

                    Lapina - Direct              114

1  Exhibits 120 through 128.

2        THE COURT:  I couldn't hear you.

3        MS. CALVIN:  I'm sorry.  I am going to hand him

4  what's been marked as Government Exhibits 120 through 128.

5  Q.  What are those documents, generally?

6  A.  Generally, these documents are -- again, they are

7  primarily dated or created during the year 1993, and contain

8  correspondence, fax transmissions, postal mail receipts, some

9  handwritten notes, correspondence.

10  Q.  What is the timeframe on documents 120 through 128?

11  A.  Again, they are dated and created primarily during 1993.

12        Again, they reflect communications between

13  Don Turner, Paul Harris, Dan Leveto, and Jack Williams and

14  also go towards -- have to do with the implementation and

15  continuation of this program.

16        MS. CALVIN:  The government would move for

17  admission of Government Exhibits 120 through 128.

18        THE COURT:  120 through 128 are admitted.

19  Q.  I would ask you to look at Government Exhibit 121.

20        What is that?

21  A.  Which one?  I'm sorry?

22  Q.  Government Exhibit 121.

23  A.  This is a document, correspondence or memo marked

24  confidential dated February, 1993, from J.D. Williams,

25  president and CEO of ASTCO, Limited, to general managers of

                    Lapina - Direct              115

1  colatos, formed in and operating from the Turks and Caicos

2  Islands, British West Indies.

3  Q.  I am going to direct your attention to the second page

4  of that document and other financial accounting, item two at

5  the bottom of the page beginning with after allowing.

6  A.  Page two or page three?  Financial accounting number.

7  Q.  At the bottom, one, two, three, the last --

8  A.  Yes.

9  Q.  What is that last sentence, the next-to-the-last

10  sentence?

11  A.  After allowing for the investor distribution, the amount

12  remaining in the account upon which taxes will be based will

13  probably not exceed $10,000.00.

14  Q.  And generally what?  And what does it say generally the

15  taxes range?

16  A.  Generally taxes range from zero to $2,500.00.

17  Q.  I would ask you to look at what's been marked as

18  Government Exhibit 122.  What is that document?

19  A.  This is a fax transmission from Maloney, Reed, Scarpitti

20  and Company to Dr. Leveto.  Looks like it's signed, from Jim.

21  I believe it's March 9th, 1993.  Contains -- there is an

22  attachment, what appears to be excerpts of one of the tax

23  organizers that were filled out each year.

24  Q.  And is there a -- how many -- Is there a comments box in

25  front of the tax organizer?

Lapina - Direct                116

1  A.  In the comments box?

2  Q.  Yes.

3  A.  It says, if I were preparing the tax return, I would ask

4  for additional information or details.  Please let me know if

5  I can provide any additional help.

6  Q.  Thank you.  I am going to ask you to look at Government

7  Exhibits 130 to 138.

8        When you are done looking through them, please tell

9  me what generally documents 130 through 138 are?

10  A.  These are all documents that were primarily created or

11  dated during the year 1994 containing correspondence, memos,

12  tax organizers, postal certified mail receipts, a personal

13  note dated 4-17-94 and also information, some spread sheets

14  attached to correspondence.  It looks like it's received from

15  the -- an envelope Simmons and Associates, Incorporated,

16      St. Simons Island, Georgia, to Daniel Leveto,

17  388 Edgewood Drive, Meadville.

18      MS. CALVIN:  We would move for admission of

19  Government Exhibit 120 through 128.  Oh, I'm sorry.  130 to

20  138.

21      THE COURT:  130 through 138 are admitted.

22  Q.  And Government Exhibit 133.  What is that?

23  A.  This is a tax organizer for 1993 from Vericon, Limited,

24  care of FAR, P.O. Box 2553, Littleton, Colorado, signed by

25  Daniel Leveto, general manager, dated 3-24-94.


Lapina - Direct            117


1      Again, this would have to do with the income,

2  expenses and net profit of the veterinarian business.

3  Q.  I would ask you to look at Government Exhibit 134.

4      What is that exhibit?

5  A.  Again, it's a copy of a tax organizer for 1993, only

6   this time it's signed by Daniel Leveto and is dated 3-27-94.

7   Q.   I would like you to look at the second page of that

8   exhibit.

9   A.   Yes.

10   Q.   What is the second page of that exhibit?

11   A.   This is essentially questions that are to be answered

12   about the activity of the business for that year.  And at the

13   bottom, you are supposed to indicate what the net income was

14   and distribution is, reflects what net taxable income there

15   would be.  In this case, there is pre-printed zero for net

16   taxable income.

17   Q.   Looking at that document, is the only figure on that

18   page the preprinted zero for net taxable income?

19   A.   Yes.  Yes, as far as I can tell.

20   Q.   I would like you to look at Government Exhibit 137.

21   What is that?

22   A.   Again, this is a copy of an envelope with a note from

23   Simmons Associates in St. Simons Island, Georgia, to Dan

24   Leveto.

25          There is also several months worth of spreadsheets

Lapina - Direct          118

1   attached for the period, looks like August, 1992, through

2   July, 1993.

3   Q.   Now, these ledgers that you see, are they similar to

4   other ledgers that you saw that you had seized?

5   A.   Yeah.  These are similar to the records which I talked

6   about earlier, copies of them, relative to the books and

7   records that were kept relative to the income and expenses of

8   the veterinarian business.

9   Q.   I would ask you to look at what's been marked as

10   Government Exhibit 138.  What is that?

11   A.   This is a memo dated December 15th, '94, from

12   J.D. Williams, president and CEO of Vericon Limited, to

13   general managers of colatos formed in and operating from the

14   Turks and Caicos Islands, British West Indies.

15   Q.   And what is the purpose of this particular letter,

16   according to the writing at the top?

17   A.   Basically, these are similar.  This is similar to others

18   that have been sent out each year to individuals who are

19   general managers basically relatively to getting tax

20   information together for the year as well as payment, annual

21   dues and trustees.

22  Q.  I would like to hand you Government Exhibits Exhibit 140

23  through 148.

24  A.  Okay.  These are all documents which were primarily

25  dated or created during the year 1995.  Included tax

                    Lapina - Direct                  119

1  organizer, again, certified mail receipts, photocopy of a

2  U.S. or a Nonresident Alien Income Tax Return or 1040 NR for

3  Center Company for the year 1994, very lengthy letter from

4  Don Turner to Dan Leveto, more correspondence from Don Turner

5  to Dan Leveto.

6        And then there is also correspondence to active and

7  inactive FAR members from Paul Harris.

8        MS. CALVIN:  The government would move for

9  admission of Government Exhibits 140 through 148.

10        THE COURT:  140 through 148 are admitted.

11  Q.  I would like you to look at Government Exhibit 140.

12  What is Government Exhibit 140?

13  A.  Okay.  It's a 1994 tax organizer which essentially has

14  attachments relative to the gross receipts and expenses and

15  what the net profit would be for the veterinarian business.

16  Q.  And looking at page three of that document, this is for

17  Center Company.  Page three of this document that is for --

18  that shows it's for Center Company?

19  A.  It says business name, Center Company, 316 Conneaut Lake

20  Road, Meadville, Pa.

21  Q.  And looking at page two of that document here again on

22  page two, what does page two ask for?

23  A.  Again, page two has a number of questions it asks of the

24  general managers for the foreign colato.  And at the bottom

25  it has, again, this space is provided for listing the net

                    Lapina - Direct                    120

1  income, less the distributions, and a preprinted zero for net

2  taxable income.

3  Q.  Even though there is no income from all sources, less

4  distribution, net taxable income zero?

5  A.  There is no other numbers there other than the net

6  taxable income was zero.

7  Q.  I would like you to look at Government Exhibits 150

8  through 154.  What is that document?

9  A.  These are documents that were primarily either dated or

10  created, I believe, during the year 1996.  And they include

11   tax organizers for 1995, correspondence to Dan Leveto from

12   Les Retherford, Executive Director of Global Scope, Limited,

13   with an address of 2000 East County Line, No. C 172,

14   Highlands, Ranch, Colorado, 80126.

15        Again, more correspondence from Global Scope,

16   Limited, signed by Les Retherford.  Looks like a fax to Dan

17   Leveto from Les Retherford.  Some handwritten notes.

18        MS. CALVIN:  The government would move for

19   admission of Government Exhibits 150 through 154.

20        THE COURT:  150 through 154 are admitted.

21   Q.  I would like you to look at Government Exhibit 153.

22   What is 153?

23   A.  This is a 1995 tax organizer signed by Daniel Leveto.

24   Looks like it is dated 3-24 or 3-29, '96, at the bottom.

25   Q.  Is this again for a Center Company?


                 Lapina - Direct              121


1   A.  Yes, it is.  I believe it pertains to the year '95.

2   Q.  And looking at page two, here again, what kind of

3   information is sought on page two?

4   A.  The same types of questions, foreign colato, general

5   managers are asked each year, and then information at the

6   bottom relative to net income, which this time there is

7   figures written of $14,276.00, distribution of $14,276.00,

8   resulting in a net taxable income of zero.

9   Q.   Now, Mr. Lapina, I would like to ask you about your

10  familiarity with foreign bank records.

11        As part of your duties, do you examine bank records

12  both domestic and foreign?

13  A.   Yeah.  It is a duty of a Special Agent, sure.

14  Q.   And do you have experience working with foreign bank

15  records?

16  A.   Yeah.  I obtain foreign bank records through tax

17  treatises the United States has with other countries.

18  Q.   Have you also gained familiarity with them through

19  seizures of documents?

20  A.   I'm sorry?

21  Q.   Have you also seized foreign documents?

22  A.   Oh, yeah.  There were -- as I previously mentioned, I

23  believe there were documents relative to three separate

24  foreign banks that were seized during the course of this

25  investigation.

Lapina - Direct            122

1  Q.  Now, when you request foreign documents from banks and

2  foreign countries, you said you use treatises?

3       What form do they take?  Letters?  Interrogatories?

4       Have your used any of those?

5  A.  Well, mutual legal type treatises are different than a

6  tax treatise.  The United States has tax treatises with

7  several countries and letters rogatory are used basically

8  with countries the United States does not have tax treatises

9  with in order to obtain information.

10  Q.  And have you seen credit slips and debit slips as part

11  of your investigation?

12  A.  Yes.  Credit slips and debit slips relative to both

13  domestic and foreign banks.

14  Q.  Have you seen a certain amount of uniformity in the

15  manner in which banks conduct business?

16  A.  Yeah.  As far as domestic and foreign bank credit slips,

17  credit and debts slips correspond to credit and debits which

18  are on the bank statements.  Credits reflect increases to the

19  bank balances and debits reflect decreases to the bank

20  balances.

21  Q.  And is it -- from your experience as a Special Agent,

22   have you found that foreign banks create these in the

23   ordinary course of their business?

24   A.   Yes.

25   Q.   And that the information contained on them is relatively

Lapina - Direct          123

1    current or made at or about the time that's reflected on the

2    documents?

3    A.   Yes.

4    Q.   And do foreign banks keep these documents?

5    A.   Foreign banks maintain records just like domestic banks.

6    Q.   I would like you to look at Government Exhibits 160

7    through 176.  160 through 175-B.  Generally, what are those

8    documents?  160 to 170 -- I'm sorry.  I gave you to one --

9    A.   160 through 175-B.  Generally, these are records

10   relative to three different banks located offshore.

11        The first series of records pertain to Barclays

12   Bank located in the Grank Turk, Turks and Caicos Islands.

13   And they primarily contain a copy of a passport, credit and

14   debit slips, fax or correspondence, I'm sorry, directed to

15   Barclays Bank from Daniel J. Leveto, a customer copy of

16  transactions; things of that nature.

17      And these records primarily deal with an account

18  located at Barclays Bank in the Grank Turk and Turks and

19  Caicos Islands in the name of Box Elder, Limited.

20  Q.  Are there handwritten notations on some of those bank

21  documents?

22  A.  Well, the passport definitely has handwriting, recording

23  withdrawals, withdrawals and deposits.  The customer copies

24  of transactions are handwritten.  Some of them have stickey

25  notes.


                    Lapina - Direct              124


1       MS. CALVIN:  Your Honor, the government would move

2  for admission of Government Exhibits 160 through 175-B.

3       THE COURT:  160 through 175-B are admitted.

4  Q.  I would like you to look at Government Exhibit 161.

5  What is that?

6  A.  161 is a passbook for Barclays Bank.  It says on the

7  outside account No. 35A331O.  Here's a copy of what was

8  inside the book, inside here.

9       Basically, again, it is for the Box Elder, Limited,

10  account beginning with the initial balance of $180.00 on

11  2-16-93, indicating subsequent deposits and withdrawals all

12  the way up until at least June of '95 on the last -- when the

13  last day is recorded in there.

