1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

_____

3

UNITED STATES OF AMERICA

4
                    Plaintiff

5

        vs.        Criminal Action No. 01-06ERIE

6

DANIEL J. LEVETO

7
                    Defendant

8  _____

9

                 PROCEEDINGS

10

        Transcript of Jury Trial commencing on Monday,
11  May 23, 2005, United States District Court, Erie,
    Pennsylvania, before Honorable Maurice B. Cohill, Jr.,
12  District Judge.

13  APPEARANCES:

14  For the Government:      For the Department of Justice
                       By:  Rita Calvin, Esq.
15                      By:  Thomas Voracek, Esq.

16  For the Defendant:      Pro Se
                       Stephen Misko, Esq.(Standby)

17
                       Reported by:
18                      Michael D. Powers, RMR
                       Official Court Reporter
19                      Room 5335 USPO & Courthouse
                       Pittsburgh, Pennsylvania 15219
20                      (412) 208-7572

21

22
    Proceedings recorded by mechanical stenography.  Transcript
23   produced by computer-aided transcription.

24

25


                                    2


1                    I N D E X

2  RULINGS            PAGE 3

3  JURY SELECTION        PAGE 9

4  COURT'S OPENING        PAGE 93

5  GOVERNMENT'S OPENING   PAGE 108

6  GOVERNMENT WITNESS    DIRECT  CROSS  REDIRECT  RECROSS

7  MARY SOMMA

8   By Ms. Calvin       127        182
     By Mr. Leveto             165
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1           P R O C E E D I N G S

2    (Court convened on Monday, May 23, 2005, at 9:45 a.m.

3    in chambers.)

4           THE COURT:  Good morning.

5           MR. VORACEK:  Good morning.

6           MS. CALVIN:  Good morning.

7           MR. LEVETO:  Good morning.

8           THE COURT:  Okay.  We had a couple of preliminary

9    motions in limine that were filed.  One from the government

10  was with respect to the Court to take judicial notice of the

11  fact that the indictment was unsealed on a certain date,

12  which escapes me now.

13       Does the defendant have any problem with that

14  motion?

15       MR. LEVETO:  Your Honor, I don't think it's

16  appropriate that I respond to that or --

17       THE COURT:  I am just asking if you have any --

18       MR. LEVETO:  I don't have it.

19       THE COURT:  Okay.  Well, we will take judicial

20  notice of the fact that the indictment was unsealed.

21       I better, for the sake of the record, say when, but

22  I don't remember when.  December 11, 2001.  And we will take

23  notice of that fact.  Okay.

24       Then the second was the one with respect to the

25  statements by alleged co-conspirators.

4

1       Was that the second one?

2       MRS. BURKOFF:  (Law Clerk)  I'm not sure which

3  order you have them in.

4          THE COURT:  Oh, okay.  This is a motion, which I

5    will read the opening paragraph.

6          The United States is moving that we rule that the

7    following evidence is admissible during the trial:

8          One.  Evidence of the defendant's prior and

9    subsequent federal tax violation history.

10         Two.  Evidence of the defendant's state tax filing

11    history.

12         And, three.  Evidence of the defendant's flight

13    shortly after the unsealing of the indictment in this case.

14         Does Mr. Leveto have any response to that?

15         MR. LEVETO:  No, I don't, Your Honor.

16         THE COURT:  We'll grant that motion.

17         Then the last one is one which I mentioned in the

18    opinion which I submitted a long, long time ago, leaving open

19    the question of exclusion or non-exclusion of statements by

20    co-conspirators.

21         In the opinion, which was -- I say it was a long

22    time ago, I don't know when, I said this:

23         The defendant moves to exclude co-conspirator

24    declarations pursuant to 801(d)(2)(e) of the Federal Rules of

25    Evidence and requests that we hold a pretrial hearing

5

1   pursuant to United States against James, 590 F.2d 575, at

2   pages 579 to eighty, Fifth Circuit, 1979.

3       And I denied the motion for a formal hearing in the

4   matter.  I said I would decide -- make the decision prior to

5   the commencement of the trial.

6       And I have had these types of situations before and

7   it's been my experience that the way to do it is for the

8   Court to determine -- and this has to come as evidence

9   unfolds -- but whether or not there is a possibility that the

10  jury may find that a conspiracy existed here.  And then you

11  let the statement in, and then you tell the jury in your

12  final instructions that it's up to them to decide, A, whether

13  or not these statements came from people involved in a

14  conspiracy and then, secondly, they have to decide -- the

15  jury has to decide whether or not they believe those

16  statements.

17      Does the government have any elaborations to make

18  on that?

19      MS. CALVIN:  No, Your Honor.

20          THE COURT:  Okay.  Do you have any response to

21  that, Mr. Leveto?

22          MR. LEVETO:  No, Your Honor.

23          THE COURT:  Okay.  Well, that is the way we'll

24  handle it.  I'll make it clear in the instructions to the

25  jury as to what we're doing.

                            6

1          Now, Nancy said you had a motion this morning,

2  Mr. Leveto?

3          MR. LEVETO:  Well, it's a motion, kind of follows

4  up to the action that I filed last week that I'm sure that

5  Your Honor is aware of.

6          THE COURT:  By that motion, I assume you are

7  referring to the fact that a complaint was filed by you

8  against me personally?

9          MR. LEVETO:  Yes.  Pursuant to 28 USC 455.

10          THE COURT:  Okay.

11          MR. LEVETO:  And I have here, it was sent and put

12  in prison mail last night, a challenge for cause, basically

13  an affidavit and declaration for your recusal from this case.

14  And I realize it's pursuant to 28 USC 144, and I realize also

15  that there is a ten-day window before the proceedings for

16  that, but the statute does make a provision for good cause,

17  which I have pled in that filing.

18      THE COURT:  Okay.  Well, I've read your complaint.

19  I am not going to grant the motion.  I mean, that would open

20  the door for any defendant any time to file an action against

21  the Judge personally and then get him to recuse, and I am

22  just not going to do it.

23      I've read through it and I feel that there are

24  other ways for that particular kind of a complaint to be

25  filed.  It will be referred to the Third Circuit to assign

7

1  another Judge to preside over that matter and I will be

2  represented at the appropriate time by some lawyer from the

3  Department of Justice.

4      MR. LEVETO:  That speaks to that, but it doesn't

5  speak to this.  This is a totally different thing.

6      THE COURT:  I'm denying the motion to recuse.

7      MR. LEVETO:  But, I don't believe it's appropriate

8  that this motion, without hearing or discussing information

9    for the -- the information in it for cause leaves the door

10   open for that.

11           I mean, I have a right to have -- I have a

12   constitutional right to have a trial by an impartial Judge.

13           THE COURT:  Sure.

14           MR. LEVETO:  If I have made that allegation and I

15   have filed this and the provision in 28 USC 144 is that I am

16   allowed to do this.  And if I pled good cause, it has to be

17   decided on the merits of it.

18           THE COURT:  I decided you didn't plead good cause.

19           MR. LEVETO:  Your Honor, I don't believe that this

20   is for you to decide this particular motion.

21           THE COURT:  The decision about whether to recuse or

22   not is my decision, and I am denying it.

23           MR. LEVETO:  Well, I cannot take part in it.  I

24   think it's highly improper, and I am just saying to you, and

25   I would like to put on the record, that I do have a right to

                                   8

1    have a trial by an impartial Judge and --

2            THE COURT:  I agree.

3            MR. LEVETO:  And I believe it is far more than

4   smoking guns.  And apart -- and as I am sure you are aware

5   that as recently as 2005, Franklin v. McCaughtry, quoted the

6   Supreme Court cases that spoke of the appearance, as well as

7   in reality, of partiality.  And I believe that I should have

8   the chance to have a hearing and adjudicate that.

9        THE COURT:  Well, you'll have the opportunity at

10  some appropriate time, but I am denying the motion to recuse

11  and we are going to start the trial this morning.

12       MR. LEVETO:  Your Honor, I'm also certainly

13  objecting to all the information that the government is

14  bringing forth.

15       I would like to put on the record that it is

16  essentially a result of a void judgment of August 12th, 2004,

17  that was severely prejudicial to me that allowed this case to

18  survive and continue to this point.

19       I don't believe that it's proper without further

20  adjudication to do that.

21       THE COURT:  Well, the trial is going forward today.

22       MR. LEVETO:  Well, Your Honor, I can't take part in

23  a mock trial.  This motion that was filed with the Court

24  deserves more of a discussion than just a denial.

25        THE COURT:  Okay.  Well, it's denied.  Okay.  Well

9

1    then, we'll go out and pick our jury.

2    (Court recessed at 9:55 a.m. in chambers.)

3    (Court reconvened in open court at 10:30 a.m.)

4        THE COURT:  Good morning.  Be seated, please.

5        I would like to talk to the lawyers over at sidebar

6    for a moment.

7    (Sidebar discussion.)

8        MR. LEVETO:  Your Honor, after some of the new

9    issues that have come up --

10        I don't have to put anything on, do I?

11        THE COURT:  No.

12        MR. LEVETO:  After some of the newer issues had

13    come up, I had additional due process concerns and I am

14    asking to be represented by counsel.

15        THE COURT:  Well, we appointed Mr. Misko counsel a

16    long, long time ago.  You have been represented by counsel,

17    but you didn't want to take advantage of it.

18        MR. LEVETO:  Well, due to some of the newer

19    developments, Your Honor, I believe that I no longer feel

file:///A|/LEVETO1A.TXT

20  comfortable pro se and I do need to be represented by an

21  attorney.

22        THE COURT:  Well, this is a bit late to be asking

23  that, so the motion is denied.

24  (End of sidebar.)

25        THE COURT:  Ladies and gentlemen, my name is

10

1  Maurice Cohill, and I am one of the Judges for the United

2  States District Court for the Western District of

3  Pennsylvania, and I do appreciate all of you answering this

4  call to jury duty.

5        What we are about to do is to select a jury in the

6  case of the United States of America against Daniel Leveto.

7  You're going to be asked a number of questions in connection

8  with this choosing of the jury, and I am going to ask that

9  you all stand now to be sworn to answer those questions

10  truthfully.  Will everybody rise?

11        MR. WITAS:  (The Clerk)  Raise your right hand.

12  (The jury panel was sworn in.)

13        MR. WITAS:  (The Clerk.)  Be seated.

14          THE COURT:  As I said, the name of this case is

15   United States of America against Daniel Leveto.  And in this

16   case, Rita Genetti Calvin and Thomas G. Voracek are the

17   attorneys for the United States Department of Justice, Tax

18   Division, and they represent the United States.

19          Mr. Leveto is representing himself in this case,

20   although seated at the table with Mr. Leveto is his standby

21   counsel, Attorney Stephen Misko.  And in a few minutes, I

22   will re-introduce them to you and ask you whether or not you

23   know any of the attorneys or the defendant.

24          The matter on which I am about to instruct is an

25   extremely important one.  Therefore, I hope that you give


                                11


1   these instructions very careful, important consideration.

2          You have been called as a jury panel in a criminal

3   case which comes before you by reason of an indictment to

4   which the defendant has pled not guilty.

5          Now, you must always keep in mind that an

6   indictment is nothing more than a document in which the

7   charges against the defendant are outlined.  An indictment is

8   never evidence in itself.  It simply informs the defendant

9   and the -- it informs the defendant of what he has been

10  charged and it's intended to inform you as to what charges

11  you are going to be asked to consider.  But, the indictment,

12  itself, is simply the formal statement of the charge and its

13  purpose is not to serve as evidence, but only to inform.

14        To this indictment, as I have said, the defendant

15  has pled not guilty, and that raises an issue of fact to be

16  tried by a jury.  A defendant is always presumed to be

17  innocent unless and until proved guilty beyond a reasonable

18  doubt.

19        Now, the indictment, which some of you are going to

20  be called upon to consider in this case, is a three-count

21  indictment charging the defendant with, one, conspiracy to

22  defraud the United States, two, willful subscription to a

23  false -- that means signing -- to a false federal income tax

24  return on April 15th, 1995, and willful subscription to a

25  false federal income tax return on April 15th, 1994.


                              12


1         Now, the indictment charges this:

2         Count 1 provides that the defendant did unlawfully

3   willfully and knowingly conspire, combine, confederate, and

4   agree with other individuals to defraud the United States by

5   impeding, impairing, obstructing and defeating the lawful

6   government functions of the Internal Revenue Service of the

7   Treasury Department in the ascertainment, computation,

8   assessment and collection of federal income taxes.  The

9   indictment further provides that the defendant committed

10   certain overt acts in furtherance of this conspiracy.

11        This is in violation of the United States Code,

12   Title 18, Section 371.

13        Count 2 of the indictment charges that on or about

14   April 15th, 1995, in the Western District of Pennsylvania,

15   the defendant did willfully make and subscribe a joint U.S.

16   Individual Income Tax Return, Form 1040, for the calendar

17   year 1994 which was made under the penalties of perjury and

18   was filed with the Internal Revenue Service, which income tax

19   return he did not believe to be true and correct as to every

20   material matter in that he failed to disclose and omitted

21   gross receipts from a business activity, whereas, he then and

22   there well knew and believed that he was required to disclose

23   the gross receipts from the business activity on his tax

24   return and he failed to disclose that he had an interest in

25   or a signature or other authority over a financial account in

13

1   a foreign country, whereas he then and there well knew and

2   believed that he had an interest in or a signature or other

3   authority over a financial account in a foreign country.

4        This is in violation of 26, United States Code,

5   Section 7206(1) and Title 18, United States Code, Section 2.

6        Similarly, Count 3 of the indictment charges the

7   same violation of Title 26, United States Code,

8   Section 7206(1) as charged in Count 2, which is willful

9   subscription to a federal income tax return for the calendar

10   year 1995.

11        Now, we're going to conduct what's called a voir

12   dire.  And a voir dire is, it's a French term simply, loosely

13   translated, means to speak the truth.  And here we are

14   talking about speaking the truth in the answers to the

15   questions that you are going to be asked.

16        And we use it to refer to the preliminary

17   examination to determine the eligibility of each individual

18   juror to be selected in this case.  Please listen very

19  carefully to my questions and statements and answer

20  accordingly, because we can only accomplish the voir dire

21  properly if you give full and complete answers to my

22  questions.

23       Now, as I ask each of the questions, I'll pause and

24  I want you to raise your hand if your answer to the question

25  is yes.  For example, the first question will be:


                              14


1       The defendant in this case is Daniel Leveto.  Do

2  any of you know him?

3       Now, if you happen to know Mr. Leveto, we want you

4  to put up your hand, and I would want to ask you and under

5  what circumstances you did know him.  I think if your answer

6  to that question was yes, I would ask you to come up here to

7  what we call sidebar, and we would talk about it out of the

8  hearing of the other people because that's liable to foul up

9  the entire process if you all heard the circumstances under

10  which one person or another knew the defendant.  And that is

11  going to be true in several of the questions that I will ask.

12  I will invite you to answer from sidebar, but most of the

13  questions you can answer right from where you are seated.

14          Please remember to give me your name and your juror

15     number because everything that's spoken in the courtroom has

16     to be taken down by our Court Reporter and, of course, that

17     also involves identifying everybody who speaks in the

18     courtroom.

19          So, please remember if your answer is yes, I will

20     ask you to stand, give me your name and number, then give me

21     the answer to your question.

22          Now, Miss Burkoff, could I see that indictment for

23     a minute?  I wanted to make sure I had those dates right.

24     Okay.  You have to wait just a minute.  We are going to have

25     Mr. Witas move that screen so you can see me and I can see

15

1     you.

2          Will that door still open without knocking it over?

3          I realize you folks don't have this in front of you

4     anyway, but I wanted to make sure on the record that I had

5     the dates straight in this thing.

6          The indictment charges that on April 15th, 1995,

7     Mr. Leveto filed a return which he did not believe to be true

8   and correct.

9          And Count 3 states that on April 15, 1996, he filed

10  an individual income tax return that he didn't think was true

11  and correct.

12         And Count 4 deals with the calendar year 1994, and

13  that would have been due on April 15, 1995.

14         I guess I'm ten years behind.  I saw that 1996 and

15  I was thinking 2006 and we haven't even gotten there yet.

16         MR. VORACEK:  Your Honor, I am sorry to interrupt.

17  Count 4 does not apply to the defendant, Daniel Leveto.

18         THE COURT:  Yes.  Okay.  Now, let's proceed with

19  the questions.

20         First of all, I'll ask Mr. Leveto to stand, and

21  stand so the people can see you.

22         Does anybody know Mr. Leveto?  Okay.  I see several

23  hands there.  Do you want to come on up and just line up here

24  one at a time, and we'll ask you to come on up to sidebar and

25  we'll talk to you one at a time.


                                    16


1   (The juror came to sidebar.)

2          THE COURT:  This is transmitting what is being said

3  over to our Court Reporter, so please speak into it each time

4  you speak.

5        Would you give me your name and number?

6        THE JUROR:  Cindy Porter.

7        THE COURT:  What's your number?

8        THE JUROR:  147.

9        THE COURT:  How do you know Mr. Leveto?

10        THE JUROR:  I don't know him personally --

11        THE COURT:  Why don't we start again.

12        THE JUROR:  I don't know him personally, but I know

13  of him.

14        THE COURT:  And under what circumstances do you

15  know of him?

16        THE JUROR:  I believe that he owned

17  Langdon & Leveto Veterinary Clinic.

18        THE COURT:  Okay.

19        THE JUROR:  I knew his late father, I believe,

20  Chester Leveto.  And, um, nothing else.

21        THE COURT:  The main point --

22        THE JUROR:  I don't know him personally.

23        THE COURT:  Of course, what we are trying to do

24    here is choose a jury that's going to be impartial.

25        Do you know anything or are you aware of any reason

                                17

1    that would make you feel unable to or unwilling to be a fair

2    and impartial juror if you are selected?

3        THE JUROR:  Um, I can't really think of anything

4    other than hearing some news information.

5        THE COURT:  What kind of news did you hear?

6        THE JUROR:  I heard -- and I believe it would apply

7    to this case -- it might have been some other things,

8    something about islands or having money in an island, or out

9    of the country, or flying a plane, but I don't know a lot of

10   details.

11       THE COURT:  Right.  And, I mean, anything that you

12   should know for purposes of this case will be brought out by

13   the testimony of witnesses.

14       I guess the logical question is, do you think that

15   anything you heard on the news reports, or however you heard

16   it, would affect your ability to be a fair and impartial

17   juror?

18       THE JUROR:  I don't think so.  I don't think I

19  heard enough details.  I just -- you know, just -- I really

20  don't.  That is all I really know.

21        THE COURT:  Do you have any questions of

22  Miss Porter?

23        MR. VORACEK:  No, Your Honor.

24        THE COURT:  Do you have any questions of Miss

25  Porter?

                              18

1        MR. LEVETO:  I would just like to have an attorney.

2        THE COURT:  Thank you.

3  (The juror left sidebar.)

4        THE COURT:  No remarks.  You can ask her a

5  question.  You got an attorney standing behind you.  If you

6  want to refer to him, you may.

7  (The juror came to sidebar.)

8        THE COURT:  You have to talk right into this thing

9  because that goes over to our Court Reporter.

10        THE JUROR:  Okay.

11        THE COURT:  Give me your name first?

12        THE JUROR:  Brenda Allen.

13          THE COURT:  Spell your last name.

14          THE JUROR:  A-l-l-e-n.

15          THE COURT:  Your number?

16          THE JUROR:  205.

17          THE COURT:  Okay.  You indicated you know

18  Mr. Leveto.

19          THE JUROR:  If I am not mistaken, he was a

20  veterinarian in Meadville, so I was a client.

21          THE COURT:  Did you know him personally?

22          THE JUROR:  No.

23          THE COURT:  That was just in connection with the

24  treatment of some pet, or something like that?

25          THE JUROR:  Yes.


                            19


1           THE COURT:  Is there any reason that you feel if

2  you were selected here that you could not be a fair and

3  impartial juror if you were selected?

4           THE JUROR:  No, I don't think so.

5           THE COURT:  Any questions of Miss Allen?

6           MR. VORACEK:  No, Your Honor.

7           THE COURT:  Okay.  Thanks, Miss Allen.

8    (The juror left sidebar.)

9    (The juror came to sidebar.)

10        THE COURT:  Okay, sir.  Would you give me your name

11  and number?

12        THE JUROR:  240.  My name is Frank Fath.

13        THE COURT:  F-a-t-h?

14        THE JUROR:  F-a-t-h.

15        THE COURT:  Okay.  And you know Mr. Leveto?

16        THE JUROR:  I don't know him personally, but I go

17  to church with his mom and his former in-laws and we were

18  pretty close that way.

19        THE COURT:  In other words, you're close to other

20  members of his family?

21        THE JUROR:  That's right.

22        THE COURT:  Is there anything about that

23  relationship that would cause you to feel you could not be a

24  fair and impartial juror if you were selected here?

25        THE JUROR:  No, there would not, Your Honor.

20

1        THE COURT:  Any questions?

2          MR. VORACEK:  No, Your Honor.

3          THE COURT:  Any questions?  Thank you, sir.

4  (The juror left sidebar.)

5  (The juror came to sidebar.)

6          THE COURT:  You have to talk into this so our

7  Court Reporter can hear you.

8  Give us your name and number.

9          THE JUROR:  Laurie, L-a-u-r-i-e, Ulbrich, U-l-b, as

10  in boy, r-i-c-h.

11          THE COURT:  U-l-b, as in boy?

12          THE JUROR:  R-i-c-h

13          THE COURT:  I-c-h?  Your number?

14          THE JUROR:  No. 225.

15          THE COURT:  Tell us how you know Mr. Leveto.

16          THE JUROR:  I had taken my dog to see him on

17  occasion, and I am from the Meadville area so I have read

18  things in the paper about it.

19          THE COURT:  Is there anything that you read or any

20  feeling you had when you were going to him as a veterinarian

21  that would cause you to feel you could not be a fair and

22  impartial juror if you were selected here?

23          THE JUROR:  No.

24          THE COURT:  Any questions of Miss Ulbrich?

25          MS. CALVIN:  I wasn't able to hear well.  Did you


                              21


1    say that you were a client or an employee?

2          THE JUROR:  A client years ago.

3          THE COURT:  Questions?

4          MR. VORACEK:  You know Mr. Leveto personally as

5    well?

6          THE JUROR:  No.

7          THE COURT:  Thanks.

8    (The juror left sidebar.)

9    (The juror came to sidebar.)

10          THE COURT:  You have to talk right into this thing

11   so -- that transmits the voice over to our Court Reporter.

12   Can you give me your name and number.

13          THE JUROR:  Diane Minman.  M-i-n --

14          THE COURT:  N, as in Nancy?

15          THE JUROR:  Yes.  And then m-a-n.

16          THE COURT:  Your number.

17          THE JUROR:  188.

18    THE COURT:  Okay.  How do you know Mr. Leveto?

19    THE JUROR:  I don't know him personally.  He's -- I

20  had taken a couple of pets to his establishment, but I never

21  met him personally.  I heard something --

22    THE COURT:  Is there anything -- what did you hear?

23    THE JUROR:  Just what was in the newspapers.

24    THE COURT:  What kind of reports were those?

25    THE JUROR:  The tax and the bank accounts, and that

22

1  was really it.  I don't remember a whole lot of details.

2    THE COURT:  Did you hear anything that would make

3  you feel you could not be a fair and impartial juror if you

4  were selected here?

5    I mean, I'll be instructing the jury that they

6  should disregard anything that they have heard or read

7  outside the courtroom, that they got to base --

8    THE JUROR:  I don't think so.

9    THE COURT:  You don't think so?

10    THE JUROR:  Yes.

11    THE COURT:  Any questions?  Okay.  Thank you.

12  (The juror left sidebar.)

13  (The juror came to sidebar.)

14      THE COURT:  Would you give me your name and number?

15      THE JUROR:  Charles McErlane.

16      THE COURT:  Spell your last name.

17      THE JUROR:  M-c-E-r-l-a-n-e.

18      THE COURT:  Your number.

19      THE JUROR:  192.

20      THE COURT:  Okay.  And how do you know or know of

21  Mr. Leveto?

22      THE JUROR:  Your Honor, I'm from Meadville and I

23  used to live in Conneaut Lake and I believe Dr. Leveto used

24  to be my veterinarian.

25      THE COURT:  Did you know him?

23

1      THE JUROR:  No, not personally, just as my

2  veterinarian.

3      THE COURT:  Is there anything that you read or

4  heard about this situation that would make you feel you

5  couldn't be a fair and impartial juror if you were selected

6  here?

7          THE JUROR:  Yes.  I know he was running from the

8    law, federal tax evasion, and I also believe federal firearms

9    are involved also.

10          THE COURT:  Okay.  I don't know that there are

11    firearms involved in this case.  Are there?  Nothing in the

12    indictment.

13          MR. VORACEK:  That are alleged in the indictment,

14    Your Honor.

15          THE COURT:  I think, under the circumstances, maybe

16    we ought to excuse this gentleman.  You go back to your seat.

17    We are going to excuse you from this jury, but I am going to

18    ask you to sit there until there will be an appropriate part

19    later on in this proceeding where we can excuse you.

20          THE JUROR:  Okay.

21          THE COURT:  Thanks.

22          THE JUROR:  Thank you, Your Honor.

23    (The juror left sidebar.)

24    (In open court.)

25          THE COURT:  Okay.  As I indicated before,

24

1    Mr. Leveto did choose to proceed on his own without an

2    attorney, but he has been appointed a standby counsel to be

3    available for consultation.  That gentleman is Stephen Misko.

4    Does anybody know Mr. Misko?  Thank you.

5         One of the lawyers for the United States is

6    Rita Genetti Calvin.  Does anybody know Ms. Calvin?  Thank

7    you.

8         And the other lawyer for the government is

9    Thomas Voracek.  Does anybody know Mr. Voracek?  Thank you.

10        Also, one of the people that's going to be a part

11   of this case -- he is not at counsel table, but I believe

12   he's in the courtroom, and that's Richard Adams, who is a

13   Special Agent for the Internal Revenue Service.

14        Does anybody know Mr. Adams?  Thank you.

15        Some of these questions are going to start out by

16   saying, are you or a member of your immediate family, and

17   then the question.  So, let me define what we mean by

18   immediate family.

