1

1      IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

_____

3

UNITED STATES OF AMERICA

4
                        Plaintiff

5
           vs.          Criminal Action No. 01-06ERIE

6

DANIEL J. LEVETO

7
                        Defendant

8   _____

9

                    PROCEEDINGS

10

        Transcript of Suppression Hearing commencing on

11  Thursday, October 28, 2004, United States District Court,
    Erie, Pennsylvania, before Honorable Maurice B. Cohill, Jr.,

12  District Judge.

13  APPEARANCES:

14  For the Government:     For the Department of Justice
                        By:  Rita Calvin, Esq.

15                          By:  Thomas Voracek, Esq.

16  For the Defendant:      Pro Se
                        Stephen Misko, Esq.

17

18                      Reported by:
                        Michael D. Powers, RMR

19                      Official Court Reporter
                        1015-A USPO & Courthouse

20                      Pittsburgh, Pennsylvania 15219

(412) 765-3419

21

22

23   Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.
24

25

                                    2

1                      I N D E X

2   GOVERNMENT WITNESSES    DIRECT  CROSS  REDIRECT  RECROSS

3   ROBERT LAPINA

4     By Mr. Voracek        4            82
                           138
5     By Mr. Leveto            70
                                    121
6
    RICHARD ADAMS
7
      By Mr. Voracek        83
8     By Mr. Leveto             94

9   THOMAS DEMKO

10    By Ms. Calvin         95         105
      By Mr. Leveto             102
11
    FRANK FALVO
12
      By Ms. Calvin         107
13    By Mr. Leveto             116

14   ARGUMENT BY MR. LEVETO - PAGE 139

15  ARGUMENT BY MS. CALVIN - PAGE 147

16  REBUTTAL BY MR. LEVETO - PAGE 153

17  COURT'S RULING        - PAGE 160

18

19

20

21

22

23

24

25


3


1          P R O C E E D I N G S

2  (Court convened on Thursday, October 28, 2004, at 9:45 a.m.)

3          THE COURT:  Good morning.  Be seated, please.

4          MR. VORACEK:  Good morning, Your Honor.

5          MS. CALVIN:  Good morning, Your Honor.

6          MR. LEVETO:  Good morning, Your Honor.

7          MR. MISKO:  Good morning, Your Honor.

8          THE COURT:  We have a motion to suppress evidence

9  filed by Daniel Leveto in this case and this is the time

10   scheduled for a hearing on that matter.

11        So, the way we usually do it where there is a

12   motion to suppress, we have the government go forward to

13   present their witnesses and then permit, of course,

14   cross-examination of any of those witnesses called by the

15   government.  So, with that, we'll proceed.

16        MR. VORACEK:  Your Honor, Thomas Voracek and Rita

17   Calvin appearing for the United States Department of Justice.

18        Your Honor, the United States will call four

19   witnesses; Robert Lapina, Richard Adams, Thomas Demko and

20   Frank Falvo.  Those are witnesses also that Mr. Leveto has

21   requested that the government provide to him.  Those

22   witnesses are in the courtroom, but we don't know if

23   Mr. Leveto is going to call any other witnesses in this case.

24        So we would ask that the Court -- we do invoke the

25   rule to exclude all witnesses from the courtroom.

4

1        THE COURT:  Sequestration.  Sure.  Are you going to

2   call any witnesses that are in the courtroom, Mr. Leveto?

3        MR. LEVETO:  No, I am not, Your Honor.

4          THE COURT:  Okay.  Then we will ask your first

5   witness to remain and the other three will please just be

6   available outside somewhere.

7          MR. VORACEK:  The United States calls Robert Lapina

8   to the witness stand.

9          THE COURT:  You can come forward and be sworn,

10   please.

11          THE CLERK:  Can you raise your right hand?

12                    * * * * *

13          DANIEL LAPINA, having first been duly sworn,

14   testified as follows:

15          THE COURT:  Have a seat up there, please, give us

16   your name and spell your last name.

17          THE WITNESS:  My name is Robert. A. Lapina.  Last

18   name is spelled L-a-p-i-n-a.

19          THE COURT:  Thank you.

20                    DIRECT EXAMINATION

21   BY MR. VORACEK:

22   Q   Mr. Lapina, are you employed?

23   A   Yes, I am.

24   Q   Where are you employed?

25   A   Currently, I am working for the U.S. Postal Service,

5

1    Office of Inspector General, in Pittsburgh.

2    Q    What is your position there?

3    A    I am a supervisor supervising a group of Special Agents

4    who investigate alleged violations of fraud, waste abuse and

5    mismanagement in the Postal Service.

6    Q    How long have you been so employed?

7    A    Since March of this year.

8    Q    Prior to your current occupation, were you also

9    employed?

10   A    Yes.

11   Q    And where were you employed?

12   A    Internal Revenue Service Criminal Investigation

13   Division.

14   Q    And what was your position there?

15   A    I was employed there for over sixteen years in both

16   capacities as Special Agent and a supervisor.

17   Q    And how long were you a Special Agent with the Internal

18   Revenue Service Criminal Investigation Division?

19   A    Total over sixteen years.

20  Q    What were some of your duties as a Special Agent?

21  A    My duties basically were to investigate alleged criminal

22  violations of the Internal Revenue Code and related offenses.

23  Q    And criminal violations of the Internal Revenue Code,

24  have they been codified?

25  A    Yes.

6

1  Q    And where is that found?

2  A    United States Code, Title 26.

3  Q    Are you familiar with that code?

4  A    Yes.

5  Q    Did you have any prior training or receive any training

6  as a Special Agent?

7  A    When I was hired as a Special Agent back in 1987, I

8  immediately was sent to training at the Federal Law

9  Enforcement Training Center in Brunswick, Georgia, received

10  tax criminal law training, Special Agent training.

11  Q    Did you have any other additional education or training

12  while you were a Special Agent?

13  A    Yes.  Sure.  On-the-job training, continued professional

14  education type situations.

15  Q    Did you have any training regarding the drafting of

16  affidavits to be used for a search warrant?

17  A    Yes.  It's a part of your training at the Criminal

18  Federal Law Enforcement Training Center in the criminal end

19  of it as far as the criminal investigative training.

20        One of your training assignments is basically

21  drafting affidavits articulating probable cause for search

22  warrants to be issued, executing the search warrant and also

23  testifying in court regarding to the execution of the

24  warrant.

25  Q    Prior to May of 1996, did you have any previous

7

1  opportunities for preparing affidavits for search warrants?

2  A    Yes, I did.  I prepared an affidavit for a search

3  warrant back in 1992 here in Erie.

4  Q    Any others?

5  A    That's it.

6  Q    How about prior to May of 1996, did you have any

7  opportunities where you were involved in the execution of

8  warrants?

9   A   Yes.  On numerous occasions, I participated either as a

10   team leader or as a member of a search warrant team.

11   Q   Is there an IRS procedure relating to any internal

12   approval of search warrants?

13   A   To my knowledge, you draft an affidavit where you

14   believe you have probable cause to obtain a search warrant.

15   That affidavit has to be reviewed by your supervisor.  Then

16   it has to be reviewed and approved by District Council before

17   it could be sent to the United States Attorney's Office for

18   finalization.

19   Q   Are you present at the time that the search warrant is

20   approved?  Is that the normal process?

21   A   Approved by superiors and District Council.

22   Q   Approved by the magistrate?

23   A   Oh, yes.  Yes.  Basically, it would be my job to go down

24   and pick up the information from the U.S. Attorney's Office,

25   the affidavit, the warrants, and the U.S. Attorney's Office

8

1   would schedule a meeting with the magistrate for me to take

2   the information over.

3   Q   Now, Agent Lapina, as part of your function as an IRS

4   Special Agent, are you familiar with how to construct an

5   individual's income?

6   A   Yes.  There is a few different ways which we use to

7   reconstruct an individual's income to show that violation has

8   been committed, to show what the true taxable income was, any

9   unreported income and additional tax, and that would be

10  either direct method of proof or indirect method of proof.

11  Q   What are some direct methods of proof?

12  A   One would be the specific items method of proof where

13  you actually have specific items of unreported income, false

14  expenses, et cetera, that you can prove specifically that

15  were omitted from the tax return.

16  Q   And by specific items, do you mean like the actual check

17  or something that may have been -- that you may consider to

18  be income?

19  A   Right.  Or, for instance, somebody received wages from

20  multiple employers and specifically you can show that the

21  wages from the one employer was not reported on the tax

22  return.

23  Q   Agent Lapina, you also indicated that an individual's

24  income could also be established by an indirect method of

25  proof.  Could you please explain that?


                                    9


1   A    Yeah.  Indirect methods of proof that we would employ

2   would be -- for example, it would be bank deposits method of

3   proof, net worth and expenditures method of proof.

4           And what you are saying there, as far as indirect

5   methods go is, basically you have to be able to reconstruct

6   an individual's income for a number of years, establish a

7   good starting point for your first year where there is an

8   alleged violation and show that there was increases to an

9   individual's net worth, increases to the expenditures and

10   basically substantiate that that was due to unreported

11   taxable income.  You have to eliminate any nontaxable sources

12   that may, you know, attribute to that increase.

13  Q    Now, a tax year for an individual begins on what date?

14  A    January 1st.

15  Q    Is it then important, as part of the indirect method, to

16   establish, let's say, what an individual's financial picture

17   looks like around January 1st?

18  A    You have to show, going into January 1st of that first

19   recommended prosecution year, that you have a good net worth

20  computation because if it is flawed, then it can flaw the

21  rest of the computations for the subsequent years.

22  Q    So, is it fair to say you need to establish what an

23  individual's assets are on December 31st of a particular

24  year?

25  A    Correct.

10

1   Q    And then you also -- is it my understanding from your

2   testimony that you need to establish an individual's net

3   worth based on assets at the end of the following year on

4   December 31st?

5   A    Assets and liabilities.

6   Q    And then, based upon looking at those figures, can you

7   come to some determination over what an individual's income

8   would have been during that year?

9   A    Well, you have to take a look at the assets and the

10  liabilities and what the resulting net worth would be, and

11  then also any personal non-deductible expenditures have to be

12  added on there to show the total picture as far as any -- if

13  there are any amounts of unreported income which would be

14   attributed as taxable sources.

15   Q    Now, as a Special Agent for the Internal Revenue

16   Service, was it part of your duties to conduct an

17   investigation of Daniel Leveto?

18   A    Yes, it was.

19   Q    Did you initiate that investigation yourself, sir?

20   A    With the approval of my supervisor.

21   Q    Was the case assigned to you?

22   A    Yes.

23   Q    Had there been any investigation done of Dr. Leveto

24   prior to the time that you received the case?

25   A    No criminal investigation had been conducted prior to my

11

1   involvement with the case.

2   Q    Were you provided with any information at all regarding

3   any other matters concerning Dr. Leveto at the time you

4   received the case?

5   A    Well, at the time, I believe it was late 1994, there

6   were a couple different things that come into play here.

7        One.  The Civil Section revenue agent of the IRS

8   here in Erie had been assigned basically to audit

9  Dr. Leveto's tax returns and felt that the information that

10  was included in the assignment basically may warrant a

11  criminal investigation rather than a civil examination.  And

12  at that point, he called me and asked me what I thought of

13  the information.

14        At the same time that happened, I also got

15  information in from a witness relative to some of the

16  activities of Daniel Leveto.

17  Q    When was the case officially referred to the IRS CID, do

18  you recall?

19  A    I believe it was late 1994 or possibly even early 1995,

20  as far as I recall.

21  Q    After you received the case, what investigative steps

22  did you take, if any?

23  A    Well, one of the first things I would have done was,

24  would be to look and -- order and look at Dan Leveto's income

25  tax returns for a number of years.  I believe I had them for,

12

1  like, the years in late eighties going all the way up through

2  that time period where the investigation was initiated,

3   basically looking for anything on those returns which would

4   indicate substantial drop off in income, any indication on

5   there that, you know, there was unreported tax or, you know,

6   things didn't look quite appropriate.

7   Q   And you did do that then for Dr. Leveto?

8   A   Yes.

9   Q   Did you take any other types of investigative steps at

10   that time?

11   A   What we normally do when you get a case assigned, you

12   check public records to determine what assets and property an

13   individual may have.  Contact the Department of Motor

14   Vehicles to determine what, if any, vehicles that they had.

15   Check NCIC and other internal databases to determine if the

16   individual has a criminal record; anything of that nature.

17   Q   Did you attempt to corroborate the information that you

18   noticed on the tax returns filed by Dr. Leveto and some of

19   the assets that you just mentioned?

20   A   Well, like I said, I had received information from an

21   individual named Mike Kalustian at the same time period, and

22   Mr. Kalustian was providing me information based upon

23   meetings and conversations he had with Daniel Leveto which

24   were indicative to me that Dr. Daniel Leveto had entered into

25   some kind of scheme in order to, you know, commit Title 26

13

1   violations as far as the Internal Revenue Code.

2        THE COURT REPORTER:  How do you spell Kalustian?

3        THE WITNESS:  I believe it's K-a-l-u-s-t-i-a-n.

4   Q   Did you initiate any undercover investigation?

5   A   Yes, I did.  Based upon the statements that were given

6   to -- provided to me by Mike Kalustian, I felt that we needed

7   to be able to corroborate that information that he provided.

8        Mr. Kalustian had some legal problems of his own at

9   the time, was -- basically had been indicted and I believe

10  entered a plea or was pleading guilty to some, if not all,

11  those charges and I felt that we needed independent

12  corroboration of the information that he provided.

13  Q   And were any meetings taped?

14  A   Yes, they were.

15  Q   And was an undercover agent involved?

16  A   Yes.  Yes.  Mr. Kalustian agreed to introduce an IRS

17  undercover agent to Daniel Leveto.

18  Q   And based on the information that you gleaned from the

19    tax returns and also from the undercover operation, did you

20    determine that search warrants were necessary in this case?

21    A    Yes, I did.

22    Q    Why was that, agent?

23    A    Well, I believe that, based upon the information I had

24    concerning Dan Leveto's tax situation, information provided

25    by the confidential witness at the time, Mike Kalustian, as

14

1    well as information determined through our undercover

2    operation, and looking at some of the other items that we

3    had, I felt that there was evidence which was indicative that

4    beginning in 1991, Daniel Leveto basically either committed

5    or attempted to commit Title 26 violations relative to he and

6    his wife's income tax liabilities.

7        I believe that, based upon the information gathered

8    at the time, that from 1991 extending to the early part of

9    1996 up until when the affidavit was completed, that the

10    evidence was indicative that there was probable cause to

11    believe that Daniel Leveto, Don Turner and other individuals

12    had entered into a conspiracy to commit these violations.

13        And also I believed that, based upon my experience

14  and evidence obtained to date in the case, that there was

15  probable cause to believe that evidence in furtherance of

16  these violations would be found in either the business or the

17  residence addresses of Daniel Leveto.

18  Q    Now, an IRS agent has summonses authority to obtain

19  records, do they not?

20  A    Yes.

21  Q    And you had the summons authority at that time and you

22  could have issued summonses?

23  A    Possibly.  However, you know, we were still in the

24  covert stage of that operation and when you issue summonses

25  on occasions, there are certain -- summons issued to third

15

1  parties that have to provide notice to the subject with

2  the -- or the taxpayer involved.  And I felt by doing that,

3  that would just really basically null and void the undercover

4  operation, what was trying to be achieved.

5  Q    Did you also become aware pursuant to the undercover

6  operation that Daniel Leveto may have been using nominees?

7  A    Yes.  You know, I felt that the evidence obtained from

8   both Mr. Kalustian and the undercover operation where

9   indicative that Dan Leveto's arrangements with Center Company

10  were basically sham transactions.  And there was also

11  information on there that there were other -- what they were

12  terming colatos, or for colatos that Leveto was affiliated

13  with.

14      And I believe even on one occasion in that

15  affidavit in one of the conversations, he indicated that he

16  had control over an account in the name of one of these

17  entities drawn on PaineWebber.

18      MR. VORACEK:  Your Honor, if I may provide the

19  witness with some documentation?

20      THE COURT:  Sure.

21  Q   Agent Lapina, I have just handed you a stack of

22  documents that begin on top with a Government Exhibit

23  sticker.  Do you have that in front of you?

24  A   Yes.

25  Q   Sir, I ask you to look at Government Exhibits A and B.

16

1   Do you recognize those documents?

2   A   Yes.

3   Q   And what are those documents, please?

4   A   These would be the search warrants and the items to be

5   seized relative to both Dan Leveto's business and residence

6   addresses.

7   Q   And the business addresses is reflected on which

8   exhibit?

9   A   Exhibit A.

10   Q   And is the residence then on Exhibit B?

11   A   Yes.

12   Q   Did you prepare these warrants, sir?

13   A   No.

14   Q   And to the best of your knowledge, who prepared them?

15   A   The U.S. Attorney's Office drafted these warrants.

16   Q   Were these the warrants that you had executed in May of

17   1996?

18   A   Yes.

19   Q   Agent Lapina, I now ask you to look at Government

20   Exhibit C.  What is that document, sir?

21   A   This would be the items to be seized list which would

22   have been attached to both of these warrants.

23   Q   Did you prepare that document, Exhibit C?

24  A   Yes, I did.

25  Q   And I ask you now to look at Government Exhibit D.  And

17

1   do you recognize that document, sir, and can you identify

2   that?

3   A   Yeah.  This appears to be the affidavit which I drafted

4   to establish probable cause for the issuance of the warrants.

5   Q   And I believe you had said earlier that IRS procedure is

6   for you to get IRS approval of affidavits for search warrants

7   before you proceed further, is that correct, sir?

8   A   Yes.

9   Q   And did you do that for this affidavit, sir?

10  A   Yes, I did.

11  Q   And did you obtain the necessary approval from your

12  supervisors?

13  A   Yes.

14  Q   And, Agent Lapina, after you obtained approval of the

15  application as set forth in Exhibit D, did you then provide

16  that to the U.S. Attorney's Office for the preparation of the

17  warrants?

18  A   The affidavit would have been forwarded to the

19  supervisor in Pittsburgh.  Then from there, it would have

20  been -- if any change were made, it would have been forwarded

21  to district council.  District council would then, upon their

22  approval, would have forwarded the affidavit and any cover

23  letter information to the U.S. Attorney's Office giving them

24  further direction and authorization.

25  Q    And, Agent Lapina, I believe you said that you have had

18

1  prior training also in preparing affidavits for search

2  warrants?

3  A    Yes.  I have had training and I also had prepared a

4  previous affidavit.

5  Q    What is your understanding of the rationale for an

6  application affidavit for a search warrant?

7  A    Well, you have to basically in that application

8  affidavit establish that there has been -- there is probable

9  cause to believe that certain violations have been committed

10  and basically there is reason to believe that evidence of

11  these violations would be found in the locations you are

12  asking to be searched.

13  Q    And have you alleged in your affidavit of Exhibit D that

14  criminal violations did occur?

15  A    Yes.  I believe I articulated that it was my belief that

16  there was probable cause to believe that evidence or

17  violations -- evidence of violations of both Title 26 and

18  Title 18 had occurred.

19  Q    And specifically which violations of Title 26 are we

20  talking about?

21  A    7201, which would be attempted evasion of tax, 7206(1)

22  relative -- it would be 7206(1), which deals with the filing

23  of materially false income tax returns.

24  Q    And were you able to determine a timeframe of criminal

25  violations?

19

1  A    Well, the years that we were concentrating on at that

2  time were 1991 through 1995.

3        However, like I explained before, when you are

4  doing an indirect method of proof case, you need to be able

5  to document a good starting point which would go back a

6  number of years prior to the first year, which would be 1991.

7  Q    Why did you limit the probable cause for the Title 26

8   counts to the 1991, I believe you said the 1994 and 1995 tax

9   years?

10  A   Well, we were in 1996 and the 1996 returns wouldn't have

11  been due to be filed at that time.

12  Q   Were you able to review the 1991 return?

13  A   Yes.

14  Q   1992?

15  A   Yes.

16  Q   1993?

17  A   Yes.

18  Q   And '94?

19  A   Yes.

20  Q   And '95?

21  A   '95 I believe had been filed at that time and I had not

22  obtained a return itself.

23  Q   And was there anything about your review of the tax

24  returns that indicated to you that there may be probable

25  cause for a criminal violation of Title 26?

20

1   A   Well, looking at his tax returns for the years 1989

2   through -- and 1990, it indicated that he reported a

3   substantial amount of gross receipts, net profits, adjusted

4   gross, taxable income as well as tax liabilities.

5          However, beginning in 1991 whenever he became

6   involved with Don Turner and these other individuals, you can

7   see that there is a drop-off in the income which extends all

8   the way through 1994.

9   Q   Sir, I ask you to look at Government Exhibit D, your

10  application affidavit.

11         Are your statements regarding your review of the

12  tax returns reflected in that affidavit?

13  A   Yes, they are.

14  Q   And what numbers of your affidavit are such statements

15  reflected in?

16  A   As far as a review of his tax returns?

17  Q   Yes.

18  A   I believe it's number eight and number nine.

19  Q   So, your inclusion of the information regarding tax

20  returns of Dr. Leveto in your affidavit pertain to probable

21  cause?

22  A   Well, it's one facet that would, you know, tend to

23  establish probable cause.

24        Basically, what we are trying to show here is that,

25   you know, prior to 1991 he reported a lot of income, had a

21

1   lucrative business and then, all of a sudden, that the income

2   drops way off.  Has to be a reason for that.

3   Q    If you then look at Government Exhibit D, your

4   affidavit, what information generally is reflected in No. 11?

5        Is that information you gleaned from your private

6   investigator?

7   A    Well, the evidence we had obtained to date or during the

8   investigation was indicative that Daniel Leveto was involved

9   in the sale and promotion of a book for Don Turner.  And back

10   in 1993, a private investigator in southern California saw an

11   advertisement for this book in I think the Southern

12   California edition of the Wall Street Journal.

13        So, he decided to send away for a copy of the

14   information that Daniel Leveto would provide basically going

15   through what this book could do for you to reduce your income

16   tax liabilities.

17        Upon the investigator's review of this

18  investigation, he felt that it wasn't valid, he felt that it

19  was a scam, and he forwarded that information to the Internal

20  Revenue Service.

21  Q    So, what was the reason that you included such

22  information in your affidavit?

23  A    Well, it was -- basically, this information is what

24  started generating the civil examination which was assigned.

25         It was also indicative that going back as far as

22

1  1993, we knew that Daniel Leveto was involved in the sale and

2  promotion of this book for Don Turner.

3  Q    Does it relate to the probable cause that a crime had

4  occurred?

5  A    Again, yes, I believe it is one facet in establishing

6  probable cause.