14  Q.   And the deposits that are reflected in this bank book as

15  having been made in 1994 and 1995, what are those dates and

16  amounts?

17  A.   For the years '94 and '95?

18  Q.   '94 and '95.

19  A.   First deposit for 1994 appears to be for $15,000.00 and

20  dated 3-7-94.  Interest of 1152 is what it looks for on

21  3-7-94.  May 27th, '94, deposit of $13,000.00, 9-9-94,

22  $81.66.

23        The next deposit recorded is 3-7-95.  Looks like

24  it's possibly interest for $40.91.

25        Then there is a deposit reflected of 5-23-95 for

                    Lapina - Direct              125

1  roughly $14,520.00.  The next deposits are not dated.

2  Q.   I would ask you to look at what's been marked Government

3  Exhibit 162.  What is Government Exhibit 162?

4  A.   This is a customer copy of a deposit that was made to

5   this particular account at Barclays Bank for $180.00.  The

6   date is 2-15-93.  Basically details -- the source apparently

7   was a Langdon and Leveto Veterinary Hospital.  It has on here

8   reference Paul Harris, ASTCO, Limited, and mailed to Box

9   Elder, Limited, Four Corners, Grand Turk, Turks and Caicos

10  Islands.

11        There was also a stickey note on there that says,

12  net deposit equal -- net deposit equal 180.  $20.00 taken out

13  by Miami Barclays, a transfer cost, or as transfer costs.

14  Q.   What is Government Exhibit 163?

15  A.   163 doesn't seem to be here.

16  Q.   I am sorry.  Well, in my notes, that must have come in

17  to -- I'm sorry.

18        I would ask you to look at Government Exhibit 164.

19  What's Government Exhibit 164?

20  A.   This is basically a deposit or a credit slip, is what it

21  appears to be, dated 3-22-93 relative to the Box Elder

22  account at Barclays.  Proceeds apparently were from ASTCO,

23  Limited, and the amount is $18,117.50.

24  Q.   And I have been showing the jurors copies of documents.

25  Is that an original that you have up there?

1  A.  I'm sorry?

2  Q.  There is a copy of the document.  I would ask you to

3  hold up the document that you are looking at.

4  A.  This is the original.

5  Q.  I would like you to look at Government Exhibit 165-A.

6  What is that document?

7  A.  This is a letter from -- signed by Daniel J. Leveto to

8  Mr. Sanford Lightbourne of Barclays Bank, which basically is

9  directing Mr. Lightbourne to debit the Box Elder account for

10  $17,500.00 and to mail a check payable to Center Company in

11  Meadville, Pennsylvania.

12  Q.  Would you look at 165-B, please?

13  A.  This 165-B looks like a customer notification to Center

14  Company, 316 Conneaut Lake Road, Meadville, dated April 21st,

15  1993, from Barclays Bank.

16       Basically, it says, at the request of your letter

17  dated April 20, 1993, we encloses our check for $17,500.00 as

18  being proceeds of Box Elder.

19  Q.  Is there a handwritten note on there in the circle?

20  A.  Yeah.  It faxed acknowledgment and then in the circle

21  is, came with check.

22  Q.  Government Exhibit 165-C, what is that?

23  A.  This is a customer's copy dated 4-21-93 relative to that

24  same transaction in the previous exhibit, only this time it

25  looks like it refers not only the $17,500.00, but possibly a

Lapina - Direct              127

1  fee of $44.35, being a total of $17,544.35.

2  Q.  And, again, you have the original?

3  A.  Yes.

4  Q.  I would ask you to look at what's been marked as

5  Government Exhibit 165-D.

6      What that is document?

7  A.  Again, this is an original dated 4-21-93, and it is

8  basically a note that your account has been debited as

9  follows re letter dated 4-21-93 for a draft payable to Center

10  Company and bank charges $17,552.85 is the total.

11  Q.  Would you look at Government Exhibit 164-A?

12  A.  164?

13  Q.  I'm sorry.  166-A.

14  A.  Okay.  166-A is a letter dated May 24th, 1993.  Again,

15  addressed to Mr. Lightbourne at Barclays Bank in the Grand

16  Turk, Turks and Caicos Islands, signed by Daniel J. Leveto,

17  basically asking Mr. Lightbourne to debit the account of Box

18  Elder, Ltd., for the amount of $38,000.00 U.S. and to mail a

19  check out to Center Company in Meadville.

20      There is also some handwriting, a handwritten note

21  attached to it.

22  Q.  Would you look at Government Exhibit 166-B?

23  A.  166-B?

24  Q.  Yes.

25  A.  Again, it's an original document.  It's a receipt

Lapina - Direct                  128

1  acknowledgment from Barclays Bank, the manager of Barclays

2  Bank, to Center Company, dated May 26, 1993, basically

3  informing him that we are enclosing a check of U.S.

4  $38,000.00 per your instructions of a letter dated May 24th,

5  1993.

6  Q.  Would you look at 166-C?

7  A.  Again, an original document debit slip from Barclays

8  Bank relative to the Box Elder account, dated May 26, 1993,

9  showing Box Elder, Limited, care of Dan Leveto, 316 Conneaut

10  Lake Road, Meadville, amount of -- $38,070.60 was the amount

11  of the debit for -- debit for that account.

12  Q.  Would you look at Government Exhibit 167?

13       What is that document?

14  A.  This is a fax from Dr. Daniel Leveto to a Miss Jennings

15  at Barclays, dated 6-10-93, which states that on 6-9-93, I

16  received a debit slip for the withdrawal from Box Elder, Ltd.

17  I received this slip by airmail but, please note, and it is

18  underlined, I have not received the registered check yet.

19  Our Post Office says that you must check the problem out on

20  your end.  The problem can be traced from your end.  Please

21  advise as soon as possible.

22  Q.  Would you look at Exhibit 168, please?

23  A.  Yes.  168 is a fax, again, from Daniel Leveto to

24  Miss Jennings at Barclays Bank, dated 6-23-93 stating, this

25  fax acknowledges the receipt of Center Company's check draft

Lapina - Direct              129

1  number 01203448, dated May 26, 1993.  Thank you, Daniel

2  Leveto.

3  Q.  Looking at Government Exhibit 169-A, what is that

4  exhibit?

5    A.   This is a credit slip relative to that Box Elder account

6    at Barclays Bank, dated 2-3-94, showing the account was

7    credited for $15,500.00, and apparently the source of the

8    funds was Vericon, Limited.

9    Q.   This is 1994?

10   A.   Yeah.  February 3rd, 1994.

11   Q.   What is 169-B?

12   A.   This is, again, a letter dated March 23rd, 1994, to

13   Mr. Lightbourne at Barclays Bank from Daniel Leveto,

14   directing basically the debiting of $15,000.00 from the

15   account.  And only this time it should be wire transferred to

16   the following bank:  Integra bank North, Meadville, at

17   account number 043305131, Center's Freedom account.

18   Q.   And signed by Daniel Leveto, this request?

19   A.   Signed by Dan Leveto.

20   Q.   What is 169-C?

21   A.   Debit slip from the same account for the amount of

22   $15,068.00, dated March 24th, 1994.

23   Q.   And 169-D?

24   A.   A copy -- or it's a fax transmission from D.J. Leveto,

25   VMD, to Mr. Lightbourne and also Miss Pat Williams, bearing a

1  wire transfer.

2       It's -- also another page was said to be included,

3  but it is not attached.  Please perform ASAP.  If you have

4  any questions, please call.  Daniel J. Leveto.

5  Q.   And is that the same date as this letter that's marked

6  as 169-B?

7  A.   Yes.  March 23rd, '94.

8       THE COURT:  I guess we'll stop here for lunch.  It's

9  a quarter of one.  So, we'll reconvene at two o'clock.

10  (The jury left the courtroom.)

11  (Court recessed at 12:45 p.m.)

12  (Court reconvened at 2:05 p.m.)

13  (The jury entered the courtroom.)

14       THE COURT:  You can sit down when you come in.  We

15  stand in respect for you.

16       Be seated, please.  Good afternoon.  Okay,

17  Ms. Calvin.

18       MS. CALVIN:  Thank you.

19            DIRECT EXAMINATION

20  BY MS. CALVIN:

21  Q.  When we left off, we were just looking -- we were about

22  to look at Government Exhibit 170.

23        Do you have that in front of you, Mr. Lapina?

24  A.  Yes.

25  Q.  What is Government Exhibit 170?

Lapina - Direct(By Ms. Calvin)        131

1  A.  This is a letter dated March 23rd, 1994, to

2  Mr. Lightbourne at Barclays Bank, unsigned, with an

3  indication it is from Dan Leveto.

4        There is some scratch on there basically indicating

5  the account number, which was 4061682.  There is a new number

6  up there of 3583110, which is written.  And instead of

7  amount, U.S. $15,000.00, there is an arrow directed to a new

8  amount of $10,500.00.

9  Q.  Would you look at Government Exhibit 171-A, please?

10  A.  171-A?

11  Q.  Yes.

12  A.  It's a fax, looks like, cover from Daniel J. Leveto to

13  Mr. Lightbourne and Miss Jennings at Barclays, dated

14  12-14-94.  Subject, wire instructions.  Comments, see letter.

15  Q.   What is Government Exhibit 171-B?

16  A.   This is a letter again from Daniel J. Leveto, signed, to

17  Mr. Lightbourne of Barclays Bank, dated December 14th, 1994,

18  with instructions to debit account number 3583310, in paren,

19  account name Box Elder, Ltd., for the amount of $10,500.00.

20  And there is an arrow up there indicating $15,000.00.  It

21  gives the wiring instructions, which is an account at Bank of

22  America for credit to PaineWebber, For Further Credit to Box

23  Elder, Ltd.

24  Q.   What is Government Exhibit 171-C?

25  A.   This is an original copy of a debit slip from Barclays

Lapina - Direct(By Ms. Calvin)          132

1  Bank relative to Box Elder account, and basically says,

2  reference to your letter dated 14, December, 1994, for wire

3  transfer, plus our charges, and it shows the amount

4  U.S. $10,556.75.

5  Q.   And who is that sent to?

6  A.   The Director of Box Elder, Ltd., 316 Conneaut Lake Road,

7  Meadville, Pa.

8  Q.   And that was dated 14, December, 1994?

9  A.   Well, it's dated the 15th of December, but it references

10  a letter dated the 14th of December.

11  Q.  Would you look at Government Exhibit 173, please?

12       What is Government Exhibits 173?

13  A.  173 is a credit slip with a Box Elder, Ltd. account,

14  indicating it was done on 5-23 of '95.  Basically looks like

15  the source of the credit was from Vericon, Limited.  The

16  total credit was $14,520.00.

17  Q.  And it was credited to which account?

18  A.  Box Elder, Limited, 3583310.

19  Q.  And the date of that?

20  A.  5-23-95.

21  Q.  I would ask you to look at what's Government Exhibit

22  174-A.

23  A.  174-A is a letter dated June 6th, 1995, to

24  Mr. Lightbourne at Barclays Bank.  It is unsigned.  Indicates

25  it is from Daniel Leveto.  Some handwriting at the top.  It

                Lapina - Direct(By Ms. Calvin)         133

1  basically is to -- directing debit debts to the Box Elder

2  account in the amount of $15,000.00 to be wired to Bank of

3  America National Trust.  PaineWebber looks for further credit

4   to Box Elder.

5   Q.   The writing at the top, does that direct someone to put

6   it on Box Elder letterhead?

7   A.   The writing at the top looks like B.E., and it is hard

8   to make out what the next thing says, but it -- then it's

9   written, use Box Elder letterhead, yes.

10  Q.   Ask you to look at Government Exhibit 174-B.

11  A.   174-B is a debit slip dated June 8th, 1995, relative to

12  the Box Elder account 3583310, directed to Box Elder, Ltd.,

13  directed to Dan Leveto, 316 -- it says Conneaut Road there,

14  Meadville, for the amount of $15,068.00 U.S.

15  Q.   That's in 1995?

16  A.   June 8th, 1995.

17  Q.   Yes.  What is Government Exhibit 174-C?

18  A.   Again, this looks like a fax cover sheet dated June 6th,

19  1995, to Mr. Lightbourne and Miss Jennings.  Says D.J. Leveto

20  to Barclays Bank.  Looks like it is signed by Daniel Leveto.

21  The subject is wire transfer.

22        Comments says, please perform the following wire

23  transfer.  Thank you, Dan Leveto.  Use Box Elder on behalf of

24  Box Elder.

25  Q.   And that fax relates back to the other document that you

Lapina - Direct(By Ms. Calvin)        134

1  were looking at as far as the date?