19        When I am talking about immediate family, I am

20   talking about you and your husband or wife, you and your

21   spouse, your parents, your children and your brothers or

22   sisters, or if you have somebody who is part of your

23  household, but perhaps not related by blood, but somebody

24  that is so close to you, you consider that person a member of

25  the family, we would include that person.


                                    25


1           So, we are talking about you and your spouse, your

2   parents, your children, your brother and sister, and anybody

3   else who is a member of your household that you consider to

4   be a member of your family.

5           And the question now is:

6           Are you or any member of your immediate family

7   employed by the federal government, with the exception of

8   military service?

9           Yes, ma'am.  Would you stand and give us your name

10  and number?

11          THE JUROR:  Rebecca Dilley.  223.

12          My sister is a secretary for -- they call them the

13  mines.  M-i-n-e-s.  They do government work through that.

14          THE COURT:  That is for the state or for the

15  federal government?

16          THE JUROR:  Federal, I believe.

17          THE COURT:  Is there anything about the fact that

18  she is employed by the federal government that would make you

19  feel you couldn't be a fair and impartial juror here?

20      THE JUROR:  No.

21      THE COURT:  Thank you.  Yes, ma'am.

22      THE JUROR:  I am Portia Lechner, juror 215.

23      My son-in-law is employed by the Federal Bureau of

24  Prisons as a warden, Atwater(Sp) facility.

25      THE COURT:  Where is that located?

26

1      THE JUROR:  California.

2      THE COURT:  Is there anything about his employment

3  by the Bureau of Prisons that would make you feel unable or

4  unwilling to be a fair and impartial juror here?

5      THE JUROR:  No.

6      THE COURT:  Anybody else in the jury box?  Okay.

7  Anyone else in the audience?

8      Okay.  Thank you.  Are you or any members of your

9  immediate family employed by or associated with any law

10  enforcement agency?

11      One way in the back there.  Would you give us your

12  name and number real loud?

13          THE JUROR:  Julie Prody.  263.  Corrections

14  officer.

15          THE COURT:  And you said?

16          THE JUROR:  Corrections officer.

17          THE COURT:  I am sorry?

18          THE JUROR:  Corrections officer.

19          THE COURT:  Where is that?

20          THE JUROR:  Venango County Prison.

21          THE COURT:  Is there anything about that person

22  being involved in law enforcement that would cause you to

23  feel unwilling or unable to be an impartial and fair juror?

24          THE JUROR:  No.  It's myself.

25          THE COURT:  Thank you.  Yes, ma'am.


                            27


1          THE JUROR:  Denise Powell, 245.  My brother is a

2  private investigator in Los Angeles County, Orange County,

3  California.

4          THE COURT:  Is he on his own, you mean?

5          THE JUROR:  Now he is.  He was working for the

6  Orange County Sheriff's Department.

7          THE COURT:  Anything about his employment in that

8   capacity that would make you feel unable or unwilling to be a

9   fair and impartial juror?

10         THE JUROR:  No, sir.

11         THE COURT:  Thank you.

12         Yes, sir.  On the right.

13         THE JUROR:  Juror 200.  Duane Kemling.  My son is a

14   state trooper and my daughter is a detective for the City of

15   Erie.

16         THE COURT:  Would either of those close

17   relationships make you feel you couldn't be a fair and

18   impartial juror here?

19         THE JUROR:  No.

20         THE COURT:  Yes, sir.

21         THE JUROR:  William Culver, 227.  My father-in-law

22   is a retired Erie police officer.

23         THE COURT:  Same question to you.  Would that

24   relationship make you feel unable or unwilling to be a fair

25   and impartial juror?

28

1        THE JUROR:  No.

2        THE COURT:  Thank you.

3        One of the investigating agencies in this case is

4   the Internal Revenue Service, Criminal Investigation

5   Division.

6        Do you have any personal feelings about the IRS or

7   its operation -- other than being mad about your income

8   taxes.  Nobody likes to pay taxes.  I know.

9        One of the investigating agencies in this case is

10  the Internal Revenue Service, Criminal Investigation

11  Division.

12        Do you have any personal feelings about the IRS or

13  its operation that would cause you not to be a fair and

14  impartial juror in this case, which the IRS helped to

15  investigate?

16        That's another question that I would want to talk

17  to you up here at sidebar if your answer to the question is

18  yes.  But, I will read it again.

19        One of the investigating agencies in this case is

20  the Internal Revenue Service, Criminal Investigation

21  Division.

22        Do you have any personal feelings about the IRS or

23  its operation that would cause you not to be fair and

24  impartial in this case, which the IRS helped to investigate?

25      What I am going to do now is slowly read through a

29

1  list of the people that may be witnesses in this case, and

2  there are quite a few of them here, but in any event, I am

3  going to go through this list.

4      After I read a name, I will pause, and if you know

5  that person, I will ask you to put up your hand.

6      So, this is the list of potential witnesses:

7      Mary Somma.  And that's spelled S-o-m-m-a.  Deborah

8  Swaney.  S-w-a-n-e-y.  Robert Lapina.  That's L-a-p-i-n-a.

9  Susannah Weis.  W-e-i-s.  Manuel Gonzales.  G-o-n-z-a-l-e-s.

10  Karen Jeannerett.  I think that is probably right.

11  J-e-a-n-n-e-r-e-t-t.  James Scarpitti.  S-c-a-r-p-i-t-t-i.

12  Mark Curley.  C-u-r-l-e-y.  Robert Eveleth.  E-v-e-l-e-t-h.

13  Robert Meyers.  M-e-y-e-r-s.  Margaret Leveto.  L-e-v-e-t-o.

14  Mildred Custard.  C-u-s-t-a-r-d.

15      Yes, ma'am.

16      THE JUROR:  Denise Powell.  245.  I think she's

17  also known as Millie and may have been his secretary, I

18  think.

19       THE COURT:  Why don't you come on up to sidebar?

20       THE WITNESS:  Okay.

21  (The juror came to sidebar.)

22       THE COURT:  Don't forget to talk into this.  This

23  transmits your voice over to our Court Reporter.

24       First of all, give me your name and number again.

25       THE JUROR:  245, Denise, D-e-n-i-s-e, Powell

30

1  P-o-w-e-l-l,

2       THE COURT:  And let me ask, is Mildred Custard, is

3  that Millie that was the secretary?

4       MS. CALVIN:  Yes.

5       THE COURT:  So, you are right in that connection.

6       THE JUROR:  I'm just take caring of all my -- he

7  was a vet, and either my mom took our dog to him, but I

8  didn't go, but then Millie, it was in the office in Cambridge

9  for a very short period of time, and I believe now she works

10  as a volunteer, or something, at the prison, but I have not

11  seen her in ages.

12          THE COURT:  Is there anything about -- you just

13  knew her then through going to the veterinarian office?

14          THE JUROR:  Just the name.  She was just a

15  wonderful person, and that's how I know her.

16          THE COURT:  Was there anything about -- in the

17  event that she is called to testify in this case, is there

18  anything about your relationship with her that would make you

19  tend to believe her more than, let's say, somebody else

20  because you knew her?

21          THE JUROR:  No.

22          THE COURT:  Is there anything about your

23  relationship with her or with the veterinarian office that

24  would make you feel you could not be a fair and impartial

25  juror here?

31

1          THE JUROR:  No.  But, I do have a question for you

2  as long as we are here?

3          THE COURT:  Sure.

4          THE JUROR:  I believe that it was his daughter who

5  was a TSA(Sp) in my classroom with the students that I had

6   last year about the time that they found him.  A.

7         THE COURT:  Okay.

8         THE JUROR:  And I don't know -- I mean, I feel I

9   can be impartial, one way or another, but I am familiar with

10  the case.

11        THE COURT:  Do you remember her name?

12        THE JUROR:  I can't remember her first name.

13  Usually, I don't even know their names.  It was just because

14  of her last name.

15        THE COURT:  Is a TSA like a temporary volunteer?

16        THE JUROR:  No.  She is a paid bodyguard for

17  children at school that have a tendency to be unruly.

18        THE COURT:  Do you work with children?

19        THE JUROR:  I'm a school teacher and they are just

20  in my room on rare occasions.

21        THE COURT:  You don't have a particular cast of

22  instructors, do you?

23        THE JUROR:  No.  And it's been a year or two since

24  she was there because she got married and moved away.

25        THE COURT:  Would that be your daughter?

32

1        THE JUROR:  I think it is, and he just hasn't seen

2  her for a long time.

3        THE COURT:  But, you don't think there is anything

4  in this situation that would make you feel -- that would make

5  you feel unfair or impartial?

6        THE JUROR:  No.  Okay.

7        THE COURT:  Okay.

8  (The juror left sidebar.)

9  (In open court.)

10        THE COURT:  Okay.  All right.  Following that last

11   name is Beverly Stevens.  S-t-e-v-e-n-s.  Barb Roberts.

12   B-a-r-b.  Maybe it is Barbara.  I don't know.  I just have

13   Barb here.  Roberts.  R-o-b-e-r-t-s.

14        And the last name is Kim Iddon.  I-d-d-o-n.

15        Yes, sir.

16        THE JUROR:  I know a Barb Roberts.  I don't know if

17  she is the one in the --

18        THE COURT:  Why don't you come on up and we'll

19  talk.

20  (The juror came to sidebar.)

21        THE COURT:  Okay.  Would you talk right into this?

22  This transmits your voice over to our Court Reporter.  Give

23  me your name and number.

24       THE JUROR:  My number is -- or my name is Jim

25  Harvey.

                                33

1       THE COURT:  H-a-r-v-e-y?

2       THE JUROR:  Correct.

3       THE COURT:  Your number.

4       THE JUROR:  255.

5       THE COURT:  Okay.  And you say you know a Barbara.

6  What is this Barb Robert's connection to the case?

7       MS. CALVIN:  She was an employee of the Levetos.

8       THE COURT:  She worked at the veterinarian's

9  office.  How do you know a Barbara?

10      THE JUROR:  From boating, I know her and her

11  husband.  I actually grew up with her.  I've known her for

12  years.  She lived here in Erie pretty much all of her life.

13      THE COURT:  Do you know where she works?

14      THE JUROR:  I don't know where she works right now.

15  Her husband owns a tavern on 26th Street.

16      THE COURT:  Does that ring any bells?

17          MR. VORACEK:  Miss Roberts lives in Linesville,

18  Pennsylvania.

19          THE JUROR:  Different one.  Sorry.

20          THE COURT:  That is okay.

21  (End of sidebar.)

22          THE COURT:  Now, this next question is -- you might

23  consider it to be -- well, it is a personal type question.

24  So, if you feel more comfortable coming up here to talk about

25  it, that's fine.  Or if it's okay to just answer it from

34

1  where you are seated, that's okay, too.

2          But, the question is this:

3          Have you or a member of your immediate family been

4  a victim of a crime or participated in a criminal case as a

5  complainant, witness for the government or in some other

6  capacity, perhaps as a juror?

7          Now, as I said, this may be personal.  I'll repeat

8  it.  I think oftentimes we have a lot of hands that go up

9  about whether you have been a juror or not, so I think I will

10  make that a separate question.  Forget about being on jury

11    duty for a minute.

12         The question then is this:

13         Have you or a member of your immediate family been

14    a victim of a crime or participated in a criminal case as a

15    complainant, witness for the government or in some other

16    capacity?

17         As I said, you can answer from where you are seated

18    or if you would rather come up, that's fine, too.

19         THE JUROR:  If I answer yes to that --

20         THE COURT:  Do you want to come up here?

21         THE JUROR:  Yes.

22         THE COURT:  Okay.

23    (The juror came to sidebar.)

24         THE COURT:  And give us your name again,

25    Miss Powell?


                          35


1         THE JUROR:  245, Denise Powell.

2         THE COURT:  Okay.

3         THE JUROR:  I don't remember the year.  It was

4    early eighties.  I was a bookkeeper for Cardinal Enterprises,

5    and we went to the Crawford County Courthouse, and it was

6  something to do with -- I think the main office thought that

7  this office was messing up with the records, and whatnot, and

8  I had to prove that my books were in order.

9      THE COURT:  So, you were named as a defendant in

10  the case?

11      THE JUROR:  No.  I think just like a witness.

12      THE COURT:  Is there anything about that experience

13  that would make you feel you couldn't be a fair and impartial

14  juror in this case?

15      THE JUROR:  No.

16      THE COURT:  Questions?  Okay.  Thank you.

17  (End of sidebar.)

18  (In open court.)

19      THE COURT:  Let's just wait here.  I'll -- put up

20  your hand if you want to come up here and talk.

21  (The juror came to sidebar.)

22      THE JUROR:  Does this have to do with, like, the --

23      THE COURT:  Might as well.  As long as you are

24  here --

25      THE JUROR:  Because I was a character witness.

36

1          THE COURT:  Give us your name and number.

2          THE JUROR:  Gail Kurdas.

3          THE COURT:  C-u-r-t-i-s?

4          THE JUROR:  K-u-r-d-a-s.

5          THE COURT:  Oh.  And your number?

6          THE JUROR:  211.

7          THE COURT:  You have to talk right into here.

8          THE JUROR:  Okay.  Well, my ex-husband got in a lot

9   of trouble with the law and I had to be a character witness

10  as to the way he was before he got in trouble.

11          THE COURT:  Oh, okay.  You say he is your

12  ex-husband?

13          THE JUROR:  Yes.  That's why, because of that mess.

14          THE COURT:  Is there anything about that situation,

15  or perhaps with offenses that he may have committed, that

16  would make you feel you couldn't be a fair and impartial

17  juror if you were selected here?

18          THE JUROR:  No, I don't think so.

19          THE COURT:  Does anybody have any questions?

20          MR. VORACEK:  Was there any way that the law

21  enforcement agencies may have treated you or him in

22  connection with this criminal situation that would cause you

23  to be completely fair with the government?

24          THE JUROR:  No, nobody ever treated me bad.  No.

25          THE COURT:  Any questions?

                                37

1           Dr. Leveto nodded.  I'm just saying he shook his

2   head no.

3           THE JUROR:  Is that it then?

4   (The juror left sidebar.)

5   (In open court.)

6           THE COURT:  Yes, sir.  Come to sidebar.

7   (The juror came to sidebar.)

8           THE COURT:  Give us your name and number.

9           THE JUROR:  Thomas Gregorchik, juror 167.

10          THE COURT:  You better spell the last name.

11          THE JUROR:  G-r-e-g-o-r-c-h-i-k.

12          THE COURT:  Okay.

13          THE JUROR:  I was a witness for the County of Elk

14  in a criminal investigation or criminal complaint where one

15  of our employees brought in explosives into our manufacturing

16  facility and blew up a truck.

17        THE COURT:  Oh, he blew up a truck?

18        THE JUROR:  Yeah.

19        THE COURT:  Was this during a strike, or something?

20        THE JUROR:  No.

21        THE COURT:  Well, what company is that?

22        THE JUROR:  It was Carbide Graphite Group in

23  St. Mary's, Pennsylvania.

24        THE COURT:  Is there anything about that experience

25  that would make you feel -- of course, this is a different

38

1  kind of a case -- but, is there anything about your

2  experience there that would make you feel you couldn't be a

3  fair and impartial juror if you were selected here?

4        THE JUROR:  No.

5        THE COURT:  Any questions of Mr. Gregorchik?

6        MR. LEVETO:  No.

7        THE COURT:  Dr. Leveto said no.  Okay.  Thanks.

8  (The juror left sidebar.)

9  (The juror came to sidebar.)

10        THE COURT:  You have to talk right into this thing.

11    Would you give us your name and number?

12          THE JUROR:  Kathryne Zieminiak.

13          THE COURT:  K?

14          THE JUROR:  With a K.  K-a-t-h-r-y-n-e.

15          THE COURT:  Last name?

16          THE JUROR:  Z-i-e-m-i-n-i-a-k.  No. 228.

17          THE COURT:  Okay.

18          THE JUROR:  I was called as a witness when I was, I

19    think, eighteen in front of a District Justice.

20          THE COURT:  What kind of a case was it?

21          THE JUROR:  I think somebody beat up --

22          THE COURT:  You were a witness to some kind of a

23    fight or assault or something?

24          THE JUROR:  Yeah.  But, it got dropped, so I never

25    went there.

39

1           THE COURT:  You never even testified?

2           THE JUROR:  Yes.  And my brother recently got a PFA

3    against his wife.

4           THE COURT:  Was there some criminal activity

5  involved in that?

6      THE JUROR:  Just some threats that she made, and

7  whatnot.

8      THE COURT:  Is there anything about any of those

9  experiences that would make you feel you couldn't be a fair

10  and impartial juror here?

11      THE JUROR:  No.

12      THE COURT:  Any questions of -- I am not going to

13  try your name.

14      THE JUROR:  Zieminiak.

15      THE COURT:  Okay.

16      MR. LEVETO:  No, Your Honor.

17      THE COURT:  Dr. Leveto says no.  Thank you.

18      THE JUROR:  Thank you.

19  (The juror left sidebar.)

20  (The juror came to sidebar.)

21      THE COURT:  Would you give me your name and number?

22      THE JUROR:  Mary Joslin.  No. 269.

23      THE COURT:  Spell your last name.

24      THE JUROR:  J-o-s-l-i-n.

25      THE COURT:  J-o-f?

1          THE JUROR:  S-l-i-n.

2          THE COURT:  F as in Frank?

3          THE JUROR:  S.

4          THE COURT:  Oh, I'm sorry.  J-o-s?

5          THE JUROR:  L-i-n.

6          THE COURT:  All right.

7          THE JUROR:  My sister was robbed at a bank.  She

8  was a bank teller.

9          THE COURT:  Did they ever get the people that did

10  that?

11          THE JUROR:  I think so.  I was she was a witness.

12  It was a very long time ago.

13          THE COURT:  Is there anything about that experience

14  with your sister that would make you feel you couldn't be a

15  fair and impartial juror?

16          THE JUROR:  I don't think so.

17          THE COURT:  Any questions of Miss Joslin?

18          MR. LEVETO:  No.

19          THE COURT:  Dr. Leveto says no.

20          Okay.  Thank you.

21  (The juror left sidebar.)

22  (The juror came to sidebar.)

23        THE JUROR:  Julie Prody.

24        THE COURT:  Spell your last name.

25        THE JUROR:  P-r-o-d-y.


                              41


1        THE COURT:  Julie Prody.  And your number?

2        THE JUROR:  263.  I go to court quite often to

3  testify for the county for contraband, or anything like that,

4  brought into the prison.  Okay?

5        THE COURT:  Don't go yet.

6        THE JUROR:  Okay.

7        THE COURT:  Well, I mean, you're in criminal law

8  enforcement.  Again, I will ask you that question.

9        Is there anything about your job that makes you

10  feel you couldn't be fair and impartial here?

11        THE JUROR:  No, sir.

12        THE COURT:  Any questions of Miss Prody?  Okay.

13  Thank you.

14  (The juror left sidebar.)

15  (The juror came to sidebar.)

16          THE COURT:  Could you give me your name and number?

17          THE JUROR:  Number 138.  Tom Matson.

18          THE COURT:  M-a-t-s-o-n?

19          THE JUROR:  Correct.

20          THE COURT:  Okay.

21          THE JUROR:  I had tools stolen out of my garage.

22  My daughter had a stereo stolen out of her car.  And my other

23  daughter was raped three years ago.

24          THE COURT:  Did they get legal action or court

25  proceedings out of any of those situations?

42

1          THE JUROR:  No.

2          THE COURT:  They never got the person that raped

3  your daughter?

4          THE JUROR:  It was his word against hers.

5          THE COURT:  So, is there anything about those

6  experiences that might make you feel you couldn't be a fair

7  and impartial juror?

8          THE JUROR:  No.

9          MR. VORACEK:  Is there any dissatisfaction that you

10   may have with the law enforcement community with regard to

11   your daughter's situation that would cause you not to be

12   completely fair and impartial to the government?

13          THE JUROR:  No, I don't think so.

14          MR. VORACEK:  Thank you.

15   (The juror left sidebar.)

16   (In open court.)

17          THE COURT:  Let me see my next question.  It might

18   all be personal.

19          I think we've probably covered this next question

20   in my conversations with various people that came up here,

21   but if you didn't come up and this question applies to you,

22   why, put your hand up.

23          This question is:

24          Have you or a member of your immediate family

25   participated in a criminal case as a defendant or witness for

43

1   the defense or in some other capacity?

2          It's slightly different than the ones I asked

3   before, but I think a lot of people gave me the answers to

4   both questions when they were up here.  Yes, sir.

5          THE JUROR:  I was the defendant in an EEO complaint

6  in Federal Court.

7          THE COURT:  Name and number.

8          THE JUROR:  Juror 240.  Frank Fath.  F-a-t-h.  I

9  was a defendant in an EEO case in Federal Court in Atlanta.

10          THE COURT:  Is there anything about that experience

11  that would make you feel you couldn't be a fair and impartial

12  juror here?

13          THE JUROR:  No, sir, not at all.

14          THE COURT:  Thank you.  Okay.

15          MR. VORACEK:  I have another question that I

16  noticed was not on your list and I was wondering if I could

17  submit it for your consideration.

18          THE COURT:  What?

19          MR. VORACEK:  It's more of a personal nature,

20  that's why I bring it up at this time.  I know that the Court

21  has inquired about the people's feelings toward the Internal

22  Revenue Service, but I was wondering if the Court could also

23  ask if they have ever been audited, because if they have,

24  they may have some feelings inside about the tax --

25          THE COURT:  Okay.   Now, usually some hands go up

44

1  on this one, but you can just answer it from where you are if

2  your answer is yes.

3        Have you ever be on a jury before?  Lots of lucky

4  people here.

5        Well, what I am going to do is just ask you to

6  stand and give your -- each time you have to give your name

7  and number.  Even though you might have done that before, you

8  have to give your name and number and then just tell us where

9  and what kind of a case it was, and tell me whether or not

10  that would make you feel that you couldn't be a fair and

11  impartial juror in this case.

12        So, we will start in the front row.

13        THE JUROR:  Jim Harvey, 255.  I have been a juror

14  several times.

15        THE COURT:  In Erie County?

16        THE JUROR:  Erie County.

17        THE COURT:  Do you remember what kind of cases?

18        THE JUROR:  Criminal case, terroristic threats

19  case, just a lot of that kind of things.

20        THE COURT:  You're a professional?

21          THE JUROR:  I'm not trying to be.

22          THE COURT:  Anything about those experiences that

23  would make you feel you couldn't be a fair and impartial

24  juror?

25          THE JUROR:  Not at all.


                              45


1          THE COURT:  Somebody else.

2          THE JUROR:  Rebecca Dilley, 223.  Venango County

3  Court, DUI and assault with a deadly weapon, and assault.

4          THE COURT:  Any of those experiences make you feel

5  you couldn't be fair and impartial here?

6          THE JUROR:  No.

7          THE COURT:  Anybody else?

8          THE JUROR:  Vickie Thompson, juror No. 161.  I was

9  selected to be a juror in McKean County.  This was probably

10  fifteen years ago.  Statutory rape case.  They ended up

11  settling out of court.

12          THE COURT:  So, you never participated in a trial?

13          THE JUROR:  No.  But, I was selected.

14          THE COURT:  Back here.

15          THE JUROR:  John Hackenberg, 166.  Erie County

16   Court.  It was a case involving the police and the black

17   ministers maybe seven or eight years ago.

18          THE COURT:  Was it a civil rights type case?

19          THE JUROR:  Yes.

20          THE COURT:  Anything about that experience --

21          THE JUROR:  No.

22          THE COURT:  -- that would make you feel you

23   couldn't be fair and impartial?

24          THE JUROR:  No.

25          THE COURT:  Thanks.


                              46


1           THE JUROR:  Gail Kurdas, 211.  It was, like, a

2    medical malpractice suit, but it was settled out of court.  I

3    was picked, but I didn't get --

4           THE COURT:  That was in Erie?

5           THE JUROR:  Erie County.  Yes.

6           THE COURT:  And anything about that experience that

7    would make you feel you couldn't be fair and impartial?

8           THE JUROR:  No.

9           THE COURT:  Back there.

10          THE JUROR:  Nadena Owens, 127.  Both times were in

11   Crawford County.  One case was a DUI.  The other case was a

12   medical malpractice.

13          THE COURT:  Either of those situations make you

14   feel you couldn't be fair and impartial here?

15          THE JUROR:  No.

16          THE COURT:  Yes, sir.

17          THE JUROR:  Thomas Gregorchik, 167.  New York

18   State.  I was on a vehicular homicide jury which was

19   resolved.  In New Jersey, I was in an assault and battery

20   case, and in Pennsylvania here, it was medical malpractice.

21          THE COURT:  Well, you're an experienced juror then.

22          Is there anything about those experiences that

23   would make you feel you couldn't be fair and impartial here?

24          THE JUROR:  No.

25          THE COURT:  Yes, sir.


47


1          THE JUROR:  Daniel Bennett, 162.  It was assault

2   and retail theft in Erie County Court.

3          THE COURT:  Anything about that experience that

4  would make you feel you couldn't be fair and impartial?

5        THE JUROR:  No.

6        THE COURT:  Anybody else in the front row?

7        THE JUROR:  Dan Noble, juror 221.  Wrongful

8  employee termination case.

9        THE COURT:  Was that in Erie County?

10        THE JUROR:  Erie County, yes.

11        THE COURT:  Was it in Federal Court or Erie County

12  Court?

13        THE JUROR:  Erie County.

14        THE COURT:  Anything about that experience that

15  would make you feel you couldn't be fair and impartial?

16        THE JUROR:  No, sir.

17        THE COURT:  Thank you.  Second row.  Yes, sir.

18        THE JUROR:  Frank Fath, F-a-t-h, juror 240.  I was

19  on a jury on welfare fraud in Cobb County, Georgia.

20        THE COURT:  Anything about that experience that

21  would make you feel you couldn't be fair and impartial?

22        THE JUROR:  No, sir.

23        THE COURT:  Thank you.  Yes.

24        THE JUROR:  205, Brenda Allen.  Twice in Crawford

25  County; once for assault and once for burglary.

48

1        THE COURT:  Anything about those experiences that

2   would make you feel you couldn't be fair and impartial?

3        THE JUROR:  No.

4        THE JUROR:  Janice Nikolishen, juror number 248.

5   It was assault and battery in Erie County Court.

6        THE COURT:  Same question.  Anything about that

7   experience that would make you feel you couldn't be fair and

8   impartial here in this case?