7  Q    Is that solely for crimes involving Title 26 or other

8  crimes?

9  A    Well, no.  It would reflect on both Title 26 and also

10  the Title 18 conspiracy charge or violation which we were

11  looking at at the time to show -- showing here back in 1993,

12  that Daniel Leveto and Don Turner were involved together.

13   Q    Then if we look further at your application and

14   affidavit, Exhibit D, do you also lay out in No. 12

15   information from a confidential witness?

16   A    Right.  That confidential witness, again, I identified

17   earlier as Michael Kalustian, had numerous conversations and

18   meetings with Daniel Leveto from, you know, in 1994 all the

19   way, I believe, through 19 -- early part of 1996.

20   Q    And what pertinence does that -- does No. 12 have in

21   your affidavit as it relates to probable cause determination?

22   A    Well, the information that is indicated in there

23   contains a lot of statements which, to me, indicated that

24   although Daniel Leveto made a lot of self-serving statements

25   to the effect that what he was doing was illegal, that he was

23

1    aware that his arrangements with Center Company were

2    basically not valid, not legitimate, also indicative -- the

3    information is his dislike for the federal government and the

4    tax system, basically how he could still dictate whatever

5    income he wanted, whatever salary he wanted, how he had

6    control over these nominee accounts in the name of Center

7  Company and, you know, other entities.

8  Q    If we look at Government Exhibit D, No. 13 I believe

9  contains information concerning a drawing of the residence.

10  Do you see that, agent?

11  A    What page is that on?

12  Q    That's No. 13 of your Exhibit D.

13  A    Yes.

14  Q    What pertinence does that information have in your

15  affidavit?

16  A    Well, the information from the confidential witness two,

17  which would have been Mike Kalustian's wife, was basically a

18  layout, to the best of her recollection, of the Levetos'

19  residence as far as, you know, office space, bedrooms,

20  kitchen.

21       She had basically provided information that there

22  was an office area in the residence that had, I believe, a

23  safe and some records and everything and we were trying to

24  determine possibly where that was.

25  Q    Did you add that section in your affidavit to establish

24

1  probable cause that evidence of possible Title 26 and Title

2  18 violations may be present at the residence?

3  A    Yes.  And also to corroborate some of the information

4  received regarding the existence of, I believe, a safe or

5  safes.

6  Q    And if I ask you to look at No. 14 of your affidavit,

7  does that include information concerning the undercover

8  agent?

9  A    Yes, it does.

10  Q    And why was that information included in your affidavit?

11  A    Well, the information developed during the undercover

12  operation basically I felt corroborated the information

13  provided by Mike Kalustian, as well as providing us with

14  information and insight into the conspiracy violation which

15  we were looking into between Dan Leveto, Don Turner and other

16  individuals.

17       During the course of that undercover operation, we

18  were able to determine that Don Turner had previously been

19  convicted of federal tax crimes, and he also had employed

20  during that time period the services of an individual by the

21  name of Jack Williams basically just to sign tax returns for

22  a fee and also appears as trustee in name only.

23          Information developed on that undercover operation

24   were indicative that Jack Williams was involved to a degree

25   with Dan Leveto's operations basically the same type of


                                25


1   format, you know, name only, had really no power or control,

2   had no input or anything as far as the operations went.

3          You know, also developed information showing

4   that -- I believe indicated that there was -- reasonably

5   violations were committed when, you know, Don Turner makes

6   statements to the fact that to get into this program first

7   you have to decide if it's legal, you have to decide if it

8   was within your comfort zone, if it is workable, things of

9   that nature.

10         Also statements made in there to the fact that --

11   which indicated that Leveto had dictated basically whatever

12   income he wanted, had control over Center Company and other

13   nominee accounts.  Again, various information which was

14   provided through statements received by Mike Kalustian.

15   Q    Did your investigation also involve doing mail covers?

16   A    Yes.  Yes, it did.

17   Q    And was that information also detailed in your

file:///A|/LEVETO1.TXT

18   affidavit?

19   A    Yes, it was.

20   Q    And for what purpose did you put that information in

21   your affidavit?

22   A    It was basically to show that there was information

23   relative to financial accounts and other financial

24   transactions that were being sent to both the business

25   address and also the residence address.  Evidence indicative

26

1   that financial accounts in nominee name were being sent to

2   those locations as well.

3   Q    You stated nominee names.  What names are you referring

4   to?

5   A    Well, I believe that Center Company was a nominee name

6   being utilized here.  Box Elder, Ltd., was another nominee

7   name.  Edge Co., I also believed that to be a nominee.  I

8   believe Daniel Leveto had control over those accounts and the

9   disposition of funds.

10   Q    When were the mail covers done?

11   A    They went on for quite a while.  I think I have in here

12  December through -- December through July.  December of '94

13  through July of 1995.

14  Q    So, you determined that through at least July of 1995,

15  there was correspondence sent to both the residence and the

16  business with some information concerning nominee names?

17  A    Correct.  Financial accounts.

18  Q    All right.  Agent Lapina, I ask you now to look at

19  Government Exhibit C.  Do you have that in front of you, sir?

20  A    Yes, I do.

21  Q    And, sir, I believe you testified earlier that you

22  prepared that document, it was entitled items to be seized.

23  Is that correct, sir?

24  A    Correct.

25  Q    And this document, was that attached to both

27

1  Government's Exhibits A and B as part of the warrant?

2  A    Yes, it was.

3  Q    Sir, I draw your attention to Government Exhibit C and I

4  ask you to look at the first item as noted on Government

5  Exhibit C.  What are those types of documents, in general

6  terms, sir?

7   A   You want me to read them all or do you just want me to

8   describe them?

9   Q   Just in general terms, sir, are those financial type

10  documents?

11  A   Yes.  Yes.  They are all either financial records or

12  records which would basically assist in the reconstruction of

13  income, the determination of unreported income and additional

14  taxable income, as well as records which could establish that

15  overt acts in furtherance of violations of Title 26 and Title

16  18 were committed.

17  Q   And did you just express why you believed these items,

18  as reflected in No. 1 constitutes fraud fruits and evidence

19  of possible violations of Title 26 and Title 18?

20  A   Yes.

21  Q   Now, if I ask you to look at No. 2 of Exhibit C, and

22  generally what types of documents are you looking for there?

23  A   Correspondence and other information which would

24  basically provide the names and other identification of

25  co-conspirators, financial institutions and other entities

28

1   who the subject had a financial relationship with.

2   Q    Now in your affidavit, did you name certain individuals

3   that may be considered conspirators or co-conspirators?

4   A    I believe I put the names of Don Turner and Jack

5   Williams in there.  But, we also had information that there

6   were others involved, including a Paul Harris, I believe, Les

7   Rutherford.(Sp)

8   Q    Did you also put in your affidavit names of possible

9   entities associated with Daniel Leveto?

10  A    Yes, I did.

11  Q    And the purpose then of putting No. 2 -- or what was the

12  purpose of asking for documents related to No. 2 of

13  Exhibit C?

14        Did you consider that to be fruits and

15  instrumentalities of crimes?

16  A    Well, correspondence, you know, my experience is that in

17  these type of investigations, co-conspirators communicate

18  with one another in some form, you know, whether it be

19  correspondence or whatever, and that would be indicative of

20  any directions, communications that they had.

21        Also, basically this information could provide

22  leads to any of the co-conspirators' whereabouts, any

23  whereabouts of the financial institutions involved in this

24  case; things like that.

25  Q    Sir, I noticed that on Exhibit C in the items that you

29

1  seized, number one and two, you don't have any timeframe as

2  far as what years such documents could be seized.

3        Can you explain why you didn't put a timeframe in?

4  A    I didn't put a timeframe here specifically in

5  conspiracy.  I felt that the evidence shoved that the

6  conspiracy began in 1991 and continued through 1996,

7  beginning of 1996, and also I articulated that you needed to

8  also get prior years' information to be able to establish the

9  Title 26 violations.

10        So, even though it is not reflected on here, I

11  would have provided that direction to the agents who were

12  involved in the search warrant at the meeting which occurred

13  prior to the warrant, basically indicating we were looking

14  for records that would help us show and prove that --

15  Title 26 violations from the late 1980's up until the present

16  time, which was approximately May, 1996.

17  Q    And would that be to establish evidence of a Title 26

18  crime, a Title 18 crime, or all the types of crimes mentioned

19  in your affidavit?

20  A    Both.  Both Title 26 and Title 18 violations.  The

21  object of the Title 18 conspiracy was to commit Title 26

22  violations.  So, I felt they went hand in hand.

23  Q    Agent Lapina, if you again look at Exhibit C and, in

24  particular, No. 1, I note that you do record a lot of

25  different types of financial documentation.

30

1        Were you able, at that time, to describe items more

2  particularly in light of the information available to you?

3  A    Well, I don't know if I was or I wasn't.  I mean, these

4  are the types of information that you need to be able to show

5  that Title 26 violations occurred or Title 18 violations

6  occurred.

7        We may have had some information, but we didn't

8  have it all.  And, you know, we were looking for basically

9  this evidence which would help us in my belief reconstruct

10  the income, determine the unreported income and tax, as well

11  as identify overt acts to the conspiracy and conspirators

12  involved.

13  Q    Well, I just noticed, for example, under No. 1 you

14  indicate bank statements.

15        Would it have been prudent for you to put in here

16  that bank statements should only apply to a particular entity

17  or from a particular bank?

18  A    No.  Because I felt that, based on my training, that you

19  have bank statements and other financial records in your

20  possession that's evidence of either ownership and/or control

21  of those financial accounts.

22  Q    And are they basically needed for your investigation to

23  determine all financial records?

24  A    Yes.  All financial records that were tied back to

25  Daniel Leveto.


                              31


1  Q    And for what purpose?

2  A    Again, if you are doing an indirect method of proof, you

3  have to be able to establish those bank account balances with

4  a reasonable certainty, you have to be able to determine the

5  value of the assets with a reasonable certainty.  Liabilities

6    have to be determined.

7        I mean, you can't put together a half-baked

8    computation because you don't have all the evidence.

9        MR. VORACEK:  Your Honor, the United States moves

10   for the admission of Government's Exhibits A, B, C and D.

11        THE COURT:  A, B, C and D are admitted.

12   BY MR. VORACEK:

13   Q    Agent Lapina, you indicated that after the warrants were

14   prepared and approved that you presented them to the

15   magistrate.  Was that your testimony, sir?

16   A    Yes.

17   Q    Do you recall when you presented them to the magistrate?

18   A    I believe it was on May 1st, 1996.

19   Q    And what did you present to her?  Was it Government

20   Exhibits A, B, C and D?

21   A    Yes.  I would have taken the approved affidavit,

22   application and the affidavit, as well as the two warrants

23   and the items to be seized, to her.

24   Q    Did you discuss the information included in Government

25   Exhibit D with the magistrate?

32

1   A   Government Exhibit D?

2   Q   Yes.  The affidavit, sir.

3   A   Yes.  She reviewed the information.  She read over the

4   affidavit and she didn't really have a lot of questions, as I

5   recall.  I know she commented that she felt it was thorough,

6   and basically she approved it.

7   Q   Did you sign the affidavit in her presence?

8   A   Yeah.  I would have sworn to the information in the

9   affidavit, I believe, in her presence.

10   Q   And was the affidavit then -- did the affidavit then

11   become part of the search warrant package at that point?

12   A   The affidavit we also -- I believe I took to her a

13   motion to seal the contents of that affidavit due to the fact

14   that we had confidential witnesses in the case.  And she

15   signed the motion to seal and basically then, you know, the

16   affidavit would not have been included or attached to the

17   warrants.

18   Q   And, in fact, the affidavit was sealed then?

19   A   Correct.

20   Q   All right.  Agent Lapina, after the warrant has been

21   approved, did you then, in fact, execute a search warrant at

22    the locations described in Government's Exhibits A and B?

23    A    Yes.

24    Q    And did that happen -- when did that happen?

25    A    Well, both of those warrants were executed -- I believe

33

1    it was May 2nd, the following day.

2    Q    The day after the magistrate signed the warrants?

3    A    Correct.

4    Q    And what steps did you take, sir, as the lead agent of

5    the case, in relation to the execution of the warrant?

6    A    Well, internal policy dictates that even if you have an

7    approved affidavit and permission to execute a warrant, you

8    have to -- internally you have to prepare a search warrant

9    plan and a risk assessment basically showing that you have a

10    logical plan to facilitate the execution of these warrants

11    and basically they are not high risk which would involve any

12    potential dangers to members of the search team as well as

13    the occupants of the addresses where you are going to.

14    Q    Did you have an opportunity to discuss the warrants with

15    the agents who would be involved in the execution of the

16    warrants?

17  A    Yes, I did.  On the afternoon of May 1st, we had a

18  meeting of all the participants, and at that time I would

19  have provided them with a synopsis, a summary of the case,

20  basically the subjects who we were aware of that were

21  involved in these activities, the timeframes that we were

22  looking at to help prove the violations.

23  Q    Were they also provided with copies of the warrants

24  Exhibit A and Exhibit B?

25  A    Yes, they would have been provided with A and B, as well

34

1  as the items-to-be-seized list, which was Exhibit C.

2  Q    Did you also provide the agents with a copy of your

3  application affidavit, Government Exhibit D?

4  A    Well, due to the fact that the affidavit was sealed, I

5  had a draft of the affidavit which I would have more than

6  likely circulated while I was going over the synopsis and

7  summary of the investigation.

8        I do believe that I gave a draft.  I would have

9  collected those after the meeting so there was no chance that

10  that information would be let out.  And I do believe that the

11  two -- the team leader who did the residence and the

12  assistant team leader who was helping me at the business,

13  were provided with copies of the drafts of that affidavit.

14  So, you know, they had it with them during the course and

15  execution of the search warrant.

16  Q    To the best of your knowledge, were any agents or anyone

17  else involved in the execution of the warrants that weren't

18  present at your meeting on May 1st?

19  A    The only individual that was not present would have been

20  the local Vernon Township police officer.

21  Q    And did that individual participate in the -- actually

22  searching either the business or the residence?

23  A    No, he didn't.

24  Q    Agent Lapina, I now ask you to look at what's been

25  marked as Government Exhibit E.  Do you see that, sir?

36

1  A    Yes, I do.

2  Q    What is that document, sir?

3  A    I believe this is a statement which I would have signed

4  and had notarized back in August of this year.

5  Q    Is that an accurate reflection of your statement, sir?

6         Is everything on that document, Exhibit E, accurate

7    to the best of your knowledge?

8    A    Yeah, to my knowledge, it is.  Otherwise, I wouldn't

9    have signed it.

10   Q    Sir, I ask you now to, regarding the actual execution of

11   the search warrants, I believe you indicated they started on

12   May 2nd?

13   A    Correct.

14   Q    What time were the agents set to begin the search

15   warrants?  What time of day?

16   A    It was early in the morning.  We had a meeting at the

17   Vernon Township Police Department for both the teams that

18   were set to go to the business as well as the residence

19   addresses.

20   Q    There were two separate teams of agents?

21   A    Correct.

22   Q    One for the business and one for the residence?

23   A    That's right.

24   Q    And on that morning of May 2nd, did you all go to the

25   business together?

36

1  A    No.  The designated individuals for that team went to

2  the business to the staging area where we had or the way

3  area, whatever you want to call it, which was a car wash

4  close to the individual business.

5        And then the team that was set to do the search of

6  the house basically went to an area in close proximity to the

7  residence and awaited the -- for the direction from the team

8  at the business.

9  Q    Where did you go, sir, that morning?

10  A    I went to the business.

11  Q    And did you immediately begin to search -- did you

12  immediately gain entrance to the business when you got there,

13  or what were your actions?

14  A    Well, I believe we arrived there around six o'clock or

15  so.  And at around six-twenty is when Daniel Leveto arrived

16  at the veterinary business.  And with that, we would have

17  gone down, got out of the car, identified ourselves and

18  stated our purpose for being there, presented him with a copy

19  of the warrant and the items to be seized.  At that time, he

20  basically let the search team into the business premises.

21        The search team went about their duties in securing

22   the premises, doing the videotaping, doing the schematic

23   drawings and beginning preparations to search.

24        At that time, we made entry, myself and Special

25   Agent Adams, I believe, went into another area of the

37

1   business and had some discussions with Dan Leveto about not

2   only the search warrant at the business but the search

3   warrant to be executed at his residence.

4   Q   Sir, I believe you mentioned that the agents went around

5   and put -- did they put letters on certain rooms at the

6   business?

7   A   Yes.  It's standard practice, basically each room in a

8   structure would get a letter and so you can determine

9   basically for seizing purposes where information was found

10   based upon the letter referenced.

11   Q   I ask you to look at what's been marked as Government

12   Exhibits M-1, M-2 and M-3.

13        Sir, are those documents the drawing of the

14   business, the index of letters, the lettered rooms and the

15   letters that were actually used at the business on May 2nd,

16   1996?

17   A   Which ones are you specifically referring to?

18   Q   M-1, M-2 and M-3.

19   A   I only see M-3.  Here we go.  M-1 and M-3.

20        THE COURT:  You have an M-2?

21        THE WITNESS:  I got an M-3.

22        THE COURT:  Do you want to borrow my M-2?

23   Q   Sir, are those the documents that you just described as

24   far as the drawing of the business and the letters used by

25   the agents in reference to rooms at the business?

38

1   A   Yeah.  These letters look to be in the handwriting of

2   the individuals who were -- the initials of the individuals

3   who were at the business location.  Referring to M-3.

4        M-2, I am looking at are basically the initials of

5   Teresa Slupe who was there at the business as well.  She

6   would have basically made this the reference -- what letters

7   referenced what rooms in that business.

8   Q   So, it is my understanding from your testimony, sir,

9   that after the rooms were lettered and drawings made, that a

10   tape is then made, a videotape?

11  A    Yeah, once the letters are put up.  And basically the

12  videotape is made to show what the building looked like

13  before the warrant, the search actually started, and also one

14  is made at the end after the search warrant is completed.

15  Q    And do you know that such tape was made in this case?

16  A    Yeah, I believe that they were.

17        MR. VORACEK:  Your Honor, if I may approach the

18  witness?

19        THE COURT:  Sure.

20  Q    Agent Lapina, I hand you what's been marked as

21  Government Exhibits -- Government Exhibit J.  And does

22  Government Exhibit J -- have you had an opportunity to

23  previously review that tape?

24  A    Yeah.  I believe I reviewed Exhibit J, as well as the

25  other two.

39

1  Q    And is Government Exhibit J -- does that -- was that a

2  videotape of the business prior to the search and also after

3  the search conducted on May 2nd, 1996?

4  A    Yeah, I believe it was.

5          MR. VORACEK:  Your Honor, I move for the admission

6    of Government's Exhibits M-1, M-2, M-3 and Government

7    Exhibit J.

8          THE COURT:  M-1, 2 and 3 and J are admitted.

9    Q    Okay, sir, after the tape is made, does the -- did the

10   search begin of the business?

11   A    Well, at that time, I know the searching activities were

12   going on there, but Judy Graham was the assistant team leader

13   there who basically took over that facet.

14          A lot of the time when I was there, I was in

15   discussions, with interview with Dr. Leveto, as well as

16   Special Agent Adams was with me, as well, in the business.

17   Q    So, you did not participate in the search, itself?

18   A    No.

19   Q    There was a team leader that was present at the search

20   of the business?

21   A    I designated another agent to be the team leader to

22   carry on if I became involved in a lengthy interview with

23   Dan Leveto.

24   Q    And are you aware of the procedures that were utilized

25   in the search of the business?

1   A    Again, the agents, prior to searching, would have

2   secured the premises.  Once the premises was secured, they

3   would have put the letters up in each room and basically had

4   a listing corresponding each room to the letter.  A videotape

5   prior to starting did a schematic drawing of the rooms in

6   that business.

7   Q    Now, sir, if an agent finds documents that the agent

8   feels is related to the items to be seized, does the agent

9   take the exhibits at that time or documents, or what does the

10  agent do with them?

11  A    Well, the agent would have an envelope, typically a

12  manilla envelope, and they would put those documents into the

13  envelope and label as to what room they came from and give

14  you a description of what those documents were.

15        And say, for instance, it was room A and they can

16  only fit so many in one envelope and they knew they had to

17  use multiple, they would label that A-1 and go on and to the

18  next one, A-2, until they were complete.

19  Q    Now, the actual searching agents, they do have a copy of

20  the items to be seized that they can refer to?

21  A   Yes.

22  Q   At the time of the execution of the warrant?

23  A   Sure.

24  Q   And after they seize such documents, do they then

25  provide such documents to another agent for cataloging?

41

1  A   How we had that process set up was, we had the

2  individuals who had our computerized search warrant inventory

3  program, and when the agents were done with the room, they

4  would take whatever it is that they had in the envelopes to

5  be seized up to that individual for input into the search

6  warrant inventory program.

7  Q   And was that done at the business?

8  A   Yes, it was.

9  Q   And was an inventory of the actual seized documents made

10  at the business?

11  A   Yes.

12  Q   And if I ask you to refer to Government Exhibit F, is

13  that sufficient?

14      THE COURT:  F?  What letter?

15      MR. VORACEK:  F.

16    THE COURT:  F?

17    MR. VORACEK:  F.

18  Q    Does Government Exhibit F accurately reflect the

19  inventory of the seized items taken from 316 Conneaut Lake

20  Road on May 2nd, 1996?

21  A    Yes.  This is the inventory that would have been -- This

22  would have been a copy of the computer-generated inventory

23  from the program based upon the input of the individual who

24  was doing that.

25  Q    Would Dr. Leveto have been provided with a copy of

42

1  Exhibit F at the conclusion of the search at the business?

2  A    Yes, he would have been.

3  Q    And when you started the search, was Dr. Leveto provided

4  with a copy of the search warrant, Government Exhibit A?

5  A    Yes, he was provided with a copy of the search warrant

6  for any items to be seized from the business as well as his

7  residence.

8  Q    So, he was provided with a copy of the Government's

9  Exhibits A, B and C?

10   A   Yes.

11   Q   And that was prior to the initiation of the searches?

12   A   Yes.

13   Q   Now, I think you said, sir, that you weren't actively

14   involved in searching the business that day?

15   A   No, I was not.

16   Q   Did you indicate that you met with Dr. Leveto the very

17   first thing in the morning?

18   A   Yeah.  What my concern was, that I had done surveillance

19   on both his business and his residence for a number of days

20   and to establish -- I knew he had children at his residence

21   who basically left to go to school at a certain time in the

22   morning.

23        And knowing that, knowing that we had to execute a

24   search warrant there, I then discussed with Mr. Leveto what

25   possible options we had.  You know, we could hold off on

43

1   serving that warrant at the residence until the children had

2   left to go to school.