2  A.  The one immediately prior?

3  Q.  Yes.  The two immediately prior.  174-A, June 6th?

4  A.  Yeah, same dates, June 6th, on both 174-A and 174-C.

5  Q.  I would ask you to look at Government Exhibit 175-A.

6  A.  This is a letter this time that reflects the letterhead

7  of Box Elder, Ltd., care of Daniel J. Leveto, 388 Edgewood

8  Drive, Meadville, dated April 29th, 1996, signed by Daniel

9  Leveto to Mr. Lightbourne.

10       Please perform the following wire transfers as soon

11  as possible to debit account 3583310, paren, account name,

12  Box Elder, Ltd.), for the amount of $16,000.00.  And provides

13  the wire transfer instructions.

14  Q.  Would you look at Government Exhibit 175-B?

15  A.  Yes.  This appears to be a fax cover sheet.  Again,

16  dated 4-30, April 30th, 1996, to Mr. Lightbourne and

17  Miss Jennings of Barclays from Daniel J. Leveto.

18       Again, subject is wire transfer.  Please perform

19  the following wire transfer.  Thank you, Daniel J. Leveto.

20  It says for Box Elder at the bottom.

21  Q.  I would like to hand you Government Exhibits 180 through

22  188.  Generally, what are these documents?

23  A.  These are documents relating to an account at First Home

24  Bank in the Grand Cayman Islands in the name of Leonard

25  Adler.  The application here is P.O. Box 54, Meadville Pa.,

Lapina - Direct(By Ms. Calvin)          135

1  16335.

2          And there is also credit slips, customer

3  notifications, bank statements; things of that nature.

4          MS. CALVIN:  Your Honor, the government moves for

5  admission of Government Exhibits 180 --

6          THE COURT:  180 is admitted.

7          MS. CALVIN:  -- and through 188.

8          THE COURT:  And 188?

9          MS. CALVIN:  Through 188.

10          THE COURT:  Through 188?

11          MS. CALVIN:  Yes.

12          THE COURT:  180 through 188 are admitted.

13  Q.  What is Government Exhibit 180?

14  A.  Government Exhibit 180 is an application, or an

15    interview sheet, I should say, with some documents attached

16    to it.  It's relative to Leonard Adler, again, P.O. Box 54,

17    Meadville Pa., dated March 5th, 1992.  Indicates his employer

18    is Dr. Daniel Leveto, 388 Edgewood Drive, Meadville, Pa.  And

19    there is a money order stub at the top for $300.00.

20          It's also reflected here that -- this $300.00 money

21    order, is the remarks for the initial deposit to that

22    account.  There are also other documentation attached here.

23    One is an authority and indemnity in respect of telephone,

24    telex and facsimile instructions to the First Home Bank --

25    Banking, Ltd., dated March 5th, 1992, with a signature of

                Lapina - Direct(By Ms. Calvin)          136

1    Leonard Adler at the bottom.

2          It says, to bank I give my permission for my

3    employer, Dr. Daniel Leveto, to obtain information from you

4    concerning my bank account with your bank and I hereby hold

5    you harmless for any liabilities which you may incur as a

6    result of giving Dr. Leveto information about my account.

7    Q.   Is there an apparent note on that document as well?

8    A.   Yes.  There is a blue stickey note on there basically

9   with some -- looks like it says, Andrea, please type just as

10  is.  Thanks, dad.  Note, Liz, et cetera.  There is a phone

11  number there.  Also several other documents attached here as

12  well.

13          One is a United Bank of Littleton reference

14  relative to Leonard Adler.  There is a signature card there

15  containing Leonard Adler's signature date dated March 5th,

16  1992, verification of account agreement with a blue stickey

17  note, and also foreign currency deposit account and agreement

18  form.

19  Q.  I would ask you to look at Government Exhibit 182.

20          What is Government Exhibit 182?

21  A.  This is an envelope, cancelled envelope to Leonard Adler

22  P.O. Box 54, Meadville, Pa., 16335, USA, with some

23  handwriting on it.

24          There is a return address of P.O. Box 914,

25  Grand Cayman, British West Indies, on the back.


                Lapina - Direct(By Ms. Calvin)          137


1           THE COURT:  Okay.  Go ahead.  we needed a little

2   comic relief anyway.

3   Q.  Now, did you find other evidence of Leonard Adler in the

4  search?

5  A.  Yes.  Yes, I did.  I found a signature stamp with his

6  name and also, I believe, some letterhead with his name on it

7  as well.

8  Q.  I am going to hand you what has been marked

9  Government Exhibits 229 and 251.

10      THE COURT:  Was that 229?

11      MS. CALVIN:  251 and 229, yes.

12      THE WITNESS:  Government Exhibit 229 is the

13  signature stamp containing Leonard Adler's signature.

14      MS. CALVIN:  Your Honor, we would move for

15  admission of Government Exhibit 251 -- 229.  I'm sorry.

16      THE WITNESS:  And then 251 is a letterhead

17  containing the name of the writing or print at the top, from

18  the desk of Leonard Adler, P.O. Box 54, Meadville Pa., 16335,

19  USA.

20      MS. CALVIN:  Your Honor, we would move for the

21  admission of Government Exhibit 251.

22      THE COURT:  251 is admitted.  And 229?

23      MS. CALVIN:  Yes, Your Honor.

24      THE COURT:  229 is also admitted.

25          MS. CALVIN:  Your Honor, we would request that the

Lapina - Direct(By Ms. Calvin)        138

1   clerk be allowed to pass the stamp to the jury.

2          THE COURT:  Sure.

3   Q.   Now, Mr. Lapina, where did you find this signature

4   stamp?

5   A.   It was found at the veterinarian business.  I believe in

6   the office.

7   Q.   Same for the letterhead?

8   A.   I believe so.  The letterhead I have has my handwriting

9   at the top.  It was found in the office safe.

10  Q.   In the office safe?

11  A.   Yes.

12  Q.   Agent Lapina, I would ask you to look at Government

13  Exhibit 184.  What is that document?

14  A.   This is a credit advice dated March 18th, 1992, relative

15  to the initial deposit to the account 1083995, First Home

16  Banking Ltd., Leonard Adler, P.O. Box 54, Meadville.

17  Indicates $300.00 U.S.

18  Q.   And if you would look at Government Exhibit 185.  What

19  is that document?

20   A.   This is a customer notification relative to transaction,

21   dated May 26, 1992, for the account No. 1083995 at First Home

22   Banking, Ltd., and it says ASTCO, Limited, the Barclays check

23   number 01221298 for $31,663.00.  It says, mail to Leonard

24   Adler, P.O. Box 54, Meadville, Pa.

25   Q.   What is Government Exhibit 186?

Lapina - Direct(By Ms. Calvin)        139

1   A.   It's a letter with an attached debit advice or slip,

2   dated November 19th, 1992, from First Home Banking, Ltd., to

3   Leonard Adler, P.O. Box 54, Meadville.

4        It says, Dear Mr. Adler:  As requested, enclosed

5   please find check No. 26319 for the U.S. $32,000.00

6   accompanied by a debit advice for your account.

7   Q.   Is there a debit advice attached?

8   A.   Yes.

9   Q.   In the amount of?

10   A.   $32,000.00.  $32,015.00.  I am sorry.

11   Q.   Now, I would ask you to look at what's Government

12   Exhibit 187.  What is Government Exhibit 187?

13   A.   187 is a series of bank statements relative to the

14  account of Leonard Adler, account No. 1083995, First Home

15  Banking in the Grand Cayman.  Covers the period starting

16  3-31-92 all the way up through June 30th of '95, when it was

17  British American Bank.

18  Q.  I would ask you to look at that document and tell me

19  what was the balance in that account on September 30th, 1992?

20  A.  As of 9-30-92, the balance reflected is $33,671.82.

21  Q.  Now, when you did your search, did you also find

22  evidence that Dr. Leveto, the defendant, had a bank account

23  in the Channel Islands?

24  A.  Yes.

25  Q.  I'd ask you to look at Government Exhibits 190 through

                Lapina - Direct(By Ms. Calvin)              140

 1  225.

 2        MS. CALVIN:  Your Honor, while he is looking at

 3  those documents, the government obtained an affidavit from

 4  TSB Bank in the Channel Islands regarding the documents that

 5  Mr. Lapina is examining at this time stating that they are

 6  bank records of TSB Bank, and they pertain to 190 to 225.

 7        THE WITNESS:  The first part of these exhibits deal

 8  with applications, correspondence, copy of a bank card, bank

9   statements relative to the account in the name of Mr. D.J.

10  Mrs. M.A. Leveto, 388 Edgewood Drive, Meadville, Pa.

11      And the second half of these documents deal with

12  applications, correspondence, letter of indemnity relative to

13  Mr. Leonard Adler, P.O. Box 54, Meadville, Pa., relative to

14  an account at TSB Bank.

15      MS. CALVIN:  Your Honor, I believe Exhibits 207 and

16  210 are in evidence, but we would offer the remainder of the

17  exhibits from 190 to 225 into evidence.

18      THE COURT:  The ones I have marked as already in

19  evidence are 195 and then 207-A through 208-A and 210 and

20  212.

21      But, you're offering all of the exhibits up to 219,

22  did you say?

23      MS. CALVIN:  225.

24      THE COURT:  225.  All right.

25      All right.  200 through 225 are admitted, if they

                Lapina - Direct(By Ms. Calvin)        141

1   haven't already been admitted.

2       MS. CALVIN:  And 190 through 200.

3          THE COURT:  190 through 200 was that?

4          MS. CALVIN:  Yes.

5          THE COURT:  All right.  They are admitted also.

6  Q.  I would ask you to look at Government Exhibit 192,

7  please.

8  A.  Government Exhibit 192 is an unsigned letter from Daniel

9  J. Leveto to TSB Bank in Jersey, Channel Islands, dated

10  August 27, 1991, expresses interest in opening an account at

11  the bank.

12  Q.  I would ask you to look at Government Exhibit 194.  What

13  is Government Exhibit 194?

14  A.  This is a TSB Bank card application for Dr. Daniel J.

15  Leveto and Mrs. Margaret A. Leveto, signed by both, dated

16  September 4th, 1991.

17  Q.  And is this a customer copy?

18  A.  Yes.  It says customer copy at the bottom.

19  Q.  I would ask you to look at Government Exhibit 195.  What

20  is Government Exhibit 195?

21          Oh, I am sorry.  We'll just skip that one.

22          I would ask you to look at Government Exhibit 200.

23  What is Government Exhibit 200?

24  A.  It's a photocopy of a bank card, Visa bank card, TSB

25  Bank, in the name of Dr. D.J. Leveto with a signature on the

Lapina - Direct(By Ms. Calvin)          142

1   back.

2   Q.   Where did you find that?

3   A.   It was found in the office safe.  And then I have some

4   further notations here that it was inside a daily planner

5   there.

6   Q.   And I would ask you to look at Government Exhibit 202.

7   What is that?

8   A.   202 are bank statements relative to account

9   No. 470915690568 in the name of Mr. Dr. D.J. and Mrs. M.A.

10  Leveto, 388 Edgewood Drive, Meadville, relative to TSB Bank

11  in the Channel Islands, and the statement starts

12  September 24th, '91, and go up -- and go up through -- the

13  last statement I have here, the last transaction is dated

14  April 21st, 1995.

15  Q.   Did you also find bank books, bank records, books for

16  TSB Bank?

17  A.   Yeah.  I believe they were what they call pay in books,

18  had some slips in them for that account.

19  Q.  What is Government Exhibit 205?

20  A.  These appear here to be checks from that account at

21  TSB Bank in the name of Mr. D.L. and Mrs. Mr. A. Leveto.

22  Q.  I would ask you to look at Government Exhibit 209.

23  A.  This is a credit slip dated 9-3-92 credited to your

24  account No. 15690568, in the sum of $2,2081.48, and I don't

25  believe that's dollars.  I believe that's another

Lapina - Direct(By Ms. Calvin)          143

1  denomination has been received from proceeds of

2  U.S. $4,000.00.

3  Q.  Would you look at Government Exhibit 211, please?

4  A.  This is another credit slip dated 11-8-92, credited to

5  the account No. 15690568.  The sum of -- again, it might be

6  pounds, sterling.  I am not for certain -- 282051, and has

7  been received from proceeds U.S. $5,500.00.  Looks like the

8  source was Center Company.

9  Q.  Look at Exhibit 214.  What is 214?

10  A.  This is a photocopy of a bank card, TSB Bank visa card

11  in the name of Mrs. M.A. Leveto.

12  Q.  Looking at Government Exhibit 220, what is that?

13  A.  This is correspondence addressed from TSB Bank to

14  Mr. L. Adler, P.O. Box 54, Meadville, Pa., relative to

15  information about account, different account options.