9        THE JUROR:  No.

10        THE COURT:  Anybody else in that row?

11        THE JUROR:  Colette Barnett, Venango County.

12        THE COURT:  Your juror number?

13        THE JUROR:  264.  Just a domestic dispute.

14        THE COURT:  Okay.  Anything about that that would

15   make you feel you couldn't be fair and impartial?

16        THE JUROR:  No.

17        THE COURT:  Thank you.  Next row.

18        THE JUROR:  Kathy Ulbrich, No. 152.  Erie County.

19   It was a PFA.

20          THE COURT:  Anything that would make you feel you

21   couldn't be fair and impartial in this case?

22          THE JUROR:  No.

23          THE COURT:  Thank you.

24          THE JUROR:  Lucille Grabofski, 232.  Attempted

25   rape, use of alcohol and drugs.


                                   49


1          THE COURT:  Anything about that experience that

2    would make you feel you couldn't be fair and impartial?

3          THE JUROR:  No.

4          THE COURT:  Thank you.

5          THE JUROR:  Mary Groshner, 172.  Crawford County,

6    DUI.

7          THE COURT:  Okay.  And was there anything in that

8    case that would make you feel you couldn't be fair and

9    impartial here?

10          THE JUROR:  No.

11          THE COURT:  Yes, ma'am.

12          THE JUROR:  Karen Gray, 180.  Warren County, DUI,

13   and no.

14          THE COURT:  Okay.  Thank you.  Anyone else?  How

15  about over here?  Yes, sir.

16          THE JUROR:  Your 200, Duane Kemling.  Erie County

17  courthouse, two murder cases.

18          THE COURT:  Either of those cause you to feel you

19  couldn't be fair and impartial here?

20          THE JUROR:  No.

21          THE COURT:  Yes, sir.

22          THE JUROR:  Don Kirsch, 156.  Two in Erie County.

23  One was a drug case and the other one was a burglary.

24          THE COURT:  Anything about those cases that would

25  make you feel you couldn't be fair and impartial?

50

1          THE JUROR:  No.

2          THE COURT:  Thank you.

3          THE JUROR:  Kathy Bemere, No. 219.  Erie County,

4  possession of drugs.

5          THE COURT:  How long ago was that?

6          THE JUROR:  About twelve years.

7          THE COURT:  Anything about that experience that

8  would make you feel you couldn't be fair and impartial?

9        THE JUROR:  No, sir.

10        THE JUROR:  Jim Preshak, 239.  Two cases in Elk

11   County.  One theft case and one rape case.

12        THE COURT:  Anything about either of those cases

13   that would cause you to feel you couldn't be fair and

14   impartial here?

15        THE JUROR:  No.

16        THE COURT:  Okay.  Have you ever been audited by

17   the Internal Revenue Service, have your income tax audited or

18   your tax returns audited?  That's anybody.

19        From your own personal knowledge, based on what

20   little I've told you about this case, do you know anything

21   about the facts of this case?

22        Yes.  Did we talk about that at sidebar?

23        THE JUROR:  Basically.

24        THE COURT:  Why don't you come on up?

25   (The juror came to sidebar.)


51


1        THE COURT:  Okay.  You want to give us your name

2   and number again?

3        THE JUROR:  Denise Powell.  245.

4          My understanding is, you want to know what I know

5   about it?

6          THE COURT:  Yes.

7          THE JUROR:  I knew he was a vet and at some point

8   in time he falsified his records, according to the publicity,

9   and then he disappeared for a while and then he came back and

10   now he's here.

11          THE COURT:  I think the question here is --

12          THE JUROR:  Inside knowledge?

13          THE COURT:  No.  Can you put all that aside?  I

14   mean, when he enters the courtroom, he's --

15          THE JUROR:  Presumed --

16          THE COURT:  -- cloaked in the presumption of

17   innocence, as they say.

18          THE JUROR:  Right.

19          THE COURT:  Now can you, despite what you read in

20   the paper, can you put those reports out of your mind?

21          THE JUROR:  Yes.

22          THE COURT:  And consider him to be innocent

23   until --

24          THE JUROR:  Until I see proof of it, yeah, he's --

25          THE COURT:  Do you have any questions of

52

1   Miss Powell?

2          MR. VORACEK:  No.

3          MS. CALVIN:  No.

4          MR. LEVETO:  No.

5          THE COURT:  Thank you.

6   (The juror left sidebar.)

7   (End of sidebar.)

8          MR. VORACEK:  Your Honor, I think there is another

9   hand.

10          THE COURT:  Yes, sir.

11          THE JUROR:  I had the sidebar, which would indicate

12   family relationship.  No new --

13          THE COURT:  I think that's all right.

14          Give us your name and number again, Mr. Fath.

15          THE JUROR:  240, Frank Fath.  F-a-t-h.

16          THE COURT:  Some of you have already told me this,

17   but I am going to ask the question just to make sure we

18   covered everybody.

19          Do you remember having read or heard about this

20  case?  If you already told me about it, don't tell me again.

21       Did we talk about that at sidebar, Mr. Fath?

22       THE JUROR:  I am not sure whether we did or not.

23       THE COURT:  I think we better talk about this at

24  sidebar.  And I see a hand back there, too.  Why don't you

25  come on up?

53

1  (The juror came to sidebar.)

2       THE COURT:  Wait until I find you on here.  Okay.

3       THE JUROR:  I know the -- the Morandini(Sp) family

4  very well and we've talked back and forth about the case.

5       THE COURT:  You've heard things about the specific

6  charges?

7       THE JUROR:  Yes, I have.

8       THE COURT:  Is there anything that you have heard

9  that you could put out of your mind, either one way or the

10  other, as we say, that he enters the courtroom, he's charged,

11  but he's got the presumption of innocence and it's up to the

12  government to prove otherwise.

13       Can you accept that instruction?

14          THE JUROR:  Yes, sir, I could.

15          THE COURT:  And give him a clean slate before you

16  decide?

17          THE JUROR:  I believe I could, yes, sir.

18          THE COURT:  Any questions?  Thank you.

19  (The juror left sidebar.)

20          THE COURT:  We had this fellow up here before, too.

21  (The juror came to sidebar.)

22          THE COURT:  Name and number.

23          THE JUROR:  Charles McErlane, juror 192, Your

24  Honor.  I am excused.

25          THE COURT:  Just don't talk to anyone else about

54

1  what you might know.  Yes, you have been excused before.

2  (The juror left sidebar.)

3  (The juror came to sidebar.)

4          THE COURT:  Give us your name and number.

5          THE COURT:  Diane Minman, 188.  And I think we

6  already discussed that I had read details in the paper, you

7  know, and as things go on, I may remember more and more about

8  the details.

9          THE COURT:  Yeah.  And I think the important thing,

10   the point we would have to make with you is, that when he

11   enters the courtroom and the case begins, he's presumed to be

12   innocent.

13          THE JUROR:  Correct.

14          THE COURT:  And you put anything you might have

15   read or heard outside the courtroom out of your mind and just

16   base any decision you make only on evidence or testimony that

17   you hear in here.  Do you think you can do that?

18          THE JUROR:  I believe I can, yes.

19          THE COURT:  Any questions of Miss Minman?

20          MS. CALVIN:  No.

21          MR. VORACEK:  No.

22          THE COURT:  Thanks.

23   (The juror left sidebar.)

24   (In open court.)

25          THE COURT:  Have you an opinion at this time as to


                              55


1   the guilt or innocence of the defendant on any of the charges

2   contained in the indictment, or have you ever expressed an

3     opinion as to the guilt or innocence of the defendant?

4          Has anyone talked to you about this case?

5          If you are selected to sit on this case, can you

6     think of any reason that you would be unable or unwilling to

7     render a verdict solely on the evidence presented at the

8     trial and on the law as I give it to you in my instructions,

9     disregarding any other ideas, notions or beliefs about the

10    law that you may have encountered?

11         And that's a very important question.

12         If you were selected to sit on this case, can you

13    think of any reason that you would be unable or unwilling to

14    render a verdict solely on the evidence presented at the

15    trial and on the law as I give it to you in my instructions,

16    disregarding any other ideas, notions or beliefs about the

17    law that you may have encountered?

18         Do you know of any reason that you may be

19    prejudiced for or against the government or for or against

20    the defendant because of the nature of the charges or

21    otherwise?

22         Yes, sir.  Do you want to come on up here?

23    (The juror came to sidebar.)

24         THE COURT:  Name and number.

25          THE JUROR:  Richard Taylor, 128.


                                56


1          THE COURT:  T-a-y-l-o-r?

2          THE JUROR:  Right.

3          THE COURT:  Okay.

4          THE JUROR:  Okay.  When I was ten years old, my

5    stepfather at that time was accused of tax fraud and, as a

6    result, he committed suicide, so --

7          THE COURT:  You feel that that's --

8          THE JUROR:  Actually, no, I don't, one way or the

9    other.  I just feel it's my duty to inform you of that.

10          THE COURT:  How long ago was that?

11          THE JUROR:  1984.

12          THE COURT:  And that was -- was there any criminal

13   charge brought?

14          THE JUROR:  Well, he committed suicide so that was

15   the end of the proceedings, I guess.

16          THE COURT:  Would you like to be excused from this

17   jury?

18          THE JUROR:  Actually, I can -- like I said, it

19  doesn't really impact me, one way or the other.

20      THE COURT:  Does the government have any questions

21  of Mr. Taylor?

22      MR. VORACEK:  The episode that you just described,

23  does that cause you to have some strong feelings regarding

24  the enforcement of tax laws in this country because of the

25  situation you encountered?

57

1       THE JUROR:  Not really.  Because, I mean, I was ten

2  years old.  So, I mean, I wasn't involved in all the facts.

3  But, from what I understand, he cheated on his taxes and that

4  was the -- the IRS investigated him.

5       MR. VORACEK:  Was there anything about the IRS

6  investigation, the government agents, or anything that you

7  had heard about at the time, that may cause you to find their

8  testimony either favorable or unfavorable if they took the

9  stand?

10      THE JUROR:  Not really.  Because what I just

11  described to you was pretty much all the knowledge that I

12  had.  I was ten years old so I really wasn't involved in it.

13  It was my stepfather.  I don't really know much about the

14    situation.

15          MR. VORACEK:  Thank you, Your Honor.

16          THE COURT:  Thank you.

17    (The juror left sidebar.)

18    (End of sidebar.)

19          THE COURT:  That last question was:

20          Do you know of any reason you may be prejudiced for

21    or against the government, or for or against the defendant

22    because of the nature of the charges or otherwise?

23          As you know by now, this case involves alleged

24    violations of federal income tax laws.

25          Is there any reason that you can't accept and

58

1    follow my instructions on federal income tax laws even if you

2    don't agree with that law?

3          The defendant in this case has elected to represent

4    himself.  Considering this fact, do you feel that you would

5    view his case more favorably?

6          Considering this fact, do you feel that you would

7    view this case less favorably?

8        Are you more likely to believe the testimony of a

9  law enforcement officer as opposed to the testimony of other

10  witnesses simply because he or she is employed in a law

11  enforcement capacity?

12       Are you less likely to believe the testimony of a

13  law enforcement officer as opposed to the testimony of any

14  other witness simply because he or she is employed in a law

15  enforcement capacity?

16       Are you inclined to give any less credibility to a

17  defendant if he testifies than to any other witnesses simply

18  because he is the defendant?

19       This is a question that you'll be welcome to come

20  up to sidebar to answer.

21       Do you have feelings or beliefs about the.

22  United States Government, the criminal justice system or the

23  prosecution of criminal cases that would affect your ability

24  to render a fair and impartial verdict in this case?

25       Do you have any health, hearing or vision

59

1  impairment, or is there any reason, personal, business,

2  health or otherwise, that would prevent you from serving as a

3    fair and impartial juror and from rendering a fair and

4    impartial verdict in this case based on the evidence

5    presented in court and the Court's instructions to you

6    concerning the law?

7        Okay.  Those are the questions I think we better

8    answer up here.

9    (The juror came to sidebar.)

10        THE COURT:  Yes, sir.  Name and number.

11        THE JUROR:  Dan Bennet, 162.  As I stated before, I

12   was --

13        THE COURT:  Not too loud.

14        THE JUROR:  As I stated before, I was on a couple

15   of juries, but at this time financially, I cannot take off

16   work again.  I am not getting paid for today.  And the longer

17   I am here -- I am the primary source of income for my family.

18        THE COURT:  Where do you live?

19        THE JUROR:  Albion.

20        THE COURT:  So, $40.00 a day doesn't do it?

21        THE JUROR:  That is not going to do it for me, no.

22        THE COURT:  I think that is a good reason to be

23   excused, and we got plenty of jurors here, so we will excuse

24  you.  I am going to ask you to go back to your seat until

25  later in the -- later in this session.

60

1   (The juror left sidebar.)

2   (The juror came to sidebar.)

3        THE COURT:  Name and number.

4        THE JUROR:  Steven Woodard, No. 212.

5        THE COURT:  Spell your last name.

6        THE JUROR:  W-o-o-d-a-r-d.  Financially, I was

7   excused twice before because I'm in a new job that I have

8   only been with two years and I don't get time off or paid for

9   time I am not at work.  I was excused twice before.

10       THE COURT:  You don't have a union contract that

11   says they got to pay you the difference?

12       THE JUROR:  No.  The last company I worked for did,

13   but this one we don't.  So, I was excused twice before

14   through letters, but --

15       THE COURT:  From this Court?

16       THE JUROR:  Yeah.  Then the clerk advised me to

17   come in and come forward.

18       THE COURT:  Okay.  Well, as I said, I think we have

19  plenty of jurors here and that's a good excuse.

20        THE JUROR:  Okay.

21        THE COURT:  I am going to ask you to go back to

22  your seat though and then we'll excuse you a little bit later

23  on.

24        THE JUROR:  Okay.

25  (The juror left sidebar.)

61

1  (The juror came to sidebar.)

2        THE COURT:  Name and number.

3        THE JUROR:  Mike Ginkel, 195.

4        THE COURT:  Last name is spelled?

5        THE JUROR:  G-i-n-k-e-l.

6        THE COURT:  Okay.

7        THE JUROR:  I lose too much money to be away from

8  work.  I can't -- I pay child support and I can't do it and I

9  resent the fact that I'm even here.

10        THE COURT:  You're not a part of any union that has

11  a contract that pays you the difference?

12        THE JUROR:  No.  I normally work twelve hours a day

13   and I only get paid for eight.

14         THE COURT:  I think we will go ahead and excuse

15   you.  I will ask you to go back and take your seat though.

16         THE JUROR:  Thank you.

17   (The juror left sidebar.)

18   (The juror came to sidebar.

19         THE COURT:  Name and number.

20         THE JUROR:  Dave Wolfgang, 197.

21         THE COURT:  W-o-l-f-g-a-n-g?

22         THE JUROR:  Right.  My company sent a letter that

23   says that they are just breaking a run ready mix out of

24   Warren and they can't spare me.

25         THE COURT:  You mean you drive a ready mix truck?


                                62


1         THE JUROR:  I drive truck and they wrote a letter

2   stating that as busy as they are --

3         THE COURT:  Do they pay you anyway?

4         THE JUROR:  No, I don't think.

5         THE COURT:  You have not had this experience

6   before?

7         THE JUROR:  No.

8          THE COURT:  Any questions of this gentleman?

9          Okay, Mr. Wolfgang, we'll go ahead and excuse you.

10    I'll ask you to go back to your seat for now.

11          THE JUROR:  Okay.  Thank you.

12    (The juror left sidebar.)

13    (The juror came to sidebar.)

14          THE COURT:  Name and number?

15          THE JUROR:  Juror 200, Duane Kemling.  This is one

16    of the prior ones about the police officers.  I was an

17    officer myself, and my kids are both officers, and I would,

18    maybe, tend to believe them more than, you know --

19          THE COURT:  Of course, this isn't really a police

20    officer type case.

21          THE JUROR:  I know that, but you asked that

22    question earlier and I didn't put my hand up.  So, rather

23    than doubt it --

24          THE COURT:  Spell your last name.

25          THE JUROR:  K-e-m-l-i-n-g.

63

1          THE COURT:  I think the important question here is,

2   you know, we ask all of our jurors to put aside any possible

3   prejudice they might have, one way or the other, and we

4   remind them that when a defendant comes in here, he's

5   presumed to be innocent, and I'm sure you law enforcement

6   people all know that.

7          And the question is:  Can you follow that

8   instruction that he's presumed innocent and it is up to the

9   government to prove otherwise?

10         THE JUROR:  Probably.  But, I would still -- you

11  know, I would be leaning towards the other side which has

12  nothing to do with this case, but --

13         THE COURT:  Okay.  Thank you.

14  (The juror left sidebar.)

15         THE COURT:  Hold it, Rich.

16         That sounded like an afterthought to get out of

17  jury duty to me, but --

18         Excuse me just a minute.  Hold it, Rich.  I wanted

19  to talk about the last situation.  I am sorry.  Anybody have

20  any questions?

21         MR. VORACEK:  Your Honor, I think if he just

22  indicated, though, that he may give more credence to a law

23  enforcement person if they testify, since he said that, I

24  don't think we have much choice here.

25        THE COURT:  I think so.  All right.  Okay, Rich.


                              64


1  (The juror came to sidebar.)

2        THE COURT:  Name and number.

3        THE JUROR:  175, Dale Wehler.

4        Over the last couple of years --

5        THE COURT:  W-h --

6        THE JUROR:  W-e-h-l-e-r.

7        THE COURT:  Okay.

8        THE JUROR:  In the last year, year and a half,

9  accounting practices, there was a lot of issues at my

10  company, there was an investigation, inappropriate accounting

11  practices.

12        THE COURT:  What's your company?

13        THE JUROR:  Metaldyne.  That's a Detroit-based

14  company.  There is a lot of allegations in regards to

15  accounting practices and several people have lost their

16  employment.  I am not sure how partial or impartial I could

17  be with regard to that.

18          THE COURT:  What's your job there?

19          THE JUROR:  Operations manager.  So, I was

20   concerned about that also there are allegations coming on

21   information being that -- trade secrets being shared with

22   other people.

23          So, I don't know how much that would influence me.

24   I just wanted to be fair.

25          THE COURT:  I appreciate your frankness.


                                65


1          I think the big question here is, would you be able

2   to follow my instructions that when a person comes in here

3   accused of a crime, he's still presumed innocent until the

4   government is able to prove beyond a reasonable doubt that he

5   is not innocent?

6          THE JUROR:  Yeah, I guess that's the bottom line.

7          THE COURT:  I think we ought to hold you in here.

8          THE JUROR:  All right.  That is fine.

9          MR. VORACEK:  The allegations that are being made,

10   are they being made by a particular agency?

11          THE JUROR:  They were audited on financial

12   reporting in the first event.

13          THE COURT:  That would be like the SEC or IRS?

14          THE JUROR:  Yes.  SEC.  And then in the second

15  instance, it's our company out of -- alleging that someone as

16  a past employee did some things in regards to trade secrets.

17          MR. VORACEK:  Is there anything about your

18  involvement with the agents, the federal agents involved,

19  that would cause you to view their testimony more or less

20  favorable?

21          THE JUROR:  No.  No, I guess not.

22          MR. VORACEK:  You could still view their testimony

23  from the witness stand as an objective individual based on

24  everything that you see about the witnesses coming in here,

25  rather than any preconceived notion that you may have?

66

1          THE JUROR:  That is the part that maybe I'm a

2  little bit concerned about.  But, I can work through that, I

3  guess, if the issue ever came up.

4          THE COURT:  I appreciate your frankness.  Rather

5  have it come up than not.  Okay.  Thanks.

6  (The juror left sidebar.)

7    (The juror came to sidebar.)

8          THE JUROR:  241, Patricia Drabina.

9          THE COURT:  Spell your last name.

10          THE JUROR:  D-r-a-b-i-n-a.

11          It would just be difficult for me to be involved

12    for any length of time.  I watch my granddaughter.  My

13    son-in-law had to take work off today, and they told me I

14    have to tell you this.  It's just me.  I am the caretaker of

15    my granddaughter.

16          THE COURT:  Where do you live?

17          THE JUROR:  I live on 33rd and Wayne here in Erie.

18          THE COURT:  I really don't know how long this trial

19    is going to last; probably last this week.  You couldn't take

20    off -- we won't be trying Friday and, of course, Monday is a

21    holiday.  That will be four days this week.

22          THE JUROR:  I just thought I ought to tell you

23    that.  He is taking off work for today.  It would be

24    difficult for them to find somebody to watch --

25          THE COURT:  I am going to have to hold off on

67

1    making a decision to excuse you.

2          THE COURT:  Okay.

3   (The juror left sidebar.)

4   (The juror came to sidebar.)

5          THE COURT:  Name and number.

6          THE JUROR:  Joyce Singer.

7          THE COURT:  Spell your last name.

8          THE JUROR:  S-i-n-g-e-r.

9          THE COURT:  Your number.

10          THE JUROR:  191.  My daughter is having surgery and

11   she has five children.

12          THE COURT:  When is that scheduled?

13          THE JUROR:  In a couple weeks.

14          The youngest one is a year old.

15          THE COURT:  Are you the baby-sitter?

16          THE JUROR:  Yes.

17          THE COURT:  She can't handle the children?

18          THE JUROR:  Right.

19          THE COURT:  Okay.  I think under the circumstances,

20   we better excuse you.  Okay.  Just go back and take your seat

21   for now though.

22          THE JUROR:  Thank you.

23  (The juror left sidebar.)

24  (The juror came to sidebar.)

25      THE COURT:  Name and number, please.


                        68


1       THE JUROR:  183, Helen Krug.

2       THE COURT:  Spell your last name.

3       THE JUROR: K-r-u-g.

4       I work in a Catholic elementary school cafeteria as

5  a cook there and I only work part time, but it is hard for me

6  to be off of work.  I don't drive.  I don't drive out of

7  town.  My husband --

8       THE COURT:  Where do you live?  Here in Erie?

9       THE JUROR:  No.  St. Mary's, Pennsylvania.  And I

10  just -- My husband had to take off to get me here.  I don't

11  drive.

12      THE COURT:  How far is that?

13      THE JUROR:  It's about two and a half hours from

14  here.

15      THE COURT:  So, that's more than fifty miles?

16      THE JUROR:  Yes.

17      THE COURT:  You would be able to stay here, you

18  know, at government expense.

19      THE JUROR:  But, I would have no one to bring me.

20  I don't drive.  I was in an accident a couple years ago and I

21  am scared to death to drive.

22      THE COURT:  Well, we'll have to think about you.  I

23  think -- do you have any questions of Miss Krug?

24      MR. VORACEK:  No, Your Honor.

25      THE COURT:  Okay.  Thanks.


                                    69


1  (The juror left sidebar.)

2  (The juror came to sidebar.)

3      THE COURT:  Name and number.

4      THE JUROR:  Dan Noble, 221.

5      THE COURT:  Spell your last name.

6      THE JUROR:  N-o-b-l-e.

7      THE JUROR:  Two issues I have.  One is, I wear a

8  hearing aid, but it doesn't seem to be a problem.

9      Two is, my wife works and I am the primary

10  caregiver to my father, who is elderly, and he is just

11  recuperating from boil surgery.  He lives with us and he is

12  supposed to be home from the hospital today.  I need to be

13  there at this time to get him around the house and bath him

14  and give him his meds.

15        THE COURT:  If we run short of jurors, we might

16  have to hold you in.  But, we will try to excuse you, but I

17  can't promise anything at this point.

18  (The juror left sidebar.)

19  (The juror came to sidebar.)

20        THE JUROR:  152, Kathy Ulbrich.

21        THE COURT:  Spell your last name.

22        THE JUROR:  It's U-l-b-r-i-c-h.

23        THE COURT:  Okay.

24        THE JUROR:  I am recently recovering from a head

25  injury and I get occasional headaches, which is one starting


70


1  about now.

2        THE COURT:  I hope I didn't give it to you.

3        THE JUROR:  No, you didn't give it to me.

4        THE COURT:  Okay.

5        THE JUROR:  And I have a doctor's appointment for

6  this injury tomorrow morning.

7          THE COURT:  I think we better excuse you under

8    these circumstances.  Thanks.  Okay.

9    (The juror left sidebar.)

10   (In open court.)

11         THE COURT:  Can you think of any other matter which

12   you should call to my attention that may have some bearing on

13   your qualifications as a juror, or that may prevent you from

14   reaching a fair and impartial verdict based solely on the

15   evidence and on my instructions as to the law?

16         Okay.  Now I want to talk to the lawyers again at

17   sidebar, and Mr. Leveto at sidebar, please, and, Rich, bring

18   your list up and let's make sure.

19   (Sidebar discussion.)

20         THE COURT:  Okay.  What's going to happen next is,

21   I'll pass out those questionnaires to the jurors that are,

22   you know, the final -- in the final cut, and they will answer

23   those questions.

24         But, there are rarely challenges for cause that

25   come up as a result of their answers to those questions so I

71

1    thought right now I had excused ones that we agreed could be

2    excused or that I ruled could be excused.

3         But, my question is:  Are there any that anybody

4    wants excused that we haven't talked about?

5         MS. CALVIN:  Can we have a minute, Your Honor?

6         THE COURT:  Here, let me turn it around.  I will

7    tell you the ones that I have got marked as being excused and

8    the ones I have marked as questionable.

9         Charles McErlane, 192.  That is the very first one

10   we had.  He's excused.

11        Then Denise Powell.  She's sitting, I think, in

12   juror No. 2 seat.  She is the one that knows -- she thought

13   she might know his daughter, but she is the bookkeeper, and

14   so on.  She is a teacher, right?  I thought she was

15   questionable.

16        MS. CALVIN:  Okay for the government.

17        THE COURT:  Do you got any problem with Denise

18   Powell?

19        MR. LEVETO:  Yes, I do.  I really need an attorney

20   to help me out here.

21        THE COURT:  Okay.  She's excused.

22        Then the ones -- that parade of people that had

23  financial difficulty, I got 160 -- 162, Dan Bennett, excused.

24  212, Steven Woodard, excused.  Mike Ginkel, G-i-n-k-e-l,

25  excused, No. 195.  197, Dave Wolfgang, got a money excuse.