3        However, that basically to do that, I couldn't

4   leave him making phone calls.  I couldn't have him leave the

5   business.  I couldn't have other employees come in and leave

6   the business for fear that communications with whoever was at

7   the residence would occur and possible destruction of

8   evidence.

9   Q    And were you in communication with the search team for

10   the residence?

11   A    Yes, I was.

12   Q    And were you able to determine -- did you find out when

13   the children vacated the residence?

14   A    Yes.  The team leader, Susie Hines, in discussions with

15   her had indicated, I believe, it was around eight o'clock

16   that morning that the children had left to go to school.

17   Q    And at that point, what did you do?

18   A    At that point -- well, basically, in my discussions with

19   Dan Leveto, he agreed to the conditions for us holding off on

20   executing the warrant until his children had left to go to

21   school.

22        Knowing that they were gone, asked him if he wanted

23   to be there, he wanted to be present.  He said yes, he wanted

24   to be present.  That necessitated us transporting him to the

25   residence.

1        Before we did that, I had some concerns that

2   transporting this individual in preparation to execute a

3   search warrant of his residence, that I don't want any

4   problems in the vehicle on the way there.  So, Special Agent

5   Adams did a pat-down to make sure he didn't have any kind of

6   instruments or knives or anything on him that possibly would

7   present a problem to us.

8        After that, we got in the vehicle, all -- it was

9   myself, Special Agent Adams, Dan Leveto as well as Special

10  Agent Ed Wirth and we proceeded to his residence.

11        We met up with the search team, where they were in

12  their area.  There was a Meadville police officer there which

13  we were going to use as a marked unit out in front of the

14  residence.  Dan Leveto had indicated he did not want that

15  police car in front of his house so we cut the police officer

16  loose, gathered up everybody and proceeded to his residence

17  where he effected entry and that's where we encountered his

18  wife.

19  Q    Did Dr. Leveto have some discussions with his wife at

20  that point regarding what was to take place?

21   A   Yeah.  There were some brief discussions about what --

22   she was informed who we were and why we were there and what

23   our purpose was and what we were going to do, et cetera.

24       We weren't there very long when he indicated he

25   wanted to return to the business.  So, we did.  We left and

                                    45

1   went back to the business and the search team at the

2   residence continued to do their job.

3   Q   So, the transportation of Dr. Leveto to the residence

4   was at his request?

5   A   Yes.  He wanted to be present.

6   Q   Was Dr. Leveto handcuffed while in the car to be taken

7   to the residence?

8   A   No, he wasn't.

9   Q   And after you encountered Mrs. Leveto at the residence,

10   you then transported Dr. Leveto back to the business?

11   A   Yes.  We went back to the business and resumed the

12   interview which we had started prior to leaving.

13   Q   Do you know whether a search had taken place at the

14   residence?

15    A    Yeah.  The search was continued to proceed at the

16    residence after we had left.

17    Q    Now, you weren't present at the search of the residence?

18    A    No; only upon the entry.

19    Q    But, how do you know that search actually did occur at

20    the residence?

21    A    Well, because my communications with Special Agent

22    Hines, who was the team leader, she provided me with an

23    inventory after the search of the items to be seized, as well

24    as, I believe, a consent form, that there was a shed, I

25    believe, out back, something, that there was -- a consent to

46

1    search was signed off on to search that as well.

2    Q    Agent Lapina, I ask you to look at Government Exhibit G.

3    A    Okay.

4    Q    What is that, sir?

5    A    This is an inventory of item seized at 388 Edgewood

6    Drive, which would be Dan Leveto's residence, on May 2nd,

7    '96.

8    Q    And was Government Exhibit G, that inventory, prepared,

9    to the best of your knowledge, in the same way as Government

10  Exhibit F was prepared as far as the inventory of the

11  business?

12  A    Could you repeat the question?

13  Q    Yes, sir.

14        Government Exhibit G, a list of the items that were

15  seized from the home, was that also prepared under the same

16  process as you previously described with regard to the

17  business?

18  A    Yes.  To my knowledge, it was.

19  Q    And was a copy of Government Exhibit G, the inventory of

20  items seized, was that left with Mrs. Leveto or provided to

21  Dr. Leveto, to the best of your knowledge?

22  A    Yes, it was, to the best of my knowledge.

23  Q    And, sir, if I ask you to look at Government Exhibits

24  N-1, N-2 and N-3.

25  A    I have an N-3 here.

47

1  Q    All right.

2  A    I don't believe I have N-1 and 2.

3  Q    They should be just prior to N-3, agent.

4   A    Okay.  Here we go.

5   Q    And, sir, are Government Exhibits N-1, N-2 and N-3, does

6   that constitute a drawing -- a schematic drawing of the rooms

7   at the residence and also an index of the lettered rooms at

8   the residence and lettered placards that were used at the

9   residence on the day of the search warrant, May 2nd, 1996?

10  A    Yes, they do.

11  Q    And, sir, to the best of your knowledge, were videotapes

12  also made of the residence prior to the search and after the

13  search?

14  A    Yes, to the best of my knowledge.

15  Q    Have you had an opportunity to review those videotapes?

16  A    Yes.

17  Q    And I ask you, sir, to look at Government Exhibits K

18  and L.  Do you have them?

19  A    Yes.

20  Q    And are those videotapes, sir, of the residence at

21  388 Edgewood Drive both prior to and after the search on

22  May 2nd, 1996?

23  A    Yes, I believe so.

24        MR. VORACEK:  Your Honor, the government moves for

25  the admission of Government's Exhibits G, K, L, N-1, N-2 and

1  N-3.

2        THE COURT:  Okay.  G.  We had already admitted J, K

3  and L.

4        MR. VORACEK:  Yes.

5        THE COURT:  And N-1, 2 and 3 are all admitted.

6        MR. VORACEK:  Yes.

7  Q   Agent Lapina, you did mention that you had received a

8  voluntary consent to search a building on the residence.

9        Was that part of your prior testimony, sir?

10 A   Yeah; not only the residence, but I also believe at the

11 business we had received voluntary consent to search the

12 upstairs apartment area at the residence.  I believe there

13 was an outbuilding.

14 Q   Agent, I ask you to look at Government's Exhibits

15 O and P.

16 A   Okay.

17 Q   And what are Government's Exhibits O and P, sir?

18 A   This is IRS Form 6884, which were voluntary consent to

19 search a person, premises -- premises or conveyances.  And in

20  this case, they are both -- one is relative -- O is relative

21  to second floor apartment used for storage by Daniel Leveto

22  at 316 Conneaut Lake Road, Meadville.

23        The other was for an outbuilding, which would be

24  388 Edgewood Drive, Meadville.  Both signed by the agents, as

25  well as one -- O is signed by Dan Leveto.  P is signed by

49

1  Margaret Leveto.

2  Q   Searching locations that are described in Government

3  Exhibits O and P, did you determine that they did not fall

4  within your search warrant of A and B?

5  A   It was questionable as to whether they did or not.  And

6  basically without having to get another warrant, if they were

7  agreeable and consented to our search of those areas, you

8  know, we felt to basically protect ourselves.

9  Q   And was consent provided to you by Daniel Leveto?

10  A   For the business, second floor area.

11  Q   Did he sign the document, Government Exhibit O?

12  A   Yes.

13  Q   And was consent also provided to search an outbuilding

14  at the residence?

15  A    Yes.

16  Q    And was that Margaret Leveto that provided such consent?

17  A    Yeah.  Her name is reflected on here.

18  Q    And she signed that document, sir?

19  A    Well, I didn't witness her signing because I wasn't

20  there.  I would imagine Susie Hines or George Torbic would

21  have witnessed her signing.

22       MR. VORACEK:  Your Honor, the government moves for

23  admission of Government Exhibits O and P.

24       THE COURT:  O and P are admitted.

25  Q    Sir, how did you spend then the rest of the day on

50

1  May 2nd, 1996, after you transported Daniel Leveto back to

2  the business?

3  A    Special Agent Adams and I continued to interview him

4  until roughly midday.  Then we took a break and we had some

5  lunch, which we offered to Dan Leveto, which he declined.

6  Took a brief break for that and then we went back and

7  continued to interview him for another hour or so basically

8  until we filled that -- oh, I think at that time that, about

9   two-thirty or so that afternoon, that Dan Leveto had

10   indicated he didn't want to answer any more questions.

11   Q    Sir, prior to interviewing Dr. Leveto on May 2nd, 1996,

12   did you advise him that he really didn't need to sit down and

13   talk with you?

14   A    Yeah.  We advised him that he was free to go at any

15   time.

16   Q    Was he really free to leave the business?

17   A    Sure.

18   Q    But, he chose to stay?

19   A    He chose to stay.  I mean, I told him that if he left,

20   he could come back.  But, if he -- you know, he was free to

21   stay as long as he wanted to and he was under no obligation

22   to answer any questions of ours either.

23   Q    Prior to interviewing him on May 2nd, did you read him

24   any rights, any noncustodial type rights?

25   A    Yes.  It's policy -- IRS policy in an administrative

51

1   investigation that prior to interviewing the subject of the

2   investigation, you have to administer your noncustodial

3   rights to the individual.  And that's what I would have done

file:///A|/LEVETO1.TXT

4  early on before we started to interview him.

5  Q   Is part of those rights that you administered to

6  Dr. Leveto that day the right that if Dr. Leveto wants, he

7  could have an attorney present?

8  A   I believe that to be in there, yes, sir.

9  Q   Is it also part of those rights that at any time during

10  the questioning of the agents, that if Dr. Leveto wanted to

11  call a halt to the questioning, he could do so?

12  A   Yes.

13  Q   And, in fact, isn't that what he did at some point

14  during the day?

15  A   Yes.  Approximately -- I believe it was like, you know,

16  two, two-thirty, that he indicated he didn't want to answer

17  any more questions, he wanted to talk to counsel.

18  Q   Agent Lapina, now you searched the business on a regular

19  business day of the veterinary practice, is that correct,

20  sir?

21  A   Yes.

22  Q   Did other employees, other than Dr. Leveto, show up at

23  the business that day?

24  A   Yes, I believe they had showed up.  Again, I was in with

25   Dan Leveto for a considerable amount of time, but we knew

52

1   they would be reporting for work.

2          Special Agent Graham was prepped on what she needed

3   to do as far as dealing with those employees.

4   Q    Did the business actually operate that day?

5   A    Not until later in the afternoon after the search was

6   substantially complete.

7   Q    What about patients, did the patients start showing up,

8   or how was that arranged?

9   A    I believe that Special Agent Graham, with the assistance

10  of some of the employees, started to cancel some of the

11  appointments.  Anybody who showed up with animals, I believe

12  that Dan Leveto provided the name of another veterinarian

13  clinic where they could go if they needed medical attention.

14         The purpose of all that being that we have

15  individuals conducting a search and for purposes of that, I

16  didn't think it was conducive to have a business operating

17  where you had animals and potentially surgeries and medicines

18  being administered.

19         And also, you know, there is really not a need for

20  those individuals to know what was going on either.

21  Q   Did you indicate that the business was able to operate

22  later that same day?

23  A   Yeah.

24  Q   When did your search conclude?

25  A   Well, it was substantially completed about two-thirty, I

53

1  believe.

2       However, there was a computer in the back area of

3  that business that was being imaged by one of our computer

4  people and we didn't really know it was going to take a

5  while.  But, that was out of sight.  Nobody was going to see

6  that individual back there.  It was agreed that the

7  individual could remain there and complete the work and then

8  the business could reopen while he was doing that.

9  Q   Now, while the search was undergoing at the business and

10  at the residence, do you know if there were occasions where

11  agents may have taken boxes of documents or that included

12  some documents that weren't actually reflected in the items

13  to be seized?  Do you know that to be the case?

14  A   Yeah, I believe that it's possible because later, I

15  think there was some items potentially like greeting cards,

16  or something, that may have been mixed in with other evidence

17  to be seized.

18  Q   Now, if an agent is searching a location and they find

19  documentation that they see is something that they should

20  seize and it's included in a box, will they necessarily take

21  the whole box or will they go through every document in that

22  box?

23  A   Well, I believe that if they find evidence within that

24  box which is indicative of the items to be seized that they

25  take the whole box.  And at this point in time, to limit the

54

1  intrusion of having the business closed for a prolonged

2  period of time and potential that the children were going to

3  come home from school at the residence, I believe that they

4  did seize evidence in containers or boxes that were at least

5  indicative to them it was on an items to be seized, they may

6  have taken the whole box.

7  Q   Sir, when the warrants were -- when the searches were

8  completed on May 2nd at both the residence and the business,

9   did you then return the search warrants to the magistrate?

10   A    I believe I probably would have returned them the

11   following day.

12   Q    Did you also include the inventories that were expressed

13   in Government Exhibits F and G with the search warrants to

14   the magistrate?

15   A    Yes.

16   Q    And I think your testimony was that inventories were

17   left with Dr. Leveto for both the items taken at the business

18   and taken at the home?

19   A    Well, for -- the items taken at the business would have

20   been left there at the business with Dan Leveto and at the

21   residence would have been left there at the residence with,

22   to my knowledge, Margaret Leveto.

23   Q    Now, the items that were seized at both the residence

24   and the business, where did they go after the searches were

25   completed on May 2nd?

55

1   A    They were transported back up to Erie to our offices.

2   Q    Did you have physical possession of those documents at

3   that time?

4   A    Yes.

5   Q    And did you undertake a review of those documents?

6   A    Yes; over many months.

7   Q    About how many boxes in total were seized on that day?

8   A    Numerous.  That's all I can say.  I couldn't give you an

9   accurate estimate.

10  Q    What if I say a dozen boxes?

11  A    Oh, I believe it to be more than a dozen.

12  Q    All right, sir, I ask you to look at what's been marked

13  as Government Exhibit M-4 and M-5.  M, as in Mary, five.

14  A    Okay.

15  Q    Do you have those in front of you, sir?

16  A    Yes.

17  Q    Sir, is the information that's included on those

18  documents reflective of your review of the seized documents

19  from the business and the residence?

20  A    Well, I believe M-4 to be from the day of the search.

21  It's labeled 5-2-96.  It would have been indicative of

22  Teresa's final tabulation of the inventory of the items to be

23  seized.

24  Q    And what about M-5?

25   A   M-5 would have been documents or notes that I would have

56

1   prepared during the course of preparation to -- during review

2   of the evidence, as well as in preparation of returning some

3   of this information.

4   Q   Your review of some of the documents that were seized at

5   the business, did you determine that they should or could be

6   returned to Dr. Leveto?

7   A   Well, go starting with, I believe, the following Monday

8   after the search, Daniel Leveto had requested that the items

9   be returned, or certain items that he wanted returned to him,

10   and I would review those items based upon his request, and if

11   I felt that we could just make photocopies and return the

12   items to him, we did that.

13       My review of the evidence entirely, I do not

14   believe was completed until later in the year 1996 just due

15   to the volume of the evidence and other assignments that I

16   had.

17   Q   Was it fair to say, though, that Government Exhibit M-5

18   constitutes a review of your -- of the documents that were

19   seized at the business and some of the documents that were

20   copied and returned to Dr. Leveto on specific dates?

21   A    Yes.

22   Q    And if you look at Government Exhibit N-4, does that

23   constitute again your review of the documents that were

24   seized at the home, at the residence on May 2nd, 1996, and

25   your making copies and/or returning some of those documents

57

1    to Dr. Leveto?

2    A    Correct.

3         MR. VORACEK:  Your Honor, the government moves for

4    the admission of Government's Exhibits M-4, M-5 and N-4.

5         THE COURT:  Government's Exhibits M-4, M-5 and N-4

6    are admitted.

7    Q    Agent Lapina, I now ask you to look at Government

8    Exhibit H.  Do you have that in front of you, sir?

9    A    Yes, I do.

10   Q    What is that document, sir?

11   A    Well, this is a listing basically of seized items which

12   would be used in evidence in the government's case.

13   Q    Have you had an opportunity to review that list, sir?

14    A    Yes.

15    Q    Have you had a recent opportunity to review the actual

16    documents reflected on Government Exhibit H?

17    A    Yes.  Last week.

18    Q    And were you able to determine whether or not the

19    documents reflected on Government Exhibit H were, in fact,

20    seized at either the business or the residence on May 2nd,

21    1996?

22    A    Yes, I believe them to be.

23    Q    You believe every document on Government Exhibit H to

24    have been seized at either location?

25    A    Well, like, I had reviewed some of the bank records that

58

1    were there.  I believe that the bank statements themselves

2    for some of the local bank accounts were the seized

3    documents, yes.

4    Q    Sir, was there a way that you could determine if a

5    document was seized at either the business or the residence

6    and where in the business or residence it may have been

7    seized?

8    A    During my review of the evidence, I would have gone

9    through the documents basically looking where they were

10   pulled out of -- what envelope they were in, which was

11   indicative of where they were located or found, and I either

12   would have handwritten likely in pencil on that document at

13   the top as to where it was found, or I had a stamp which I

14   would have stamped that document as to what particular --

15   like, if it was room B, if it was B-1, 2, 3, or B so forth

16   and so on, to designate whether it was at the business or the

17   residence.  I would have put an R next to the letter, which

18   was indicative of the residence rather than the business.

19   Q    Sir, I ask you to look at Government Exhibit H and I

20   note that the Exhibits 11 through 21 appear to be related to

21   financial institutions, bank records.

22   A    Correct.

23   Q    Sir, were such records included as part of the items to

24   be seized as stated in your -- as attached to your warrants?

25   A    Yes, I believe them to fall into this category one.


59


1    Q    Sir, I note also that if we refer to Government Exhibit

2    H, it appears that Exhibits 22 relate to credit card

3   information.

4         Was credit card information also part of the items

5   to be seized as attached to either of your warrants?

6   A   Yes.

7   Q   And I note that Government's Exhibits 23 has to do with

8   investment account information.

9         Was that also part of the items to be seized

10  attached to your warrants?

11  A   Yes.

12  Q   And where would that have been found on the attachment

13  to the warrant?

14  A   Well, there is one in there including the purchase, sale

15  and trading of commodities, stocks, bonds, mutual funds, or

16  other investments.

17  Q   And you are reading that from Exhibit C?

18  A   Yes.  Under No. 1.

19  Q   Sir, I now ask you to look at Government Exhibit H.

20  Numbers 30 through 36 appear to relate to business ledger

21  information from the veterinary practice, is that correct,

22  sir?

23  A   Yes.

24  Q    And the business ledger information, does that concern

25  the financial affairs of the veterinary practice?


                                   60


1   A    Yes; to my knowledge, yes.

2   Q    And did you review those documents, sir?

3   A    I did.

4   Q    Sir, was the documents that are reflected in numbers 30

5   through 36 on Government Exhibit H part of the items to be

6   seized under Exhibit C?

7   A    Yeah.  No. 1, I mean, books, records and ledgers, which

8   I believe what these items were.

9   Q    Sir, again looking at Government Exhibit H, if we

10  generally look at what's been numbered from 70 through 154,

11  sir, are those documents reflective of certain

12  correspondence, faxes, with names on it such as Donald

13  Turner, Center Company, and FAR?

14  A    Up to what exhibit?

15  Q    154.  70 through 154.

16  A    Yes.

17  Q    And, sir, were those documents also part of the items to

18  be seized at the -- during the searches?

19  A   I believe that these would have fallen into either No. 1

20  or No. 2 on that items-to-be-seized list.

21  Q   Sir, Government Exhibits 160 through 225, as noted on

22  Government Exhibit H, appear to relate to bank records of a

23  certain type.  Is that correct?

24  A   Foreign bank records.

25  Q   Foreign bank records, sir?

61

1  A   Yes.

2  Q   Do foreign bank records fall within the items to be

3  seized as reflected on Government Exhibit C?

4  A   Sure.  I believe they do.  I believe they fall into item

5  one, at a minimum.

6  Q   All right.  Sir, look at -- if I can draw your attention

7  to Exhibit No. 229 on Government Exhibit H.

8  A   Yes.

9  Q   And what is Government Exhibit 229?

10  A   It was a stamp of a signature for an individual named

11  Leonard Adler.

12  Q   And was that seized, sir?

13  A   Yes.

14  Q   And did that also fall within the items-to-be-seized

15  list attached in Government Exhibit C?

16  A   Yeah, I believe that to -- based on other evidence

17  related to that that was found would be evidence which was

18  indicative of, and other items evidencing the obtaining,

19  secreting, transfer and/or concealment of assets and the

20  obtaining, secreting, transfer, concealment and/or

21  expenditure of money.

22        Also, it could have been possibly number two.  It

23  could have fallen into the co-conspirator category.

24  Q   Can you describe the stamp?  What type of stamp was it?

25  A stamp of what?


                              62


1  A   A stamp of a signature.

2  Q   And was that signature Daniel Leveto's signature?

3  A   No.

4  Q   Whose signature was on the stamp?

5  A   Appeared to me that it was the signature for someone

6  named Leonard Adler.

7  Q   And where was that stamp found?

8   A   I believe it was found in the office area, maybe more

9   particularly in the office safe area.

10       I would have to look specifically at the items to

11  be seized.

12  Q   Agent Lapina, I now ask you to look at -- on Government

13  Exhibit H, numbers 230 to 329.

14       Do those appear to be handwritten notes?

15  A   230 to what number?

16  Q   329.

17  A   Yes, they do.

18  Q   And was it your determination that those handwritten

19  notes fell within the list of items to be seized on a -- that

20  are reflected in Government Exhibit C?

21  A   Yes, I believe they fall into -- into the area of other

22  items which would evidence the secreting or basically

23  obtaining, secreting, transfer, concealment of assets and

24  expenditures of money.

25  Q   Was there any information that you were able to glean

                              63

1   from Government Exhibits 230 to 329 that reflected financial

2   affairs?

3   A    Well, as I recall, some of these notes were notes

4   that -- primarily that I believe were in Dan Leveto's

5   handwriting relative to directions or instructions on how he

6   was to carry out certain procedures in this scheme.

7        Also, I remember seeing notes, handwritten notes

8   which also I believe were in his handwriting indicating how

9   funds would go from the U.S. to foreign accounts, eventually

10  come back to the United States.

11  Q    Did any of those notes also include the names of

12  individuals and/or entities that are reflected in your

13  affidavit as part of the overall scheme?

14  A    Yeah.  I believe that the Center Company and

15  Edge Co., Box Elder, and some of the individuals, Don Turner

16  and Paul Harris, and so forth and so on, names were reflected

17  in those notes.

18        MR. VORACEK:  Your Honor, the government moves for

19  the admission of Government Exhibit H.