16  Q.  And then what is Government Exhibit 222?

17  A.  This is a TSB Bank card application for Mr. Leonard

18  Adler, P.O. Box 54, Meadville.  It says date of birth,

19  8-24-52.  And it says employer's name and address, Dr. Daniel

20  Leveto, 316 Conneaut Lake Road, Meadville, Pa., signed

21  Leonard Adler, 5-28-92.

22  Q.  I would ask you to look Government Exhibit No. 225.

23       What is that document?

24  A.  This is a letter of indemnity to TSB Bank in the Channel

25  Islands signed by Leonard Adler, dated 18th of June, 1992.


Lapina - Direct(By Ms. Calvin)        144


1  Has another page attached to it, which this is typed, which

2  says to the bank, I gave my permission for my employer,

3  Dr. Daniel J. Leveto, to obtain information from you

4  concerning my account with your bank, and I hereby hold you

5  harmless for any liabilities which you might incur as a

6  result of giving Dr. Leveto information about my account.

7  Q.  Now, during the search that you conducted, were you also

8   looking for handwritten notes that -- regarding this matter?

9   A.   Yes.

10  Q.   Did you find some?

11  A.   Oh, yeah.  Quite a few.

12  Q.   I am going to hand you what has been marked as 230 to

13  329.

14  A.   Yeah.  These -- I had gone through these before.

15  Basically were handwritten notes that were seized during the

16  course of the search warrants, from either the business or

17  the residence, May 2nd, '96.

18        They are indicative of a number of different

19  things; flow of funds, how to set up Center Company, the

20  setting up of a domestic and foreign accounts, tax return

21  preparation, wire transfer instructions, notes of

22  conversations with Don and Paul, information relative to

23  nominee names, such as Box Elder and Leonard Adler, again,

24  how to set up a Post Office Box, how to transfer property in

25  somebody else's name.

                Lapina - Direct(By Ms. Calvin)          145

1        MS. CALVIN:  Your Honor, at this time, the

2   government would move for admission of Government Exhibits

3   230 to 329.

4         THE COURT:  230 to 329 are admitted.

5   Q.  I would ask you to look at Government Exhibit 230.

6         What is the date on that document?

7   A.  Well, there is a date written two different times of

8   8-12-91.

9   Q.  And where did you find this document?

10  A.  This document doesn't have specific markings on it, but

11  it would have been either at the office, or I'm sorry, the

12  veterinary business or the residence.

13  Q.  If you would look at the copy that the government has.

14  A.  Okay.  Yeah.  As I recall, making copies of these and

15  not writing on them and putting on there that, my copy, that

16  is my handwriting on that.  It says office safe.

17  Q.  And what does this concern, this handwritten note?

18  A.  Well, the first part of it is opening up a discretionary

19  bank account for a non-corporate business association, and

20  has Center Company listed there, has an EIN of 980119216,

21  information relative to de facto account.

22  Q.  Okay.  I would ask you to look at Government Exhibit

23  231.  What is that exhibit?

24  A.  231 again --

25  Q.  And, again, you have an original document?


Lapina - Direct(By Ms. Calvin)          146


1   A.  Yes.  The first part of it talks about Maggie, salient

2   features, Center Company.  I am general manager.  I have

3   appointed USA co-general manager if something happens.

4   Appoint -- I believe it's TWF as general manager.

5   Q.  Does it also give you a date on when this was written?

6   A.  There is a date on here of 10-9-91.

7   Q.  Now, also as part of that document, there is a picture

8   that shows the flow of funds?

9   A.  Yes.  There is a diagram on the page two basically

10   showing funds going from Center Company, DBA Langdon and

11   Leveto, to Jack Williams in care of Don Turner, redistributed

12   to -- I believe that's CCUCCH L. Adler, and a de facto

13   account having it going over to TSB in the Channel Islands,

14   and then eventually an arrow showing it going back to

15   Center's Freedom account.

16  Q.  Thank you.  I would ask you to look at Government

17   Exhibit 235.  What is 235?

18  A.  Again, more handwritten notes at the top.  Basically

19  says, go to AAA office.  Become a member.  Pay $40.00 for --

20  under name of Tom Peters.  There is something else written

21  here, secrete any cash.

22  Q.  Okay.  Thank you.  Ask you to look at Government Exhibit

23  239.

24  A.  These are handwritten notes again.  I don't see any

25  dates on there, but I see TSB.  It talks about in pounds,

                Lapina - Direct(By Ms. Calvin)          147

 1  secret P.O. Box, my name, and looks like phony name.

 2  Q.  I would ask you to at Government Exhibit 240.

 3  A.  These notes indicate accounts.  It says L. Adler,

 4  totally secret.  Can fax document to empty account or

 5  withdraw or deposit, Box Elder fax in a form of a letter to

 6  head man.  See sample.  Information about star buck.  Talks

 7  about book.  Paul can always help.

 8  Q.  Thank you.  Ask you to look at Exhibit 241.

 9  A.  This is handwritten.  Again, the top of this note

10  basically says typed on the line, underline, to bank, colon,

11  I give my permission, goes on to say, for my employer,

12  Dr. Daniel Leveto, to obtain information from you concerning

13  my account with your bank and I hereby hold you harmless for

14  any liability which you may incur as a result of giving

15  Dr. Leveto information about my account.

16      It says, thank you, and it says I'll sign above.

17  Q.  Ask you to look at Government Exhibit 248.

18  A.  These are copies of notes.  Talked to Paul, his

19  information about Box Elder, has a new Box Elder, I believe

20  that's the account No. 3583310.

21  Q.  Is that 248?

22  A.  248.

23  Q.  Does it also talk something about, talked to Paul?

24  A.  I'm sorry?

25  Q.  Is there also a note on there about talked to Paul?

                Lapina - Direct(By Ms. Calvin)        148

1  A.  Yeah.  Talked to Paul.  It has underlined, for refund

2  for Center.  Talks about Box Elder.  Some of it is illegible.

3  Q.  I would ask you to look at Government Exhibit No. 249.

4  What is that?

5  A.  More notes with some figures on there.  Talks about

6  colato created by PAP.(Sp).  Called Wayne Co.  He is trustee.

7  Sole purpose of opening P.O. Box -- looks like open up P.O.

8   Boxes in a box.

9   Q.   Thank you.  I would ask you to look at Government

10  Exhibit 250.

11  A.   These are copies of notes.  Traveler -- looks like T.

12  Checks, 4,000, in paren, Karen to buy them.  Maggie to take

13  out cash, sterling.

14        Top right-hand corner, it talks about Jim

15  Scarpitti, trail to borrow funds.  No paper trail.

16  Q.   Okay.  Thank you.  Government Exhibit 252.

17  A.   This is a photocopy of excerpts that were in a daily

18  planner.  You see information about Leonard Adler, P.O.

19  Box 54, with the date of birth, signature stamp, okayed by

20  him below.  Talks about First Home Bank in the Grand Cayman,

21  who to -- who the contact people are.

22  Q.   I would ask you to look at Government Exhibit 255.

23  A.   These are stickey notes.

24        First item on there is, see statement, says to

25  above money, Channel Islands, use card.  Second is Leonard

          Lapina - Direct(By Ms. Calvin)         149

1   Adler, $1,800.00 balance, can copy wire, with signatory

2   stamp.  We are giving control over that account.  Mail, can

3   call to confirm I.D. as L. Adler, and P.O. Box, that type of

4   information.

5           Box Elder talks.  You really have no association

6   with Box Elder.  Only they give you the capacity to use

7   money.  No one is to know about Box Elder.

8   Q.   Okay.  I would ask you to look at Government

9   Exhibit 257.

10  A.   257?

11  Q.   Yes.  257.

12  A.   These appear to be copies of notes with information

13  relative to L. Adler, de facto account with the P.O. Box,

14  again, 54 in Meadville, Wayne Co., P.O. Box 54.  Information

15  about First Home Banking in the Grand Cayman.  Bank

16  references for Leonard Adler.

17  Q.   I would ask you to look at Government Exhibit 258.  Just

18  read the first part of it.  Date?

19  A.   It's dated March 6, '92.  Talk to Paul and Don at the

20  top.  The first part says, Don will send back executed pages

21  with Jack Williams' name on them.

22  Q.   What is Government Exhibit 259?

23  A.   Copies of handwritten notes indicative of L. Adler.  It

24  says $33,000.00, land deal $45,000.  From the desk of Leonard

25  Adler, P.O. Box 54, and there are some figures on there.

Lapina - Direct(By Ms. Calvin)         150

1  Talks about faxing the Barclays or the wiring to Barclays.

2  Q.  I would ask you to look at Government Exhibit 260.

3  A.  It's handwriting on 260.  Says wire sender, Center

4  Company.  D.J. Leveto, general manager, to wire $33,671.00

5  from Center Freedom account, and it says wire these funds

6  to -- wire these funds to -- wire these funds to Barclays

7  Miami branch ABA.  Number is 066010746, for further credit to

8  Barclays in Grand Turk, Turks and Caicos Islands, account

9  number 0038151, account name ASTCO.

10  Q.  Thank you.  I am going to ask you to look at Government

11  Exhibit 283, please.

12  A.  These are handwritten notes, also receipts, Postal

13  Service receipts.  The first one is for P.O. Box rented, and

14  some other non-postal postage stamps, items that were

15  purchased there.  It has information on the notes about a

16  Dr. Douglas Kapstad,(Sp), P.O. Box, doesn't really have

17  information about the number, Meadville, Pa.

18  Q.  I would ask you to look at Government Exhibit 318.  What

19  is Government Exhibit 318?

20  A.  This is a memo from Paul D. Harris, opportunity

21  consultant, Littleton, Colorado.  It says, Dear Dan.  All

22  distributions to Box Elder are complete.  Look for more info

23  on tower within the next week or so.  Best wishes.  And it's

24  signed.

25  Q.  Now, Mr. Lapina, did you have an opportunity to

Lapina - Direct(By Ms. Calvin)          151

1  interview the defendant?

2  A.  Yes, I did; the day of the search warrant.

3  Q.  And do you recognize Daniel Leveto in the courtroom?

4  A.  Yes, I do.

5  Q.  And would you describe him for us, please?

6  A.  He is sitting over there at the defense table with the

7  green shirt, glasses, beard.

8        MS. CALVIN:  May the record reflect that Mr. Lapina

9  has identified the defendant?

10        THE COURT:  The record may so indicate.

11  Q.  Now, did you ask the defendant -- did he agree to an

12  interview with you?

13  A.  Yes.

14  Q.  And did you ask him about the purported sale of his

15  business?

16  A.  Yeah.  I am referring to a memorandum of the interview

17  that I prepared.  Yes.

18      In discussing with him, I reviewed the 1991 tax

19  return with regard to the transfer, and he confirmed what was

20  on there, that basically goodwill was sold to Center Company

21  for 180,000.  It was an employment agreement involved for

22  40,000, and business assets of 10,000 in 1991.

23  Q.  And did you ask him about the specifics of the

24  employment agreement?

25  A.  Yeah.  Relative to the employment agreement, he

                Lapina - Direct(By Ms. Calvin)          152

1  indicated there was a complex agreement which he devised with

2  the assistance of attorney Russ Schetroma, S-c-h-e-t-r-o-m-a,

3  from Meadville.

4  Q.  Did he tell you that it had a fudge factor in it?

5  A.  Yes.  He explained that the Veterinary Association of

6  Pennsylvania stipulates that a veterinary practice must be

7    owned by a licensed veterinarian, and said the employment

8    agreement contained a fudge factor which insures that even

9    though he sold the name and other assets of the business, he

10   would still be operating the veterinary practice, said there

11   were provisions built into the agreement which specifically

12   state he cannot be terminated.

13       He stated he is an employee of Center Company who,

14   in return, allows him to run the veterinarian business trade

15   futures and supplies him with a line of credit.

16   Q.   Did you ask him whether or not his attorney or

17   accountant were fully informed about what he was doing?

18   A.   Basically, his attorney, Russ Schetroma, his accountant,

19   Jim Scarpitti, indicated that neither one of those never

20   really understood what he was doing and they basically did

21   what he told them to do.

22   Q.   Who said this?

23   A.   Dr. Leveto.

24   Q.   And did you ask him whether or not he gave them all the

25   details of the agreement?

Lapina - Direct(By Ms. Calvin)        153

1    A.   He didn't believe it was necessary -- "he" being

file:///A|/LEVETO-3.TXT

2  Dr. Leveto -- to -- for them to know any of the specific

3  details.

4  Q.   And did you ask him who then owned and operated Center

5  Company?

6  A.   Yes.  And Dr. Leveto indicated that he knew of only an

7  individual named Jack Williams.

8  Q.   Did you ask him if he ever met him or spoke to him, or

9  anything?

10  A.   When I asked him questions about Jack Williams, he

11  really didn't know much about Mr. Williams, said he's never

12  personally met or even spoken to Williams on the telephone.

13       And then went on to say probably hadn't had any

14  contact with Williams in at least two years.