72

1  Duane Kemling, K-e-m-l-i-n-g, 200, I got him excused and I

2  forget why.

3      MS. CALVIN:  I think he had a family in law

4  enforcement and he couldn't be impartial --

5      THE COURT:  Yes.  Then this Dave Wehler,

6  W-e-h-l-e-r, 175, is the one whose company has been evaluated

7  by SEC apparently for having -- and apparently having tax

8  troubles, too.  He is a reluctant juror certainly.  I don't

9  know -- any problem with excusing him?

10      MR. VORACEK:  None from the government, Your Honor.

11      MS. CALVIN:  No.

12      MR. VORACEK:  What number was that?

13      THE COURT:  175.  And Patricia Drabina.  She is the

14  one that got baby-sitter problems.  My preference usually is

15  to excuse those people if they are having problems like that,

16  especially when we have plenty of jurors here, because their

17  mind is not going to be on the trial.  It is going to be on

18  something else.  Okay?

19       MR. VORACEK:  That is fine.

20       THE COURT:  Excuse 241.  And then Joyce Singer,

21  191.  She is the one whose daughter is looking at surgery.  I

22  would say excuse her.

23       Helen Krug is the one from St. Mary's.  She doesn't

24  drive.  She wants to be excused.

25       MR. WITAS:  (The clerk)  What number is she?


                              73


1        THE COURT:  183.  And then Dan Noble is the one

2  whose father got the boil problem, surgery.  Excuse him?

3        MR. VORACEK:  What is his number?

4        THE COURT:  221.

5        And 152 is Kathy Ulbrich.  She is the one that just

6  had the head injury.  I'm going to excuse her.

7        MR. WITAS:  (The clerk)  What's her number?

8        THE COURT:  152.  Okay.

9        Now, I think what we'll do, I'll have Rich excuse

10  these people, we'll put the replacements into their --

11       MR. LEVETO:  There is another page.

12          THE COURT:  I thought everybody had the --

13          You get ten peremptory challenges later on.  This

14  is cause.  Peremptories are for no reason.  Okay.  Any

15  challenges?  I mean we, still got an option when we hear what

16  their answers to those questions are, but I want to get the

17  excuses out of here now and get everybody in place again.

18  Then we'll take a bathroom break and then we'll have you

19  choose your jury.  Okay?

20          MR. VORACEK:  We're fine.

21          THE COURT:  Are you okay, Mr. Misko and Mr. Leveto?

22          MR. MISKO:  Yes, Your Honor.

23          THE COURT:  Okay.  Rich, do you think you have it?

24          MR. WITAS:  (Judge's Clerk)  No.

25          THE COURT:  Do you want to --


                              74


1          MR. WITAS:  (Judge's Clerk)  I've got -- out of the

2  original thirty-two people, okay, I have got five people that

3  I need to replace.

4          Now, does anybody disagree with that?  I can tell

5  you the ones that are going to go, the ones that I have.

6   Juror No. 2, Denise Powell, she is gone.  And juror No. 16,

7   Stephen Woodard, he is going to be gone.  And then No. 17,

8   Daniel Bennett, he needs to be replaced.  I have juror

9   No. 221, Daniel Noble, he is going to go.  And the last one I

10  have is juror No. 152, Kathy Ulbrich.

11          Those are the five people that I need to replace.

12          THE COURT:  Then I will keep an eye on them.

13          MR. WITAS:  (Judge's Clerk)  If there is anyone

14  else that I missed, you got to let me know.

15          THE COURT:  He ought to be able to pick it up.

16          THE MR. WITAS:  (The clerk)  Those five people will

17  be replaced right now.

18          MR. MISKO:  How many jurors will we need?

19          MR. WITAS:  (The clerk)  We have a total of

20  thirty-two.  On your list when I replace them, you will end

21  up with thirty-two.

22          THE COURT:  That's sixteen peremptories, twelve

23  jurors and two alternates.

24          MR. WITAS:  (Judge's Clerk)  Two alternates.

25          MR. LEVETO:  I would like to ask you again that if

75

1  I could have counsel appointed for me?

2      THE COURT:  You already asked me and that's been

3  denied.  That's the law of the case, so don't bother asking

4  me again.

5      MR. LEVETO:  Okay.

6  (End of sidebar.)

7      THE COURT:  Okay.  At this point, we still have a

8  little -- I will tell you what we are doing now.  We are

9  going to excuse the ones that we have decided to excuse at

10  this point.

11      Then there will be some other jurors that are

12  filling in some of these vacancies, then we'll take a break.

13  If anybody really needs to go to the restroom now, why, we

14  will let you, but please come back to this courtroom.

15  Anybody that just has to be excused now?  This is just going

16  to be a few more minutes.  Okay.  All right.

17      We'll have Mr. Witas here read the ones that are to

18  be excused that are out of these early seats.  Okay.

19      MR. WITAS:  (The clerk)  I need the following

20  people as I call your numbers to step down and take a seat in

21  the back, please:

22          Juror No. 245, juror No. 212, juror No. 162, juror

23   No. 221, and juror No. 152.

24          Now, the following people, as I call your names,

25   please come up and take the seats that are assigned to you:


                                76


1           Seat No. 7, Laurie Bilich, seat No. 17.

2           Juror No. 16 is going to be James Preshak.

3   P-r-e-s-h-a-k.  No. 16.  Right here, sir.

4           Juror No. 232, take the last seat over here,

5   please.

6           Juror No. 180, take seat No. 20, please.  And juror

7   No 170, come up and take seat No. 2, please.

8           THE COURT:  The ones that have just been -- the

9   four or five of you that are standing back there, you folks

10   see Mr. Witas out here in the hallway, please, and, Nancy,

11   will you pass out those questionnaires to the jurors?

12          This is a time saver.  These are sort of the final

13   questions in this session.  And now each of you have a

14   question sheet in front of you.  And one at a time, we are

15   going to ask you to stand, give your juror number and then

16   just go down the list and answer these questions.

17        Everybody have their question sheet?

18        THE COURT:  Okay.  Start with juror number one.

19  Would you stand, give us your name and number and then just

20  go down that list of questions?

21        THE JUROR:  Thomas J. Matson, juror No. 138.  I

22  live in the City of Erie in Erie County.  I have lived here

23  for fifty-four years.  Lived in Pennsylvania for fifty-four

24  years.  I have a Master's Degree engineering.  I'm a product

25  manager for modernization on locomotives.

77

1        I'm married, have three children, age twenty-six,

2  twenty-four and twenty-one.  I have a lawyer.  His name is

3  McVetter.(Sp)

4        THE COURT:  Are your children employed?

5        THE JUROR:  One daughter works for Erie Insurance

6  and the other daughters work for WICU Erie News.

7        THE JUROR:  Timothy Szczepaniak.  I live in

8  Linesville, Pennsylvania.  I lived there for seven years.

9        THE COURT:  What's your number?

10        THE JUROR:  My number is 170.

11          THE JUROR:  I live in Lineville, Pennsylvania.  I

12  have lived there for seven years.  I have lived in

13  Pennsylvania for forty-six years.  I graduated high school.

14          I'm retired right now from automotive parts.  I am

15  single, no children, and I do not have a lawyer.

16          THE COURT:  Thank you.

17          THE JUROR:  Gisele McCalla, juror number 150.  I

18  live in Lake City, Pennsylvania, lived there for about six

19  months.  Lived in Pennsylvania for about thirty-five years.

20  High school, retired.

21          THE COURT:  What did you do before you retired?

22          THE JUROR:  Sales for Sears.  Married.  I have

23  three children.  A daughter living in Florida, who is a

24  para-legal, and two sons, thirty-eight and thirty-four.  Both

25  engineers.  And I don't have an attorney.

78

1          THE COURT:  Does the daughter that is the -- did

2  you say she is in Florida?

3          THE JUROR:  Yes.

4          THE COURT:  Next.

5          THE JUROR:  James Harvey, juror No. 255.  The City

6   of Erie for fifty-one years.  Same for Pennsylvania.  High

7   school.  Occupation is, I'm a maintenance technician.  I have

8   one son, twenty-seven years old.  And, no, I don't have a

9   lawyer.

10        THE COURT:  Thank you.  Is your son employed?

11        THE JUROR:  Yes.

12        THE COURT:  I didn't hear what --

13        THE JUROR:  He's in the auto parts business.

14        THE JUROR:  Rebecca Dilley, 223.  I live in

15  Cooperstown, Pennsylvania, Venango County.  I've lived there

16  for thirty-five years.  I've lived in Pennsylvania for

17  thirty-eight and a half years.

18        Graduated high school.  I'm a quality control

19  inspector at Coborn.  I'm married.  I have two children, one

20  three and one eight.  And John McGurney(Sp) is my lawyer.

21        THE JUROR:  I am Vickie Thompson, juror 161.  I'm

22  from Kane, Pennsylvania, McKean County.  I've lived there for

23  forty-five years.  I've also lived in Pennsylvania for

24  forty-five years.

25        I'm a high school graduate with some college.

79

1  Presently, I'm an office manager at the Kane Area High

2  School, Kane, Pennsylvania.  I'm married.  My husband is

3  involved in manufacturing.

4        I have two children.  My daughter is twenty.  My

5  son is seventeen, and they are both students.  And I have a

6  lawyer in Kane, Mike Baker.

7        THE COURT:  Thank you.

8        THE JUROR:  Juror 215.  My name is Portia Lechner.

9  I live in Sugargrove, Pennsylvania, which is Warren County.

10  I have been there approximately fifty years.  I have lived in

11  the state approximately the same.

12        I have had a high school education and three years

13  beyond.  I am a retired interior designer currently employed

14  part time as a bar manager.  I am single.

15        I have two children.  A son forty-five, who is a

16  crew chief for a racing team and a daughter who is a teacher.

17  My attorney is James Blackman,(Sp) Warren County

18        THE JUROR:  John Hackenberg, juror No. 166.  I live

19  in Wattsburg, Erie County.  Lived there for approximately

20  thirty years.  Lived in Pennsylvania about fifty-three years.

21        Graduated high school and GE apprentice course.

22    I'm retired.  Married.  My wife works still at Van de

23    Camps.(Sp.)  Three children.  One son, twenty-nine, a

24    daughter twenty-five that's married, and a twenty-one

25    year-old daughter that's going to college.  No lawyer.

80

1          THE COURT:  How about your son, where is he

2    employed?

3          THE JUROR:  Ridge Rack(Sp) as a machinist.

4          THE COURT:  Okay.  Thank you.

5          THE JUROR:  Richard Taylor, No. 128.  Live in

6    Northeast, Erie County.  Lived there for twenty-eight years.

7    Pennsylvania thirty-one years.  I have a Bachelor of Arts.  I

8    am an assessment case manager.  Single, and used an attorney

9    in the past, Richard Blakely.(Sp)

10          THE COURT:  Thank you.

11          THE JUROR:  Stacey Zurcher, 125.  I live in

12    Meadville, Pennsylvania, Crawford County.  I have lived there

13    for a year.  I have lived in Pennsylvania twenty-five years.

14          I am currently working on my Master's.  I am a

15    teacher.  I am married and my spouse is also a teacher.  I do

16   not have any children and I don't have a lawyer.

17          THE COURT:  Thank you.

18          THE JUROR:  William Culver, 227.  Erie County.

19   Harbor Creek, Erie County.  I have lived in Harbor Creek ten

20   years, Pennsylvania forty-seven.

21          One year of college.  I'm a truck driver.  Married.

22   My wife is a social worker.  One eleven year-old son and my

23   lawyer is Dave Mack.(Sp)

24          THE COURT:  Thank you.

25          THE JUROR:  Gail Kurdas, juror No. 211.  I live in

81

1   Erie.  That is Erie County.  I have lived there for twelve

2   years.  I have lived in Pennsylvania for twelve years.

3          I have a Bachelor's Degree and a graduate

4   certificate.  I'm an RN working part time now through an

5   agency, HVA.  I'm married and my husband is Casmier(Sp)

6   Kurdas.  He's a GE -- test man at GE.  And I have a

7   twenty-five year old daughter.  She has a degree in

8   journalism.  And I have a lawyer named Karen Chapsinas.(Sp).

9          THE JUROR:  My name is Nadena Owens, juror

10   number --

11          THE COURT:  Louder, please.

12          THE JUROR:  Nadena Owens, 127.  I live in

13  Jamestown, which is Crawford County.  I have been there for

14  about ten years, been in Pennsylvania for about thirty-six

15  years.

16          I have a high school education.  My occupation is

17  cash management and fugitive investigation.  I'm single.  No

18  children, and I don't have a lawyer.

19          THE COURT:  Thank you.

20          THE JUROR:  Lindsey Craig, number 168, and I live

21  in Harrisville, Pennsylvania.  I have lived there about two

22  years.  I have lived in Pennsylvania for about twenty-five

23  years.

24          I have a Bachelor's Degree in science.  I am a

25  registered nurse, single, no children and no attorney,

82

1  lawyer.

2          THE JUROR:  Thomas Gregorchik, juror 167.  I live

3  in St. Mary's, Pennsylvania, Elk County.  Lived there for

4  twenty-five, years as well as in Pennsylvania for twenty-five

5    years.

6           I have a Bachelor's Degree in business

7    administration.  I'm a retired human resource manager for an

8    industrial corporation.  I'm married.  My wife is a

9    homemaker.

10          I have four children.  A daughter that's

11   thirty-eight.  She is in sales in a software computer

12   company.  And I have daughter who is thirty-five, she is an

13   anesthetist at a hospital in Maryland.  I have another

14   daughter that is a software trainer in Maryland, and I got a

15   son who is an industrial engineer in Virginia.

16          I have a lawyer, and it is Tom Wagner(Sp) of Elk

17   County

18          THE JUROR:  Jim Preshak.  I'm juror No. 239.  I

19   live near Wilcox in Elk County.  I've lived there for

20   fifty-seven years and in Pennsylvania for fifty-seven years.

21          I have one year of college.  Millwright.  I'm

22   married.  My spouse is disabled.  I have two children.  One

23   girl in North Carolina, who is a speech therapist, and the

24   other in Elk County that -- who is a housewife, and I have no

25   attorney.

1          THE COURT:  Thank you.

2          THE JUROR:  My name is Laurie Bilich, juror

3     No. 225.  I live in Springboro, Pennsylvania, Crawford

4     County.  I have lived there for about four years and in

5     Pennsylvania for about twenty-three years.

6          High school graduate.  Employed by an accounting

7     firm.  I am divorced.  I have a son eighteen, who is

8     currently moving to Gettysburg, and I do not have a lawyer.

9          THE COURT:  Thank you.

10          THE JUROR:  Elizabeth Barton, 251.  I live in

11     Warren, Warren County.  I have lived there for four years,

12     Pennsylvania fifteen.

13          High school graduate.  I'm a food -- I'm in food

14     service.  I'm married.  My husband is an equipment operator.

15     I have one son that's in the military.  He's twenty-one, and

16     I don't have a lawyer.

17          THE COURT:  Thank you.

18          THE JUROR:  Mary Joslin, No. 269.  I live in West

19     Springfield, Erie County.  I have lived there and in

20     Pennsylvania for ten years.

21          High school graduate.  I work in manufacturing.  I

22  am married and my husband also works in manufacturing.  I

23  have a twenty-five year-old daughter, who also works in

24  manufacturing, and I don't have a lawyer.

25          THE COURT:  Thank you.


                              84


1          THE JUROR:  Karen Gray, juror No. 180.  Russell,

2  Pennsylvania, Warren County.  Sixty years for living there

3  and sixty years for being in Pennsylvania.

4          I went to about fourteen years of schooling.  I'm a

5  customer service representative.  I am married.  My husband

6  is a production supervisor.  Together we have seven children.

7  Mine are -- and I don't know his age -- his children's ages.

8          My adult children are thirty-eight.  She is an LPN.

9  My son is thirty-six.  He's a paramedic foreman, Montgomery

10  County, Maryland.  My other daughter is thirty-two.  She's a

11  social worker for the Alzheimer's Unit, and my twenty-seven

12  year old-son, who is in construction.  And Ken Crosby(Sp) is

13  my lawyer.

14          THE COURT:  Thank you.

15          THE JUROR:  Frank Fath, juror No. 240.  I live in

16  Conneaut Lake, Pennsylvania, in Crawford County.  I have

17  lived there for ten years.  I lived in the State of

18  Pennsylvania for ten year.

19        Graduated from college with a Bachelor's in

20  accounting.  I'm retired from federal government.  I'm a

21  resources manager with a subtitle of auditor.

22        THE COURT:  Where did you work for the federal

23  government?

24        THE JUROR:  In Chicago and in Dallas and in Atlanta

25  and in Los Angeles and in Salt Lake City.


                            85


1         THE COURT:  What division?

2         THE JUROR:  Department of Defense.  Defense

3  contract audit.

4         THE COURT:  Okay.

5         THE JUROR:  I'm married and my wife is a housewife.

6  I have five children.  The youngest lives in Seattle going to

7  college.  The next oldest boy, which is thirty-five, he works

8  for Federal Express in Atlanta.  My next son is two years

9  older than him.  He works for a software company in Atlanta

10    as a CPA.

11         My next oldest son is an office -- a restaurant

12    manager in Birmingham, Alabama and my daughter is a manager

13    for Kendrick Air in Knoxville, Tennessee, and I don't have a

14    lawyer.

15         THE COURT:  Thank you.

16         THE JUROR:  William Keesler, 135.  Bradford,

17    McKean County.  Forty years.  Forty years living in

18    Pennsylvania.  High school education.  Maintenance mechanic.

19    Married.  Food service.  I have two children.  Six years and

20    six months.  No lawyer.

21         THE COURT:  Thank you.

22         THE JUROR:  Brenda Allen, 205.  Meadville, Crawford

23    County, forty-seven years.  Pennsylvania forty-seven years.

24         Twelfth grade.  Clerk typist at Crawford County

25    Board of Assistance.  Married.  Husband is a tool and die


                              86


1    maker, thirteen year-old son and twenty-four year old

2    daughter.  She goes to college.  No lawyer.

3         THE JUROR:  Janice Nikolishen, juror No. 248.  I

4    live in Millcreek Township, Elk County, for ten years.  I

5   lived in Pennsylvania fifty-seven years.

6          High school education.  I'm retired.  I was

7   supervisor for patient accounting and payroll.  My husband is

8   retired.  He was a City of Erie firefighter.

9          I have two children.  A daughter thirty-six, who is

10  a technical writer and a son thirty-five, who is

11  superintendent of a construction company in Phoenix.  And I

12  do not have a lawyer.

13         THE COURT:  Thank you.

14         THE JUROR:  Kathryne Ziemniak, No. 228.  I live in

15  the City of Erie, Erie County, for three months and

16  Pennsylvania twenty-four years.

17         I have a high school diploma.  I'm a machinist.

18  Not married.  No children, and I don't have a lawyer.

19         THE JUROR:  Diane Minman, juror 188.  I live in

20  Meadville, Crawford County.  I have been there forty-six

21  years.  Lived in Pennsylvania forty-six years.

22         High school graduate with some college.  I'm a

23  store manager.  Divorced.  Two sons, age nineteen and twenty.

24  Both are students, and I do not have a lawyer.

25         THE COURT:  Thank you.

1          THE JUROR:  Colette Barnett, juror 264.  Franklin,

2    Venango County, for twenty-five years.  In Pennsylvania

3    forty-eight years.

4          I have a Master's in education.  I'm an elementary

5    teacher.  And my husband is a senior electrical engineer for

6    Carlin(Sp) Engineering.  I have one daughter age thirteen,

7    and Mike Snyder is my lawyer.

8          THE JUROR:  Verna Trudeau.  My number is 173.  I

9    live in Millcreek, Erie County.  I have lived there

10   fifty-eight years.  I have lived in Pennsylvania fifty-eight

11   years.

12         I graduated high school.  I work for GE.  I am

13   married.  My husband is retired.  My children, thirty-six and

14   thirty-five.  One works for PNC Bank.  The other one is a

15   housewife, and my lawyer is Stephen Tetwell.(Sp)

16         THE COURT:  What do you do at GE?

17         THE JUROR:  I'm an assembler.

18         THE JUROR:  Susan Guianen, No. 265.  I live in

19   Brookside Harbor Township, Erie County.  I have lived there

20   for -- in my house for thirteen years; Pennsylvania

21 sixty-one.

22        I went to high school and a couple years in the

23 medical field.  I am a medical assistant.  My husband is

24 retired from Welsh(Sp) Foods.  I have four children.  My

25 oldest is forty and he works in plastics.  My next son is

88

1 thirty-eight and he works at GE.  Next son is thirty-six and

2 he's a salesman.  My daughter is thirty-four and she is a

3 registered nurse and I have no lawyer.

4        THE JUROR:  Bob Nahay, juror 242.  I live in

5 Meadville, Pennsylvania, Crawford County.  Thirty-seven

6 years.  I lived in Pennsylvania for forth forty-three years.

7        I went to high school and various technical

8 schools.  I'm an industrial electrician.  I'm married.

9 Spouse works at Crawford Central School District.  Two

10 children.  One goes to YSU(Sp) and she also works at

11 Allegheny College in the summer.  The other son is a student,

12 and I have no lawyer

13        THE JUROR:  Cindy Porter, 147.  Guys Mills,

14 Crawford County.  I lived there for eight years and I have

15    lived in Pennsylvania twenty-six years.

16          I graduated from high school, and I am currently

17    pursuing a degree.  I'm a human resource specialist.  I am

18    married.  My spouse is a maintenance worker.  I have two

19    children age thirteen and twenty-one.  Twenty-one year old is

20    a student, and I did have a lawyer, John Spatero(Sp) in the

21    past, but he's now a Judge.

22          THE JUROR:  Juror 232, Lucille Grabofski.  I live

23    in Millcreek, Erie County.  I lived in this state for

24    seventy-two years.  Forty-one years in Millcreek.

25          I went to design school.  Graduated.  I am a

89

1    retired federal employee for the Commerce Department

2    gathering statistics.  I am married.  My husband is retired.

3    Draftsman.  We have one child.  He's forty-four and he owns a

4    restaurant in North Carolina.  We do not have a lawyer.

5          THE COURT:  I think that's probably it.  May I see

6    the lawyers and Mr. Leveto at sidebar?

7    (Sidebar discussion.)

8          THE COURT:  Mr. Voracek or Ms. Calvin, any

9    challenges for cause?

10          MR. VORACEK:  No, Your Honor.

11          MS. CALVIN:  No, Your Honor.

12          THE COURT:  Mr. Leveto or Mr. Misko?

13          What has been said so far could be off the record.

14          Anyway, the question is, are there any challenges

15  for cause?  Now, you'll have -- there are a -- once the

16  challenges for cause are out of the way, then we got a pool

17  of thirty-two jurors.  And out of that pool, you will be

18  picking twelve jurors and two alternates.  And we have

19  sixteen peremptory challenges.  The defendant has ten and the

20  government has six.  And then one each on the -- Rich, on the

21  alternates, what do they have, one more challenge each?

22          MR. WITAS:  (The clerk)  Yes.  Here's the list.

23  That's exactly how they are to pick.

24          THE COURT:  Good.  My question now is, are there

25  any challenges for cause?  Because, if not, I'll excuse

90

1  everybody except for the people in the pool.  Everybody agree

2  there is no challenges for cause?

3          MR. VORACEK:  Yes, Your Honor.

4        MS. CALVIN:  Yes.

5        THE COURT:  Okay, Rich.

6   (End of sidebar.)

7        THE COURT:  Everybody except people with a

8   questionnaire now.  We appreciate your attention to these

9   questions and your cooperation.  We can excuse you, but see

10  Mr. Witas out in the hall.  He will give you further

11  instructions.  If you have a question -- if you have a

12  question sheet, stay here.

13        Okay, ladies and gentlemen, be sure to come back to

14  the seat that you are in now.  We'll be picking twelve jurors

15  and two alternates from this pool of jurors, but I think this

16  is a good time for a break.  And we'll -- it's twenty to one

17  now.

18        This shouldn't take too long when we get started.

19  We'll ask you to be back in your seat at ten to one and then

20  we'll have a break after the jury is selected.

21  (Court recessed at 12:40 p.m.)

22  (Court reconvened at 12:50 p.m.)

23        THE COURT:  Be seated, please.

24        Well, as I said, ladies and gentlemen, now is the

25  time for the lawyers to make their selections.  And once that

1   is accomplished, why, we'll break for lunch and then we'll

2   begin the testimony after lunch.

3          May I see the lawyers at sidebar?

4   (Sidebar discussion.)

5          THE COURT:  I have been informed by my deputy clerk

6   that the government is only using two peremptory challenges

7   and Mr. Leveto has waived his right to any peremptory

8   challenges.

9          Is that correct, Mr. Leveto?

10          MR. LEVETO:  As far as I know, that's right.

11          THE COURT:  Mr. Misko, is that correct, he's

12   waiving --

13          MR. MISKO:  Yes.

14          MR. WITAS:  (The Clerk)  And that's including the

15   alternates?

16          MR. LEVETO:  Yes.

17   (End of sidebar.)

18          MR. WITAS:  (Judge's Clerk) the following jurors,

19   as I call your names, please step down and take a seat in the

20   back.  Richard Taylor.  William Culver.

21        The following jurors, as I call your names, please

22   come up and take the seats that are assigned to you.

23        Seat No. 1, Nadena Owens.  Third seat in the back,

24   please.  And seat No. 11, Lindsey Craig.  Alternate juror

25   No. 1, Susan Guianen.  And alternate juror No. 2,

92

1   Robert Nahay.

2        THE COURT:  Mr. Witas, you will now swear the jury.

3        MR. WITAS:  (Judge's Clerk)  Will the jury panel

4   please stand and raise your right hands.

5        You and each of you do solemnly swear that you will

6   well and truly try this issue between the United States of

7   America versus Daniel J. Leveto, at Criminal No. 01-06, Erie,

8   and a true verdict render according to the evidence and the

9   law as given to you by the Court, so help you God?

10        Be seated.

11        THE COURT:  Ladies and gentlemen who were not

12   selected for this jury, we certainly appreciate your

13   attention.  As you see, we go through quite a process to come

14   to ending up with a jury, and we certainly appreciate your

file:///A|/LEVETO1A.TXT

15    attention.