20        THE COURT:  H is admitted.

21  Q    Sir, just to clean up loose ends, do you have Government

22  Exhibit I in front of you?

23  A    Yes.

24  Q    And what is Exhibit I?

25  A    Exhibit I appears to be a drawing that -- of the

64

1   Edgewood Drive residence.  That would have been done for us

2   by Kathy Kalustian.

3        MR. VORACEK:  Your Honor, the United States moves

4   for admission of Government Exhibit I.

5        THE COURT:  I is admitted.

6   Q    Sir, after the conclusion of the search warrants on

7   May 2nd, 1996, you continued your investigation of Daniel

8   Leveto?

9   A    Yes.

10  Q    Did you issue summonses in the case?

11  A    Yes.

12  Q    What types of summonses did you issue?  Can you explain

13  that?

14  A    Well, Form 2309 is an IRS summons which is used to

15  compel testimony or used for compelling the production of

16  records which is enforceable, I believe, in Federal Court,

17  and these are typically used in administrative criminal

18  investigations to obtain evidence needed.

19  Q   Sir, I ask you to look at Government Exhibit Q.

20  A   T as in Tom?

21  Q   I am sorry.  Q.

22  A   Q?

23  Q   Q as in queen.

24  A   Okay.

25  Q   Do you have that, sir?  What is that exhibit, sir?


65


1   A   This appears to be a schedule of the summons that were

2   served in this investigation by either myself or other

3   individuals.

4   Q   All right.  It's a summons to individuals and/or

5   entities?

6   A   Correct.

7   Q   And what generally is requested in summonses?

8   A   Well, it could be a summons for testimony or a summons

9   for the production of records or it could be for both.  Okay.

10  There was a number of records that -- although we had

11  executed search warrants, there were still a number of

12  records that we needed to prove -- to finish proving the

13    criminal case.

14          I mean, some of the records that we seized were

15    incomplete, so forth and so on, and we had leads to some

16    records.  We had to interview people, get testimony relative

17    to the transactions from some of those records.

18    Q    Now, at the time that those summonses, as reflected in

19    Government Exhibit Q, were issued, had the Department of

20    Justice taken over the investigation of the case?

21    A    No.

22    Q    The case had not been referred -- at those times that

23    are reflected on the summonses, it had not been referred to

24    the Department of Justice?

25    A    No.  I mean, we had probable cause to execute search


                                    66


1    warrants, but by no means were we finished with the criminal

2    investigation and ready to make a referral for prosecution.

3    Q    After a referral of prosecution is made to the

4    Department of Justice, may the IRS still continue to issue

5    summonses?

6    A    No.

7   Q   So, is it your testimony then that all the summonses

8   that are reflected in Government Exhibit Q predated the

9   referral of the case to the Department of Justice?

10  A   To the best of my knowledge, at least the ones I served

11  and I don't believe -- you know, without seeing the exact

12  date of the referral, I know the ones that I did, basically

13  up and through the beginning of 1998, there was no referral

14  made to the Department of Justice.

15  Q   Did you leave the investigation at sometime in 1998,

16  agent?

17  A   Yes, I did.

18  Q   And why did you leave the investigation?

19  A   There was an opportunity for a supervisory position in

20  the Pittsburgh office.  Basically, I was out of the

21  investigation probably from the beginning of 1998.  I was

22  acting as supervisor there for a few months and then later

23  was promoted to the job full time, I believe, in late July.

24  Q   Did another agent take over the investigation of

25  Dan Leveto at that time?

67

1   A   Yes.  Richard Adams took over the investigations.  He

2  was the most knowledgeable and assisted me most in the course

3  of the investigation.

4  Q    And that was sometime during the 1998 year?

5  A    Yes.

6  Q    Sir, I ask you now to look at Government Exhibits R

7  and S.

8  A    Okay.

9  Q    What are those documents, sir?

10  A    These are copies of summonses that I served to the

11  accounting firm of Maloney, Reed, Scarpitti & Company in

12  Edinboro relative to this investigation.  One is dated

13  May 30th -- or no.  I'm sorry.

14        One was served May 2nd, 1996.  That would be

15  Exhibit R.  Exhibit S was served June 6th of '97.

16  Q    Sir, when a summons is issued by the IRS, is the

17  taxpayer notified of the issuance of that summons?

18  A    Not on every summons.  There are certain summons

19  where -- served on individuals or firms that were considered

20  to be third-party record keepers.  And in this instance, this

21  accounting anywhere was Daniel Leveto's tax return preparers.

22  They would fall into that category.  So, notice was required

23   to be served at that time.

24   Q    So, when we look at Government Exhibits R and S, the

25   summonses to the accounting firm, Daniel Leveto was sent

68

1   notice of those summonses.

2   A    Yes.  I certified that I gave him notice in both

3   instances.

4   Q    Let's look at Government Exhibit R.

5   A    Yes.

6   Q    When was notice provided to Daniel Leveto of that

7   summons?

8   A    May 3rd, '96, at four o'clock in the afternoon I would

9   have mailed it to him.

10   Q    Do you have any other information that Daniel Leveto

11   received notice of that summons?

12   A    Yes.  Later, after he had obtained Leonard Ambrose as

13   his counsel, we had a meeting and discussion with him.  And

14   at that time, I recall he had the Attorney Ambrose ask

15   questions and bring up the fact that Dr. Leveto had provided

16   him with copies of notices which were served, summons that

17   were served on the Maloney, Reed, Scarpitti & Company and he

18  had inquired about records that were obtained pursuant to

19  that summons.

20         Actually, what happened in the first summons,

21  because I believe the conversation was in the fall of '96,

22  there only had been one summons served to that time.

23  Q    And as to Government Exhibit S, another summons to the

24  accounting firm, was Daniel Leveto notified of the issuance

25  of that summons?

69

1   A    Yes.  I certified that I notified him.

2   Q    And when would he have been provided with notice?

3   A    June 10th, '97, one-fifty in the afternoon.

4          MR. VORACEK:  The United States moves for the

5   admission of Government Exhibits Q, R and S.

6          THE COURT:  Q, R and S are admitted.  I may have

7   missed it, but I don't have -- I have D and I as -- wait a

8   minute.  E and F as having been identified by the witness,

9   but not offered in evidence.  Maybe I missed it.

10         MR. VORACEK:  That is my fault, Your Honor.  The

11  government moves for the admission of Government Exhibits E

12  and F.

13       THE COURT:  Okay.  E and F are admitted.  And I

14  think that's everything on this list.

15       THE CLERK:  Your Honor, do you have I?

16       THE COURT:  I have I as having been admitted.

17       MR. VORACEK:  Your Honor, the United States has no

18  further questions of Agent Lapina at this time.

19       THE COURT:  Okay.  Let's take a ten-minute break.

20  We'll reconvene at, say, twenty to twelve.

21  (Court recessed at 11:25 a.m.)

22  (Court reconvened at 11:40 a.m.)

23       THE COURT:  Be seated, please.

24       Okay, Mr. Leveto -- Dr. Leveto, you may

25  cross-examine.


70


1       MR. LEVETO:  Okay, Your Honor, I would just like to

2  let the Court know, and make sure that it's all right, that I

3  really would like to recall Agent Lapina after the

4  government's case in chief because he is going to be my

5  primary witness.

6       For cross, I have a few questions for him, but I

file:///A|/LEVETO1.TXT

7   would just like to make sure that I can do that.

8        THE COURT:  Okay.  You realize that calling him as

9   your witness means you have to accept everything he says as

10  true?

11       MR. LEVETO:  Yes, Your Honor.

12       THE COURT:  Okay.

13                    CROSS-EXAMINATION

14  BY MR. LEVETO:

15  Q    Agent Lapina, you had testified, and I would just like

16  to clarify for the record that you testified today that in

17  your assembling of the items to be seized that, in your

18  words, I believe it's an all records search, is that correct?

19  A    I don't believe that to be correct.

20  Q    Okay.  Could we -- okay.  So, you are saying that

21  Exhibit B is not an all records search?

22  A    Exhibit B relative to the residence at 388 Edgewood

23  Drive?

24  Q    Well, I am saying actually Exhibit B to either one.

25  They are both exactly the same.  So, I think that the

71

1   question generally is to both of them.

2   A   Well, the records that were articulated in Exhibit C is

3   what was to be seized.

4   Q   Oh, I am sorry.  Exhibit C.  Exhibit C then.

5   A   Okay.

6   Q   I am getting my exhibits confused with yours.  Okay,

7   Exhibit C.  Items to be seized.  That's the heading?

8   A   Yes.

9   Q   All right.  So, it was your term that it was an all

10  records search?

11  A   The records that were reflected on here?

12  Q   Yes.

13  A   I don't know what you mean by "all records."

14  Q   Okay.  I believe that that's what your testimony was,

15  but we'll let that go.  We'll go with that.

16          Also, Agent Lapina, you testified that you had

17  prepared the application and affidavit?

18  A   Yes.

19  Q   And you said you did not prepare the search warrants,

20  that they were prepared by the United States Attorney?

21  A   That's correct.

22  Q   Could you tell me who that United States Attorney was?

23  A   Well, the AUSA that I had dealt with during that

24  timeframe was James Donovan.

25  Q   James Donovan?

72

1   A   I assume that he's the one that prepared them.

2   Q   Okay.  Okay.  Agent Lapina, now I am a little bit

3   confused.  Perhaps you can help me out.  On Government

4   Exhibit I, No. 4, this -- I believe this is your affidavit

5   that was just prepared the 10th of August?

6   A   D?  The affidavit itself?

7   Q   Yes.  The affidavit.

8   A   Okay.

9   Q   E.  Your affidavit.

10  A   D, yeah, as in dog.

11  Q   E as in Edward?

12  A   Oh, E?

13  Q   I am sorry.  Maybe I'm not coming through clearly.

14  A   Okay.  Sorry.

15  Q   I'm a little bit confused when I read paragraph No. 4,

16  especially in light of the importance of this.

17        Could you perhaps clarify that for me?

18   A   Well, that statement, "I prepared the search warrants,"

19   I did not prepare the search warrants.  That's inaccurate.

20   Q   So, this affidavit of yours --

21   A   Exhibit A and Exhibit B, I did not personally prepare.

22   Q   Okay.  So, what you are saying is what you swore to on

23   the search warrant isn't correct?  Or on the affidavit.  I'm

24   sorry.  That's what you are telling me?

25   A   Well, I don't believe I swore to this information in the

73

1   affidavit.

2   Q   It's an affidavit, Agent Lapina.

3   A   I signed it and it was notarized and it was verified on

4   my part.

5   Q   And if you look on the last page, it says:  Subscribed

6   and sworn, I believe, to before me this 10th day of August?

7   A   Yeah.  But, I was not put under oath by the notary.

8   Q   I understand.  Okay.  So, it's kind of like it depends

9   on what the definition of his is.  Okay.  Thank you.

10        Okay.  Thank you.  Next I would like -- you had

11   testified that there was -- and this is another very, very

12    important thing.  You had testified that there was an

13    affidavit on the search site.  Perhaps -- a draft perhaps?

14    A    I testified that I provided the team leader and

15    assistant team leader with an affidavit, a draft of the

16    affidavit at the search meeting.  You know, what they did

17    with it -- I can't say that they actually had it with them.

18    I would assume that they did, but --

19    Q    Okay.  So, then saying that it was at the search site,

20    you are assuming that, so that's really not something that's

21    factually here, is that correct?

22    A    I would assume that they had it there with them.

23    Q    I see.

24    A    For reference purposes.

25    Q    Okay.    And you had referred to a discussion about

74

1    reading me noncustodial rights, and you had said that it's

2    customary in an administrative criminal investigation?

3    A    That's right.

4    Q    And I'm a little bit confused about that.  That's --

5    could you explain to me what an administrative criminal

6  investigation is?

7  A    Well, there is two types of ways we can conduct criminal

8  investigations.  One is through the administrative process

9  and one is through the grand jury process.  This was not a

10  grand jury situation which required the issuance of

11  subpoenas.  In a grand jury investigation, it's the

12  discretion of the U.S. Attorney assigned whether or not any

13  rights are read to individuals in noncustodial situations.

14         However, for an administrative case, which is an

15  IRS case internally, that basically is the policy, that when

16  you interview the subject of the investigation before

17  proceeding with the interview, you advise them of

18  noncustodial -- him or her of his noncustodial rights and

19  make sure they acknowledge that they understand those rights.

20  Q    Okay.

21         MR. LEVETO:  Thank you.  I would like to enter

22  Exhibit No. 1.

23         THE COURT:  I mean, were you going to ask him about

24  that?

25         MR. LEVETO:  Yes.

75

1  Q    Agent Lapina, do you recognize this page?

2  A    Yes.  This looks like part of our handbook which was

3  current policy at the time as far as summonses provisions.

4  Q    Yes.  And you speak of your familiarity with Title 26

5  and your authority to issue summonses.  I believe that it's

6  provided here on this page in No. 361, if I'm not mistaken,

7  is that correct?  There are a number of statutes listed

8  there?

9  A    Right.

10  Q    And in this case, we're actually talking about

11  third-party summonses.  Would you agree with that?

12  A    What situation in particular are you talking about?

13  Q    Well, the summonses that you testified about today.

14  A    Yes.

15  Q    They pretty much were third-party summonses, is that

16  correct?

17  A    Yes.

18  Q    Okay.

19  A    Well, third party in the classification of when notice

20  has to be provided?  I don't believe all of them fell into

21  that classification.

22  Q   Okay.  Let's -- we'll be more specific and say at least

23  those to James Scarpitti and perhaps an attorney, those are

24  third parties, is that correct?

25  A   I would agree, yes.

76

1  Q   Okay.  So, by this listing of statutes here, we know

2  that we have, or perhaps you'll confirm with me, that

3  IRC 7602, examination of books and witnesses, and 7609 IRC,

4  special procedures for third-party summonses are primarily

5  what we are talking about.

6        MR. LEVETO:  I would like to admit Exhibits 2

7  and 3.

8        THE COURT:  You can just give them directly to the

9  witness and then have him tell us what they are.

10  A   This appear to be -- Exhibit 2 appears to be from

11  weslaw.com.  Exhibit 3 appears to be from weslaw.com. dated

12  August of this year about relationship to 7602 and 7609 of

13  the Internal Revenue Code.

14  Q   Do you recognize those as those two statutes?

15  A   Yeah.

16  Q   And these pretty much are your summons authority, is

17   that correct, Agent Lapina, as you understand it?

18   A   Repeat the question, please?

19   Q   Are these what you would tell me or anyone that would

20   say, Agent Lapina, how do you have the authority, the

21   statutory authority to execute summonses for third parties?

22   A   Yes, I believe it would be found in these sections here.

23   Q   Okay.  So, could you look at, I think, 7602?  Is that

24   Exhibit 2, I believe?

25   A   Yes, it is.

                                77

1   Q   Could you look at Exhibit 2, 7602(c)?  This is the first

2   place that one would have any basically title notice of

3   contact of third parties.  And this is kind of a short

4   paragraph, but it's within the general statute of examination

5   of books and witnesses, speaking in a cursory fashion on

6   third-party summonses.

7        Would you agree with that, if you could look at

8   that, please?

9   A   Paragraph 3-A, B and C?

10   Q   No.  Paragraph C.

11  A   C, right.

12  Q   Yes.  So, within this general statute of examination of

13  books and witnesses, we have C, which is notice of contact of

14  third parties?

15  A   Right.

16  Q   And then it has exceptions.  In other words, this

17  subsection shall not apply, okay, and could you tell me what

18  No. 3 says in the C category?

19  A   It says it right here, C, with respect to any pending

20  criminal investigation.

21  Q   Okay.  Would you, Agent Lapina, perceive or believe that

22  a search and seizure, a judicially approved search and

23  seizure would have anything to do with a criminal

24  investigation?

25  A   The search and seizure is part of a criminal

78

1  investigation.

2  Q   Is it part of a criminal investigation?

3  A   Yes.

4  Q   Okay.

5  A   In this instance, it was.

6  Q    Okay.  So, notice of contact of third parties, this

7  subsection does not apply then, is that correct?  In other

8  words, the authority to issue a summons, you would not get it

9  from here if there is a criminal investigation occurring, is

10  that correct?

11  A    No, that's inaccurate.  If you read Exhibit 1, okay,

12  paragraph under Section 362, paragraph four, says, the

13  Supreme Court held that although investigation may result in

14  a recommendation of criminal prosecution be instituted

15  against a taxpayer, an Internal Revenue summons may be issued

16  under IRC 7602 in aid of an income tax investigation if it is

17  issued in good faith prior to recommendation for criminal

18  prosecution.

19  Q    Agent Lapina, do you know what good faith means in this

20  paragraph?

21  A    Yes.

22  Q    Could you explain it to me?

23  A    Well, in this instance, I had good faith in issuing the

24  summonses because I needed additional evidence to help me

25  prove the criminal charges, the criminal case.

79

1  Q   Okay.

2  A   Okay?  It wasn't -- I mean, I felt that when I issued it

3  that I was following all the procedures that were applicable.

4  Q   Okay.  Let's get back to the law.  Would you go along

5  with the concept that Subsection C would not apply during the

6  time that you execute a search and seizure because it is with

7  respect to a criminal investigation?

8  A   I really don't understand your question.  You know,

9  notice would have had to have been given to thirty-party

10  subjects to the investigation, so to speak, in this case when

11  it was so applicable.

12  Q   Let me see if I can put this another way.

13       I don't think I have the cite.  Sun, I believe it's

14  S-u-n, Baltimore v Getz(Sp), and I don't have the cite, where

15  the Court unequivocally stated that a search and seizure is

16  certainly a criminal proceeding and of the most adverse at

17  that.

18       What I am trying to establish here, Agent Lapina,

19  is that Subsection C does not apply with a pending criminal

20  investigation.  That doesn't say anything about the rest of

21  that 7602 because it does apply, but that's applying to the

22  taxpayer himself.  We are talking about notice of third

23  parties.

24  A    I guess are you saying that it doesn't authorize the

25  issuance of summonses when you have a pending criminal

80

1  investigation?  Is that what you are trying to say?

2  Q    That's what Subsection C seems to be implying.  Is that

3  correct?

4  A    Well, yeah, what it seems to be saying here, I don't

5  agree with.

6  Q    But --

7  A    I know what the policy was and the procedures for

8  serving summonses.

9  Q    Okay.  I'm interested in policies and procedures, but

10  I'm really most interested in the law.  So, why don't we --

11        THE COURT:  And that really is the function of the

12  Court, the Judge.  You know, what you are raising now are

13  questions of law.  This Agent Lapina doesn't purport to be a

14  lawyer.  I don't know if he is or not.

15        But, I think what you are raising is a question

16  that should be argued to me and the government can make their

17  argument in the same direction.  I don't think it has to come

18  from the witness.

19          MR. LEVETO:  Okay, Your Honor.

20          THE COURT:  I mean, you can get him to identify

21  this as being a regulation or directive, or whatever, but his

22  interpretation is something best left to the Court.

23          MR. LEVETO:  Okay.

24  Q   Let's move on from here then, Agent Lapina.  If you

25  could go to Exhibit 3.

81

1          Could you identify that statute?  Are you familiar

2  with that statute?

3  A   Internal Revenue Code 7609.

4  Q   Yes.

5  A   Special procedures for third-party summonses.

6  Q   Okay.  Could you go to 26, USC, 7609(c)(2)?

7  A   Okay.  Under exceptions?

8  Q   Yes.  This appears to me that this section shall not

9  apply to any summons, and then it lists the exceptions that

10  this section perhaps won't impart authority to.

11        Could you read E-1?

12  A   E-1 says -- well, two says the section shall not apply

13  to any summonses.  E-I-B(Sp) indicates issued by criminal

14  investigator or the IRS in connection with investigation of

15  an offense connected with the administration of enforcement

16  of the Internal Revenue laws.

17  Q   Okay.  That would appear to kind of support what we

18  talked about in 7602, but we don't have to go any further

19  with that.

20        I have just one more question, Agent Lapina.  I'm

21  not sure which exhibit it is, the first one to Mr. Scarpitti,

22  the summons.  It is Exhibit R.  Government Exhibit R.

23  A   Yes.

24  Q   The second page of Government Exhibit R, your

25  certification of notice, is it custom and policy to use

82

1  regular mail?

2  A   No.  Typically, you are supposed -- the policy is that

3  they send it certified or registered mail to the last known

4  address of the noticee.

5  Q   Okay.  Very good.  Thank you, Agent Lapina.

6       THE COURT:  Any redirect, Mr. Voracek?

7       MR. VORACEK:  Just one question, Your Honor.

8               REDIRECT EXAMINATION

9  BY MR. VORACEK:

10  Q   Why did you use regular mail, Agent Lapina?

11  A   Well, at the time of -- this summons notice was served

12  was -- I believe it was five three.  It was a Friday

13  afternoon about four o'clock.  I had a number of things that

14  had transpired during the course of the day.  I wanted to get

15  the notices out because  have three days and, at that time,

16  more than likely, I didn't have any certified cards, the

17  green cards which to attach to the mail.  So, I did the best

18  job I could.  I sent them as is.

19       MR. VORACEK:  No other questions, Your Honor.

20       THE COURT:  Okay.  Thanks, agent.  You may step

21  down, but you have to remain available for Mr. Leveto.

22  (The witness was excused.)

23       THE COURT:  Were you moving for the admission of

24  your Exhibits 1, 2 and 3?

25       MR. LEVETO:  Pardon?

1        THE COURT:  Were you moving for the admission of

2  your Exhibits 1, 2 and 3?

3        MR. LEVETO:  Yes, Your Honor.

4        THE COURT:  One, two and three are admitted.

5        Stand here and be sworn, please.

6        THE CLERK:  Can you raise your right hand?

7              * * * * *

8        RICHARD ADAMS, having first been duly sworn,

9  testified as follows:

10        THE COURT:  Would you have a seat up here, please,

11  and give us your name and spell your last name.

12        THE WITNESS:  My name is Richard Adams.  A-d-a-m-s.

13        THE COURT:  Thank you.

14              DIRECT EXAMINATION

15  BY MR. VORACEK:

16  Q    Mr. Adams, are you employed?

17  A    Yes.  I am a Special Agent with the Criminal

18  Investigation Division of the Internal Revenue Service.

19  Q    And how long have you been so employed?

20  A    Approximately ten years.

21  Q    What are some of your duties as a Special Agent of the

22  Internal Revenue Service?

23  A    My duties would be to investigate violations of

24  Title 26, Internal Revenue laws, and some money laundering.

25  Q    As part of your responsibilities as an IRS Special

Adams - Direct(By Mr. Voracek)          84

1  Agent, did you investigate Daniel Leveto?

2  A    I became involved in the case.  I did some work in the

3  initial stages of the case.  But, in -- I believe it was July

4  of 1998, I took over for case Agent Robert Lapina when he was

5  promoted to a manager position in Pittsburgh.