15  Q.   Did you ask him whether or not anybody in Center Company

16  ever came to view the veterinarian practice?

17  A.   Yes.  I asked him if either Williams or anybody else

18  from Center Company ever been to Meadville to see the

19  veterinarian business they allegedly owned -- "they" being

20  Center Company -- or to even discuss business operations with

21  him.  And he explained that Center Company wouldn't bother

22  him as long as the veterinarian business remains profitable

23  and does not beat up their commodities account.

24  Q.  Did he say he ever dealt with someone on behalf of Jack

25  Williams?

Lapina - Direct(By Ms. Calvin)        154

1  A.  Yeah.  He indicated he deals with Jack Williams -- a

2  representative of Jack Williams.  But, when asked for the

3  name of this individual, he couldn't remember that person's

4  name, and basically indicated it was -- and basically

5  indicated it was probably somewhere in the office.

6  Q.  Did he tell you how he first came into contact with

7  Center Company?

8  A.  He found out about Center Company through First America

9  Research.  He indicated that First America Research is also

10  based in the Turks and Caicos Islands.  Said they acted as

11  the middleman, facilitated the sale of the veterinarian

12  business to Center Company.

13  Q.  Did you ask him who he dealt with at FAR?

14  A.  Yes; and he couldn't name anyone.  He indicated that we

15  could probably find that information during the search as

16  well.  He indicated that no one from First America Research

17  had ever traveled to Meadville to see the veterinarian

18  business or to discuss business operations.

19       MS. CALVIN:  May I have a moment, please?

20  Q.  Did you ask him about the relationship between Center

21  Company and the sale of commodities?

22  A.  Yeah.  I recall asking him about that, and I believe he

23  indicated that he does commodities research for Center

24  Company.  He was working on a program he had about ten or

25  twelve years to develop.

            Lapina - Direct(By Ms. Calvin)        155

1  Q.  Did you ask him what records he had to provide to

2  convince FAR or Center Company that his veterinarian business

3  was viable?

4  A.  Yeah.  He was not sure what records he provided in order

5  to convince Center Company his veterinarian business was

6  worth purchasing.

7       He indicated that Center Company may have been

8  primarily supervised in gross receipts figures of the

9  business instead of the net profit, but said he was

10  uncertain.

11       He couldn't recall the names of any individuals

12  whom he provided any records or details to.

13  Q.  Did you show him any Center Company tax returns at this

14  time?

15  A.  Yeah; a little later on, I believe.

16  Q.  Would you like to refresh your recollection?

17  A.  Yeah.  When asked about Center Company, he indicated, to

18  the best of his knowledge, they filed Federal Income Tax

19  Returns on a yearly basis, indicated he may even have copies

20  of the '93 and '94 returns there.  And I actually had the '91

21  and '92 returns with me, and then the '94 return, which we

22  discussed a little bit earlier, was brought to me during the

23  course of the search.  It was a copy of the '94.  And we

24  discussed the figures on there relative to the gross receipts

25  and the net profit that was reported.


                Lapina - Direct(By Ms. Calvin)          156


1  Q.  Did you ask him where the figures on Center Company's

2  tax returns came from?

3  A.  Yeah.  I just have to find it here.  I recall he

4  indicated about Karen Jeannerett basically keeping track of

5  the income and expenses on spread sheets, and then after she

6  had done preliminary work on the monthly worksheet, she

7   provides the work sheets to Leveto for his review.  He then

8   said he would normally make adjustments for the worksheets or

9   items like advances to take on his line of credit.

10   Q.   And was it he who provided the information to Center

11   Company then for their tax returns?

12   A.   Yes.

13   Q.   Did you ask him who those tax people were?

14   A.   Yeah.  He indicated that Center Company's tax people may

15   have made some adjustments to the figures, but then he

16   couldn't provide any specific information about who they may

17   be.

18   Q.   Did you show him the earlier tax returns, like for 1989,

19   1990 and 1991 for personal returns?

20   A.   Yes, I did.

21   Q.   And did you ask him why the profits were so much higher

22   in the years prior to the sale?

23   A.   Yeah.  As opposed to the '92, '93, '94 years --

24   Q.   Yes.

25   A.   -- For Center Company?

Lapina - Direct(By Ms. Calvin)          157

1          He indicated that there were pet supplies being

2    sold there at the veterinarian business which he had greater

3    inventory expenses, he had greater expenses associated with

4    the sale of his book, or the book, Tax Free, and I believe he

5    indicated that they were keeping up with accounts payable

6    much better now.

7    Q.    And did you ask him if he was expensing personal items

8    through the business?

9    A.    Yeah.  When I -- we were talking about the net profits,

10   I asked him if the profits were lower since the alleged sale

11   of Center Company due to him expensing personal items through

12   the business, and he responded initially by saying no, not

13   for the most part.

14          When asked what he meant by that, he indicated that

15   he does not do this because he backs out any personal

16   expenses of his pay for the veterinarian business before

17   preparing the yearly worksheets he submits to Center Company.

18   Q.    Did you ask him about a commodities account?

19   A.    Yes.  I asked him if -- we had talked about a

20   commodities account, and I asked if he transferred a

21   commodities account from his name into the name of Center

22   Company and continued trading this account.

23  Q.  I am going to ask you, did you ask him if he had any

24  credit cards?

25  A.  Yeah.

Lapina - Direct(By Ms. Calvin)        158

1  Q.  And he gave you a list of them?

2  A.  Yes.  He had several.  He may have even pulled them out,

3  and I wrote the account numbers down here.  They were either

4  in his name or he and his wife's name.  Different banks.

5  Nations Bank, MNBA, FCC National Bank, Chase Manhattan Bank

6  Q.  Did you also ask him whether or not he had options on

7  property?

8  A.  Yes.

9  Q.  And what did he tell you?

10  A.  We were talking about -- we started out with gains and

11  losses reported on his 1992 returns, and he went on to

12  discuss the transactions, there were two separate -- well, at

13  least the one on his return we were talking about had to do

14  with property which was located near the veterinarian

15  business which he sold an option to Center Company on that

16  property and then Center Company sold -- eventually sold the

17  property to -- I believe it was a Mr. Petruso(Sp) from

18  Meadville.

19  Q.  I am going to hand you what's been marked as Government

20  Exhibits 350 to 356 and ask if you recognize them?

21  A.  Yeah.  These are documents that were seized during the

22  course of the search warrant, search warrants, primarily from

23  the residence, relative to real estate options, contracts,

24  and I believe this had to do with property located on Route

25  322 towards Conneaut Lake.


                Lapina - Direct(By Ms. Calvin)          159


1  Q.  Are documents 350 to 356, are those signed by the

2  defendant?

3  A.  350 is.  351 is.  352 is signed by him.  353 is signed

4  by him.  354 is not.  355 is.  356 is not.

5        MS. CALVIN:  Your Honor, we would move for the

6  admission of Government Exhibits 350 through 356.

7        THE COURT:  350 through 356 is admitted.

8  Q.  Now, did you ask him why he did the negotiations for

9  these two land sales?

10  A.  When I asked him why he would take it upon himself to

11  negotiate land deals on behalf of Center Company, he said he

12  did it because he needed some cash, because the deals were

13  lucrative and they served to preserve him in the eyes of

14  Center Company.

15      And when asked if he ever discussed the deals with

16  anyone at Center Company, he stated he did not.

17  Q.  Did you ever ask him -- did you ask him during this

18  interview about whether or not he owned an airplane?

19  A.  Yes.

20  Q.  And what did he respond?

21  A.  When I asked him about owning an airplane, he said that

22  Center Company actually owns the airplane, but he is named as

23  a co-owner because of FAA regulations concerning ownership by

24  foreigners.  He indicated it was his idea to purchase the

25  airplane and he didn't have to discuss the matter with anyone

           Lapina - Direct(By Ms. Calvin)        160

1  at Center Company.

2      He said this is actually the third plane he had

3  purchased on behalf of Center Company.  I believe this one

4  was purchased for $81,000.00, was not financed, and he said

5  he uses this aircraft primarily for business purposes and

6  flying to commodities --

7  Q.  Now, I am going to turn your attention to some of the

8  actions that the defendant took and how that affects the

9  Internal Revenue Service.

10        When you obtained the tax returns, did you look to

11  see if he reported having any offshore accounts?

12  A.  On the Schedule B, I believe?

13  Q.  Yes.

14  A.  Yes.  I don't believe that there was any indication that

15  he had control or ownership of any offshore accounts.

16  Q.  Now, why does the IRS want to know that?  What impact

17  does that have on the Internal Revenue Service?

18  A.  Well, as an IRS agent, whether you be an investigator or

19  an auditor, even a revenue officer, you are assigned -- given

20  an assignment, somebody has reported substantial amount of

21  income, it indicates that they have a foreign bank account,

22  you may not really give it much attention.

23        But, if somebody has zero or little taxable income

24  reported, they indicate that they own offshore accounts, that

25  would definitely catch your attention.  And if it wasn't

Lapina - Direct(By Ms. Calvin)        161

1  disclosed on the return, it would definitely have an

2  influence as to whether you probe that tax return any

3  further.

4  Q.   What is the impact of having bank accounts in other

5  people's names and with numbers that aren't associated with

6  you?

7  A.   Again, as an IRS, either agent, auditor officer, if

8  someone reports large amounts of taxable income and they own

9  a lot of property, it may not -- probably wouldn't cause you

10  to probe that return further.  But, again, if they own or --

11  I am sorry.  If they report little or no taxable income and

12  they own substantial amounts of property, it would cause you

13  to probe into that tax return further.

14       And by concealing assets or bank accounts, other

15  items in nominee names, it would tend to influence whether or

16  not an IRS agent would tend to probe that return further.

17  Q.   And what's the impact of having a lien on your property?

18  A.   If there is a lien on a piece of property and you go to

19  collect or seize that property, it impacts on whether or not

20  you can do those activities.  That lien has to be satisfied.

21  Q.   And if you see a large lien on a piece of property, how

22   does that influence whether or not the IRS decides to seize

23   it?

24   A.   Well, it would tend to indicate that they would probably

25   not pursue that if there is a large lien on there.


               Lapina - Direct(By Ms. Calvin)          162


1   Q.   What would happen if you titled your house to someone

2   else?

3   A.   If you sold it to somebody else?

4   Q.   Or transferred the title to someone else.

5   A.   Well, if you were seeking collection for an outstanding

6   liability or looking to seize that property, this was, again,

7   in somebody else's name or titled to somebody else, it would

8   definitely have an impact on what actions you could take.

9   Q.   What is the impact on the IRS of people having foreign

10   bank accounts?

11   A.   Foreign bank accounts located in locations as we just

12   went over, Grand Cayman, Turks and Caicos Islands, those

13   countries have no tax laws.  And for the IRS to make a

14   request to National City Bank to get records is one thing,

15   but to try -- the IRS to try to obtain foreign bank

16   information relative to a tax matter, those countries, those

17  bank will not provide information.

18  Q.   And what would be the effect of, say, a sham transaction

19  such as selling your business, how would that affect --

20  A.   Could you say that again, please?

21  Q.   Yes.  How does it influence the IRS if there is a sham

22  transaction suggesting that a business has been sold if it

23  hasn't?

24  A.   Again, much in the same way that I just described.  If

25  you have a business which you basically control but have it

                    Lapina - Cross                    163

1   in nominee name, it would impact any kind of actions you

2   could take relative to bank accounts or assets for that

3   business, and things of that nature.

4   Q.   And is the same true if you omit gross receipts for your

5   business, just not identify that you have it?

6   A.   If you fail to report gross receipts?

7   Q.   Right.  Does the IRS need to know both that you have a

8   business and that it has gross receipts?

9   A.   Sure.  Gross receipts, they want to, you know, know what

10   -- how much income you have earned during the course of the

11  year from that business.

12  Q.  Thank you.

13      MS. CALVIN:  I have no further questions of this

14  witness, Your Honor.

15      THE COURT:  Okay.  Let's take a break now, ladies

16  and gentlemen, and we'll reconvene at twenty-five to four.

17  (The jury left the courtroom.)

18  (Court recessed at 3:20 p.m.)

19  (Court reconvened at 3:40 p.m.)

20  (The jury entered the courtroom.)

21      THE COURT:  Be seated, please.

22      Do you have any cross-examination, Mr. Leveto?

23      MR. LEVETO:  Yes, Your Honor.

24          CROSS-EXAMINATION

25  BY MR. LEVETO:


            Lapina - Cross              164


1  Q.  First, personally, I would like to apologize to the jury

2  that many of the documents gone over today, I could have

3  stipulated to and authenticated.

4      THE COURT:  Don't talk to the jury.  Talk to this

5  gentleman and ask questions only.

6        MR. LEVETO:  Yes, sir.

7   Q.   Well, first of all, I would like to know if it's custom

8   and policy in your memorandum of interview to conduct the

9   interview and then sixteen to eighteen days later write the

10  interview?