16          I will ask you folks to see Mr. Witas out in the

17    hall there and he'll give you further instructions.

18    (The panel left the courtroom.)

19          THE COURT:  Okay, ladies and gentlemen, what we are

20    going to do is, we'll break for lunch now and Miss Burkoff

21    here will -- I think she is down here.  There she is.

22    Anyway, she'll show you where our jury room is.  And from now

23    on when you come in the building, you come to our jury room

24    until the trial is over, and we'll -- let's see.  It's

25    almost -- we will ask you to be back and ready to go at two

93

1    o'clock, and come in our jury room and then you will be

2    called into the courtroom at the appropriate time.

3    (The jury left the courtroom.)

4          THE COURT:  Do you want to come up to sidebar?

5    This juror says she got something she wants to talk about.

6    (The juror came to sidebar.)

7          THE COURT:  Name and number.

8          THE JUROR:  Vickie Thompson, juror 161.  Okay.  I

9   have travel -- prearranged travel plans.  I don't know how

10  long the trial will last.

11          THE COURT:  When does your travel start?

12          THE JUROR:  June 9th.

13          THE COURT:  Oh, we will be done by then.

14          THE JUROR:  Positively?

15          THE COURT:  Positively.  Promise.

16          THE JUROR:  Okay.

17          THE COURT:  Okay.

18  (The juror left sidebar.)

19  (End of sidebar.)

20  (Court recessed at 1:05 p.m.)

21  (Court reconvened at 2:20 p.m.)

22          THE COURT:  Well, that was a very smooth entrance,

23  please.  Rich is a tough drill instructor.

24          Well, ladies and gentlemen, what we are going to do

25  now is, I am going to give you what I call a preliminary

94

1   charge.  This is just kind of an outline of the way we expect

2   the trial to go.  After that, the government may make an

3   opening statement, if it wishes, in which it will outline,

4  you know, what it expects to be able to prove here.  It's not

5  an argument.  It's just a statement of what they hope to

6  prove.  And then after that, Mr. Leveto may make a statement

7  if he wants to or he may waive making that statement.  That

8  is entirely up to him.

9      So, with that, let me give you these words of

10  advice and instruction.

11      As you know, you have now been sworn in the case of

12  United States of America against Daniel Leveto.  And this is

13  intended to be an introduction to the trial of this case and

14  it's not a substitute for the detailed instructions about the

15  law and the evidence that I will give you at the end of the

16  trial.

17      This is a criminal case commenced by the

18  United States, which I may sometimes refer to as the

19  prosecution or the government.  And the defendant is

20  Daniel Leveto.

21      Now, the case is based on a three-count federal

22  grand jury indictment charging the defendant with various

23  violations of the federal income tax laws.

24      Count 1 of the indictment provides that the

25  defendant unlawfully, willfully and knowingly conspired,

95

1  combined, confederated and agreed with other individuals to

2  defraud the United States by impeding, impairing, obstructing

3  and defeating the lawful governmental functions of the

4  Internal Revenue Service in the ascertainment, computation,

5  assessment and collection of federal income taxes.

6          The indictment further provides that the defendant

7  committed certain overt acts in furtherance of this

8  conspiracy.

9          Count 2 charges that on or about April 15th, 1995,

10  in the Western District of Pennsylvania, the defendant did

11  willfully make and subscribe -- and, as I told you, that

12  means signed -- a joint U.S. individual income tax return

13  Form 1040 for the calendar year 1994, which was verified by a

14  written declaration that it was made under the penalties of

15  perjury and it was filed with the Internal Revenue Service,

16  which said income tax return he did not believe to be true

17  and correct as to every material matter in that he failed to

18  disclose and omitted gross receipts from a business activity,

19  whereas, he then and there well knew and believed that he was

20    required to disclose the gross receipts from the business

21    activity on his tax return and he failed to disclose that he

22    had interest in or a signature or other authority over a

23    financial account in a foreign country, whereas, he then and

24    there well knew and believed he had an interest in or a

25    signature or other authority over a financial account in a

96

1    foreign country.  And this is in violation of the United

2    States Code.

3          And, similarly, Count 3 of the indictment charges

4    the same violation of Title 26, United States Code,

5    Section 7206(1), which is a willful subscription to a false

6    federal income tax return for the calendar year 1995.

7          Now, in a nutshell, those are the charges against

8    Mr. Leveto.

9          You should keep in mind, and this is very

10    important, that in every criminal case, the government is

11    merely a party to the case; no more, no less.  There is no

12    presumption that just because the government is bringing this

13    action, that the defendant must be guilty.

14          On the contrary, the government always has the

15   burden throughout the trial of proving the guilt of the

16   defendant beyond a reasonable doubt.  And because the

17   defendant has pled not guilty, questions of fact will be

18   presented at trial and you have been chosen as the jurors to

19   determine those facts.

20          The indictment simply sets out the charges.  It's

21   not evidence against the defendant.  The government has the

22   burden of proving each of the essential elements of the

23   indictment beyond a reasonable doubt.

24          A reasonable doubt is a doubt based upon reason and

25   common sense, the kind of a doubt that would make a

97

1   reasonable person hesitate to act.  Proof beyond a reasonable

2   doubt must, therefore, be proof of such a convincing

3   character that a reasonable person would not hesitate to rely

4   and act upon it in the most important of that person's own

5   affairs.  The purpose of this trial is to determine whether

6   the government can meet its burden to show that the defendant

7   is guilty beyond a reasonable doubt.

8          I often tell my jurors that there are really two

9   judges in the case.  You collectively as a juror are the

10  judge with respect to the facts.  It is going to be up to you

11  to determine what the facts are.  I'm the judge with respect

12  to the law.  In other words, I am -- a Judge is a pretty

13  fancy name for a referee.  Actually, I am in charge of

14  telling you what the law is and then, based on my

15  instructions to you on the law, you will be the ones to

16  decide what the facts of this case are and whether the

17  government has succeeded in meeting its burden of proof.

18          Now, you will notice that Mr. Leveto is

19  representing himself.  And, of course, this should have no

20  effect on your decision in the case, as all individuals who

21  come to court have the right to represent themselves.  This

22  may require additional conferences or discussions among

23  Mr. Leveto, his standby counsel, the lawyers for the

24  United States and me.  But, to insure that the trial proceeds

25  as smoothly as possible under the circumstances, in which one

98

1   party is unfamiliar, or may be unfamiliar with this branch of

2   the legal system, we have to make some exceptions to keep the

3    playing field level, so to speak.

4         Now, you will be expected to perform your duty of

5    deciding the facts without bias for either the defendant or

6    the government.  The law does not permit jurors to be

7    governed by sympathy or prejudice or public opinion.  Both

8    the defendant and the government expect that you will

9    consider all of the evidence impartially, follow the law as I

10   state it, and reach a just verdict regardless of the

11   consequences.

12        Now, the trial will proceed in this order:

13        First, the parties may make opening statements, as

14   I indicated.  The government may make an opening statement at

15   the beginning of the case and the defendant may then make an

16   opening statement then or delay the opening statement until

17   the close of the government's case.  What's said in the

18   opening statements is not evidence.  It is not supposed to be

19   argument.  The statements simply serve to provide you with an

20   introduction to the case.

21        Secondly, the government will then introduce

22   evidence in support of the charges contained in the

23   indictment.  After the government has presented its evidence,

24   the defendant may present evidence, but is never obligated to

25  do so.

99

1        At the conclusion of the evidence, the government

2   will present an oral argument in support of its side and the

3   defendant will present an oral argument in support of his

4   side.  What is said in the closing arguments is not evidence,

5   just as what was said in the opening statements is not

6   evidence.

7        The purpose of the closing argument is to present

8   the parties' positions as to what the evidence shows and what

9   conclusions may be drawn from that evidence.  I'll then

10  instruct you on the law, after which you will retire to

11  consider your verdict.  Your verdict must be unanimous.

12        Under our criminal procedure, you, the jury, are

13  the sole judges of the facts, as I said.  It is especially

14  important, therefore, that you perform that duty carefully

15  and conscientiously, for ordinarily there is no means of

16  correcting an incorrect finding of fact by a jury.  When you

17  go into your deliberations, you will be all by yourselves.

18  There won't be anybody else in there, no Court Reporter, or

19  anybody, with you in the jury room.  The decision will be

20  entirely in your hands.

21       Out here, if I make a mistake on the law,

22  everything said out here is taken down by the Court Reporter.

23  So, if I do make a mistake on the law, some Court of Appeals

24  can look at that and decide whether or not I have made a

25  mistake.  But, with respect to your deliberations, there is

100

1  no way to discover that a mistake was made if, indeed, you

2  should make a mistake.

3       So, as I say, you are the finders of the fact.

4  But, on the other hand, I instruct you that the law which you

5  are to consider is to be only the law as I give it to you.

6  And it is going to be your duty to follow it even though you

7  might disagree with the law as I explain it.  And there is an

8  important reason for this.

9       Your deliberations are going to be secret, as I

10  said, and if you were to use different law than that which I

11  gave you, no one would ever be able to know this and you

12  would committing an injustice to one of the parties in the

13  case.

14          Now, one of the important things I want to tell you

15    about before the testimony begins concerns the credibility of

16    the witnesses, that is, their believability.

17          Some of the ways by which you may judge the

18    credibility of a witness is the manner in which the witness

19    gives the testimony, the witness' attitude on the stand, the

20    reasonableness or unreasonableness of what the witness says,

21    the witness' means of knowing any facts, the witness'

22    interest in the outcome of the case, any feeling the witness

23    may have for or against one of the parties, the witness'

24    ability to remember, or any previous contradictory statements

25    the witness has made.


101


1          Ultimately, you must decide what weight you will

2    give to the testimony of each of the witnesses who have

3    testified.

4          Now, when an attorney for the government, and in

5    this case, Mr. Leveto when acting as his own attorney, asks a

6    question, the words in their question are not evidence.  They

7    are merely the question.  You must listen to the answer of

8   the witness and that is the testimony on which you must base

9   your decision.

10        Well, what do I mean by that?  Well, suppose

11  someone asking the questions, the lawyer or Mr. Leveto, says

12  to the witness, was the car red?  And the witness says, well,

13  I don't know.  Well, at that point, you would have to put out

14  of your mind that the car might have been red because, you

15  see, that came from the lawyer, not from the witness.  It's

16  the answer of the witness which is the testimony you are to

17  consider in the case.

18        And just as the remarks by any of the participants

19  about the evidence in the case are not evidence in itself,

20  any remarks that I might be make about the testimony which

21  differ from your recollections are not binding on you.

22        Some people think that the jury will have available

23  to it a copy of the transcript.  That is what the Court

24  Reporter records during the trial.  Well, that's not so.  You

25  are expected to use your own memories to recall what was said

                              102

1   in the testimony.

2         During this trial, I am going to permit you to take

3    notes.  Many Courts don't permit note taking by jurors, but I

4    do.  I believe it's all right, and a word of caution,

5    however, is in order.

6          There is often a tendency to attach undue

7    importance to matters which one has written down.  Some

8    testimony which is considered unimportant at the time it is

9    presented, and thus not written down, may take on greater

10   importance during the trial in light of all the evidence

11   presented.  Therefore, I instruct you that your notes are

12   only a tool to aid your individual memory.  Above all, your

13   memory should be your greatest asset when it comes time to

14   deliberate and render a decision in the case.  When you leave

15   at night, you should leave your notes in the jury room.

16         During the trial, any notes taken by any juror

17   concerning this case should never be disclosed to anyone

18   other than a fellow juror.  And we don't want you to discuss

19   the case, of course, until the trial is over and all the

20   evidence is in and then you have your instructions on the law

21   and retire to deliberate.

22         There will be occasions during the trial when

23   objections might be made to certain evidence presented or

24  questions asked.  An attorney or participant has a duty to

25  object if the attorney believes that a question is improper

103

1  or that certain evidence should not be admitted.  But, unless

2  there is an objection, I don't have to make any ruling on the

3  evidence.  And, therefore, you should never hold it against

4  either side when there is an objection.

5          At times, I may sustain the objections or I may

6  order that you disregard certain testimony.  I think that's

7  perhaps one of the more difficult things that we ask our

8  jurors to do.  Sometimes a witness will blurt out something

9  which is really entirely inappropriate for the trial.  It

10  might be prejudicial for several reasons, that kind of thing.

11  And in that case I might say that the jury should disregard

12  that testimony.  And I know it's a human reaction.  You are

13  liable to think, oh, geez, the Judge said forget it,

14  disregard it, now I am going remember it because that's what

15  he told me I wasn't supposed to do.

16          Well, if you can't forget it, I ask you to at least

17  put it off in another compartment of your minds and don't let

18  it influence you in your deliberations of the case.

file:///A|/LEVETO1A.TXT

19          You are expected to follow my instructions and not

20    consider any evidence to which an objection has been

21    sustained or which I have told you to disregard.

22          From time to time, there will be conferences over

23    here at sidebar, and you saw many of those during the jury

24    selection process.  And that is when I meet with the people

25    at that end of the bench to discuss some legal point.  And we

104

1    hold these conferences outside your hearing not because we

2    are trying to withhold any evidence from you that you should

3    hear but, rather, we are trying to avoid mistakes, and it's

4    simply a way of being sure that you have before you only

5    legally correct evidence on which to base your decision.  I

6    hope there won't be too many such conferences, but I imagine

7    there will be some, and I ask for your patience in advance.

8          At times, I may ask a witness questions and if I

9    do, it is to bring out matters that I feel should be brought

10    out and not in any way to reveal my opinion about the facts

11    or to indicate the weight that I feel you should give the

12    testimony of that witness.

13          No one is permitted to talk to you about this case,

14   and I don't want you to talk about it until it's all over.

15   And by "anyone," I mean your wife, your husband, your

16   children, your parents, your relatives, your friends, no one

17   at all.  I don't even want you to talk to each other about

18   the case until you have heard all the evidence, until I give

19   you the final charge on the law and you begin your

20   deliberations in the jury room.  And we have good reason for

21   requiring this.

22          Suppose a juror should make up his or her mind

23   early in the case and talk to others about it, and maybe

24   others are giving that juror some advice, too, which would be

25   wrong.  But then perhaps later on in the trial, other

105

1   evidence comes in and now that juror might want to change his

2   mind, but because he or she has already stated a position,

3   again, it's a human reaction, oh, geez, now I don't want to

4   look like I'm stupid, I don't want to be embarrassed.  So, we

5   avoid that situation entirely by just saying don't talk about

6   it.

7          Of course, when you finally retire, we want you to

8  talk about it for just as long as you want to.  But, in order

9  to do the best possible job, don't discuss the evidence until

10  after you have heard all of it and until you have heard the

11  final charge on the law from me.  Then when you begin to

12  deliberate, you should discuss it freely and openly and at

13  length with your fellow jurors.

14        I gather that there has been some publicity about

15  this case at some time.  I don't want anything that you may

16  have seen or read about the case in the paper or other media

17  to influence you in any way.  You are to decide this case on

18  the basis of what you see and hear in this courtroom only.

19        If there should be something more in the news media

20  and you recognize that that looks like the case I am a juror

21  on, we ask you don't pay attention.  If it is on TV, turn it

22  off.  If there is something in the paper, we ask you don't

23  read it.  Get your spouse to cut it out and save it until

24  after the trial is over, if you want to, but please insulate

25  yourself from any outside influences like that.


106


1        And, here again, I think the reason is fairly

2   clear.  You have taken an oath to decide this case on the law

3   as I give it to you and the evidence as you hear and see it

4   here in the courtroom.  The parties have a right to expect

5   you to live up to that oath.  If you talk to someone outside

6   the courtroom, you could get a false impression about either

7   the facts or the law and you would certainly be talking to

8   somebody who doesn't know as much about the case as you do.

9        And the same would be true if you should read about

10  it or see something on the television about it.  You would be

11  listening to excerpts that are put together by persons who

12  don't have the same privilege of sitting throughout the case

13  as you do and won't know as much about it as do you.

14       If at any time during the trial, you should read or

15  hear something outside the courtroom that you think might

16  influence your decision, you should present that to my

17  attention immediately.  Because if anyone should attempt to

18  discuss the case in your presence when, for example, you are

19  standing in the hallway or in the elevator or in one of the

20  local restaurants around here, you know, you could be sitting

21  right next to somebody that's going to be a witness in the

22  case.  You might not know it.  They might not know that you

23  are going to be a juror -- that you are a juror.  But, again,

24  we avoid that situation entirely if we just don't talk about

25  it until everything is over.

107

1          If you feel that somebody is persisting in trying

2   to talk to you about the case outside the courtroom, you

3   should advise me about that immediately because that is a

4   very serious matter.

5          The attorneys in this case are very affable

6   persons.  But, if they see you somewhere, they are not going

7   to chat with you because they are under my instructions not

8   to talk to you outside this courtroom under any

9   circumstances.

10         After the closing arguments, I will explain the law

11  that applies in the case.  And when you retire, you will

12  consider the law as I've explained it to you and then you

13  will determine the facts and arrive at your decision.

14         It is going to be for you to decide what

15  conclusions you will draw from the testimony and the

16  evidence.  You have been assigned a very solemn and a very

17  important duty.  It is one that I am sure you will accept and

18  devote your conscientious and best efforts to in coming to a

19  just result.

20      Now, as far as housekeeping is concerned, as I said

21  before lunch, whenever you come in the courtroom, you should

22  come up here to our jury room.  We will normally start at

23  9:00 o'clock in the morning, and I do like to be prompt.

24  This lunch hour today was a little bit of an exception, kind

25  of running late, but we try to start on time.


108


1       We will normally work from nine until

2  twelve-thirty -- with a break in the middle of the morning --

3  for lunch.  We will start again at quarter to two, work

4  through the afternoon until between four-thirty and five,

5  with a break in mid-afternoon.  That is the normal procedure.

6       There will not be -- and I don't know how long the

7  case is going to take.  You never know how long any

8  particular witness is going to take.  But, if we are still

9  going by Thursday, I'll tell you there will not be any court

10  on Friday and there will not be any court on Monday, Memorial

11  Day.  So, if it does go beyond this Thursday, why, we will be

12  picking it up again Tuesday, and I certainly would think we

13    will be finished by the following week.  But, that is the way

14    the schedule looks right now.

15        So, with all of these instructions in mind, we will

16    have the opening statement on behalf of the government.

17        MS. CALVIN:  May it please the Court, members of

18    the jury, the defendant, Daniel Leveto, is a veterinarian and

19    he operated a very successful practice in Meadville,

20    Pennsylvania.

21        Although the practice was called Langdon and

22    Leveto, Dr. Leveto, the defendant, was the sole owner and he

23    made all the decisions.  He had bought the business from

24    Dr. Langdon in the 1980's.  Because he was the sole owner and

25    made all the business decisions, he was completely in charge.


109


1    The defendant had bank accounts in the name of Langdon and

2    Leveto.  And it was the normal practice of his business to

3    deposit all of the business receipts into these accounts, and

4    he had signature authority over these accounts.

5        By 1989, the defendant's business was making gross

6    receipts of over half a million dollars a year, and the

7  defendant knew that he had a legal obligation to file tax

8  returns which reported his business, the business activities,

9  its gross receipts and any profits which it generated, and

10  the defendant did.

11        And in 1989, the defendant filed tax returns

12  declaring that he had over $531,000.00 in receipts and profit

13  well over $100,000.00.

14        In 1990, the defendant again filed tax returns

15  reporting a business activity and its gross receipts and

16  profits.  That year the tax returns reflect the business as

17  earning $567,000.00, with a profit of $177,000.00.

18        And with the profit that the defendant generated

19  from his veterinarian practice, he was able to maintain a

20  very nice lifestyle.  He lived in a nice home with a swimming

21  pool.  He drove nice cars.  He bought his wife jewelry.  He

22  took nice vacations.

23        Then in 1991, the defendant joined an organization

24  called First America Research, also called FAR.  And this was

25  based in Colorado and operated by two men by the name of

110

1  Donald Turner and Paul Harris.  Together, Turner and Harris

2   directed all of FAR's activities.  Donald Turner had written

3   a book called Tax Free, How The Super Rich Do It.  And the

4   goal of FAR was to help people just like the defendant hide

5   their income and assets from the Internal Revenue Service.

6          After the defendant became a member of FAR, he

7   started taking steps to hide the fact that he was the owner

8   of the veterinary practice that he operated.

9          In mid-1991, the defendant told people that he had

10  sold his business to an entity called Center Company.  The

11  defendant filed tax returns for 1991 which stated that he had

12  sold his company in August of 1991.  And the 1991 tax return

13  only accounted for some of the profits and the business

14  receipts, the first half of 1991.

15         But, the defendant continued to operate this

16  veterinary practice making all the business decisions.  He

17  filed tax returns for 1992, 1993, 1994 and 1995, but he never

18  again accounted for the veterinary practice and its receipts.

19  This despite the fact that the veterinary practice continued

20  to thrive, making over half a million dollars a year.

21         Over the course of this trial, you are going to

22  hear a lot about Center Company.  Paperwork was generated to

23   make it appear as if Center Company was a company located in

24   the Turks and Caicos Islands, but you will learn that Center

25   Company was a sham.  It was a nominee name used by the

111

1   defendant to hide his ownership of the practice.

2         With the guidance of Don Turner and Paul Harris,

3   the defendant took steps to make it look as if Center Company

4   was the actual owner of his business.  He opened three bank

5   accounts in the name of Center Company doing business as

6   Langdon and Leveto.

7         And the goal of this whole scheme was to prevent

8   the Internal Revenue Service from identifying income received

9   by the defendant and from learning about assets which he

10   owned.  Because of these actions, the defendant is charged

11   with three crimes, and that is why we're and you are here

12   today.

13         As Judge Cohill told you, I'm Rita Calvin, and

14   together with Tom Voracek, I represent the United States.

15   Special Agent Richard Adams will be assisting us with the

16   prosecution of this case.  He was the case agent.

17         This opening is an opportunity for me to tell you

18  what the government intends to prove and give you a preview

19  of the evidence which will be presented to you.

20      We will prove that the defendant conspired with

21  Donald Turner, Paul Harris and others, to defraud the

22  United States by committing a number of acts which were

23  designed to deceive the Internal Revenue Service and to

24  conceal the defendant's ownership of his veterinarian

25  practice.  As part of the plan, he also filed false returns

112

1  for the years 1994 and 1995.

2      The facts of this case are somewhat confusing, but

3  they are confusing because the defendant designed the scheme

4  to be that way.  He sent money out of the country.  Then

5  using nominee names, he brought the money back into the

6  country.  He had money transferred into accounts over which

7  he had signature authority.  He deliberately used different

8  names and took steps making it almost impossible for the

9  Internal Revenue Service to calculate his income or find his

10  assets.

11      We will prove to you that this sale to Center

12   Company was nothing more than a paper transaction and its

13   only purpose was to deceive the Internal Revenue Service.

14   The defendant, himself, referred to it as a paper tiger.  Don

15   Turner and Paul Harris helped the defendant by making it

16   appear that he had sold his business to Center Company for

17   $230,000.00.

18          According to the contract of sale, Center Company

19   is owned by Jack Williams and it's located in the Turks and

20   Caicos Islands.  The defendant called himself the general

21   manager of Center Company, and he continued to make every

22   business decision for the veterinary business purportedly

23   owned by Center Company, but he admitted that he never met or

24   spoke to Jack Williams.

25          The business receipts were deposited into a Center


113


1   Company account in Meadville, Pennsylvania, over which the

2   defendant had signature authority and he alone decided how

3   the money would be used.  And although the defendant claimed

4   to have no ownership in Center Company or the practice, life

5   continued for him much as it always had.

6          He still lived in a nice house.  He still drove

7   nice cars.  He still took nice vacations.  He still bought

8   his family nice jewelry.  In fact, after the alleged sale of

9   the business, the defendant was able to buy two airplanes

10   which he took on pleasure trips.

11          In addition to opening bank accounts in the nominee

12   name of Center Company, the defendant used other names to

13   transact business.  He directed one of his employees to open

14   a Post Office box in Meadville, Pennsylvania, in the name of

15   Wayne Co.  She opened Post Office Box 54 in Meadville and

16   gave the key to the defendant.  Wayne Co. is just another

17   name used by the defendant.

18          The defendant also used other nominee names.  The

19   defendant opened an account in the Grand Cayman Islands in

20   the name of Leonard Adler.  The application for this account

21   shows that Leonard Adler received his mail at Post Office

22   Box 54 in Meadville.  The application form for the

23   Leonard Adler account requires two references to open the

24   account.  And the application form shows that the first

25   reference was the defendant and the second reference was

114

1    First America Research.

2         The evidence will establish that there was no

3    Leonard Adler.  There was no Leonard Adler who worked for the

4    defendant.  That was just another name used by the defendant.

5         The defendant also opened a bank account in the

6    Turks and Caicos Islands in the name of Box Elder.  Box Elder

7    is another nominee name used by the defendant.  The defendant

8    used the Leonard Adler account and the Box Elder account to

9    bring money into the United States, money that he had already

10   sent offshore.  And the defendant used the name Box Elder

11   again to open an account at PaineWebber in Bethesda,

12   Maryland.  The defendant claimed that the account was for a

13   foreign entity, but the defendant had signature authority

14   over that account as well.

15        The evidence will show that the defendant used the

16   name Center Company, Box Elder, Leonard Adler, Wayne Co. and

17   they were all him.  They were all names that he used to

18   disguise the fact that the money from the veterinary clinic

19   was all his money and he was free to use it however he

20   wanted.

21        The defendant also opened a bank account in his own

22   name in the Channel Islands.  Both the defendant and his then

23    wife, Margaret, had signature authority over that account.

24    Both the defendant and Mrs. Leveto had debit carts so the

25    defendant could send the money to the Channel Islands and use

115

1    the debit card to pull the money out of the account and bring

2    it back here to spend.  And it was just one more way that the

3    defendant attempted to keep the Internal Revenue Service from

4    learning about his income and his assets.

5           As a result of this scheme which the defendant

6    orchestrated, he is charged with three criminal counts.  One,

7    he was charged with a count of conspiracy, and he's also

8    charged with filing false Federal Individual Income Tax

9    Returns for 1994 and 1995.

10          At the end of this case, Judge Cohill is going to

11    instruct you on the law.  But, I am going to tell you a

12    little bit about what the government is going to prove.