6  Q    After you became the case agent on the case in 1998, did

7  you at some point prepare a recommendation for prosecution to

8  the Department of Justice?

9  A    Yes.  The -- primarily, once I took over, a lot of the

10  aspects of the case had been pleaded, I completed a number of

11  schedules and put the -- a report together, yes.

12  Q    Was your case -- was the investigation of Dr. Leveto

13  ultimately referred to the Department of Justice to the best

14  of your knowledge?

15  A    Yes.

16  Q    Do you recall when that would have been?

17  A    I believe my report was submitted and approved in -- I

18  think it was June of 1999.  And then I believe the case after

19  that was referred over possibly in September.

20  Q    Now, I believe you stated earlier that you were involved

21  to a certain degree in the investigation of Dr. Leveto prior

22  to you becoming the case agent on the case in 1998?

23  A    That's correct.

24  Q    And did part of your involvement include the

25  participation and execution of search warrants at

Adams - Direct(By Mr. Voracek)            85

1  Dr. Leveto's residence and office?

2  A    Yes.  On May 2nd of 1996, I was involved in the search

3  warrants.

4  Q    What was your role in the search warrants?

5  A    My primary role was to be part of the entry team and to

6  interview the subject in this case.

7  Q    Were you able to review the actual search warrants as

8  part of your execution of the warrants?

9  A    Yes.

10  Q   Did you see both the warrants for the office and the

11  home as well?

12  A   Yes, I did.

13  Q   Did you also see a copy of the items -- of the list of

14  items to be seized attached to both of the warrants?

15  A   Yes.  Both warrants had copies of items to be seized

16  attached to each one of them, yes.

17  Q   And did you also participate, Agent Adams, in a

18  pre-search warrant meeting?

19  A   Yes.  On May 1st, after the search warrants were signed

20  by the magistrate, a meeting was held in the FBI office on

21  State Street, 717 State Street, where the members of the

22  teams that were going to be involved in the search warrants,

23  we met there.

24  Q   And was an explanation of the potential -- of the

25  possible crimes and the items to be seized presented to the

                    Adams - Direct(By Mr. Voracek)          86

1  agents during the meeting?

2  A   Yes.  Case Agent Lapina went over the -- essentially

3  when we meet for those, we go over the plan.  In other words,

4  set up the teams that were going to be involved in the

5   searches.  Since we had two different locations, we went over

6   the particular plans.

7        At that point, there was a discussion of the

8   violations and of items to be seized, as well as a general

9   overview of the case.

10  Q   Now, on the morning of the search, of the execution of

11  the warrants May 2nd, 1996, were you at the business

12  residence, or where was your location?

13  A   I was involved in the search warrant at the business.

14  Q   Do you recall approximately what time the search

15  commenced at the business?

16  A   I would say I believe the time was to be around 6:20, I

17  think, is when Dr. Leveto arrived at the business and we

18  pulled in behind him.

19  Q   And you had an encounter with Dr. Leveto at that time?

20  A   At that point, we came -- Agent Lapina, myself, we were

21  with the -- I believe it was a Vernon Township police

22  officer.  We came down in his marked cruiser along with the

23  members of the other team.  They came down in other cars that

24  followed us.

25        I came up to the door with Agent Lapina and we

Adams - Direct(By Mr. Voracek)          87

1  approached Dr. Leveto there, provided him with copies of the

2  search warrant, asked for his permission if he would open the

3  door, and he agreed to do that.

4  Q    Was Dr. Leveto also provided with a list of the items to

5  be seized as part of the search warrant?

6  A    Yes.  That was attached to the search warrant.

7  Q    It was attached, stapled or paper clipped to the

8  warrant?

9  A    It probably would have been stapled to it.

10 Q    And did Dr. Leveto then let you into the business at

11  that time?

12 A    Yes.  He had unlocked the door and then we entered the

13  business.

14 Q    Now, what was your role during the search of the

15  business on May 2nd?

16        Did you participate in searching?

17 A    Essentially, I was not involved in the search.

18 Basically, what I ended up doing is, once we got in and we

19  discussed -- there were some procedures that we discussed

20  with Dr. Leveto regarding the execution of the search warrant

21  that was to be done at the house.

22      Once we decided on how those were going to be

23  approached, Mr. Lapina, myself and Dr. Leveto went into a

24  room and we started to interview Dr. Leveto.

25  Q   Now, did you explain to Dr. Leveto that he didn't have

                  Adams - Direct(By Mr. Voracek)          88

1  to be interviewed if he didn't want to at the time?

2  A   Yes.  We read him his noncustodial rights and explained

3  to him that he had the right to terminate the interview at

4  any time.  He didn't have to answer any questions.

5      We asked if he understood those rights and he told

6  us he did.

7  Q   Was Dr. Leveto cooperative at that point in your

8  opinion?

9  A   He was very cooperative, yes.

10  Q   Did you remain then at the business the entire day or

11  did you go elsewhere?

12  A   No.  At approximately -- what was decided when we went

13  in, we held the other team up because his kids were at the

14  house.  We gave him give him the option of, we could send

15  them in right away or if we waited at the business until they

16  left, then what we would do is, that team would go in after

17  we were notified that the kids had left to go to school.

18      I think it was around 8:00 o'clock, we were

19  notified, and Dr. Leveto asked us if he could go to the house

20  and be there so he could explain this to his wife, so he

21  could let us into the house, explain to his wife what was

22  going on.  And he asked if we could do that and we said we

23  could.

24      So, we left the business, I think it was

25  approximately 8:00 o'clock, and drove to the staging area

Adams - Direct(By Mr. Voracek)          89

1  where the second team was waiting.

2  Q   So, Dr. Leveto agreed and, in fact, asked to actually go

3  to the residence?

4  A   That's correct.  He said he wanted to go there and be

5  there for his wife to explain what was going on.  And at that

6  point, myself, I believe it was Agent Lapina and

7  Agent Wirth we put him into the car, one of our government

8  cars, and we drove him over to the staging area.

9      Once we arrived at the staging area, Dr. Leveto

10   seen a marked car there and he asked us if we would not take

11   that marked unit to his house because he didn't really want

12   the neighbors to see a car there.

13        Agent Lapina said, that's fine, notified the agent

14   who was handling that team to ask the police officer to go

15   ahead and leave.  So, he did.

16   Q   Were you present with Dr. Leveto when he encountered his

17   wife at the residence on May 2nd, 1996?

18   A   Yes, I was.  Once the police officer left, we drove --

19   the team drove down to the residence.

20        Myself, Agent Lapina and Agent Wirth, I think, I

21   believe along with Agent Hines, went up to the house with

22   Dr. Leveto.  He let us into the house.  He met his wife at

23   the front door and explained to her why we were there.

24        We presented them with the search warrant and

25   explained the search warrant and then the teams entered the

                    Adams - Direct(By Mr. Voracek)          90


1   residence.

2   Q   Did Dr. Leveto then decide to stay at the residence the

3   rest of the day?

4  A   No.  Dr. Leveto told us he would like to go back to the

5  business.  So, we were only there a few minutes and we left

6  there and escorted him back to the business.

7  Q   Do you have any knowledge of whether or not a search did

8  proceed at the residence that day?

9  A   Yes, there was a search done of the residence.

10  Q   And do you know how long the search actually continued

11  at the residence?

12  A   I can't say exactly what time they finished there.

13  Q   Well, was the search at the residence concluded before

14  the children arrived home from school?

15  A   Yes.  It was my understanding that it was, yes.

16  Q   Now, you went back to the business then with Dr. Leveto?

17  A   That's correct.

18  Q   What happened next?

19      Did you attempt to question Dr. Leveto further?

20  A   Well, we returned to the business.  We went back into

21  the room with Dr. Leveto and continued to question him.  He

22  said he would continue to answer questions, so we talked to

23  him there.

24  Q   How long did you interview Dr. Leveto?

25  A   I believe that interview lasted until approximately one

Adams - Direct(By Mr. Voracek)          91

1  o'clock, when we were pretty much done.  And at that point,

2  we stopped, and I believe we had pizza brought over to the

3  business because of the length of time we were there.

4       We offered some to Dr. Leveto.  He declined.  He

5  didn't want to eat.  We stayed out there for a little while,

6  we talked, and we went back in with -- we received some

7  documents that had been found at the business and we asked

8  Dr. Leveto if we could question him again, and I think that

9  started around 1:30 until 2:30.

10  Q   Dr. Leveto terminated the interview himself?

11  A   Yes, he did.

12  Q   And, in fact, the interview was terminated at that

13  point?

14  A   That's correct.

15  Q   Do you know if documents were seized from the business?

16  A   Yes, I am aware that documents were seized.

17  Q   What was -- in general terms, what was your

18  understanding of the types of documents to be seized at the

19  business and the residence on May 2nd, 1996?

20    A    Well, according to the search warrant and the items to

21    be seized, we were looking for any financial documentation

22    that would support the violations of Title 26 and also the

23    conspiracy charge of 371.

24    Q    Was there a timeframe set up as far as documents to be

25    seized?


            Adams - Direct(By Mr. Voracek)            92


1    A    Well, we were aware of essentially the review of

2    Dr. Leveto and Mrs. Leveto's tax returns and noticed that in

3    '91, there was a change in the income and the reporting of

4    the business.  After 1991, we knew that the income

5    substantially was reduced.

6        So, what we would do, since we are looking at a

7    possibility in these cases of a net worth, you would take

8    financial records and you would look at them for possibly two

9    to three years prior to that.

10        So, we might look from '98 through the present time

11    because you want to have a starting point of an individual's

12    assets, their liabilities, their expenditures, and then you

13    work forward from there.

14    Q    And how about subsequent to the tax returns under

15  review, did you also seize evidence relating to time period

16  after you had tax returns?

17  A    Well, right.  In the particular case, we were aware that

18  there were foreign bank accounts being used and the

19  possibility of nominee names.  We had some names of other

20  possibly businesses or individuals that were involved.

21        So, we were looking for anything that involved the

22  possibility that we have a conspiracy charge that we believe

23  continued, plus the fact that '95 was in -- at that point, it

24  was continuing on forward also.

25  Q    You believe that the conspiracy was continuing.

                Adams - Direct(By Mr. Voracek)          93

1        Was that explained to you at the pre-search meeting

2  or did you read that in the affidavit?

3  A    Well, it probably would have been both for me because I

4  was involved with the affidavit to some extent and we talked

5  about it at the pre-op meeting beforehand, yes.

6  Q    And is part of your belief that it was continuing based

7  upon evidence of mail covers that were recently performed at

8  the business and the residence?

9   A   Yes, that would be correct, along with other

10   investigative means, yes.

11   Q   How long did the search last at the business?

12   A   Well, we went in at 6:20, and I believe we concluded the

13   interview with Dr. Leveto -- I believe I said it was around

14   2:30 when we finished with that.  I think after that,

15   Agent Lapina left the business for a short time.  I believe

16   at that point, the search itself was completed.  We were

17   awaiting downloading of some records from the computers.

18        What the attempt was there, was to image the

19   computers, get the information off there and still leave the

20   computers there intact so the business could continue to

21   operate.

22        I believe that didn't finish until sometime after

23   four, 4:30; somewhere around there.

24   Q   When you were dealing with the computers, though, was

25   the business still able to function as an enterprise even

Adams - Cross                94

1   though you were still there working with the computers?

2   A   I believe all the agents, except for myself,

3   Agent Lapina, and I believe it was Agent Grover, who was

4  involved -- G-r-o-v-e-r, I believe, he was the agent who was

5  involved in downloading the information from the computer so

6  he was still in the back room, was in the back office along

7  with myself, and I think Agent Lapina, who had left for a

8  short time, then returned.

9  I think by 2:30, most everybody was out of the business.  I

10  think at that point we said that we were pretty much done.

11       MR. VORACEK:  I have no further questions,

12  Your Honor.

13       MR. LEVETO:  Yes.  Just a couple of questions.

14              CROSS-EXAMINATION

15  BY MR. LEVETO:

16  Q   Agent Adams, was the affidavit circulated around or gone

17  over at the pre-raid meeting on May 1st?

18  A   I don't believe the affidavit was circulated.  I believe

19  that the -- from what I recall, the case was just discussed

20  with the agents.  The affidavit had been sealed.

21  Q   It had been sealed?

22  A   Yes.

23  Q   And how about at the raid site, or either raid site, was

24  the affidavit present on either raid site?

25  A   To my knowledge, it was not.


95


1           MR. LEVETO:  No further questions.

2           THE COURT:  Thanks, Mr. Adams.

3  (The witness was excused.)

4           THE COURT:  Well, this looks like a good time to

5  stop for lunch, so we'll stop now and reconvene at 1:30.

6  (Court recessed at 12:25 p.m.)

7  (Court reconvened at 1:35 p.m.)

8           THE COURT:  Good afternoon.  Be seated, please.

9           Okay, Mr. Voracek, do you want to call your next

10  witness?

11          MS. CALVIN:  Yes, Your Honor.

12          THE COURT:  Or Ms. Calvin.

13          MS. CALVIN:  We call Thomas Demko, please.

14          THE COURT:  I am sorry.

15          MS. CALVIN:  Thomas Demko, please.

16          THE COURT:  Come forward and be sworn, please.

17          THE CLERK:  Would you raise your right-hand,

18  please?

19               * * * * *

20        THOMAS DEMKO, having first been duly sworn,

21   testified as follows:

22        THE COURT:  Have a seat up here, please, give us

23   your name and spell your last name.

24        THE WITNESS:  Thank you, Your Honor.  My name is

25   Thomas Demko.  D, as in David, e-m-k-o.


                 Demko - Direct(By Ms. Calvin)          96


1     THE COURT:  Thank you.

2              DIRECT EXAMINATION

3   BY MS. CALVIN:

4   Q    Mr. Demko, where are you currently employed?

5   A    I'm employed with the Internal Revenue Service, Criminal

6   Investigation.

7   Q    What position do you hold there?

8   A    Currently, I'm a supervisory Special Agent.

9   Q    And what are some of your duties as a supervisory

10   Special Agent?

11   A    I'm assigned to review the work of the Special Agents

12   that are assigned to my group.

13   Q    And how long have you held that position?

14   A    Approximately nineteen years.

15   Q    And have you held any other positions with the Internal

16   Revenue Service?

17   A    Yes.  Prior to becoming a supervisory Special Agent, I

18   was a Special Agent in -- roughly altogether, I have about

19   twenty-five years with the Criminal Investigation of the

20   Internal Revenue Service.

21   Q    Now, as part of your responsibilities when you were a

22   Special Agent, did you investigate violations of Title 26?

23   A    As an agent, yes, I did.

24   Q    And what other responsibilities did you have when you

25   were an agent?

Demko - Direct(By Ms. Calvin)          97

1    A    Well, as an agent, I not only investigated, I was called

2    upon to perform other duties, such as the execution of search

3    warrants, drafting of affidavits for search warrants, and

4    things of that nature, that deal with violations of Title 26

5    statutory provisions.

6    Q    And did you investigate other financial crimes as well?

7    A    Yes, I did.

8    Q    Now, as part of your job responsibilities now, do you

9   review affidavits for search warrants before they are

10  presented to a Magistrate or before any search warrants are

11  executed?

12  A   Yes, I do.

13  Q   And in 1996, was that part of your role?

14  A   Yes, it was.

15  Q   Were you involved, in any way, in the review of the

16  search warrant affidavit for the business and the residence

17  of Daniel Leveto?

18  A   Yes, I was.

19  Q   Was there approval process for search warrant affidavits

20  in place within the IRS in 1996?

21  A   Yes, there was.

22  Q   And you're familiar with that process?

23  A   Yes, I am.

24  Q   Would you describe the process that would have been

25  followed before an IRS Special Agent seeks or executes a

Demko - Direct(By Ms. Calvin)          98

1   search warrant?

2   A   Well, it is the responsibility of the Special Agent to

3   gather the information and draft it in the form of an

4   affidavit, and that affidavit is then given to the front-line

5   manager, which at the time was myself.

6           I would have reviewed that and then I would have

7   forwarded that affidavit to what was termed our district

8   counsel, which are our inhouse attorneys.

9           After their completion of their review process,

10  they then would have forwarded it to the United States

11  Attorney's Office.

12  Q    And that's where typically the warrant, itself, would be

13  drafted, the search warrant?

14  A    Yes.  The agent and then the assigned United States

15  Attorney would sit down and draft it, yes.

16  Q    When you were reviewing an affidavit that was submitted

17  to you for review, what would you have been looking for?

18  A    Well, as a supervisor, I would have been looking it over

19  for grammatical errors.  I would be looking at the content of

20  the affidavit as it relates to probable cause.

21          I would also be looking at the listed items to be

22  seized to make sure that they relate to the alleged violation

23  that we are pursuing.

24          MR. LEVETO:  I object, Your Honor.  This seems to

25  be more rehashing of the same information that we've heard --

Demko - Direct(By Ms. Calvin)          99

1        THE COURT:  I assume if he was the person that

2  actually did the reviewing, it's appropriate for him to

3  testify.

4        MS. CALVIN:  Thank you.

5  BY MS. CALVIN:

6  Q    And would you also be checking to make sure that there

7  was, within the affidavit, information from which you could

8  conclude that the evidence that you were seeking would be

9  found at the locations?

10  A    Yes.

11  Q    And for details such as making sure it was the

12  identifiable location?

13  A    That's correct.

14  Q    Now, after you would review it, you would send it off to

15  district counsel?

16  A    That's correct.

17  Q    The person who reviewed it again would be an attorney?

18  A    That's correct.

19  Q   When it is sent to the U.S. Attorney's Office for

20  formalization, is that considered a referral to the

21  Department of Justice?

22  A   No, it is not.

23  Q   Why not?

24  A   Well, because at that point in time, the referral to the

25  Department of Justice is based upon two different types of

                Demko - Direct(By Ms. Calvin)          100

1   referrals.

2         And those are, when an agent completes an

3   investigation and the agent has made a determination as to

4   the recommendation of a prosecution and the agent has

5   completed the investigation, at that point in time when we

6   give it to our inhouse counsel and they make the referral

7   over to the Department of Justice, at that point in time,

8   that constitutes a referral to the Department of Justice.

9         The other instance would be, when we are conducting

10  an investigation and we decide to convert what we term an

11  administrative investigation into a grand jury investigation,

12  we would then request from the department the approval to do

13  so.

14          And at that point in time, it becomes a referral to

15   the Department of Justice.

16   Q   Now, in May of 1996, when the search warrants were

17   executed on Dr. Leveto's home and business, what type of

18   investigation was this?

19   A   It was an administrative investigation.

20   Q   Are you also familiar with the process and the abilities

21   of the IRS to serve summonses?

22   A   Yes, I am.

23   Q   And do you know for what purposes administrative

24   summonses can be served?

25   A   An administrative summons are served in an

                    Demko - Direct(By Ms. Calvin)          101

1   administrative investigation and we use that vehicle to

2   obtain testimonial as well as documentary evidence to either

3   support or disprove the charges that are alleged.

4   Q   And do Special Agents have the authority to issue

5   administrative summonses?

6   A   Yes, they do.

7   Q   During the pendency of a criminal investigation?

8   A   That's correct.

9   Q   At what point in an investigation would the summonses

10   authority of an agent stop?

11   A   Well, the -- we would cease serving summonses at the

12   point in time a referral is made to the Department of

13   Justice.

14       At that point in time, no summonses are to be

15   issued.

16   Q   Now, do you know what date that Dr. Leveto's case was

17   referred to the Department of Justice for prosecution?

18   A   Yes, I do.  September 10th, 1999.

19   Q   And up until that point, Agent Lapina was fully within

20   the law to issue administrative subpoena -- forgive me --

21   summonses for this case?

22   A   Up until that point, yes, he was within his rights.

23       MS. CALVIN:  I have no further questions, Your

24   Honor.

25       MR. LEVETO:  Just a couple more questions,

                    Demko - Cross                102

1   Mr. Demko.

2       THE WITNESS:  Sure.

3          CROSS-EXAMINATION

4    BY MR. LEVETO:

5    Q    Is it custom and policy to be serve civil summonses at

6    exactly the same time doing a search warrant, executing a

7    search warrant?

8    A    When you say "civil summonses," when we are conducting a

9    criminal investigation under the administrative process,

10   during that whole process until such time it becomes a

11   referral to the Department of Justice, we then will use the

12   summonses process to obtain either documentary or testimonial

13   evidence.

14   Q    The reason I said "civil summonses" is because they fall

15   under the purview of the civil arm of the Federal Court when

16   they are enforced.  And if one can liken the rules with

17   civil -- or the summonses, the administrative summonses, they

18   are very much like rules of civil discovery.  At least that's

19   what the Courts say.

20          So, I guess that, that all I would like to know is,

21   who prepared the search warrant?

22   A    Who prepared the search warrant?

23   Q    Yes.

24  A   Robert Lapina.  Special Agent Robert Lapina prepared the

25  affidavit for the search warrant.

                    Demko - Cross                103

1           At such time as it cleared the review process and

2   it ultimately went to the United States Attorney's Office,

3   I'm sure Special Agent Robert Lapina and the assigned

4   Assistant United States Attorney would have got together and

5   then put the documents needed to present to the Magistrate

6   for the approval of the search warrant.

7   Q   Maybe I didn't totally understand your answer.

8           The face of the warrant itself, that was prepared

9   by who?

10  A   I wouldn't know that.  I mean, when it's over at the

11  United States Attorney's Office and the Special Agents are

12  putting together the documents, I wasn't present there at the

13  point in time.

14  Q   So, you don't know the custom and policy of the

15  preparation of the search warrant, who normally would prepare

16  it?

17  A   Well, like I say, the affidavit is what we look at and

18  insure that the probable cause or the items to be seized or

19  the place that the records are allegedly stored at is what we

20  get involved in, and then present all that information to the

21  United States Attorney's Office.  And at that point in time,

22  they then would present that to the Magistrate.

23      As to the actual preparation, who did the writing

24  on the particular search warrant, I wouldn't know that.

25  Q   Okay.  And just for the record, I wanted to clarify, did

Demko - Cross              104

1   you call -- that you would say or what you have termed an

2   administrative investigation using both summonses and an

3   administrative criminal investigation, is that correct?

4   A   Could you please ask that question again, sir?

5   Q   Okay.  When you term an investigation being an

6   administrative investigation, that can entail both civil

7   summonses and search and seizure?