11  A.   I prepared the memorandum May 15th, sixteen -- or I'm

12  sorry -- May 16th, 17th, 18th, and the 20th through the 24th

13  of 1996 after reviewing the notices and refreshing my

14  recollection.  There were a lot of other things that

15  transpired immediately after the search warrant dialogue I

16  had with you that prevented me from finishing this

17  memorandum.

18        MR. LEVETO:  Okay.  Secondly, I would like to ask

19  the Court, you know, this -- at the time that this interview

20  was taken, the Third Circuit has ruled the interview --

21  actually, all of the custodial interrogation and false

22  arrest --

23        MS. CALVIN:  Objection, Your Honor.

24        THE COURT:  This is not the time to read that kind

25  of thing, Mr. Leveto.

Lapina - Cross          165

1          MR. LEVETO:  It's an objection, Your Honor.

2          THE COURT:  It's an objection that should have been

3    made pretrial, if at all.

4          MR. LEVETO:  Well, okay, Your Honor.  What I am

5    going to ask is to delay my questions for Agent Lapina.

6          THE COURT:  That is denied.  Ask him now, or that's

7    it.

8          MR. LEVETO:  I will need him for my defense, Your

9    Honor.

10          THE COURT:  Then you can call him as a defense

11    witness.  That's all right.  But, then keep in mind that you

12    are bound by any testimony that he gives if he's your

13    witness.

14          MR. LEVETO:  Yes, sir.  That is all.

15          THE COURT:  Thanks, Agent Lapina.

16    (The witness was excused.)

17          MR. VORACEK:  The United States calls Manuel

18    Gonzalez.

19          THE COURT:  Would you stand here to be sworn,

20    please?

21          THE CLERK:  Would you raise your right hand?

22          * * * * *

23          MANUEL GONZALEZ, having first been duly sworn,

24  testified as follows:

25          THE COURT:  Have a seat up here, please, give us

Gonzalez - Direct(By Mr. Voracek)          166

1  your name and spell your last name.

2          THE WITNESS:  My name is Manuel Gonzalez, Jr.  Last

3  name is spelled G-o-n-z-a-l-e-z.

4          THE COURT:  Thank you.

5                  DIRECT EXAMINATION

6  BY MR. VORACEK:

7  Q.  Mr. Gonzalez, where do you reside currently?

8  A.  In the Pittsburgh area.

9  Q.  Are you employed right now?

10  A.  Yes.

11  Q.  What is your employment?

12  A.  I'm a background investigator for various departments

13  within the federal government.  I do background investigation

14  for security clearance, for people that need security

15  clearances for government employment.

16  Q.  How long have you been doing that?

17  A.  Approximately four years.

18  Q.  Prior to being an investigator, were you employed?

19  A.  Yes.

20  Q.  Where were you employed?

21  A.  I was employed as a Special Agent for the Internal

22  Revenue Service, Criminal Investigation Division, in

23  Pittsburgh.

24  Q.  How long were you so employed as a Special Agent?

25  A.  Thirty-one years.

Gonzalez - Direct(By Mr. Voracek)        167

1  Q.  As a Special Agent, what were some of your duties?

2  A.  Investigate criminal violations of the Internal Revenue

3  laws and related offenses.

4  Q.  Since you are no longer an employee of the Internal

5  Revenue Service, are you receiving any compensation for your

6  testimony today?

7  A.  Yes, I am.

8  Q.  Monetary compensation?

9  A.  Yes.

10  Q.  How much?

11  A.  I don't know exactly how much.  It's the same amount of

12  money that I would receive as a Special Agent, Grade 13,

13  Step 10.  I don't know what that is.

14  Q.  You would be receiving the same amount of money if you

15  were still a Special Agent?

16  A.  Yes.

17  Q.  And it would be only for your time and testimony?

18  A.  For the time that I spent going over transcripts and

19  case records and review of testimony and working with you and

20  the case agent.

21  Q.  Now, prior to becoming a Special Agent, I assume you had

22  some training?

23  A.  Yes.

24  Q.  What types of training did you have?

25  A.  I guess it was about three months.  It was Criminal

                Gonzalez - Direct(By Mr. Voracek)          168

1  Investigators School, which included some, you know, tax

2  training and then training in the investigative techniques of

3  this particular agency.

4  Q.  Did you also take updated courses throughout --

5  A.  Yes.  CPE.  Continuing Professional Education topics.

6  Q.  Throughout your thirty years as a Special Agent?

7  A.  Throughout my thirty years, yes, sir.

8  Q.  As part of your job as a Special Agent with the Internal

9  Revenue Service, did you ever participate as an undercover

10  agent?

11  A.  Yes.

12  Q.  Can you describe what an undercover agent is?

13  A.  An individual who takes an identity of someone else in

14  another occupation and does work in the field.

15  Q.  And you have done that before, you have taken the

16  identity of another individual?

17  A.  Yes, I have.

18  Q.  And as part of an undercover agent's function, do you

19  customarily, or do you, from time to time, wear any recording

20  devices?

21  A.  Yes.

22  Q.  And what type of devices did you wear?

23  A.  Generally, I wore a manufactured -- it was called a

24  Nagra recorder.  It was a reel-to-reel recorder that lasted

25  two and a half to three hours long.

Gonzalez - Direct(By Mr. Voracek)          169

1  Q.  And you did this more than once?

2  A.  Oh, yes.

3  Q.  How often have you done that?

4  A.  I mean, I participated in approximately thirty-five

5  undercover operations over the years, over a ten-year period.

6  So, I mean, I wore -- worn a Nagra probably on every occasion

7  that I had contact with a target.

8  Q.  And can you describe for the jury the process of wearing

9  a Nagra monitoring device?

10       In other words, did you install it yourself, sir?

11  A.  No, sir.

12  Q.  Who does it?

13  A.  There is a technical Special Agent that knows about

14  electronics and he installs it and he threads the tape

15  through and he connects the mikes, and so forth, and turns it

16  on.

17  Q.  So, on your body some place, there is a microphone?

18  A.  Yes.

19  Q.  Where is the microphone usually?

20  A.  Generally, on the chest, but it varies.  It varies from

21  agent to agent.

22  Q.  Do you wear any other device, other than the monitor,

23  the microphone?

24  A.  Yes.  Occasionally, there is a monitoring device on it

25  for emergency purposes.


            Gonzalez - Direct(By Mr. Voracek)        170


1  Q.  You can explain that for the jury.

2  A.  Yes.  There is a monitoring device in the event of an

3  emergency so that agents in close proximity can hear the

4  conversation in case of an emergency happening and they can

5  respond to the emergency.

6  Q.  Now, Mr. Gonzalez, when you're in an undercover capacity

7  and you are wearing a monitoring device, are there other

8  agents in the vicinity?

9  A.  Yes.

10  Q.  And are they listening to what you are listening to?

11  A.  Generally, they are.  And the reason I say that,

12  sometimes it's difficult to get that close and sometimes they

13  can't hear the monitored conversation but, generally, yes.

14  Q.  Now, you said that you became an undercover agent about

15  1991?

16   A.   That's correct.

17   Q.   As part of your duties as a Special Agent, did you

18   participate in an undercover operation of Daniel Leveto?

19   A.   Yes.

20   Q.   Do you recall when that would have been?

21   A.   1995 -- 1995 through -- actually it was February 10th,

22   1995, through November 1st, 1995.

23   Q.   Did you initiate this operation yourself or were you

24   assigned to it?

25   A.   I was assigned to it.

                    Gonzalez - Direct(By Mr. Voracek)          171


1   Q.   So, you, yourself, were not conducting an investigation

2   of Dr. Leveto?

3   A.   No.

4   Q.   Another agent was?

5   A.   Yes.

6   Q.   And who was that agent?

7   A.   That was Special Agent Robert Lapinta.

8   Q.   Is that customary where the undercover agent is not also

9   the investigating agent?

10  A.  That's correct.

11  Q.  And why is that?

12  A.  It's policy that the undercover agent can't also be the

13  case agent.

14  Q.  Do you have recollection then of the undercover

15  operation that was conducted with regard to Daniel Leveto in

16  1995?

17  A.  Yes.

18  Q.  What was the basic general purpose of the undercover

19  operation?

20  A.  Well, it was to identify Dr. Leveto was promoting a book

21  and called Tax Free, and one of the objectives was to buy the

22  book, identify other people in the group who were connected

23  with him, to engage him in conversation to find out about the

24  nuts and bolts of the operation of this group, to find out

25  about his selling and the reconstruction of his business.  He

Gonzalez - Direct(By Mr. Voracek)        172

1  sold his business using this device, so to speak, and to find

2  out about that.  Identify any assets that he may have and

3  determine the level of control that he had over his assets

4  and his business.

5   Q.   Now, you mentioned the term a device.  Did you also hear

6   the term colato?

7   A.   Yes.

8   Q.   What did you know about colato, if anything?

9   A.   Yeah.  Basically, what I understood of it, it was a

10   device, an entity that individuals could restructure their

11   existing business and transfer their business over to this

12   entity, it's called the colato, and substantially eliminate

13   the tax or totally eliminate the tax or reduce it

14   substantially.

15   Q.   Now, as part of your investigation, did you actually

16   become a member of the group?

17   A.   No.

18   Q.   You indicated that there was also a book being sold?

19   A.   Yes.  There was a book that Dr. Leveto sold -- sold to

20   me.

21   Q.   Did you ultimately, as part of your investigation, buy

22   that book?

23   A.   Yes, I did.

24   Q.   Now, as part of that investigation, the investigation,

25   did you, in fact, make contact with Dr. Leveto?

Gonzalez - Direct(By Mr. Voracek)          173

1  A.  Yes, I did.

2  Q.  How did you make contact with him?

3  A.  I was introduced to Dr. Leveto by Michael Kalustian.

4      I don't know how to spell his name.

5  Q.  And do you know whether Mr. Kalustian had any

6  relationship with Dr. Leveto, if you know, sir?

7  A.  Mr. Kalustian was a neighbor and a social friend of

8  Dr. Leveto.

9  Q.  Do you know the reasons -- if there were any reasons

10  that Mr. Kalustian was cooperating?

11  A.  He was cooperating as a result of an action against him

12  in the Federal Court system.

13  Q.  Now, during 1995, did you, in fact, have some contacts

14  with Dr. Leveto?

15  A.  Yes, I did.

16  Q.  Approximately how many contacts did you have?

17  A.  Thirteen.

18  Q.  Now, were these contacts in person or were they over the

19  phone, or was there a little of both?

20  A.  Both.

21   Q.   And generally were all the contacts in the year 1995?

22   A.   Yes.

23   Q.   Now, during that same year, did you also make any other

24   contact with any associates of Dr. Leveto's?

25   A.   Yes, I did.

Gonzalez - Direct(By Mr. Voracek)          174

1   Q.   Who did you make contact with?

2   A.   Donald Turner.

3   Q.   And how did you know to contact Donald Turner?

4   A.   During my discussions with Dr. Leveto, he had mentioned

5   that if I wanted to take the next step, I would have to

6   contact Don Leveto -- or Don Turner to -- excuse me -- Don

7   Turner to buy the colato and go further with this

8   transaction.

9   Q.   You said the next step.

10        There was more than one step involved in this

11   program?

12   A.   Yes.

13   Q.   Now, as an undercover agent, did you use the name

14   Manuel Gonzalez?

15  A.  No, I did not.

16  Q.  What identity did you use in your contacts with

17  Dan Leveto?

18  A.  I used the name Joseph Rivera.

19  Q.  And was Joseph Rivera the name that you first began

20  using in 1995 as part of your investigation of Dr. Leveto?

21  A.  Yes.

22  Q.  You had never used the name Joe Rivera before, prior?

23  A.  Oh, yes, I had.

24  Q.  You had?

25  A.  Yes.  That was my standard cover name for operation --

Gonzalez - Direct(By Mr. Voracek)          175

1  for undercover operations.

2  Q.  When did you begin using the name Joe Rivera?

3  A.  1991.

4  Q.  Now, when an agent uses an undercover name like that, do

5  they do anything in addition to just calling themselves Joe

6  Rivera.  Do they take any other steps?

7  A.  No.  I had a cover background, Social Security card and

8  credit and telephones and driver's license and car

9  registrations.

10  Q.  How about an address?

11  A.  I had an address.

12  Q.  Did you also have an occupation or assume an occupation

13  as Joe Rivera?

14  A.  Well, in this case, I had -- for this particular

15  operation relative to Dr. Leveto, my occupation was a

16  marketing consultant.

17  Q.  Was there any reason why you picked a type of job like

18  that in your operation with Dr. Leveto?