13          Count 1 alleges that the defendant conspired to

14    defraud an agency of the United States, in violation of

15    Title 18, U.S.C., Section 371.  And a conspiracy is an

16    agreement between two or more people to do something illegal.

17   In this case, the defendant is charged with entering into an

18   agreement to defraud the United States by impeding,

19   impairing, obstructing and defeating the lawful function of

20   the Internal Revenue Service in the ascertainment,

21   computation, assessment and collection of taxes.

22          We will prove that the defendant willfully joined

23   this conspiracy, and we will also prove that one of the

24   conspirators committed at least one of the overt acts which

25   is charged in the conspiracy as its goal.  And the acts which

116

1    were committed and charged include generating paperwork to

2    make it appear as if Center Company was a foreign corporation

3    to which the defendant had sold his business, opening bank

4    accounts in the name of Center Company, opening bank accounts

5    in false names in foreign country, filing false Federal

6    Individual Income Tax Returns for '94 and '95, providing

7    information for the preparation of Center Company returns,

8    the filing of tax returns purportedly on behalf of Center

9    Company, and the transfer of the defendant's home to his

10   parents.

11          The defendant knowingly entered into this

12    conspiracy with the intent to further its purpose.

13        Counts 2 and 3 of the indictment charge the

14    defendant with willfully making and signing materially false

15    tax returns for the years 1994 and 1995, in violation of

16    Title 26, United States Code, Section 7206(1).  And we will

17    prove that he signed these tax returns under penalties of

18    perjury.

19        The indictment charges that these tax returns are

20    false as to two material matters.

21        The first material matter is that the defendant

22    failed to disclose and omitted gross receipts from a business

23    activity.

24        The second material matter that he failed to

25    disclose was that he had an interest in or signature

117

1    authority over a financial account in a foreign country.

2        And in order to prove this, the government will

3    prove to you that the defendant signed and filed these tax

4    returns and that they were false as to these material

5    matters, that he signed them under penalties of perjury and

6  that he did not believe these tax returns to be true and

7  correct as to every material matter at the time that he

8  signed them, and that he subscribed to it with the specific

9  intent to disobey the law.

10       You are going to hear from a number of witnesses.

11  You are going to hear from the defendant's employees,

12  Barbara Stevens, Karen Jeannerett and Mildred Custard.  All

13  worked for the defendant both before and after the alleged

14  sale.

15       They will tell you that nothing in the practice

16  changed after the sale.  They will tell you they never heard

17  from or spoke to anyone from Center Company.  They will tell

18  you they never heard of Leonard Adler, and they will tell you

19  that in addition to selling -- to running his veterinary

20  practice, the defendant began to sell Don Turner's book, Tax

21  Free, How The Super Rich Do It.

22       Barbara Stevens and Karen Jeannerett will testify

23  regarding the books and records that were kept at the

24  business, and you will see the records which were kept, and

25  they show that throughout this period, the practice continued

118

1   to generate gross receipts of over half a million dollars.

2        Miss Jeannerett will tell you that the defendant

3   told her to open a Post Office box in Meadville in the name

4   of Wayne Co., which she did.  And she will also tell you that

5   the defendant regularly brought in bills from home to be paid

6   by the business and that the defendant directed her to book

7   them as business expenses.

8        Mildred Custard, who worked at the practice for

9   years, will tell you that the defendant told her the sale was

10  only for tax purposes.  And all of the office workers will

11  tell you that they never heard of Leonard Adler, who was

12  supposed to be a trainee of the defendant's.

13        Another witness will be Manuel Gonzalez.

14  Mr. Gonzalez is a retired Special Agent for the Criminal

15  Investigation Division of the Internal Revenue Service.  He

16  worked undercover as Joe Rivera.  Mr. Gonzalez bought

17  Don Turner's book from the defendant and he had a number of

18  meetings with the defendant.  The meetings between

19  Mr. Gonzalez and the defendant were taped, and you will hear

20  some of the matters which they discussed.

21        You will also hear from James Scarpitti, a

22  certified public accountant, who prepared the defendant's tax

23  returns.  He will tell you that when he began working for the

24  defendant in the mid-eighties, he received very detailed

25  information.  But, after the sale to Center Company, he

119

1  received very limited information which was all provided by

2  the defendant.

3        And Mr. Scarpitti was never made aware that the

4  sale to Center Company was a sham, or that Center Company was

5  only a nominee name used by the defendant for Center Company,

6  the practice was paying the living expenses, or some of those

7  expenses, for the defendant.

8        Another witness will be a representative of the

9  Internal Revenue Service, Mary Somma.  She will introduce the

10  tax returns which the defendant filed and tax returns which

11  were filed on behalf of Center Company.  She will also

12  introduce amended tax returns which were filed by the

13  defendant.

14        In 1996, the defendant filed amended returns for

15  all of the years 1991 through 1995.  An amended return is a

16  return which has a change in information from a tax return

17  which had been filed before.  But, rather than file correct

18  returns, the defendant filed returns showing that all of his

19  income was zero, and he had zeros for all of his financial

20  information, including adjusted gross income and taxable

21  income.  And the defendant attached a two-page statement

22  saying that no section of the Internal Revenue Code

23  establishes a tax liability.

24       You will hear from Deborah Swaney, a representative

25  of National City Bank, who will testify regarding the bank

120

1  accounts held by the defendant.

2       As part of her testimony, Miss Swaney will talk

3  about the bank accounts and the deposits, and we will offer

4  the bank account information into evidence.  And you will

5  learn that the defendant sent money to offshore accounts and

6  that money, either in the form of checks or wire transfers,

7  came back overseas into his bank accounts.

8       Robert Lapina, the Special Agent who investigated

9  the case, will be here to tell you about his investigation.

10  As part of his investigation, the IRS Criminal Investigation

11   Division executed search warrants on the defendant's home and

12   business.  Numerous documents were seized.

13         Agent Lapina will introduce letters, faxes and

14   other documents from the defendant's co-conspirators,

15   Donald Turner and Paul Harris.  These pieces of

16   correspondence were addressed to the defendant and provided

17   him with directions on how to implement the scheme to hide

18   his income from the government.

19         The faxes and letters began in mid-1991 and they

20   continued throughout the course of the conspiracy.  And you

21   will learn from the evidence that the defendant acted on

22   those directions by setting up the bank accounts in the name

23   of Center Company, Leonard Adler and Box Adler, and that he

24   set up accounts both here and Pennsylvania and overseas and

25   that he moved income into these accounts to hide it from the

121

1   United States.

2         The defendant set up bank accounts in the Turks and

3   Caicos Islands, which is part of the British West Indies

4   located in the Bahamas, set up bank accounts in the Grand

5   Cayman, which is another British West Indies island located

6    south of Cuba, and he set up an account at the Channel

7    Islands, which is located off the coast of France in the

8    English Channel.  These islands are not any part of the

9    United States.

10        Agent Lapina will also introduce faxed documents

11   from the defendant to these overseas banks and they

12   instructed banks to wire his money from one account to

13   another.

14        For example, the defendant maintained a bank

15   account in the name of Box Elder at Barclays Bank in the

16   Turks and Caicos Islands and the defendant would send faxes

17   to Barclays directing them to wire transfer money from his

18   foreign account to an account here in this country so he

19   could use the money.

20        And during the 1990's, you will see from these

21   faxes that the defendant instructed his foreign banks to send

22   a substantial amount of money back to his Center Company

23   accounts in Pennsylvania and that he used the money.

24        You will learn also that the day after the

25   indictment was announced, the defendant fled and he never

122

1    returned to the veterinary practice.

2         In addition to testimony, there will be paper.

3    Because this is a tax case, there will be a lot of paper.

4         To make it appear as if the sale was real,

5    defendant Donald Turner, Paul Harris and Jack Williams

6    created a lot of paperwork.  You will see numerous letters

7    sent by Donald Turner, Paul Harris and Jack Williams and

8    others, and you will see the numerous faxes between them that

9    went throughout the length of the conspiracy.

10        And you will see letters that caution the defendant

11    not to keep any more than three month's worth of records in

12    his possession, that everything is to be kept secret.  You

13    will notice that, just as the defendant used a lot of

14    different names, Turner and Harris also used different names.

15        They used the name First America Research, FAR,

16    American Security Trust, also known as ASTCO, Vericon and

17    Global Company.  And while you will hear a number of names,

18    they all represent Turner and Harris and associates.  And

19    Donald Turner later changed his name to

20    Don Wood.

21        You will see the contract which purports to sell

22   the veterinary practice.  And you will see that the contract,

23   itself, states that Donald Turner and Paul Harris had been

24   United States Consultants for Center Company.  And this

25   documentation was created for the sole purpose of making it

123

1   appear that the sale was legitimate, thus disguising the

2   defendant's ownership.

3          You will also see the defendant's tax returns.  The

4   defendant told the IRS that in return for running this half a

5   million dollar a year business, he was paid a salary.  Center

6   Company paid him a salary of $5,000.00 for 1992, $2,000.00

7   for 1993, but the defendant's tax returns for 1994 and 1995

8   reflect no wages at all.  And meanwhile, the practice

9   continued to flourish.

10         You will see tax organizers which the defendant

11   filled out to provide to Turner and Harris so that they could

12   prepare tax returns for Center Company.  And you will have

13   the opportunity to see tax returns filed by Center Company.

14   And Center Company showed very little profit while the

15   practice continued to earn in excess of $500,000.00 a year.

16        Three facts are important to remember about Center

17   Company's returns:

18        The first fact is that all of the information used

19   to prepare them came from the defendant.  The defendant sent

20   all of the tax information to Colorado to Turner and Harris.

21        The second fact that's important to remember is

22   that while the gross receipts remained over $500,000.00 a

23   year, the profits of this veterinary business went way down.

24   For 1994 and 1995, the profit of the veterinary clinic, which

25   had been over $100,000.00 a year, was now under $10,000.00 a

124

1   year.

2        And the third fact that's important to remember

3   about Center Company's returns is that Center Company claimed

4   to be a trustee which distributed all of the profits from

5   Center Company to a foreign beneficiary which it called

6   Newbury and, therefore, Center Company never paid any taxes

7   on the profits of the veterinary practice.

8        You will also see a large volume of bank documents.

9   And these bank documents will establish the amount of

10   receipts that the practice earned and will also show the

11   transfer of money out to foreign accounts and back in from

12   those foreign accounts.

13          At the end of the government's case, the government

14   will call a summary witness, Kim Iddon, who will testify

15   regarding the money that the veterinary practice received and

16   what the voluminous documents show regarding the transfer of

17   funds.

18          Miss Iddon will be in court throughout the entire

19   case listening to all the testimony and reviewing all the

20   evidence which is admitted.

21          You may be thinking that this is going to require

22   you to interpret a convoluted or convoluted tax statute.

23   This case will not require that.  In a tax case, it's always

24   very helpful to keep your eye on the money, and you will see

25   that it was the defendant that earned this money.  It was the

125

1   defendant that controlled the money.  It was the defendant

2   who spent the money, and it was the defendant who had the

3   obligation to declare these business receipts on his tax

4   return and who failed to do so.

5          Although the defendant took numerous steps to

6   deceive the Internal Revenue Service, he left a paper trail

7   for us to follow, and this trail remains despite all of his

8   efforts to hide it.  This paper trail will tell you what the

9   defendant did and why.

10          All of the transactions to the foreign accounts

11  were a smoke screen.  Despite the foreign bank accounts and

12  the transactions that used those bank accounts, the funds

13  sent abroad represent only a very small percentage of the

14  money generated by the veterinary practice.  The great

15  majority of the money never left Meadville, Pennsylvania.

16          You will see over and over again that whether the

17  receipts went abroad or whether the receipts stayed here in

18  Pennsylvania, all of the veterinary receipts eventually went

19  straight to the defendant.

20          At the close of the government's evidence, the

21  United States will have an opportunity to review with you

22  what the evidence has been and to discuss what this evidence

23  proves, and you will be asked to rely on three things.

24          The first is the evidence, the testimony that you

25  will hear, the documents that you see.

1       You will be asked, secondly, to rely on the law,

2    and the law in this case will come only from Judge Cohill.

3       But, the third thing you will use in this case is

4    your common sense.  Each of you brings to this courtroom a

5    lifetime of experiences which are uniquely your own.  Your

6    experiences will have taught you what is reasonable to

7    believe and what is not reasonable to believe.  And your

8    common sense is going to lead you to the proper decision in

9    this case.

10       At the end of the case, ladies and gentlemen, we

11   will ask you to conclude that the defendant entered into a

12   conspiracy to defraud the United States by impeding and

13   impairing the lawful functions of the United States, and that

14   Daniel Leveto willfully filed materially false income tax

15   returns for the years 1994 and 1995.

16       At that time, ladies and gentlemen, we will ask you

17   to return a verdict of guilty on Counts 1, 2 and 3 of the

18   indictment.

19       Thank you for your attention.

20       THE COURT:  Mr. Leveto, do you care to make an

21  opening statement?

22       MR. LEVETO:  Yes, Your Honor.  Good afternoon

23  members of the court, members of the jury.

24       You know, Your Honor, due to the sheer intimidation

25  of all of this -- I really believed that I could represent

127

1  myself, but I seem to be having difficulties and mental

2  blocks, and I am asking you again to have an attorney

3  represent me.

4       THE COURT:  This is not the time and place to make

5  a motion like this.  I've already ruled that you have had

6  back-up counsel for some time and it's a little late to be

7  asking for more counsel now.

8       MR. LEVETO:  Yes, Your Honor.  I guess I will wait

9  until after the government's case.

10       THE COURT:  Okay.  Call your first witness.

11       MS. CALVIN:  The government calls Mary Somma.

12       THE COURT:  Come up here to be sworn, please.

13       THE CLERK:  Can you raise your right hand?

14                   * * * * *

15       MARY SOMMA, having first been duly sworn, testified

file:///A|/LEVETO1A.TXT

16  as follows:

17       THE COURT:  Would you have a seat up here, please,

18  give us your name and spell your last name.

19       Try to speak -- that's good.  Just speak right into

20  that.

21       THE WITNESS:  Okay.  My name is Mary Somma.  My

22  last name is spelled S-o-m-m-a.

23       THE COURT:  How do you spell your first name?

24       THE WITNESS:  M-a-r-y.

25       THE COURT:  I guess I didn't understand.

                    Somma - Direct(By Ms. Calvin)         128

1        THE WITNESS:  Oh.

2        THE COURT:  Before we start, I think I got to turn

3  around this screen up here.

4        MS. CALVIN:  Your Honor, may I approach the witness

5  to provide her with a document?

6        THE COURT:  I'm sorry?

7        MS. CALVIN:  Your Honor, may I approach the witness

8  to provide her with a document?

9        THE COURT:  Sure.  Okay, Ms. Calvin.

10        DIRECT EXAMINATION

11   BY MS. CALVIN:

12   Q    Miss Somma, by whom are you employed?

13   A    I'm employed by the Internal Revenue Service.

14   Q    And is that an agency of the United States?

15   A    Yes, it is.

16   Q    And where is your place of employment?

17   A    I'm employed at the Philadelphia Service Center in

18   Philadelphia.

19   Q    And how long have you been so employed?

20   A    Thirty-three years.

21   Q    What are your present duties?

22   A    I am the group witness coordinator for the Philadelphia

23   Service Center.  And my duties are to secure information

24   documents and have them certified to be presented in court on

25   behalf of the Special Agent who is working the case.


          Somma - Direct(By Ms. Calvin)          129


1   Q    Where you a designated representative?

2   A    I'm a designated representative of the commissioner,

3   yes.

4   Q    And are you also a custodian of records?

5   A   I am the custodian of records representing the

6   commissioner.

7   Q   Now, have you testified before?

8   A   Yes, I have, many times.

9       THE COURT:  I am having a little trouble hearing

10  you, Ms. Calvin.

11      MS. CALVIN:  I'm sorry.  Is that better?

12      THE COURT:  Much better.  Thanks.

13  BY MS. CALVIN:

14  Q   I believe I just asked you if you had been a witness at

15  trial before?

16  A   Yes, many times.

17  Q   About how many?

18  A   About two hundred times.

19  Q   What geographical location does the Philadelphia Service

20  Center cover?

21  A   We take care of the states of Pennsylvania, Maryland,

22  Delaware, Washington, D.C., Virginia, and foreign countries,

23  foreign possessions.

24  Q   And what does the Philadelphia Service Center campus do?

25  A   We process returns, for the most part.  We also process

1   correspondence that comes in, but mainly returns.

2   Q    And would you explain for us what you mean when you say

3   you process returns, what that involves?

4   A    Okay.  When a return comes into the Service Center, when

5   you mail your returns to be processed, they come into our

6   Receipt Control Department, which is our Mail Department.

7   From there, they are sorted and they are batched in batches

8   of one hundred.

9        They are then taken out to our Returns Analysis

10   area.  They are then coded, and they are coded for input

11   through our District Data Entry area.  The documents are then

12   taken back to Receipt and Control and they are numbered.

13        Each document is given its own document locator

14   number in the upper right-hand corner of the return, and that

15   number is then used for filing purposes and for securing the

16   documents, as I did.

17   Q    And were you asked to conduct a search for any records

18   involving Daniel Leveto and Margaret Leveto?

19   A    Yes, I was.

20   Q    And would you explain to us how that search was

21  conducted and what you did?

22  A   When we conduct a search looking for records, if it is

23  on an individual, we use the Social Security number.  The IRS

24  system is built on numbers, and we have everything set up

25  under either a Social Security number for individuals or an

Somma - Direct(By Ms. Calvin)          131

1  employer identification number for business type returns.

2  Q   Now, you say employer identification number.

3        Is that what's none as EIN?

4  A   Yes.

5  Q   After the search was done, did you have the records

6  certified?

7  A   Yes.  I always have the records certified.

8  Q   You have in front of you a folder which has Government

9  Exhibits 1-A through 8-D in front of you, and I would ask you

10  to look at Exhibits 1-A through 1-Y for a moment.

11  A   I have it.

12  Q   Would you tell us briefly what are Exhibits 1-A through

13  1-Y?

14  A   I had the certified copies of the original returns that

15    were filed by -- let me get the right name -- Daniel and

16    Margaret Leveto.

17    Q    For what period of time?

18    A    These are for the years 1989 and up to and including

19    1998.

20          MS. CALVIN:  Your Honor, at this time I would move

21    for admission of Government's Exhibits 1-A through 1-Y.

22          THE COURT:  1-A through 1-Y are admitted.

23          MS. CALVIN:  If we could have just a moment to see

24    if we could get this screen working so that we could show

25    these.  I apologize to the Court and to the members of the

Somma - Direct(By Ms. Calvin)        132

1    jury.  This was working earlier, but I'll move on and we'll

2    just talk about them until we can show them.  All right.

3    Q    Looking at Government Exhibit 1-A, what is Government

4    Exhibit 1-A?

5    A    Exhibit 1-A, this is an original copy of the income --

6    the Individual Income Tax Return for the year 1989 in the

7    name of Daniel and Margaret Leveto.

8    Q    And I would ask you to look and see if it has a

9    Schedule C attached to it?

10  A   Yes, there is.

11  Q   And what is a Schedule C?

12  A   A Schedule C is a schedule -- that a person who has a

13  sole proprietorship or a -- is able to show the profit and

14  loss of his business, and they attach this to the 1040 and

15  then they take their gain or loss on the front of their 1040

16  return.

17  Q   And when they take the profit or loss from the

18  Schedule C, from their business, and put it on the front,

19  where would that go?

20  A   It would go on the line in the middle here of the 1040.

21  That is -- in this case here, it would be line twelve,

22  business income or loss from the Schedule C.

23  Q   And looking at that tax return, how much in gross

24  receipts did that practice generate?

25  A   The gross receipts were $531,572.00.

            Somma - Direct(By Ms. Calvin)        133

1  Q   And the profit?

2  A   And the profit was $137,058.00.

3  Q   And that figure was transferred then to the front of the

4   tax return?

5   A   The 137,000 was transferred to the front.

6   Q   Looking at 1-B-1.  What is Government Exhibit 1-B-1?

7   A   This is a certified copy of an original income tax

8   return for the year 1990 in the name of Daniel and Margaret

9   Leveto.

10  Q   Does that tax return have a Schedule C?

11  A   Yes, it does.

12  Q   And looking at that Schedule C for that business, I

13  didn't ask you the last time, what is that business?

14  A   Veterinarian.

15  Q   And does it have a business name?

16  A   Langdon and Leveto.

17  Q   And a business address?

18  A   316 -- I would say it's Conneaut Lake Road, Meadville,

19  Pennsylvania.

20  Q   And what were the profits of the business that year?

21  A   The gross receipts or the profits?

22  Q   Well, gross receipts and profits.

23  A   Okay.  The gross receipts were $567,185.00, and the net

24  profit was $176,969.00.

25  Q   I would ask you to look at what is Government

Somma - Direct(By Ms. Calvin)          134

1  Exhibit 1-C-1.

2  A    Okay.  This is an original copy of the Individual Income

3  Tax Return for the year 1991 in the name of Daniel and

4  Margaret Leveto.

5  Q    And does this tax return have a Schedule C?

6  A    Yes, it does.

7  Q    And in this Schedule C for the Langdon and Leveto

8  veterinarians, what are the gross receipts and profits for

9  that year?

10  A    The gross receipts are $404,127.00, and gross -- the net

11  profit was $142,121.00.

12  Q    Now, I would ask you to look at what's been marked as

13  Government's Exhibit 1-C-2.  What is that?

14  A    This is an original copy of an Amended Individual Income

15  Tax Return for the year 1991 in the name of Daniel and

16  Margaret Leveto.

17  Q    Now, this amended return was received by the Internal

18  Revenue Service when?

19  A    This was received in September of 1997.

20  Q    And this tax return, amended tax return, do you have to

21  put a reason why you are amending your tax return?

22  A    Yes.

23  Q    And what reason is given for amending this tax return?

24  A    The reason given was:

25        The 1040 form fraudulently induced me to report


                Somma - Direct(By Ms. Calvin)          135


1  sources of income as income itself.

2        The Privacy Act notice fraudulently induced me into

3  believing that I had an income tax liability citing

4  Section 6001, 6011 and 6012.

5        The Privacy Act notice, by law, was supposed to

6  tell me if filing was voluntary or mandatory.  Instead, it

7  cited Sections 6001, 6011 and 6012 which neither establishes

8  return information as voluntary or mandatory under the law.

9  Q    And what changes did this tax return reflect?

10  A    The reflection shows that all income that was originally

11  reported, it was all zeroed out.

12  Q    When you say "it was all zeroed out," what do you mean

13  by that?

14  A    It was minused out to reflect zeros.

15  Q    And that includes the adjusted gross income, deductions?

16  A    Everything.

17  Q    And did it request a refund?

18  A    Yes.  As a result, it was requesting a $30,500 --

19  $30,559.00 refund.  This would have been all the tax,

20  estimated tax, whatever, that had been originally paid.

21  Q    I would ask you to look at Government Exhibit 1-D-1.

22  A    Okay.

23  Q    What is Government Exhibit 1-D-1?

24  A    This is a copy of an Individual Income Tax Return for

25  the year 1992 in the name of Daniel and Margaret Leveto.

                Somma - Direct(By Ms. Calvin)          136

1  Q    And does this tax return have a Schedule C?

2  A    No, it does not.

3  Q    Does it show him to be a W-2 wage earner?

4  A    Yes, it does.

5  Q    And how much in wages?

6  A    $5,000.00 are reported in wages.

7  Q    And where do those wages emanate from according to his

8  tax return?

9   A   Where did they come from, you said?

10   Q   Yes.

11   A   There is a copy of an attached W-2, yes, and it's

12   showing Center Company doing business as Langdon and Leveto

13   Veterinary, $5,000.00 in wages.

14   Q   And were there any taxes owed for this year?

15   A   There was an assessment of $4,050.00, and then there was

16   a tax of $3,425.00 owed.

17   Q   And I would ask you to look at Government Exhibit 1-D-2.

18   A   Okay.  What we have here is an Application for Tentative

19   Refund.  It's a copy -- a certified copy for the year 1992 in

20   the name of Daniel and Margaret Leveto.

21   Q   And 1-D-3.  What is 1-D-3?

22   A   Okay.  This is an original certified copy of an Amended

23   Individual Income Tax Return for the year 1992 in the name of

24   Daniel and Margaret Leveto.

25   Q   And what is the amendment that's made to this tax

Somma - Direct(By Ms. Calvin)          137

1   return?

2   A   I'm sorry?

3   Q   What is amended on this tax return, which items?

file:///A|/LEVETO1A.TXT

4   A    Would you like me to read the reasons for the amended

5   return?

6          What is amended are, all the figures -- again, all

7   the figures are zeroed out.  They are all taken out.

8   Q    And does it give the same reason for this return as it

9   did the last one?

10   A    Yes, it does.

11   Q    And does this one ask for a refund?

12   A    Yes, there is a refund.  $3,425.00.

13   Q    Looking at Government Exhibit 1-E-1.  What is that

14   document?

15   A    This is a certified copy of the Individual Income Tax

16   Return for the year 1993 in the name of Daniel and Margaret

17   Leveto.

18   Q    Does this return have a Schedule C?

19   A    No.  No Schedule C.

20   Q    And how much in adjusted gross income does he have for

21   this year?

22   A    $25,355.00.

23   Q    And how much of that is the result of wages paid to him?

24   A    There were $2,000.00 paid in wages.

25  Q   I would ask you to look at Government Exhibit 1-E-2.

Somma - Direct(By Ms. Calvin)          138

1   What is 1-E-2?

2   A   This is an original copy of an Amended Income Tax Return

3   for the year 1993 in the name of Daniel and Margaret Leveto.

4   Q   Now, what is the reason for amending this return?

5   A   The reason for amending the 1993 income tax return is

6   overstatement of income in error and misunderstanding.

7       And then it goes on to say:  See the attachment

8   which is integral part of this amended return.

9   Q   And is there an attachment to this?

10  A   The attachment to this is correspondence -- typed

11  correspondence, two pages of it.