8   A   Well, when you talk about civil summonses, I get a

9   little bit lost there because the administrative

10  investigation process is still a criminal investigation

11  because that's the line of work we do in the IRS.

12      And in the administrative process, even though it's

13  still a criminal investigation, we utilize the summons

14  vehicle in order to obtain the information that we are

15  seeking.

16  Q    Along with a search and seizure?  I won't use the word

17  civil summonses.  Summons plus search and seizure?

18  A    Well, when you say "search and seizure," a search

19  warrant, again, is another vehicle whereby it helps us to

20  obtain the information we are seeking as long as we get the

21  sufficient elements.  And what I mean by that is, the

22  probable cause, and also the fact that the records are

23  located at the place that we're looking at, and we present

24  that through our review process.

25        So, I look at a search warrant as another -- I use

                Demko - Redirect(By Ms. Calvin)          105

1  the word vehicle like I do with the summons, in order for us

2  to obtain the information both documentary and testimonial

3  that we are looking for.

4  Q    Okay.  Maybe we have terminology differences here.

5        I guess that I am asking, it's custom and policy to

6  have a posture where you would use summonses and search

7  warrants at the very same time?

8   A    Oh, yes.  Yes.

9   Q    Okay.  You did say that you took part in the search, is

10  that correct?

11  A    My role in that was, I reviewed the affidavit at the

12  time it was submitted to me.  And also on the day of

13  execution, I was at what we term the command post.

14       Usually, I'm on site somewhere at the site in case

15  some problems should arise that I should be aware of.

16  Q    I see.  And was there a copy of the affidavit of

17  probable cause at either search site?

18  A    I don't know.

19  Q    Okay.  Thank you.

20       MR. LEVETO:  That is all.

21       THE COURT:  Any redirect, Ms. Calvin?

22       MS. CALVIN:  Just one question.

23              REDIRECT EXAMINATION

24  BY MS. CALVIN:

25  Q    Is there anything improper about using an administrative

106

1   summons at the same time that a search warrant is being

2  sought or executed?

3  A   No, there is no problem that I am aware of.

4  Q   As long as it hasn't already been referred to the

5  Department of Justice?

6  A   Correct.  The only time that the summons should cease is

7  at the point in time when we make a referral under those two

8  situations that I explained.

9       At that point in time, the services of the

10  summonses must cease.

11  Q   So that in this case, it was September the 10th?

12  A   1999.

13       MS. CALVIN:  Thank you.

14       THE COURT:  Thank you, sir.

15       THE WITNESS:  Thank you, Your Honor.

16  (The witness was excused.)

17       MS. CALVIN:  Your Honor, our next witness is going

18  to be Frank Falvo.  And I should inform the Court that

19  Mr. Falvo is an attorney for the Internal Revenue Service and

20  he has an attorney-client privilege, as recognized under

21  Upjohn and the Third Circuit case of Impounded with the

22  Internal Revenue Service, as to any advice, any

23  communications that were given for purposes of rendering

24  legal advice.

25      However, he was requested to be present by the

Falvo - Direct(By Ms. Calvin)          107

1  defendant, and he is the attorney at district counsel who

2  reviewed the search warrant application and affidavit.

3      THE COURT:  Would you come forward, please, and be

4  sworn?

5      THE CLERK:  Can you raise your right hand?

6          * * * * *

7      FRANK FALVO, having first been duly sworn,

8  testified as follows:

9      THE COURT:  Have a seat up here, please and state

10  your name and spell your last name.

11      THE WITNESS:  My name is Frank Falvo.  F, as in

12  Frank, a-l-v-o.

13      THE COURT:  Thank you.

14          DIRECT EXAMINATION

15  BY MS. CALVIN:

16  Q   And, Mr. Falvo, what is your current position?

17  A   I'm a senior attorney with the Office of Chief Counsel

18  of the Internal Revenue Service, and my post of duty is in

19  Pittsburgh.

20  Q    What's your educational background?

21  A    I have an accounting degree from Duquesne University and

22  a law degree from Dickinson School of Law.

23  Q    And how long have you occupied your current position?

24  A    Twenty-four years.

25  Q    And what are some of the duties that you perform in the

                Falvo - Direct(By Ms. Calvin)          108

1  position that you hold?

2  A    Currently, my position entails all civil tax work,

3  collection, bankruptcy, income estate, excise tax, litigation

4  in the Tax Court, and at this point, it's all civil.

5        Prior to 2000, I was involved in both civil and

6  criminal matters, review of criminal matters on behalf of the

7  Internal Revenue Service at that time.

8  Q    Now, did your change in positions occur as a result of

9  reorganization with the Internal Revenue Service?

10  A    Yes, it did.  In 2000, there was a reorganization and

11  attorneys were either assigned to purely civil or purely

12  criminal.

13      So, as of 2000, all of my work has been purely

14  civil.

15  Q    But, in 1996, you were still involved with criminal?

16  A    I was.

17  Q    Are you familiar with when an agent can serve a summons?

18  A    Yes, I am.

19  Q    And for what purposes can an agent serve a summons, an

20  administrative summons?

21  A    An IRS agent or revenue officer can serve a summons

22  under a number of circumstances.

23      According to the Internal Revenue Code, Section

24  7602, a summons can be served for purposes of determining a

25  liability, tax liability of an individual or corporation.  It

                Falvo - Direct(By Ms. Calvin)          109

1   can also be for purposes of determining the amount of

2   liability that's owed by a taxpayer.

3       A summons can also be served to aid collection.

4       And, finally, a summons can be served for purposes

5   of investigating violations or offenses involving Internal

6   Revenue laws.

7  Q   How long has that been the law?

8  A   It's been a law many years with respect to the service

9  of the summons for civil purposes.

10        In 1982, the Internal Revenue Code was amended and

11  one of the changes that was made at that time was to

12  specifically state that in 7602 that a summons could be

13  issued for purposes of investigating criminal cases involving

14  Internal Revenue laws.

15  Q   Does a Special Agent have the authority to issue

16  summonses and execute and serve search warrants?

17  A   A Special Agent does.

18  Q   And can a Special Agent serve an administrative summons?

19  A   A Special Agent, according to Section 7602 -- and if I

20  may refer to the code so I can have the proper subsection?

21        7602(a) or 7602(b) provides that a summons may

22  be -- summons may be served for the purposes of acquiring

23  into any offense connected with the administration or

24  enforcement of the Internal Revenue laws.

25        So, that it can be -- a summons can be served by a

Falvo - Direct(By Ms. Calvin)          110

1  Special Agent for purposes of investigating a violation of

2  the tax laws.

3      And under Section 7602(d), that may be done at any

4  time prior to a referral of the case to the Department of

5  Justice.

6      And a referral is defined in 7602(d)(2) as any time

7  prior to a request for a grand jury investigation or at any

8  time prior to recommendation by the Internal Revenue Service

9  that a case be prosecuted by the Department of Justice.

10     So, prior to a determination that a case should be

11 prosecuted, a recommendation made to the Department of

12 Justice, administrative summonses may be issued by the

13 Special Agent.

14     THE COURT:  What is the rationale for that rule, if

15 you know?

16     I mean, why couldn't the IRS continue to

17 investigate after it was referred to the --

18     THE WITNESS:  I believe that the rationale is, once

19 it's referred to the Department of Justice, administrative

20 investigation should discontinue at that point.  And at that

21 point, if there is to be further investigation it should be

22 done through grand jury and the grand jury process and the

23    subpoenas.

24        THE COURT:  I mean, is it just to avoid duplication

25    of work or --


Falvo - Direct(By Ms. Calvin)        111


1        THE WITNESS:  I don't think it's so much to avoid

2    duplication of work as it is so that the -- that the IRS is

3    not administratively going out and seeking this information

4    at the behest of the Department of Justice when the

5    Department of Justice should be doing it through grand jury

6    process.

7        THE COURT:  All right.

8    BY MS. CALVIN:

9    Q    Does a referral to the U.S. Attorney's Office requesting

10    a search warrant constitute a referral to the Department of

11    Justice?

12    A    It does not.  That's not one of the enumerated

13    definitions of a Department of Justice referral.

14    Q    Now, you were involved in the review of Daniel Leveto's

15    search warrant application and affidavit?

16    A    That's correct.

17    Q    And do you know what date the case of Daniel Leveto was

18  referred to the Department of Justice?

19  A   It was referred to the Department of Justice for

20  prosecution on September 10th, 1999.

21  Q   So, a Special Agent working the case had authority under

22  the law to summon records until September the 10th, 1999?

23  A   That's correct.

24  Q   And I think you previously stated that Special Agents

25  have the authority to conduct search warrants -- execute

                    Falvo - Direct(By Ms. Calvin)          112

1  them?

2  A   They have the authority to go execute search warrants

3  and also to issue summons.  The statutory authority is 7608

4  of the Internal Revenue Code.

5  Q   And do you know whether there was an approval process

6  for search warrants in place in 1996?

7  A   Yes, there was.

8  Q   And would you explain that process?

9  A   Yes.  A Special Agent would prepare an affidavit and

10  send it to our office, which was the Office of District

11  Counsel.

12        We would -- one of the attorneys in the office

13   would be assigned the case.  We would review the case, make a

14   determination as to whether there was sufficient probable

15   cause to recommend that the search warrant be issued.

16        If we made that determination, our office would

17   send a letter to the United States Attorney's Office

18   requesting that the search warrant be issued.

19        If, based upon our review, we determine that there

20   was a sufficient cause or additional evidence was needed, we

21   would make a recommendation to the Special Agent either

22   orally or in writing what additional information may be

23   needed.

24        If that information was not forthcoming or could

25   not be developed, at that point we would reject the proposed

                Falvo - Direct(By Ms. Calvin)        113

1   search warrant.

2   Q    And what would you do with the affidavit and list of

3   items to be seized after it was submitted to you for review

4   if, in fact, you thought that it had sufficient probable

5   cause and that there was reason to believe that the evidence

6   of the crime could be found at the location sought to be

7   searched?  What would normally happen?

8   A    We would send that along with our letter to the United

9   States Attorney's Office asking that the search warrant be

10  issued.

11  Q    When district counsel sends that, does that constitute a

12  referral?

13  A   It does not.  It does not constitute a referral for when

14  a summons can be issued.

15  Q    And did you review this search warrant for Daniel

16  Leveto?

17  A   I did.

18  Q    And was standard procedures followed?

19  A   They were.

20  Q   I think you have up there in front of you what's been

21  offered and accepted into evidence as Defendant's Exhibit 2.

22       MRS. DAVIS:  (Law Clerk).  It's right here.

23       THE WITNESS:  Thank you.

24  Q   I ask you if you recognize that document?

25  A   I recognize that document as being a copy of Section

Falvo - Direct(By Ms. Calvin)          114

1  7602 of the Internal Revenue Code.

2  Q    And was 7602 -- can you tell us the background on that

3  statute?

4  A    7602 is the section of the Internal Revenue Code that

5  authorizes various IRS employees the authority to issue

6  summonses.  And there are -- there is various subparts.

7       Subpart A -- Subsection A relates to the authority

8  that defines when and under what circumstances a summons may

9  be issued.

10      Subsection B sets forth the fact that a summons can

11  be issued for purposes of investigating an offense involving

12  an internal -- involving the Internal Revenue laws.

13      Subsection C relates to certain notices that are

14  required for contacts to the third parties.

15  Q    Do you know when this particular law came into effect?

16  A    7602 has been in existence for many years.  I don't know

17  the exact date.

18      Subsection C, dealing with notice of contact of

19  third parties, was enacted under the authority of the Tax

20  Reform Act of 1998.

21      So, subsection C, notice of contact for third

22  parties, became effective in 1998.

23  Q    And is that section -- does that require a civil

24  examiner to provide notice?

25  A    What subsection C requires is, as I stated, this was

Falvo - Direct(By Ms. Calvin)        115

1  part of the Tax Reform Act of 1998 and, at that time,

2  Congress was concerned that the IRS may be making contacts

3  with third parties and it may be an invasion of the

4  taxpayer's privacy.

5        So, Congress passed subsection C.  And what that

6  requires is that for civil purposes, for a civil examination

7  or for civil collection, prior to the time that the IRS can

8  go out and make a contact with a third party, whether it be

9  through summons or just a direct person-to-person contact,

10  the IRS must issue a notice to the taxpayer stating that

11  contact may be made with a third party.

12        Once that notice is issued, the IRS can then go out

13  and make contacts, but it's required to keep a list of the

14  third-party contacts that it makes.  And that list is

15  required to be available to the taxpayer upon request.

16        There is certain exceptions to when the IRS is

17  required to make these -- give this notice to the taxpayer of

18  potential third-party contacts, and one of the exceptions

19  relates to a criminal investigation.

20      A Special Agent, during the course of a criminal

21  investigation, is not required to notify a taxpayer that they

22  may be making thirty-party contacts, and that's one of the

23  exceptions to this section.

24      MS. CALVIN:  Your Honor, I have no further

25  questions of this witness.


                    Falvo - Cross                116


1              CROSS-EXAMINATION

2  BY MR. LEVETO:

3  Q   Okay, Mr. Falvo.  Just a couple of questions.

4      Do you know who prepared the search warrant itself?

5  A   The affidavit was prepared by Special Agent Robert

6  Lapina.  The search warrant was prepared by somebody at the

7  U.S. Attorney's Office.  I don't recall who it may have been.

8  Q   Somebody at the U.S. Attorney's Office?

9  A   Somebody at the U.S. Attorney's Office.  One of the

10  Assistant U.S. Attorneys.

11  Q   Okay.  Could the rationale of the Justice Department

12  referral have anything to do with the huge difference between

13  civil and criminal discovery, in other words, the huge

14  difference in rules?

15        Could you perceive anything like that?

16  A    I don't understand your question.

17  Q    The difference, for instance, in the Fourth and Fifth

18  Amendment rights of an individual, okay, when they are

19  summonsed by an administrative summons versus a criminal

20  process, let's say a search warrant, if we look at the

21  differences in civil and criminal discovery, could that have

22  anything to do with the Justice Department referral?

23        And the reason I'm asking is, because perhaps it --

24  many years ago when the courts were discussing at different

25  times the good faith and bad faith, in other words, if an

                    Falvo - Cross              117

1   agent had the perception that this was criminal in nature, he

2   was supposed to abandon using administrative process, and

3   many times there was not a bright line between that.

4         So, the Justice Department referral, I do agree

5   with in 7602.  I understand exactly what that is.

6          But, is that perhaps what that signifies the bright

7    line of intent?

8    A    I think we need to make a distinction between civil

9    summons and what you are calling criminal summons.

10          Any summons -- we are talking about a civil

11    summons.  I think, generally, what you are talking about is

12    that a summons that's issued by an exam.  What we are talking

13    about generally with summonses that are issued by the IRS are

14    administrative summons, and I believe that's what we are

15    speaking to.

16          With respect to your question, prior to 1982, there

17    was quite a bit of litigation as to when a Special Agent

18    could issue a summons.

19          There was a Supreme Court case by the name of

20    LaSalle National Bank, which basically stated that it could

21    not be issued solely for criminal purposes, that the

22    institution, the IRS institution had to have something other

23    than solely criminal.

24          Congress enacted in 1982 Section 7602(b) to

25    basically address the LaSalle case and make it clear that a

Falvo - Cross                    118

1  summons could be issued solely for criminal purposes.

2       So, I think to answer your question, I believe that

3  was the rationale so that it would alleviate the litigation

4  regarding when a summons could be issued by a criminal

5  investigator.

6  Q   I see.  Could you please find Exhibit 3 there in the

7  Defendant's Exhibits?

8  A   I have it.

9  Q   Okay.  What does this code section authorize, or what

10  does it pertain to?

11  A   Exhibit 3 relates to Section 7609, which is entitled

12  Special Procedures for Third-Party Summons, and it relates to

13  summonses which are issued to third parties.

14  Q   Would you say that it is the law concerning that?

15  A   It certainly is the law.

16  Q   Okay.  Could you tell me your interpretation of

17  7609(c)(2)(E) and I or small one?

18  A   7609 deals with the procedures for third-party

19  summonses.  And third-party summonses are generally summonses

20  which, as the name states, issued to third parties.

21  Basically, it's any summons issued to somebody other than the

22    taxpayer.

23        And (c) states that it applies to any summons

24  issued under 7602.  (C)(2) provides certain exceptions.

25        And I believe you asked me to direct my attention

Falvo - Cross            119

1  to (c)(2) capital E.  And one of the exceptions to the

2  third-party procedures -- and maybe I should back up to

3  explain what this third-party procedures are.

4        Generally, if a summons is issued to a third party,

5  the IRS is required to give notice to the taxpayer of the

6  issuance of the summons.  There are certain exceptions that

7  are listed under (c)(2).

8        (c)(2)(E)) provides that the third-party notice is

9  not required if it's being issued by a criminal investigator

10  for purposes of investigating an offense involving the

11  Internal Revenue laws and if it's served on a person who is

12  not a third-party recordkeeper.

13        So, if a Special Agent issues a summons to a third

14  party who is not a third-party recordkeeper, the Special

15  Agent is not required to provide a notice to the taxpayer, is

16  my interpretation of the section that you asked me to

17   address.

18   Q    Okay.  Well, it seems that 7602(c) is the notice part.

19   This seems to be that this section does not apply at all if

20   they are issued by criminal investigators.  That's in two.

21        This is just an exception for the entire statute of

22   7609, is that correct?

23   A    Well, it is, except there are two parts to (E).

24        The one part is that it's issued by a criminal

25   investigator and it's served on any person who is not a

120

1   third-party recordkeeper.  That's the exception.  If it is a

2   third-party recordkeeper, the notice requirements apply.

3        If it's issued by a criminal investigator to a

4   person who is not a third-party recordkeeper, then the notice

5   requirements do not apply.

6   Q    Okay.  So, that No. 2 is really with No. 1?

7   A    Yes, it is.

8   Q    Okay.  So, it's not like an addition and just other

9   examples, it's basically a part of that?

10   A    E capital, or E I and double I are in the conjunctive.

11   There is an and separating those two.  So, both requirements

12   must be met.

13   Q    Okay.

14        MR. LEVETO:  That's all I have.  Thank you.

15        MS. CALVIN:  Nothing further, Your Honor.

16        THE COURT:  Thank you, sir.

17        THE WITNESS:  Thank you.

18   (The witness was excused.)

19        MS. CALVIN:  No further witnesses for the

20   government, Your Honor.

21        THE COURT:  And you wanted Mr. Lapina recalled,

22   Dr. Leveto?

23        MR. LEVETO:  Agent Lapina?

24        THE COURT:  Yes.

25        MR. LEVETO:  Yes.  And procedurally, could I just

                    Lapina - Recross              121

1   ask a question, Your Honor, of how I will proceed after I'm

2   finished with my position?  Will we have, like, a closing

3   argument?

4        THE COURT:  Yes.

5        MR. LEVETO:  Is that how it will be structured?

6       THE COURT:  Yes.

7       MR. LEVETO:  Okay.  Thank you, Your Honor.

8               * * * * *

9       ROBERT LAPINA, having first been duly sworn,

10  testified as follows:

11       THE COURT:  Agent Lapina, you're already under

12  oath.  You can just take the stand.

13               RECROSS-EXAMINATION

14  BY MR. LEVETO:

15  Q   Good afternoon, Agent Lapina.

16  A   Good afternoon.

17  Q   I would like to have you -- let's see.  That's

18  Exhibits B and C of the Government Exhibits.

19       I would like you to have that handy, if you would,

20  because we will be talking about that.

21  A   B and C?

22  Q   Yes.  B -- it could be A and C or B and C.

23  A   Basically, we would like the search warrant as it came.

24  All right.

25  Q   First of all, was the affidavit attached to the search

Lapina - Recross          122

1   warrant?

2   A    Well, when I picked up the affidavit and the search

3   warrant, the items to be seized, and took it to the

4   Magistrate, they were all together in one packet.

5        But, as far as when I provided you with a copy of

6   the search warrant and the items to be seized, no, the

7   affidavit was not because it was under seal.

8   Q    Yes, the affidavit was under seal.  I understand.

9        And there was -- so, there was no reference to the

10  affidavit?

11       The affidavit really had nothing to do with the

12  search warrant on the day that you executed the warrant,

13  other than kind of administerial, boiler plate language that

14  the warrant was, you know, produced by probable cause from a

15  an affidavit?

16  A    Well, without that affidavit, in my opinion, there would

17  have been no warrant.

18  Q    What I am saying is, the warrant itself was your license

19  to come to Meadville, there were no other documents, no

20  affidavits attached, or anything like that?

21  A    No.  The warrant authorized us to execute the search.

22  Q   Yes.  Okay.

23       MR. LEVETO:  Your Honor, I would like to ask leave

24  of the Court, if I could, to perhaps do something a little

25  unusual, though it's unusual to me because I'm not -- this is

                    Lapina - Recross              123

1   not my profession.

2        I would like to elicit factual testimony from

3   Agent Lapina in a little different style.  In other words,

4   even though perhaps I should be talking about myself as a

5   defendant, I would like to have a little more leeway to use

6   the first person and I.

7        THE COURT:  Well, that's okay.  But, you got to

8   realize you can't testify without being under oath yourself.

9        If this is, like, a form of testimony, it would not

10  be proper.

11       MR. LEVETO:  Yes, Your Honor.  I am not really

12  going to testify, but it is going to be kind of the form of

13  how I am going to elicit facts.

14       THE COURT:  You can use the first person if you

15  want.

16          MR. LEVETO:  Okay.

17   BY MR. LEVETO:

18   Q    And, Agent Lapina, what I am going to ask first that you

19   identify the search warrant, and I believe that we can use

20   either B and C or A and C and know that we are talking about

21   mere images of one another since they were same so we don't

22   have to talk about specific locations.

23          And that was issued to you by Magistrate Baxter, is

24   that correct?

25   A    She signed it, authorized it, yes.

                    Lapina - Recross                  124


1   Q    She authorized it?

2          I would like to kind of go back because really the

3   facts and issues that I am going to be eliciting today

4   haven't really changed in eight and a half years, and I would

5   like to being back eight and a half years.

6          You were the lead agent.  I was the target of the

7   investigation.  At that time, I was a citizen that probably

8   wasn't as discerning as I should have been, but I moved aside

9   when you brought -- or came down with your men to execute the

10   search warrant.

11       To demonstrate some of the facts that I would like

12   to bring out today, um, I would like to -- we'll enter into

13   kind of a question answer conversation.  The only thing now

14   is, I will be a citizen, but I will be a bit more discerning

15   so that's going to allow me to ask some questions to you.

16       So, I just would like the Court to bear with me a

17   little bit.