19  A.  Yes.  Because I was supposed to be working with

20  Mike Kalustian, who was marketing a product.

21  Q.  Now, as Joe Rivera in your investigation, in your

22  undercover operation, were you an employee of this marketing

23  group, or was that your company?

24  A.  That was my company.  I was self-employed.  I was -- in

25  my cover capacity.  I was a self-employed individual.

                Gonzalez - Direct(By Mr. Voracek)          176

1  Q.  So, you were set up as an individual who owns your own

2  business?

3  A.  Yes, I was.  Yes.

4   Q.   And where would Joe Rivera be located?

5   A.   In Pittsburgh.

6   Q.   You have before you, Mr. Gonzalez, several exhibits.

7        I ask you to take a look at what's been marked as

8   Government Exhibit 40.  I believe the Government Exhibit

9   number is actually on the second page of that.

10  A.   Yes, it is.

11  Q.   What is Government Exhibit 40?

12       Do you recognize that document, sir?

13  A.   Yes, I do.

14  Q.   What is that?

15  A.   It's a letter dated March 10th, 1995, addressed to

16  Joseph Rivera.

17  Q.   And from whom is that letter?

18  A.   It was signed by Daniel Leveto.

19  Q.   Now, did this letter just appear in your mailbox or did

20  you make some prior contact?

21  A.   I had -- yeah.  I had or I think -- yeah, I had a

22  meeting with him prior to that and then I talked to him on

23  the telephone.  I had a telephonic contact about the book and

24  he sent me -- he sent me this introduction letter.

25  Q.   So, you received Government Exhibit 40 after you made

Gonzalez - Direct(By Mr. Voracek)          177

1  contact with Dr. Leveto?

2  A.  Yes.

3  Q.  And it was pursuant to that first contact that you had?

4  A.  Yes.

5      MR. VORACEK:  Your Honor, the government moves for

6  the admission of Government Exhibit 40.

7      THE COURT:  40 is admitted.

8  Q.  I ask you to take a look at Government Exhibit 40.

9      At the very top of the page, what is printed?

10  A.  At the top of the page?

11  Q.  On top of the second page.  I am sorry.

12  A.  Second page?

13  Q.  Yes.  The second page.

14  A.  Okay.  Center Company.

15  Q.  And what is written right underneath the name Center

16  Company?

17  A.  Daniel Leveto, VMD, GM.

18  Q.  I also see the imprint of a dollar?

19  A.  That's correct.

20  Q.  Did you receive it as a copy of a dollar or did you

21  actually receive a dollar bill?

22  A.  There was an original dollar bill.

23  Q.  And I see that this letter is addressed to a Joseph A.

24  Rivera, McKnight Road, Pittsburgh, Pennsylvania?

25  A.  That's correct.


                Gonzalez - Direct(By Mr. Voracek)        178


1  Q.  Was that your undercover?

2  A.  That was an address that I used.

3  Q.  As your -- as the undercover agent?

4  A.  Yeah; for receiving mail.

5  Q.  Now, if we go down that document, sir, I ask you to read

6  the words right next to No. 2 on the first page?

7        Can you read that, sir?

8  A.  Yes.

9  Q.  You can read it out loud, please.

10  A.  Since what I am writing about can mean enormous amounts

11  of money for you, I figured using a $1.00 bill as an eye

12  catcher was a good idea.

13  Q.  And underneath that, sir, there are some words that are

14  emboldened, that are set apart.

15      Can you read those words, as well?

16  A.  Yes.

17  Q.  Please do.

18  A.  Hot new report reveals unique way to pay zero taxes and

19  totally eliminate lawsuits.

20  Q.  I ask you now to go to the next page of that document,

21  sir.

22      Now, what is written by the No. 7?

23  A.  Reduce or totally eliminate all federal taxes.

24  Q.  And if you go down a little bit on that page, does it

25  indicate the price of the book?

Gonzalez - Direct(By Mr. Voracek)        179

1  A.  Yes.

2  Q.  And what was the price of the book?

3  A.  $297.00.

4  Q.  Sir, I ask you to go down a little bit further on the

5  page, the paragraph that begins with the word before.

6      Do you see that?

7  A.  Yes, sir.

8  Q.  I ask you to go about half way through that paragraph

9    and begin with the reading with the words, when you receive

10   this book, if you could just read that sentence, sir?

11   A.   When you receive this book, it will come in a sealed

12   envelope with a special notice printed on both sides.

13   Q.   Could you read the following sentence?

14   A.   Basically, what this notice says is, if you open

15   envelope, you are agreeing to keep confidential the secrets

16   you are about to learn.

17   Q.   Sir, if you can flip to the second-to-last page of that

18   exhibit?

19        Do you see the heading, every time you read one

20   more page?

21   A.   Yes, sir.

22   Q.   And do you see the paragraph that begins with the word

23   and?

24   A.   Yes.

25   Q.   Could you read that paragraph?

Gonzalez - Direct(By Mr. Voracek)          180

1    A.   And what else you are going to discover is there is no

2    downside to all this.  The IRS is not going to audit you

3    because you used these secret laws.  In fact, after you use

4   the secrets revealed in this book, it is very likely the IRS

5   will completely lose interest in -- and you.

6   Q.   Now, sir, let's go to the very last page of that

7   exhibit.  And, sir, can you read the paragraph that begins

8   with look?

9   A.   Yes, sir.  Look, I am not an attorney, some hot shot

10   financial advisor, or anything like that.  Believe it or not,

11   I'm a veterinarian and, because of that, for many years I

12   have been so busy taking care of animals.

13   Q.   And read the following portion.

14   A.   The bold part?

15   Q.   Yes, please.

16   A.   I didn't take the time to take care of my money.

17   Q.   And the first sentence of the next paragraph.

18   A.   However, because of this book, that has all changed now

19   and I have a financial piece of mind which I never enjoyed

20   before.

21   Q.   Is that letter signed, sir?

22   A.   Yes, sir.

23   Q.   And can you read the -- either the signature or the name

24   underneath the signature?

25  A.  Dan Leveto, VMD.

Gonzalez - Direct(By Mr. Voracek)        181

1  Q.  Sir, I now ask you to take a look at what's been marked

2  as Government Exhibit 41.  Do you have that, sir?

3  A.  Yes, sir.

4  Q.  What is that document?

5  A.  That's a photocopy of a letter dated March 28, 1995,

6  which I sent to Daniel Leveto, VMD, GM.

7  Q.  And what was the purpose of sending this letter to Dan

8  Leveto?

9  A.  The purpose of the letter was to send -- transmit a

10  check to purchase the Tax Free book.

11  Q.  And did you, in fact, send a check to Dan Leveto?

12  A.  Yes, I did.

13  Q.  And is that also part of Government Exhibit 41?

14  A.  Yes, it is.

15        MR. VORACEK:  Your Honor, the United States moves

16  to admit Government Exhibit 41.

17        THE COURT:  41 is admitted.

18  Q.  And what was the amount of the check that you sent to

19  Dr. Leveto?

20  A.  $297.00.

21  Q.  Agent Gonzalez, Mr. Gonzalez, I now ask you to look at

22  what's been marked as Government Exhibit 42.

23      Do you have that document in front of you, sir?

24  A.  Yes, sir.

25  Q.  And what is that?

Gonzalez - Direct(By Mr. Voracek)        182

1  A.  It's a letter dated April 4th, 1995, addressed to Joseph

2  Rivera, signed by Daniel J. Leveto, VMD.

3  Q.  Now, as part of your undercover capacity as Joe Rivera,

4  did you, in fact, receive this letter?

5  A.  Yes.

6      MR. VORACEK:  Your Honor, the United States moves

7  for the admission of Government Exhibit 42.

8      THE COURT:  42 is admitted.

9  Q.  And, sir, I ask you to take a look at this letter.  And

10  on the second paragraph of that letter in the second sentence

11  of the second paragraph, would you please read that, where it

12  begins with this book?

13  A.  Okay.  This book and accompanying literature will

14  eliminate the process.

15  Q.  And did you, in fact, receive a book, Agent Gonzalez?

16  A.  Yes, I did.

17  Q.  And did the book accompany this letter?

18  A.  Yes.

19  Q.  Was this what you paid the $297.00 for?

20  A.  Yes.

21  Q.  Sir, I ask you to go down to the third paragraph of that

22  letter, half way through where it begins with, at the end of

23  this letter, can you read from there to the very end of that

24  paragraph?

25  A.  At the end of this letter, I have provided you with the

                Gonzalez - Direct(By Mr. Voracek)          183

1  names of people who can answer your questions.  Your book is

2  registered so when you call with questions, please have that

3  number available.  First America Research provides virtually

4  unlimited consultation once you purchase the book.

5  Q.  Do you have an explanation as far as that number?

6        Did you, in fact, receive a registered number?

7  A.  I'm not sure of that.

8  Q.  Okay.

9   A.  I think I had a number, but I'm not sure what it was,

10  because when I called one of Dr. Leveto's individuals who was

11  involved in this, he told me that I had a number and he gave

12  that number.  But, I can't remember having a number.

13  Q.  Do you know if you needed number in order to receive any

14  further advice?  Was that part of the --

15  A.  Yes.  I think part of it was -- I think that Dr. Leveto

16  explained to me that when I call someone, you know, to go the

17  next step, I was to give him a number, but I'm not sure I had

18  a number.

19  Q.  All right.  And just further on down that page where it

20  says, if you have any questions, who were to you call?

21  A.  Do you want me to read that?

22  Q.  Just at that little line.

23  A.  If you have any questions, please call Paul Harris or

24  Les Retherford at 303-798-0800 or 303-794-7078.

25  Q.  And was this letter signed?

Gonzalez - Direct(By Mr. Voracek)          184

1  A.  Yes.

2  Q.  And who signed that letter, sir?

3   A.   Daniel J. Leveto, VMD.

4   Q.   Sir, I ask you now to look at what's been marked as

5   Government Exhibit 43.  Do you have that, sir?

6   A.   Yes.

7   Q.   What is Government Exhibit 43?

8   A.   43.  Exhibit 43 is the book that I purchased from Dan

9   Leveto, Don Turner's Tax Free.

10   Q.   Is this the book that accompanied the letter to which

11   you just testified?

12   A.   Yes.

13         MR. VORACEK:  Your Honor, the United States moves

14   for the admission of Government Exhibit 43.

15         THE COURT:  Exhibit 43 is admitted.

16   Q.   Agent Gonzalez, I ask you to open up that book for a

17   moment, sir.

18         Would you please go to the page, it's -- right at

19   the beginning, there is two small i's.  Do you see that, sir,

20   right at the beginning of the book?  It's ii.

21   A.   Yes.

22   Q.   Could you read the second paragraph of that page, sir?

23   A.   Beginning with, this publication?

24   Q.   Yes.

25  A.  This publication is designed to provide accurate and

Gonzalez - Direct(By Mr. Voracek)          185

1  authoritative information in regard to the subject matter

2  covered.  It is sold with the understanding that the

3  publisher and/or author is not engaged in rendering legal,

4  accounting, or other competent professional service.  If

5  legal or other expert assistance is required, the services of

6  a competent professional person should be sought.  The

7  information, ideas and suggestions contained herein have been

8  developed from sources believed to be reliable; at the same

9  time, no guarantees are made either expressly or by

10  implication.  Moreover, because of the technical nature of

11  the materials and individual case differences and, the fact

12  that tax law is never static, but organic in nature, the

13  assistance of a qualified and up-to-date practitioner is

14  heartily recommended.

15  Q.  Sir, I would now ask you to look at page x five, small x

16  five.  Do you have that, sir?

17  A.  Yes, sir.

18  Q.  And is the heading of that page author's preface?

19  A.  Yes.

20  Q.  Sir, I ask you to read the first sentence of paragraph

21  four of that page?

22  A.  The secrets within these pages have never been offered

23  for such a paltry sum as you paid for this book.  That there

24  has never been a book as this is evidence enough that the

25  information revealed to you here was never intended to be

Gonzalez - Direct(By Mr. Voracek)          186

1  widely known, read, studied, and used -- especially from a

2  single volume.  For this reason, vigorous steps shall be

3  taken to help eliminate unauthorized copies from appearing.

4  Q.  Sir, I now ask you to turn to page 5.39 of that

5  document.

6       Sir, do you have that in front of you?

7  A.  Yes, sir.

8  Q.  Do you see the heading, No Federal Income Tax, with an

9  exclamation point?

10  A.  Yes.

11  Q.  And it's 5.197?

12  A.  Yes.

13  Q.  Sir, I ask you to read that entire section there.  It's

14  about a paragraph long.