12  Q   And have you seen correspondence like this before?

13  A   Many times.  Back at this period of time, these years,

14  there were many returns that were processed through the

15  Service Center that had this type of correspondence attached.

16  Yes.

17  Q   And is this -- again, what was the amendment here?

18  A   Again, all the figures were zeroed out.

19  Q   I would ask you to look at Government Exhibit 1-F-1.

20  A    This is an original copy of the Individual Income Tax

21  Return for the year 1994 for Daniel and Margaret Leveto.

22  Q    And does this tax return have a Schedule C?

23  A    No.  No Schedule C.

24  Q    Any wages?

25  A    I'm sorry?

Somma - Direct(By Ms. Calvin)        139

1  Q    Any wages?

2  A    No wages.

3  Q    What's the adjusted gross income here?

4  A    The adjusted gross income is $24,130.00.

5  Q    Now, I want to ask you if this tax return has a

6  Schedule B attached to it?

7  A    Yes, it does.

8  Q    And would you explain to us what Schedule B is asking

9  for in Part III?

10  A    In Part III, the Schedule B is asking for us -- for the

11  taxpayer to check off if there are any foreign accounts or

12  trusts that he may be involved with.

13  Q    Specifically, what's the language of 11a?

14  A   At any time during 1994, did you have an interest in or

15  a signature or other authority over a financial account in a

16  foreign country, such as a bank account, securities account,

17  or other financial account?

18        And then it asks you -- it tells you about the

19  exceptions to this particular statement.  And that would be

20  if you were involved in the military and you had a bank in a

21  foreign country that was on a military base, you would not

22  have to check this off.

23        But, other than that, you should be checking it

24  off, yes.

25  Q   And what did the defendant tell the IRS regarding

Somma - Direct(By Ms. Calvin)        140

1  whether he had any signature authority over a bank account in

2  1994?

3  A   He said no.

4  Q   I would like you to look at Government Exhibit 1-F-2.

5  Okay?

6  A   Okay.

7  Q   What is 1-F-2?

8  A   This is a copy of an Amended Individual Income Tack

9  Return that was certified, and it's for the year 1994, and

10  it's for Daniel and Margaret Leveto.

11  Q    And does it give the same reasons for amending it?

12  A    Yes, it gives the same reason as the last one.

13  Overstatement of income in error and misunderstanding, along

14  with the correspondence attached, which are two pieces of

15  typed information, and it zeros out the return.

16  Q    Everything on there is zeroed?

17  A    Everything is zeroed out.

18  Q    I ask you to look at Government Exhibit 1-G-1.

19        What is Government Exhibit 1-G-1?

20  A    This is a copy of the original Individual Income Tax

21  Return for the year 1995 for Daniel and Margaret Leveto.

22  Q    Is there a Schedule C here?

23  A    No, there is not.

24  Q    Does he declare any wages for this year?

25  A    No wages.


                    Somma - Direct(By Ms. Calvin)        141


1  Q    And what is his adjusted gross income?

2  A    $23,940.00.

3  Q   Now, does this tax return have a Schedule B?

4  A   Schedule B?

5  Q   Yes.

6  A   Yes, it does.

7  Q   And does Part III ask about foreign accounts?

8  A   Yes.  It asks the same question, only this time it's

9  asking about during the year 1995, rather than '94, and it

10  mentions foreign accounts.  And, again, it's checked off no.

11  Q   I would ask you to look at 1-G-2.  What is 1-G-2?

12  A   1-G-2?

13  Q   Yes.  1-G-2.

14  A   Okay.  This is an original copy of an Amended Individual

15  Income Tax Return for the year 1995 and it's in the name of

16  Daniel and Margaret Leveto.

17  Q   And did he give the same reason for amending this

18  return?

19  A   Yes.  It's giving the same reasons as he did for the

20  other returns, the 1994 and '93, overstatement of income in

21  error and misunderstanding, along with the attached

22  correspondence, and he has zeroed out the return completely.

23  Q   I would ask you to look at Government Exhibit 1-H-1.

24  What is Government Exhibit 1-H-1?

25  A   Okay.  We have a copy -- a certified copy of the

Somma - Direct(By Ms. Calvin)          142

1  Individual Income Tax Return for the year 1996 and this is in

2  the name of Daniel J. Leveto.

3  Q   And the filing status here?

4  A   The filing status is married, filing separate.

5  Q   And how much does he declare in wages this year?

6  A   Zero.

7  Q   And is it zero on the tax return?

8  A   It's says zero on the tax return.

9  Q   And taxable refunds?  Any income whatsoever on this

10  return?

11  A   No.  This return is a complete return with nothing but

12  zeros.  And then attached is the same correspondence that was

13  on the amended returns.

14  Q   Okay.  What is Government Exhibit 1-H-2?

15  A   This is an original copy of the Individual Income Tax

16  Return for the year 1996 for Margaret A. Leveto.

17  Q   I am going to ask you to look at 1I.  And what is 1I?

18  A   Okay.  This is an original copy of the Individual Income

19  Tax Return for the year 1997 in the name of Daniel J.

20  Leveto.

21  Q   And are there markings on that that were put on there by

22  the Internal Revenue Service?

23  A   Yes, there are some markings.  They do this in Returns

24  Analysis when they bring the returns out.  In this case, they

25  were putting on the markings as far as exemptions, and so

                    Somma - Direct(By Ms. Calvin)          143


1   forth, and filing status.

2         They also have on here information that they took

3   from an attached W-2 since it was not provided by the

4   taxpayer himself.

5   Q   And so the line that shows the wages, was put on there

6   by the Internal Revenue Service?

7   A   Yes.

8   Q   And how is it that you can tell that?

9   A   Well, mainly I can tell from the handwriting, the

10  handwriting being the same as that which is edited at the

11  top, and the zeros that are on here are quite different.

12        But, it's -- if it's the original return, it would

13  probably show -- to be quite honest with you, it would be

14  showing up more in red because we do the editing in red.

15  Q   Okay.  I ask you to look at 1J.  What is 1J?

16  A   This is the Individual Income Tax Return.  It's an

17  original copy certified for the year 1998 in the name of

18  Daniel J. Leveto.

19  Q   And what does this tax return show, as far as income,

20  adjusted gross income, payments, taxes?

21  A   Zeros.

22  Q   Anything other than a zero on any of those lines?

23  A   Zeros.

24  Q   Okay.  Now, Miss Somma, were you also asked to look and

25  find tax returns for Center Company?

Somma - Direct(By Ms. Calvin)          144

1  A   Yes.

2  Q   And how did you search for those tax returns?

3  A   Again, now they are different because this is a

4  business.  So, I had to search through employer

5  identification number, or the EIN that was mentioned earlier.

6  Q   And what are Government Exhibits 2A through 2J?

7  A   These are the certified returns -- copies of returns for

8  Center Company.

9  Q    And those are all certified, Exhibits 2A through 2J?

10  A    Yes.

11        MS. CALVIN:  Your Honor, we would move for

12  admission of 2A through 2J?

13        THE COURT:  2A to 2J?

14        MS. CALVIN:  Yes, 2A to 2J.

15        THE COURT:  2A to 2J are admitted.

16  BY MS. CALVIN:

17  Q    Looking at Government Exhibit 2A.  What is Government

18  Exhibits 2A?

19  A    This is a certified copy of a Nonresident Alien Income

20  Tax Return for the year 1991 in the name of Center Company.

21  Q    And where does it say it's located?

22  A    This is located in the Caicos Islands, the Grand Turk,

23  Turks and Caicos Islands, British West Indies.

24  Q    And does this have a Schedule C?

25  A    Yes, it does.


                    Somma - Direct(By Ms. Calvin)          145


1  Q    And what kind of a company is Center Company here?

2  A    Center Company is a veterinary hospital and it's located

3   in Meadville, Pennsylvania.

4   Q    And the street address?

5   A    316 -- I don't know if I am saying this right or not.

6   I'm sorry.  I am saying Conneaut -- Conneaut Lake Road.

7   Q    I believe it's Conneaut Lake Road.

8   A    Oh, I apologize to the people that live there.

9   Conneaut.  Okay.

10  Q    How much in gross receipts?

11  A    Gross receipts were $258,560.00.

12  Q    And the profit?

13  A    And the net profit was $33,470.00.

14  Q    Now, did this company pay any tax?

15  A    No.  No tax.

16  Q    And what did they claim that they did with the money?

17  A    Well, the money was brought forth onto the 1040 NR under

18  the Schedule C, and then there was a loss on the Schedule D

19  of $2,082.00.

20         But, the main distribution of the money was from a

21  Schedule K-1, or a 1041, and distribution to a beneficiary

22  was a loss of $31,663.00 which, in turn, then there was no

23  adjusted gross income.  There was no tax.

24   Q    And from what company to what company on the

25   Schedule K-1 does it show that the money transferred?


Somma - Direct(By Ms. Calvin)          146


1    A    Okay.  The money is going from Center Company to ASTCO,

2    Limited, and from there their beneficiary is ABCO, A-B-C-O,

3    and these are all located in the Grand Turk, Caicos Islands.

4    Q    Looking at Government Exhibit 2B.  What is 2B?

5    A    Okay.  I have an original copy of a Nonresident Alien

6    Income Tax Return in the name of -- it's ASTCO, Limited,

7    Trustee for Center Company for the year 1992.

8    Q    And did this company file a Schedule C?

9    A    Yes.  Yes, it did.  It was ASTCO, Limited, Trustee for

10   Veterinary Clinic, Center Company, and it's at Conneaut -- am

11   I saying it right? -- 316, okay, Conneaut Lake, Lamar --

12   RD762, Lamar Street, Meadville, Pennsylvania.

13   Q    What were the gross receipts of this company?

14   A    The gross receipts were $618,869.00.

15   Q    And the profit?

16   A    $12,711.00.

17   Q    Now, did the business pay any tax on this income?

18   A    The business, no, but there was money withheld in source

19   with the sale of some kind of property, or whatever.  And so

20   that was a tax that was withheld at the time.

21   Q    Looking at that particular return, are there attachments

22   on this Form 8288-A which will tell you where the money was

23   withheld?

24   A    Yes.

25   Q    And where was money withheld that year?


                    Somma - Direct(By Ms. Calvin)            147


1    A    There was money withheld -- okay.  The first one --

2    let's go right to the first one.

3          The first one, it was in the amount of $14,000.00.

4    This was a Statement of Withholding on Dispositions by

5    Foreign Persons of U.S. Real Property Interests.  There is

6    money that was withheld by M.C.F. Land Corporation for Center

7    Company.

8    Q    And was there a second one?

9    A    And then the second one was for the amount of $1,581.70,

10   same thing, by Center Company, and it was withheld by Watts

11   and Pepicelli PC.

12   Q    When you say these are Statements of Withholding

13  Dispositions by Foreign People of U.S. Real Property, what do

14  you mean by "real property"?

15  A    What do I mean by "real property"?

16  Q    Yes.

17  A    These were benefits and parts of profits that were owned

18  by Center Company and the tax then is withheld as source by

19  the foreign company prior to then being paid over to the

20  United States by us, and they would either pay us for it at

21  the end of the year, if need be, and it would be returned if

22  there is no tax.

23  Q    And what happened to this particular sum?

24  A    This money was returned to the taxpayer.  There was a --

25  what they call a manual refund.  And in accounting, in our

Somma - Direct(By Ms. Calvin)        148

1  department, they have a receipt and they write a check and

2  they send it to the company or to the person, whoever it is

3  intended for, I should say.

4  Q    And did they request this refund?

5  A    They don't have to request it.  If they are entitled to

6  it, whether there is no tax due and owing according to their

7  paperwork, it would be sent to them.

8  Q    Can you tell from the tax return whether that happened

9  here?

10  A    There is a stamp marked on the return of a manual

11  refund, and the refund that was issued, plus interest of

12  $226.42, and this was scheduled to go out on January 29th,

13  1993.

14  Q    And I ask you to look at Government Exhibit 2C, please.

15  A    Okay.  This is a certified copy of a Nonresident Alien

16  Return for the year 1993, and this is in the name of Center

17  Company.  And then in parens, it's Vericon, Limited, Trustee,

18  and the address is the Caicos Islands.

19  Q    And does this tax return have a Schedule C?

20  A    Yes.  Yes, it does.

21  Q    How much in gross receipts were they making in this

22  year, 1993?

23  A    $553,535.00.

24  Q    And what was their profit?

25  A    $7,948.00.


Somma - Direct(By Ms. Calvin)          149


1  Q    Did they pay any tax that year?

2  A    There was a 1042, which is money that is withheld as

3  source again, a tax of $97.00, and that was not paid by the

4  taxpayer, per se.  It was money that was held due to the

5  foreign transaction and refunded back to the taxpayer because

6  there was no tax.

7  Q    Looking at the K-1, what happened to the profit of the

8  company?

9  A    The K-1 was also now another distribution that was -- do

10  you want me to give the -- okay.  I have it here.

11        It was Center Company going through Vericon and the

12  trustee and they were distributing the monies through

13  Newbury.  This is another trust.  And this money then was

14  transferred to them.

15  Q    And they are located?

16  A    They are also located in Grand Turk, Turks and Caicos

17  Islands in the British West Indies.

18  Q    Looking at Government Exhibit 2D --

19  A    Okay.

20  Q    -- what were the gross receipts -- I'm sorry.  What is

21  2D?

22  A    This is a certified copy of a Nonresident Alien Return

23  in the name of Center Company for the year 1994.

24  Q    And what were the gross receipts and the profits for

25  Center Company for 1994?


            Somma - Direct(By Ms. Calvin)        150


1   A    Are you talking about the Schedule C?

2   Q    From the Schedule C.

3   A    From the Schedule C, being Center Company, and the gross

4   receipts were $547,265.00 and the profits were $6,481.00.

5   Q    Are you talking about the net profit?

6   A    This is the net profit I'm talking about, yeah.

7   Q    Now, what is the address of Center Company?

8   A    Center Company's other address has now become

9   388 Edgewood Drive, Meadville, Pennsylvania.

10  Q    I would ask you to look at Government Exhibit 2E.  No.

11  I'm sorry.

12          What did they do with any profits they earned that

13  year -- I am sorry.  I should have asked you -- the 1994

14  year?

15  A    With the profits?

16  Q    Yes.

17  A    The profits were then distributed as the others were.

18  Center Company distributed these through Vericon as a trustee

19  and these were distributed to Newbury.

20  Q    Thank you.  Now I will ask you to look at 2E.

21  A    Okay.  This is a certified copy of a Nonresident Alien

22  Return for the year 1995 for Center Company.

23  Q    And off of Schedule C, what do you see for profits and

24  gross receipts for the year 1995 for Center Company?

25  A    Just the profits?  Net profit?

Somma - Direct(By Ms. Calvin)          151

1  Q    Gross receipts.

2  A    Gross receipts were $581,824.00, and the net profit was

3  $5,256.00.

4  Q    What did they do with the profit in this year, 1995?

5  A    Okay.  They also then had a distribution through the

6  1041 of $14,277.00, and this was distributed from the K-1 as

7  the other was.  This went from Center Company through Vericon

8  to Newbury.

9  Q    Thank you.  Okay.  I would ask you to look at

10  Government Exhibit 2-F-1.  What's 2-F-1?

11  A    What this is showing us here, that in the year 1996,

12  Center Company did not file any type of Nonresident Alien

13  Return as they had earlier in the prior years.  There was no

14  record of a return.

15  Q    Okay.  Would you just describe briefly the process that

16  you go through when you are looking for a return and you

17  don't find one and so that you certify that there is no

18  record?

19  A    Well, in this case, we are looking at something a little

20  bit different than the norm because I keep talking about a

21  Nonresident Alien type return which is normally a 1040 type

22  or 1040 NR.

23        But, I am searching through the employer

24  identification number and these accounts are all kept and

25  maintained on what we call a nonresident file.  And the

                    Somma - Direct(By Ms. Calvin)        152

1  reason for that is because it's a business using an

2  individual type return.  There is nothing wrong with that,

3  but because they are using it as a fiduciary or trust, but

4  they are not able to place that on our normal master file

5  because of the difference of an EI versus an individual type

6  form, they are not compatible.

7       So, when I was doing my research, I would research

8   -- I did research through the regular BMF tapes of --

9   business master tapes.  But, then I did go back, of course,

10   through nonmaster file, nonmaster file because that's where

11   all the others had been filed.

12       I wanted to make sure when I am saying there is no

13   record, that there is no record, and that's what I was doing.

14   Q    Now, you are attached to a particular Service Center.

15       Now, when you say you do a search and you determine

16   that there was no record of a tax return filed, do you search

17   other Service Center records as well to determine that it

18   wasn't filed in Atlanta or some place?

19   A    Well, when I do a search, the way our system is set up

20   today versus how it was ten years ago, we have national

21   access.  So, when I am searching through our master file, it

22   is already going out through the whole country.

23       And doing this research, the nonmaster file is a

24   little bit different but, fortunately, Philadelphia is the

25   only Service Center that handles anything that has a foreign


                Somma - Direct(By Ms. Calvin)        153


1   address.

2       So, even if it were filed in another Service

3  Center, they would have to give it to us to process.  So, I

4  only had to search the Philadelphia nonmaster file.

5  Q   What is 2-F-2?

6  A   2-F-2 is, again, is part of the research.  I am now

7  saying that there was no 1040 NR, that was the first time no

8  record.  And this one is also saying that I had no record of

9  a 1996 return or nonmaster file.  It was just probing both

10  sides of the copy.

11  Q   What is 2-G?

12  A   2-G is a certified copy of a Nonresident Alien Return

13  for the year 1997 for Center Company.

14  Q   And does this one have a Schedule C?

15  A   Yes.

16  Q   And what does that reflect?

17  A   The Schedule C reflects it's for Center Company, and

18  it's showing $564,649.00 in gross receipts, and $30,778.00 as

19  net profit.

20  Q   And what happened to this net profit?

21  A   This profit was also then redistributed through the

22  1041, or the K-1 from the 1041 to another trust, and

23  explaining that it was Center Company and now it's going

24  through the Trawg Consulting Services, which are also in the

25  Grand Turk Islands, and this was going to Newbury, which is


Somma - Direct(By Ms. Calvin)        154


1  in the Grand Turk Islands.

2  Q    2-H?

3  A    Okay.  We have a certified copy of the Nonresident Alien

4  Return for the year 1998 in the name of Center Company.

5  Q    And what does that return reflect, as far as profits,

6  gross receipts, and what happened to those profits?

7  A    This one is coming in -- it says Center Company owns a

8  small animal care clinic, and the gross receipts were

9  $546,847.00.  And there were no profits.  $4,705.00 loss.

10  Q    I am going to ask you to skip over to I -- 2-I and 2-J,

11  which are in evidence, and look at 3-A.

12        THE COURT:  Excuse me.  This might be a good spot

13  to take a break.  So, we'll recess until four-fifteen.

14        MS. CALVIN:  Thank you, Your Honor.

15  (Court recessed at 4:00 p.m.)

16  (Court reconvened at 4:15 p.m.)

17        THE COURT:  Be seated, please.  We have -- the

18   projector is now working.  That angle is not very good.  Can

19   the people at this end see that screen up there?  Is that

20   okay now?  All right.

21        MS. CALVIN:  I'm not seeing anything up there on

22   the screen at the moment.

23   BY MS. CALVIN:

24   Q   I will come back to this exhibit in just a moment,

25   Miss Somma.  But, right now, I would like you to look at


                Somma - Direct(By Ms. Calvin)          155


1    Exhibits 3-A through 3-D.

2         THE COURT:  Can't you get it going?  Okay.

3         MS. CALVIN:  Thank you.

4    Q   What are those exhibits, Miss Somma?

5    A   We have the Nonresident Alien Income Tax Returns for

6    Newbury.

7    Q   For what time period?

8    A   1992 and 1993 and 1994 and 1995.

9         MS. CALVIN:  We would ask for Government Exhibits

10   3-A through 3-D to be admitted into evidence, Your Honor.

11        THE WITNESS:  I have one for 1997 also.  I'm sorry.

12          THE COURT:  You are offering them, Ms. Calvin?

13          MS. CALVIN:  Yes, Your Honor.

14          THE COURT:  3-A through -- is it through 3-H-2, is

15  that your last one on this series?

16          MS. CALVIN:  I offered 3-A through 3-D, but I can

17  ask also what are exhibits 3-F, 3-G-1, 3-G-2, 3-H-1 --

18          THE COURT:  3-A through 3-D are admitted.

19          MS. CALVIN:  Thank you.  I would like to --

20          THE COURT:  Oh, nice picture of your hands on

21  there.

22          MS. CALVIN:  Well, it works.  I would like to go

23  back for a moment to Government Exhibit 2-J and just talk

24  about that so we can take a look at what the tax return

25  actually looks like.  What is 2-J?


            Somma - Direct(By Ms. Calvin)          156


1  A    Wait a minute.  I don't have it.

2           Okay.  This is a certified copy of a Nonresident

3  Alien Return Income Tax Return for the year 2000 for Center

4  Company.

5  Q    And does this have a Schedule C?

6  A    Yes, it does.

7  Q   And what does it show that the gross receipts are for

8  that year?

9  A   $515,207.00.

10  Q   With a profit of?

11  A   With a loss of $10,815.00.

12  Q   Now, looking at this tax return, did they pay any taxes

13  this year?

14  A   No.

15  Q   Any K-1 distributions?

16  A   The K-1 distribution, there was a loss of $645.00.

17  Q   Okay.  Thank you.  Now, I'm going to 3-A, the three

18  series.  Sorry to jump around on you that way.

19       I would ask you to look at what Government Exhibit

20  3-A is?

21  A   Okay.  This is a certified copy of a Nonresident Alien

22  Income Tax Return for the year 1992 in the name of Newbury

23  Trawg Trust Company, Trustee.

24  Q   And does it show that it received a distribution?

25  A   Yes.  It showed that there was a distribution from the

Somma - Direct(By Ms. Calvin)     157

1   1041.  It showed a loss, not a gain, of the distribution.

2   Q   What did they do with it?

3   A   This money was distributed from Newbury through the

4   trustee, Trawg Trust Company, to Lac La Hache in the Caicos

5   Islands.

6   Q   All in the Turk --

7   A   I am sorry?

8   Q   I'm sorry.  Did you say it was all in the Turk, Turks

9   and Caicos Islands?

10  A   Grand Turk, Turks and Caicos Islands.

11  Q   Was any tax then paid by Newbury?

12  A   No.  No tax.

13  Q   Okay.  What is 3-B?

14  A   This is a certified copy of a Nonresident Alien Income

15  Tax Return in the year -- for the year 1993 in the name of

16  Newbury.

17  Q   Did Newbury pay any tax that year?

18  A   There was no tax paid.

19  Q   What does this tax return show where Newbury got its

20  money and what they did with it?

21  A   Well, it showed that the money was a distribution,

22  again, to the K-1 of the 1041 to the beneficiary, but in this

23  case, again it was a loss, and it was a loss of $10,105.00.

24  Q   What is 3-C?

25  A   This is a certified copy of a Nonresident Alien Income

Somma - Direct(By Ms. Calvin)        158

1  Tax Return for the year 1994 and in the name of Newbury.

2  Q   And what does this tax return reflect so far as any

3  income --

4  A   The income --

5  Q   -- reported and tax due and owing?

6  A   Okay.  There was no tax paid, there was no tax owed and,

7  again, the distribution from the K-1 form 1041 to the

8  beneficiary was a loss of $9,664.00.

9  Q   And looking at the K-1, where did the money go from

10  Newbury to?

11  A   It went through -- from Newbury through the consulting

12  service, Trawg Consulting Services to Lac La Hache.

13  Q   And they are located where?

14  A   Turks and Caicos Islands.

15  Q   3-D.

16  A   This is also a certified Nonresident Alien Return for

17  the year 1995 in the name of Newbury.

18  Q    What does this tax return reveal about Newbury's money

19  and what they owed?

20  A    There is no tax due and owing on Newbury.  Again, there

21  was a distribution to the 1041 of the K-1 to the beneficiary

22  and there was a loss of $14,277.00.  And the beneficiary was

23  Lac La Hache.

24  Q    What is 3-F?

25  A    This is a certified copy of a Nonresident Alien Income

Somma - Direct(By Ms. Calvin)        159

1  Tax Return for the year 1997 in the name of Newbury.

2  Q    How much money did Newbury get?

3  A    The only thing that is declared here is the K-1

4  distribution from the 1041 and it's a loss of $32,500.00.

5  Q    What does this tax return tell you about that

6  thirty-two, that K-1 distribution?

7  A    Again, this is Newbury and now this one is going through

8  Finance Global, Limited as their trustee.  And the

9  distribution is going to -- or the loss of, I should say, is

10  Tabliqui, T-a-b-l-i-q-u-i.  Tabliqui.

11  Q    From Newbury to these --

12  A    Yes.  And these are located in the Turks and Caicos

13  Islands.

14  Q    What is 3-G-1?

15  A    We have here a Certification for a Lack of Record for

16  Newbury Company for the year 1998.  In other words, we have

17  no record of a 1040 NR, or anything, listed for this company.

18  Q    And 3-G-2?

19  A    In 3-G-2, we also have a Certification for Lack of

20  Record for the year 1998 for Newbury Company.  And, again,

21  there is no 1040 NR or nonmaster file, that there is no

22  record of any filing -- and coming out of Caicos.

23  Q    What are 3-H-1 and 3-H-2?

24  A    3-H-1 and 3-H-2 is the same, lack of records for the

25  year 1999.  And 3-H-2 is also the lack of records for the

                    Somma - Direct(By Ms. Calvin)          160

1  year 1999, reflecting both the 1040 NR and the nonmaster

2  file, that there is no record of any filing for Newbury.

3  Q    I would ask you to look at Government Exhibits 5-A

4  through 5-M.  What's that?

5  A    Okay.  I have 5-A through 5-M.

6   Q    What are those documents?

7   A    Pardon?

8   Q    What are those documents?

9   A    These are certified transcripts of Certificates of

10   Assessments and Payments and any other matters that pertain

11   to the history of the taxpayer's account.

12          This is information that we would take from the

13   taxpayer's return and we would put it onto our permanent

14   tapes.

15   Q    And what taxpayer does this concern?

16   A    This is for the year 1989 in the name of Daniel and

17   Margaret Leveto.

18   Q    Generally, what does the five series -- what is the five

19   series?

20   A    What is the what series?

21   Q    5-A through M.

22   A    Oh.  We're dealing here with, again, like I said, the

23   history of the taxpayer's account, and it's for the years

24   1989, and this will go up to and including the year 2000.