18       That morning on May 2nd, Agent Lapina, when you

19   came to the office and you and your men got out of your

20   vehicles, you came and showed me what we can call the

21   license, in other words, everything that's been said today

22   and discussed today has been leading up to you acquiring the

23   license to come across my threshold, is that correct?

24   A   That morning when I arrived at your business, I

25   identified myself, told you who I was and what our purpose


                 Lapina - Recross              125


 1   was being there, and I showed you the warrant in conjunction

 2   with that.

 3   Q   Agent Lapina, you have the warrant there and I have the

 4   warrant in front of me.

file:///A|/LEVETO1.TXT

5   A   Okay.

6   Q   Back at that morning, if we say that, we'll just kind of

7   go back to that morning.  And, Agent Lapina, this is really

8   upsetting.  I see that you guys have guns, and everything,

9   and flak jackets, could you tell me what's going on?  What

10  did I do.  What is happening?

11  A   And I believe I told you that we had an investigation

12  into your income tax liabilities, as well as other related

13  violations, which would be referring to Title 18, 371

14  violations as exhibited on the warrant.

15  Q   Well, Agent Lapina, I am certainly not a lawyer, but

16  thank you for giving me a copy of the warrant.

17        But, as I look at the warrant, I look at what I

18  supposedly did and I see Title 18, United States Code, 371.

19  I don't know anything about that, other than one time I read

20  in the paper a fellow that was hauling illegal liquor and

21  that statute was used and I wasn't sure just what you meant.

22  I don't see anything in here about income tax.

23        But, could you explain further, please?

24  A   Well, I believe that I would have gotten into basically

25  a brief explanation, without outlining my whole case, that

1  basically the conspiracy was tied to violations of Title 26,

2  as far as income tax liabilities and I believe that you were

3  part of that conspiracy.

4  Q    Well, Agent Lapina, I'm not asking -- I wouldn't have

5  been asking that day for you to outline your case.

6        I'm just seeing all of your men running around the

7  veterinary hospital, and I'm just asking you because, see, I

8  know that the Fourth Amendment requires the warrant to uphold

9  a very high position.  One position is for me to know that

10  there was judicial process and you were allowed to do what

11  you were doing and that was served.

12        The second is, that I can see from the warrant and

13  I'm on notice and assured of just what you can seize and what

14  you are there for and what the criminal conduct is, what I

15  had done to bring you there so I can know things about what

16  you are doing.

17        And, of course, the third thing, the third high

18  purpose certainly is so you could, and your men -- because

19  all of your men and ladies had copies of this with them so

20  this was what was going to channel their activities as they

21  were taking property that wasn't theirs.  I mean, that's a

22  very, very serious thing, not to be taken lightly.

23      So, as you would have come in and asked me this or

24  told me about this, and as your men were running around

25  securing the property, I would have asked you again what do

Lapina - Recross            127

1  you mean, income taxes?  I don't see anything on here with

2  income taxes.  And this is what I have to look at because

3  this is the license.

4      As a matter of fact, the Third Circuit and the

5  Supreme Court have just, in 2004, reiterated and

6  recapitulated the importance of this being the license for

7  you to come into my life, or an agent to come into a

8  citizen's life.

9      So, I don't know very much about 371, Agent Lapina.

10  But, it seems to me that it can mean that I've conspired to

11  do anything, and that bothers me.

12      So, we can leave that because I'm not going to be

13  able to get a lot of satisfaction because that, you see, 371

14  allows, or it can be referring to hundreds and hundreds of

15  statutes which, in and of themselves, are far too general

16  many times to even implicate specific criminal conduct, which

17  is very much required for a warrant.

18      But, in this case, 371 is even worse than the

19  statutes that it brought because it can be me planning to do

20  any of the statutes.

21      So, I would have to question you on that.  And, of

22  course, the high purpose of the warrant would allow me to do

23  that.  I would need to do that as a discerning citizen.  Back

24  then, I was a citizen of more faith in my public service.

25      THE COURT:  What's the question, Dr. Leveto?


                Lapina - Recross            128


1  Q   The question is, what is the crimes as set forth on the

2  face of the warrant where I have to know about them, where I

3  have to see them?

4  A   Dr. Leveto, at the time, I would have explained to you

5  that that conspiracy violation had to do with income taxes,

6  had nothing to do with, say, conspiracy to commit any other

7  crime, like murder or robbery or anything.

8      Outside of that, I don't know what my duty to

9  explain to you is.  Basically, if you would have had any

10   other questions, I would have referred you to call the U.S.

11   Attorney's Office.

12   Q    The key issue, Mr. Lapina, or Agent Lapina, is that if

13   you're telling me about income tax crimes and I don't see

14   them here, then I have to wonder about the judicial approval

15   and license, because what is in your head -- again, the Third

16   Circuit and the Supreme Court have just talked about that

17   also -- what is in your head, what is in a document somewhere

18   in a courtroom, what is in a Magistrate's office, or what is

19   in a paper laying somewhere means nothing.  It's the license

20   itself.

21         So, that's why I am saying that even if you wanted

22   to have explained that to me, this document would have

23   presented a severe problem with me as a citizen if I was

24   discerning enough to know it at that time.

25         We can move on from the face of the warrant.


                    Lapina - Recross              129


1          And for the record, we've talked about a great

2   number of things today that were done right and the

3   government has been very explicit about the things that were

4   done right.  But, of course, my motion to suppress was

5    revolving around the things that weren't done right, and very

6    important things at that.

7        So, it's a little exciting where, we're at the

8    practice now and your people are finally calming down and

9    they are not looking for guns, or anything.  And perhaps we

10   can go to Exhibit B because I know -- I know the judicial

11   officer approved 18, United States Code, 371, and I don't

12   have any idea what that means.  And when you tell me, or if

13   one of your agents tell me, or if someone else tells me, the

14   face of the warrant still says this is what you are approved

15   to come for.

16       As we move to Exhibit B, Agent Lapina, I look at

17   this document and -- now I don't know what I have done wrong

18   because that's not explicit.  And, again, the affidavit is

19   not attached.  There is no other paperwork here.  This is

20   what we have, the license.

21       As it can be said, the proof of the pudding is in

22   the eating.  All of the wonderful things of the affidavit and

23   probable cause and the investigation, and all of these

24   things, they have consummated to this.  These two pieces of

25   paper, actually a fourth of the two locations, this is what

1   we have to look at, the items to be seized.

2          Agent Lapina, unfortunately I am somewhat of a pack

3   rat and I have a huge number of documents here.  The hospital

4   is six thousand feet on the bottom floor and three thousand

5   feet on the top floor.  There were hundreds of thousands,

6   perhaps millions of papers in it.  I don't know what I've

7   done because of the first page of the warrant.

8          Now, I don't know what you want.  But, perhaps the

9   most important thing, Agent Lapina, are you sure that you're

10  at the right address?  I realize the number is right, but I

11  don't see anything on the items to be seized that has

12  anything specific to do with me.

13          Can you help me?  Because you have all these people

14  here and they are wearing guns and they are turning my

15  clients away, and this is extremely upsetting and

16  embarrassing for me.  And I need to know, because as I know

17  the Fourth Amendment and the high function of the warrant

18  necessitates you helping me to understand that, and you're

19  not taking part in the search so you need to do that.

20          If you didn't do it eight and a half years ago,

21   today you can.  What do you want?

22   A    What's your question again?

23   Q    My question is, I know that these things on Exhibit B

24   need to relate to what's on page one, my alleged criminal

25   conduct.  I don't really understand what my alleged criminal

                      Lapina - Recross              131

1    conduct is.

2              Of course, I understand that you told me what you

3    mean it is, but what the Magistrate said here, I don't

4    understand that 18 USC 371, just that statute.  But, are you

5    sure you're at the right place because my name isn't even on

6    it?  There are five businesses here going back over twenty

7    years.  I'm storing records for many, many companies.  I have

8    three to six thousand veterinary client records here,

9    records, books.  I have library books.  I have all kinds of

10   books.  I have financial books.

11             Can you help me?  Because I also know that the high

12   function of the Fourth Amendment and the search warrant is

13   so -- I know what you have the authority to take.  That is

14   extremely important.  So, please help me.

15  A    As I stated before, the affidavit that I prepared, I

16  believed that it was indicative that beginning in 1991,

17  yourself basically either committed or attempted to commit

18  Title 26 violations.

19  Q    Agent Lapina, I don't want to be impolite, but we're

20  speaking about something that's not here.  It's not here for

21  me to know about.  You've come into this practice, you have

22  totally upset and turned my life upside-down.  Please tell

23  me, Agent Lapina, you see there is no affidavit attached to

24  this.  The affidavit, although if we were going to talk about

25  probable cause and we are going to talk about other things,

                    Lapina - Recross              132

1  which we are not, this is the project of all that you did,

2  this has to stand on its own, Doe v. Groody, 2004, Third

3  Circuit case, particularity of me knowing what's in this, is

4  the touchstone of the Fourth Amendment.  The affidavit could

5  not be attached because it was under seal.  That is of no

6  issue to what I as a citizen have a right --

7        THE COURT:  What's your question?

8        MR. LEVETO:  My question is, what did this

9  authorize Agent Lapina to take?

10          THE COURT:  It authorized him to take everything

11    that's on this Exhibit B.

12    BY MR. LEVETO:

13    Q    For what business, Agent Lapina?

14    A    Basically, for records that were going to help me prove

15    the conspiracy and the tax violations that were committed

16    relative to your income tax liabilities.  Okay.  Records

17    which I believe would help me reconstruct your income,

18    determine unreported tax and taxable income, and also tie you

19    into various other individuals who I believe you were

20    involved in a conspiracy with.

21    Q    So, you had information to know about other individuals'

22    businesses, business names?

23    A    I had information which was indicative -- I knew some of

24    the names that were involved in the scheme, per se, like

25    Center Company, Box Elder, Edge Co.  I didn't pretend to know


                    Lapina - Recross               133


1    all the names at the time.

2    Q    Did it ever occur to you to perhaps list any of those?

3    Again, you seem to be a man that knows an awful lot about

4   this and you did a lot of the investigation.

5        The affidavit does have factual material in it, or

6   alleged factual material.

7        MR. LEVETO:  I would like to enter into evidence

8   the memorandum of meeting.

9        THE COURT:  Is that marked?  Give it to the agent.

10  Q   Okay, Agent Lapina.  If you would look at that exhibit.

11  This is the exhibit that -- would you tell me what the

12  exhibit is?

13  A   This appears to be a copy of a memorandum of meeting

14  which I prepared subsequent to the pre-warrant execution back

15  on May 1st, '96.

16  Q   Okay.  So, this is what you brought forth to the agents

17  that were going to take part in the search?

18  A   This was prepared as a result of the meeting that we

19  had.

20  Q   It was prepared as a result of the meeting?  Okay.

21        And on the second page, it's quite rich with

22  details.  And many of them are in addition to what we would

23  find in the affidavit, is that correct?

24  A   I believe you are probably referencing some of the names

25  here, Harris and Retherford, Cayman Islands.  Is that what

Lapina - Recross          134

1   you are referring to.

2   Q   Yeah.  Magdan Corporation, a number of things that I

3   didn't see anywhere in the affidavit.

4        So, again, I am just saying that we have quite a

5   few rich details here, rich in details, and you even -- could

6   you tell me what you talk about with the years you gave the

7   agents some other -- a lot of information?

8   A   Well, I believe it was articulated on these records

9   extending back to the late eighties to help reconstruct the

10   income going forward and evidence relative to conspiracy --

11   the conspiracy was continuing into early 1996.

12        So, I thought that the whole timeframe was relevant

13   to the execution of the search warrant.

14   Q   So, you had this very well worked out.  You had a number

15   of specific names.  You had businesses.  You had years that

16   you wanted to look for, and you had more information than was

17   on the affidavit.

18        Yet, somehow as the discerning citizen again, and

19   as I'm looking again at the license, the license doesn't have

20  any of the information on it.

21        And I would have asked you that day, or I could

22  have asked you that day, Agent Lapina, since I am kind of a

23  pack rat and this was a large building, are you going to go

24  through all of my material and all of the stuff in this

25  building and maybe take my library books, and everything,

               Lapina - Recross          135

1  which subsequently there were numbers of books taken, but is

2  that what this was supposed to say?

3  A    That search warrant basically didn't have an affidavit

4  attached to it because the affidavit was sealed.  I explained

5  to you why we were there.  I showed you copies of the

6  warrants.

7        We talked at length during the course of that day.

8  And if you didn't have an understanding as to why I was there

9  by the end of that day, then I don't know how else I could

10  have explained it to you.

11  Q    Agent Lapina, I think we are at a misunderstanding here.

12  I am not at all accusing you of not perhaps trying to

13  explain.  But, the license that you brought in showing me

14  that the Judge allowed you to actually cart away documents

15  that belonged to me and others, it's not there.  That's the

16  problem I have.

17          We have, first, a statute on the face page, which

18  really from what the Judge approved, gave me no inference of

19  what was happening.  Yes, I could read, IRS, CID, on your

20  coats and you could tell me all you wanted to, but the

21  Magistrate approved this and the Magistrate approved this,

22  and this doesn't tell me anything.

23          So, what I'm trying to get at is, you really -- you

24  really can't explain anything to me from this.  I'm really

25  not interested in all the allegations of the affidavit

                    Lapina - Recross              136

1  because this is what made me step aside.

2          I mean, I could have looked at this, and I probably

3  would have been smarter to and said, wait a minute, we better

4  call somebody because there is something wrong here.  There

5  is nothing to say that this has got anything to do with me.

6  Rich in detail, your affidavit, fairly rich in detail the

7  discussion with your fellow agents, perhaps rich in detail in

8  the minds of you --

9        THE COURT:  What's your question?

10   Q    My question is, is there a way that I can know all of

11   the things you are telling me you were looking for by looking

12   at this items to be seized?

13   A    I don't know if you can or can't.  I mean, I did my best

14   job to explain what was going on to you, and I did not

15   prepare the warrants.  I explained that before.  The warrants

16   would have been approved, the affidavit been read, and I was

17   sworn to it.

18        That is the best answer I can give you.

19   Q    And would you call this -- we went through this before,

20   but I wanted to make sure that basically you were looking for

21   virtually all records, or this said all records?

22   A    The records listed on items to be seized list, which I

23   believe would help me prove the Title 26 and the Title 18

24   violations.

25        When you say all records, you had records there


                    Lapina - Recross            137


1   relative to animals and patients, and whatever, and stuff

2   like that.  I don't believe any of that stuff was touched.

3   So, I don't know where you are going with the "all records."

file:///A|/LEVETO1.TXT

4    Q    You downloaded the computers, the practice computers as

5    well.  Those were the animal records?

6    A    That was basically so we could minimize the intrusion

7    and leave your business so you could open again and we could

8    review them.  We didn't want to stay there any longer than we

9    had to.

10    Q    What I am talking about all records -- and correct me if

11    I'm wrong -- this items to be seized basically has, if you

12    look at the categories, when we are talking about business

13    right here, now it has basically all categories, and from

14    this list, can you see where there is any channeling of the

15    discretion of your agents by year, by name, by business, by

16    type even?

17        In other words, is there anything to say this is

18    what I am going to seize and this is not what I am going to

19    seize?

20    A    Without them having been briefed and having the facts of

21    the case read to them and basically gone over everything,

22    explained about the years involved, I don't know if they

23    could or not.

24    Q    So, what you are saying is, you certainly won't say yes

25   that they could, but --


Lapina - Redirect(By Mr. Voracek)          138


1   A    I can't speak for somebody else.

2   Q    But, it more came from you in talking with them than it

3   did from the Magistrate?

4          Again, we are talking about the license, so this is

5   what has to contain everything.

6          So, you're saying to me that this, in itself,

7   really kind of didn't channel their discretion?

8   A    That, along with, again, the information that they had

9   been provided during the course of pre-warrant meeting

10   enabled them to carry out their assignments.

11          MR. LEVETO:  No further questions.

12          THE COURT:  Do you have anything further of

13   Agent Lapina?

14          MR. VORACEK:  Very briefly.

15                REDIRECT EXAMINATION

16   BY MR. VORACEK:

17   Q    Agent Lapina, when you executed the search warrant at

18   the beginning on May 2nd at the business, you encountered

19   Dr. Leveto, is that correct?

20  A   Yes.

21  Q   And you showed Dr. Leveto a copy of the search warrant

22  and a list of the items to be seized, is that correct, sir?

23  A   Yes.

24  Q   Did Dr. Leveto at that time ask you, agent, what are you

25  looking for?

139

1       Do you recall a question to that effect?

2  A   I don't recall.

3  Q   Okay.  At any time during your discussions with

4  Dr. Leveto that day, did Dr. Leveto indicate to you that he

5  had concerns over what the agents were going to be seizing

6  and asking further to explain what exactly you are looking

7  for at the business?

8  A   I don't recall him asking me those questions, no.

9       MR. VORACEK:  I have no further questions,

10  Your Honor.

11       THE COURT:  Thank you, Mr. Lapina.

12  (The witness was excused.)

13       THE COURT:  Okay.  We'll hear argument.

14  Dr. Leveto, you first as to why you feel the warrant or the

15  evidence should be suppressed.

16          MR. LEVETO:  I am sorry, Your Honor.  Could I have

17  the admission of this last document?

18          THE COURT:  It's admitted.  Four is admitted.

19          MR. LEVETO:  No. 4.  And Attorney Misko and I were

20  talking, and I didn't hear the last thing you told me.  I am

21  sorry.

22          THE COURT:  I said go ahead and we'll have argument

23  now, and you go first, as to why the evidence should be

24  suppressed.

25          MR. LEVETO:  Okay.  Your Honor, the basic position

140

1  that I have with the evidence is the face of the warrant.  My

2  motion to suppress, I covered most of the issues in that

3  concerning the two very, very important things that the

4  warrant, in itself, must do.

5          We first have to establish that it's been made, as

6  a matter of fact today, that the affidavit and application

7  were not attached to the warrant.  The judicial document, the

8  license to carry out this warrant, is contained within these

9    two pages.

10        As recently as 2004, Doe v. Groody in the Third

11    Circuit, and Groh v. Ramirez, the Supreme Court, which

12    certainly constitutes the law of the land, had two very

13    interesting cases that really recapitulated the important

14    part of the warrant.  They were two cases basically about --

15    one was about qualifying -- or they were about qualified

16    immunity, but basically the principles are the same.

17        One thing was that both of these warrants in these

18    two cases had redeeming qualities.  They still were ruled to

19    not have the good-faith exception and the situation or the

20    qualified immunity because the warrants failed to do the job

21    that the warrant must do.

22        For instance, in Doe v. Groody, it was somewhat of

23    an attachment mistake.  Even though the affidavit was even

24    attached to the warrant, it wasn't incorporated by reference,

25    so the warrant had to stand on its own.  And one of the

141

1    findings were that the warrant must stand on its own.

2        It is the license to do what's going to be done

3  and, in and of itself, not what agents talk about, not a

4  document somewhere.  And as Groh v. Ramirez agreed,

5  recapitulating the law surrounding that, if the affidavit is

6  not attached, that ends the matter of discussing the

7  affidavit as far as the key aspects of the warrant.

8        In Doe v. Groody, we had a situation where the

9  touchstone -- it was said that the touchstone was

10  particularity.  So, when we look at particularity in the

11  warrant at bar now, we have to think of specificity which

12  breaks down into particularity and breadth.

13        We have to look at these two documents, the two

14  warrants for the house -- one for the house and one for the

15  business, and basically what we are talking about today is

16  the report card for the license itself.

17        If we speak of the breadth of these warrants, the

18  breadth is somewhat controlled or mostly controlled by the

19  statutory backdrop of the criminal conduct alleged, not the

20  criminal conduct alleged in the affidavit or what the agents

21  talked about, but the warrant itself holding the high

22  position.

23        Numerous cases, such as U.S. v. Cardwell, was just

24  a tax evasion statute.  Boss(Spelled Phonetically) v.

file:///A|/LEVETO1.TXT

25  Bordeguard(Spelled Phonetically), probably the only other

142

1  case that I can find at least open point for the statute, the

2  statutory backdrop for the breadth of the warrant.

3  Richert(Spelled Phonetically) v. Sweeney, conspiracy and the

4  tax statute.  U.S. v. Roach.  These are all cases from the

5  Second Circuit, Ninth Circuit, Tenth Circuit and Eighth

6  Circuit, that speak to the fact that the breadth of the

7  warrant and the wide-ranging statutes are not

8  constitutionally acceptable and they do note provide any

9  backdrop for which agents can know what they are seizing or

10  not what they are seizing.  Title 18, United States Code,

11  Section 371, happens to be one of the worst.

12       Another example is U.S. v. Leary where, in that

13  case, there were export statutes and those export statutes

14  were deemed not specific enough -- certainly more specific

15  than these -- but those were not specific enough.

16       So, when we talk about, first, the breadth of the

17  warrant, that is one of the two fatal flaws with this

18  warrant.

19          The first fatal flaw is the breadth, and the Title

20   18, USC, 371, that has -- and those cases that I enumerated

21   essentially defeated those warrants by itself.

22          The second thing that we speak about, the

23   particularity, which again the Third Circuit has just ruled

24   it as absolutely the touchstone of the Fourth Amendment must,

25   in and of itself, set forth and tell me the person that is

143

1   having it executed against what's to be seized.

2          It also is supposed to channel the discretion of

3   the executing officers in helping them know what to seize.

4   This, viewed with the criminal conduct and, of course, in

5   this case that's a problem also.

6          And the third thing is to say that the Magistrate

7   has approved that.  So, when we look at listings, there are a

8   great number of cases.  If we look at U.S. v. Leary,

9   U.S. v. Leary was another case in the Tenth Circuit that -- I

10   believe it's the Tenth Circuit -- that basically turned on

11   the fact that the export statutes were too general.  The

12   list -- which the list was far, far more specific than this,

13   and these people exported to foreign countries.  They knew

14  there were difficulty with records, and things like that, but

15  the list was much more specific than this.

16      The export statutes were much more specific than

17  371, and that warrant was certainly defeated because of,

18  again, the high function of the warrant itself.

19      United States v. Kyle, a 1995 Ninth Circuit case.

20  Again, the particularity or the list of items to be seized,

21  there were fourteen items that -- the name of the company and

22  the various names of people, and we are talking about, when

23  we talk about complex, this was a 26-count indictment that

24  was returned with all kinds of tax frauds and nominee

25  companies, and all kinds of things.


                                144


1      And within that particular warrant, the items to be

2  seized mentioned the name of the company several times.  Two

3  or three of them were limited by years and they were within

4  the realm of where one might even think of severance or

5  redaction.