15  A.  5.197.  Virginia's colato was created by foreigners for

16  foreigners in a foreign county under foreign law.  It is,

17  therefore, subject to that foreign country's laws and tax

18  statutes.  All colatos enjoy what is termed as the conduit

19  tax arrangement where the tax is conduited to the

20  beneficiary, we understand what we noted above that the

21  source of the income is transformed from U.S. source to

22  foreign source income.  This is the only conclusion one can

23  come to when the statutes and cases, which we have thoroughly

24  examined, are all taken into account.  The IRS may not have

25  one rule of tax for one person and another for a different

Gonzalez - Direct(By Mr. Voracek)          187

1  fellow.  We must have equal justice under the law.  Since the

2  IRS has no authority to tax foreigners, it is legally

3  possible to do just as the courts have recognized as

4  possible -- altogether avoid any taxes.  This makes even more

5  sense when we ponder the fact that taxes are legal creations

6  themselves.  The presupposition of legally created taxes is

7  that there will always be a legal way to escape them, and the

8  courts have ever thus been persuaded.

9  Q.  Could you also just read 5.198?

10  A.  Virginia has all the necessary power she needs over the

11  affairs of the business she is running, except the legal and

12  tax responsibilities.  Those are retained by the trustee.

13  The rule of tax law is that the tax collector must follow the

14  money until it reaches the person who earns it.  The foreign

15  CCU holder passively earns the money that is distributed and

16  there the tax liability disappears because there is no IRS

17  authority in that foreign country.  Since the colato pays all

18  of its U.S. taxes due and since there is also no tax treaty

19  with the country in question, there is absolutely no way for

20  the IRS to collect more tax than is actually due.

21  Q.  Sir, I now ask you to turn to page 8-33.

22       Do you have that?

23  A.  Yes, sir.

24  Q.  What is reflected on page 8-33?

25  A.  It's a photocopy of 1040 Nonresident, U.S. Nonresident

                Gonzalez - Direct(By Mr. Voracek)          188


1  Alien Income Tax Return for 1998.  19 -- yeah, 1989.  Excuse

2  me.

3  Q.  This form was included as part of that book in

4  Government Exhibit 43?

5  A.  Yes, sir.

6  Q.  Sir, I ask you now to turn to page 9-29.

7       Sir, do you have that?

8  A.  Yes, sir.

9  Q.  Sir, is this entitled Constitution of First America

10  Research?

11  A.  Yes, it is.

12  Q.  Article I?

13  A.  Yes.

14  Q.  Declaration of Purpose?

15  A.  Yes.

16  Q.  Could you read 9.10?

17  A.  This is a free and voluntary association of persons who

18  hereby declare we are each members of First America Research,

19  a Fraternal Association created and existing for the purposes

20  and benefits set forth below for those who are, or who in the

21  future may become members.  We each hereby declare that our

22  main objective is to restore, maintain and approve the civil

23  rights, constitutional guarantees and political freedoms for

24  each member, and indirectly thereby for each citizen or

25  resident of the United States of America.


Gonzalez - Direct(By Mr. Voracek)        189


1  Q.  Finally, sir, I ask you to read 9.14 on that same page.

2  It's a little bit down there, same page.

3  A.  Our Association further advocates the use of the courts

4  for litigation to achieve the objective of equal protection

5  under the law, and with limited governmental activities;

6  solutions to governmental practice of excessive and unequal

7  taxation; the protection of family estates from the ravages

8  of obsolete and corrupt probate and tax practices; advocacy

9  to expose the double standards in laws and taxation, and

10  finally to propose, discuss, analyze, propound and develop

11  solutions to all these problems and others, through research

12  and free association.

13  Q.  Sir, I ask you now to look at what's been marked as

14  Government Exhibit 44.

15       What is Government Exhibit 44?

16  A.  It's a photocopy of a Confidential and Nondisclosure

17  Agreement dated April 12, 1999, by Joseph Rivera, Pittsburgh,

18  Pa., 15237, in favor of the First America Research.

19  Q.  Did you sign this document, sir?

20  A.  Yes.

21  Q.  And when and where did you receive this document?

22  A.  It came with the book.  It came in a package of the

23  book.

24  Q.  It came as part of the book that was referenced in

25  Government Exhibit 43?

Gonzalez - Direct(By Mr. Voracek)          190

1  A.  Yes.

2       MR. VORACEK:  Your Honor, The United States moves

3  for the admission of Government Exhibit 44.

4       THE COURT:  44 is admitted.

5  Q.  Sir, again, the title of that document is what?

6       Can you read it again, just the title?

7  A.  Confidentiality and Nondisclosure Agreement?

8  Q.  Now, sir, was it part of the program that you needed to

9  sign this document?

10  A.  Yes.

11  Q.  And what were you instructed to do with this document?

12  A.  Send it back to Dr. Leveto.

13  Q.  Was it -- if you wouldn't have done that, agreed to this

14  confidential nondisclosure agreement, could you still have

15  become part of the program, do you know?

16  A.  To my understanding, no.

17  Q.  Sir, I ask you if you could just read what's written by

18  the No. 1?

19  A.  Except as herein set forth, "A" shall not (a) reveal or

20  make known to any person, firm, corporation, or entity, or

21  (b) utilize in his, her, its own business or (c) make any

22  other usage of, any information disclosed to, "A," by FAR in

23  connection with the discussions and negotiations above

24  mentioned.

25  Q.  And is "A," would that have been Joseph Rivera in this

                    Gonzalez - Direct(By Mr. Voracek)          191

1  case?

2  A.  Yes.

3  Q.  Now, you mentioned that as an undercover agent

4  investigating Dr. Leveto, that there were a few purposes that

5  you were interested in?

6  A.  Yes.

7  Q.  And again, what were just a few of those purposes?

8   A.   To purchase the book, identify anyone else that was

9   connected with that organization, to engage Dr. Leveto in

10   discussions about the mechanisms in the book, how he used the

11   mechanisms in the book in his own transforming his business

12   into a colato, identify assets that he has and control over

13   assets and his business.

14   Q.   Now, would it be important for the IRS to know of

15   Dr. Leveto's degree of control over his business after a

16   sale?

17   A.   Yes.

18   Q.   And for what reason?

19   A.   Well, if he has the same amount of control in his

20   business operation that he had previously, then that would

21   change the tax ability of his structure that he had.

22   Q.   Agent Gonzalez, or Mr. Gonzalez, I am now going to hand

23   you what's been marked as Government Exhibits 50 through 64.

24        Sir, do you recognize Government Exhibits 50

25   through 64?

Gonzalez - Direct(By Mr. Voracek)          192

1   A.   Yes.

2  Q.   What are they?

3  A.   These are transcripts of recordings that I made from

4  conversations between myself and Dr. Leveto.

5  Q.   You indicated transcripts.  Are the -- there are tapes

6  also?

7  A.   Yes.

8  Q.   As part of 50 to 64?

9  A.   Yes, there are.

10  Q.   And where are they located?

11  A.   They are located in this box.

12  Q.   And could you pull out tape -- is there a tape 50-A?

13  A.   Yes.

14  Q.   Now, prior to coming into court today, have you listened

15  to all of these tapes marked as Government Exhibits 50

16  through 64?

17  A.   Yes, I have.

18  Q.   And are all of these tapes marked with an exhibit number

19  of 50 through 64?

20  A.   Yes.

21  Q.   Now, again, what does the tape represent, these tapes

22  that you listened to on No. 50 to 64?

23  A.   They are conversations between myself and Dr. Leveto.

24  Q.  Okay.  How about with any conversations between you and

25  any other associate of Dr. Leveto?


            Gonzalez - Direct(By Mr. Voracek)        193


1   A.  Oh, yes.  And also there are transcripts of telephone

2   calls that I had with Don Turner also, two telephone calls I

3   had with Don Turner.

4   Q.  And these are all -- these are all contacts with

5   Dr. Leveto during the year 1995?

6   A.  Yes.

7   Q.  And you have indicated that you listened to all tapes?

8   A.  Yes, I have.

9   Q.  Are you able to verify the tapes as accurate reflections

10  of what was actually said?

11  A.  Yes.

12  Q.  Are you able to identify the voices on the tapes?

13  A.  Yes.

14  Q.  And whose voices are on the tapes?

15  A.  Dr. Leveto's, Mike Kalustian's, mine, Don Turner.  And

16  several of the telephone conversations that I had with

17  Dr. Leveto's office, when I initially called him, there was

18  an unidentified female who answered the phone.  I have no

19  idea who that was.

20  Q.   Now, in general, the tapes that are marked as Government

21  Exhibits 50 to 64, did you engage in some discussion with

22  Dr. Leveto concerning your areas of investigation?

23  A.   Yes.

24  Q.   And, again, were those, as you mentioned earlier, are

25  those areas to probe or to discuss with him the program, the

Gonzalez - Direct(By Mr. Voracek)          194

1  implementation of the program?

2  A.   Yes.

3  Q.   And there are discussions of that nature on those tapes,

4  Government Exhibits 50 through 64?

5  A.   Yes.

6  Q.   Now, you also indicated that there is transcript, is

7  there?

8  A.   That's correct.

9  Q.   Have you read -- what is a transcript?

10  A.   A transcript is the -- an individual takes the written

11  or the voice recording and transcribes it into the written

12  word so it can be read.

13  Q.  And prior to coming to trial, have you read all those

14  transcripts?

15  A.  Yes.

16  Q.  And did you listen to the actual tape while you read the

17  transcript to insure that the transcript was an accurate

18  reflection of what was on the tape?

19  A.  Yes, I did.

20  Q.  And are you of the opinion whether or not that

21  transcript is an accurate reflection of the tape?

22  A.  Yes, they are accurate.

23  Q.  Now, does the transcript also indicate which party is

24  actually speaking the words?

25  A.  Yes.


              Gonzalez - Direct(By Mr. Voracek)          195


1  Q.  And based upon your listening to the tape, were you able

2  to ascertain whether the transcript accurately depicts which

3  individuals actually is speaking the words on the tape?

4  A.  Yes.

5  Q.  That the transcript is correct?

6  A.  Yes.

7  Q.  So, if the transcript indicates that Dr. Leveto is

8  speaking, you're in agreement, based on your contacts with

9  Dr. Leveto, that that was his voice on the recording?

10  A.  Yes.

11       MR. VORACEK:  Your Honor, the United States moves

12  for the admission of Government Exhibits 50 through 64.

13       THE COURT:  50 through 64 are admitted.

14  Q.  Sir, I now hand you what's been marked as Government

15  Exhibit 66.  What is Government Exhibit 66?

16  A.  66 is a CD that contains excerpts, selected excerpts

17  from the tapes that were just introduced.

18  Q.  Have you listened to the CD?

19  A.  Yes.

20  Q.  And is Exhibit 66 an accurate depiction of portions of

21  the dialogue which was recorded in Exhibits 50 through 64

22  that you just talked about?

23  A.  Yes.

24  Q.  And along with Government Exhibit 66, is there also a

25  transcript?

                Gonzalez - Direct(By Mr. Voracek)         196

1  A.  Yes.

2   Q.   And you have that in front of you, sir?

3   A.   Yes.

4   Q.   Did you read the transcript at the time that you were

5   listening to the CD, Government Exhibit 66?

6   A.   Yes.

7   Q.   And are you convinced, sir, that the transcript

8   accurately reflects the dialogue as recorded in Exhibit 66?

9   A.   Yes.

10          MR. LEVETO:  I object, Your Honor.  I have not been

11   able to receive or review any composit CD of these tapes.

12          MR. VORACEK:  Your Honor, the government did mail a

13   composit CD to standby counsel, I believe at least a week or

14   a week and a half prior to trial.

15          THE COURT:  Have you received that, Mr. Misko?

16          MR. MISKO:  Not to my recollection, Your Honor.

17          THE COURT:  It's about quitting time anyway.  Maybe

18   you could give it to him to listen to this evening and we can

19   start this tomorrow morning.

20          MR. VORACEK:  Very good, Your Honor.  Thank you.

21          THE COURT:  Okay.  All right, ladies and gentlemen,

22   well, for your future plans, I don't know if one of my clerks

23  told you this or not, tomorrow will be the normal working day

24  nine to approximately five.  The next day, we are going to

25  work through the lunch hour, but then we are going to stop at


             Gonzalez - Direct(By Mr. Voracek)          197


1  two o'clock and let you leave, let you out of school early

2  that day.

3        And if you want to bring a snack to eat during one

4  of the breaks, why, we will probably take two breaks that

5  day.  But, anyway, our day that day will be nine to two and

6  then we'll pick it up on Tuesday after Memorial Day.

7        So, have a good evening and we'll see you at nine

8  o'clock tomorrow.

9  (The jury left the courtroom.)

10  (Court recessed on Tuesday, May 24, 2005, at 4:30 p.m.)

11

12              * * * * *

13        I certify that the foregoing is a correct transcript

14  from the record of proceedings in the above-entitled matter.

15              S\Michael D. Powers
                Michael D. Powers
16              Official Reporter

17

18

19

20

21

22

23

24

25