25          And, again, this is in the name of Daniel and

Somma - Direct(By Ms. Calvin)          161

1   Margaret Leveto.  And towards the end, it will become just

2   Daniel Leveto.

3       MS. CALVIN:  Your Honor, we move for the admission

4   of Government Exhibits 5-A through %-M.

5       THE COURT:  5-A through 5-M are admitted.

6   Q   What kind of information would be reflected on this

7   Certificate of Assessments and Payments in, as you describe

8   it, the history of the taxpayer?

9   A   Well, what it would give you basically would be the

10  figures that were reflected on the 1040, like when you

11  prepare your return, figures that you put onto your return

12  would then be taken from the return itself and put through

13  our data entry onto the tapes in the Computer Center so that

14  they have a permanent record.

15      Now, these would just be the figures of when the

16  return was filed, the adjusted gross income on that return,

17  if you had any estimated payments, if you owed and paid a

18  balance due, or if you received refunds, things of that

19  nature.

20  Q   Now, if a person files a tax return for one year and it

21  turns out that there is an adjustment made in a later year,

22  or it turns out that they owe more and they pay, is that

23  what's reflected on one of these?

24  A    It can be reflected, yes, if there is an adjustment to

25  an account, certainly.  It's the whole history.  Even if it

Somma - Direct(By Ms. Calvin)          162

1  comes at a later time, it will reflect back to the year of

2  the adjustment.

3  Q    I would ask you to look at Government Exhibit 5-E, if

4  you could, please.  I'm sorry.  5-F.

5  A    F?

6  Q    5-F.  What is Exhibit 5-F?

7  A    This is a Certificate of Assessment and Payments in the

8  name of Daniel and Margaret Leveto for the year 1994, and

9  it's telling me this concerns the Individual Income Tax

10  Return, this 1040, and it will tell me in this case that

11  there was a return filed and has a document locator number

12  which shows me or indicates that, yes, there was one filed,

13  but it also shows that there was no monies on the return, no

14  figures.

15  Q    Okay.  And what about 5-G?  What is 5-G?

16  A    5-G is the same.  It's in the name of Daniel and

17  Margaret Leveto.  It's a Certificate of Assessment and

18  Payments for the year 1995 concerning their individual income

19  tax return.  It shows that the return was filed, and again

20  there is a document locator number, too, and it also shows

21  that it was a zero return.

22        In addition, it's telling me that there was an

23  amended return filed as well, which was also zero.

24  Q    Okay.

25  A    So, this is the information that would have been taken

Somma - Direct(By Ms. Calvin)         163

1  from those returns, I was indicating before, that said zeros,

2  all zeros, and these are zero returns.

3  Q    Okay.  I would ask you to look at what are Government

4  Exhibits 6-A through 6-E, and 7-A, A and B.  What are those

5  documents?

6  A    Okay.  The 6-A through 6-E, these are the Certificates

7  of Assessment and Payments, and these are in the name of

8  Center Company.

9        MS. CALVIN:  Your Honor, we would move for

10  admission of Government Exhibits 6-A through 6-E and

11   Government Exhibits 7-A and B.

12        THE WITNESS:  That reflects the same, yes.

13        THE COURT:  Yes.  You said -- I thought you said

14   just 6-A and B.  You don't want 6-D and E at this time?

15        No.  6-A through E.  Through 7-B?

16        MS. CALVIN:  And 7-A, 7-B.

17        THE COURT:  I want to make sure I have it right.

18   6-A, B, plus C, D and E?

19        MS. CALVIN:  C, D and E and 7-A and B.

20        THE COURT:  Okay.  They are admitted.

21   BY MS. CALVIN:

22   Q    And what are those, did you say?

23   A    These are the Certificates of Assessment and Payments.

24   They are certified showing the history of the taxpayer,

25   Center Company.  This is the information that we had stored


               Somma - Direct(By Ms. Calvin)          164


1    on tape for them.

2         MS. CALVIN:  Are those admitted, Your Honor?

3         THE COURT:  Yes.

4    Q    I'd ask you to look through all of those and answer

5    whether or not Center Company ever paid any taxes?

6   A   No.

7   Q   Okay.  I would ask you to look at A and B, at 7-A and B,

8   and see whether or not ASTCO, as trustee for Center Company,

9   ever paid any taxes?

10  A   You are saying 7-A and 7-B?

11  Q   Yes.

12  A   It's Center Company.  Okay.  But, there is no tax paid.

13  Q   And I would ask you to look at Government Exhibits 8-A

14  through 8-D.

15  A   Okay.  These are certified transcripts of Certificates

16  of Assessment and Payments in the name of Newbury, Trawg

17  Trust Company, Limited, Trustee, for the years 1992 through

18  and including 1995.

19      MS. CALVIN:  Your Honor, we would move for

20  admission of Government Exhibits 8-A through 8-D.

21      THE COURT:  8-A, B, C and D are admitted.

22  Q   And looking through those Certificates of Assessment and

23  Payments for Newbury, did Newbury ever pay any taxes?

24  A   No.

25      MS. CALVIN:  Your Honor, I have no further

Somma - Cross          165

1  questions of this witness.

2      THE COURT:  Cross-examine.

3              CROSS-EXAMINATION

4  BY MR. LEVETO:

5  Q   Hello, Mrs. Somma.

6  A   Hello.

7  Q   If we could go back toward the beginning of some of the

8  exhibits in the neighborhood of 1-E-1, that will serve to

9  help us discuss a couple of things there, but it will also

10  involve, like, 1-F-1 and 2.

11  A   Are you saying 1-E-1 and you said 1-F?

12  Q   Yes.  I think perhaps you should get out 1-F, 1-E-1.

13  Just a second here.  Also 1-F-1.

14  A   I have 1-I-1.  1-F-1.  Anything else?

15  Q   That will be good for now.

16  A   Sure.

17  Q   On those returns, you did say that there was an income

18  reflected, is that correct?

19  A   I said there was an AGI, adjusted gross income.

20  Q   And does it list on there what that is from?

21  A   Yes.  There were wages of $2,000.00.  There was interest

22  that was declared of $17,212.00.  There was a capital gain of

23  $7,153.00.  There was a loss on a -- probably a trust.  I am

24  not sure.  I would have to look.  It's a Schedule E -- of

25  $1,010.00.

                    Somma - Cross                166


1        And that gives us a total income of $25,355.00.

2  Q    Okay.  And with that tax return, were there documents of

3  business sales or documents describing or reporting business

4  sales to the Internal Revenue Service for schedule -- or

5  schedules that would imply that there were business sales

6  that brought forth the capital gains and the interest income,

7  and this type of thing?

8  A    There was schedule attached here.  Let me see what we

9  have here.  We have Schedule D for the capital gains, which

10  was mentioned, of $7,153.00.  And then we have here

11  Schedule E, and we're referring to Magdan, Incorporated, and

12  that's where your loss of $1,010.00 is reflected.

13  Q    Were there any documents there reporting the sale of the

14  business within that tax return?

15  A    Okay.  There was an installment sale income.

16  Q   Yes.

17  A   Okay.

18  Q   Yes, ma'am.  What is listed for that?

19  A   Good will.

20  Q   Okay.

21  A   Description of property.  Goodwill.

22  Q   All right.

23  A   Okay.

24  Q   Is there anything else on the schedule of business sale

25  or income?


                    Somma - Cross              167


1  A   And now we also have an installment sale income of an

2  employment agreement at various, and then there is a money

3  amount of $1,611.00.

4  Q   So, generally speaking, the documentation that's sent in

5  with that return is a documentation that shows that -- if I

6  can speak in the first person -- that I had sold the

7  practice, is that correct?

8        In other words, it's talking about an installment

9  sale, goodwill, and those things that you would expect to see

10  when a business is sold, is that correct?

11  A    Yes.  You would expect to see schedules attached to the

12  business that's sold.

13  Q    So, that tax return clearly shows that, the breakdown of

14  the income, and it shows where that income came from in --

15  what was that, in 1993, I believe?

16       So, there was no Schedule C -- you can answer the

17  last question.  I'm sorry.

18  A    That's okay.  You are right.

19  Q    There was no Schedule C.  There was documentation that

20  the business was sold.  So, the tax return kind of fully

21  tells that story?

22       In other words, there is no business, there is no

23  Schedule C, but there is the inference that the reason there

24  is no Schedule C is because something happened to the

25  business, is that correct?


                    Somma - Cross              168


1  A    It's declaring that there was an installment sale income

2  schedule attached.  It doesn't fully describe, though, that

3  it's your business that was sold.  It just simply addresses

4  the description of property being called goodwill, that that

5    was your business.

6          It's not reflected as your business.  I am just

7    taking it for what it says.

8    Q    But, it could be inferred as that?

9          For instance, if we now go on to Exhibit 2-C, I

10   believe it's E-2-C, and that is the 1993 Nonresident Alien

11   Tax Return.

12   A    2-C?  Okay.  I have it.  2-C?

13   Q    Yes.

14   A    I have it in my hand.  Okay.

15   Q    Okay.  So, 2-C showed a Schedule C, is that correct?

16   A    Yes.  Yes, it did.

17   Q    So, a reasonable person might infer that 1-E-1 with a --

18   '93, with no Schedule C from Dan and Margaret Leveto, there

19   certainly were not gross receipts from the veterinary

20   hospital, correct, the gross income which reflects

21   $25,355.00?

22   A    Gross receipts that reflect that came mainly, I would

23   say, from your interest.

24   Q    Right.  But, I mean, there was no Schedule C, there was

25   no veterinary receipts?

1  A   Okay.

2  Q   Exhibit 2-C --

3        THE COURT:  Are you talking about '93?

4        MR. LEVETO:  Yes, Your Honor.  Yes.  1993.

5        THE WITNESS:  On his 1040.

6        MR. LEVETO:  Yes.  On my 1040.

7        THE COURT:  But, you said there was no Schedule C,

8  though.

9        THE WITNESS:  No.  He said --

10       MR. LEVETO:  I'm sorry.  Maybe I did say that.  I

11  didn't mean that.  On the '93 income tax return on 1-E-1,

12  there is probably not a Schedule C.  I think I am correct on

13  that.

14       THE COURT:  I thought you were talking about 2-C.

15  That one has a Schedule C on it.

16       MR. LEVETO:  Right.  I am talking about these two

17  returns because they are going to reflect --

18       THE WITNESS:  What return we going to refer to now?

19  Q   Okay.  1-E-1.  I just want to make sure that there is

20  not a Schedule C.

21  A   1-E?

22  Q   I think we just had that.

23  A   Okay.  You do not have a Schedule C on the 1-E-1.

24  Q   There is not a Schedule C?

25  A   That's correct.

Somma - Cross              170

1  Q   Okay.  And on the 2-C, that same year for Center

2  Company, there is a Schedule C showing the veterinary

3  receipts, is that correct?

4  A   There is a -- yes.

5  Q   Okay.  So, we went through -- for the sake of not

6  putting everyone to sleep, let's say that we went through

7  several years, that we could match images of the years, that

8  where -- when it disappeared from one, it appeared on the

9  other.

10       And those things, even though we covered them

11  separately when Dan and Margaret Leveto's tax returns stopped

12  showing the Schedule C and the gross receipts -- the gross

13  receipts showed up on Center Company?

14  A   Right.  It was your reflecting.  Not you.  I didn't mean

15  you personally.

16  Q   Yes, ma'am.

17  A   The Center Company is now reflecting on Schedule C, they

18  are mentioning it as Vericon Corporation, Trustee, Center

19  Company, but they are using the 388 Edgewood as your address.

20  Q   Yes.  That's another confusing point to me.

21  A   Well, I didn't put it there.  It was put on the return

22  by somebody else.

23  Q   Okay.  I found that you had said that for 1995, and that

24  was 2-I, and I don't believe that the other returns that I

25  saw reflected that, I think they were reflecting Airport Road

                    Somma - Cross              171

1  on the Turks and Caicos Islands?

2  A   As it goes on, the Caicos comes into play, yes.  But, in

3  the beginning, you were showing them in Meadville where it

4  was Conneaut, or it was this new address.

5  Q   So, you are saying that on the -- like, the 1991 Center

6  Company 1040 NR, the address is 388 Edgewood Drive?

7  A   No.  I am looking on the Schedule C, not on the return

8  itself.

9  Q   On the Schedule C?

10  A    Yes.

11  Q    The 388 Edgewood Drive, that's basically a home having

12  the business address.  So, for the Schedule C, that would be

13  fine because it could be construed as the location of the

14  veterinary business?

15  A    It is saying Vericon Corporation, Trustee, and Center

16  Company, and then it said the business address, and this is

17  on the Schedule C, was 388 Edgewood Drive.

18  Q    I understand.  I am just saying, for some reason,

19  evidently it was juxtaposed from the 338 Conneaut Road, which

20  was the physical address of the business, or the

21  Schedule C -- or the Schedule C income source?

22  A    Um-hum.

23  Q    Okay.  So, we have several years that we can say where

24  they disappeared from Langdon and Leveto Veterinarian

25  Hospital as filed by me, they appeared on Center Company's

Somma - Cross              172

1  Schedule C, which basically is showing the veterinary

2  receipts still being reported.

3      That's an important factor here.  That's all I am

4  trying to get at is, because your testimony so far has said

5    that, but it's just been spread out in so many exhibits.

6           THE COURT:  Just ask a question, Mr. Leveto.

7           MR. LEVETO:  Okay.

8    Q    Is that a reasonable inference to say that the two were,

9    where it left one, it appeared on the other?

10   A    I wouldn't like to say exactly that because that would

11   open up other questions by having something disappear off one

12   and appear on the other because it's telling me that you are

13   changing your entities and you are going now from filing as

14   Mr. Leveto into filing as a trust for your company.

15          So, and that's where you are reflecting your

16   Schedule C.  And that's something else that -- I may not be

17   quite, quite desperate on explaining all of that to the

18   jurors, and I don't want to confuse them.

19   Q    Because it really is a little confusing?

20   A    It is confusing.  And, again, I don't feel as though I

21   am the expert on that.

22          I can say this, though:  That your return as an

23   individual with Mrs. Leveto at the time did not reflect the

24   Schedule C.  But, in 1993 there was a trust that did appear

25   that reflected your Schedule C.  I can say that because

1  everybody knows that I've said that in court.

2  Q    Right.  And it looks like 2-C, 2-D, 2-B, 2-C, 2-D all

3  reflect Schedule C's and all reflect veterinary receipts, as

4  well as 2-A.  So, 2-A, B, C, D reflect veterinary receipts?

5  A    It's reflecting the veterinary receipts under the trust.

6  Q    On the Schedule C?

7  A    On the Schedule C.  And then that money is reported on a

8  1040 NR account of the Caicos Islands, and that's why there

9  is no tax.

10  Q    You spoke of the years '94, '95, the Schedule B, or the

11  B sheet that discussed interest in a foreign account?

12  A    Um-hum.

13  Q    Could you tell me, are there any criteria that makes one

14  responsible to report that, or are there any numbers or

15  balances that one does not have to, or perhaps back at this

16  time, one does not need to X that box yes?

17       Is there a certain precedent or a threshold that

18  one has to report it?

19  A    There is nothing that I know, as far as a threshold

20  goes.  It just simply addresses the fact that if you have

21  signed or you are holding any kind of interest in a bank or

22  other financial institution that is outside of the United

23  States, such as in the Grand Turk Islands, that you should

24  reflect that.

25      It also is saying if you are a beneficiary of a

                    Somma - Cross              174

1   trust, a foreign trust, you may, in fact, be required to file

2   a 3520-A.  That is another type form that -- I don't know if

3   you come under that.  I'm not sure.  But, that's also checked

4   off no.

5       And, again, as I explained this a little bit to the

6   jurors, that the people that have signatures on bank accounts

7   in foreign countries, or have any kind of holdings there,

8   that are in the military or on a military base, they are not

9   required.  They are the exemptions.  Other than that, you

10  should have marked it yes.

11  Q   I should have marked it yes.

12      Can you tell me -- that's okay.  We are speaking in

13  the first person here.

14  A   Yes, we are.  You said that.  You brought it up first.

15  Q    Right.  There is a -- have you ever heard of a

16  $10,000.00 balance to where it's reportable for an account?

17  Does that ring any kind of bell at all?

18  A    Say this again.

19  Q    A $10,000.00 balance.

20       In other words, if anytime within the year the

21  account goes to or above $10,000.00.

22  A    No.  If you were reading the bottom of the Schedule B,

23  it doesn't go into it, doesn't give you line figures, as far

24  as money goes.  It simply says if you have signed or -- now,

25  we are not saying that if you file these forms that are

                    Somma - Cross                175

1  required that you are going to be liable for anything.

2       We are just simply saying that you should have

3  filed them and you should have marked it yes.  If your name

4  is on a foreign bank or a -- or any kind of a foreign

5  document of this nature, banking or otherwise, financial

6  statements, or something like that, you should have marked it

7  yes.

8       I am not going into what the tolerances are, 10,000

9  better or less.  No, I am not going into that.  I am just

10  simply addressing what is on the return.

11  Q    So, you are saying you are not going into it, in other

12  words?

13  A    You just said about the 10,000 limit.

14  Q    Are you aware of it?

15  A    No, I am not totally aware of it.  That's why I don't

16  want to go into it.

17  Q    It is an important point.  So, that if you are not aware

18  of it, that's fine.  So, that there is a good reason we need

19  to travel there then.

20          You had spoke on some of the amended returns and

21  you went over them, and we won't painfully go over them

22  again, but many of these, all of these zeroed returns that

23  you talked about, they had explanations there, in other

24  words, you read on -- if you would like to get one of them,

25  perhaps we can look at it, like 1-D-3.

                    Somma - Cross              176


1  A    1-D-3?

2  Q    Yes.

3  A    I have it.

4  Q   Okay.  So, you said on the amended return, if I am not

5  mistaken, there was an explanation on the return itself and

6  then there was an attachment of a couple of pages?

7  A   Not on this one.  Maybe on the next one.

8  Q   Okay.  Let's try another one.  I'm sorry.

9  A   I am familiar somewhat with what you are talking about,

10  though.

11  Q   So, between the explanation and the attachment, were

12  there any notations on the return of any discussions with me,

13  or did the IRS write me anything or refute anything that was

14  said there, or was what was said or what was there improper

15  by anyone's notations on the return, or anything like that?

16  A   No.  What are you referring to as notations on a return?

17  You mean, did we write on the return that we --

18  Q   Was there anything sent back to me refuting that?  Does

19  the return say that?

20        In other words, you talked about one return that

21  the IRS actually filled in some numbers.

22  A   Because there was a W-2 attached and they are able to do

23  that.  They were just editing or coding it, yes.  Okay.

24  Q   On these returns, there was nothing filled in, there was

25  nothing, no correspondence noted, or anything like that, is

Somma - Cross          177

1   that correct?

2   A    Okay.  On these returns, they were not able to -- you

3   amended the return.  You did the changing --

4   Q    Yes.

5   A    -- by taking out the figures.  In other words, the

6   figures that were reflected on the 1040, you amended them now

7   and said, I changed my mind, take them out.  So, you are

8   editing them out when you put brackets.  You will see all

9   these returns.  And this is what I am talking about, the

10  first line, it has ordinary reported income was $1,936.00.

11  Then he is going to change it and he is decreasing it by the

12  $1,936.00, which leaves it zero for the correct amount.  You

13  have done this on every line.  You are making every line now

14  read zero.  And the reason for that was what you attached in

15  the back when you included, fraudulently induced me to report

16  income, and things of that nature.  Okay?

17       Why would we make changes and send you letters, and

18  so forth, on something like that?

19  Q    Well, I am not sure when you had said that.  I -- you

20  know, I guess I have to ask you.  You are saying I changed my

21  mind, although wouldn't it look more like I perhaps learned

22  something or thought something differently and supplied the

23  IRS with that information?  I mean, that's really what I did

24  there with the two pages and what I had said.

25      So, I just wanted to clear my -- that there was an

                    Somma - Cross              178

1  explanation for what I did as I guess she testified to that.

2      MS. CALVIN:  Your Honor, we would ask if he would

3  ask a question, please.

4      THE COURT:  Ask a question.

5      MR. LEVETO:  I'll try to do better at that.  I will

6  try to do better at that.

7  Q   You had testified, as you went through different tax

8  returns, of different trusts of Newbury, ASTCO,

9  Lac La Hache, Trawg, and all of these types of things.

10      I guess, as a general question, without you having

11  to go over all of them, but did you find anything about me on

12  those?

13      In other words, was my name on them, or was

14  anything on there regarding me?  Because I am not really

15  familiar with those, and I would just like to know perhaps a

16  little more, because Ms. Calvin went through many, many, many

17  returns and the pertinence and the relevance of the returns

18  was confusing me even because I know about as much as the

19  jury.

20      THE COURT:  Just ask a question.  Ask a question.

21  Q   Oh.  Was there any connection or anything you could find

22  on there that was my name on any of those?

23  A   On the actual return?

24  Q   Yes.

25  A   No.  Your name wasn't the only thing that we came --

                    Somma - Cross               179

1   that was attached to the return was a showing Center Company

2   using your address as the business address on the Schedule C.

3   Q   Right.  So, Center Company, that's way up the ladder

4   here, was using my address with the Schedule C?

5   A   Right.

6   Q   And these were maybe trusts that were distributed to, is

7   that correct?

8   A   Well, the trusts now are becoming distributed through

9   other trusts and it is going from one trust to another trust

10  and all coming out of the same place, the Caicos, but it's

11  just changing names from one trust to another.  And your name

12  is not reflected on that, no.

13  Q   Okay.  Okay.  You looked at quite a lot of returns, I'm

14  sure, Mrs. Somma, or Miss Somma.

15       Are you aware of any returns that perhaps would

16  show the seller of a business and the buyer of a business

17  both reporting gross receipts when the business is sold?

18  A   Would I be aware of them having -- you are confusing me.

19  Q   Okay.  Would it -- would you believe it would make any

20  sense for a business to be sold and a business to be bought

21  by person B, person A selling the business, and say it was

22  sold at the beginning of 1993?

23  A   Um-hum.

24  Q   Would you have any reason to believe that the receipts

25  of that business would be shown for 1993 by the buyer or the

                    Somma - Cross              180


1   buyer and the seller for that business?

2   A   If he sold the business in January of 1993?

3   Q   Yes.

4  A    And then in December of 1993 when he is filing the

5  return, would it reflect any gross receipts from that

6  business from the seller of the business to the buyer?

7  Q    Yes, the seller.

8  A    Let's say the seller and the buyer, when they fill out

9  their '93 taxes for April 15th, 1994, okay, you being the

10  seller of the business would not necessarily have gross

11  receipts because the buyer of the business if he, in fact,

12  continued the business from the first date of buying the

13  business would have the gross receipts, not the guy who sold

14  it.

15  Q    So, it is safe to say if the seller -- if the gross

16  receipts disappear from the seller and they appear from the

17  buyer -- on the buyer's tax return, that makes sense?

18        MS. CALVIN:  Objection, Your Honor.  This woman is

19  a records custodian for the Record Center.  She is not an

20  expert in tax law, nor is she an accountant.

21        THE COURT:  Well, if she feels she can answer the

22  question, she may.  If she feels that's beyond her knowledge,

23  why, she can tell us that.

24        THE WITNESS:  Well, the only thing I would reflect

25   at this point would be, that if there had been gross receipts

Somma - Cross                181

1   that were still being withheld from the seller, in other

2   words, maybe it was money that was due and owed to him from a

3   previous year, and it may be receipts that he should report

4   that was not included in the sale of the business, yes, then

5   he would report gross receipts for that year in that sense.

6   That's all I can tell you though.

7          It's really -- now you are talking about something

8   that audit would have to look at to see maybe if -- and

9   that's not me.

10   Q   Okay.  Let me -- and I don't want to go anywhere I am

11   not supposed to here, but let me just make it simpler.

12          And if you don't want to answer, that's fine,

13   Mrs. Somma.

14   A   Okay.

15   Q   Would you say -- and we are not talking about any

16   receipts split or left over or somebody not reporting.

17          Would you say that it is normal for a business that

18   is sold, that the gross receipts disappear from that business

19   and they show up on the buyer if the business stays the same?

20  A   It could be.  I really don't know though.  I don't want

21  to answer it because I may be wrong.

22  Q   Okay.

23       MR. LEVETO:  That's all.  Thank you.

24       THE COURT:  Any redirect, Ms. Calvin?

25       MS. CALVIN:  Very briefly.


                              182


1        THE COURT:  I am just trying to finish this witness

2   up so she can get out of town if she wants to.

3                    REDIRECT EXAMINATION

4   BY MS. CALVIN:

5   Q   Miss Somma, you indicated that 2-C, I believe it was,

6   showed an address of 388 Edgewood Drive?

7   A   Yes.

8   Q   Do you know what that address is?

9   A   That is the address of Mr. Leveto.

10  Q   As shown on one of the individual tax returns?

11  A   Yes.

12  Q   And I guess I should ask you, what is a 1040 NR?

13  A   A 1040 NR is a Nonresident Alien Return that is used

14  for -- by fiduciary trusts when they are going to have a

15  trust that is using a business address of the Caicos, and

16  Grand Turk Islands, and places of that nature.

17  Q    So, the gross receipts of 1993 were reported on the --

18  the Center Company return was 1040 NR?

19  A    It would be reported on 1040 NR.

20  Q    So, Center Company was a 1040 NR filing?

21  A    Yes.

22  Q    Okay.

23          MS. CALVIN:  I have no further questions, Your

24  Honor.

25          THE COURT:  Thank you, ma'am.  You are excused.  I

183

1   assume you don't plan to recall her, Ms. Calvin?

2           MS. CALVIN:  No, Your Honor.

3           THE COURT:  Okay.  Thank you very much.

4   (The witness was excused.)

5           THE COURT:  Ladies and gentlemen, we'll recess for

6   the evening and we'll start at nine o'clock tomorrow morning.

7           Please keep in mind, don't talk about the case, and

8   take your notebooks up to the jury room.  Don't leave them

9   here.

10   (Court recessed on Monday, May 23, at 5:05 p.m.)

11

12                    * * * * *

13          I certify that the forgoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15

16                         S/Michael D. Powers
                           Michael D. Powers
17                         Official Reporter

18      *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****

19

20

21

22

23

24

25