6      But, in that, the -- as in U.S. v. Christine in the

7  Third Circuit, the warrant smacked of a general warrant and

8  it was defeated for that.  So, that was just on the

9  particularity.

10        Again, we have to keep in mind that we are dealing

11  with both of those problems in these warrants.  We have the

12  statutory deficiency of not guiding, not instructing me, not

13  channeling the officers, and we have the items to be seized

14  which must stand alone, which basically is an all-records

15  search.

16        Now, all records searches have occasionally been

17  approved but, of course, we know the all-records search must

18  be a backdrop or broad that has specifically reasonable types

19  of conduct, not just a broad statute, but criminal conduct.

20        And another thing about an all-records search,

21  people have to infer somewhere, or it has to be laid out in

22  the affidavit or somewhere, that the entire operations is

23  permeated with fraud, and that was certainly not mentioned or

24  even pushed for in this case at all.

25        So, we have what I feel, Your Honor, are two fatal

145

1  flaws, either one of which numerous Circuits have defeated

2  warrants.  In and of themselves, either one can do it, and

3  here we happen to have two.

4         These warrants today, as we've heard testimony, can

5  really be no more helpful to me to know anything using the

6  warrants than they were eight and a half years ago.  Just

7  because I wasn't discerning eight and a half years ago and

8  maybe I was so intimidated by a lot of people running around

9  with guns, and perhaps I should have asked a lot more

10  questions, that really is not germane to the issue here.

11         At the time, I'm sure I might have had questions

12  answered, but the idea of this being the license and it must

13  perform all the functions as we speak today just like it had

14  to back then, that's the important part of it.

15         Now, will I get a chance to go back or will I have

16  one time and they'll have one time?

17         THE COURT:  I'll give you a brief time for

18  rebuttal, if you want, but it will have to be a rebuttal, not

19  new material.

20         MR. LEVETO:  Okay.  I appreciate that.

21         I believe that we have established today the facts

22  that if we stick to what is on the face of the warrant and on

23  the items to be seized, the paucity of information, this

24  becomes very obvious when it comes to from the Fourth

25  Amendment demands.

146

1       Through eight and a half years of looking at search

2   warrants, I've yet to find one like this.  But, the thing is,

3   since we are talking about two fatal flaws and the

4   government, on one hand, seems to want to infer that the

5   nature of the investigation was such that more information

6   was difficult to develop but, on the other hand, we are

7   extolling the virtues of all the information we've developed

8   pointing to probable cause.

9       And I don't take issue with the probable cause now,

10  but as we showed with Agent Lapina, a memorandum of the

11  meeting, it's very bothersome to me, Your Honor, that less

12  than three -- less than three hours after the Magistrate's

13  approval of the warrant, we have something, as we discussed

14  with agents, that almost make a totally different picture of

15  items to be seized.

16       It would have been nice to know some of those

17  things but, again, in these newest 2004 cases, they are

18  talking about, if the agents, just because they know about

19  things, if that's accepted as being adequate for Fourth

20  Amendment reasons, that means the neutral Magistrate has not

21  either done her job or we are not respecting the job of the

22  neutral Magistrate because it's them who have put the

23  parameters of the search, so that's not an acceptable thing.

24       It's the same thing with the 18 USC, 371.  If they

25  can come in and tell me what the statutes are, how do I know

147

1  that the statutes weren't twelve other ones when they are

2  telling me because this is actually what the Magistrate

3  approved?

4       So, in summary, I believe the facts are pretty

5  clear.  As a matter of law, the Fourth Amendment has had more

6  paper wasted and hot breathe than all of the Bill of Rights

7  from what I understand.

8       And as a matter of law, these warrants, which must

9  stand on their own, I believe cannot do that and are

10  unconstitutional and fail miserably to do the things that

11  would allow the government to use the things seized by them

12  and the derivative use of other evidence developed from them.

13          THE COURT:  All right.  Ms. Calvin.

14          MS. CALVIN:  Your Honor, we have briefed this issue

15    and are not going to reiterate a lot of the points that we

16    made in our brief.  So, therefore, I'll just briefly discuss

17    what occurred today.

18          First of all, we note that the defendant has the

19    burden of proof in this evidentiary hearing.  We also note

20    that the case law does support the fact that an affidavit may

21    set forth probable cause narrowing a search even if the

22    affidavit has not been attached or incorporated into the

23    warrant.

24          And that, therefore, the affidavit did set forth

25    sufficient probable cause and that the analysis is a totality

148

1    of the circumstances analysis.  There was probable cause to

2    believe that the crime had been committed and that evidence

3    of the crime could be found at the locations described and

4    the Magistrate Judge so found.

5          The affidavit set forth the agent's background,

6    which is something that could be considered.  He had eight

7    years of experience.  He knew that individuals and entities

8   who conduct business generally maintain a number of records

9   which he delineated.

10      He also stated that indirect method of proof might

11  have to be used, and that the investigative techniques would

12  require a large array of financial records which would be

13  located either in the business or the house.  And all of the

14  listed items bear a rationale relationship to the probable

15  cause as laid out in the warrant.

16      Now, if the face of the warrant could have been

17  more specific regarding 371, but the affidavit did

18  appropriately narrow the scope of the search to permissible

19  limits.  And the affidavit list things relevant to the

20  investigation which could be seized.

21      As evidence of the crime, Agent Lapina knew him to

22  be a veterinarian with an ongoing business.  He reviewed tax

23  returns from 1989, or so, and saw a significant drop off in

24  adjusted gross income.

25      He saw information regarding a sale to an offshore

149

1   company and reviewed those returns.  He received information

2   from a California private investigator regarding an

3   advertisement.  He had information from a confidential --

4   from two confidential witnesses who knew the Levetos and told

5   him about statements made by the Levetos.

6       The confidential witnesses described the layout of

7   the house.  There was an undercover operation in which the

8   undercover agent bought a book called Tax Free, How the Super

9   Rich Do It, from Dr. Leveto.

10      There were numerous conversations.  There were mail

11  covers on the home and the business showing mail from all

12  over the country.  The agent had records regarding aircraft

13  to haul -- the home vehicles.  There was surveillance to see

14  if they still lived at Edgewood Drive and whether the

15  defendant was still working at his business address.

16      And given the tax returns that Daniel Leveto filled

17  out, there was more than ample information in the affidavit

18  to establish that a tax crime had been committed and that

19  evidence of the crime could be found in the locations to be

20  searched.

21      The Magistrate Judge considered the face of the

22  warrant.  She considered the affidavit and the list of items

23  to be seized in determining if probable cause existed.

24        This is evidenced by the fact that she signed the

25   warrant and she signed and sealed the affidavits.  We note

150

1   that the accuracy of information is not contested, only the

2   fact in the briefing about the type of safe in the Leveto

3   home.

4         We also submit that the items bear a reasonable

5   relationship to the crimes, items to be seized to the crimes

6   that were alleged.  The fact that it is broad does not mean

7   the fact that it is voluminous, does not means it is

8   overbroad.  That this investigation was attempting to

9   reconstruct Dr. Leveto's income and expenses, assets and

10   liabilities for a five-year period.

11        The agent had noted that it might require an

12   indirect method of proof which meant that financial

13   information for years outside of the investigation would be

14   necessary to reconstruct the years under investigation.

15        And, importantly, the affidavit stated that the

16   conspiracy was believed to be ongoing at the time of the

17   application and affidavit.

18          The items that were seized did fall within the

19   ambit of the probable cause and the list of items to be

20   seized.

21          As demonstrated by testimony today, the agent was

22   careful about seizing only those items reasonably believed to

23   be authorized under the search warrant.  And even if there

24   had been improperly seized items, as a general rule, only

25   improperly seized evidence should be suppressed unless there

151

1   was a flagrant disregard for the terms of the warrant and the

2   items which the government intends to use against the

3   defendant, and of which the defendant and the Court has a

4   copy, were all properly seized.  They all come under the

5   probable cause.

6          If, in fact, the Court should find that the warrant

7   is too broad, the agents did act in good faith, and the

8   standard for that is whether or not a reasonably,

9   well-trained officer would have known that the search was

10   illegal, despite the Magistrate's authorization.  And this is

11   a question of objective reasonableness rather than subjective

12   good faith.

13          From the testimony of the officers here today, I

14    think it is evident that they had reason to believe that this

15    warrant, which had been signed by the Magistrate, with the

16    training that they had received, was a legal warrant.

17          And on the day prior to the execution of the

18    warrant, each agent was provided with a copy, they had a

19    meeting, Agent Lapina provided the seizing agents with a

20    synopsis of the overall investigation.  He also advised them

21    with the details of identities of co-conspirators, that there

22    might be nominees.  He was available at the search site

23    should there have been any questions.

24          The warrants and the list of items to be seized

25    were served on the defendant at the time.  There are

152

1    exceptions to when the exception applies, but none of those

2    apply in this particular case.

3          And I would like to just briefly touch on the

4    defendant's claims of bad faith.  He briefed four.  They

5    ignore internal guidelines.  I think we covered that today,

6    barbaric war and execution, again, I think that was covered

7   in the hearing today, the doubtful assurances of Directive

8   52, which the Court has already ruled on, and improper hybrid

9   investigation.

10          And what this defendant insisted, that it was wrong

11  to serve administrative summonses after the search warrant,

12  and I think the evidence today showed that this position is,

13  if it's relevant at all, it is wrong.  I think that the

14  testimony shows that the agents were within their authority

15  to serve administrative summons.

16          And I also found no law that suggested that the

17  good-faith standard relates to things that happen after the

18  execution of the search.

19          I would also like to point out one thing.

20  Agent Lapina never called the search warrant an all-records

21  search.  That was used by the defendant, and only the

22  defendant.  It never came from the witness.

23          We believe that the search was proper, that there

24  was probable cause, that it was executed in conformity with

25  the law.  We believe that those items that are on the list to

153

1   be used were properly seized.

2       And in the event the Court finds otherwise, we

3   believe that there is good faith on the part of the agents

4   which should permit the evidence to be used in the

5   government's case in chief.

6       THE COURT:  Thank you.  Did you have any rebuttal,

7   Dr. Leveto?

8       MR. LEVETO:  Yes, Your Honor.

9       The first thing I would like to clear up and

10  perhaps somewhat put to bed, the affidavit issue are issues

11  which we continue to spend 80 percent of our time on.  Yes,

12  there are two very carefully carved-out exceptions to when

13  the affidavit, not attached to the warrant, may help the

14  warrant or narrow down the warrant.

15      As a matter of fact, that was in Doe v. Groody,

16  2004, Third Circuit.  The one exception, because this is an

17  exception that I'm not even so sure that the Supreme Court

18  would rule on, but it is the law of our Circuit at this time,

19  the one exception is that if there is a clerical error in the

20  warrant, the affidavit can be used to correct that.

21      And the second carefully carved-out exception is,

22  if the warrant is facially valid, the affidavit, which is a

23  more narrowing affidavit, okay, that affidavit is what

24  actually the officers seized, like, in other words, they

25  seized within that affidavit, that affidavit can help because

154

1  basically what they are doing is what U.S. v. Christine

2  discussed as redaction.

3       In other words, that can be done, but those depend

4  on facially valid warrants, which I certainly -- my position

5  today is that these are not facially valid warrants.  And if

6  the whole warrant or if the entire warrant, as we have

7  demonstrated with both particularity smacks of a general

8  warrant, there can be no redaction or no help from the

9  affidavit.

10       Even more important than that, the affidavit, the

11  list within the affidavit, really is the same list that is

12  within the warrant.  We were not talking about reducing or

13  narrowing the warrant by going and reading the affidavit.

14  Those types of -- that carved-out exception is basically an

15  exception, that it was listed in the affidavit transmuted on

16  to the warrant a little different and they went by the

17  affidavit, but here the same list was in the affidavit.

18      So, the affidavit really has very little to do with

19   my position.  Yes, my position is somewhat narrow because

20   it's very important that the high standard of the warrant is

21   upheld.

22      So, we can't keep talking about probable cause and

23   we can't keep talking about things that are not germane to

24   the facial validity of the warrant.

25      As far as these records bearing a relationship to

155

1   tax crimes, it's kind of a novel approach because of all

2   warrants, U.S. v. Cardwell, if we are talking about

3   Richert(Spelled Phonetically), or even Marvin(Spelled

4   Phonetically), one of the government's cases, where you talk

5   about cases that we are talking about, income tax, yes, the

6   same rules apply, but they know and what you find is, the

7   Court speaks of the years in question.  That's extremely

8   important to have within a warrant.

9      Yes, we have some ways, yes, it relates to records.

10   Well, everything relates to your income tax records,

11   everything with a page number on it.  But, it's kind of a

12    shill to use that as kind of an excuse to have, again,

13    Exhibit B with no dates, no constrict dates, no constrict

14    names, no company names, no people's names and absolutely

15    nothing on there to let me know to help guide the officers or

16    to fulfill any of the requirement with the Fourth Amendment.

17    So, that's very important.

18          As far as the Magistrate goes, I think we are a

19    little bit up in the air as to who really drafted the

20    warrant.  I must say that through the litigation that I have

21    had with the government, both in the Bivens and what we have

22    had here, this is the first time today that we had a

23    U.S. Attorney said to have drafted the warrant.

24          Interestingly enough, regardless of which one it

25    is, we also have a sworn affidavit that said Agent Lapina


                                 156


1    did, but the Magistrate's approval when the warrants are

2    drafted by other people, but especially by agents,

3    Groh v. Ramirez made some very interesting statements of,

4    it's less justifiable to think that just because the

5    Magistrate signed it that she agreed with or he agreed with

6    everything in the warrant.

7          So, when the agents have an active role, as I

8    believe they did in this case, just because the Magistrate's

9    signature is there does not make it correct.

10          Not only that, in U.S. v. Kyle, a very good example

11   of the government alleging two Assistant U.S. Attorneys and a

12   Magistrate still cannot cure a warrant that's facially

13   invalid because the facial invalidity has to do with the

14   citizens and the Bill of Rights and not just to try to keep

15   the evidence that the government wants to keep.  So, I think

16   it is very important to understand that.

17          And as far as not saying it's an all-records

18   search, there were at least 90 percent of all the records

19   and, as I said, Your Honor, I am kind of a pack rat, 90

20   percent of all the records that were taken, there were huge

21   numbers of boxes of records, many, many from the residence,

22   many, many from the business; many were from the business.

23          I guess you can always say that, I mean, it is hard

24   to imagine papers with numbers on them not having a

25   relationship to taxes.  But, of course, we have to go back to

157

1  what is on the face of the warrant, no guidance, no dates, no

2  people, no business.

3        And the -- in U.S. v. Leary, the government tried

4  to say that they did not have additional information because

5  the type of crime that they were talking about made it so

6  they could only develop so much information.  And just like

7  we demonstrated today, there was a lot more information

8  floating around here, information in the affidavit,

9  information in the agents' meetings, and that still could

10  have helped makes this warrant more firm.

11        And the last thing I would like to talk about.

12  When we talk about the Leon, good-faith exception, I believe

13  that the fourth good-faith exception to the good-faith rule,

14  is that a warrant that is so facially invalid that no

15  reasonable officer could depend on it.  That is where I'm

16  alleging this suppression, the basis of this suppression.

17        Both factors of this warrant are woefully

18  inadequate.  Either one has been pretty consistently shot

19  down by the Circuit, by all the Circuit Courts of Appeals.

20  We have seen many, many warrants far better than this.  But,

21  with the two of them, the two fatal flaws, the lack of a

22  specific criminal conduct and the lack of particularity, it's

file:///A|/LEVETO1.TXT

23  unconscionable to think that a reasonable officer could look

24  at this and try to execute it because when they picked up any

25  piece of paper, any book, including greeting cards, library

158

1  books, children's medical records, psychological records, if

2  they picked up anything, they could seize it.

3         I made a mistake at one point in the litigation, I

4  think it was in the Bivens, where I said that they

5  overstepped the warrant.  And I probably was in -- I was

6  mistaken because this warrant is almost impossible to

7  overstep.

8         It really does take into consideration that you can

9  take everything, correspondence with anybody that a financial

10  relationship exists.

11         Well, that really narrows it down to everything

12  with a number on it; books, records ledgers.

13         So, what I am saying here is, this is precisely the

14  kind of warrant that the fourth exception in Leon talks

15  about, when it's facially so invalid, both prongs of

16  specificity fail miserably.

17        And the last thing I would like to say, it's often

18   been talked about the complexity of this investigation.

19        There is a Third Circuit Court case -- and I think

20   it's very interesting.  It actually comes out of the District

21   of New Jersey, U.S. v. Gawrysiak, which is unpublished in the

22   Third Circuit, but it was affirmed.  And here is a case that,

23   when we talk about complexity, one can read the whole hearing

24   and the suppression hearing and what they were trying to work

25   at, and the Third Circuit was very, very clear when they

159

1   talked about impermissibly general.

2        And, of course, all the things that we have talked

3   about with the other Circuits came into play.  But, the key

4   thing is in U.S. v. Gawrysiak, it was alleged that this

5   warrant was too general.  And the Third Circuit had four

6   holdings.

7        And these four holdings were, one, in this warrant,

8   it authorized the seizure of evidence on four specific

9   enumerated crimes.

10        My warrant miserably fails there.

11        Number two.  The crimes were specifically committed

file:///A|/LEVETO1.TXT

12    by specifically enumerated individuals or their attorneys.

13            I don't have a hint of anything like that here.

14            Three.  The encompassed crimes committed can

15    specify three-year time periods in the timeframe period.

16            And, four.  It only allows the evidence pertaining

17    to sixteen individuals or entities named in the affidavit as

18    perpetrators, intermediaries or victims.

19            This warrant certainly was -- affirmed this being a

20    good warrant, but it's interesting to note that, again,

21    looking at the touchstone of the Fourth Amendment, you can

22    tell that this is the Third Circuit's opinion and action as

23    far as what the warrant must do.

24            When I look at those things that U.S. v. Gawrysiak

25    affirmed, it's a very good thing -- it's very pertinent and

                                160

1    it's indistinguishable from if we look at my list and see

2    that none of those things occurred.

3            So, it appears to me that no matter how we talk

4    about the affidavit, the agents' meetings, what was in the

5    agents' minds, what was known and not known, what was secret

6   and not secretive, the warrants, the license, meet both

7   failures that we see, that even one can destroy it.

8        So, in light of that, I'm urging this Court to

9   suppress the derivative use of the evidence as well as the

10  evidence itself.

11       THE COURT:  We are going to deny the motion.  I

12  think much of what Dr. Leveto argues today and seeks today is

13  information to which a defendant in a criminal case is

14  entitled at some point, but not at the time the search

15  warrant is served.

16       What he talks about today he is certainly entitled

17  to with respect to a criminal case, but that comes later.

18       We had here an undercover investigation for two

19  years, 1994 to 1996, I don't know, about two years, leading

20  up to the issuance of the search warrant.

21       The agent then served or filed with the Magistrate

22  a twenty-eight page affidavit, goes into, I would say,

23  excruciating detail about the results of what, to that point,

24  had been the investigation of the affairs of Dr. Leveto.

25       Income tax cases are different from searching a

161

1  house for some kind of contraband, like a gun or drugs, or

2  that kind of thing.

3       An income tax case necessarily involves paperwork,

4  a paper chase, and you can't identify papers very well

5  without looking at them.  And I think what Dr. Leveto would

6  be asking the agent to do in this kind of a situation would

7  be simply impossible for the agent to accomplish.

8       So I don't think we can agree that the warrant was

9  too broad in listing the items which the agents were looking

10  for.

11       Now, he's got a point about the years involved, and

12  that, but the agents had had a meeting before the search in

13  which Agent Lapina says he gave verbal instructions to the

14  agents about what it was that they should be looking for.

15       As far as this 18, United States Code, Section 371,

16  conspiracy is, of itself, a crime.  Conspiracy carries -- a

17  conspiracy to violate the laws or to defraud the United

18  States carries with it its own penalty.

19       If a person is charged with a conspiracy to violate

20  the income tax laws, and then there is a second count that

21  says how the income tax laws were violated, the defendant is

22  faced with penalties attaching to two separate crimes, the

23  crime of conspiracy and the crime of violation of the income

24  tax laws.

25        So, I am satisfied that the warrant, while broad,

162

1   was necessarily broad under the circumstances of this case.

2         I also feel that justice was done with respect to

3   the issuance of the warrant and the manner in which it was

4   carried out by the agents.

5         So, we are going to deny the motion to suppress.

6         Now, we did have a meeting last week with counsel

7   and Dr. Leveto present, and Mr. Misko, his standby counsel,

8   was present on the telephone while we had that meeting, and I

9   am going to have a brief recess now and let you fellows talk

10  about where we are going to go from here on that.

11  (Court recessed at 3:25 p.m.)

12  (Court reconvened at 3:40 p.m.)

13        THE COURT:  Be seated, please.

14        Okay.  As I said last week when we met, there

15  was -- we discussed a plea on the part of Dr. Leveto.  And

16  what have we come up with on that?

17          Mr. Misko, do you want to speak to that, or

18   Dr. Leveto himself?

19          MR. LEVETO:  Well, I would like a little bit of

20   time.  I would like to schedule something as soon as

21   possible, but I think Mr. Misko, the first opportunity he has

22   to be here is on the eighth in the afternoon, but we have to

23   know your schedule, Your Honor.

24          And I also am going to address some changes in

25   circumstances, and I would like to file a motion and perhaps

163

1   we could talk about that then also regarding detention.

2          THE COURT:  Okay.  Kathleen, do we know what we are

3   doing the eighth?  Okay, the eighth is okay.  So, we'll

4   figure on hearing this on the -- what time, Mr. Misko?  I

5   mean, is the morning okay?

6          MR. MISKO:  I have a hearing at nine; late morning,

7   early afternoon.

8          THE COURT:  You have a hearing in Pittsburgh?

9          MR. MISKO:  Butler.

10          THE COURT:  Butler.  Well, that's part way here.

11    Why don't we set it for one o'clock on Monday, the eighth.

12        MR. LEVETO:  Your Honor, I have a question.  I have

13    kind of a change in a family member's health and I have some

14    issues that I am going to be asking you.

15        Should I motion you or brief you so we can talk

16    about them at that time regarding detention as far as change

17    in circumstances?

18        THE COURT:  That would be the best time to do it.

19        MR. LEVETO:  Okay.

20        THE COURT:  Okay.  Court is in recess until

21    November 8th.

22    (Court adjourned on Thursday, October 28th, 2004,

23    at 3:45 p.m.)

24

25

                                    164


1                    * * * * *

2        I certify that the forgoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4

5                    S/Michael D. Powers

6                    Michael D. Powers
                     Official Reporter

7        *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25